## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AAC HOLDINGS, INC., *et al.*,[1]<br><br><div align="center">Debtors.</div> | Chapter 11<br><br>Case No. 20-11648 (JTD)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 192, 193** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING ADEQUACY OF DISCLOSURE STATEMENT, (II) APPROVING SOLICITATION AND NOTICE PROCEDURES FOR CONFIRMATION OF DEBTORS' PLAN OF REORGANIZATION, (III) APPROVING BALLOT AND NOTICE FORMS IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") of AAC

Holdings, Inc. ("AAC") and its affiliated debtors and debtors-in-possession (together with AAC,

the "Debtors") hereby submits this objection (the "Objection") to the *Motion of Debtors for an*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Recovery First of Florida, LLC (3005); Fitrx, LLC (5410); Oxford Treatment Center, LLC (7853); Oxford Outpatient Center, LLC (0237); Concorde Treatment Center, LLC (6483); New Jersey Addiction Treatment Center, LLC (7108); ABTTC, LLC (7601); Laguna Treatment Hospital, LLC (0830); AAC Las Vegas Outpatient Center, LLC (5381); Greenhouse Treatment Center, LLC (4402); AAC Dallas Outpatient Center, LLC (6827); Forterus Health Care Services, Inc. (4758); Solutions Treatment Center, LLC (8175); San Diego Addiction Treatment Center, Inc. (1719); River Oaks Treatment Center, LLC (0640); Singer Island Recovery Center LLC (3015); B&B Holdings Intl LLC (8549); The Academy Real Estate, LLC (9789); BHR Oxford Real Estate, LLC (0023); Concorde Real Estate, LLC (7890); BHR Greenhouse Real Estate, LLC (4295); BHR Ringwood Real Estate, LLC (0565); BHR Aliso Viejo Real Estate, LLC (2910); Behavioral Healthcare Realty, LLC (2055); Clinical Revenue Management Services, LLC (8103); Recovery Brands, LLC (8920); Referral Solutions Group, LLC (7817); Taj Media LLC (7047); Sober Media Group, LLC (4655); American Addiction Centers, Inc. (3320); Tower Hill Realty, Inc. (0039); Lincoln Catharine Realty Corporation (5998); AdCare Rhode Island, Inc. (2188); Green Hill Realty Corporation (4951); AdCare Hospital of Worcester, Inc. (3042); Diversified Healthcare Strategies, Inc. (3809); AdCare Criminal Justice Services, Inc. (1653); AdCare, Inc. (7005); Sagenex Diagnostics Laboratory, LLC (7900); RI - Clinical Services, LLC (6291); Addiction Labs of America, LLC (1133); AAC Healthcare Network, Inc. (0677); AAC Holdings, Inc. (6142); San Diego Professional Group, P.C. (9334). Grand Prairie Professional Group, P.A. (2102); Palm Beach Professional Group, Professional Corporation (7608); Pontchartrain Medical Group, A Professional Corporation (1271); Oxford Professional Group, P.C. (8234); and Las Vegas Professional Group - Calarco, P.C. (5901). The location of the Debtors' corporate headquarters is 200 Powell Place, Brentwood, TN 37027.

*Order (I) Approving Adequacy of Disclosure Statement, (II) Approving Solicitation and Notice Procedures for Confirmation of Debtors' Plan of Reorganization, (III) Approving Ballot and Notice Forms in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Docket No. 193] (the "Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

The Debtors have proposed a Plan (defined below) that, by the stroke of a pen, likely eviscerates any hope for unsecured creditor recoveries through unjustifiable (and, worse, undisclosed) releases in favor of the Debtors' current and former officers and directors, some of whom stand accused of serious wrongdoing and none of whom have made the requisite contributions to the Debtors' reorganization needed to sustain such releases under Third Circuit law.  Unless the Debtors sell their assets for a price that exceeds their approximately $426 million in secured claims, a result they could not achieve through an extensive prepetition marketing process, unsecured creditors will receive no distribution under the Plan while potentially valuable causes of action against the Debtors' insiders are buried for no consideration.  This Court must not allow this result.

The Plan proposes sweeping releases of the non-Debtor Released Parties (defined below), which include certain of the Debtors' current and former officers and directors who are named defendants in three shareholder actions asserting, among other claims, violations of securities laws and breaches of fiduciary duty related to allegations of: (1) deceptive marketing

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

practices that sacrificed the Debtors' professional reputation and long-term business prospects for a short-term surge in patient census; (2) conspiracy to conceal that a significant portion of the Debtors' receivables were uncollectible in order to inflate the Debtors' public financial reporting; and (3) self-dealing stock sales (including by AAC's former CEO and Chairman of the Board, Michael Cartwright) and corporate repurchases while the company's stock price was artificially inflated as a result of the aforementioned conduct.

These accusations were not pulled from the ether—in fact, the shareholder complaints suggest a 2017/2018 Congressional investigation into the marketing of addiction treatment centers (including the Debtors'),[3] a 2018 SEC investigation into the Debtors' collections practices, and, in 2019, the Debtors' own restatement of tens of millions of dollars of accounts receivables in their prior financial reporting. But rather than provide creditors with the detailed disclosure necessary to satisfy the Bankruptcy Code's requirement of adequate disclosure, including the extent of any independent investigation (if any) undertaken by the Debtors, the Disclosure Statement merely proclaims these allegations meritless in the apparent hope of sneaking these proposed releases past the Court and unsuspecting creditors. This is plainly unacceptable.

At a minimum, the Disclosure Statement must be revised to provide creditors with substantially more information regarding:

- The factual nature of the allegations made in the Shareholder Litigation;

---

[3] Preliminary transcripts of hearings and other supporting documents related to these investigations are available at:
https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=106716
https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=108592.

61370/0001-21089234v11

- The specific steps independent and disinterested representatives of the Debtors have taken to evaluate the merits of the various claims that may be brought based on those allegations and determine the value thereof to the Debtors' estates and their creditors; and

- The scope of the Third-Party Releases, including, specifically, whether the Third-Party Releases are intended to apply to claims of creditors (including derivative claims brought on the Debtors' behalf) based on the allegations in the Shareholder Litigation.

In addition to failing to provide adequate information regarding prior alleged wrongdoing, the releases identified in the Disclosure Statement render the Plan patently unconfirmable.  As noted above, the Plan grants releases to current and former officers and directors without any explanation of how these releases were negotiated and agreed upon, the benefit of such releases to the Debtors' estates or their importance to the Debtors' reorganization, or the nature and extent of any consideration provided by the Released Parties in exchange for such releases.  While the Committee recognizes that these issues are customarily reserved for Plan confirmation, the complete absence of disclosure by the Debtors – in the face of troubling allegations of wrongdoing by current and former directors and officers – dictates that the proposed releases cannot pass muster under prevailing Third Circuit law.  Accordingly, the Court's approval of the Disclosure Statement would, at this time, merely waste estate resources by needlessly prolonging a doomed Plan process.

In sum, both the Disclosure Statement and Plan are plainly deficient in their current form.  The proposed releases compel creditors to forego potentially valuable causes of action that could be pursued for their benefit in exchange for no discernible consideration or benefit.  Even worse, the scant information provided in the Disclosure Statement concerning the proposed releases and the claims and causes of action to be extinguished thereunder make it impossible for

creditors to cast an informed vote on the Plan.  In light of these issues, the Committee submits that the Disclosure Statement cannot be approved until the Disclosure Statement and Plan are modified to address the myriad problems noted above and further below in this Objection.

## BACKGROUND

### A.  The Chapter 11 Cases

1.  On June 20, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

2.  The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner in these Chapter 11 Cases.

3.  On July 2, 2020, the Acting United States Trustee for Regions 3 and 9 appointed the Committee.  See Docket No. 97.  The Committee consists of the following members: (1) Collect RX LLC; (2) Beckman Coulter, Inc.; and (3) Willie Meadows. On July 6, 2020, the Committee retained Cole Schotz P.C. as its counsel and Province, Inc. as its financial advisor.

### B.  The Dual-Track Plan Process

4.  On July 25, 2020, the Debtors filed the *Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates* [Docket No. 191] (the "Plan")[4] and its accompanying disclosure statement [Docket No. 192] (the "Disclosure Statement").

---

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

5

5.      The Plan contemplates alternative restructuring pathways: (1) if the Debtors receive a bid for substantially all of their assets for a price that exceeds their approximately $426 million in secured claims (or is otherwise acceptable to the Debtors' junior secured lenders), then they will consummate and implement such sale (the "Entire Company Asset Sale") through the Plan; or (2)  if the sale process does not result in such a bid, the Debtors will consummate and implement a stand-alone reorganization (the "Reorganization Transaction"), through which the Debtors' existing secured loans would be converted into exit facilities or paid down and the secured lenders would receive equity or warrants to purchase equity in the Reorganized Debtors.

6.      As currently proposed, the only source of recovery under the Plan for general unsecured creditors is a "waterfall" distribution of net sale proceeds if and only if an Entire Company Asset Sale is consummated and senior priority claims (including the DIP Claims, the Senior Lender Claims, the Junior Lender Claims, and administrative and priority claims) are paid in full from such proceeds.  If the Reorganization Transaction is consummated, the Plan provides no recovery to general unsecured creditors.

7.      The Debtors, working with their investment banker, Cantor Fitzgerald & Co. ("CF&CO"), are currently marketing the Entire Company Asset Sale to potential counter-parties.  Under the Court-approved bid procedures, the deadline for parties to submit qualified bids is September 11, 2020.  If the Debtors receive more than one qualified bid, an auction is scheduled for September 21, 2020.  See Docket No. 188 (the "Bid Procedures Order").

61370/0001-21089234v11

8.     As further described in the Disclosure Statement, the current marketing process marks the Debtors' _third_ effort in less than two years to find new debt or equity financing or sell substantially all of their assets:

> In January 2019, CF&CO commenced the process of finding new financing for the Debtors.  It discussed the opportunity with a total of thirteen (13) healthcare debt investors.  As part of this process, thirteen (13) confidentiality agreements were executed, thirteen (13) investor packages were distributed, nine (9) management calls were held, and five (5) term sheets were received. This process did not result in a transaction.
>
> In March 2019, CF&CO commenced a new process focused on strategic alternatives. . . .  As part of the most recent marketing process commenced in March 2020, CF&CO contacted fifty-five (55) parties with respect to a possible Transaction, including thirteen (13) potential strategic buyers and forty-two (42) sponsors. Of the fifty-five (55) potential bidders with whom the Debtors and CF&CO have had contact, fourteen (14) have executed confidentiality agreements and were provided access to a virtual data room containing confidential information regarding the Debtors, their business, and their assets.  Three (3) potential bidders submitted proposals, but no final agreements were reached with these bidders.

Disclosure Statement at 28–29.  Despite their extensive prepetition marketing processes, the Debtors failed to enter into a stalking horse arrangement with any bidder prior to the Petition Date, and, as of this Objection, have not identified a proposed stalking horse in connection with the postpetition sale process.

9.     Accordingly, absent the consummation of an Entire Company Asset Sale at a price that exceeds the approximately $426 million of secured debt – a result the Debtors did not achieve through an extensive prepetition sale process and have yet to achieve postpetition – unsecured creditors will receive no recovery under the Plan.

## C.    Release of Potentially Unencumbered Assets

10.    The Final DIP Order (defined below) in these cases provides that the

Debtors' secured lenders may not look to Avoidance Actions or commercial tort claims for

satisfaction of their claims until all other collateral has been fully exhausted:

> [T]he DIP Secured Parties and the Prepetition Secured Parties shall first look to
> DIP Collateral other than (i) Avoidance Actions or (ii) commercial tort claims (the
> foregoing clauses (i) and (ii) together with proceeds thereof, collectively, the "Last
> Out DIP Collateral") to satisfy (x) the DIP Obligations or (y) any adequate
> protection obligations owing under this Final Order, as applicable, before seeking
> to satisfy such obligations from any Last Out DIP Collateral.

Docket No. 159 (the "<u>Final DIP Order</u>") at ¶ 34.

11.    The proposed Plan contains broad releases[5] both from the Debtor (the

"<u>Debtor Releases</u>") and third parties (the "<u>Third-Party Releases</u>") in favor of the Debtors' current

and former directors and officers and other non-Debtor Released Parties.[6]  Plan, Art. X(E), (F).

---

[5] The Plan's release provisions extend to "any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors or their respective Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transaction, the DIP Loan Documents, Senior Lien Loan Documents, the Junior Lien Loan Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement or any Asset Sale, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, knowing violation of law or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan (the '<u>Third Party Release</u>')."  Plan, Art. X(F).

[6] The Plan defines "Released Parties" to include "(a) the Debtors and Reorganized Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the Junior Lien Agent; (e) the Junior Lenders; (f) the Senior Lien Agent; (g) the Senior Lenders; (h) the Committee, (i) the PCO, (j) the Plan Administrator, if any, and (l) with respect to the foregoing clauses (a) through (j), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants,

Creditors are deemed to grant the Third-Party releases (whether or not they receive any value) unless they affirmatively elect to opt-out. Plan, Art. X(E), (F). These Third-Party Releases include Avoidance Actions and derivative claims assertable on behalf of the Debtors or their respective Estates. Id.

12. Although the Plan's release provisions contain a carve-out for Claims and Causes of Action related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, knowing violation of law or gross negligence, the carve-out does not apply to other claims, including breach of fiduciary duty, that could be investigated and pursued derivatively for the benefit of unsecured creditors. Moreover, the Plan's failure to provide a mechanism through which potential derivative claims of these estates could be pursued for the benefit of creditors following the Effective Date significantly limits (if not renders completely meaningless) the impact of this proposed carve-out.

## D.   Allegations of Prepetition Misconduct by the Debtors' Officers and Directors

13. In 2019, certain of AAC's shareholders (the "Shareholders") filed three separate lawsuits stemming from AAC's April 15, 2019 restatement of its 2017 and 2018 financial disclosures, including a reduction in tens of millions of dollars in collectable accounts receivables. The Shareholders brought these actions against certain of the Debtors' current and former officers and directors (all of whom are to be released under the Plan) in the United States District Court for the Middle District of Tennessee (collectively, the "Shareholder Litigation").[7] The Shareholders

---

representatives, investment managers, and other professionals, each in their capacity as such; provided that any Holder of a Claim or Interest that opts out of the releases contained in the Plan or otherwise is not a Releasing Party shall not be a "Released Party."

[7] The Shareholder Litigation consists of: (1) Caudle v. AAC Holdings, Inc., et. al., Case No. 3:19-CV-00407 (M.D. Tenn.); (2) Cooper v. Cartwright, et. al., Case No. 3:19-CV-00717 (M.D. Tenn.); and (3) Pedernera v. Cartwright, et.

generally allege that current and former officers and directors orchestrated deceptive marketing schemes and concealed highly improper accounting practices to artificially inflate ACC's stock price and personally enrich themselves through sales of millions of dollars' worth of inflated stock.

<div align="center">

*i.*    *Allegations of Deceptive Marketing Practices*

</div>

14.    The Shareholders allege that the Debtors' top executives, including its CEO, directed a deceptive marketing campaign that increased short term sales but, once uncovered, ultimately undermined the Debtors' position in the market and destroyed substantial value.

15.    According to the Shareholders, beginning in 2015, AAC used an extensive network of websites that appeared to offer addicts and their families treatment and medical advice, but were, in reality, designed to drive a vulnerable population to commission-based salespeople:

> AAC's purportedly "best-in-class sales and marketing engine" consisted of what it characterized as its "air game" and its "ground game." . . .
>
> AAC's "air game" was driven in large part by its July 2015 acquisition of Referral Solutions Group, LLC ("RSG") for $35 million in cash and $25 million in stock. RSG's primary business involved operating over 100 websites, with URLs like rehabs.com and recovery.org, which appeared to provide informational resources about drug abuse and drug treatment, as well as directories of treatment facilities in different parts of the country. In reality, RSG's websites were thinly veiled lead generation mechanisms . . . .
>
> [T]hese websites included a toll-free phone number on almost every page. When people seeking help called the toll-free phone number displayed on the websites, they were connected with an AAC sales representative who was paid on a commission basis, and subject to minimum admissions goals, to enroll patients in AAC's facilities.

---

*al.*, Case No. 3:19-CV-00777 (M.D. Tenn.).  Copies of the complaints underlying each Shareholder Litigation are attached hereto as Exhibit A.  The Chapter 11 Cases stayed the nascent Shareholder Litigation with respect to AAC. Of the three actions, the class action litigation commenced by David Caudle has advanced the furthest.  Caudle v. AAC Holdings, Inc., et. al., Case No. 3:19-CV-00407 (M.D. Tenn.).  On November 4, 2019, Caudle filed an amended complaint (the "Caudle Complaint").  The month prior to the Petition Date, the parties to the Caudle action completed motion to dismiss briefing.

<div align="center">

10

</div>

<u>Caudle v. AAC Holdings, Inc.</u>, <u>et. al.</u>, Case No. 3:19-CV-00407 (M.D. Tenn.) [Docket No. 45]

(the "<u>Caudle Amended Complaint</u>") at ¶¶ 28, 30-31.

        16.     The Shareholders allege, in response to the Debtors' deceptive marketing

practices, trade associations, Congress, and vendors began to take actions against the Debtors:

> By 2017, the proliferation of predatory and deceptive drug treatment marketing began attracting significant media and oversight attention. . . .

> Industry trade associations began taking steps to address unethical and illegal marketing practices. Founded in 1978, the National Association of Addiction Treatment Providers ("NAATP") is a not-for-profit professional membership association which functions as a trade association for addiction treatment providers. . . .

> In January 2018, the NAATP declined to renew AAC's membership in the organization. . . . AAC's web marketing practices were found to violate NAATP's Code of Ethics, making AAC ineligible for membership renewal, and AAC spent months, before and after the hearing, seeking to rejoin the NAATP and participate in its events, including by sending a threatening cease and desist letter.

<u>Id.</u> ¶¶ 33–34, 44.

> Congress also took notice. On December 12, 2017, the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, held a hearing entitled, "Examining Concerns of Patient Brokering and Addiction Treatment Fraud." . . .

> On July 25, 2018, the House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, held another hearing, entitled "Examining Advertising and Marketing Practices within the Substance Use Treatment Industry."

> Cartwright was called to testify at the July 25, 2018 hearing and was questioned directly about AAC's practices, including whether AAC clearly identified its websites as being affiliated with AAC, as well as its use of incentive compensation and quotas in its call center.

<u>Id.</u> ¶¶ 36, 39, 41.

> Google also began to scrutinize addiction treatment advertising. . . .  In September 2017, . . . Google stopped selling ads for addiction treatment-related search terms

in the US, stating that "[w]e found a number of misleading experiences among rehabilitation treatment centers that led to our decision."

On April 16, 2018, LegitScript, a company which monitors and certifies health and other high-risk websites on behalf of search engines, payment providers, and e-commerce platforms, issued a release entitled, "LegitScript and Google Partner on New Certification Program for Addiction Treatment Providers." Google had decided to again allow Google Ads advertising by addiction treatment entities . . . .

AAC immediately sought to inject itself into LegitScript's certification process, reaching out to LegitScript and its CEO in an attempt to install itself as a LegitScript advisor. But its efforts were rebuffed. Beginning in May 2018 (and continuing until at least May 2019) AAC also sought to obtain certification from LegitScript so that it could resume Google Ads marketing. Its efforts were unsuccessful, however, as LegitScript's certification standards preclude "lead generators" from certification.

Id. ¶¶ 42-43, 45-46.

17.     The Shareholders allege that the efforts by third parties, including Congress, "to curtail predatory and unscrupulous operators from taking advantage of individuals seeking treatment took a profound toll on AAC, which relied heavily on deceptive methods to fuel its growth, and saw its revenues decline by tens of millions of dollars when it was no longer able to employ such tactics." Id. ¶ 49.

    ii.     *Allegations of Financial Manipulation Related to AAC's Restatement*

18.     In late 2018 and early 2019, the Debtors publicly filed restatements of AAC's 2017 and 2018 financial reports correcting misstatements related to the collectability of the Debtors' accounts receivables.  The Shareholders allege that the Debtors' officers and directors knowingly and intentionally misstated tens of millions of dollars of AAC's accounts receivable to artificially inflate its share price.  The Shareholders specifically allege that:

- During 2017 and 2018, AAC publicly stated that it calculated "doubtful accounts" based on its own historical collection experience.  In reality, however, AAC used more favorable collection rates based on industry and other data to paint a rosier collections picture.  Caudle Amended Complaint

12

at ¶¶ 54–57. "As a result, AAC treated a large portion of its revenues as collectible and thus included it in its accounts receivable without deducting it as a 'doubtful account,' even though defendants were in possession of historical data that indicated that AAC was unlikely ever to receive payment." Id. at ¶ 57.

- In 2017, "AAC had accounts receivable – predominantly related to laboratory testing – that had not been written off for two to three years after the services were rendered," contrary to representations that AAC "fully reserved" for receivables aged greater than one year. Id. Even after third-party payors for laboratory testing increased their scrutiny of submitted bills, requiring documentation that AAC did not have, AAC retained these accounts receivable on its public financial disclosures. See id.

- AAC treated receivables owed by clients (individuals often facing significant financial and other difficulties) identically to those due from commercial third-party payors such as insurance companies and government agencies. Id. at ¶ 52.

19. The Shareholders allege that this scheme began to unravel when AAC received a subpoena from the SEC in March 2018. The Shareholders further allege that "Cartwright and McWilliams concealed AAC's receipt of that subpoena from the market until November 6, 2018." Id. ¶ 58.

20. The Shareholders allege that, as a result of the SEC investigation, the Debtors were forced to submit public restatements beginning in November 2018. At that time, they allege, AAC restated its receivables related to laboratory testing (the receivables that were the subject of the SEC's initial investigation) resulting in a $6 million reduction of AAC revenue for the third fiscal quarter in 2018 and a $5.7 million increase in AAC's net-losses over the first three quarters of 2018. Id. ¶ 58. Allegedly, this was "just the tip of the iceberg." Id.

On April 15, 2019, AAC issued its annual report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K disclosed AAC's restated financial results for 2017, and the first three quarters of 2018. On April 16, 2019, McWilliams also discussed the Company's restatement on a conference call, stating that AAC "determined [in] consultation with our auditors that adjustments to certain of our previously issued annual and interim financial

statements were necessary. These adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue . . . ."

Id. ¶ 60.

21.      The Shareholders allege that the Debtors' officers and directors were not only aware of the misstatements at the time they were made, but made such misstatements with knowledge of the actual facts. Id. ¶ 62.

22.      Based on AAC's 2018 Form 10-K, the Debtors' 2019 restatement to AAC's 2017 and 2018 accounts receivable was significant:

| **Reporting Period** | **Reported/ Restated Accounts Receivable** |
|---|---|
| FY 2017 | $94.096 million/ $63.746 million |
| Q1 2018 | $99.581 million/ $71.944 million |
| Q2 2018 | $97.362 million/ $71.057 million |
| Q3 2018 | $94.583 million/ $59.839 million |

23.      Further, the Shareholders allege that, from March 2017 through August 2019, AAC's directors and officers caused AAC to further inflate its stock price by repurchasing approximately $814,267 of its already inflated common stock, which allegedly was only worth approximately $142,081.  See Cooper v. Cartwright, et. al., Case No. 3:19-CV-00717 (M.D. Tenn.) [Docket No. 1] (the "Cooper Complaint") at ¶¶ 154-170.  During this time, the Shareholders allege that certain of AAC's officers and directors benefited significantly from the inflated stock prices by selling millions of dollars' worth of their personal AAC shares, including more than $4.7 million in shares sold by Mr. Cartwright in 2017 and 2018.  See id. at ¶ 24.

14

*iii.*     *Debtors' Disclosure of AAC's Restatement and Shareholder Litigation*

24.     The Debtors provide scant disclosure regarding the details of the Shareholders' allegations or the potential Causes of Action to be released through the Plan.

25.     With respect to its multimillion-dollar restatement of its 2017 and 2018 financial statements, the Debtors' summarily disclose that they "continue to fully cooperate on [the SEC investigation], including providing the SEC with information regarding the restatements of historical financial reports contained in the Debtors' most recent Annual Report."  Disclosure Statement at 31–32.

26.     The serious allegations made in the Shareholder Litigation are disclosed as an afterthought and summarily dismissed:

- "Caudle generally alleges that the Caudle Defendants violated Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by making allegedly misleading statements relating to the Debtors' marketing practices and with respect to financial statements reported by the Debtors for periods between 2016 and 2018"; and

- That the other two Shareholders have alleged that the Debtors' current and certain former directors and senior executives "breached their fiduciary duties and engaged in mismanagement."

- "The Debtors believe that the allegations are without merit."

Disclosure Statement at 32.

27.     Moreover, the Disclosure Statement and Plan provide no indication whatsoever that the Released Parties have provided any value in exchange for the proposed releases or are otherwise necessary to the Debtors' reorganization.  In fact, several of the Released Parties are former officers and directors.

61370/0001-21089234v11

**E.**     **The Committee's Investigation**

28.     The Committee commenced an investigation of the allegations raised by the Shareholders to determine whether these estates possess colorable claims that can be pursued for the benefit of general unsecured creditors.   The Committee is requesting the production of documents and information from the Debtors concurrently herewith and, if appropriate, will seek standing to bring estate causes of action in the future.

**OBJECTION**

**A.**     **The Plan Does Not Provide Adequate Information Regarding The Released Claims**

29.     Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a).

30.     The disclosure of adequate information is of the utmost importance in this Circuit.   See In re Oneida Motor Freight, Inc., 848 F.2d 414, 417 (3d Cir. 1988) ("we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.").   A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."   In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

31.     Importantly, a disclosure statement should not be approved where the debtor's disclosure is incomplete or inaccurate.   See Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) ("[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system.   Because creditors and the bankruptcy court

16

rely heavily on the debtor's disclosure statement in determining whether to approve a proposed

reorganization plan, the importance of full and honest disclosure cannot be overstated." (citing

Oneida Motor Freight, 848 F.2d at 417-18)).

33.     The Debtors propose a Plan that will return value to unsecured creditors

only if all of the Debtors' secured debt and administrative expenses are satisfied from the profits

of an Entire Company Asset Sale.  The Debtors and CF&CO ran a marketing process in 2019

without so much as finding a stalking horse bidder, giving little indication that the current sale

process will result in meaningful value.  Not only does the Plan propose a potential zero cent

recovery for unsecured creditors, it also seeks to release the potential Causes of Action, which are

the only apparent source of potentially valuable unencumbered assets.  And it appears the Debtors

are proposing that unsecured creditors provide the releases in exchange for no value from the non-

Debtor Released Parties.

33.     However, the Debtors provide no meaningful disclosure of the potential

value that creditors are being asked to release.  The Debtors attempt to sweep under the rug

substantial information concerning the potential Causes of Action against the Debtors' officers

and directors without any meaningful justification or explanation.  First, the Debtors almost

entirely fail to disclose AAC's 2019 restatement of tens of millions of dollars in accounts

receivable, burying the reference in a sterile discussion of the SEC's investigation:

> In March 2018, the Debtors provided general accounting, finance and governance
> documentation in response to a subpoena received from the U.S. Securities and
> Exchange Commission (the "SEC"). Following this initial document request, the
> SEC requested additional information pertaining to the Debtors' accounting for
> partial payments from insurance companies, where the Debtors are continuing to
> pursue additional collections for the estimated balance. Beginning in the third

17

quarter of 2018, the audit committee of the Debtors (the "Audit Committee") initiated a review of the Debtors' accounting for these partial payments. In connection with this review, the Audit Committee determined that the Debtors' change in estimate of the collectability of accounts receivable relating to partial payments was appropriate. The SEC's investigation remains ongoing, and the Debtors continue to fully cooperate on this matter, *including providing the SEC with information regarding the restatements of historical financial reports contained in the Debtors' most recent Annual Report.*

Disclosure Statement at 31–32 (emphasis added). There is no discussion regarding what information the Debtors restated, the scope of the restatement, the impact of the restatement on the Debtors, or how the restatement relates to the SEC investigation.

34.    The Debtors not only fail to give creditors information necessary to evaluate the impact of the 2019 restatement, in fact, they attempt to downplay the SEC investigation:

The SEC's investigation is neither an allegation of wrongdoing nor a finding that any violation of law has occurred. At this time, the Debtors cannot predict the final outcome of this matter or what impact it might have on the Debtors' consolidated financial position, results of operations or cash flows.

Disclosure Statement at 30.

35.    Second, the Disclosure Statement discusses the Shareholder Litigation in the most perfunctory manner possible and provides creditors with absolutely no insight into the factual allegations made against the Debtors' officers and directors therein. With respect to the allegations that the Debtors' officers and directors undertook multiple years of fraudulent and deceptive conduct that, among other things, (i) cost the Debtors' tens of millions of dollars in revenue, (ii) subject their CEO to a congressional investigation, and (iii) resulted in AAC being banned from an influential trade association and Google Ads, the Disclosure Statement merely provides that:

Caudle generally alleges that the Caudle Defendants violated Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated

thereunder by making allegedly misleading statements relating to the Debtors' marketing practices and with respect to financial statements reported by the Debtors for periods between 2016 and 2018, which statements were restated in the Debtors' Annual Report on Form 10-K for the year ended December 31, 2018.

In two related matters, on August 16, 2019 and September 23, 2019, alleged shareholders filed derivative actions on behalf of AAC Holdings, Inc. in the United States District Court in the Middle District of Tennessee, styled Cooper v. Cartwright, et al. and Pedernera v. Cartwright, et al., against certain of the Debtors' current and certain former members of their board of directors and senior executive team, alleging that these individuals breached their fiduciary duties and engaged in mismanagement.

Disclosure Statement at 32.

36.     The Disclosure Statement utterly fails to provide creditors entitled to vote on the Plan with information necessary to understand or value the potential Causes of Action the Debtors are seeking to release.

37.     Given that the Plan may provide unsecured creditors with no recovery, it is imperative that creditors be made fully aware of the extent of allegations made against the Debtors' officers and directors in the Shareholder Litigation and otherwise, and that the claims based on the alleged misconduct are being released.  Without fulsome information in those regards, creditors cannot be said to have an understanding of what, if anything, they are receiving under the Plan sufficient to make an informed decision on whether to accept or reject the Plan.  Accordingly, the Disclosure Statement fails to contain adequate information within the definition of section 1125 of the Bankruptcy Code and should not be approved.

**B.    The Plan's Release Provisions Render It Patently Unconfirmable**

38.     A court should deny approval of a disclosure statement that describes a patently unconfirmable plan, regardless of the adequacy of its disclosures.  As the Third Circuit has recognized, "if it appears there is a defect that makes a plan inherently or patently

19

unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." In re American Capital Equipment, LLC, 688 F.3d 145, 154 (3d Cir. 2012) (citation omitted); see also In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures") (citations omitted).

39.     The Disclosure Statement should not be approved because the Plan's release provisions render the Plan patently unconfirmable. By its plain language, the Bankruptcy Code does not permit non-debtors to receive bankruptcy discharges. See 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). However, the Third Circuit has held that nonconsensual releases of a non-debtor may be approved as an extraordinary remedy that should be used sparingly. See In re Continental Airlines, 203 F.3d at 212. In order to bind all of the affected parties without their consent, the Debtors would need to show that the impacted classes received fair consideration and that the release is necessary to the Debtors' reorganization. See id. at 215; In re Spansion, Inc., 426 B.R. 114, 144-145 (Bankr. D. Del.).

40.     In assessing the propriety of non-consensual releases in bankruptcy, the Third Circuit in Continental focused on whether the releases were given in exchange for reasonable financial consideration, separate and apart from the consideration to which the class was entitled as creditors under the Plan. In re Continental Airlines, 203 F.3d at 215. Courts in Delaware

20

consider a number of factors in evaluating non-consensual third party releases, including whether:

"(i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees

have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial

contribution is necessary to make the plan feasible; and (iv) the release is fair to the nonconsenting

creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange

for the release." Spansion, 426 B.R. at 144.

41.     Here, there is no indication in the Plan or the Disclosure Statement that the

Third-Party Releases are supported by consideration or that they are necessary to the Debtors'

reorganization.  The Disclosure Statement speaks in merely conclusory terms that are plainly

insufficient to warrant the extraordinary relief of granting releases to non-Debtor directors and

officers and other third parties against whom significant allegations of wrongdoing have been

made.  The Disclosure Statement provides:

> The Debtors believe that the releases, exculpations, and injunctions set forth in the
> Plan are appropriate because, among other things, the releases are narrowly tailored
> to the Debtors' restructuring proceedings, and each of the Released Parties has
> contributed value to the Debtors and aided in the reorganization process, which
> facilitated the Debtors' ability to propose and pursue confirmation. The Debtors
> believe that each of the Released Parties has played an integral role in formulating
> the Plan and has expended significant time and resources analyzing and negotiating
> the issues presented by the Debtors' prepetition capital structure. The Debtors
> further believe that such releases, exculpations, and injunctions are a necessary part
> of the Plan.

Disclosure Statement at 99.

42.     These boilerplate statements are insufficient to overcome the presumption

against Third-Party Releases in the Third Circuit.

43.     Moreover, the facts suggest that, contrary to the statements made in the Disclosure Statement, the Third-Party Releases are not supported by any consideration whatsoever and serve merely to deprive unsecured creditors of any source of recovery in these cases while granting a windfall to significant wrongdoers.  In fact, the Released Parties include former officers and directors—it is difficult to conceive of what value they might provide.  The Debtors have simply made no showing that the Third-Party Releases are appropriate.

44.     Further, the opt-out mechanism cannot save the Third-Party Releases.  The Court should treat the proposed Third-Party Releases as non-consensual, notwithstanding the inclusion of an opt-out mechanism because creditors are very likely to receive no value under the Plan.  Multiple courts in this District have ruled that "any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases." In re Washington Mutual, Inc., 442 B.R. 314, 355 (Bankr. D. Del. 2011); see also In re Emerge Energy Servs. LP, No. 19-11563 (KBO), 2019 WL 7634308, *18 (Bankr. D. Del. Dec. 5, 2019).  As these courts recognize, especially in situations where a purported releasing party will receive no value under a plan and is deemed to reject, an opt out mechanism does not convert a non-consensual third-party release into a consensual release.  Id.  It would be improper to require creditors that will receive no value under a plan to nonetheless remain active in a case to preserve their rights against non-debtors.

45.     Recently, in Emerge Energy, the court held that unless the plan proponent can show that silence may constitute acceptance under basic contract principles then silence cannot constitute consent: "A party's receipt of a notice imposing an artificial opt-out requirement, the

22

recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt out simply do not qualify." In re Emerge Energy Servs. LP, No. 19-11563 (KBO), 2019 WL 7634308, *18 (Bankr. D. Del. Dec. 5, 2019). Here, there is a strong likelihood that creditors will receive no value under the Plan, but each creditor will nonetheless grant the Third-Party Releases unless it affirmatively opts out. If creditors receive no value under the Plan, silence may not be construed as acceptance to these broad, unnecessary releases.

C.    **Solicitation and Procedural Objections**

46.    Regardless of whether the Third-Party Releases can be approved at confirmation, the Court should not permit the Debtors to use the opt-out mechanism to side-step their burden to show the appropriateness of the Third-Party Releases and the Committee's investigation of potential Causes of Action. The proposed Plan is clear that any party that does not affirmatively opt out will be deemed to have granted, and be bound by, the Third Party Releases. In other words, creditors that vote yes, creditors that vote no, creditors that are deemed to accept or to reject, and creditors that are entitled to vote but do not, will all be bound by the Third-Party Releases unless they affirmatively opt-out.[8]

47.    As discussed above, such automatic opt-out provisions are particularly suspect where the "meager recoveries" offered to creditors could "explain their inaction with regard to the" proposed release. In re SunEdison, Inc., 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) ("There are other plausible inferences that support the opposite inference. For example, the meager recoveries (here, less than 3% for the unsecured creditors) may explain their inaction without

---

[8] See Plan, Art. X(F).

23

regard to the Release.  Or the creditor could have failed to return a ballot because it supported the Plan but did not want to give the Release.").

48.    The Committee submits that, even assuming that these opt-out structures can ever be approved, their use should be determined on a case-by-case basis.  Here, where the Debtors seek to impose broad releases of claims of unknown value, that were apparently negotiated and agreed to by the parties that stand to benefit, and the Debtors have provided little clarity regarding what, precisely is being released, the Committee respectfully submits that the opt-out mechanismis entirely inappropriate.

## RESERVATION OF RIGHTS

49.    The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Motion, and to introduce evidence prior to or at any hearing regarding the Motion in the event that the Committee's objections are not resolved prior to such hearing.

## CONCLUSION

50.    For all of the foregoing reasons, the Committee respectfully requests that the Court deny the Motion.

Dated: August 4, 2020
       Wilmington, Delaware

**COLE SCHOTZ P.C.**

  */s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Andrew John Roth-Moore (No. 5988)
Cole Schotz P.C.
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
jalberto@coleschotz.com
aroth-moore@coleschotz.com

- and -

Seth Van Aalten (Admitted Pro Hac Vice)
Anthony De Leo (Admitted Pro Hac Vice)
1325 Avenue of the Americas
19th Floor
New York, NY 10019
svanalten@coleschotz.com
adeleo@coleschotz.com

- and -

Michael Trentin (Admitted Pro Hac Vice)
25 Main Street
Hackensack, NJ 07601
mtrentin@coleschotz.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

61370/0001-21089234v11