## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AAC HOLDINGS, INC., *et al.*,[1] | Case No. 20-11648 |
| Debtors. | (Jointly Administered) |

## AMENDED DISCLOSURE STATEMENT FOR THE AMENDED JOINT CHAPTER 11 PLAN OF AAC HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE AMENDED JOINT CHAPTER 11 PLAN OF AAC HOLDINGS, INC. AND ITS DEBTOR AFFILIATES. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**GREENBERG TRAURIG, LLP**

David B. Kurzweil (admitted *pro hac vice*)
Alison Elko Franklin (admitted *pro hac vice*)
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Email: kurzweild@gtlaw.com
        franklinae@gtlaw.com

Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

Dated: September 1, 2020

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Recovery First of Florida, LLC (3005); Fitrx, LLC (5410); Oxford Treatment Center, LLC (7853); Oxford Outpatient Center, LLC (0237); Concorde Treatment Center, LLC (6483); New Jersey Addiction Treatment Center, LLC (7108); ABTTC, LLC (7601); Laguna Treatment Hospital, LLC (0830); AAC Las Vegas Outpatient Center, LLC (5381); Greenhouse Treatment Center, LLC (4402); AAC Dallas Outpatient Center, LLC (6827); Forterus Health Care Services, Inc. (4758); Solutions Treatment Center, LLC (8175); San Diego Addiction Treatment Center, Inc. (1719); River Oaks Treatment Center, LLC (0640); Singer Island Recovery Center LLC (3015); B&B Holdings Intl LLC (8549); The Academy Real Estate, LLC (9789); BHR Oxford Real Estate, LLC (0023); Concorde Real Estate, LLC (7890); BHR Greenhouse Real Estate, LLC (4295); BHR Ringwood Real Estate, LLC (0565); BHR Aliso Viejo Real Estate, LLC (2910); Behavioral Healthcare Realty, LLC (2055); Clinical Revenue Management Services, LLC (8103); Recovery Brands, LLC (8920); Referral Solutions Group, LLC (7817); Taj Media LLC (7047); Sober Media Group, LLC (4655); American Addiction Centers, Inc. (3320); Tower Hill Realty, Inc. (0039); Lincoln Catharine Realty Corporation (5998); AdCare Rhode Island, Inc. (2188); Green Hill Realty Corporation (4951); AdCare Hospital of Worcester, Inc. (3042); Diversified Healthcare Strategies, Inc. (3809); AdCare Criminal Justice Services, Inc. (1653); AdCare, Inc. (7005); Sagenex Diagnostics Laboratory, LLC (7900); RI - Clinical Services, LLC (6291); Addiction Labs of America, LLC (1133); AAC Healthcare Network, Inc. (0677); AAC Holdings, Inc. (6142); San Diego Professional Group, P.C. (9334). Grand Prairie Professional Group, P.A. (2102); Palm Beach Professional Group, Professional Corporation (7608); Pontchartrain Medical Group, A Professional Corporation (1271); Oxford Professional Group, P.C. (8234); and Las Vegas Professional Group - Calarco, P.C. (5901). The location of the Debtors' corporate headquarters is 200 Powell Place, Brentwood, TN 37027.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**[2]

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF AAC HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PROPOSED BY THE DEBTORS. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND THE CONSENTING LENDERS WHO ARE PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT, AND HOLD MORE THAN 89% OF THE AGGREGATE PRINCIPAL AMOUNT OF THE SENIOR LENDER CLAIMS AND IN EXCESS OF 60% OF THE AGGREGATE PRINCIPAL AMOUNT OF THE JUNIOR LENDER CLAIMS. HOWEVER, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE DEBTORS' CASES DOES NOT SUPPORT THE PLAN, WHICH IN ITS CURRENT FORM PROVIDES NO RECOVERY TO CLASS 5 GENERAL UNSECURED CLAIMS. THE COMMITTEE RECOMMENDS THAT CLASS 5 GENERAL UNSECURED CREDITORS RETURN BALLOTS REJECTING THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, ACCOUNTING, BUSINESS OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE,

---

[2] Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS, IN ALL MATERIAL RESPECTS, THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON OR ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS OR INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE XI OF THE PLAN.  THERE IS NO ASSURANCE THAT THE

PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND THE OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE SECURITIES THAT MAY BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL HAVE NOT BEEN REGISTERED UNDER THE SECURITIES AT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), OR UNDER THE SECURITIES LAWS OF ANY STATE ("<u>BLUE SKY LAWS</u>") OR ANY OTHER JURISDICTION. THE PLAN AND THIS DISCLOSURE STATEMENT HAVE NEITHER BEEN FILED WITH, NOR APPROVED OR DISAPPROVED BY, THE SEC OR ANY STATE SECURITIES COMMISSION. NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS ARE RELYING ON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(A)(1) OF THE BANKRUPTCY CODE WITH RESPECT TO THE OFFERING AND ISSUANCE OF NEW SECURITIES PURSUANT TO THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A STATEMENT OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "WILL," "SHOULD," "EXPECT," "ANTICIPATE," "ESTIMATE," "BELIEVE," "DESIGNED," "INTEND," "PLAN," "GOAL," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS, INCLUDING THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; THE EFFECTS OF GOVERNMENTAL REGULATION ON THE

DEBTORS' BUSINESSES; AND THOSE ADDITIONAL RISKS SET FORTH IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS".

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XI OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE VIII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION..................................................................................................1

II.    OVERVIEW OF PLAN TRANSACTIONS..........................................................1

III.   EXECUTIVE SUMMARY ..................................................................................3

     A.     Chapter 11 Overview and this Disclosure Statement ...............................3
     B.     Voting on the Plan .................................................................................3
     C.     Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan.......................................................................6
     D.     Confirmation Hearing ............................................................................7
     E.     Contact Information ...............................................................................8

IV.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW..................................................................................8

     A.     AAC's Corporate History, Assets and Operations .................................8
     B.     The Debtors' Management Team ...........................................................15
     C.     The Special Restructuring Committee....................................................15
     D.     The Debtors' Prepetition Capital Structure.............................................16

V.     EVENTS LEADING TO THE CHAPTER 11 FILINGS.................................20

     A.     Financial Difficulties ...........................................................................20
     B.     COVID-19..........................................................................................22
     C.     The Restructuring Support Agreement and DIP Financing......................23

VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES .......................................................................................24

     A.     Expected Timetable of the Chapter 11 Cases .......................................24
     B.     First Day Relief...................................................................................24
     C.     Other Procedural and Administrative Motions.......................................25
     D.     Approval of the DIP Facility.................................................................26
     E.     Schedules and Statements.....................................................................26
     F.     Trading Orders....................................................................................26
     G.     Appointment of Creditors' Committee...................................................27
     H.     Appointment of Patient Care Ombudsman .............................................27
     I.     Bidding Procedures Motion ..................................................................28
     J.     Claim Bar Dates ..................................................................................30
     K.     Key Employee Retention Plan ..............................................................31
     L.     341 Meeting ........................................................................................31
     M.    Litigation Matters................................................................................31
     N.     Valuation Analysis...............................................................................34

VII.    **THE PLAN** ...........................................................................................................**34**

    A.    Administrative Claims and Priority Tax Claims.................................35
    B.    Classification and Treatment of Claims and Interests .......................38
    C.    Means for Implementation of the Plan...............................................44
    D.    Treatment of Executory Contracts and Unexpired Leases .................54
    E.    Provisions Governing Distributions....................................................57
    F.    The Plan Administrator ......................................................................61
    G.    Reserves Administered by the Plan Administrator .............................64
    H.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims..........68
    I.    Settlement, Release, Injunction, and Related Provisions.....................70
    J.    Conditions Precedent to Confirmation and the Effective Date............77

VIII.    **RISK FACTORS**.............................................................................................**80**

    A.    Bankruptcy Law Considerations.........................................................80
    B.    Risks Related to Recoveries under the Plan .......................................83
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses .............84
    D.    Risks Related to the Reorganized AAC Equity Interests or New Warrants. .........98

IX.    **CONFIRMATION OF THE PLAN** .................................................................**100**

    A.    Requirements for Confirmation of the Plan.......................................100
    B.    The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions...........................................................................................101
    C.    Best Interests of Creditors/Liquidation Analysis ..............................101
    D.    Feasibility..........................................................................................102
    E.    Acceptance by Impaired Classes .......................................................102
    F.    Confirmation Without Acceptance by All Impaired Classes..............103

X.    **CERTAIN SECURITIES LAW MATTERS** .................................................**104**

XI.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.........................................................**105**

    A.    Introduction.......................................................................................105
    B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors.........................................................................107
    C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims ...............................................................................................111
    D.    Taxation of Reorganized Debtors ......................................................121
    E.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims ............................................................................121
    F.    U.S. Information Reporting and Back-Up Withholding.....................125

XII.    **RECOMMENDATION** ....................................................................................**126**

# EXHIBITS[3]

EXHIBIT A    Plan

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Corporate Organization Chart

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Liquidation Analysis

EXHIBIT F    Financial Projections

---

[3] Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION

AAC Holdings, Inc., a Nevada corporation, along with certain of its affiliates and subsidiaries (collectively, the "Debtors" or "AAC") submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates* (the "Plan"), dated September 1, 2020.[4] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

## II.    OVERVIEW OF PLAN TRANSACTIONS

The Plan contemplates the following alternative plan structures: (1) if, in accordance with the Bidding Procedures, the Debtors receive a successful bid with respect to a sale of all or substantially all of the Debtors' assets that would satisfy in full, in Cash, all Allowed Administrative Claims, Priority Claims, Other Secured Claims, DIP Lender Claims, S enior Lender Claims and Junior Lender Claims (or such lesser amount of Junior Lender Claims as is acceptable to the Requisite Consenting Lenders in their sole and absolute discretion), then such sale transaction (the "Entire Company Asset Sale") shall be consummated and implemented through the Plan with creditors to receive the net proceeds from such sale transaction on the Effective Date as set forth herein; or (2) alternatively, if the Debtors' sales process does not result in a bid for all or substantially all of the Debtors' assets that is sufficient to satisfy in full, in Cash, all Allowed Administrative Claims, Priority Claims, Other Secured Claims, DIP Lender Claims, Senior Lender Claims and Junior Lender Claims (or such lesser amount of Junior Lender Claims as is acceptable to the Requisite Consenting Lenders in their sole and absolute discretion), then a stand -alone reorganization (the "Reorganization Transaction") will be consummated and implemented as set forth in the Plan with creditors receiving those distributions set forth herein.  The Reorganization Transaction may include a sale of less than all or substantially all of the Debtors' assets, with such net sale proceeds distributed as set forth in the Plan.

As set forth in the Plan, both the Entire Company Asset Sale and Reorganization Transaction preserve the going-concern value of the Debtors' businesses, maximize recoveries available to all constituents, provide for an equitable distribution to the Debtors' stakeholders, and protect the jobs of the Debtors' employees.  More, specifically, pursuant to the terms of the Plan, the Entire Company Asset Sale or the Reorganization Transaction, as applicable, provide, among other things:

- All Allowed Administrative Claims, Allowed Priority Tax Claims, Al lowed Other Secured Claims, and Allowed Other Priority Claims shall be paid in full in cash or receive such other treatment that renders such Claims Unimpaired.

---

[4] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

- If there is an Entire Company Asset Sale, Allowed DIP Lender Claims and Allowed Senior Lender Claims shall be paid in full in cash from the proceeds of such sale. Remaining sale proceeds, together with any other Distributable Proceeds, shall be distributed to the Holders of Allowed Junior Lender Claims, up to the full amount of such claims. If there are any remaining Distributable Proceeds after payment in full of the Allowed Junior Lender Claims, such Distributable Proceeds will be paid to the Holders of General Unsecured Claims.

- If there is a Reorganization Transaction, the following will occur:

  o Each Holder of an Allowed DIP Lender Claim shall receive its Pro Rata share of Partial Asset Sale Proceeds, if any, up to the full amount of its Allowed DIP Lender Claim. To the extent there are any remaining amounts due and owing to the Holders of Allowed DIP Lender Claims, such Holders shall either (i) receive their respective Pro Rata share of (A) the Exit Term Loan Facility in the aggregate amount of the Converted DIP Facility Amount, (B) Cash equal to the Remaining DIP Facility Amount, and (C) the New Warrants, or (ii) be Paid in Full in Cash with the proceeds of an Acceptable Exit Facility.

  o Each Holder of an Allowed Senior Lender Claim shall receive its Pro Rata share of any Partial Asset Sale Proceeds, if any, after all Allowed DIP Lender Claims have been Paid in Full. To the extent there are any remaining amounts due and owing to the Holders of Allowed Senior Lender Claims, such Holders shall either (i) receive their respective Pro Rata share of (A) the Exit Term Loan Facility in the aggregate amount of the Converted Senior Facility Amount and (B) the New Warrants, or (ii) be Paid in Full in Cash with the proceeds of an Acceptable Exit Facility.

  o Each Holder of an Allowed Junior Lender Claim shall receive its Pro Rata share of any Partial Asset Sale Proceeds, if any, after all Allowed DIP Lender Claims and Allowed Senior Lender Claims have been Paid in Full. To the extent there are any remaining amounts due and owing to the Holders of Allowed Junior Lender Claims, such Holders shall receive their Pro Rata share of 100% of the Reorganized AAC Equity Interests, subject to dilution by the New Warrants and the Management Incentive Plan.

  o Holders of General Unsecured Claims shall not receive a recovery or distribution.

- In either an Entire Company Asset Sale or Reorganization Transaction, Holders of Interests in AAC Holdings shall not receive a recovery or distribution on account of such Interests.

The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each of the Debtors. ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## III.   EXECUTIVE SUMMARY

### A.   Chapter 11 Overview and this Disclosure Statement

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### B.   Voting on the Plan

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as Exhibit D.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### 1.      Holders of Claims Entitled to Vote on the Plan

The Plan constitutes a separate Plan proposed by each Debtor and the classifications set forth below shall be deemed to apply to each Debtor.  Each Class shall be deemed to constitute separate Sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such Sub-Class shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in section C of this Article III provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3, 4 and 5 (collectively, the "Voting Classes").  The Debtors are not soliciting votes from holders of Claims or Interests in Classes 1, 2, 6, 7, 8 or 9 because such Classes are deemed to accept or reject the Plan.

### 2.      Third Party "Opt-Out" Provisions of Ballots

As provided in the Solicitation and Voting Procedures, certain Holders of Claims in the Voting Classes may opt out of the Third Party Release set forth in Article X.F of the Plan.  In the event that you are a Holder of such a Claim and receive a notice that includes an "opt-out" provision, you may wish to review the Plan and seek legal advice concerning the effects of the Third Party Release on your Claim.  As to Holders of Claims in Class 5, under the terms of the Plan, if Class 5 is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, such Holders will not be "Releasing Parties" on account of such Class 5 Claims.  However, if Class 5 is not deemed to reject the Plan, each Holder of a Class 5 Claim shall be deemed to have consented to the Third Party Release, unless such Holder (a) votes to reject the Plan and completes the Opt-Out Form so it is received by the Voting/Opt-Out Deadline, or (b) if such Holder chooses not to vote on the Plan, such Holder completes the rest of the Ballot and completes the Opt-Out Form, so it is received by the Voting/Opt-Out Deadline.

### 3.      Voting Record Date

The Voting Record Date is August 26, 2020.  The Voting Record Date is the date on which it will be determined which holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim or Interest.

### 4. Ballots Not Counted

No ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent) or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

### 5. Claims Voting/Opt-Out Deadline

> **THE CLAIMS VOTING/OPT-OUT DEADLINE IS**
> **OCTOBER 1, 2020 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

### 6. Voting Instructions

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' notice and claims agent, Donlin, Recano & Company, Inc. (the "<u>Notice and Claims Agent</u>") by the Voting Deadline.

To vote, complete, sign, and date your ballot and return it *promptly* to one of the below addresses:

| If sent by first-class mail | If sent by hand delivery or overnight mail: |
|---|---|
| **Donlin, Recano & Company, Inc.**<br>**Re: AAC Holdings, Inc., et al.**<br>**P.O. Box 199043**<br>**Blythebourne Station**<br>**Brooklyn, NY 11219** | **Donlin, Recano & Company, Inc.**<br>**Re: AAC Holdings, Inc., et al**<br>**6201 15th Avenue**<br>**Brooklyn, NY 11219** |

PLEASE SELECT JUST ONE OPTION TO VOTE.
EITHER RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE
OR
VOTE VIA ELECTRONIC MAIL TO DRCVotes@DONLINRECANO.COM

Holders of Claims who cast a ballot via electronic mail to DRCVotes@DONLINRECANO.COM with "AAC BALLOTS" in the subject line should NOT also submit a paper Ballot.

FOR ANY BALLOT CAST VIA ELECTRONIC MAIL, A FORMAT OF THE ATTACHMENT MUST BE FOUND IN THE COMMON WORKPLACE AND INDUSTRY STANDARD FORMAT (*I.E.*, INDUSTRY-STANDARD PDF FILE) AND THE RECEIVED DATE AND TIME IN THE NOTICE AND CLAIMS AGENT'S INBOX WILL BE USED AS A TIMESTAMP FOR RECEIPT.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL FREE AT (877) 476-4387 OR VIA ELECTRONIC MAIL TO AACINFO@DONLINRECANO.COM.**

C.    **Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan**

The following table provides a summary of the anticipated recovery[5] to holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claims/Interests | Plan Treatment | Voting Rights | Projected Amount of Allowed Claims/Interests | Projected Plan Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | $3,400,000 | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | $417,000 | 100% |
| 3 | Senior Lender Claims | Impaired | Entitled to Vote | $55,698,866.82[6] | 100% |

---

[5]  The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed, as well as other factors related to the Debtors' business operations and general economic conditions.

[6]  The projected amount of Senior Lender Claims does not reflect postpetition interest, which shall be allowed pursuant to the Plan under section 506(b) of the Bankruptcy Code.

6

| Class | Claims/Interests | Plan Treatment | Voting Rights | Projected Amount of Allowed Claims/Interests | Projected Plan Recovery |
|-------|-----------------|----------------|---------------|---------------------------------------------|-------------------------|
| 4 | Junior Lender Claims | Impaired | Entitled to Vote | $450,593,283.62[7] | [●][8] |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote | $35,800,000[9] | 0% in the case of a Reorganization Transaction; 0%, or possibly more, in the case of an Entire Company Sale.[10] |
| 6 | Intercompany Claims | Unimpaired / Impaired[11] | Not Entitled to Vote | N/A | N/A |
| 7 | Subordinated Claims | Impaired | Deemed to Reject | Unknown | 0% |
| 8 | Intercompany Interests | Unimpaired/ Impaired[12] | Not Entitled to Vote | Unknown | N/A |
| 9 | Interests in AAC Holdings | Impaired | Deemed to Reject | Unknown | 0% |

### D.    Confirmation Hearing

The Bankruptcy Court has scheduled the Confirmation Hearing for **October 14, 2020 at 10:00 a.m. prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than **October 1, 2020 at 4:00 p.m. prevailing Eastern Time** in accordance

---

[7] The projected amount of the Junior Lender Claims does not reflect postpetition interest, which shall allowed pursuant to the Plan to the extent that the Junior Lender Claims are oversecured under section 506(b) of the Bankruptcy Code.

[8] As discussed in further detail below, the Debtors are presently engaged in a sale and marketing process in accordance with the Bidding Procedures. To ensure that the integrity of the sale and marketing process is preserved and value is maximized, the Debtors are not disclosing the expected recoveries for Junior Lender Claims at this time.  The Debtors will file, as part of the Plan Supplement, the expected recoveries to creditors under the Plan.

[9] This amount does not include any contingent, unliquidated and/or disputed litigation claims set forth in the Debtors' schedules of assets and liabilities.

[10] In the event of an Entire Company Asset Sale, the Debtors will include with the Plan Supplement additional disclosure setting forth the projected recovery to Holders of Class 5 General Unsecured Claims if the projected recovery is greater than 0%.

[11] See Article III.B.6 of the Plan 6 for scenarios in which Holders of Intercompany Claims may be Unimpaired and those in which they may be Impaired.

[12] See Article III.B.8 of the Plan for scenarios in which Holders of Intercompany Interests may be Unimpaired and those in which they may be Impaired.

7

with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### E.    Contact Information

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Donlin, Recano & Company, Inc., via one of the following methods:

| | |
|---|---|
| *By regular mail at:* | *By hand delivery or overnight mail at:* |
| Donlin, Recano & Company, Inc. | Donlin, Recano & Company, Inc. |
| Re: AAC Holdings, Inc., et al. | Re: AAC Holdings, Inc., et al. |
| P.O. Box 199043 | 6201 15th Avenue |
| Blythebourne Station | Brooklyn, NY 11219 |
| Brooklyn, NY 11219 | |
| | |
| *By telephone at:* (877) 476-4387 | *By facsimile at:* (212) 481-1416 |
| | |
| *By electronic mail at:* | |
| aacinfo@DonlinRecano.com | |

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the addresses above or by downloading the exhibits and documents from the website of the Notice and Claims Agent at https://www.donlinrecano.com/Clients/aac/index (free of charge).

## IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    AAC's Corporate History, Assets and Operations

A leading provider of inpatient and outpatient substance abuse treatment services, AAC treats adults struggling with drug addiction, alcohol addiction, and co-occurring mental/behavioral health issues.  In connection with its treatment services, AAC performs clinical diagnostic laboratory services and provides physician services to its clients.  AAC has developed the company and the American Addictions Centers national brand through substantial investment in its clinical expertise, facilities, professional staff, and national sales and marketing program.

*ACTIVE 52312155v1*

*Clinical Expertise and Services.* AAC maintains a research-based, disciplined treatment plan for all clients with schedules designed to engage the client in an enriched recovery experience. Its curriculum, which is peer reviewed and research-based, has been recognized as one of its program strengths by the Commission on Accreditation of Rehabilitation Facilities and the Joint Commission on the Accreditation of Healthcare Organizations, leaders in the promotion and accreditation of quality, value, and optimal outcomes of service. In addition, AAC offers a variety of forms of therapy types, settings, and related services that the National Institute on Drug Abuse has recognized as effective. AAC offers the following types of therapy, including but not limited to: motivational interviewing, cognitive behavioral therapy, rational emotive behavior therapy, dialectical behavioral therapy, solution-focused therapy, eye movement desensitization and reprocessing, and systematic family intervention. Its variety of therapy settings includes individual, group, and family therapies, recovery-oriented challenge therapies, expressive therapies (with a focus on music and art), equine and trauma therapies.

AAC also provides Medicated-Assisted Treatment ("MAT"), which is the use of FDA-approved medications, in combination with counseling and behavioral therapies, to provide a "whole-patient" approach to the treatment of substance use disorders. AAC believes that it is particularly effective for treating certain conditions such as opioid use disorder and alcohol use disorder. MAT is an important and integral treatment modality that AAC deploys when appropriate based upon individual patient needs.

As detailed below, AAC offers a full spectrum of treatment services to clients, based upon individual needs as assessed through comprehensive evaluations at admission and reevaluated throughout their participation in the program:

    a. *Detoxification ("detox")*. Detoxification is usually conducted at an inpatient facility for clients with physical or psychological dependence. Detoxification services are designed to clear toxins out of the body so that the body can safely adjust and heal itself after being dependent upon a substance. Clients are medically monitored 24 hours per day, seven days per week by experienced medical professionals who work to alleviate withdrawal symptoms through medication, as appropriate. AAC provides detoxification services for several substances including but not limited to alcohol, sedatives, and opiates.

    b. *Residential Treatment*. Residential care is a structured treatment approach designed to prepare clients to return to the general community with a sober lifestyle, increased functionality, and improved overall wellness. Treatment is provided on a 24 hours per day, seven days per week basis, and services generally include a minimum of two individual therapy sessions per week, regular group therapy, family therapy, didactic and psycho-educational groups, exercise (if cleared by medical staff), case management and recreational activities. Medical and psychiatric care is available to all clients, as needed, through AAC's contracted professional physician groups.

    c. *Partial Hospitalization.* Partial hospitalization is a structured program providing care a minimum of 20 hours per week. This program is designed for clients who are stable enough physically and psychologically to participate in everyday activities but who still require a degree of medical monitoring. Services include a minimum of weekly

individual therapy, regular group therapy, family education and therapy, didactic and psycho-educational groups, exercise (if cleared by medical staff), case management and off-site recovery meetings and activities. Medical and psychiatric care is available to all clients, as needed, through AAC's contracted professional physician groups.

d.  *Intensive Outpatient Services.*  Less intensive than the aforementioned levels of care, intensive outpatient services are comprised of a structured program providing care three days per week for three hours per day at a minimum.  Designed as a "step down" from partial hospitalization, this program reinforces progress and assists in the attainment of sobriety, reduction of detrimental behaviors and improved overall wellness of clients while they integrate and interact in the community.  Services include weekly individual therapy, group therapy, family education and therapy, didactic and psycho-educational groups, case management, off-site recovery meetings and activities, and intensive transitional and aftercare planning.

e.  *Outpatient Services.*  Traditional outpatient services are delivered in regularly scheduled sessions, usually less than nine hours per week.  Outpatient services include professionally directed screening, assessment, therapy, and other services designed to support successful transition to the community and long-term recovery.  These services are tailored to a person's specific needs and stage of recovery and may involve many modalities, including motivational enhancement, family therapy, educational groups, occupational and recreational therapy, psychotherapy, and pharmacotherapy.

f.  *Ancillary Services.*  In addition to inpatient and outpatient treatment services, AAC provides medical monitoring for adherence to addiction treatment as well as clinical diagnostic laboratory services.  AAC also provides physician services to its clients through its contracted professional physician groups.  It believes toxicological monitoring of clients is an important component of substance abuse treatment.  Clients are evaluated for illicit substances upon admission and thereafter on a random basis and as otherwise determined to be medically necessary by the treating physician.  AAC conducts laboratory testing for its facilities using quantitative liquid chromatography time-of-flight mass spectrometry technology at its laboratory located in Brentwood, Tennessee.

g.  *Sober Living Facilities.*  AAC provides sober living arrangements that serve as an interim environment for clients transitioning from inpatient treatment centers to lower levels of care and eventually back to their former living arrangements.  Sober living facilities enable AAC to utilize existing beds for clients requiring higher levels of care, while still providing housing for clients completing outpatient treatment programs.  AAC provides sober living arrangements to clients through AAC's owned and leased properties in Texas, Nevada, Mississippi, and Florida.  AAC plans to continue using sober living facilities as a complement to its outpatient services.

*Facilities.*  As of the Petition Date, and as set forth in greater detail in the table below, AAC operates a total of 26 facilities in eight states focused on delivering effective clinical care and treatment solutions across 1,360 inpatient and sober living beds located in California, Florida, Massachusetts, Mississippi, Nevada, New Jersey, Rhode Island, and Texas.

10

The following table presents information about AAC's network of substance abuse treatment facilities, including current facilities and facilities under development as of May 2020:

| Facility Name | State | Beds[13] | Property |
|---|---|---|---|
| *Residential*[14] | | | |
| AdCare Rhode Island | RI | 59 | Owned |
| AdCare Substance Abuse Hospital | MA | 114 | Owned |
| Desert Hope Treatment Center | NV | 148 | Owned |
| Greenhouse Treatment Center | TX | 130 | Owned |
| Laguna Treatment Hospital | CA | 93 | Owned |
| Oxford Treatment Center | MS | 124 | Owned |
| Recovery First Treatment Center | FL | 56 | Owned/Leased |
| River Oaks Treatment Center | FL | 162 | Owned |
| Sunrise House Treatment Center | NJ | 110 | Owned |
| **Total Residential Beds** | | **996** | |
| *Sober Living* | | | |
| Resolutions Arlington | TX | 157 | Leased |
| Resolutions Las Vegas | NV | 159 | Leased |
| Resolutions Oxford | MS | 48 | Owned |
| **Total Sober Living Beds** | | **364** | |
| **TOTAL RESIDENTIAL & SOBER LIVING BEDS** | | **1,360** | |

| Facility Name | State | Locations | Property |
|---|---|---|---|
| *Outpatient*[15] | | | |
| AdCare Outpatient Centers | MA/RI | 10 | Owned/Leased |
| Desert Hope Outpatient Center | NV | 1 | Leased |
| Greenhouse Outpatient | TX | 1 | Leased |
| Oxford Outpatient Center | MS | 1 | Owned |
| Sunrise House Outpatient | NJ | 1 | Owned |
| **TOTAL OUTPATIENT FACILITIES** | | **14** | |

*Professional Staff.* As of the Petition Date, AAC has approximately 2,000 employees. AAC's highly trained clinical staff deploys research-based treatment programs with structured curricula for detoxification, inpatient treatment, partial hospitalization, and intensive outpatient care.

AAC employs a variety of staff related to providing client care, including clinicians, case managers, social workers, therapists, medical technicians, housekeepers, cooks and drivers, among

---

[13] Bed capacity reflected in the table represents total available beds. Actual capacity utilized depends on current staffing levels at each facility and may not equal total bed capacity at any given time.

[14] Inpatient facilities generally have the ability to provide detox, residential, partial hospitalization, and intensive outpatient services.

[15] Outpatient facilities generally have the ability to provide partial hospitalization and intensive outpatient services.

others.  AAC also employs a professional sales force and staffs a centralized admissions center. AAC's corporate staff includes accounting, billing and finance professionals, corporate compliance, marketing and human resource personnel, IT staff, and senior management.

A majority of the employees at the Sunrise House Treatment Center in New Jersey are part of a labor union.  On June 14, 2017, Sunrise House Treatment Center entered into a three-year collective bargaining agreement with the union that has been extended until September 11, 2020. None of AAC's other employees are represented by a labor union or covered by a collective bargaining agreement.

The Professional Entities (defined below) engage physicians and mid-level service providers to provide professional services to AAC's clients through professional services agreements with each treatment facility.  Under the professional services agreements, the Professional Entities also provide a physician to serve as medical director for the applicable facility.

***Sales and Marketing.***  AAC uses a multi-faceted approach to reach potential clients suffering from the disease of addiction and co-occurring psychiatric disorders.  This multi-pronged approach includes, among other things, national marketing, multi-media marketing, and recommendations by alumni.  AAC deploys and manages a national marketing force, a group of approximately 100 representatives nationwide that focuses primarily on developing relationships with hospitals, other treatment facilities, psychiatrists, therapists, social workers, employers, unions, alumni and employee assistance programs.  Its sales representatives educate these various constituents about the disease of addiction and the variety of treatment services that the company provides.

In addition, AAC advertises through various media to obtain new clients as well as to develop a national brand.  AAC operates a broad portfolio of internet assets that service millions of website visits each month.  Through comprehensive online directories of treatment providers, treatment provider reviews, user content that discusses the disease of addiction, treatment and recovery, as well as discussion forums and professional communities, AAC's addiction-related websites serve families and individuals who are struggling with addiction and seeking treatment options.   Additionally, AAC continues to pursue advertising opportunities in television commercials, radio spots, newspaper articles, medical journals, and other print media that promote its facilities and have the intent to build its integrated, national brand.

***Incorporation of AAC Holdings, Inc. and Operations.***  Debtor AAC Holdings, Inc. ("AAC Holdings") was incorporated as a Nevada corporation on February 12, 2014 for the purpose of acquiring the common stock of Debtor American Addiction Centers, Inc. ("AAC, Inc.") and to engage in certain reorganization transactions in connection with the initial public offering of AAC Holdings' common stock, which was completed in October 2014.  AAC, Inc. was founded by Michael Cartwright and incorporated as a Nevada corporation on February 27, 2007.

In December 2014, AAC made its first acquisition as a public company, acquiring Recovery First Inc., a Florida-based substance abuse and rehab services company.  In 2015, AAC acquired several sites in California, Mississippi, New Jersey, and Rhode Island, as well as two digital marketing firms focused on publishing online content on substance abuse.  By 2018, AAC was

12

operating 12 residential treatment centers and 18 outpatient facilities, and reported a revenue of almost $296 million.

In 2018, AAC acquired AdCare, Inc. ("AdCare"), a 114-bed hospital in Worcester, Massachusetts that also operates five outpatient centers in Massachusetts and a 59-bed residential treatment center and two outpatient centers in Rhode Island. AdCare participates in both Medicare and Medicaid, and the acquisition, therefore, significantly increased AAC's overall participation in governmental payor programs. AdCare was purchased for total consideration of $85.1 million (the "AdCare Acquisition"), subject to certain agreed-to adjustments including a promissory note in the aggregate principal amount of approximately $9.6 million (the "AdCare Note").[16]

The corporate organizational structure of the Debtors is depicted on the chart attached hereto as **Exhibit C**. AAC Holdings is managed by existing management and a board of directors (the "Board") consisting of seven directors, including five independent directors. AAC Holdings is a holding company for AAC, Inc. and AAC Healthcare Network, Inc. ("AAC Healthcare"). AAC, Inc. and AAC Healthcare own all of the operating subsidiaries.

AAC, Inc. owns the following subsidiaries:

a. AAC Dallas Outpatient Center, LLC d/b/a Greenhouse Outpatient Center;
b. AAC Las Vegas Outpatient Center, LLC d/b/a Desert Hope Outpatient Center;
c. ABTTC, LLC;
d. B&B Holdings Intl LLC;
e. Behavioral Healthcare Realty, LLC;
f. BHR Aliso Viejo Real Estate, LLC d/b/a Resolutions San Diego;
g. BHR Greenhouse Real Estate, LLC d/b/a Resolutions Arlington;
h. BHR Oxford Real Estate, LLC d/b/a Resolutions Oxford;
i. BHR Ringwood Real Estate, LLC d/b/a Resolutions Franklin;
j. Clinical Revenue Management Services, LLC;
k. Concord Real Estate, LLC d/b/a Resolutions Las Vegas;
l. Concorde Treatment Center, LLC d/b/a Desert Hope Center;
m. FitRX, LLC;
n. Forterus Health Care Services, Inc.;
o. Greenhouse Treatment Center, LLC d/b/a The Greenhouse;
p. Laguna Treatment Hospital, LLC;
q. New Jersey Addiction Treatment Center, LLC d/b/a Sunrise House;
r. Oxford Outpatient Center, LLC;
s. Oxford Treatment Center, LLC;
t. Recovery Brands, LLC;

---

[16] The purchase price was comprised of (i) approximately $66.8 million in cash, excluding expenses and other adjustments, (ii) approximately $5.4 million in shares of AAC Holdings' common stock (or 562,051 shares at $9.68 per share), (iii) the AdCare Note, and (iv) contingent consideration valued at $500,000 initially recorded in accrued and other current liabilities. AAC acquired $2.7 million of cash on hand at AdCare, which was returned to the seller within 60 days of the acquisition as required by the Purchase Agreement.

13

u.  Recovery First of Florida, LLC d/b/a Recovery First d/b/a Recovery First Fort Lauderdale East;
v.  Referral Solutions Group, LLC;
w.  River Oaks Treatment Center, LLC;
x.  San Diego Addiction Treatment Center, Inc.;
y.  Singer Island Recovery Center LLC;
z.  Sober Media Group, LLC;
aa. Solutions Treatment Center, LLC d/b/a Solutions Recovery;
bb. Taj Media, LLC d/b/a RankLab Interactive; and
cc. The Academy Real Estate, LLC.

AAC Healthcare owns the following subsidiaries, including AdCare:

a.  AdCare Criminal Justice Services, Inc.;
b.  AdCare Hospital of Worcester, Inc.;
c.  AdCare, Inc.;
d.  AdCare Rhode Island, Inc.;
e.  Addiction Labs of America, LLC;
f.  Diversified Healthcare Strategies, Inc.;
g.  Green Hill Realty Corporation;
h.  Lincoln Catharine Realty Corporation;
i.  RI – Clinical Services, LLC;
j.  Sagenex Diagnostics Laboratory, LLC; and
k.  Tower Hill Realty, Inc.

Six affiliates of AAC are professional associations or professional corporations under applicable state law (collectively, the "Professional Entities").[17]  During the years 2014 through 2016, the Professional Entities each entered into separate agreements with AAC (collectively, the "Agreements").  The Agreements state that AAC will provide management, administrative, and consulting services to the Professional Entities' medical practices and various systems designed to support the medical practices but strictly preserve the practice of medicine to the Professional Entities.

AAC has a centralized corporate office located in Brentwood, Tennessee that houses its accounting, billing and collections, corporate compliance, information technology, legal and centralized marketing offices, as well as its call center and admissions center.

The admissions center, open 24 hours per day, seven days per week, focuses on enrolling clients.  As part of its role, the admissions center team conducts benefits verification, handles initial communication with insurance companies, completes client intake screenings, consults with

---

[17]  The Professional Entities are as follows:  Grand Prairie Professional Group, P.A.; Las Vegas Professional Group - Calarco, P.C.; Oxford Professional Group, P.C.; Palm Beach Professional Group, Professional Corporation; Pontchartrain Medical Group, A Professional Corporation; and San Diego Professional Group, P.C.  These Professional Entities are also loan parties and guarantors under the prepetition loan documents, and each are debtors in these Chapter 11 Cases.  Brentwood Professional Group, P.C. is also an affiliate of AAC and a professional entity, but it is not a loan party, guarantor or debtor in the Chapter 11 Cases.

14

AAC's clinicians where necessary regarding a potential patient's specific medical or psychological condition, begins the pre-certification process for treatment authorization, helps each client choose a proper treatment facility for his or her clinical and financial needs, and assists clients with arrangements and logistics.

The Debtors also have a clinical laboratory facility in Brentwood, Tennessee that performs high complexity testing, COVID-19 testing, quantitative drug testing, and other laboratory services. The laboratory holds a certificate of accreditation from the Clinical Laboratory Improvement Amendments of 1988 certifying it for complex testing, and the laboratory is therefore required to meet more stringent requirements than laboratories performing less complex testing. The facility is regularly subject to survey and inspection to assess compliance with program standards. In addition, the laboratory is also accredited by the College of American Pathologists.

## B.    The Debtors' Management Team

AAC Holdings is managed by existing management and the Board.

Michael Cartwright co-founded the Debtors in 2012 and currently serves as Chairman of the Board. With over 20 years of experience, he is a noted behavioral health expert, author and entrepreneur whose treatment philosophy is based on his expertise and involvement in 15 federally funded research studies on dual diagnosis and addiction.

Chief Executive Officer Andrew McWilliams joined the company as Chief Accounting Officer in August 2014. From October 1998 through August 2014, Mr. McWilliams worked as an auditor with Ernst & Young LLP, a national public accounting firm. During his tenure with Ernst & Young, Mr. McWilliams served multiple healthcare clients and also gained experience across a variety of corporate transactions, including public offerings of securities and mergers and acquisitions.

Karen Abbott, Chief Legal Officer & Chief Compliance Officer, brings a wealth of experience to her position, having been in healthcare for the majority of her career. Most recently, Karen was Sr. Vice President, Senior Counsel and Chief Compliance Officer at Diversicare Health Services. Prior to that, she was the Chief Administrative Lawyer, Vice President, Associate General Counsel & Assistant Corporate Secretary with IASIS Healthcare Corporation (now Steward Health Systems, LLC) where she held progressive legal positions in the company beginning in 1999.

## C.    The Special Restructuring Committee

Prior to the Petition Date, on January 11, 2020, the Board approved the charter of the Special Restructuring Committee (the "Special Restructuring Committee"). The Special Restructuring Committee is comprised of Lucius E. Burch and two independent directors, T. Michael Logan and Scott Vogel (collectively, the "Special Restructuring Committee Members"). The Special Restructuring Committee's duties and responsibilities include (i) negotiating with the Debtors' creditors, (ii) examining and informing the Board regarding the sale or disposition of the Debtors' assets, (iii) effectuating the restructuring of the Debtors, (iv) coordinating with the management of the Debtors to effectuate said restructuring, (v) directing and working with the

15

Debtors' professionals, and (vi) performing such other duties as may be assigned by the Board to the Special Restructuring Committee from time to time.

On July 18, 2020, the Debtors filed an application to retain Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") as counsel to the Special Restructuring Committee [Docket No. 166].  On August 5, 2020, the Bankruptcy Court entered an order authorizing the retention of Cleary Gottlieb [Docket No. 372].

### D.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had prepetition secured indebtedness in the aggregate principal amount in excess of $363.6 million, plus accrued and unpaid interest and fees, consisting of two credit facilities (together, the "Prepetition Credit Facilities") as described further herein.

***The Prepetition Junior Lien Facility.*** Pursuant to that certain Credit Agreement, dated as of June 30, 2017 (as amended, supplemented, restated or otherwise modified from time to time prior to, and as in effect on, the Petition Date, the "Prepetition Junior Lien Credit Agreement", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, that certain Prepetition Intercreditor Agreement[18] and that certain Forbearance Agreement dated as of October 30, 2019 (as amended, supplemented or otherwise modified from time to time) among the Junior Lien Loan Parties (as defined below), the lenders constituting Required Lenders under the Prepetition Junior Lien Credit Agreement party thereto and the Junior Agent, collectively, the "Junior Lien Loan Documents") by and among AAC Holdings, as borrower (the "Junior Lien Borrower"), each of the Debtors party thereto, as guarantors (the "Junior Lien Guarantors", and together with the Junior Lien Borrower, the "Junior Lien Loan Parties"),[19] the lenders party thereto (collectively, the "Junior Lenders"), and Ankura (as successor by assignment to Credit Suisse AG), as administrative agent (in such capacity, the "Junior Administrative Agent") and collateral agent (in such capacity, the "Junior Collateral Agent", and together with the Junior Administrative Agent, collectively, the "Junior Agent"), the Junior Lenders provided a credit facility (the "Prepetition Junior Lien Facility") to the Junior Lien Borrower.

The Debtors, as the Junior Lien Loan Parties, granted to the Junior Agent, for the benefit of itself and the Junior Lenders, liens, mortgages and security interests (collectively, the "Prepetition Junior Facility Liens") in all "Collateral" as defined in the Prepetition Junior Lien Credit Agreement (collectively, the "Prepetition Junior Lien Collateral").

---

[18]   The relative rights and remedies of the Prepetition Secured Parties and the relative priority of their respective security interests in any shared or common Prepetition Collateral are governed by that certain Intercreditor Agreement dated as of March 8, 2019 (as amended, supplemented or otherwise modified from time to time) by and among the Debtors, the Senior Lien Agent and the Junior Lien Agent (the "Prepetition Intercreditor Agreement").

[19]   The following Debtors are not Junior Lien Guarantors and are therefore not Junior Lien Loan Parties:  ABTTC, LLC; AdCare Criminal Justice Services, Inc.; B&B Holdings Intl LLC; Clinical Revenue Management Services, LLC; Diversified Healthcare Strategies, Inc.; FitRX, LLC; Singer Island Recovery Center LLC; and Taj Media LLC.

16

The Prepetition Junior Lien Facility initially provided for (a) a term loan (the "Junior Lien Term Loan") in the aggregate principal amount of $210 million with a stated maturity of June 30, 2023, and (b) a revolving line of credit (the "Junior Lien Revolver") in the aggregate principal amount of $40 million with a stated maturity of June 30, 2022. The Prepetition Junior Lien Facility also provided for standby letters of credit in an aggregate undrawn amount not to exceed $7.0 million. The Junior Lien Term Loan required scheduled quarterly principal repayments in an amount equal to $1.7 million for September 30, 2017 through June 30, 2019 and $3.4 million for September 30, 2019 through March 31, 2023, with the remaining principal balance of the Junior Lien Term Loan due on the maturity date of June 30, 2023. The Junior Lien Term Loan was fully drawn on June 30, 2017.

The Prepetition Junior Lien Facility also included an incremental facility providing for additional term loans in an aggregate principal amount of up to $25 million and additional revolving commitments in an aggregate principal amount of up to $15 million (the "Incremental Revolver").

The proceeds of the Junior Lien Term Loan were used by the Debtors to (a) prepay all existing indebtedness under (i) the Debtors' 2015 senior secured credit facility with Bank of America, N.A, then outstanding in the aggregate approximate amount of at least $140 million and (ii) two subordinated financing facilities with affiliates of Deerfield Management Company in the aggregate approximate amount of $50 million (the "2015 Subordinated Debt"), (b) to pay transaction costs associated with the foregoing, and (c) for general corporate purposes. The proceeds of the Junior Lien Revolver drawn at closing were used to pay the consent fee of approximately $3 million due in connection with calling the 2015 Subordinated Debt, to pay transaction costs associated with the foregoing, and for general corporate purposes.

In addition, in conjunction with AAC Holdings' acquisition of AdCare, (a) on September 25, 2017, the Junior Lien Loan Parties incurred the Incremental Revolver thereby increasing the Junior Lien Revolver from $40 million to $55 million, and (b) on March 1, 2018, the Junior Lien Loan Parties secured a $65 million incremental term loan commitment under the Prepetition Junior Lien Facility.

As of the Petition Date, the Debtors were indebted to the Junior Lenders under the Prepetition Junior Lien Facility in the aggregate principal amount of $316,612,692.97, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Junior Lien Loan Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, make wholes, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements of the Junior Lenders and the Junior Agent), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the Junior Lien Loan Documents (collectively, the "Prepetition Junior Lien Obligations").

***The Prepetition Senior Lien Facility.***  Pursuant to that certain Credit Agreement dated as of March 8, 2019 (as amended, supplemented, restated or otherwise modified from time to time prior to, and as in effect on, the Petition Date, the "Prepetition Senior Lien Credit Agreement", and together with all other agreements, documents, instruments and certificates executed or

*ACTIVE 52312155v1*

delivered in connection therewith, including that certain Prepetition Intercreditor Agreement and that certain Forbearance Agreement dated as of October 30, 2019 (as amended, supplemented or otherwise modified from time to time) among the Senior Lien Loan Parties (as defined below), the lenders constituting Required Lenders under the Prepetition Senior Lien Credit Agreement party thereto and the Senior Agent, collectively, the "Senior Lien Loan Documents", and together with the Junior Lien Loan Documents, the "Prepetition Loan Documents") by and among AAC Holdings, as borrower (the "Senior Lien Borrower"), the guarantors party thereto (the "Senior Lien Guarantors", and together with the Senior Lien Borrower, the "Senior Lien Loan Parties", and together with the Junior Lien Loan Parties, the "Prepetition Loan Parties"),[20] the lenders party thereto (collectively, the "Senior Lenders", and together with the Junior Lenders, the "Prepetition Lenders") and Ankura (as successor by assignment to Credit Suisse AG), as administrative agent (in such capacity, the "Senior Administrative Agent") and collateral agent (in such capacity, the "Senior Collateral Agent", and together with the Senior Administrative Agent, collectively, the "Senior Agent", and together with the Junior Agent, the "Prepetition Agents", and collectively with the Prepetition Lenders, the "Prepetition Secured Parties"), the Senior Lenders provided a credit facility (the "Prepetition Senior Lien Facility") to the Senior Lien Borrower. The Prepetition Senior Lien Facility initially provided for a term loan in the principal amount of $30 million and matured on its original term on April 15, 2020.

The Debtors, as the Senior Lien Loan Parties, granted to the Senior Agent, for the benefit of itself and the Senior Lenders, properly perfected continuing liens, mortgages and security interests (collectively, the "Prepetition Senior Facility Liens") in all "Collateral" as defined in the Prepetition Senior Lien Credit Agreement (collectively, the "Prepetition Senior Lien Collateral", and together with the Prepetition Junior Lien Collateral, the "Prepetition Collateral").

Contemporaneously with the Senior Lien Loan Parties' entry into the Prepetition Senior Lien Facility, on March 8, 2019, the Junior Lien Loan Parties entered into that certain Amendment and Waiver No. 1 to Credit Agreement with the Required Lenders under the Prepetition Junior Lien Credit Agreement and the Junior Agent, which amended the Prepetition Junior Lien Facility to, among other things, (a) increase the interest rate on the Junior Lien Term Loans, (b) increase the commitment fee for the undrawn portion of the Junior Lien Revolver, (c) provide that, upon repayment of all indebtedness under the Prepetition Senior Lien Facility, the Prepetition Loan Parties must use proceeds from the sale or disposition of certain Prepetition Collateral to prepay outstanding Junior Lien Obligations, including payment of certain prepayment premiums, and (d) revise certain financial covenants, including a maximum senior secured coverage ratio and budgeting and reporting covenants, to mirror those contained in the Prepetition Senior Credit Facility.

***Incremental Funding Under the Prepetition Senior Lien Facility and Entry into Forbearance.*** On October 30, 2019, the Debtors entered into amendments to each of the Prepetition Credit Facilities, which (a) provided for additional term loans under the Prepetition Senior Lien Facility from certain Senior Lenders in the aggregate amount of $5 million and (b) amended the Prepetition Junior Lien Facility to allow for such additional funding capacity

---

[20] The following Debtors are not Senior Lien Guarantors and are therefore not Senior Lien Loan Parties: ABTTC, LLC; AdCare Criminal Justice Services, Inc.; B&B Holdings Intl LLC; Clinical Revenue Management Services, LLC; Diversified Healthcare Strategies, Inc.; FitRX, LLC; Singer Island Recovery Center LLC; and Taj Media LLC.

*ACTIVE 52312155v1*

under the Prepetition Senior Lien Facility.  In connection with the October 30, 2019 amendments and incremental funding under the Prepetition Senior Lien Facility, the Prepetition Loan Parties entered into forbearance agreements (together, the "Forbearance Agreements") with the Prepetition Agents and the requisite lenders under each of the Prepetition Credit Facilities (collectively, the "Forbearing Lenders"), pursuant to which the Forbearing Lenders agreed, among other things, to forbear from exercising their remedies under the Prepetition Credit Facilities that would have otherwise been available due to existing events of default through March 31, 2020.

On January 9, 2020, the Forbearing Lenders delivered to the Debtors a notice of the termination of the forbearance periods under the Forbearance Agreements (the "Forbearance Periods") due to, among other things, the occurrence of certain events of default under the Prepetition Credit Facilities and termination events under the Forbearance Agreements.

On January 24, 2020, the Debtors entered into further amendments to each of the Prepetition Credit Facilities, which (a) provided for additional term loans under the Prepetition Senior Lien Facility from certain Senior Lenders in an aggregate principal amount equal to $12 million, $10 million of which was funded at closing of such amendments, and $2 million of which was funded on February 26, 2020 and (b) amended the Prepetition Junior Lien Facility to allow for such additional funding under the Prepetition Senior Lien Facility.  Accordingly, as of the Petition Date, the Debtors were indebted to the Senior Lenders under the Prepetition Senior Lien Facility in the aggregate principal amount of $47,000,000, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Senior Lien Loan Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, make wholes, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements of the Senior Lenders and the Senior Agent), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the Senior Lien Loan Documents (collectively, the "Prepetition Senior Lien Obligations", and together with the Prepetition Junior Lien Obligations, the "Prepetition Obligations").

In connection with the January 2020 amendments to the Prepetition Credit Facilities and incremental funding under the Prepetition Senior Lien Facility, the Debtors and the Forbearing Lenders entered into amendments to each of the Forbearance Agreements pursuant to which the Forbearing Lenders agreed, among other things, to forbear from exercising their remedies under the Prepetition Credit Facilities that would have otherwise been available due to existing events of default through March 31, 2020.  On March 31, 2020, the Forbearance Agreements terminated in accordance with their terms.  In June 2020, prior to the Petition Date, the Prepetition Lenders gave notice of acceleration of the Prepetition Obligations.

***Financing Lease Obligation.*** On August 9, 2017, AAC closed on a sale-leaseback transaction with MedEquities Realty Operating Partnership, LP, a subsidiary of MedEquities Realty Trust, Inc. ("MedEquities"),[21] for $25.0 million (the "2017 Sale-Leaseback"), in which MedEquities purchased from subsidiaries of AAC two drug and alcohol rehabilitation outpatient

---

[21] On May 17, 2019, Omega Healthcare Investors, Inc. acquired of all of the outstanding shares of MedEquities.

facilities and two sober living facilities: the Desert Hope Facility and Resolutions Las Vegas, each located in Las Vegas, Nevada, and the Greenhouse Facility and Resolutions Arlington, each located in Arlington, Texas (collectively, the "Sale-Leaseback Facilities").

Simultaneously with the sale of the Sale-Leaseback Facilities, AAC, through its subsidiaries and MedEquities, entered into an operating lease, dated August 9, 2017, pursuant to which AAC would continue to operate the Sale-Leaseback Facilities. The operating lease provides for a 15-year term for each facility with two separate renewal terms of five years each if AAC chooses to exercise its right to extend the lease term. The initial annual minimum rent payable from AAC to MedEquities is $2.2 million due in equal monthly installments of $0.2 million. On the first, second and third anniversary of the lease date, the annual rent will increase 1.5% from the annual rent in effect for the immediately preceding year. On the fourth anniversary of the lease date and thereafter during the lease term, the annual rent will increase to the amount equal to the CPI Factor (as defined in the lease) multiplied by the annual rent in effect for the immediately preceding year; provided, however, that the adjusted annual rent increase will always be between 1.5% and 3.0%.

*Capital Lease Obligations.* AAC has capital leases with third party leasing companies for vehicles, copiers, and equipment. The capital leases have maturity dates in July 2021 and January 2024. The total obligations under the capital leases as of March 31, 2020 were approximately $485,281, of which $138,015 was included in the current portion of long-term debt.

*Subordinated Note.* On March 1, 2018, in conjunction with the AdCare Acquisition, AAC issued the AdCare Note to the seller in the original principal amount of $9.6 million, with a stated maturity of September 29, 2023 and with a fixed interest rate per annum equal to 5.0%, compounded annually. Payments of principal and interest pursuant to the AdCare Note commenced on April 30, 2018. The obligations under the AdCare Note are not guaranteed by any of the other Debtors.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Financial Difficulties

Beginning in the fourth quarter of 2018 and continuing into the first quarter of 2019, AAC took steps to consolidate and divest certain of its markets, reduce corporate staff and administrative expenses, and increase operational efficiency. On December 1, 2018, it ceased operations at its 36-bed sober-living center and outpatient center in San Diego, California, consolidating its operations with its Laguna Treatment Hospital. During the fourth quarter of 2018, AAC also announced that it was seeking strategic alternatives for its Louisiana operations, which it subsequently sold pursuant to a Membership Interest Purchase Agreement with an effective date of January 28, 2019 among AAC, Inc., Avenues Recovery Center of Louisiana, LLC, and certain affiliates of such parties.

While AAC has had ongoing financial difficulties, 2019 was a particularly difficult year. Specifically, changes in liquidity had a material adverse effect on AAC's assets, business, cash flow, financial condition, prospects, and the results of operations despite AAC implementing cost-savings initiatives, targeting to sell the company's real estate, exploring potential recapitalization, and obtaining additional financing.

In February 2019, AAC instituted actions to reduce bed count and staffing in its Las Vegas, Nevada market by consolidating its Solutions Recovery treatment operations into those of its Desert Hope operations. Earlier in 2018, AAC consolidated its Clinical Services of Rhode Island outpatient centers into AdCare's Rhode Island outpatient operations. It also consolidated diagnostic test operations, moving laboratory operations in Louisiana to Tennessee. During the fourth quarter of 2018 and the first quarter of 2019, AAC also conducted reductions in force at its corporate headquarters in Brentwood, Tennessee and at certain of its facilities. These expense savings initiatives completed in the second half of 2018 and into the 1st quarter of 2019 reduced operating expenses by over $30 million annually, but were not enough to significantly improve liquidity.

To fund acquisition development and operational strategies, AAC entered into the Prepetition Senior Lien Facility. AAC has historically relied on debt financing to partially fund its acquisitions, *de novo* projects, facility expansions, and operations. AAC's level of indebtedness has made it more difficult for AAC to satisfy its obligations with respect to its indebtedness, resulting in defaults on, and acceleration of, such indebtedness. In addition, dedicating a substantial portion of its cash flows from operations to debt service obligations has reduced the availability of such cash flows to fund working capital, capital expenditures, and other general corporate requirements and to carry out other aspects of its business.

To continue operations and be able to discharge its liabilities and commitments in the normal course of business, AAC decided it must do some or all of the following: (i) improve operating results by increasing census while maintaining efficiency regarding operating expenses through the cost savings initiatives implemented in late 2018 and early 2019; (ii) execute strategic alternatives related to its real-estate portfolio which could include further sale leasebacks of individual facilities or larger portions of the real estate portfolio; (iii) sell additional non-core or non-essential assets; and/or (iv) obtain additional financing.

Prior to the Petition Date, AAC explored several of these alternatives, including engaging Cantor Fitzgerald & Co. ("CF&CO") as investment banker to assist with potential strategic corporate transactions involving the company's real estate and other assets, as well as potential recapitalization. A more detailed description of the marketing and sale process led by CF&CO is set forth in Article VI.I of this Disclosure Statement. While CF&CO explored options to improve the balance sheet, particularly through monetizing the value of AAC's real estate portfolio and evaluating assets for a recapitalization, its efforts did not result in a transaction prior to the Petition Date.

AAC is currently unable to pay all of its debts that matured, including the Prepetition Senior Lien Facility in the aggregate principal amount of $47,000,000, and the Forbearance Agreements have expired. As a result, the Prepetition Loan Obligations are immediately due and payable. AAC's current level of cash on hand, internally generated cash flows, and borrowings under its credit facilities are not sufficient to fund its working capital needs, debt service and repayment obligations, and capital expenditures, especially without anticipated proceeds from sale-leaseback transactions and limited access to debt and capital markets due to its leverage capacity, existing debt agreements, credit ratings, and general market conditions.

21

### B.     COVID-19

Beginning in late March and early April of 2020, AAC faced challenges due to the Coronavirus Disease 2019 pandemic ("COVID-19").  AAC experienced a decline in inpatient admissions and outpatient visits as a result of the virus and the measures undertaken to combat the virus, including mandatory stay-at-home orders, restrictions on travel, supply chain disruptions, and preventive measures to ensure that facilities remain coronavirus-free.  These measures have had and will continue to have an adverse impact on the Debtors.  While cash on hand became more limited and access to credit became more restricted, AAC's costs rose during this difficult economic time.  AAC expended significant time and resources in ensuring that its facilities remained open and had sufficient staff and personal protective equipment to keep their patients and staff safe during the pandemic.

After carefully and deliberately evaluating the economic needs of its operations, AAC filed a borrower application under the Paycheck Protection Program ("PPP"), established by section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  On May 2, 2020, AAC received funds in the amount of $10 million from Bank of America, N.A.  AAC believes it has used these funds in strict compliance with PPP and CARES Act requirements and regulations prior to the filing of these Chapter 11 Cases.  AAC intends to submit a loan forgiveness application for the full principal amount of the loan guaranteed under the PPP.  Despite this financial assistance, AAC continued to experience financial distress related to COVID-19 and liquidity issues.  In May, admissions started to improve, but had not yet returned to pre-COVID-19 levels.  Notwithstanding these challenges, the ongoing pandemic has presented AAC with opportunities related to conducting COVID-19 testing at its clinical laboratory facility for patients, staff and third parties and the expansion of outpatient services through the use of telemedicine offerings.

Despite the financial and operational disruptions caused by the COVID-19 crisis, AAC remains open and committed to individuals struggling with addiction, while enforcing safety and prevention as a top priority in regards to COVID-19.  AAC is strictly following recommendations from the U.S. Centers for Disease Control and Prevention ("CDC") and the World Health Organization ("WHO") and taking as many proactive actions as possible to protect current and future patients and staff.  In late February, AAC's executive team began meeting almost daily to address the emerging concerns surrounding COVID-19.  In early March, corporate management and local facility management developed and implemented a comprehensive plan focusing on key areas of concern and creating the Health Protection Committee ("HPC").

HPCs have been established at each facility to ensure hygiene and safety measures are consistently in place and followed.  Working with the Chief Executive Officer, the Chief Medical Officer, the Chief Compliance Officer, the Vice President of Human Capital and the Chief of Staff, the HPC at each facility ensures a coordinated company response to any concerns and establishes protective protocols in the event that the health of patients or employees may have been compromised as a result of COVID-19.  The HPC works directly and daily with the Chief Medical Officer to implement and enforce the most up-to-date procedures as the coronavirus information evolves.  AAC is maintaining its already stringent daily cleaning and disinfecting processes along with regularly scheduled deep cleanings and closely monitoring the health of patients and staff.  As a condition to admission, all incoming patients must be tested for COVID-19 and quarantined

22

from the facility population, which restricts bed availability. AAC is constantly following and updating procedures and policies as necessary in line with guidance from the CDC and the WHO, as well as federal and state authorities. AAC remains committed to supporting its patients and their families who suffer from and are directly impacted by the disease of addiction during this unprecedented global health crisis.

AAC has remained open during the pandemic to assist in saving the lives of some of the most vulnerable people in need of care at a time when anxiety, depression, social isolation and uncertainty exasperates their disease of addiction. James Carroll, the Director of the White House Office of National Drug Control Policy, recognized in a letter to healthcare professionals that treatment of substance use disorders, or "SUDs", is an "essential medical service" and "[d]uring these uncertain times, it is important that the Debtors not lose sight of the very vulnerable population suffering from SUDs." His letter emphasized that these crucial services must remain available during the pandemic and that personal protective equipment is needed for those caring for these patients. Accordingly, during the COVID-19 crisis, AAC continues to focus on providing critical treatment services for a disease that claims thousands of lives every year while making every effort to keep patients and employees safe and protected with preventative measures. AAC believes that addiction care must be reinforced, instead of postponed, to avoid complications of both substance use disorders and COVID-19 and to prevent the transmission of the coronavirus.

### C.    The Restructuring Support Agreement and DIP Financing

Prior to commencing these Chapter 11 Cases, the Debtors entered into the Restructuring Support Agreement with Prepetition Lenders holding in excess of 89% in aggregate principal amount of the loans outstanding under Prepetition Senior Lien Facility and 60% of loans outstanding under the Prepetition Junior Lien Facility (collectively, the "Initial Consenting Lenders"). The Restructuring Support Agreement and the plan term sheet attached thereto set forth the material terms for a consensual restructuring, including (a) a post-petition continuation of the pre-petition marketing process for the sale of the Debtors' assets, (b) certain case milestones that must be satisfied, including seeking and obtaining approval of the DIP Facility (described below), seeking and obtaining approval of bidding procedures, filing a pre-negotiated plan of reorganization and disclosure statement in connection therewith, and obtaining approval of the disclosure statement and order confirming the Plan, (c) proposed treatment for holders of claims and interests, and (d) mutual releases and exculpation by and among the parties thereto.

In addition, certain Prepetition Lenders signed a commitment letter pursuant to which they agreed to provide debtor in possession financing in an aggregate amount of up to $62.5 million (the "DIP Facility"), including up to $25.5 million on an interim basis, subject to the terms thereof. The transactions contemplated by the Restructuring Support Agreement, including the DIP Facility more fully described herein, are designed to allow the Debtors to emerge from these cases as a viable enterprise going forward.

The Debtors filed the Chapter 11 Cases to restructure their businesses, enhance liquidity, and bolster their long-term growth prospects and operating performance. The Plan represents the successful culmination of months of restructuring efforts and numerous compromises and gives the Debtors the best opportunity to withstand current adverse market conditions, generate

23

sufficient liquidity to fund their operations, and maximize value for the benefit of their stakeholders.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly.  The Restructuring Support Agreement and the DIP Facility include the following milestones:

- file the Disclosure Statement, the motion for approval of the Disclosure Statement, the form of ballots, and the Solicitation procedures, and the Plan with the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-five (35) calendar days after the Petition Date or July 25, 2020);

- obtain entry of the Final DIP Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-five (35) calendar days after the Petition Date or July 25, 2020);

- obtain entry of the Bidding Procedures Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than forty (40) calendar days after the Petition Date or July 30, 2020);

- obtain entry of the Disclosure Statement Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than August 31, 2020);

- obtain entry of the Confirmation Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than October 14, 2020); and

- cause the Effective Date to occur as soon as reasonably practicable after the Petition Date (but in no event later than October 29, 2020 (the "Outside Date").

No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable contemplated by these milestones.

### B.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of J. Jette Campbell, Chief Restructuring Officer, in Support of Chapter 11*

*Petitions and First Day Pleadings* and *the Supplemental Declaration of J. Jette Campbell, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Pleadings* (collectively, the "First Day Declaration"), both of which are incorporated herein by reference [Docket Nos. 3 and 44]. The relief granted as part of the First Day Motions included:

- Joint administration of the Chapter 11 Cases;

- Retention of Donlin, Recano & Company as the claims and noticing agent;

- Waiver of the requirement to file an equity security holders list, authorization to file a consolidated list of creditors and consolidated top 30 list of creditors and authorization to redact certain personally identifiable information from such lists;

- Approval of procedures to maintain and protect confidential client information;

- Authorization to continue using bank accounts, the Debtors' cash management system and business forms;

- Authorization to pay certain prepetition employee payroll, salary and benefits;

- Authorization to maintain, administer and modify the client refund program and the Brand Promise Program;

- An order prohibiting utility providers from altering, refusing or discontinuing services and deeming such utility providers adequately protected;

- Authorization to maintain and continue paying for insurance; and

- Authorization to pay certain taxes and regulatory fees.

Certain of the First Day Motions were granted on an interim basis on June 23, 2020 and subsequently on a final basis on July 15, 2020. The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at: https://www.donlinrecano.com/Clients/aac/Index.

### C.    Other Procedural and Administrative Motions

The Debtors also filed several other motions after the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

*Ordinary Course Professionals Motion*. On June 25, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 77] (the "OCP Motion"). The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On July 15, 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 158].

*Retention Applications*. On June 25, 2020, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the

Bankruptcy Code, including Greenberg Traurig, LLP, as legal counsel; CF&CO as investment banker; Donlin, Recano & Company, Inc., as administrator advisor; Chipman Brow Cicero & Cole, LLP, as conflicts counsel; and Carl Marks Advisory Group LLC, as Chief Restructuring Officer (collectively, the "Retention Applications"). On July 15, 2020, the Bankruptcy Court approved each of the Retention Applications. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

On July 31, 2020, the Debtors filed an application seeking to retain Deloitte Tax LLP as a tax services provider [Docket No. 355], and on August 27, 2020, the Bankruptcy Court entered an order approving the application [Docket No. 454].

### D.    Approval of the DIP Facility

Based on the Debtors' need for debtor in possession financing and their conclusion that the DIP Facility represents the best terms available, on the Petition Date, the Debtors filed a motion seeking authorization to enter into the DIP Facility on an interim and final basis (the "DIP Facility Motion"). On June 23, 2020, the Bankruptcy Court entered an order approving the DIP Facility Motion on an interim basis [Docket No. 65] (the "Interim DIP Order"), and on July 15, 2020, the Bankruptcy Court entered an order approving the DIP Facility Motion on a final basis [Docket No. 159] (the "Final DIP Order").

Under the terms of the DIP Facility Loan Agreement, the $62.5 million DIP Facility is available in multiple draws. Upon the Bankruptcy Court's entry of the Interim DIP Order, the Debtors were able to access $22.5 million under the DIP Facility. Upon the Bankruptcy Court's entry of the Final DIP Order, the Debtors had authority to access the entire $62.5 million DIP Facility subject to a number of conditions precedent.

### E.    Schedules and Statements

On June 25, 2020, the Debtors filed a motion seeking entry of an order that would extend the deadline to file their schedules of assets and liabilities, schedules of executory contracts, and unexpired leases, and statements (collectively, the "Schedules and Statements") [Docket No. 76]. On July 15, 2020, the Bankruptcy Court extended the deadline for the Debtors to file the Schedules and Statements to August 3, 2020 [Docket No. 155]. The Debtors filed their Schedules and Statements with the Bankruptcy Court on July 27, 2020 and July 28, 2020. If you would like to view the Schedules and Statements, you may do so by visiting: https://www.donlinrecano.com/Clients/aac/Index.

### F.    Trading Orders

The Debtors net operating loss ("NOL") carryforwards and certain other tax attributes are valuable assets of its estates because a corporation can carry forward NOLs to offset future income or tax, thereby reducing its tax liability in future periods. The Debtors estimate that they have incurred consolidated NOLs of approximately $87 million as of the Petition Date and are expecting that the consolidated NOLs will increase to approximately $190 million as of December 31, 2020. The Debtors believe that, even after taking account any cancellation of debt impact of the Plan on

26

the Debtors, the NOL carryforwards and other tax attributes may result in significant future tax savings, which would enhance the Debtors' cash position and significantly contribute to its successful reorganization.

The ability of the Debtors to use their NOL carryforwards and other tax attributes is subject to certain statutory limitations.  In particular, section 382 (in conjunction with section 383) of the Internal Revenue Code limits a corporation's ability to use its NOLs and certain other tax attributes after the corporation undergoes a specified change of ownership.  However, even to the extent an ownership change of the Debtors is expected to occur upon implementation of the Plan, the limitations imposed by section 382 of the Internal Revenue Code upon a change of ownership pursuant to a confirmed plan are significantly more relaxed than those otherwise applicable, particularly under section 382(l)(5) of the Internal Revenue Code, if the plan involves the retention or receipt of at least half of the stock of the reorganized debtor by its stockholders or qualified creditors.

Accordingly, in order to protect the value of its NOL carryforwards and other tax attributes, the Debtors filed a motion requesting an order of the Bankruptcy Court granting authorization to protect and preserve valuable NOLs in excess of the "section 382 limitation," as defined in 26 U.S.C. § 382(a) by establishing notice and waiting periods to govern transfers of equity interests in AAC  (the "Trading Motion") [Docket No. 15].  On June 23, 2020, the Bankruptcy Court granted the Trading Motion on an interim basis [Docket No. 60], and on July 15, 2020, the Bankruptcy Court granted the Trading Motion on a final basis [Docket No. 150].

### G.    Appointment of Creditors' Committee

On July 2, 2020, the U.S. Trustee appointed the Creditors' Committee [Docket No. 96].  The Creditors' Committee is currently composed of the following members: Collect RX LLC; Beckman Coulter, Inc.; and Willie Meadows.  On August 20, 2020, the Bankruptcy Court authorized the retention of Cole Schotz P.C. as legal counsel to the Creditors' Committee [Docket No. 425].  On August 20, 2020, the Bankruptcy approved the Creditors' Committee's application to retain and employ Province, Inc. as its financial advisor [Docket No. 425].

### H.    Appointment of Patient Care Ombudsman

On July 10, 2020, the Bankruptcy Court entered an order directing the appointment of a patient care ombudsman ("PCO") [Docket No. 119].  On July 14, 2020, the U.S. Trustee filed a notice appointing David N. Crapo as the PCO [Docket No. 123].

Since his appointment, the PCO has filed a series of applications seeking court authorization to retain and employ certain professionals to help fulfill his duties as PCO [Docket Nos. 383, 415, and 416].  On August 28, 2020, the Court authorized the employment of Susan N. Goodman to inspect the Debtors' residential treatment centers in Nevada and California on behalf of the PCO [Docket No. 469].  On that same day, the Court also authorized the employment of Gibbons P.C. as counsel for the PCO [Docket No. 468].  On September 2, 2020, the Court will hold a hearing on the PCO's last remaining employment application, which seeks to employ Marie Kraemmer, LMHC to inspect the Debtors' residential treatment facilities in Florida on behalf of the PCO [Docket No. 416].

On August 13, 2020, the Bankruptcy Court approved a stipulation between the Debtors and the PCO that allows the PCO to have limited access to confidential patient information [Docket No. 396]. The limited access allows the PCO to fulfill his duties under section 333 of the Bankruptcy Code and ensure that the patients for certain Debtors continue to receive quality patient care during the bankruptcy proceedings.

## I.    Bidding Procedures Motion

On July 3, 2020, the Debtors filed a motion seeking, among other things, court approval of their Bidding Procedures (the "Bidding Procedures Motion"). On July 23, 2020, the Bankruptcy Court entered an order [Docket No. 188] approving the Bidding Procedures Motion, including the Bidding Procedures.

### 1.    Overview of Bidding Procedures[22]

As noted herein and in the Bidding Procedures Motion, prior to the Petition Date, the Debtors and the Initial Consenting Lenders entered into the Restructuring Support Agreement. The Restructuring Support Agreement includes, among other things, a plan term sheet that sets forth the principal terms of the Plan, pursuant to which the Debtors' secured lenders will receive a combination of cash, new debt instruments and/or equity in the reorganized Debtors, among other things, in exchange for their secured claims (or, the Reorganization Transaction), subject to a bidding process for higher or otherwise better bids. At the same time that the Debtors are seeking confirmation of the Plan, the Debtors are to continue marketing their assets and business for higher or otherwise better bids than the Reorganization Transaction and if one or more higher or otherwise better bids are received and an auction occurs, the winning bid at that auction will be effectuated pursuant to the Plan.

Bids may take the form of a bid to purchase substantially all of the Debtors' assets or a bid for only certain of the Debtors' assets, in each case to be effectuated through the Plan. Bids also may take the form of a plan sponsorship proposal whereby the plan sponsor receives the newly issued equity in the reorganized Debtors and the secured creditors receive a distribution of equity or debt consideration in addition to cash (a "Plan Sponsorship Proposal"). The Plan, as filed, contains a toggle feature that will provide for the sale of substantially all of the Debtors' assets (or, an Entire Company Asset Sale) or alternatively, the distribution of newly issued debt and equity to the prepetition lenders (of, the Reorganization Transaction). A Partial Sale(s) may occur in either instance. If the winning bid at the auction conducted pursuant to the Bidding Procedures Motion is a Plan Sponsorship Proposal, the Debtors will file an amended chapter 11 plan to incorporate such Plan Sponsorship Proposal upon the conclusion of such auction.

The Bidding Procedures are the mechanism by which the Debtors will market their assets and subject the Plan to a market test in an effort to ensure that the value of their estates is maximized in these chapter 11 cases (the "Chapter 11 Cases"). The Bidding Procedures provide ample time for potential bidders to conduct the necessary due diligence and submit bids, and they

---

[22] This summary of the Bidding Procedures is qualified in its entirety by the actual terms of the Bid Procedures. To the extent that there is any conflict between this summary and the Bidding Procedures, the latter shall control. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bidding Procedures.

are flexible in allowing bidders to submit various forms of bids. If bids are received for an Entire Company Asset Sale or a Plan Sponsorship Proposal that do not pay the Senior Lender Claims and the Junior Lender Claims in cash in full, the Debtors must obtain the consent of the Requisite Consenting Lenders to proceed with such bids instead of the Reorganization Transaction. Likewise, if a bid for a Partial Asset Sale is received, the Debtors must obtain the consent of the Requisite Consenting Lenders to proceed with such Partial Asset Sale.

## 2.    Prepetition Marketing Process

Prior to the Petition Date, CF&CO was retained as the Debtors' investment banker to explore financing and strategic alternatives for the Debtors, including a sale of all or part of the Debtors' business, third-party equity and financing alternatives, a "standalone" restructuring of the Debtors' balance sheet, and various permutations of the foregoing. The Debtors considered both in- and out-of-court alternatives. As part of this process, CF&CO developed a list of parties whom they believed may be interested in, and whom the Debtors reasonably believed would have the financial resources to consummate, an Entire Company Asset Sale or a Partial Asset Sale, which list included both strategic investors and financial investors.

In January 2019, CF&CO commenced the process of finding new financing for the Debtors. It discussed the opportunity with a total of thirteen (13) healthcare debt investors. As part of this process, thirteen (13) confidentiality agreements were executed, thirteen (13) investor packages were distributed, nine (9) management calls were held, and five (5) term sheets were received. This process did not result in a transaction.

In March 2019, CF&CO commenced a new process focused on strategic alternatives. CF&CO discussed the opportunity with a total of fifty-two (52) parties, including thirty-nine (39) private equity sponsors and thirteen (13) strategic buyers. As a result of this process, thirty-three (33) confidentiality agreements were executed, fifteen (15) bidders received confidential information presentations and virtual dataroom access, eighteen (18) management calls and/or meetings were held, and fourteen (14) follow-up diligence calls were conducted with CF&CO and management. There were four (4) subsequent indications of interest received -- three (3) indications of interest were for real estate sales and/or sale-leasebacks and one (1) indication of interest was for a financial restructuring. This process did not result in a transaction.

As part of the most recent marketing process commenced in March 2020, CF&CO contacted fifty-five (55) parties with respect to a possible Transaction, including thirteen (13) potential strategic buyers and forty-two (42) sponsors. Of the fifty-five (55) potential bidders with whom the Debtors and CF&CO have had contact, fourteen (14) have executed confidentiality agreements and were provided access to a virtual data room containing confidential information regarding the Debtors, their business, and their assets. Three (3) potential bidders submitted proposals, but no final agreements were reached with these bidders.

CF&CO is continuing this marketing process for a possible Transaction and is in the process of reaching out to those persons previously contacted regarding a possible Transaction in addition to others who maybe be interested in a possible Transaction.

### 3.    Key Dates and Deadlines

The key dates and deadlines in the Bidding Procedures are as follows:

| Deadline | Description |
|---|---|
| August 14, 2020 at 5:00 p.m. (Eastern time) | Deadline for potential Bidders to submit non-binding indications of interest |
| September 11, 2020 at 5:00 p.m. (Eastern time) | (1) Bid Deadline (2) Deadline for Debtors to designate one or more non-competing Bidders as a "stalking horse bidder" and grant certain bid protections to the stalking horse bidder |
| September 16, 2020 | Deadline for the Consenting Lenders to elect whether to proceed with one or more Qualified Bid(s) or with the Plan |
| September 18, 2020 | Deadline for holders of DIP Facility Claims, Senior Lender Claims and Junior Lender Claims to make a Bid that is in the form of a credit bid |
| September 19, 2020 | Deadline for Debtors to designate Qualified Bidders and Baseline Bid(s) |
| September 21, 2020 at 10:00 a.m. (Eastern time) | (1) Auction (if any) (2) Deadline for Debtors to return Deposits of Bidders who are not Qualified Bidders |
| September 22, 2020 | Deadline for Debtors to file notice of Winning Bidder(s) and Backup Bidder(s) |
| September 24, 2020 | Deadline for the Debtors to file the Sale Process Documents of the Winning Bidder(s) with the Plan supplement |

## J.    Claim Bar Dates

On July 10, 2020, the Debtors filed a motion seeking to set deadlines for filing proofs of claim [Docket No. 120]. On July 23, 2020, the Bankruptcy Court entered an order approving the motion [Docket No. 189] and set the following bar dates:

*General Bar Date*:  August 26, 2020 at 5:00 p.m. (prevailing Eastern Time). The General Bar Date is the last date for persons or entities, other than governmental units, to file Proofs of Claim against the Debtors on account of claims (as defined in section 101(5) of the Bankruptcy Code) arising, or deemed to have arisen, prior to the Petition Date, including, for the avoidance of doubt, claims arising under section 503(b)(9) of the Bankruptcy Code.

*Government Bar Date*: December 17, 2020 at 5:00 p.m. (prevailing Eastern Time). The Government Bar Date is the last date for governmental units, as defined in section 101(27) of the Bankruptcy Code, to file Proofs of Claim against the Debtors on account of claims arising, or deemed to have arisen, prior to the Petition Date.

30

### K.      Key Employee Retention Plan

On July 21, 2020, the Debtors filed under seal a motion seeking court approval to implement a key employee retention plan (the "KERP") [Docket No. 175]. Under the KERP, the Debtors identified certain individuals critical to the Debtors' operations (the "KERP Participants"). To ensure that the Debtors retain the KERP Participants during the Chapter 11 Cases, each KERP Participant has the opportunity to receive a payment contingent on the Plan going effective. The aggregate payments under the KERP equal $1,239,130.80. The KERP Participants are non-insiders and non-senior management employees and will receive varying percentages of the $1,239,130.80 based on (a) the degree to which the KERP Participant is critical to maintaining the Debtors' successful operations and pursuing the Debtors' restructuring process, (b) the risk that such KERP Participant would voluntarily leave the Debtors or be recruited by a competitor of the Debtors, (c) the difficulty of replacing the KERP Participant, and (d) the KERP Participant's possession of irreplaceable proprietary knowledge. A hearing to consider the KERP is scheduled for August 31, 2020.

### L.      341 Meeting

On July 28, 2020, the U.S. Trustee conducted a telephonic meeting of creditors (the "341 Meeting") at which the U.S. Trustee and creditors had the opportunity to question the Debtors under oath concerning the Debtors' acts, conduct, property, and the administration of the Chapter 11 Cases. The 341 Meeting was continued to, and concluded on, August 12, 2020.

### M.      Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to treatment under the plan, release, and discharge upon the Effective Date of the Plan, with certain exceptions.

### 1.      Prepetition Litigation and Related Matters

***Personal Injury Claims.***  To date, approximately thirty-six personal injury claims are pending against the Debtors. The Debtors believe these claims, including related defense costs, are covered by insurance, which insurance generally has a $150,000 per claim self-insured retention ("SIR") amount.

***Reyna Litigation.***  Prior to the Petition Date, Ana Reyna, Brandi Reyna, Brandon Reyna, and the Estate of Shaun Reyna (collectively, the "Reyna Plaintiffs") each filed a civil action against certain Debtors and certain Affiliates in the California Superior Court for the County of Riverside for alleged wrongful death claims of the Reyna Plaintiff's husband/father Shun Reyna while under the care of the Debtors. Shortly after, the cases were consolidated into one case styled *Ana Reyna*

31

*et al. v. ABTTC, Inc.*, d/b/a Better Tomorrow Treatment Center, et al., (the "Reyna Litigation").  In January of 2020, the parties settled the Reyna Litigation.

***RSG Litigation.***    On June 30, 2017, Jeffrey Smith, Abhilash Patel, and certain of their affiliates (the "RSG Plaintiffs") filed a lawsuit in the Superior Court of the State of California in Los Angeles County against certain Debtors and certain of the Debtors' current and former officers (collectively, the "RSG Defendants") styled *Jeffrey Smith, Abhilash Patel,* et al. *v. American Addiction Centers, Inc.*, et al. (the "RSG Litigation").  The RSG Plaintiffs are former owners of Referral Solutions Group, LLC ("RSG") and Taj Media, LLC, which were acquired by the Debtors in July 2015.  The RSG Plaintiffs generally alleged that, in connection with the Debtors' acquisition, the RSG Defendants violated California securities laws and further allege intentional misrepresentation, common law fraud, equitable fraud, promissory estoppel, civil conspiracy to conceal an investigation and civil conspiracy to conceal profitability.  On November 21, 2018, the Debtors entered into a settlement (the "RSG Settlement") with the RSG Plaintiffs providing, in part, that the Debtors pay the RSG Plaintiffs an aggregate amount of $8 million.  In addition, in connection with the RSG Settlement, the Debtors agreed to release one of RSG's former officers and directors, Jerrod N. Menz ("Menz"), from his agreement to contribute 300,000 shares as part of a settlement reached in connection with a previously settled securities class action lawsuit and, in exchange for such agreement, Menz released his claim for indemnification arising out of the RSG Litigation.

***SEC Matter.***    In March 2018, the Debtors provided general accounting, finance and governance documentation in response to a subpoena received from the U.S. Securities and Exchange Commission (the "SEC").  Following this initial document request, the SEC requested additional information pertaining to the Debtors' accounting for partial payments from insurance companies, where the Debtors are continuing to pursue additional collections for the estimated balance.  Beginning in the third quarter of 2018, the audit committee of the Debtors (the "Audit Committee") initiated a review of the Debtors' accounting for these partial payments.  In connection with this review, the Audit Committee determined that the Debtors' change in estimate of the collectability of accounts receivable relating to partial payments was appropriate.  The SEC's investigation remains ongoing, and the Debtors continue to fully cooperate on this matter, including providing the SEC with information regarding the restatements of historical financial reports contained in the Debtors' most recent Annual Report.  The SEC's investigation is neither an allegation of wrongdoing nor a finding that any violation of law has occurred.  At this time, the Debtors cannot predict the final outcome of this matter or what impact it might have on the Debtors' consolidated financial position, results of operations or cash flows.

***Shareholder Litigation.***    On May 16, 2019, an alleged shareholder ("Caudle") filed a purported class action in the United States District Court for the Middle District of Tennessee against certain Debtors and certain of their current and former officers (the "Caudle Defendants") styled *Caudle v. AAC Holdings, Inc.,* et al. (the "Caudle Litigation").  On November 4, 2019, Caudle filed an amended complaint on behalf of a putative class of shareholders who purchased equity interests in AAC between March 8, 2017 and April 15, 2019.  Caudle generally alleges that the Caudle Defendants violated Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by making allegedly misleading statements relating to the Debtors' marketing practices and with respect to financial statements reported by the Debtors for

32

periods between 2016 and 2018, which statements were restated in the Debtors' Annual Report on Form 10-K for the year ended December 31, 2018.

In the Caudle Litigation, Lead Plaintiff Indiana Public Retirement System alleges that AAC, Cartwright, McWilliams, and Manz violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by engaging in a fraudulent scheme and by materially misleading AAC's investors. Lead Plaintiff alleges that AAC, Cartwright, McWilliams, and Manz misled investors by touting AAC's "best-in-class sales and marketing engine" and its "marketing knowledge and infrastructure" giving it a "significant competitive advantage," when in fact it was engaged in a deceptive patient recruiting scheme that ultimately decimated its business when AAC was barred from advertising on Google, denied renewed membership in a prominent addiction treatment professional society, and forced to defend its conduct before Congress. Lead Plaintiff alleges that AAC, Cartwright, McWilliams, and Manz also misled investors by fraudulently inflating AAC's financial results, failing to timely reserve for or write off impaired receivables, causing it to overstate net income and understate net losses by tens of millions of dollars. Lead Plaintiff alleges that the truth began to be revealed on November 6, 2018, when defendants disclosed that AAC had missed its revenue and earnings targets and lowered guidance for the rest of fiscal 2018, due to defendants' inability to continue their marketing and accounting schemes. Then, on April 15, 2019, AAC filed its annual report on Form 10-K for fiscal 2018, revealing AAC was restating its historical financial statements and had missed its already-lowered 4Q18 guidance. Lead Plaintiff further alleges that AAC's stock price collapsed more than 86% from its Class Period high, causing investors tens of millions of dollars in losses, amid an exodus of senior executives and directors. The Debtors and the defendants in the Caudle Litigation deny and are vigorously contesting the Lead Plaintiff's allegations for, among other reasons, those set forth in the defendants' motion to dismiss on file in the Caudle Litigation, which motion is currently pending.

In two related matters, on August 16, 2019 and September 23, 2019, alleged shareholders filed derivative actions on behalf of AAC in the United States District Court in the Middle District of Tennessee, styled *Cooper v. Cartwright*, et al. and *Pedernera v. Cartwright,* et al., against certain of the Debtors' current and certain former members of their board of directors and senior executive team, alleging that these individuals breached their fiduciary duties and engaged in mismanagement. The two cases have been consolidated and the consolidated action is stayed pending a decision on the defendants' pending motion to dismiss filed in the Caudle Litigation. Similar to the Caudle Litigation, these shareholders allege that the Debtors' directors and officers made material misstatements in the Debtors' financial reporting regarding the collectability of the Debtors' accounts receivable in order to inflate AAC's share price. These shareholders also allege that, while AAC's share price was inflated, certain of the Debtors' directors and officers sold shares in AAC that they held in their individual capacities for at least $5 million. The Debtors and the defendants in these two related matters deny and are vigorously contesting the allegations stated above.

Given the uncertainty of litigation and the preliminary stage of these cases, the Debtors cannot estimate the reasonably possible loss or range of loss that may result from these actions. The Debtors believe that the allegations are without merit. If the Plan is confirmed, the Debtors and their creditors and shareholders will forever release any Claims and Causes of Action (including any derivative claims brought on the Debtors' behalf) against, among other non-Debtor Released Parties, the Debtors' current and former directors and officers who are defendants in

33

these shareholder litigation matters.  These releases are fully described in Article X of the Plan.  A creditor may opt out of the Third-Party Release by voting to reject the Plan, or abstaining from voting, and checking the appropriate box on its ballot by the October 1, 2020 voting deadline.

The Committee asserts that it has not received satisfactory evidence that the company undertook a fulsome and independent investigation into the merits of the allegations set forth in the shareholder litigation as described above. The Committee further asserts that the allegations in such shareholder litigation, if true, would give rise to potentially valuable claims and, potentially, a source of recovery for Holders of Class 5 General Unsecured Claims.  The Committee has served discovery on the Debtors regarding the such shareholder litigation, and the Debtors will respond to that discovery

### N.    Valuation Analysis

As described above, the Debtors are presently engaged in a sale and marketing process in accordance with the Bidding Procedures.  The Debtors believe that the sale and marketing process is the best method to value the business because it allows the market to determine the value.  The sale and marketing process is a comprehensive and arm's length process with the goal of identifying counterparties for a potential transaction.  Accordingly, to ensure that the integrity of the sale and marketing process is preserved and value is maximized, the expected recoveries for Junior Lender Claims are not, at this time, being disclosed herein, and the Debtors are not filing a valuation analysis.  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *see also In re Keisler*, No. 08-34321, 2009 WL 1851413, at *5 (Bankr. E.D. Tenn. June 29, 2009) ("[V]aluation is not a necessary component in the determination of whether a disclosure statement contains adequate information.); *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 654 (Bankr. S.D.N.Y. 1986).  Courts have approved disclosure statements that conducted a valuation analysis through a comprehensive market process.  *See e.g.*, *In re GCX Limited,* et al., Case No. 19-12031 (CSS) (Bankr. D. Del. Dec. 4, 2019) [Docket No. 203]; *In re Ditech Holding Corp.,* et al., Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. May 10, 2019) [Docket No. 544]; *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) [Docket No. 360]; *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) [Docket No. 282].

The Debtors will file, with the Plan Supplement, the expected recoveries to creditors under the Plan including the Junior Lender Claims.  Further, if necessary, the Debtors will also file, as part of the Plan Supplement, a valuation analysis.

## VII.    THE PLAN

**THIS ARTICLE VII OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED**

34

**TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN AND PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.**

> ### A.     Administrative Claims and Priority Tax Claims

> #### 1.     Administrative Claims and Priority Tax Claims

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Lender Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of: (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; provided that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Post-Effective Date Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Post-Effective Date Debtors and the requesting party by the Claims Objection Bar Date.

> #### 2.     Professional Compensation

> ##### i.     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the

35

Effective Date, provided, however, that nothing in the Plan alters the ability of an Ordinary Course Professional to be paid, or the authority of the Debtors or Post-Effective Date Debtors to pay Ordinary Course Professionals, pursuant to the terms of the OCP Order, and such Ordinary Course Professionals shall not be required to file requests for payment of Professional Fee Claims unless such requests are required under the OCP Order. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Post-Effective Date Debtors shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

### ii.    Professional Fee Escrow Account

On the Effective Date, the Debtors or Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Allowed Professional Fee Claims. Such funds shall not be considered property of the Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be returned to the Post-Effective Date Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Post-Effective Date Debtors.

### iii.    Professional Fee Reserve Amount

Professionals shall estimate their unpaid Professional Fee Claims, and shall deliver their reasonable best estimate to the Debtors and the DIP Agent no later than five (5) days before the Effective Date; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Post-Effective Date Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### iv.    Post-Effective Date Fees and Expenses

Upon the Effective Date, the Post-Effective Date Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court, and any requirement of such professionals to comply with section 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered on or after such date shall terminate.

36

3.    **DIP Lender Claims**

As of the Effective Date, the DIP Lender Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding on the Effective Date under the DIP Credit Agreement, the DIP Orders, and the other DIP Documents, including principal, interest, fees, prepayment premiums and expenses and other amounts constituting obligations under the DIP Credit Agreement. Except to the extent that a Holder of an Allowed DIP Lender Claim agrees, in its sole and absolute discretion, to a less favorable treatment, the DIP Lender Claims and all Liens securing such DIP Lender Claims shall be satisfied in full as follows:

(i)    in the case of an Entire Company Asset Sale, the DIP Lender Claims will be Paid in Full in Cash on the Effective Date from the Distributable Proceeds; or

(ii)    in the case of a Reorganization Transaction, each Holder of an Allowed DIP Lender Claim shall receive on the Effective Date its Pro Rata share of Partial Asset Sale Proceeds, if any, up to the full amount of its Allowed DIP Lender Claim and, to the extent there are any remaining amounts due and owing to the Holders of Allowed DIP Lender Claims, such Holders shall:

a.    be Paid in Full in Cash on the Effective Date from the Acceptable Exit Facility to the extent there are sufficient proceeds or availability under the Acceptable Exit Facility; or

b.    receive on the Effective Date their respective Pro Rata share of (A) the Exit Term Loan Facility in the aggregate amount of the Converted DIP Facility Amount, (B) Cash equal to the Remaining DIP Facility Amount, and (C) the New Warrants DIP Lender Allocation.

Subject to the Allowed DIP Lender Claims being Paid in Full or otherwise satisfied as contemplated by Article II.C of the Plan, and all obligations under the DIP Credit Agreement being satisfied, on the Effective Date, all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

4.    **Priority Tax Claims**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Post-Effective Date Debtor, each Holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Post-Effective Date Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. For the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### 5.    Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Post-Effective Date Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Classification and Treatment of Claims and Interests

### 1.    Summary of Classification

The Plan constitutes a separate Plan proposed by each Debtor and the classifications set forth in Classes 1 through 9 shall be deemed to apply to each Debtor.  Each Class shall be deemed to constitute separate Sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such Sub-Class shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.  All Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Senior Lender Claims | Impaired | Entitled to Vote |
| 4 | Junior Lender Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired[23] | Not Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |

---

[23]    See Article III.B.6 of the Plan for scenarios in which Holders of Intercompany Claims may be Unimpaired and those in which they may be Impaired.

38

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 8 | Intercompany Interests | Unimpaired/ Impaired[24] | Not Entitled to Vote |
| 9 | Interests in AAC Holdings | Impaired | Deemed to Reject |

## 2.    Treatment of Claims and Interests

Subject to Article VI of the Plan, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

### i.    Class 1 – Other Priority Claims

*Classification*: Class 1 consists of Other Priority Claims.

*Treatment*: In full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each Holder thereof will receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

*Voting*: Class 1 is Unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

### ii.    Class 2 – Other Secured Claims

*Classification*: Class 2 consists of Other Secured Claims.

*Treatment*: In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder thereof will receive at the option of the Debtors (with the consent of the Requisite Consenting Lenders): (a) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; (b) delivery of the collateral securing any such Claim and payment of  any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) such other treatment rendering such Claim Unimpaired.

---

[24]    See Article III.B.8 of the Plan for scenarios in which Holders of Intercompany Interests ma y be Unimpaired and those in which they may be Impaired.

*ACTIVE 52312155v1*

*Voting*: Class 2 is Unimpaired.  Holders of Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

        iii.        **Class 3 – Senior Lender Claims**

*Classification*: Class 3 consists of all Senior Lender Claims.

*Allowance*: The Senior Lender Claims shall be Allowed, in the aggregate, in the Senior Lender Claims Allowed Amount

*Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Senior Lender Claim shall receive either:

(i)      in the case of an Entire Company Asset Sale, Cash on the Effective Date from Distributable Proceeds in the full amount of its Allowed Senior Lender Claim on the Effective Date (which, for the avoidance of doubt, shall not include adequate protection payments, including interest payments, under the terms of the DIP Order); or

(ii)     in the case of a Reorganization Transaction, each Holder of an Allowed Senior Lender Claim shall receive on the Effective Date (x) Cash in the amount of the Senior Lender Unpaid Postpetition Interest Amount and (y) its Pro Rata share of any Partial Asset Sale Proceeds, if any, after all Allowed DIP Lender Claims have been Paid in Full and, to the extent there are any remaining amounts due and owing to the Holders of Allowed Senior Lender Claims, such Holders shall:

        A.      be Paid in Full in Cash (which, for the avoidance of doubt, shall not include adequate protection payments, including interest payments, already paid under the terms of the DIP Order) on the Effective Date with the proceeds of an Acceptable Exit Facility to the extent there are sufficient proceeds or availability under the Acceptable Exit Facility; or

        B.      receive on the Effective Date their respective Pro Rata share of (A) the Exit Term Loan Facility in the aggregate amount of the Converted Senior Facility Amount and (B) the New Warrants Senior Lender Allocation.

*Voting*: Class 3 is Impaired. Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

        iv.        **Class 4 – Junior Lender Secured Claims**

*Classification*: Class 4 consists of all Junior Lender Secured Claims.

40

*Allowance*: The Junior Lender Secured Claims shall be Allowed, in the aggregate, in the Junior Lender Secured Claim Allowed Amount.

*Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Junior Lender Secured Claim shall receive either:

(i)     in the case of an Entire Company Asset Sale, its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery, up to the full amount of its Allowed Junior Lender Secured Claim; or

(ii)    in the case of a Reorganization Transaction, each Holder of an Allowed Junior Lender Secured Claim shall receive on the Effective Date its Pro Rata share of any Partial Asset Sale Proceeds, if any, after all Allowed DIP Lender Claims and Allowed Senior Lender Claims have been Paid in Full, and, to the extent there are any remaining amounts due and owing to the Holders of Allowed Junior Lender Secured Claims, such Holders shall receive their Pro Rata share of 100% of the Reorganized AAC Equity Interests, subject to dilution by the New Warrants and the Management Incentive Plan.

*Voting*: Class 4 is Impaired.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

### v.     **Class 5 – General Unsecured Claims**

*Classification*: Class 5 consists of all General Unsecured Claims.

*Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive (unless the applicable Holder agrees to a less favorable treatment):

(i)     in the case of an Entire Company Asset Sale, its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery, if any; or

(ii)    in the case of a Reorganization Transaction, no recovery or distribution.

*Voting*: For voting purposes, Class 5 is Impaired, and Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

### vi.    **Class 6 – Intercompany Claims**

*Classification*: Class 6 consists of all Intercompany Claims.

*Treatment*: In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim will either be (i) treated consistent with the transactions contemplated by the Entire Company Asset Sale or Partial Asset Sale, if applicable or (ii) in the case of a Reorganization Transaction, (A) Reinstated as of the Effective Date for tax purposes or (B) cancelled, in which case no distribution shall be made on account of such Allowed

41

Intercompany Claim, in each case as determined by the Debtors with the consent of the Requisite Consenting Lenders.

*Voting*: Holders of Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

vii.        **Class 7 – Subordinated Claims**

*Classification*: Class 7 consists of all Subordinated Claims.

*Treatment*: Subordinated Claims will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Subordinated Claim will not receive any distribution on account of such Subordinated Claim.

*Voting*: Class 7 is Impaired.  Holders of Class 7 Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

viii.        **Class 8 – Intercompany Interests**

*Classification*: Class 8 consists of all Intercompany Interests.

*Treatment*: In full and final satisfaction of each Allowed Intercompany Interest, each Intercompany Interest shall either be (i) treated consistent with the transactions contemplated by the Entire Company Asset Sale or Partial Asset Sale, if applicable or (ii) in the case of a Reorganization Transaction, as determined by the Debtors, with the consent of the Requisite Consenting Lenders, as of the Effective Date, (A) Reinstated or (B) cancelled, in which case no distribution shall be made on account of such Intercompany Interests.

*Voting*: Holders of Class 8 Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

ix.        **Class 9 – Interests in AAC Holdings**

*Classification*: Class 9 consists of all Interests in AAC Holdings.

*Treatment*: Each Allowed Interest in AAC Holdings shall be cancelled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in AAC Holdings shall be entitled to any recovery or distribution under the Plan on account of such Interests.

*Voting*: Class 9 is Impaired. Holders of Class 9 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

*ACTIVE 52312155v1*

3. **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of the Confirmation Hearing by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims and Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII thereof to the extent, if any, that confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

4. **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5. **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

6. **Intercompany Interests and Intercompany Claims**

Under a Reorganization Transaction, Holders of Intercompany Interests or Intercompany Claims may retain their respective Interests or Claims not on account of such Interests or Claims, as applicable, but rather for the purposes of administrative convenience, for the ultimate benefit of the Holders of Reorganized AAC Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

7. **Subordinated Claims and Interests**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

43

C.      **Means for Implementation of the Plan**

    1.      **Means for Implementation Applicable to an Entire Company Asset Sale or a Reorganization Transaction**

The following provisions shall apply whether the Plan is implemented through an Entire Company Asset Sale or a Reorganization Transaction.

    i.      **Implementation of Plan Transaction Generally**

On the Effective Date, or as soon as reasonably practicable thereafter, the Post-Effective Date Debtors shall take all actions, not inconsistent with the Restructuring Support Agreement, as may be necessary or appropriate to effectuate the restructuring transactions contemplated by the Plan, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Plan; (e) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

    ii.      **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise specifically provided for in the Plan (including, without limitation, the satisfaction of the DIP Lender Claims in accordance with Article II.C of the Plan): (1) any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, that notwithstanding entry of the Confirmation Order or Consummation, any such instrument or document that governs the rights of a Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) allowing Holders to receive distributions under the Plan; (2) allowing the Senior Lien Agent and Junior Lien

44

Agent to enforce their respective rights, claims, and interests vis-à-vis any parties other than the Released Parties; and (3) preserving any rights of the Senior Lien Agent and Junior Lien Agent to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders of Senior Lender Claims and Junior Lender Claims, respectively, including any rights to priority of payment.

### iii.    General Settlement of Claims

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their respective Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their respective Estates and Causes of Action against other Entities.

### iv.    Asset Sales

The Debtors shall consummate any Asset Sales pursuant to the terms of the Plan, and the Confirmation Order shall authorize the Debtors to enter into and perform under the Asset Sale Agreements. On the Effective Date, all of the transactions contemplated by any Asset Sale shall be consummated. Any property of the Debtors' Estates that is not transferred under an Asset Sale Agreement or distributed on the Effective Date pursuant to the terms of the Plan shall revest in the Post-Effective Date Debtors in accordance with the terms of the Plan.

Unless otherwise expressly provided under the terms of a particular Asset Sale Agreement, all matters and transactions provided for in the Asset Sale Agreements, and any partnership, membership, or shareholder action required by the Debtors or the Post-Effective Date Debtors in connection with the Asset Sale Agreements, will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the Debtors or the Post-Effective Date Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers, directors, managers or managing members of each Debtor or Post-Effective Date Debtor, as applicable, shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by the Asset Sale Agreements (or necessary or desirable to effect the transactions contemplated by the Asset Sale Agreements), and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Asset Sale Agreements, in each case in the name of and on behalf of such Debtor or Post-Effective Date Debtor. Such authorizations and approvals will be effective notwithstanding any requirements under non-bankruptcy law.

45

v.      **Preservation of Causes of Action**

Except for any Cause of Action against a Person that is expressly waived, relinquished, exculpated, released, compromised under the Plan or Final Order, transferred in connection with an Asset Sale, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in the Post-Effective Date Debtors' sole discretion. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Post-Effective Date Debtors will not pursue any and all available Causes of Action against it. Unless any Causes of Action against a Person is expressly waived, relinquished, exculpated, released, compromised, transferred in connection with an Asset Sale, or settled under the Plan, the Debtors or Post-Effective Date Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of, entry of the Confirmation Order or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors. The Post-Effective Date Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

vi.     **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases.

vii.    **Director and Officer Liability Insurance**

The Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance

46

Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity on or at any time prior to the Effective Date shall be entitled to the full benefits of any such policy (including any "tail" policy) for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date, in each case to the extent set forth in such policies.

viii.    <strong>Exemption from Certain Transfer Taxes and Fees</strong>

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including any Asset Sales, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

ix.    <strong>Tax Structure</strong>

To the extent practicable, the transactions contemplated by the Plan, and the consideration received in connection therewith, shall be structured in a manner that (i) minimizes any current taxes payable as a result of the consummation of such transactions and (ii) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of such transactions to the Debtors, the Post-Effective Date Debtors, and the holders of equity or debt in the Reorganized Debtors going forward, in each case as determined by the Requisite Consenting Lenders and the Debtors.

<strong>2.    Means for Implementation Specific to an Entire Company Asset Sale</strong>

The following provisions shall apply only if the Entire Company Asset Sale Trigger Occurs.

i.    <strong>The Wind-Down Debtors</strong>

The Wind-Down Debtors shall continue to exist after the Effective Date for purposes of (a) dissolving and winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts in accordance with Article VIII of the Plan, (e) filing

47

appropriate tax returns, (f) complying with continuing obligations under the Entire Company Asset Sale Agreements, if any, and (g) administering the Plan. Subject in all respects to the terms of the Plan, each of the Wind-Down Debtors shall be dissolved and wound up as soon as practicable on or after the Effective Date, and notwithstanding any requirements under non-bankruptcy law all corporate actions required by the Debtors, or the Post-Effective Date Debtors in connection with such dissolution and winding up shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Post-Effective Date Debtors.

The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### ii.     Vesting of Assets of the Wind-Down Debtors

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date, the assets of the Debtors shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Wind-Down Debtors may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### iii.     Plan Administrator

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors, board of managers, managing members and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors, managers, managing members or officers of the Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole director, sole manager, sole managing member and sole officer of each of the Wind-Down Debtors. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors, pursuant to the terms of the Plan, Confirmation Order, and Plan Administrator Agreement, as further described in Article VII of the Plan.

### iv.     Boards of the Wind-Down Debtors

As of the Effective Date, without any further action required on the part of any such person or of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, (i) all members of the existing board of directors or managers (and all committees thereof), as applicable, or the managing member or manager, as applicable, of each of the Wind-Down Debtors shall automatically cease to serve in such capacity and shall be deemed to have been removed from such

positions (ii) all remaining officers of each of the Wind-Down Debtors shall automatically cease to serve in such capacity and shall be deemed to have resigned from such positions, as of the Effective Date, and (iii) the Plan Administrator shall be deemed to have been elected or appointed as the sole director, sole manager, sole managing member and sole officer, as applicable, of each of the Wind-Down Debtors; provided however, that all directors, managers, managing members and officers of the Debtors who served in such capacity on or at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies as provided in Article IV.A.7 of the Plan, for the full term of such policies.

### 3.    Means for Implementation Specific Reorganization Transaction

If the Entire Company Asset Sale Trigger does not occur, the terms of the Plan will be implemented through a Reorganization Transaction. The Reorganization Transaction may include one or more Partial Asset Sales. Any Partial Assets Sales shall be consummated pursuant to the Confirmation Order and other provisions of the Plan (including Article IV.A.4 of the Plan ). The following provisions describe provisions that will apply only if the Plan is implemented through a Reorganization Transaction.

#### i.    Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan from the following sources: (a) Cash on hand, including Cash from operations and Partial Asset Sale Proceeds, if any, and (b) the proceeds of any Exit Facility. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors, as applicable.

#### ii.    Vesting of Assets

Except as otherwise provided in a Partial Asset Sale Agreement, the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in a Partial Asset Sale Agreement or the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

#### iii.    Reorganized AAC Equity Interests and New Warrants; Reporting Upon Emergence

On the Effective Date, the Reorganized Debtors shall issue the Reorganized AAC Equity Interests and New Warrants, if any, as set forth in the Plan. In the case of a Reorganization Transaction, the Reorganized AAC Equity Interests shall be distributed to Holders of Allowed Junior Lender Secured Claims in accordance with Article III of the Plan and Article IV.C.3 thereof and, in the case of an Exit Term Loan Facility, the New Warrants shall be distributed to Holders of Allowed DIP Lender Claims and Allowed Senior Lender Claims. The issuance of Reorganized AAC Equity Interests and the New Warrants (if applicable), as well as options, or other equity

49

awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

All Reorganized AAC Equity Interests and New Warrants issued and distributed under the Plan shall be (including the securities issuable upon exercise of the New Warrants, when issued upon such exercise in accordance with the terms of the New Warrants) duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, Reorganized AAC Holdings shall enter into the New Stockholders' Agreement with each Entity that receives a distribution of Reorganized AAC Equity Interests or New Warrants pursuant to the Plan, and each such Entity shall be deemed as a result of having received distributions of Reorganized AAC Equity Interests pursuant to the Plan to have accepted terms of the New Stockholders Agreement and the New Organizational Documents, in each case without the need for execution by any party thereto other than Reorganized AAC Holdings.  As of the Effective Date, the New Stockholders Agreement shall be valid, binding, and enforceable in accordance with its terms by and against each of the parties thereto, and each holder of Reorganized AAC Equity Interests and each holder of New Warrants shall be bound thereby. Without limiting the foregoing, it shall be a condition to the receipt of any Reorganized AAC Equity Interests or any New Warrants that, prior to such receipt, each such recipient duly executes and delivers to the Debtors a duly executed counterpart signature page to the New Stockholders Agreement.

Upon the Effective Date, (i) the Reorganized AAC Equity Interests shall not be registered under the Securities Act and shall not be listed for trading on any national securities exchange, (ii) none of the Reorganized Debtors will be a reporting company under the Exchange Act, (iii) Reorganized AAC Holdings shall not be required to and will not file Exchange Act reports with the SEC or any other entity or party, and (iv) Reorganized AAC Holdings shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date. The Reorganized AAC Equity Interests and the New Warrants will be issued pursuant to section 1145 of the Bankruptcy Code and be freely transferrable under applicable securities laws without further registration, subject to certain restrictions on transfers by affiliates and underwriters under applicable securities laws. Notwithstanding the foregoing, the Reorganized AAC Equity Interests and the New Warrants shall be subject to transfer restrictions that prohibit any transfer thereof that Reorganized AAC Holdings determines will or could reasonably be expected to result in (i) the number of "holders of record" (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of the Reorganized AAC Equity Interests exceeding the applicable thresholds for registration under Section 12(g) of the Exchange Act or (ii) Reorganized AAC Holdings otherwise being required to register the Reorganized AAC Equity Interests under the Exchange Act, assuming for purposes of (i) and (ii) that all outstanding New Warrants are exercised at the time of such transfer, and any such purported or attempted transfer of New Warrants or Reorganized AAC Equity Interests, as applicable, shall not be recognized by Reorganized AAC Holdings or its stock transfer agent or warrant agent, as applicable.

iv.      **Exit Facility**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to

50

be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

On the Effective Date all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtors and the Entities that grant such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The Debtors will need an Acceptable Exit Facility that provides at least $15 to $20 million of working capital.  The Debtors expect this Acceptable Exit Facility to be a revolving credit facility secured with a first lien on the Reorganized Debtors' receivables and inventory.  The Debtors are currently soliciting potential lenders.  Further details will be included in the Plan Supplement.

v.      **Corporate Existence**

Except as otherwise provided in the Plan, the New Organizational Documents, the New Stockholders' Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.  Notwithstanding the foregoing, in the event of a Reorganization Transaction, Reorganized AAC Holdings shall be redomiciled as a Delaware corporation, pursuant to a statutory conversion or otherwise, on the Effective Date prior to the issuance of the Reorganized AAC Equity Interests and New Warrants.

51

vi.        **Corporate Action**

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (a) the implementation of the Reorganization Transaction; (b) the selection of the directors and officers for the Reorganized Debtors; (c) the entry into the Exit Facility and the incurrence of credit thereunder; (d) the adoption of the Management Incentive Plan, if any, by the New Board; (e) the issuance and distribution of the Reorganized AAC Equity Interests and, if applicable, the New Warrants; and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility, the Reorganized AAC Equity Interests, the New Warrants (if applicable) and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.C.6 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

vii.        **New Organizational Documents**

On or after the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents, without further order of the Bankruptcy Court.

viii.        **New Board**

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and such board members will be deemed to have resigned, and the New Board and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. The initial composition of the New Board shall be the New Board Composition.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will

52

serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

ix.     **Management Incentive Plan**

Within a reasonable time after the Effective Date, the New Board shall adopt a management incentive plan (the "<u>Management Incentive Plan</u>") that provides for the issuance of restricted stock units, options, stock appreciation rights and/or other similar appreciation awards of up to 10% of the Reorganized AAC Equity Interests (on a fully diluted basis) to management, key employees and directors of the Reorganized Debtors. The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but not limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its discretion.

x.      **Employee Obligations**

Upon the consent of the Requisite Consenting Lenders, on the Effective Date, the Debtors (other than any Debtor whose assets are sold pursuant to a Partial Asset Sale) shall be deemed to have assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors (but excluding any severance agreements with any of Debtors' former employees)**.**

xi.     **Indemnifications Obligations**

Notwithstanding anything in the Plan to the contrary each Indemnification Obligation shall, subject to the consent of the Requisite Consenting Lenders (in their sole discretion), be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive confirmation of the Plan, irrespective of when such obligation arose. Upon the consent of the Requisite Consenting Lenders (in their sole and absolute discretion), the Debtors shall assume the Indemnification Obligations for the directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such, who served or were employed by the Debtors as of or after the Petition Date, irrespective of whether such person has exhausted all remedies under applicable D&O Liability Insurance Policies (subject in each case to the terms of the applicable Indemnification Obligation as in effect on the date of the act or omission for which indemnification is sought). To the extent assumed by the Debtors in accordance with Article IV.11 of the Plan, any Claim based on the Debtors' obligations in Article IV.11 of the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of

53

the Bankruptcy Code or otherwise. Notwithstanding the foregoing, nothing shall impair the ability of the Post-Effective Date Debtors to modify indemnification obligations (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided*, *however*, that the assumption of the obligations under the Indemnification Obligations shall not be deemed an assumption by the Debtors of any contract, agreement, resolution, instrument or document in which such Indemnification Obligations are contained, memorialized, agreed to, embodied or created (or any of the terms or provisions thereof) if such contract, agreement, resolution, instrument or document requires the Debtors or the Reorganized Debtors to make any payments or provide any arrangements (including any severance payments) to any current or former director or officer of any of the Debtors other than indemnification payments, reimbursement, and advancement expenses and other similar payments, in each case only pursuant to the Indemnification Obligations.

### D.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, in any Asset Sale Agreements, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan or any Asset Sale Agreements, as of the Effective Date, each Debtor will be deemed to have assumed (and in the case of any Asset Sales, assumed and assigned to the applicable Buyer) each Executory Contract or Unexpired Lease to which such Debtor is a party, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected; (ii) was previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion or notice to reject Filed on or before the Confirmation Date; or (iv) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.

The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions (or assumptions and assignments, as applicable) or rejections described above as of the Effective Date. Unless otherwise indicated, all assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or by Bankruptcy Court order, will vest in and be fully enforceable by the applicable Reorganized Debtor or assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Notwithstanding the foregoing paragraph or anything contrary herein or in the Plan, the Debtors reserve the right, with the consent of the Requisite Consenting Lenders or Buyer(s), as applicable, to alter, amend, modify, or supplement the Executory Contracts and Unexpired Leases identified for assumption, assumption and assignment, or rejection in the Plan Supplement prior to the Effective Date.

2.      **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Noticing and Claims Agent no later than the later of (i) thirty (30) days after the Effective Date and (ii) the Bar Date established in the Chapter 11 Cases.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3.      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any Cure Claim (2) the ability of the Reorganized Debtors or any assignee (including a Buyer), as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption. To the extent the Bankruptcy Court determines that the amount of a Cure Claim for an Executory Contract or Unexpired Lease is greater than the amount reflected on the Cure Notice related to such Cure Claim, the Debtors or Post-Effective Date Debtors shall have the right to reject such Executory Contract or Unexpired Lease and, in such an instance, shall not be required to pay the Cure Claim.

At least fourteen (14) days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure amount must be Filed by the Cure/Assumption Objection Deadline**. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure amount. To

55

the extent that the Debtors seek to assume and assign an Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

**Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

### 4. Insurance Policies

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Post-Effective Date Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

### 5. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

### 6. Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan or any Asset Sale Agreement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

### 7. Nonoccurrence of Effective Date

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

### 8.    Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into in the ordinary course of business after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Reorganized Debtor or the Buyer(s), as applicable, in the ordinary course of its business, and will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

### E.    Provisions Governing Distributions

### 1.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### i.    Delivery of Distributions in General

Except as otherwise provided in the Plan (including the subsequent paragraph of Article VI.B.1 of the Plan), distributions to Holders of Allowed Claims or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors: (1) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf. Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Post-Effective Date Debtors, and the Plan Administrator shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

57

All Distributions on account of Allowed DIP Lender Claims, Allowed Senior Lender Claims, and Allowed Junior Lender Claims shall be made to or at the direction of the DIP Agent, Senior Lien Agent, and Junior Lien Agent, as applicable, for further distribution to the DIP Lenders, Senior Lenders, and Junior Lenders, as applicable, in accordance with the Plan and the DIP Credit Agreement, Senior Lien Credit Agreement, and Junior Lien Credit Agreement, as applicable, and shall be deemed completed when made to or at the direction of the DIP Agent, Senior Lien Agent, and Junior Lien Agent, as applicable. For the avoidance of doubt: (i) the Reorganized AAC Equity Interests and New Warrants will be in book entry form only; (ii) the DIP Agent, Senior Lien Agent, and Junior Lien Agent shall have no liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan; and (iii) the Reorganized Debtors shall reimburse the DIP Agent, Senior Lien Agent, and Junior Lien Agent for any reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its counsel and agents) incurred on or after the Effective Date in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

###   ii.    No Fractional Distributions

No fractional shares of Reorganized AAC Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Reorganized AAC Equity Interests that is not a whole number, the actual distribution of shares of Reorganized AAC Equity Interests shall be rounded as follows: (a) fractions of one half or greater shall be rounded to the next higher whole number and (b) fractions of less than one half shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of Reorganized AAC Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

###   iii.    Minimum Distributions

Holders of Allowed Claims entitled to distributions of $100 or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article X of the Plan and its Holder is forever barred pursuant to Article X of the Plan from asserting that Claim against the Reorganized Debtors or their property.

###   iv.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors or the Plan Administrator, as applicable, have determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six (6) months after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Post-Effective Date Debtor, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

### 3.      Registration or Registration Exemption

If a Reorganization Transaction occurs, the Reorganized AAC Equity Interests and the New Warrants will be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The offering, distribution, issuance and sale of the Reorganized AAC Equity Interests and the New Warrants as contemplated by the Plan will be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration of the Reorganized AAC Equity Interests and the New Warrants prior to the offering, issuance, distribution, or sale thereof, to the fullest extent permitted by Section 1145 of the Bankruptcy Code. The Reorganized AAC Equity Interests and the New Warrants issued pursuant to Section 1145 of the Bankruptcy Code (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely transferable by any initial recipient thereof that (a) is not an "affiliate" of the issuer of the Reorganized AAC Equity Interests as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, and (c) is not an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code, subject to the applicable restrictions on transfer set forth in the New Organizational Documents and any applicable regulatory approval.

The Reorganized AAC Equity Interests or New Warrants issued otherwise than pursuant to Section 1145 under the Bankruptcy Code, if any (e.g., those issued to a person who is an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code), will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act or any other available exemption from registration under the Securities Act, as applicable, and will be "restricted securities" as defined under Rule 144 under the Securities Act. These securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration under the Securities Act or pursuant to an applicable exemption from registration under the Securities Act and other applicable law, subject to the applicable restrictions on transfer set forth in the New Organizational Documents and any applicable regulatory approval. All persons who receive restricted securities pursuant to the Plan will be requ ired to agree that they will not offer, sell or otherwise transfer any such shares except in accordance with an applicable exemption from registration under the Securities Act, and each such person will also be required to represent that such person is an "accredited investor", as defined under Rule 501(a) promulgated under the Securities Act.

### 4.      Tax Issues and Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Post-Effective Date Debtors or the Plan Administrator, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding

distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Property deposited into the various Claim distribution accounts described elsewhere in the Plan (including the Priority Claims Reserve, Other Secured Claims Reserve, and the General Account) will be subject to disputed ownership fund treatment under section 1.468B-9 of the United States Treasury Regulations. All corresponding elections with respect to such accounts shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts, any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such accounts shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).

### 5.      Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

### 6.      No Postpetition Interest on Claims

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 7.      Setoffs and Recoupment

The Debtors or the Post-Effective Date Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Post-Effective Date Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtors of any such Claim it may have against the Holder of such Claim.

### 8.      Claims Paid or Payable by Third Parties

#### i.      Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Post-Effective Date Debtor, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Post-Effective Date Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Post-Effective Date Debtor, to the extent the

Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure o f such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Post-Effective Date Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### ii.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### iii.     Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary (including, without limitation, Article X of the Plan), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### F.      The Plan Administrator

The following provisions shall apply only if the Entire Company Asset Sale Trigger occurs and a Plan Administrator is appointed.

### 1.      The Plan Administrator

The powers of the Plan Administrator shall be set forth in the Plan Administrator Agreement and shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Wind-Down Debtors, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors in accordance with the Wind-Down Reserve; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts in accordance with the Wind-Down Reserve; (3) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-

61

Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) reconciling, objecting to, and resolving Claims in accordance with Article IX of the Plan, (10) pursuing any Causes of Action included in the Plan Administrator Assets, and (11) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court, pursuant to the Plan, pursuant to the Plan Administrator Agreement, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind -Down Reserve.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Consenting Lenders and the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Consenting Lenders. Upon appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

### i.      Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down Reserve, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

### ii.      Wind-Down Budget

The Debtors shall include in the Plan Supplement, in form and substance satisfactory to the Required Consenting Lenders, a statement of cash receipts and disbursements (which shall include the funding of the Distribution Reserve Accounts and the Professional Fee Escrow Account) and amount of Senior Lender Claims, if any, and Junior Lender Claims outstanding for the Wind-Down, setting forth on a weekly basis, the anticipated uses of the Distributable Proceeds (the "Wind-Down Budget", as may be updated, amended or modified from time to time with the written consent of the Requisite Consenting Lenders).

### iii.      Retention of Professionals

The Plan Administrator shall have the right, subject to the Wind-Down Reserve, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind -Down Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

iv.        **Compensation of the Plan Administrator**

The Plan Administrator shall have the right, subject to the Wind-Down Reserve, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

v.        **Plan Administrator Expenses**

All costs, expenses and obligations incurred by the Plan Administrator in administering the Plan, the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget. Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

2.        **Wind-Down**

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Entire Company Asset Sale Agreements and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

3.        **Exculpation, Indemnification, Insurance & Liability Limitation**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful

*ACTIVE 52312155v1*

misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

### 4. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability or refunds due each of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 5. Dissolution of the Wind-Down Debtors

At any time the Plan Administrator determines that the expense of administering the Wind-Down Debtors so as to make a final distribution to Holders of Claims is likely to exceed the value of the assets remaining for such distribution, the Plan Administrator may (i) reserve any amount necessary to close the Chapter 11 Cases and dissolve and otherwise wind down the Wind-Down Debtors and (ii) donate any balance to a charitable organization that is unrelated to the Debtors, the Plan Administrator, and any insider of the Plan Administrator.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which each Wind-Down Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

### G. Reserves Administered by the Plan Administrator

The following provisions shall apply only if the Entire Company Asset Sale Trigger occurs and a Plan Administrator is appointed; provided, however, that in the case of a Reorganization Transaction, if the Debtors or Reorganized Debtors, with the consent of the Requisite Consenting Lenders, determine that they are required, or that it is necessary, to establish any of the reserves set forth in Article VIII of the Plan, the Reorganized Debtors (rather than a Plan Administrator) shall administer such reserves in the manner established by Article VIII of the Plan.

1.       **Establishment of Reserve Accounts**

The Plan Administrator shall establish each of the Distribution Reserve Accounts (which may be affected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).

2.       **Undeliverable Distribution Reserve**

i.       **Deposits**

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B.2 of the Plan.

ii.       **Forfeiture**

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within three months after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, or their respective properties or assets. In such cases, any Cash or other property held by the Wind-Down Debtors in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, without any further action or order of the Bankruptcy Court shall promptly be transferred to the General Account to be distributed according to the priority set forth in Article VIII.F of the Plan, notwithstanding any federal or state escheat laws to the contrary.

iii.       **Disclaimer**

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; provided that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

iv.       **Distribution from Reserve**

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of the Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in Article VIII.B of the Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, to the General Account.

*ACTIVE 52312155v1*

### 3.     Wind-Down Reserve

On the Effective Date, the Plan Administrator shall establish the Wind-Down Reserve by depositing Cash, in the amount of the Wind-Down Amount into the Wind-Down Reserve. The Wind-Down Reserve shall be used by the Plan Administrator solely to satisfy the expenses of Wind-Down Debtors and the Plan Administrator as set forth in the Plan and Wind-Down Budget; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget. In no event shall the Plan Administrator be required or permitted to use personal funds or assets for such purposes. Any amounts remaining in the Wind-Down Reserve after payment of all expenses of the Wind-Down Debtors and the Plan Administrator shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.F of the Plan without any further action or order of the Bankruptcy Court.

### 4.     Priority Claims Reserve

On the Effective Date, the Plan Administrator shall establish the Priority Claims Reserve by depositing Cash in the amount of the Priority Claims Reserve Amount into the Priority Claims Reserve. The Priority Claims Reserve Amount shall be used to pay Holders of all Allowed Priority Claims and Allowed Administrative Claims to the extent that such Priority Claims and Administrative Claims have not been paid in full on or before the Effective Date. If all or any portion of a Priority Claim or Administrative Claim shall become a Disallowed Claim, then the amount on deposit in the Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims and Allowed Administrative Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Priority Claims Reserve after payment of all Allowed Priority Claims and Allowed Administrative Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.F of the Plan without any further action or order of the Bankruptcy Court.

### 5.     Other Secured Claim Reserve

On the Effective Date, the Plan Administrator shall establish the Other Secured Claims Reserve by depositing Cash in the amount of the Other Secured Claims Reserve Amount into the Other Secured Claims Reserve. The Other Secured Claims Reserve Amount shall be used to pay Allowed Other Secured Claims. If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan, and shall otherwise promptly be

66

transferred to the General Account to be distributed in accordance with the Plan without any furt her action or order of the Bankruptcy Court. Any amounts remaining in the Other Secured Claims Reserve after satisfaction of all Allowed Other Secured Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.F of the Plan without any further action or order of the Bankruptcy Court.

### 6.   Distributable Proceeds/Waterfall Recovery

All Distributable Proceeds shall be allocated and paid to the applicable Holders of Claims in the following priority (in each case on a Pro Rata basis): (i) *first*, on account of Allowed DIP Lender Claims until Paid in Full; (ii) *second*, on account of Allowed Senior Lender Claims until Paid in Full; (iii) *third*, on account of Allowed Junior Lender Secured Claims until Paid in Full; and (iv) *fourth*, on account of Allowed General Unsecured Claims (the "Waterfall Recovery").

### 7.   The General Account and Distribution Reserve Account Adjustments

Beginning on the six-month anniversary of the Effective Date or at such other times as the Plan Administrator shall determine is appropriate, and thereafter, on each six-month interval or such other interval as the Plan Administrator shall determine is appropriate, the Plan Administr ator shall determine the amount of Cash required to adequately maintain each of the Distribution Reserve Accounts. If after making and giving effect to any determination referred to in the immediately preceding sentence, the Plan Administrator determines that any Distribution Reserve Account (i) contains Cash in an amount in excess of the amount then required to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer such surplus Cash to the General Account to be used or distributed according to the priority set forth in Article VIII.F thereof, or (ii) does not contain Cash in an amount sufficient to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall, with the consent of the Required Consenting Lenders, transfer Cash from the General Account, to the extent Cash is available in the General Account until the deficit in such Distribution Reserve Account is eliminated. Any funds in the General Account not needed to eliminate a Distribution Reserve Account deficit shall be allocated and paid as Distributable Proceeds pursuant to the Waterfall Recovery as set forth in Article VIII.F of the Plan.

### 8.   GUC Disputed Claims Reserve

To the extent that there are sufficient Distributable Proceeds pursuant to the Waterfall Recovery to make one or more distributions to Holders of Allowed General Unsecured Claims, the Plan Administrator shall establish, for the benefit of each holder of a Disputed General Unsecured Claim, the GUC Disputed Claims Reserve consisting of Cash in an amount equal to the Pro Rata share of distributions that would have been made to the holder of such Disputed General Unsecured Claim if it were an Allowed General Unsecured Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed General Unsecured Claim or if no Proof of Claim has been filed the liquidated amount set forth in the Schedules, (ii) the amount in which the Disputed General Unsecured Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed General Unsecured Claim or (iii) such other amount as may be agreed upon by the holder of such

ACTIVE 52312155v1

Disputed General Unsecured Claim and the Plan Administrator. Amounts held in the GUC Disputed Claims Reserve shall be retained by the Wind Down Debtors for the benefit of holders of Disputed General Unsecured Claims pending determination of their entitlement thereto under the terms of the Plan. No payments or distributions shall be made with respect to all or any portion of any Disputed General Unsecured Claim pending the entire resolution thereof by Final Order.

At such time as a Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, the Plan Administrator shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan. Such distribution, if any, shall be made as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed General Unsecured Claim becomes a Final Order.

If a Disputed General Unsecured Claim is Disallowed, in whole or in part, the Plan Administrator shall distribute amounts held in the GUC Disputed Claims Reserve with respect to such Claim (or, if Disallowed in part, the amounts held in the GUC Disputed Claims Reserve with respect to the Disallowed portion of such Claim) to the General Account.

## H.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.    Allowance of Claims

After the Effective Date, the Plan Administrator or each of the Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

### 2.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Plan Administrator or the Reorganized Debtors, as applicable, shall have the sole authority to File and prosecute objections to Claims, and the Plan Administrator or Reorganized Debtors, as applicable, shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and direct the adjustment of the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 3.    Estimation of Claims

Before, on, or after the Effective Date, the Debtors, Plan Administrator or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section

*ACTIVE 52312155v1*

502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Plan Administrator or Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register as directed by the Debtors, the Plan Administrator or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

### 6. Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Plan Administrator or the Reorganized Debtors, as applicable.  All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise provided herein or as agreed to by the Plan Administrator or the Reorganized Debtors, as applicable, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive

69

any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.

### 7.    Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, or by agreement with the Plan Administrator or the Reorganized Debtors, as applicable, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law, unless otherwise ordered by the Bankruptcy Court.

### 8.    No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim or unless otherwise determined by the Plan Administrator or Reorganized Debtors, as applicable.

### 9.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

### I.    Settlement, Release, Injunction, and Related Provisions

### 1.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Effective Date Debtors, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

## 2.    Discharge of Claims and Termination of Interests

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including the Exit Facility Documents and the New Organizational Documents, as applicable): (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of any and all Claims (including any Intercompany Claims resolved or compromised (consistent with the Reorganization Transaction) after the Effective Date by the Post-Effective Date Debtors), Interests (including any Intercompany Interests reinstated or cancelled and released (consistent with the Reorganization Transaction) after the Effective Date by the Post-Effective Date Debtors), and Causes of Action against the Debtors of any nature whatsoever including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such liability relates to services performed by employees of the Debtors prior to the Effective Date and that arises from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, any interest accrued on Claims or Interests from and after the Petition Date, and all other liabilities against, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, (b) the Plan shall bind all holders of Claims and Interests, (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code, and (d) all Entities shall be precluded from asserting against the Debtors, their respective Estates, the Post-Effective Date Debtors, their successors and assigns, and its assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, in each case regardless of whether or not: (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; (iii) the Holder of such a Claim or Interest has accepted, rejected or failed to vote to accept or reject the Plan; or (iv) any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

## 3.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

71

### 4. Release of Liens

Except as otherwise specifically provided in the Plan (including, without limitation the satisfaction of the DIP Lender Claims in accordance with Article II.C of the Plan), the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors. The DIP Agent, Senior Lien Agent, and Junior Lien Agent shall execute and deliver all documents reasonably requested by the Post-Effective Date Debtors or the agent(s) under the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Post-Effective Date Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

### 5. Debtor Release

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed forever released, waived, and discharged by the Debtors, Post-Effective Date Debtors, and their respective Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities, from any and all claims and Causes of Action, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors or their respective Estates, that the Debtors, Post-Effective Date Debtors, or their respective Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transaction, the DIP Loan Documents, the Senior Lien Loan Documents, the Junior Lien Loan Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement or any Asset Sale, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other

72

occurrence taking place on or before the Effective Date except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, knowing violation of law or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan (collectively, the "**Debtor Release**"). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Asset Sales, or any document, instrument, or agreement (including the Restructuring Documents, and other documents, instruments and agreements set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release, waiver, or discharge of any of the Debtors' or Post-Effective Date Debtors' assumed indemnification provisions as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan, including with respect to a Restructuring Transaction and Asset Sales, as applicable; a good faith settlement and compromise of the Claims released by the Debtor Release; in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, Post-Effective Date Debtors, or the Debtors' respective Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

IF THE PLAN IS CONFIRMED AND THIS DEBTOR RELEASE IS APPROVED AS PROPOSED, THEN TO THE EXTENT HOLDERS OF CLAIMS OR INTERESTS HAVE ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION AGAINST THE RELEASED PARTIES THAT ARE ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR RESPECTIVE ESTATES, SUCH DERIVATIVE CLAIMS AND CAUSES OF ACTION WOULD BE RELEASED.

6.    **Release by Holders of Claims or Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, and to the fullest extent allowed by applicable law, each Releasing Party is deemed to have forever released, waived, and discharged each of the Debtors, Reorganized Debtors, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors or their respective Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transaction, the DIP Loan Documents, Senior Lien Loan Documents, the Junior Lien Loan

73

Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement or any Asset Sale, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, knowing violation of law or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan (the "<u>Third Party Release</u>"). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, the Asset Sales, or any document, instrument, or agreement (including the Restructuring Documents, and other documents, instruments, and agreements set forth in the Plan Supplement) executed to implement the Plan and (2) any indemnification obligations of the Term Loan Lenders owed to the Term Loan Agent pursuant to the Term Loan Credit Agreement and shall not result in a release, waiver, or discharge of any of the Debtors' or Post-Effective Date Debtors' assumed indemnification provisions as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan, including with respect to a Restructuring Transaction and Asset Sales, as applicable; a good faith settlement and compromise of the Claims released by the Third-Party Release; in the best interests of the Debtors and their respective Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

7.    **Exculpation**

Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement or any Asset Sale, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of

74

property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, knowing violation of law or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release or exculpate any Claim relating to any post-Effective Date obligations of any party or Entity under the Plan, the Asset Sales, or any document, instrument, or agreement (including the Restructuring Documents, and other documents, instruments and agreements set forth in the Plan Supplement) executed to implement the Plan.

### 8.    Mutual Release Between Debtors and Consenting Lenders

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, (i) each of (a) the Debtors, (b) the Post-Effective Date Debtors, (c) their respective Estates, and (d) with respect to the foregoing clauses (a) through (c), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such (with respect to the foregoing clauses (a) through (d), the "<u>Debtor Parties</u>") is deemed released and discharged by each of (x) the Consenting Lenders and (y) each Consenting Lender's current and former Affiliates, and such Consenting Lender's and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such (with respect to the foregoing clauses (x) and (y), the "<u>Consenting Lender Parties</u>") and (ii) each of the Consenting Lender Parties is deemed released and discharged by each of the Debtor Parties, in each case in the foregoing clauses (i) and (ii) on behalf of themselves and their respective successors, assigns, and

75

representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities, from any and all claims and Causes of Action, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any intercompany transaction, the Senior Lien Loan Documents, the Junior Lien Loan Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement or any Asset Sale, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, knowing violation of law or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan (collectively, the "<u>Mutual Release</u>"). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Asset Sales, or any document, instrument, or agreement (including the Restructuring Documents, and other documents, instruments and agreements set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release, waiver, or discharge of any of the Debtors' or Post-Effective Date Debtors' assumed indemnification provisions as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Mutual Release.

9.    Injunction

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released by the Debtors pursuant to the Plan; (c) have been released by third parties pursuant to the Plan, (d) are subject to exculpation pursuant to the Plan; or (e) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Post-Effective Date Debtors, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating,

**perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan**.

### 10.    Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Effective Date Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Post-Effective Date Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

### 11.    Recoupment

In no event shall any Holder of a Claim be entitled to recoup against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 12.    Subordination Rights.

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### J.    Conditions Precedent to Confirmation and the Effective Date

### 1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI.C thereof):

i.        The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Requisite Consenting Lenders;

ii.        The final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement in all material respects and otherwise approved by the Requisite Consenting Lenders and the Debtors consistent with their respective consent and approval rights in the Restructuring Support Agreement; and

iii.        The Disclosure Statement Order, in form and substance acceptable to the Debtors and the Requisite Consenting Lenders, (a) shall have been duly entered and in full force and effect, (b) shall not have been reversed, stayed, modified or vacated on appeal, and (c) shall have become a Final Order.

## 2.        Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI.C thereof):

i.        The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Requisite Consenting Lenders;

ii.        All Transaction Expenses shall have been Paid in Full in Cash;

iii.        The Debtors shall not be in default under the DIP Credit Agreement or the DIP Orders (or, to the extent that the Debtors have been or are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured in a manner consistent with the DIP Credit Agreement and the DIP Order, as applicable);

iv.        The DIP Lender Claims shall have been Paid in Full or otherwise satisfied in accordance with Article II.C of the Plan;

v.        In the case of a Reorganization Transaction, (a) all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived; and (b) the Minimum Liquidity Condition shall have been satisfied;

vi.        In the case of a Reorganization Transaction, the New Organizational Documents shall have been filed with the appropriate governmental authority, as applicable;

vii.        The Confirmation Order, in form and substance acceptable to the Debtors and the Requisite Consenting Lenders, (a) shall have been duly entered and in full force and effect, (b) shall not have been reversed, stayed, modified or vacated on appeal, and (c) shall have become a Final Order;

viii.        All governmental and third-party approvals and consents necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would

78

restrain, prevent or otherwise impose materially adverse conditions on such transactions;

ix.     The final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement in all material respects and otherwise approved by the Requisite Consenting Lenders and the Debtors consistent with their respective consent and approval rights in the Restructuring Support Agreement;

x.     All fees, expenses, and other amounts payable pursuant to the Restructuring Support Agreement and the DIP Orders shall have been paid in full;

xi.     All Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

xii.     All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

xiii.     All conditions precedent to the issuance of the Reorganized AAC Equity Interests, other than any conditions related to the occurrence of the Effective Date, shall have occurred and the Reorganized AAC Equity Interests shall have been issued;

xiv.     In the case of a Reorganization Transaction, there shall be no ruling, judgment or order issued by any Governmental Unit making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Reorganization Transaction, unless such ruling, judgment or order has been stayed, reversed or vacated within three (3) Business Days after such issuance;

xv.     The Debtors shall have implemented the Reorganization Transaction in a manner consistent in all material respects with the Plan, the Confirmation Order, and the Restructuring Support Agreement; and

xvi.     In the event of any Asset Sales, all conditions precedent to the effectiveness of the Asset Sale Agreements shall have been satisfied or waived pursuant to the terms thereof, and the consummation of such Asset Sales shall have occurred concurrently with the occurrence of the Effective Date.

### 3.     Waiver of Conditions

The conditions to confirmation of the Plan and to the Effective Date of the Plan set forth in Article XI of the Plan may be waived only by consent of the Debtors and the Requisite Consenting Lenders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

ACTIVE 52312155v1

### 4. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## VIII. RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article XI of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the estates than the Plan.

*ACTIVE 52312155v1*

#### 4.  The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan (including the requirement that the Plan be in form and substance acceptable to the Requisite Consenting Lenders), reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

#### 5.  Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, a bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

81

### 6. Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders

82

certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes entitled to vote to accept or reject the Plan or require any sort of revote by such Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 10. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Post-Effective Date Debtors, or Released Parties, as applicable.  Discussions and summaries of these provisions can be found in Articles VII.I and IX.B of this Disclosure Statement.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan and the Plan may no longer be confirmable.

### B.    Risks Related to Recoveries under the Plan

#### 1.   The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results.

If the Entire Company Asset Sale does not occur, the Reorganized Debtors will continue to operate their businesses after the Effective Date.  The Reorganized Debtors, however, may not be able to achieve their projected financial results.  The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the Reorganized AAC Equity Interests may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

### 3. The Reorganized Debtors May Not Be Able to Obtain an Acceptable Exit Facility.

The Plan contemplates that the Reorganized Debtors may need to enter into an Acceptable Exit Facility. However, it is possible that the Reorganized Debtors may not be able to obtain or consummate an Acceptable Exit Facility. If the Reorganized Debtors do not obtain funding under an Acceptable Exit Facility, they may lack sufficient liquidity to continue operating in the ordinary course post-emergence and may be unable to the consummate the Plan or any other plan of reorganization.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness.

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility upon emergence.

### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, clients, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

*ACTIVE 52312155v1*

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, clients, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. Prolonged Operations in Bankruptcy May Harm the Debtors' Businesses.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that clients and vendors will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative relationships or treatment options.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require debtor in possession financing to fund the Debtors' operations. If the Debtors are unable to fully draw on the availability under the DIP Facility or are unable to consummate the Exit Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. The Debtors Operate in a Highly Competitive Industry.

The market for mental health and substance abuse treatment facilities is highly fragmented with approximately 12,000 different companies providing services to the adult and adolescent population, of which only 30% are operated by for-profit organizations. The Debtors' inpatient treatment facilities compete with several national competitors and many regional and local competitors. Some of the competitors are government entities that are supported by tax revenue,

85

and others are non-profit entities that are primarily supported by endowments and charitable contributions. The Debtors do not receive financial support from these sources. Some larger companies in the industry compete with the Debtors on a national scale and offer substance abuse treatment services among other behavioral healthcare services. To a lesser extent, the Debtors also compete with other providers of substance abuse treatment services, including other inpatient behavioral healthcare facilities and general acute care hospitals.

The Debtors' operations depend on the efforts, abilities and experience of their management team, physicians and medical support personnel, including nurses, mental health technicians, therapists, addiction counselors, pharmacists and clinical technicians. The Debtors compete with other healthcare providers in recruiting and retaining qualified management, mental health technicians, therapists, nurses, counselors, and other support personnel responsible for the daily operations of the Debtors' facilities. The nationwide shortage of nurses and other medical support personnel has been a significant operating issue facing their industry in recent years, made more acute by the COVID-19 pandemic. This shortage may require the Debtors to enhance the Debtors' wages and benefits to recruit and retain nurses and other medical support personnel or require them to hire expensive temporary personnel. If the Debtors are unable to attract and retain qualified personnel, they may be unable to provide their services, the quality of the Debtors' services may decline and they could experience a decline in client volume, all of which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

If the Debtors are unable to compete effectively with their competitors, patients may seek addiction treatment services from other providers.

5. **The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.**

Substance abuse treatment providers are regulated extensively at the federal, state and local level. In order to operate the Debtors' business and obtain reimbursement from commercial and government payors, the Debtors must obtain and maintain a variety of licenses, permits, certifications and accreditations, and ensure the providers are licensed and certified (where applicable) to provide such services. The Debtors must also comply with numerous other laws, regulations, and guidance applicable to the provision of substance abuse disorder services, including medication-assisted treatment ("MAT"), detoxification, and behavioral therapy. The facilities of the Debtors are also subject to periodic on-site inspections by the regulatory and accreditation agencies in order to determine the Debtors' compliance with applicable requirements.

The laws, regulations, and guidance that affect substance abuse treatment providers are complex and change frequently. The Debtors must regularly review the Debtors' organization and operations and make modifications as necessary to comply with changes in the law or new interpretations of laws, regulations, and guidance. In recent years, significant public attention has focused on the healthcare industry, including attention to the conduct of industry participants and the cost of healthcare services. Federal and state government agencies have heightened and coordinated civil and criminal enforcement efforts relating to the healthcare industry. The ongoing investigations relate to, among other things, referral practices, cost reporting, billing practices,

86

credit balances, health information privacy and security, physician ownership and joint ventures involving hospitals and other healthcare providers. Recently, federal and state governmental officials have focused on fraud and abuse in the addiction treatment industry. In particular, new laws and regulations have been passed that are intended to prohibit the payment of kickbacks, bribes and other inducements in exchange for referrals of patients to treatment providers, including residential treatment centers and outpatient programs. The Debtors expect that healthcare costs and other factors will continue to encourage both the development of new laws and regulations and increased enforcement activity, including among substance abuse treatment providers.

While the Debtors believe that they are in substantial compliance with all applicable laws and regulations, and the Debtors are not aware of any material pending or threatened investigations involving allegations of wrongdoing, there can be no assurances of compliance. Compliance with such laws and regulations may be subject to future government review and interpretation, as well as significant regulatory action including fines, penalties and exclusion from government health programs.

### 6. The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or facility levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' and/or the Reorganized Debtors' businesses and the results of operations.

### 8. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Petition Date or before confirmation of the Plan (a) would be subject to

87

compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan. Any Claims not ultimately discharged through the Plan could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

9. **If Reimbursement Rates Paid by Third-Party Payors are Reduced, if the Debtors are Unable to Maintain Favorable Contract Terms with Payors or Comply with Their Payor Contract Obligations, or if Third-Party Payors Otherwise Restrain Their Ability to Obtain or Provide Services to Clients, Their Business, Financial Condition and Results of Operation Could be Adversely Affected.**

Managed care organizations and other third-party payors pay for the services that the Debtors provide to many of their clients. For 2018, approximately 90% of the Debtors' revenue was reimbursable by third-party payors, including amounts paid by such payors to clients, with the remaining portion payable directly by their clients. The Debtors' third-party payors are primarily commercial payors. If any of these third-party payors reduce their reimbursement rates or elect not to cover some or all of the Debtors' services, the Debtors' business, financial condition and results of operations may be materially adversely affected.

In addition to limits on the amounts that payors will reimburse for the services the Debtors provide to their members, utilization management imposed by third-party payors designed to reduce admissions and the length of stay for clients, including preadmission authorizations and utilization review, have affected and are expected to continue to affect the Debtors' facilities. Utilization review entails the review of the admission and course of treatment of a client by third-party payors. Inpatient utilization, average lengths of stay and occupancy rates continue to be negatively affected by payor-required preadmission authorization and utilization review and by payor pressure to maximize outpatient and alternative healthcare delivery services for less acutely ill clients. The Debtors believe that generally, health insurance companies have become more stringent and aggressive with respect to addiction treatment providers; taking measures that have put pressure on reimbursement rates, length of stay and timing of reimbursement. The Debtors expect that payor efforts to impose more stringent cost controls will continue. Although the Debtors are unable to predict the effect these controls and changes could have on their operations, significant limits on the scope of services reimbursed and on reimbursement rates and fees could have a material adverse effect on their business, financial condition and results of operations. If the rates paid or the scope of substance use treatment services covered by third-party commercial payors are reduced, the Debtors' business, financial condition and results of operations could be materially adversely affected.

Third-party payors often use plan structures, such as narrow networks or tiered networks, to encourage or require clients to use in-network providers. In-network providers typically provide services through third-party payors for a negotiated lower rate or other less favorable terms. Third-party payors generally attempt to limit use of out-of-network providers by requiring clients to pay higher copayment and/or deductible amounts for out-of-network care. Additionally, third-party payors have become increasingly aggressive in attempting to minimize the use of out-of-network providers by disregarding the assignment of payment from clients to out-of-network providers (i.e., sending payments directly to clients instead of to out-of-network providers), capping out-of-network benefits payable to clients, waiving out-of-pocket payment amounts and initiating

88

litigation against out-of-network providers for interference with contractual relationships, insurance fraud and violation of state licensing and consumer protection laws. The majority of third-party payors consider certain of the Debtors' facilities to be "out-of-network" providers. If third-party payors continue to impose and to increase restrictions on out-of-network providers, the Debtors' revenue could be threatened, forcing the Debtors' facilities to participate with third-party payors and accept lower reimbursement rates compared to the Debtors' historic reimbursement rates.

Third-party payors also are entering into exclusive source contracts with some healthcare providers, which could effectively limit the Debtors' pool of potential clients. Moreover, third-party payors are beginning to carve out specific services, including substance abuse treatment and behavioral health services, and establish small, specialized networks of providers for such services at fixed reimbursement rates. Continued growth in the use of carve-out arrangements could materially adversely affect the Debtors' business to the extent the Debtors are not selected to participate in such smaller specialized networks or if the reimbursement rate is not adequate to cover the cost of providing the service.

**10. If the Debtors Overestimate the Reimbursement Amounts That Payors Will Pay Them for Out-Of-Network Services Performed, It Would Increase the Debtors' Revenue Adjustments, Which Could Have a Material Adverse Effect on Their Revenue, Profitability and Cash Flows.**

For out-of-network services, the Debtors recognize revenue from payors at the time services are provided based on their estimate of the amount that payors will reimburse for the services performed. The Debtors estimate the net realizable value of revenue by adjusting gross client charges using their expected realization and applying this discount to gross client charges. A significant or sustained decrease in their collection rates could have a material adverse effect on the Debtors' operating results. There is no assurance that the Debtors will be able to maintain or improve historical collection rates in future reporting periods.

Estimates of net realizable value are subject to significant judgment and approximation by management. It is possible that actual results could differ from the historical estimates management has used to help determine the net realizable value of revenue. If the Debtors' actual collections either exceed or are less than the net realizable value estimates, the Debtors will record a revenue adjustment, either positive or negative, for the difference between their estimate of the receivable and the amount actually collected in the reporting period in which the collection occurred. A significant negative revenue adjustment could have a material adverse effect on their revenue, profitability and cash flows in the reporting period in which such adjustment is recorded. In addition, if the Debtors record a significant revenue adjustment, either positive or negative, in any given reporting period, it may lead to significant changes in the Debtors' results from operations from quarter to quarter, which may limit their ability to make accurate long-term predictions about their future performance.

89

### 11. A Deterioration in the Collectability of the Accounts Receivable Could Have a Material Adverse Effect on Their Business, Financial Condition and Results of Operations.

Collection of receivables from third-party payors and clients is critical to the Debtors' operating performance.  The Debtors' primary collection risks are (i) the risk of overestimating their net revenue at the time of billing, which may result in the Debtors receiving less than the recorded receivable, (ii) the risk of non-payment as a result of commercial insurance companies denying claims, (iii) in certain states, the risk that clients will fail to remit insurance payments to the Debtors when the commercial insurance company pays out-of-network claims directly to the client and (iv) resource and capacity constraints that may prevent them from handling the volume of billing and collection issues in a timely manner.  Additionally, their ability to hire and retain experienced personnel affects the Debtors' ability to bill and collect accounts in a timely manner. The Debtors routinely review accounts receivable balances in conjunction with these factors and other economic conditions that might ultimately affect the collectability of the client accounts and adjust the Debtors' allowances as warranted. Significant changes in business operations, payor mix or economic conditions, including changes resulting from legislation or other health reform efforts (including to repeal or significantly change the Affordable Care Act), could affect the Debtors' collection of accounts receivable, cash flows and results of operations. In addition, increased client concentration in states that permit commercial insurance companies to pay out-of-network claims directly to the client instead of the provider, such as California and Nevada, could adversely affect the Debtors' collection of receivables. Unexpected changes in reimbursement rates by third-party payors could have a material adverse effect on the Debtors' business, financial condition and results of operations.

### 12. The Debtors' Business Depends on Their Information Systems.  Failure to Effectively Integrate, Manage and Keep the Debtors' Information Systems Secure Could Disrupt the Debtors' Operations and Have a Material Adverse Effect on the Business.

The Debtors' business depends on effective and secure information systems that assist them in, among other things, admitting clients to the Debtors' facilities, monitoring census and utilization, processing and collecting claims, reporting financial results, measuring outcomes and quality of care, managing regulatory compliance controls and maintaining operational efficiencies. Given the dependence on electronic health systems, the Debtors could be subject to cybersecurity risks such as a cyber-attack that bypasses the Debtors' information technology security systems and other security incidents that result in security breaches, including the theft, loss, destruction or misappropriation of individually identifiable health information subject to HIPAA and other privacy and security laws, proprietary business information or other confidential or personal data. Such an incident could disrupt the Debtors' information technology systems, impede clinical operations, cause the Debtors to incur significant investigation and remediation expenses, and subject them to litigation, government inquiries, penalties and reputational damages. Information security and the continued development, maintenance and enhancement of their safeguards to protect the Debtors' systems, data, software and networks are a priority for them.  As security threats continue to evolve, the Debtors may be required to expend significant additional resources to modify and enhance the Debtors' safeguards and investigate and remediate any information security vulnerabilities.  Cyber-attacks may also impede the Debtors' ability to exercise sufficient

90

disclosure controls. If the Debtors are subject to cyber-attacks or security breaches, the Debtors' business, financial condition and results of operations could be adversely impacted.

The Debtors' information systems are also vulnerable to damage or interruption from fire, flood, natural disaster, power loss, telecommunications failure, break-ins and similar events. A failure to implement the Debtors' disaster recovery plans or ultimately restore the Debtors' information systems after the occurrence of any of these events could have a material adverse effect on the Debtors' business, financial condition and results of operations. Because of the confidential health information that the Debtors store and transmit, loss, theft or destruction of electronically-stored information for any reason could expose them to a risk of regulatory action, litigation, liability to clients and other losses.

In addition, these electronic health systems include software developed in-house and systems provided by external contractors and other service providers. To the extent that these external contractors or other service providers become insolvent or fail to support the software or systems, their operations could be negatively affected.  The Debtors' facilities also depend upon the Debtors' information systems for electronic medical records, accounting, billing, collections, risk management, payroll and other information.   If they experience a reduction in the performance, reliability or availability of the Debtors' information systems, their operations and ability to process transactions and produce timely and accurate reports could be adversely affected.

The Debtors' information systems and applications require continual maintenance, upgrading and enhancement to meet the Debtors' operational needs. The Debtors regularly upgrade and expand the Debtors' information systems' capabilities. If they experience difficulties with the transition and integration of information systems or are unable to implement, maintain or expand the Debtors' systems properly or in a timely manner, they could suffer from, among other things, operational disruptions, regulatory problems, working capital disruptions and increases in administrative expenses.

### 13. The Debtors' Ability to Maintain Census is Dependent on a Number of Factors Outside of Their Control, and if They are Unable to Maintain Census, Their Business, Results of Operations and Cash Flows Could be Materially Adversely Affected.

The Debtors' revenue is directly impacted by their ability to maintain census.  These metrics are dependent on a variety of factors, many of which are outside of the Debtors' control, including the Debtors' contracts with commercial payors for referrals, average length of stay of the Debtors' clients, the extent to which third-party payors require preadmission authorization or utilization review controls, competition in the industry and the decisions of their clients to seek and commit to treatment, particularly in light of the ongoing COVID-19 pandemic and the potential risks associated with residential treatment. Further, their census depends upon the effectiveness of the Debtors' multi-faceted marketing program. A significant decrease in census could materially adversely affect the Debtors' revenue, profitability and cash flows due to fewer or lower reimbursements received, and the additional resources required to collect accounts receivable and to maintain the Debtors' existing level of business.

Given the client-driven nature of the substance abuse treatment sector, the Debtors' business is dependent on clients seeking and committing to treatment.  Although increased

91

awareness and de-stigmatization of substance abuse treatment in recent years has resulted in more people seeking treatment, the decision of each client to seek treatment is ultimately discretionary. In addition, even after the initial decision to seek treatment, the Debtors' clients may decide at any time to discontinue treatment and leave the Debtors' facilities against the advice of the Debtors' physicians and other treatment professionals. For this reason, among others, average length of stay can vary among periods without correlating to the overall operating performance. The continued course of COVID-19 may also contribute significantly to clients' treatment decisions. If clients or potential clients decide not to seek treatment or discontinue treatment early, census could decrease and, as a result, the Debtors' business, financial condition and results of operations could be adversely affected.

**14. The Debtors May Have Limited Ability to Utilize NOLs.**

The Debtors estimate that they have incurred consolidated NOLs of approximately $87 million as of the Petition Date and are expecting that the consolidated NOLs will increase to approximately $190 million as of December 31, 2020. Section 382 of the Internal Revenue Code imposes limitations on a corporation's ability to utilize NOLs if it experiences an "ownership change." In general terms, an ownership change may result from transactions increasing the ownership of certain stockholders in the stock of a corporation by more than 50 percentage points over a three-year period. In the event of an ownership change, utilization of the Debtors' NOLs generally would be subject to an annual limitation under Section 382. Any unused NOLs in excess of the annual limitation may be carried over to later years.

The imposition of a limitation on the Debtors ability to use their NOLs to offset future taxable income could cause U.S. federal income taxes to be paid earlier than otherwise would be paid if such limitation were not in effect and could cause such NOLs to expire unused, reducing or eliminating the benefit of such NOLs. The Debtors have taken steps to avoid an ownership change as defined by Section 382 of the Internal Revenue Code prior to the implementation of the Plan and intends to implement the Plan in a manner that will mitigate the adverse impact on its NOLs of an ownership change.

**15. If the Debtors Fail to Comply with the Extensive Laws and Government Regulations Impacting their Industry, the Debtors Could Suffer Penalties, be the Subject of Federal and State Investigations or be Required to Make Significant Changes to Their Operations, Which May Reduce Their Revenue, Increase Costs and Have a Material Adverse Effect on Their Business, Financial Condition and Results of Operations.**

Healthcare service providers are required to comply with extensive and complex laws and regulations at the federal, state and local government levels relating to, among other things:

a.  licensure, certification and accreditation of substance use treatment services;

b.  licensure, certification and accreditation of laboratory under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA");

c.  privacy and security of health-related information, client personal information and medical records, as required by the Health Information Portability and Accountability

92

Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH"), and 45 CFR Part 2 (governing the confidentiality of substance use disorder patient records);

d.     handling, administration and distribution of controlled substances;

e.     necessity and adequacy of care and quality of services;

f.     licensure, certification and qualifications of professional and support personnel;

g.     referrals of clients and permissible relationships with physicians and other referral sources;

h.     claim submission and collections, including penalties for the submission of, or causing the submission of, false, fraudulent or misleading claims and the failure to repay overpayments in a timely manner;

i.     extensive conditions of participation for Medicare and Medicaid programs;

j.     consumer protection issues and billing and collection of client-owed accounts issues;

k.     communications with clients and consumers, including laws intended to prevent misleading marketing practices;

l.     physical plant planning, construction of new facilities and expansion of existing facilities;

m.     activities regarding competitors;

n.     The Food and Drug Administration ("FDA") laws and regulations related to drugs and medical devices;

o.     operational, personnel and quality requirements intended to ensure that clinical testing services are accurate, reliable and timely;

p.     health and safety of employees;

q.     handling, transportation and disposal of medical specimens and infectious and hazardous waste;

r.     corporate practice of medicine, fee-splitting, self-referral and kickback prohibitions, including recent state and federal laws intended to eliminate bribes and kickbacks; and

s.     the SUPPORT for Patients and Communities Act, which became law on October 24, 2018.

The United States has recently enacted the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA") to create a new federal crime for knowingly and willfully: (1) soliciting or receiving any remuneration in return for referring a patient to a recovery home, clinical treatment facility, or laboratory; or (2) paying or offering any remuneration to induce such a referral or in exchange for

93

an individual using the services of a recovery home, clinical treatment facility, or laboratory. Certain states, including Florida, have enacted similar laws, or will likely enact similar laws in the future.

While the Debtors make every effort to comply with the above stated laws and regulations, the Debtors could suffer penalties, be the subject of federal and state investigations or be required to make significant changes to their operations, which may reduce their revenue, increase costs and have a material adverse effect on their business, financial condition and results of operations.

### 16. Changes to Federal, State and Local Regulations, as Well as Different or New Interpretations of Existing Regulations, Could Adversely Affect the Debtors' Operations and Profitability.

Because the Debtors' treatment programs and operations are regulated at federal, state and local levels, they could be affected by regulatory changes in different regional markets. Increases in the costs of regulatory compliance and the risks of noncompliance may increase the Debtors' operating costs, and they may not be able to recover these increased costs, which may adversely affect their results of operations and profitability.

Many of the current laws, regulations, and guidance are relatively new, including the EKRA and recent state laws intended to prohibit deceptive marketing practices in the addiction treatment industry. Some recently enacted laws do not have corresponding regulations or guidance available for compliance. Thus, the Debtors do not always have the benefit of significant regulatory or judicial interpretation. Evolving interpretations or enforcement of these laws and regulations could subject the Debtors' current or past practices to allegations of impropriety or illegality or could require them to make changes in the Debtors' treatment facilities, equipment, personnel, services or capital expenditure programs. A determination that the Debtors have violated these laws, or a public announcement that the Debtors are being investigated for possible violations of these laws, could adversely affect their business, operating results and overall reputation in the marketplace.

In addition, federal, state and local requirements may be enacted that impose additional obligations on their facilities. Adoption of legislation or the creation of new regulations affecting the Debtors' facilities could increase their operating costs, restrain the Debtors' growth or limit them from taking advantage of opportunities presented and could have a material adverse effect on their business, financial condition and results of operations. Adverse changes in existing comprehensive zoning plans or zoning regulations that impose additional restrictions on the use of, or requirements applicable to, their facilities may affect the Debtors' ability to operate their existing facilities or acquire new facilities, which may adversely affect their results of operations and profitability.

**17. The Debtors are Subject to Governmental Investigations and Potential Claims and Lawsuits by Clients, Employees and Others, which May Increase the Debtors' Costs, Cause Reputational Issues and Have a Material Adverse Effect on Their Business, Financial Condition Results of Operations and Reputation.**

Given the nature of addiction and mental health issues and treatment , the substance abuse treatment industry is heavily regulated by governmental agencies, and involves significant risk of liability. The Debtors are exposed to the risk of governmental investigations, regulatory actions and whistleblower lawsuits or other claims against the Debtors, their physicians and other professionals arising out of the Debtors' day to day business operations, including, without limitation, client treatment at the Debtors' facilities and relationships with healthcare providers that may refer clients.  Addressing any investigation, lawsuit or other claim may distract management and divert resources, even if the Debtors ultimately prevail. Regardless of the outcome of any such investigation, lawsuit or claim, the publicity and potential risks associated with the investigation, lawsuit or claim could harm the Debtors' reputation or the reputation of their management and negatively impact the perception of the Debtors by clients, investors or others and could have a materially adverse impact on their financial condition and results of operations.  Fines, restrictions, penalties and damages imposed as a result of an investigation or a successful lawsuit or claim that is not covered by, or is in excess of, the Debtors' insurance coverage, may increase the Debtors' costs and reduce the Debtors' profitability. The Debtors' insurance premiums have increased year over year, and insurance coverage may not be available at a reasonable cost in the future, especially given the significant increase in insurance premiums generally experienced in the healthcare industry.

The Debtors are subject to an inherent risk of potential medical malpractice lawsuits and other potential claims or legal actions in the ordinary course of business.  From time to time, the Debtors are subject to claims alleging that the Debtors did not properly treat or care for a client, that the Debtors failed to follow internal or external procedures that resulted in death or harm to a client or that their employees mistreated the Debtors' clients, resulting in death or harm.  Any deficiencies in the quality of care provided by the Debtors' employees could expose the Debtor to governmental investigations and lawsuits from the Debtors' patients.  Some of these actions may involve large claims as well as significant defense costs.  The Debtors cannot predict the outcome of these lawsuits or the effect that findings in such lawsuits may have on them.  In an effort to resolve one or more of these matters, the Debtors may decide to negotiate a settlement, and amounts they pay to settle any of these matters may be material.  All professional and general liability insurance they purchase is subject to policy limitations. The Debtors believe that, based on the Debtors' past experience, their insurance coverage is adequate considering the claims arising from the operation of their facilities. While the Debtors continuously monitor the Debtors' coverage, the Debtors' ultimate liability for professional and general liability claims could change materially from their current estimates.  If such policy limitations should be partially or fully exhausted in the future or if payments of claims exceed their estimates or are not covered by the Debtors' insurance, such issues could have a material adverse effect on the Debtors' financial condition and results of operations.

The Debtors' care for a large number of clients with complex medical conditions, co-occurring disorders, special needs or who require a substantial level of care and supervision. There is an inherent risk that the Debtors' clients could be harmed while in treatment, whether through

95

negligence, by accident or otherwise. Further, clients might engage in behavior that results in harm to themselves, the Debtors' employees or to one or more other individuals. Patient safety incidents may result in regulatory enforcement actions, negative press about the Debtors or the addiction treatment industry generally and lawsuits filed by plaintiff's lawyers against them. These developments could diminish public perception of the quality of the Debtors' services, which in turn could lead to a loss of client placements and referrals, resulting in a material adverse effect on the Debtors' business, results of operations and financial condition.

Failure to comply with applicable laws, regulations and guidance could result in the imposition of significant civil or criminal penalties, loss of license or certification or require them to change their operations, or the exclusion of one or more facilities from participation in the Medicare, Medicaid and other federal and state healthcare programs, any of which may have a material adverse effect on the Debtors' business, financial condition and results of operations. Both federal and state government agencies as well as commercial payors have heightened and coordinated civil and criminal enforcement efforts as part of numerous ongoing investigations of healthcare organizations.

The Debtors endeavor to comply with all applicable legal and regulatory requirements, however, there is no guarantee that they will be able to adhere to all of the requirement that apply to the Debtors' business. The Debtors seek to structure all of their relationships with referral sources and clients to comply with applicable anti-kickback laws, physician self-referral laws, fee-splitting laws and state corporate practice of medicine prohibitions. The Debtors monitor these laws and their implementing regulations and implement changes as necessary. However, the laws and regulations in these areas are complex and often subject to varying interpretations. For example, if an enforcement agency were to challenge the compensation paid under the Debtors' contracts with professional physician groups, the Debtors could be required to change their practices, face criminal or civil penalties, pay substantial fines or otherwise experience a material adverse effect as a result.

### 18. State Efforts to Regulate the Construction or Expansion of Healthcare Facilities Could Impair Their Ability to Operate and Expand Their Facilities.

The construction of new healthcare facilities, the expansion, transfer or change of ownership of existing facilities and the addition of new beds, services or equipment ma y be subject to state laws that require a determination of public need and prior approval by state regulatory agencies under certificates of need ("CONs") laws or other healthcare planning initiatives. Review of and similar CONs proposals may be lengthy and may require public hearings. States in which the Debtors now or may in the future operate may require CONs under certain circumstances not currently applicable to the Debtors or may impose standards and other health planning requirements upon them. Violation of these state laws and the Debtors' failure to obtain any necessary state approval could:

(a)     result in the Debtors' inability to acquire a targeted facility, complete a desired expansion, establish a new facility, or make a desired replacement; or

96

(b)     result in the revocation of a facility's license or imposition of civil or criminal penalties any of which could have a material adverse effect on their business, financial condition and results of operations.

If the Debtors are unable to obtain required regulatory, zoning or other required approvals for renovations and expansions, the Debtors' growth may be restrained, and their operating results may be adversely affected.  In the past, the Debtors have not experienced any material adverse effects from such requirements, but the Debtors cannot predict their future impact on their operations.

**19. Change of Ownership or Change of Control Requirements Imposed by State and Federal Licensure and Certification Agencies May Limit the Debtors' Ability to Timely Realize Opportunities, Adversely Affect Their Licenses and Certifications, Interrupt Their Cash Flows, Adversely Affect the Debtors' Profitability and Delay the Effective Date.**

State licensure laws and many federal healthcare programs (where applicable) impose a number of obligations on healthcare providers undergoing a change of ownership or change of control transaction.  States may require notices to the governing agencies, and in many cases, new license applications with varying timelines.  These provisions require the Debtors to be proactive when considering both internal restructuring and acquisitions of other treatment companies. Failure to provide, or timely provide, such notices or to submit required paperwork can adversely affect licensure on a going forward basis, can subject the parties to penalties, can adversely affect the Debtors' ability to operate the Debtors' facilities and/or may delay the Effective Date.

**20. A Pandemic, Epidemic or Outbreak of an Infectious Disease in the Markets in Which the Debtors Operate Facilities, or Which Otherwise Impacts the Debtors' Facilities, Could Adversely Impact the Debtors' Business.**

If a pandemic, epidemic, outbreak of an infectious disease, or other public health crisis were to affect any or all of the markets in which the Debtors operate, the Debtors' business and results of operations could be adversely affected.  Such a crisis could diminish the public's trust in healthcare facilities.  If any of the Debtors' facilities were involved in treating clients who contracted such a contagious disease, other clients might cancel appointments or fail to seek needed care from the Debtors' facilities.  Further, a pandemic might adversely impact the Debtors' business by causing a temporary shutdown, by disrupting or delaying production and delivery of materials and products in the supply chain or by causing staffing shortages in the Debtors' facilities.  In the event that a pandemic disrupts the production or supply of pharmaceuticals and medical supplies, for example, the Debtors' business could be adversely affected.  Although the Debtors have disaster plans in place and operate pursuant to infectious disease protocols, the potential impact of a pandemic, epidemic or outbreak of an infectious disease, with respect to the Debtors' markets or the Debtors' facilities is difficult to predict and could adversely impact the Debtors' business.  In addition, if such events lead to a significant or prolonged impact on capital or credit markets or economic growth, then the Debtors' business, financial condition and results of operations could be adversely affected.

As provided earlier, beginning in late March and early April of 2020, the Debtors faced challenges due to COVID-19. The Debtors experienced a decline in inpatient admissions and outpatient visits as a result of the virus and the measures undertaken to combat the virus, including mandatory stay-at-home orders, restrictions on travel, supply chain disruptions, and preventive measures to ensure that facilities remain coronavirus-free. The number of cases of COVID-19 has recently increased significantly in states where the Debtors generate in excess of 80% of their revenue. COVID-19, and the measures undertaken by the Debtors, have had and will continue to have an adverse impact on the Debtors. While cash on hand became more limited and access to credit became more restricted, the Debtors' costs rose during this difficult economic time. The Debtors expended significant time and resources in ensuring that its facilities remained open and had sufficient staff and personal protective equipment to keep their patients and staff safe during the pandemic.

While the Debtors make every effort to combat COVID-19, the spread of the illness may decrease the number of clients the Debtors can treat, which will strain the Debtors' operations, as additional preventative measures are implemented for the safety of clients and employees.

### D.    Risks Related to the Reorganized AAC Equity Interests or New Warrants.

#### 1.    The Debtors Have Not Registered, and Do Not Intend to Register the Reorganized AAC Interests or New Warrants under the Securities Act or the Securities Laws of Any States, Nor Do the Debtors Intend to Offer to Exchange the Reorganized AAC Equity Interests or New Warrants for Securities Registered under any such Laws in a Registered Exchange Order.

If the Entire Company Asset Sale does not occur, the Reorganized Debtors will issue the Reorganized AAC Equity Interests and, in the case of the Exit Term Loan Facility, the New Warrants. The Debtors have not registered, and do not intend to register, the Reorganized AAC Equity Interests or New Warrants under the Securities Act or under the securities laws of any state, nor do the Debtors intend to offer to exchange the Reorganized AAC Equity Interests or New Warrants for securities registered under the Securities Act in an exchange offer registered thereunder. As a result, the Reorganized AAC Equity Interests or New Warrants may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

Any Reorganized AAC Equity Interests or New Warrants issued under the Plan in satisfaction of Claims that are issued in a transaction exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such Securities; provided, however, that such Securities will not be freely transferable if, at the time of transfer, the Holder is either an "affiliate" of Reorganized AAC Holdings as defined in Rule 144(a)(1) under the Securities Act or has been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including in a transaction effected in accordance with Rule 144 under the Securities Act. Reorganized AAC Equity Interests or New Warrants issued pursuant to the Plan

to persons who are deemed to be "underwriters" will not have been issued pursuant to section 1145 of the Bankruptcy Code, and instead will have been issued pursuant to the exemption from registration provided by Section 4(a)(2) of the Securities Act and Rule 506 promulgated thereunder, and such Persons would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including in a transaction effected in accordance with Rule 144 under the Securities Act.

In addition, the information which the Debtors are required to provide in order to issue the Reorganized AAC Equity Interests or New Warrants pursuant to the Plan may be less than the Debtors would be required to provide if the Reorganized AAC Equity Interests or New Warrants were registered under the Securities Act.

The Reorganized AAC Equity Interests or New Warrants issued otherwise than pursuant to Section 1145 under the Bankruptcy Code will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act and Rule 506 promulgated thereunder, and will be "restricted securities" as defined under Rule 144 under the Securities Act. These securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration under the Securities Act or pursuant to an applicable exemption from registration under the Securities Act and other applicable law. All persons who receive restricted securities pursuant to the Plan will be required to agree that they will not offer, sell or otherwise transfer any such shares except in accordance with an applicable exemption from registration under the Securities Act, and each such person will also be required to represent that such person is an "accredited investor", as defined under Rule 501(a) promulgated under the Securities Act.

## 2. Any Implied Valuation of the Reorganized AAC Equity Interests and New Warrants is Not Intended to Represent any Potential Trading Price of the Reorganized AAC Equity Interests or the New Warrants.

Any implied valuation of the Reorganized Debtors is not intended to represent the any potential trading or market value of the Reorganized AAC Equity Interests or the New Warrants in any public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities, if any, at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market prices, if any, of the Reorganized AAC Equity Interests or New Warrants are likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market prices of the Reorganized AAC Equity Interests and the New Warrants to rise and fall precipitously. Accordingly, the implied value of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the Reorganized AAC Equity Interests or New Warrants in any the public or private markets.

*ACTIVE 52312155v1*

3.  **There is No Established Market for the Reorganized AAC Equity Interests or New Warrants.**

The Reorganized AAC Equity Interests and New Warrants will be a new issuance of Securities, and there is no established trading market for those Securities, and the Debtors do not expect a market to develop. The Debtors are under no obligation, and do not intend to apply for the Reorganized AAC Equity Interests or New Warrants to be listed on any securities exchange or to arrange for quotation of such securities on any automated dealer quotation system or over-the-counter market. Without an active market, the liquidity of the Reorganized AAC Equity Interests and New Warrants will be extremely limited. Further, the Reorganized AAC Equity Interests and New Warrants may be subject to transfer restrictions in the New Shareholders Agreement. Accordingly, you may be required to bear the financial risk of your ownership of the Reorganized AAC Equity Interests and New Warrants indefinitely. If a trading market were to develop, you may experience difficulty in reselling the Reorganized AAC Equity Interests or New Warrants and may not be able to sell your Reorganized AAC Equity Interests or New Warrants at a particular time or at favorable prices. If a trading market were to develop, any such future trading p rices of the Reorganized AAC Equity Interests or New Warrants may be volatile and will depend on many factors, including: (a) the Reorganized Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities.

4.  **Holders of the Reorganized AAC Equity Interests May Experience Dilution of their Ownership Interests.**

Shares of Reorganized AAC Equity Interests received by Holders of Junior Lender Claims under the Plan on account of such Claims are subject to dilution by the issuance of New Warrants, if any, and by the issuance of Reorganized AAC Equity Interests pursuant to the Management Incentive Plan.

## IX.   CONFIRMATION OF THE PLAN

### A.   Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

*ACTIVE 52312155v1*

### B.    The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions.

Under applicable law, a release provided by a debtor is appropriate where: (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of th e estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." Id. Further, a chapter 11 plan may provide for a release of third-party claims against non-debtors, such as the Third-Party Releases, where such releases are consensual. *Id.* at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id.* at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012). In addition, approval of the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan will be limited to the extent such releases, exculpations, and injunctions are permitted by applicable law.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to t he Debtors' restructuring proceedings, and each of the Released Parties has contributed value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. In addition, the Debtors believe the Third-Party Releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See Indianapolis Downs*, 486 B.R. at 304–06. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of confirming the Plan.

### C.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the

101

value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the Reorganized AAC Equity Interests and New Warrants to be distributed under the Plan or, alternatively, in the purchase price of an Entire Company Asset Sale. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of the Debtors' Chief Restructuring Officer, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit F** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class or Sub-Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class or Sub-Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class or Sub-Class shall be deemed to have accepted the Plan.

## F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class or Sub-Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class or Sub-Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

103

## 2.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

As a condition to the test, section 1129(b)(2) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a dissenting impaired class of unsecured claims if the creditors in the class receive or retain property of a value equal to the allowed amount of their claims or, failing that, no creditor of lesser priority, or shareholder, receives any distribution under the plan.  This requirement is sometimes referred to as the "absolute priority rule."

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes and Sub-Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes and Sub-Classes that have equal rank. With respect to the fair and equitable requirement, and "absolute priority rule," no Class or Sub-Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class or Sub-Class.  The Debtors believe that the Plan and the treatment of all Classes and Sub-Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## X.    CERTAIN SECURITIES LAW MATTERS

If a Reorganization Transaction occurs, the Reorganized AAC Equity Interests will or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

Pursuant to Section 1145 of the Bankruptcy Code, the offering, distribution, issuance and sale of the Reorganized AAC Equity Interests and the New Warrants as contemplated by the Plan are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration of the Reorganized AAC Equity Interests and the New Warrants prior to the offering, issuance, distribution, or sale thereof. If issued in accordance with section 1145 of the Bankruptcy Code, the Reorganized AAC Equity Interests and the New Warrants (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely transferable by any initial recipient thereof that (a) is not an "affiliate" of Reorganized AAC Equity Interest as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, and (c) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

The Reorganized AAC Equity Interests or New Warrants issued otherwise than pursuant to Section 1145 under the Bankruptcy Code, if any (e.g., to a person w ho is an "underwriter" within the meaning of Section 1145 of the Bankruptcy Code), will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act and Rule 506

promulgated thereunder, and will be "restricted securities" as defined under Rule 144 under the Securities Act. These securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration under the Securities Act or pursuant to an applicable exemption from registration under the Securities Act and other applicable law. All persons who receive restricted securities pursuant to the Plan will be required to agree that they will not offer, sell or otherwise transfer any such shares except in accordance with an applicable exemption from registration under the Securities Act, and each such person will also be required to represent that such person is an "accredited investor", as defined under Rule 501(a) promulgated under the Securities Act.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and beneficial owners of Claims (each, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Warrants or the Reorganized AAC Equity Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder holds only Claims in a single Class or Sub-Class and holds a Claim only as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the

105

same Class or Sub-Class, and the tax consequences for such Holders may differ materially from that described below.

The U.S. federal income tax consequences of the implementation of the Plan will depend on, among other things, whether the Reorganization Transaction is structured as a taxable sale of the Debtors' assets and/or stock (such a structure, a "<u>Taxable Transaction</u>"). While a Taxable Transaction potentially offers the Reorganized Debtors certain tax advantages in periods following the Effective Date, the availability of these tax advantages depends on numerous considerations that cannot be known with certainty at this time. These considerations include the value and tax basis of the Debtors' assets on the Effective Date, and whether the Debtors have sufficient net operating loss carry forwards to offset any taxable gain arising from a Taxable Transaction. As a result, the Debtors have not yet determined whether they intend to structure the Reorganization Transaction as a Taxable Transaction, and, except as otherwise provided, and the following discussion assumes that the implementation of the Plan will not be structured as a Taxable Transaction. Moreover, if the Debtors pursue a Taxable Transaction, the U.S. federal income tax consequences of the implementation of the Plan to Holders of Claims may differ materially from the tax consequences described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, UNLESS SPECIFICALLY NOTED OTHERWISE, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS APPLICABLE ONLY TO U.S. HOLDERS, AS DEFINED ABOVE, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.     **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

1.     **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the Tax Code, a debtor is not required to include COD Income in gross income (a) if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception") or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the Tax Code. The Debtors have not yet determined whether this election will be made. Whether or not an election is made pursuant to Section 108(b)(5) of the Tax Code, the reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

The amount of COD Income that may result in a reduction of Reorganized AAC's tax attributes, and that may by allocated to the Holders of equity in Reorganized AAC will depend on the value (or issue price, in case of new debt) of the consideration received by Holders. The fair market value and issue price, as applicable, of such consideration cannot be known with certainty until after the Effective Date.

107

## 2.    Limitations of NOLs Carry Forwards and Other Tax Attributes

The precise amount of NOL carryovers and other tax attributes (such as capital loss carryforwards, tax credit carryforwards and losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) that will be available to the Debtors at emergence is based on a number of factors and is impossible to calculate at this time.  The Debtors estimate that they have incurred consolidated NOLs of approximately $87 million as of the Petition Date and are expecting that the consolidated NOLs will increase to approximately $190 million as of December 31, 2020.   Some of the factors that will impact the amount of available NOLs include: the amount of taxable income or loss incurred by the Debtors in 2019 and 2020; the fair market value of the New Warrants or Reorganized AAC Equity Interests; and the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.  Further, the Debtors are under Audit for taxable years 2013 and 2014.  Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above based on the audit for 2013 and 2014 or an audit for any other past taxable year.  The Debtors anticipate that, taking these factors into account, they will have some federal NOL carryovers following emergence, subject to the limitations discussed below.  The Debtors' subsequent utilization of any losses and NOL carryovers remaining and possibly certain other tax attributes may be restricted as a result of and upon consummation of the Plan.

Following consummation of the Plan, the Debtors anticipate that any remaining NOL and tax credit carryovers and, possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under Section 382 of the Tax Code as a result of an "ownership change" of the Debtors by reason of the transactions pursuant to the Plan.  Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.

### i.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 0.89 percent for July 2020 or August 2020).  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, which will prevent any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

108

If the Debtors' assets in the aggregate have a fair market value less than the Debtors' tax basis therein (a "Net Unrealized Built-in Loss"), any built-in losses recognized during the following five years (up to the amount of the original Net Unrealized Built-in Loss), including loss on disposition of assets and depreciation and amortization deductions attributable to the excess of the tax basis of the assets of the Debtors over their fair market value as of the date of the ownership change, generally will be treated as Pre-Change Losses subject to the annual limitation. While the Debtors have not completed a review and valuation of their assets, the Debtors do not expect to have a Net Unrealized Built-in Loss in their assets after the consummation of the Plan.

If the Debtors' assets in the aggregate have a fair market value greater than the Debtors' tax basis therein (such excess, a "Net Unrealized Built-in Gain"), any Net Unrealized Built-in Gain recognized by the Debtors in the five years immediately after the ownership change will generally increase the section 382 limitation in the year recognized, such that the Debtors would be permitted to use their pre-change NOLs against such gain in addition to their regular allowance. For these purposes, the Debtors would be permitted to increase their annual section 382 limitation during the five years immediately after the ownership change by an amount determined by reference to the depreciation and amortization deductions that a hypothetical purchaser of the Debtors' assets would have been permitted to claim if it had acquired the Debtors' assets in a taxable transaction as compared to the actual depreciation and amortization deductions of the Debtors. While the Debtors have not completed a review and valuation of their assets, the Debtors do not expect to have a Net Unrealized Built-in Gain in their assets after recognizing the incipient COD after the consummation of the Plan.

## ii.    **Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). A "qualified creditor" generally is a creditor who has held (i) its claim continuously for at least 18 months prior to the petition date or (ii) a claim incurred in the ordinary course of the debtor's business since the claim was incurred. A claim that arises upon the rejection of a burdensome contract pursuant to a chapter 11 case is treated as an ordinary course claim. Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after consummation of the Plan, then the Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual Section 382 limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately

109

before the ownership change.  This differs from the ordinary rule that requires the fair market value of the stock of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs, with any resulting limitation instead determined under the regular rules for ownership changes.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception.  Alternatively, even if the 382(l)(5) Exception could apply, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence.  In either case, the Debtors anticipate that their use of the Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

### 3.        NOL Refund and Funds from PPP

The Debtors used the change in carry back rules under the CARES Act which permitted the carryback of NOLs to be applied against prior years' income to apply for a refund and may do so again when their 2019 returns are finalized.  Any Federal income tax refund received by the Debtors will not be taxable; any state and local refunds received will be taxable on the federal return.  Additionally, as set forth in the Plan, the Debtors received a loan of $10,000,000 of PPP under the CARES Act and as further set forth in the Plan, the Debtors believe the funds are being used in accordance with the requirements of the CARES Act and will be forgiven in 2020. Provided the requirement of the CARES Act have been followed, the forgiveness of the $10,000,000 loan will not create any cancellation of debt income or any other income.

### 4.        Restrictions on Resale of Securities to Protect NOLs

The Debtors expect to emerge from chapter 11 with valuable tax attributes, including substantial NOLs.  Regardless of whether the Debtors elect to utilize the 382(l)(5) Exception, the Debtors' ability to utilize these NOLs could be subject to elimination of the limitation if an "ownership change" with respect to the issuance of New Warrants and/and Reorganized AAC Equity Interests were to occur after emergence.  To the extent reasonably necessary to avoid adverse federal income tax consequences resulting from an ownership change (as defined in Section 382 of the Tax Code), the Amended Certificate of Incorporation and the Stock holders Agreement may impose certain restrictions on the transfer of (i) New Warrants and (ii) Claims prior to their Allowance without the consent of the Reorganized Board. Such restrictions, if any, will be described in the Plan Supplement.

**C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Reorganization Transaction currently contemplated by the Plan.  Holders of Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Reorganization Transaction.

As discussed below, the tax consequences of the Plan to U.S. Holders of Allowed Claims on the Plan will depend upon a variety of factors, among other things: (a) the type of consideration received by the Holder of Allowed Claims against the Debtors in exchange for such Claim; (b) the taxable year in which the Holder receives distributions under the Plan; (c) the nature of such Claim; (d) whether the Holder has previously claimed a bad debt or worthless security deduction in respe ct of such Claim; (e) whether such Claim constitutes a security, as further discussed below; (f) whether the Holder of such Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis, or falls into any special class of taxpayers, as mentioned above; (g) whether the Holder of such Claim against the Debtors reports income on the accrual or cash basis; (h) the manner in which the Holder acquired the Claim and whether the Claim was acquired at a discount; (i) the length of time that the Claim has been held; (j) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; and (k) whether the Holder of such Claim against the Debtors recei ves any distributions under the Plan in more than one taxable year.  For tax purposes, if a Claim is reinstated yet subject to a modification, the reinstatement may be treated as a taxable exchange of the Claim by the Holder for a new Claim, even though no actual transfer takes place.  The character of any recognized gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's  hands (including whether the Claim constitutes a capital asset), whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim, and whether any part of the U.S.  Holder's recovery is treated as being on account of accrued but untaxed interest. In general, for purposes of the discussion below, subject to other matters discussed herein such as the market discount rules, gain or loss recognized by a Holder upon exchange of that Claim generally would be long-term capital gain or loss if the U.S. Holder held such asset for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations.  If property is received by a Holder upon an exchange, a Holder's tax basis in the property received should equal the fair market value of such property. A U.S. Holder's holding period for the property received on the Effective Date would begin on the day following the Effective Date.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of a Debtor for U.S. federal income tax purposes.  Neither the Tax Code nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the available collateral,

111

the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. The Prepetition Senior Lien Credit Agreement has a term of less than five years, and accordingly the Debtors intend to treat Senior Lender Claims as not constituting a "security." The Prepetition Junior Lien Facility has a term in excess of five years, but less than ten years. The treatment of the Junior Lien Claims is uncertain and the Debtors are still evaluating this issue. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Senior Lien Claims and Junior Lien Claims for U.S. federal income tax purposes. U.S. Holders should be aware that the Debtors will not issue any documents purporting to declare whether Junior Lien Claims are a security or not.

### 1. U.S. Federal Income Tax Consequences to U.S. Holders of Class 1 (Other Priority Claims).

Pursuant to the Plan, in full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each Holder thereof will receive payment in full in Cash or other treatment rendering such Claim Unimpaired. A U.S. Holder of an Allowed Other Priority Claim that receives payment in full in Cash should generally not recognize any income or loss. For any Holder of Class 1 Claim that did not take the interest into income as it accrued, the amount recovered that is attributable to the interest must be taken into account as ordinary interest income.

### 2. U.S. Federal Income Tax Consequences to U.S. Holders of Class 2 (Other Secured Claim).

Pursuant to the Plan, in full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder thereof will receive: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) such other treatment rendering such Claim Unimpaired. A U.S. Holder of an Allowed Other Secured Claim that receives payment in full in Cash should generally not recognize any income or loss. For any Holder of Class 2 Claim that did not take the interest into income as it accrued, the amount recovered that is attributable to the interest must be taken into account as ordinary interest income.

### 3. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 3 Claims (Senior Lender Claims)

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Senior Lender Claim shall receive (i) Cash, (ii) Exit Term Loan interests, and/or (ii) New Warrants.

A U.S. Holder of an Allowed Senior Lender Claim is expected to be treated as receiving its distributions under the Plan in a taxable exchange under Section 1001 of the Tax Code. Other

than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such Claim is expected to recognize gain or loss equal to the difference between (i) the sum of (a) the Cash received in exchange for the Claim, (b) the issue price of the Exit Term Loan interests, and (c) the fair market value of New Warrants received in exchange for the Claim, and (ii) such U.S. Holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors unique to the U.S. Holder, including the tax status of the U.S. Holder whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.

U.S. Holders of such Claims that receive the Exit Term Loan interests and the New Warrants are expected to obtain tax basis in the Exit Term Loan interests that equals its issue price on the date of the exchange, and the tax basis in the New Warrants equal to the fair market value thereof as of the date the New Warrants are distributed to the U.S. Holder. The holding period for any such Exit Term Loan interests and New Warrants is expected to begin on the day following the Effective Date.

The tax basis of any Exit Term Loan interests and New Warrants determined to be received in satisfaction of accrued but untaxed interest is expected to equal the amount of such accrued but untaxed interest. The holding period for any such Exit Term Loan interests and New Warrants is expected to begin on the day following the Effective Date.

### 1. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 4 Claims (Junior Lender Claims)

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Junior Lender Claim shall receive (i) Cash and/or (ii) Reorganized AAC Equity Interests.

If Junior Lender Claims are not treated as a "security" or if the Reorganization Transaction is treated as a Taxable Transaction, then a U.S. Holder of an Allowed Junior Lender Claim would be treated as receiving its distributions under the Plan in a taxable exchange under Section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such Claim is expected to recognize gain or loss equal to the difference between (i) the sum of (a) the Cash received in exchange for the Claim and (b) the fair market value of the Reorganized AAC Equity Interests, and (ii) such U.S. Holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors unique to the U.S. Holder, including the tax status of the U.S. Holder whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.

U.S. Holders of such Claims that receive Reorganized AAC Equity Interests are expected to obtain tax basis in the Reorganized AAC Equity Interests, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the fair market value thereof as of the date such Reorganized AAC Equity Interests are distributed to the U.S. Holders. The holding period for any such Reorganized AAC Equity Interests are expected to begin on the day

113

following the Effective Date.

The tax basis of Reorganized AAC Equity Interests determined to be received in satisfaction of accrued but untaxed interest is expected to equal the amount of such accrued but untaxed interest.  The holding period for such Reorganized AAC Equity Interests should begin on the day following the Effective Date.

If Junior Lender Claims are treated as a "security," a U.S. Holder of an Allowed Junior Lender Claim constituting a tax security who receives only Reorganized AAC Equity Interests would be treated as exchanging securities pursuant to a "reorganization" under Section 368(a)(1)(E) of the Code and Treasury Regulations (a "<u>Reorganization</u>") and a U.S. Holder should not recognize gain and should not recognize loss (except the Holders who included accrued interest into income would have ordinary loss to the extent that the partial satisfaction of their Claims leaves interest unpaid).  Such U.S. Holder's total combined tax basis in its Reorganized AAC Equity Interest received should equal the U.S. Holder's tax basis in the Allowed Class 4 Claim surrendered therefor increased by gain, if any, recognized by such U.S. Holder in the transaction. Subject to the section below discussing "Accrued Interest," a U.S. Holder's holding period for its interest in Reorganized AAC Equity Interests should include the holding period for the Allowed Class 4 Claim surrendered therefor.  If an Allowed Class  4 Claim Holder receives Cash and Reorganized AAC Equity Interests, such Holder would recognize gain (but not loss) on the exchange, to the extent of the amount of cash received.  If the Allowed Class 4 Claim Holder receives only cash, the transaction would subject to the standard rules of gain or loss recognition on property exchanges under Section 1001(c), as discussed above, whether the Allowed Class 4 Claim is treated as a security or not.

### 2. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 5 Claims (General Unsecured Claims)

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of its Claim, each Holder of an Allowed General Unsecured Claim shall receive no recovery or distribution.  A U.S. Holder of such Claim is expected to be treated as receiving its distributions under the Plan in a taxable exchange under Section 1001 of the Tax Code. Each U.S. Holder of such Claim is expected to recognize loss equal to the such U.S. Holder's adjusted basis in such Claim.

### 3. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 7 Claims (Subordinated Claims)

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of its Claim, each Holder of an Allowed Subordinated Claim shall receive no recovery or distribution.  A U.S. Holder of such Claim is expected to be treated as receiving its distributions under the Plan in a taxable exchange under Section 1001 of the Tax Code. Each U.S. Holder of such Claim is expected to recognize loss equal to the such U.S. Holder's adjusted basis in such Claim.

114

### 4. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 9 Claim (Interests in AAC Holdings)

Each Allowed Interest in AAC Holdings shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in AAC Holdings shall be entitled to any recovery or distribution under the Plan on account of such Interests. Each U.S. Holder of such Claim is expected to recognize capital loss, long term or short term depending upon their holding period, equal to such U.S. Holder's adjusted basis in such Claim.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR U.S. FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS OR INTERESTS.**

### 5. Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest or original issue discount ("OID") on the debt instrument constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest or OID previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest for U.S. federal income tax purposes is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 6. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market

115

discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 7. Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of all the U.S. Holder's capital losses over all the U.S. Holder's capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 8. Distributions on Reorganized AAC Equity Interests

Cash distributions on account of the Reorganized AAC Equity Interests will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Debtors (as determined under U.S. federal income tax principles). Such income will be includable in the gross income of a U.S. Holders as ordinary income on the day actually or constructively received by such U.S. Holder.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. Distributions on Reorganized AAC Equity Interests that are treated as dividends for U.S. federal income tax purposes generally will be eligible for the dividends-received deduction so long as

116

there are sufficient earnings and profits.  However, the dividends-received deduction is only available to corporate U.S. Holders if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed Reorganized Debtors' current and accumulated earnings and profits (as determined for U.S. federal income tax purposes), such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as a disposition and subject to the treatment discussed below.

### 9.  Sale, Redemption, or Repurchase of Reorganized AAC Equity Interests

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of Reorganized AAC Equity Interests in an amount equal to the difference between (i) the amount realized on the disposition and (ii) such U.S. Holder's adjusted tax basis in such shares. Such capital gain will generally be long-term capital gain if at the time of the sale, exchange, redemption, or other taxable disposition, the U.S. Holder held the Reorganized AAC Equity Interests for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.  Under the recapture rules of Section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the Reorganized AAC Equity Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for Reorganized AAC Equity Interests.

### 10. Ownership and Disposition of the Exit Term Loans

The U.S. federal income tax consequences to a holder of the Exit Term Loan may depend on certain terms of the Exit Term Loan which have not yet been finalized.  The final terms of the Exit Term Loan will be described at a later date in a Plan Supplement.  Accordingly, depending on the final terms of the Exit Term Loan, the U.S. federal income tax consequences of owning and disposing of the Exit Term Loan may differ from that described below.

### a.    Issue Price and Investment Unit

The consideration received by holders of the Class 3 Claims, which will include some combination of Cash, Exit Term Loans, and New Warrants, will likely be treated as an investment unit issued in exchange for the Class 3 Claim.  In such case, the issue price of the Exit Term Loans will depend, in part, on the issue price of the investment unit, and the respective fair market values of the elements of consideration that compose the investment unit.  The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument.

117

As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established securities market.

In general, a debt instrument will be treated as traded on an established securities market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments, (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property, or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property.   Whether the investment unit should be considered "publicly traded" may not be known until after the Effective Date.

If the investment unit is considered to be traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit on the date the new debt is issued.  The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded.  In such a case, it is unclear whether the issue price of the investment unit is determined by reference to (a) the fair market value of the investment unit or (b) by reference to the fair market value of the debt for which it was exchanged.  In particular, if the Exit Term Loans issued as part of an investment unit is publicly traded but the other piece of the investment unit, such as the New Warrants, is not, although not free from doubt, it may be the case that the trading value of the publicly traded instrument will ultimately determine their issue price notwithstanding the potential application of the investment unit rules.

Under the applicable Treasury regulations, the Reorganized Debtors are required to determine whether the Exit Term Loan is publicly traded and, if so, the fair market value of the Exit Term Loan, and make these determinations available to Holders in a commercially reasonable fashion, including by electronic publication, within ninety (90) days of the issue date of the Exit Term Loan. The Debtors intend to make this information available.  The Debtors' determination is binding on a U.S. Holder unless a U.S. Holder explicitly discloses on its tax return that its determination is different and the reasons for its determination (including how it determined the fair market value of its Exit Term Loan).

### b.    Payment of Interest and OID on the Exit Term Loan

A debt instrument, such as the Exit Term Loans, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."  Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually.

Stated interest paid on the Exit Term Loan will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received, in accordance with its method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest."

118

Stated interest is "qualified stated interest" if it is payable in cash at least annually. Thus, the cash interest payable on the Exit Term Loan is expected to be treated as qualified stated interest. The remainder of the interest payable on the Exit Term Loan is payable in kind monthly by increasing the principal amount of Exit Term Loan outstanding ("PIK interest"); the amount of PIK interest payable on the Exit Term Loan will be included in the determination of the OID on such debt. Accordingly, the Exit Term Loan is expected to be issued with OID to the extent of the PIK interest and to the extent the investment unit allocation rules described above result in such debt instruments having an issue price that is less than their stated redemption price at maturity.

If, as expected, the principal amount of the Exit Term Loan exceeds its issue price by more than a de minimis amount, then the Exit Term Loan will be considered to have been issued with OID for U.S. federal income tax purposes in the amount of such excess. For these purposes, the PIK interest will be included in the principal amount of the Exit Term Loan at maturity and taxed as part of OID. A U.S. Holder will be required to include any such OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

A U.S. Holder (whether a cash or accrual method taxpayer) generally should be required to include OID in gross income (as ordinary income) as the OID accrues (on a constant yield to maturity basis), in advance of the U.S. Holder's receipt of cash payments attributable to this OID. In general, the amount of OID includible in the gross income of a U.S. Holder should be equal to a ratable amount of OID for each day in an accrual period during the taxable year or portion of the taxable year in which a U.S. Holder held the debt. An accrual period may be of any length and the accrual periods may vary in length over the term of the debt, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period. The amount of OID allocable to any accrual period is an amount equal to the excess, if any, of (a) the product of (i) the adjusted issue price of the debt at the beginning of such accrual period, and (ii) its yield to maturity, determined on the basis of a compounding assumption that reflects the length of the accrual period, over (b) the sum of the stated interest payments on the debt allocable to the accrual period.

If interest other than qualified stated interest is paid in cash on the Exit Term Loans, a U.S. Holder should not be required to adjust its OID inclusions. Instead, each payment made in cash should be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal. A U.S. Holder generally should not be required to include separately in income cash payments received on debt to the extent such payments constitute payments of previously accrued OID. The OID rules are complex and U.S. Holders are urged to consult their tax advisors regarding the application of the OID rules to the Exit Term Loans.

### c.   Market Discount on the Exit Term Loan

A U.S. Holder will have market discount with respect to the Exit Term Loan if its initial basis in any portion of the Exit Term Loan is less than the issue price of such portion of the Exit Term Loan, unless the difference is less than a specified de minimis amount. If a U.S. Holder's Exit Term Loan has market discount with respect to any portion of such Exit Term Loan and, if

such holder so elects or has so elected, it will be required to include the market discount as ordinary income as it accrues, either on a ratable basis or on the basis of a constant-yield method. Any such election applies to all debt instruments with market discount that the U.S. Holder acquires on or after the first day of the first taxable year to which the election applies. In addition, the U.S. Holder may be required to defer, until the maturity of the Exit Term Loan, as applicable, or its earlier disposition (including in one of certain nontaxable transactions), the deduction of all or a portion of the interest expense on any indebtedness incurred or maintained to purchase or carry any portion of such Exit Term Loan with respect of which the U.S. Holder has market discount.

### d.    Acquisition and Bond Premium on the Exit Term Loan

A U.S. Holder will have acquisition premium with respect to the Exit Term Loan if its initial basis in any portion of the Exit Term Loan, as applicable, exceeds the issue price of such portion of the Exit Term Loan but does not exceed the stated redemption price at maturity of such portion of the Exit Term Loan. If a U.S. Holder has acquisition premium with respect to a portion of the Exit Term Loan, it may reduce the amount of any OID accruing on such portion of the Exit Term Loan for any taxable year by a portion of the acquisition premium properly allocable to that year.

If a U.S. Holder's initial basis in any portion of the Exit Term Loan exceeds the stated redemption price at maturity of such portion of the Exit Term Loan, the excess generally will constitute amortizable bond premium and the U.S. Holder will not be required to include any OID attributable to its income with respect to such portion of the Exit Term Loan.  Generally a U.S. Holder may elect to amortize this bond premium over the remaining term of such portion of the Exit Term Loan using a constant yield method and apply the amortization to offset stated interest otherwise required to be included in income with respect to such portion of the Exit Term Loan.

### e.    Disposition of the Exit Term Loan

Upon the sale or other taxable disposition of the Exit Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the Exit Term Loan.  A U.S. Holder's adjusted tax basis in the Exit Term Loan generally will equal its initial tax basis in the Exit Term Loan, increased by any OID or market discount previously included in income with respect to the Exit Term Loan and decreased by payments on the Exit Term Loan other than payments of stated interest and any previously amortized bond premium.  For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income.  Except to the extent attributable to any accrued market discount not previously included in income, gain or loss recognized on the sale or other taxable disposition of the Exit Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the Exit Term Loan is treated as held for more than one year.  Any gain attributable to accrued market discount not previously included in income will be recharacterized as ordinary income.  Long-term capital gains recognized by non-corporate taxpayers are subject to reduced tax rates.  The deductibility of capital losses is subject to significant limitations.

*ACTIVE 52312155v1*

D.        **Taxation of Reorganized Debtors**

Assuming there is a reorganization of the Debtors and not a sale of all the assets, it is expected that there will still be a consolidated group for income tax purposes, with only one company AAC, being the reporting company.  In a consolidated group filing, all the income and expenses of all the subsidiaries are combined (eliminating intercompany items) to create one income statement at the parent level.  AAC will be taxed as a corporation subject to a US Corporate income tax rate, currently 21% plus any applicable state and local taxes.  If the reorganization plan is capable of availing itself of Section 382(l)(5) of the Tax Code, as explained more fully  in other parts of the Disclosure Statement, then the reorganized group will be able to use available NOLs, reduced by any NOLs used for the refund application and further reduced by any interest paid or accrued in the last three years on the Claims that were converted to the new equity.  In the event that the reorganization does not qualify for Section 382(l)(5) treatment, then it is expected that the reorganized entity will have few, if any, available NOLs and will still be taxed as a consolidated group.

E.        **Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Reorganization Transaction currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Reorganization Transaction to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations and does not address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex.  **Each non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan and their ownership of Claims.**

1.        **Gain Recognition with respect to Claims**

Whether a Non-U.S. Holder realizes gain or loss on the exchange of its Claim is determined in the same manner as set forth above in connection with U.S. Holders.  Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be recognized and subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the restructuring transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange, <u>provided</u> the Non-U.S. Holder has timely filed U.S. federal

121

income tax returns with respect to such losses. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate or exemption provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. However, a branch profits tax may not apply if the Non-U.S. Holder qualifies for the "exit exemption" (i.e., after the exchange, the Holder has no other U.S. business assets and neither the Holder nor a related party reinvests the proceeds in the U.S. for a period of three years following the exchange).

## 2.      Accrued Interest and OID

Payments to a non-U.S. Holder that are attributable to accrued interest (including OID and any gain from the sale, redemption, retirement or other taxable disposition of the Claim that is treated as interest income) generally will not be subject to U.S. federal income tax or withholding pursuant to the portfolio interest exemption, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an applicable or successor IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Reorganized Debtor's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Reorganized Debtor (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest (or original issue discount) is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the portfolio interest exemption generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments

ACTIVE 52312155v1

through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### 3.        Distributions on Reorganized AAC Equity Interests

Any distributions made (or deemed made) with respect to Reorganized AAC Equity Interests will constitute "dividends" for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Debtors, as determined under U.S. federal income tax principles. To the extent any distribution exceeds Reorganized Debtors' current and accumulated earnings and profits, such distribution will be treated (i) as a non-taxable return of the non-U.S. Holder's adjusted basis in the Reorganized AAC Equity Interests, which generally will not be subject to U.S. federal income taxation,  and (ii) thereafter as capital gain treated as described below.

Except as described below, "dividends" made (or deemed made) with respect to Reorganized AAC Equity Interests held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (unless a reduced rate or exemption applies under an applicable income tax treaty).

A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or successor form), upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax  with respect to such payments. Any "dividends" made (or deemed made) with respect to Reorganized AAC Equity Interests held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder. To claim an exemption from U.S. federal withholding tax on the effectively connected income, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States.  A non-U.S. Holder that is a corporation for U.S. federal income tax  purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (unless a reduced rate or exemption applies under an applicable income tax treaty).

ACTIVE 52312155v1

### 4.    Sale, Redemption, or Repurchase of Reorganized AAC Equity Interests

In general, a non-U.S. Holder of Reorganized AAC Equity Interests will not be subject to U.S. federal income tax or U.S. federal withholding tax with respect to the Reorganized AAC Equity Interests unless (a) in the case of gain only, such non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met; (b) any gain is effectively connected with such non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the non-U.S. Holder in the United States) or (c) the Reorganized AAC Equity Interests constitute U.S. real property interests (USRPI) by reason of the Reorganized Debtor being treated as a U.S. real property holding corporation ("USRPHC")for U.S. federal income tax purposes. If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In addition, a non-U.S. Holder that is a corporation also may be subject to a branch profits tax equal to 30 percent (or such lower rate specified by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain taxes. Non-U.S. Holders are urged to consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

If the third exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Reorganized AAC Equity Interests, as applicable, and will be required to file U.S. federal income tax returns.  Under provisions commonly referred to as "FIRPTA," taxable gain from the disposition of a U.S. real property interest (generally equal to the difference between the amount realized and such non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the Reorganized AAC Equity Interests will be required to withhold a tax equal to 15 percent of the amount realized on the sale of such Reorganized AAC Equity Interests ("FIRPTA Withholding").  The amount of any such FIRPTA Withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS. Although it is not certain, it appears that the Reorganized Debtor will be treated as a USRPHC. Generally, a corporation is a USRPHC if the fair market value of its U.S. real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business. The determination whether the Reorganized Debtor will be a USRPHC is currently under review.

### 5.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions ("FFI") and certain other non-financial foreign entities ("NFFE") must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30

124

percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of Reorganized AAC Equity Interests). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Previously, withholding with respect to gross proceeds from the disposition of certain property that produces U.S. source interest or dividends, like the Reorganized AAC Equity Interests, was scheduled to begin on January 1, 2019, however, such withholding has been eliminated under proposed U.S. Treasury regulations (the "Proposed Regulations"), which can be relied on until final regulations become effective, which may adopt or alter the provisions of the Proposed Regulations. A Holder can avoid FATCA withholding if it adheres to certain procedures and requirements imposed by the Code and applicable IRS rules and certifies such compliance to payers of pass-through payments. These rules vary dramatically depending upon whether the non-U.S. person is characterized as an FFI or a non-financial foreign entity. In addition, certain non-U.S. persons are "deemed compliant" with FATCA if they meet certain criteria and certify certain facts to the IRS.

FATCA obligations may vary depending on whether the non-U.S. person subject to FATCA regulations is a resident of a country with which the U.S. has signed a bilateral intergovernmental agreement. Each non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

### F.      U.S. Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest, dividends and other amounts payable under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the

ACTIVE 52312155v1

transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

Under certain Tax-Information Exchange Agreements or bilateral income tax treaty that the United States has with certain other countries, the United States Treasury can upon request disclose to revenue authorities of the country in which the Non-U.S. Holder is a resident a consideration received in an exchange transaction without notice to or consent of the non-U.S. Holder.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.   RECOMMENDATION

The Debtors believe that the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

[*Remainder of page intentionally left blank*]

Respectfully submitted, as of the date set forth above,

AAC HOLDINGS, INC.
on behalf of itself and all other Debtors

By:
Name: J. Jette Campbell
Titles: Chief Restructuring Officer and Authorized Person