**Exhibit A**

(Exit Facility Documents)

This Exhibit A contains a revised draft of the Exit Facility Credit Agreement set forth in Exhibit A to the Plan Supplement, which remains subject to ongoing review and comment by the Debtors and the Consenting Lenders. Schedule 1 below contains the revised Exit Facility Credit Agreement. Schedule 2 below contains a redlined version of the Exit Facility Credit Agreement showing changes made to the Exit Facility Credit Agreement filed with the Court in the Plan Supplement.

Schedule 1

(Revised Exit Facility Credit Agreement)

**DRAFT – SUBJECT TO FURTHER REVISION**

CREDIT AGREEMENT[1]

dated as of

December [11], 2020

as amended by

among

AAC INTERMEDIATE HOLDCO, INC.,
as Holdings

AAC NEW HOLDCO INC.,
as Borrower,

THE LENDERS PARTY HERETO

and

ANKURA TRUST COMPANY, LLC,
as Administrative Agent and Collateral Agent

---

[1] NTD:  Subject to final review/signoff by Lenders/Stroock and Ankura/Kilpatrick.

*1" = "1" "NY 78231004v14" "" NY 78231004v14*

TABLE OF CONTENTS

ARTICLE I Definitions ..................................................................................................... 1

    SECTION 1.01        Defined Terms ............................................................ 1
    SECTION 1.02        Terms Generally ......................................................... 27
    SECTION 1.03        Pro Forma Calculations .............................................. 28
    SECTION 1.04        Classification of Loans and Borrowings...................... 28
    SECTION 1.05        Designation as Senior Debt......................................... 28

ARTICLE II The Credits ................................................................................................. 28

    SECTION 2.01        Commitments............................................................. 28
    SECTION 2.02        Loans......................................................................... 29
    SECTION 2.03        Borrowing Procedure................................................. 29
    SECTION 2.04        Evidence of Debt; Repayment of Loans ..................... 30
    SECTION 2.05        Fees ........................................................................... 31
    SECTION 2.06        Interest on Loans....................................................... 31
    SECTION 2.07        Default Interest ......................................................... 31
    SECTION 2.08        [Reserved].................................................................. 32
    SECTION 2.09        Termination and Reduction of Commitments............... 32
    SECTION 2.10        [Reserved].................................................................. 32
    SECTION 2.11        Repayment of Term Borrowings ................................ 34
    SECTION 2.12        Voluntary Prepayments............................................... 34
    SECTION 2.13        Mandatory Prepayments ............................................ 35
    SECTION 2.14        Reserve Requirements; Change in Circumstances ................................. 36
    SECTION 2.15        [Reserved].................................................................. 37
    SECTION 2.16        Breakage ................................................................... 38
    SECTION 2.17        Pro Rata Treatment ................................................... 38
    SECTION 2.18        Sharing of Setoffs ..................................................... 38
    SECTION 2.19        Payments................................................................... 39
    SECTION 2.20        Taxes......................................................................... 40
    SECTION 2.21        Assignment of Commitments under Certain Circumstances; Duty to Mitigate........................................................................ 42
    SECTION 2.22        [Reserved].................................................................. 43
    SECTION 2.23        Incremental Loans ..................................................... 43
    SECTION 2.24        Defaulting Lenders .................................................... 44
    SECTION 2.25        Amend and Extend Transactions ................................ 45

ARTICLE III Representations and Warranties.................................................................. 47

    SECTION 3.01        Organization; Powers.................................................. 47
    SECTION 3.02        Authorization; No Default .......................................... 47
    SECTION 3.03        Enforceability ........................................................... 47
    SECTION 3.04        Approvals and Consents ............................................ 47
    SECTION 3.05        Financial Statements................................................... 48
    SECTION 3.06        No Material Adverse Effect......................................... 48
    SECTION 3.07        Title to Properties; Possession Under Leases ....................................... 48
    SECTION 3.08        Subsidiaries................................................................ 49
    SECTION 3.09        Litigation; Compliance with Laws .............................. 49

SECTION 3.10        Agreements ...................................................................................... 49
SECTION 3.11        Federal Reserve Regulations ................................................................ 50
SECTION 3.12        Investment Company Act ..................................................................... 50
SECTION 3.13        Use of Proceeds .................................................................................. 50
SECTION 3.14        Tax Returns......................................................................................... 50
SECTION 3.15        No Material Misstatements.................................................................. 50
SECTION 3.16        Employee Benefit Plans....................................................................... 51
SECTION 3.17        Environmental Matters ........................................................................ 51
SECTION 3.18        Insurance............................................................................................. 51
SECTION 3.19        Security Documents............................................................................. 51
SECTION 3.20        Location of Real Property and Leased Premises .................................. 52
SECTION 3.21        Labor Matters...................................................................................... 53
SECTION 3.22        Solvency ............................................................................................. 53
SECTION 3.23        Senior Indebtedness ............................................................................ 53
SECTION 3.24        Sanctioned Persons ............................................................................. 53
SECTION 3.25        USA PATRIOT Act............................................................................. 53
SECTION 3.26        Foreign Corrupt Practices Act ............................................................ 53
SECTION 3.27        Intellectual Property............................................................................ 54
SECTION 3.28        Healthcare Matters.............................................................................. 55

ARTICLE IV Conditions of Lending .............................................................................. 56

SECTION 4.01        All Credit Events ................................................................................ 56
SECTION 4.02        First Credit Event................................................................................ 56

ARTICLE V Affirmative Covenants ................................................................................ 59

SECTION 5.01        Existence; Compliance with Laws; Businesses and Properties .............. 59
SECTION 5.02        Insurance............................................................................................. 60
SECTION 5.03        Obligations and Taxes ........................................................................ 60
SECTION 5.04        Financial Statements, Reports, etc....................................................... 61
SECTION 5.05        Litigation and Other Notices............................................................... 62
SECTION 5.06        Information Regarding Collateral......................................................... 63
SECTION 5.07        Maintaining Records; Access to Properties and Inspections;
                           Maintenance of Ratings ...................................................................... 63
SECTION 5.08        Use of Proceeds .................................................................................. 64
SECTION 5.09        Employee Benefits............................................................................... 64
SECTION 5.10        Compliance with Environmental Laws................................................. 64
SECTION 5.11        Preparation of Environmental Reports.................................................. 65
SECTION 5.12        Further Assurances ............................................................................. 65
SECTION 5.13        Intellectual Property............................................................................ 66
SECTION 5.14        Compliance with Real Estate Obligations ........................................... 67
SECTION 5.15        Lender Calls........................................................................................ 67
SECTION 5.16        Healthcare Laws ................................................................................. 67
SECTION 5.17        Post-Closing Obligations .................................................................... 68

ARTICLE VI Negative Covenants ................................................................................... 69

SECTION 6.01        Indebtedness ....................................................................................... 69
SECTION 6.02        Liens .................................................................................................. 71
SECTION 6.03        Sale and Leaseback Transactions ........................................................ 73

SECTION 6.04    Investments, Loans and Advances ............................................................ 73
SECTION 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions .................. 74
SECTION 6.06    Restricted Payments; Restrictive Agreements ...................................... 74
SECTION 6.07    Transactions with Affiliates ................................................................ 75
SECTION 6.08    Business of Borrower and Subsidiaries ................................................ 75
SECTION 6.09    Other Indebtedness and Agreements .................................................... 75
SECTION 6.10    Financial Covenants ............................................................................ 76
SECTION 6.11    Fiscal Year .......................................................................................... 76
SECTION 6.12    Sanctions .............................................................................................. 76
SECTION 6.13    Anti-Corruption, Anti-Bribery, Anti-Terrorism and Anti-Money
                Laundering Laws ................................................................................... 77
SECTION 6.14    Use of Proceeds ................................................................................... 77
SECTION 6.15    Healthcare Authorizations ................................................................... 77
SECTION 6.16    Anti-Layering ...................................................................................... 77

ARTICLE VII Events of Default .................................................................................................. 78

SECTION 7.01    Events of Default ................................................................................. 78

ARTICLE VIII The Administrative Agent and the Collateral Agent; Etc. .................................... 82

ARTICLE IX Miscellaneous ......................................................................................................... 84

SECTION 9.01    Notices; Electronic Communications .................................................. 84
SECTION 9.02    Survival of Agreement ......................................................................... 86
SECTION 9.03    Binding Effect ...................................................................................... 86
SECTION 9.04    Successors and Assigns ........................................................................ 86
SECTION 9.05    Expenses; Indemnity ............................................................................ 92
SECTION 9.06    Right of Setoff ...................................................................................... 93
SECTION 9.07    Applicable Law ..................................................................................... 94
SECTION 9.08    Waivers; Amendment ........................................................................... 94
SECTION 9.09    Interest Rate Limitation ....................................................................... 95
SECTION 9.10    Entire Agreement ................................................................................. 96
SECTION 9.11    WAIVER OF JURY TRIAL ................................................................ 96
SECTION 9.12    Severability ........................................................................................... 96
SECTION 9.13    Counterparts ......................................................................................... 96
SECTION 9.14    Headings ............................................................................................... 97
SECTION 9.15    Jurisdiction; Consent to Service of Process ........................................ 97
SECTION 9.16    Confidentiality ..................................................................................... 97
SECTION 9.17    Lender Action ....................................................................................... 98
SECTION 9.18    USA PATRIOT Act Notice .................................................................. 98
SECTION 9.19    Withholding Taxes ................................................................................ 98
SECTION 9.20    No Fiduciary Duty ................................................................................ 98
SECTION 9.21    Acknowledgment and Consent to Bail-In of EEA Financial
                Institutions ............................................................................................ 99
SECTION 9.22    Cashless Settlement ............................................................................. 99
SECTION 9.23    Intercreditor Agreement ....................................................................... 100
SECTION 9.24    Release .................................................................................................. 100

1" = "1" "NY 78231004v14" "" NY 78231004v14

SCHEDULES

Schedule 1.01(a)   -   Subsidiary Guarantors
Schedule 1.01(b)   -   Mortgaged Property
Schedule 2.01      -   Lenders and Commitments
Schedule 3.08      -   Subsidiaries
Schedule 3.18      -   Insurance
Schedule 3.20(a)   -   Owned Real Property
Schedule 3.20(b)   -   Leased Real Property
Schedule 3.27      -   Intellectual Property
Schedule 5.17      -   Post-Closing Deliverables
Schedule 6.01(d)   -   Properties Subject to Lease Renegotiation
Schedule 6.01(p)   -   Existing Letters of Credit

EXHIBITS

Exhibit A   -   Form of Administrative Questionnaire
Exhibit B   -   Form of Assignment and Acceptance
Exhibit C   -   Form of Borrowing Request
Exhibit D   -   Form of Guarantee and Collateral Agreement
Exhibit E   -   Form of Mortgage
Exhibit F   -   Form of Affiliate Subordination Agreement
Exhibit G   -   Form of Compliance Certificate
Exhibit H   -   Form of Landlord Personal Property Collateral Access Agreement
Exhibit I   -   Form of AAC Holdings Legacy Deposit Account Report[2]

---

[2]      GT to provide in response to Section 5.18(a).

*1" = "1" "NY 78231004v14" "" NY 78231004v14*

CREDIT AGREEMENT, dated as of December [11], 2020 (as amended, restated, supplemented or otherwise modified from time to time, this "***Agreement***"), among AAC Intermediate Holdco, Inc., a Delaware Corporation, AAC NEW HOLDCO INC., a Delaware corporation (f/k/a Restructured 20-11648 Merger Sub, Inc.) (the "***Borrower***"), the Lenders (such term and each other capitalized term used but not defined in this preamble having the meaning given to it in Article I) party hereto and ANKURA TRUST COMPANY, LLC ("***Ankura***"), as administrative agent for the Lenders (in such capacity, including any successor thereto, the "***Administrative Agent***") and as collateral agent for the Secured Parties (in such capacity, including any successor thereto, the "***Collateral Agent***").

## RECITALS

**WHEREAS**, on June 20, 2020 (the "***Petition Date***"), AAC Holdings, Inc., a Nevada corporation ("***AAC Holdings Prepetition Borrower***") and the Subsidiary Guarantors (collectively, and together with AAC Holdings Prepetition Borrower, the "***Debtors***", and, each, a "***Debtor***") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") initiating their respective jointly administered cases under Chapter 11 of the Bankruptcy Code (Case No. 20-11648 (JTD)) (collectively, the "***Chapter 11 Cases***");

**WHEREAS**, on October 20, 2020, the Bankruptcy Court entered the Plan Confirmation Order (as defined below) confirming the Plan of Reorganization (as defined below) filed by the Debtors with the Bankruptcy Court in connection with the Chapter 11 Cases;

**WHEREAS**, certain Lenders and/or their respective affiliates (the "***Prepetition Lenders***") are parties to, and extended certain loans and provided other financial accommodations to AAC Holdings Prepetition Borrower under, that certain Credit Agreement, dated as of March 8, 2019, by and among AAC Holdings Prepetition Borrower, the Prepetition Lenders party thereto and Ankura Trust Company, LLC (as successor to Credit Suisse AG), as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time prior to the Petition Date) (the "***Prepetition Priming Credit Agreement***");

**WHEREAS**, certain Lenders and/or their respective affiliates (the "***DIP Lenders***") are parties to, and extended certain loans and provided other financial accommodations to AAC Holdings Prepetition Borrower under that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of June 25, 2020, by and among AAC Holdings Prepetition Borrower, the lenders party thereto and Ankura Trust Company, LLC, as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time prior to the Plan Effective Date) (the "***DIP Credit Agreement***");

**WHEREAS**, on the Plan Effective Date (as defined below), immediately prior to the making of the Term Loans (as defined below), AAC Holdings Prepetition Borrower contributed certain of its assets to AAC Dropdown-Co, LLC a Delaware limited liability company ("***AAC Dropdown-Co, LLC***"), as further described in the Contribution Agreement (as defined below) and, thereupon, AAC Dropdown-Co, LLC merged with and into the Borrower, as set forth further in that certain Agreement and Plan of Merger, dated as of the date hereof, by and among AAC Holdings Prepetition Borrower, AAC Dropdown-Co, LLC and the Borrower (the "***Merger Agreement***") (the transfers of property and mergers contemplated pursuant to the Contribution Agreement and/or the Merger Agreement, together with all other related or ancillary transactions, collectively, the "***Merger Transactions***");

**WHEREAS**, pursuant to the Plan of Reorganization, on the Plan Effective Date, certain Prepetition Priming Facility Claims and DIP Lender Claims (as defined below) will be automatically converted into indebtedness outstanding hereunder in the form of Term Loans and, in connection therewith, the Lenders party hereto on the Closing Date shall be deemed to have advanced to the Borrower on the Closing Date

Term Loans in an aggregate principal amount equal to $[___],[3] on the terms and subject to the conditions set forth herein, the other Loan Documents (as defined below) and the Plan of Reorganization; and

**WHEREAS**, the Borrower, the Lenders, the Collateral Agent and the Administrative Agent are entering into this Agreement and the other Loan Documents (as applicable) in connection with the implementation and consummation of, the Plan of Reorganization.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## ARTICLE I

### *Definitions*

SECTION 1.01    *Defined Terms*.  As used in this Agreement, the following terms shall have the meanings specified below:

"*AAC Dropdown-Co, LLC*" shall have the meaning assigned to such term in the recitals.

"*AAC Holdings Prepetition Borrower*" shall have the meaning assigned to such term in the recitals.

"*AAC Holdings Legacy Deposit Account*" shall have the meaning assigned to such term in Section 5.18.

"*Acquired Entity*" shall have the meaning assigned to such term in Section 6.04(h).

"*Administrative Agent*" shall have the meaning assigned to such term in the preamble.

"*Administrative Agent Fees*" shall have the meaning assigned to such term in Section 2.05(b).

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"*Affiliate*" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, that, for purposes of the definition of "Eligible Assignee" and Section 6.07, the term "Affiliate" shall also include (i) any Person that directly or indirectly owns 10% or more of any class of Equity Interests of the Person specified and (ii) any Controlled Physician Affiliate.

"*Affiliate Subordination Agreement*" shall mean an Affiliate Subordination Agreement in the form of Exhibit F pursuant to which intercompany obligations and advances owed by any Loan Party are subordinated to the Obligations.

"*Agency Fee Letter*" shall mean the Agency Fee Letter, dated as of the Closing Date between the Borrower and the Agents, as amended, restated, supplemented or otherwise modified from time to time.

---

[3] Final amount to be included.

2

"*Agents*" shall have the meaning assigned to such term in Article VIII.

"*Agreement*" shall have the meaning assigned to such term in the preamble.

"*Agreement Value*" shall mean, for each Hedging Agreement, at the applicable time, the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or any Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"*Allowed*" shall have the meaning assigned to such term in the Plan of Reorganization.

"*Ankura*" shall have the meaning assigned to such term in the preamble.

"*Applicable Margin*" shall mean 18.00% per annum.

"*Applicable Payments*" shall have the meaning assigned to such term in Section 5.18.

"*Applicable Payment Arrangements*" shall have the meaning assigned to such term in Section 5.18.

"*Asset Sale*" shall mean the sale, transfer or other disposition (by way of merger, casualty, condemnation or otherwise) by the Borrower or any of the Subsidiaries to any Person other than the Borrower or any Subsidiary Guarantor of (a) any Equity Interests of any of the Subsidiaries (other than directors' qualifying shares) or (b) any other assets of the Borrower or any of the Subsidiaries (other than (i) inventory, damaged, obsolete or worn out assets, scrap and Permitted Investments, in each case disposed of in the ordinary course of business, (ii) any lease or sub-lease of any real property or personal property, in each case in the ordinary course of business, (iii) any license or sublicense of intellectual property of the Borrower or any Subsidiary, in each case in the ordinary course of business, (iv) any sale, transfer or other disposition constituting the abandonment of intellectual property rights that, in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and the Subsidiaries, in each case in the ordinary course of business, (v) any sale, transfer or other disposition consisting of the granting of Liens permitted by Section 6.02 and (vi) (A) any sale, transfer or other disposition consummated prior to the Closing Date and (B) after the Closing Date, any sale, transfer or other disposition or series of related sales, transfers or other dispositions having a value not in excess of $3,500,000 per fiscal year.

"*Assignment and Acceptance*" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"*Attributable Indebtedness*" shall mean, when used with respect to any Sale and Leaseback Transaction permitted by Section 6.03, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"*Auction Procedures*" shall mean the auction procedures with respect to Dutch Auctions reasonably satisfactory to the Borrower and the Administrative Agent.

"*Available Amount*" shall mean as of any date of determination (the "*Reference Date*"), an amount determined on a cumulative basis equal to:

1" = "1" "NY 78231004v14" "" NY 78231004v14

(a)   the sum (without duplication) of:

1.      an amount equal to 50% of Consolidated Net Income for the period from the first day of the fiscal quarter of the Borrower during which the Closing Date occurred to and including the last day of the most recently ended fiscal quarter of the Borrower prior to the Reference Date for which internal consolidated financial statements of the Borrower are available (or, in the case such Consolidated Net Income for such period is in deficit, minus 100% of such deficit);

2.      the cumulative amount of (A) any capital contributions (whether in cash or Permitted Investments) received by the Borrower after the Closing Date and on or prior to the Reference Date, and (B) any Net Cash Proceeds of any issuances of any Equity Interests of the Parent made after the Closing Date and on or prior to the Reference Date to any Person other than the Borrower or any Subsidiary thereof the Borrower (to the extent directly or indirectly contributed in cash to the Borrower);

3.      the aggregate amount received by Borrower or any Restricted Subsidiary after the Closing Date and on or prior to the Reference Date from dividends and distributions (whether in cash or Permitted Investments) made by any joint venture that is not a Restricted Subsidiary and interests, returns of principal, repayments and similar payments made by any joint venture that is not a Restricted Subsidiary in respect of Investments made by the Borrower or any Restricted Subsidiary to any joint venture that is not a Restricted Subsidiary, and the Net Cash Proceeds in connection with the sale, transfer or other disposition of assets or the Equity Interests of any joint venture that is not a Restricted Subsidiary of the Borrower to any Person (other than a Restricted Subsidiary) after the Closing Date and on or prior to the Reference Date;

4.      an amount equal to any Declined Proceeds retained by the Borrower after the Closing Date and on or prior to the Reference Date (and not, for the avoidance of doubt, applied for any other purpose, including as permitted by Section 2.12(b)); and

5.      to the extent not otherwise included, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually theretofore received in cash or Permitted Investments in respect of any Investment made pursuant to Section 6.04(i)(ii) after the Closing Date and on or prior to the Reference Date;

*minus*

(b)   the sum (without duplication) of the aggregate amount of (A) Restricted Payments made pursuant to Section 6.06(a)(ii), (B) Investments made pursuant to Section 6.04(i)(ii) and (C) distributions, payments, commitments, redemptions, repurchases, retirements, acquisitions or set aside made pursuant to Section 6.09(b)(iv), in each case of the foregoing clauses (A) through (C), during the period from (and including) the Business Day immediately following the Closing Date through to (and including) the Reference Date (without taking account of the intended usage of the Available Amount on such Reference Date).

"*Available Liquidity*" shall mean, at any time, the sum of (a) the aggregate amount of all unused available commitments outstanding at such time under any Revolving Credit Facility available to be borrowed as loans thereunder at such time plus (b) the aggregate amount of unrestricted cash and Permitted Investments of the Borrower and its Subsidiaries at such time held in any Deposit Account, securities account, commodities account, or other cash account (or any combination thereof, as applicable) maintained in a Controlled Account or in any other account maintained by a branch office of the applicable bank or securities intermediary located within the United States that is the subject of a control agreement granting

1" = "1" "NY 78231004v14" "" NY 78231004v14

Control to the Collateral Agent (or the administrative agent or lender, as applicable, with respect to any Revolving Credit Facility, to the extent such Revolving Credit Facility is permitted hereunder and incurred in accordance with the terms hereof, subject to the terms of any applicable Intercreditor Agreement) in a manner reasonably satisfactory to the Required Lenders.

"***Bail-In Action***" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"***Bail-In Legislation***" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" shall mean the title 11 of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended and in effect from time to time, and any successor statute.

"***Bankruptcy Court***" shall have the meaning assigned to such term in the Recitals.

"***Beneficial Ownership Regulation***" shall mean 31 C.F.R. § 1010.230.

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"***Borrower***" shall have the meaning assigned to such term in the preamble, and shall include any Successor Borrower, to the extent permitted pursuant to Section 6.05.

"***Borrower Materials***" shall have the meaning assigned to such term in Section 9.01.

"***Borrowing***" shall mean Loans of the same Class made on the same date.

"***Borrowing Request***" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"***Business Day***" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"***Capital Expenditures***" shall mean, for any period, the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP, but excluding in each case any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with insurance proceeds, condemnation awards or damage recovery proceeds relating to any such damage, loss, destruction or condemnation.

"***Cash Interest Rate***" means 10.00% per annum.

A "***Change in Control***" shall mean any event or series of events by which:

(a) a "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any

5

person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than the Permitted Holders becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of thirty-five percent (35%) or more of the aggregate voting or economic power of the Equity Interests of Holdings or the Borrower entitled to vote for members of the board of directors or equivalent governing body of Holdings or the Borrower on a fully-diluted basis (and taking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right);

(b)     Holdings shall cease to (i) Control the Borrower or (ii) have "beneficial ownership" (construed as set forth in clause (a)) of 100% of the aggregate voting or economic power of the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis, free and clear of all Liens (except Liens expressly constituting Permitted Liens pursuant to clause (b), (d), (g) or (t) of Section 6.02);

(c)     the disposition, sale, lease or transfer, in any one transaction or any series of related transactions, of all or substantially all of the assets of Holdings, the Borrower and its Subsidiaries, taken as a whole, to any Person other than the Permitted Holders; or

(d)     the approval of any plan for the liquidation or dissolution of Holdings or the Borrower.

"*Change in Law*" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Chapter 11 Cases*" shall have the meaning assigned to such term in the Recitals.

"*Charges*" shall have the meaning assigned to such term in Section 9.09.

"*Class*" when used in reference to any Loan or Borrowing, shall refer to whether such Loan, or the Loans comprising such Borrowing, are Term Loans or Other Term Loans and, when used in reference to any Commitment, refers to whether such Commitment is a Term Loan Commitment or Incremental Term Loan Commitment in respect of any Other Term Loan.

"*Closing Date*" shall mean the date on which the conditions set forth in Section 4.02 shall have been satisfied or waived, which date is December [11], 2020.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"*Collateral*" shall mean all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties.

6

"*Collateral Agent*" shall have the meaning assigned to such term in the preamble.

"*Commitment*" shall mean, with respect to any Lender, such Lender's Term Loan Commitment or Incremental Term Loan Commitment or commitment to make any Extended Term Loans, as the case may be.

"*Communications*" shall have the meaning assigned to such term in Section 9.01.

"*Compliance Certificate*" shall mean a certificate of a Financial Officer substantially in the form of Exhibit G.

"*Consolidated EBITDA*" shall mean, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) Consolidated Interest Expense for such period, (ii) consolidated income tax expense for such period (including any franchise taxes imposed in lieu of income taxes and any income taxes), (iii) all amounts attributable to depreciation and amortization for such period, (iv) any non-cash charges, expenses or losses (including, but not limited to, impairment of goodwill or other intangible assets and exchange rate losses) of the Borrower or any of its Subsidiaries for such period (excluding any such charges, expenses or losses incurred that constitutes an accrual of or a reserve for cash charges for any future period); provided, that this clause (iv) shall not include any write-downs or write-offs of, or reserves in respect of, of accounts receivable and/or similar add backs in reliance on this clause (iv) or in reliance on any other clauses in this paragraph (a), (v) any extraordinary, unusual, or non-recurring cash charges or expenses for such period (including without limitation, severance, retention bonuses or other similar one time compensation payments made to employees of the Borrower or any of its Subsidiaries or made in connection with a Permitted Acquisition), (vi) deferred compensation, stock-option or employee benefits-based and other equity-based compensation expenses for such period, (vii) fees, costs and expenses in connection with the Transactions for such period, (viii) fees, costs and expenses in connection with any Investment (including any Permitted Acquisition), asset disposition (including any Asset Sale), issuance of Equity Interests or issuance, modification or refinancing of any Indebtedness for such period, in each case to the extent permitted under this Agreement and whether or not such transaction shall have been consummated, (ix) any losses or expenses to the extent reimbursable by third parties in connection with any Permitted Acquisition for such period, as reasonably determined in good faith by the Borrower, provided, however, that if the Required Lenders (or the Administrative Agent after consultation with the Required Lenders), acting reasonably, determine in such period or the immediately succeeding period that any such losses or expenses, or any portion thereof (which, in each case, were included in Consolidated EBITDA for such period or such immediately preceding period pursuant to this clause (ix)), are no longer reimbursable or are not reasonably likely to be reimbursed, then such losses or expenses, or any portion thereof, shall be subtracted from Consolidated Net Income in calculating Consolidated EBITDA in for such period, (x) unrealized losses in respect of Obligations under Hedging Agreements for such period, (xi) any losses or expenses from discontinued operations or incurred in connection with the disposal of discontinued operations in accordance with GAAP for such period (or if not in accordance with GAAP as otherwise reasonably acceptable to the Administrative Agent or the Required Lenders), (xii) non-cash charges or amounts recorded in connection with purchase accounting under FASB Accounting Standards Codification Topic 805 (ASC 805), Business Combinations (including any applicable to future Permitted Acquisitions) for such period, (xiii) non-cash purchase accounting adjustments relating to the writedown of deferred revenue (whether billed or unbilled) that are the result of accounting for any acquisition for such period, (xiv) the cumulative effect of a change in accounting principles to the extent permitted by Section 1.02(b) for such period, (xv) any expenses in connection with any litigation or claim involving the Borrower or its Subsidiaries for such period, (xvi) debt discount and debt issuance costs, fees, charges and commissions, in each case incurred in connection with Indebtedness permitted to be incurred under Section 6.01 (whether or not such Indebtedness has been incurred) for such period, (xvii) any losses or expenses incurred by the

7

Borrower or its Subsidiaries in connection with establishing new or materially expanding existing Healthcare Facilities for a period of 6 months prior to the new establishment or material expansion of such Healthcare Facilities and continuing for 12 months after the new establishment or completed material expansion of such Healthcare Facilities, as reasonably determined in good faith by the Borrower, for such period, in an aggregate amount not to exceed, together with any add backs made pursuant to the succeeding clause (xviii), 25% of Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended prior to the determination date (without giving effect to any adjustments pursuant to this clause (xvii) and the succeeding clause (xviii)), (xviii) the amount of net cost savings, operating expense reductions and other operating improvements and acquisition synergies projected by the Borrower in good faith to be realized during such period (calculated on a *pro forma* basis as though such items had been realized on the first day of such period) as a result of actions taken or to be taken in connection with any acquisition, disposition or restructuring by the Borrower or any Subsidiary, net of the amount of actual benefits realized during such period that are otherwise included in the calculation of Consolidated EBITDA from such actions, provided, that (A) a duly completed certificate signed by a Financial Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 5.04(c), certifying that (x) such cost savings and operating expense reductions and synergies are reasonably expected and factually supportable as determined in good faith by the Borrower, and (y) such actions are to be taken within 12 months after the consummation of the acquisition, disposition or restructuring, which is expected to result in such cost savings or expense reductions or synergies, (B) no cost savings and operating expense reductions and synergies shall be added pursuant to this clause (xviii) to the extent duplicative of any losses, expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period, (C) projected amounts (and not yet realized) may no longer be added in calculating Consolidated EBITDA pursuant to this clause (xviii) to the extent occurring more than four full fiscal quarters after the specified action taken in order to realize such projected cost savings and operating expense reductions and synergies and (D) the aggregate amount of add backs made pursuant to the foregoing clause (xvii) and this clause (xviii) shall not exceed 20% of Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended prior to the determination date (without giving effect to any adjustments pursuant to the foregoing clause (xvii) and this clause (xviii)), and (xix) any Winddown Expenses of the Borrower or any Subsidiary for such period, and minus (b) without duplication (i) to the extent included in determining such Consolidated Net Income, any extraordinary, unusual, or non-recurring cash gains and all non-cash items of income for such period, all determined on a consolidated basis in accordance with GAAP, (ii) unrealized gains in respect of Obligations under Hedging Agreements permitted under Section 6.01 for such period and (iii) any gain from discontinued operations or any gain incurred in connection with the disposal of discontinued operations in accordance with GAAP for such period (or if not in accordance with GAAP as otherwise reasonably acceptable to the Administrative Agent); provided, that, in each case, for any period (A) the Consolidated EBITDA of any Acquired Entity acquired by the Borrower or any Subsidiary pursuant to a Permitted Acquisition during such period shall be included on a pro forma basis for such period (assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith occurred as of the first day of such period) and (B) the Consolidated EBITDA of any Person or line of business sold or otherwise disposed of by the Borrower or any Subsidiary during such period shall be excluded for such period (assuming the consummation of such sale or other disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such period).

"*Consolidated Interest Expense*" shall mean, for any period, the sum of (a) the interest expense (including imputed interest expense in respect of Financing Lease Obligations and Synthetic Lease Obligations) of the Borrower and the Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (including, for the avoidance of doubt, (i) any amounts of premium or penalty payable in connection with the payment of make-whole amounts or other prepayment premiums payable in connection with any Indebtedness of the Borrower or any of its Subsidiaries, and (ii) all commissions, discounts and other fees and charges owed in respect of interest rates to the extent such net costs are

8

allocable to such period in accordance with GAAP), plus (b) any interest accrued during such period in respect of Indebtedness of the Borrower or any Subsidiary that is required to be capitalized rather than included in consolidated interest expense for such period in accordance with GAAP. For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by the Borrower or any Subsidiary with respect to interest rate Hedging Agreements permitted under Section 6.01.

"***Consolidated Net Income***" shall mean, for any period, the net income or loss of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, that there shall be excluded (a) the income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by the Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such Subsidiary except that (x) the Borrower's equity in any net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income and (y) the net income of any Controlled Physician Affiliate shall be included in the determination of Consolidated Net Income for any period to the extent that any Loan Party has received cash payments under the management agreement with such Controlled Physician Affiliate during such period, (b) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary, (c) the income of any Person in which any other Person (other than the Borrower or a Wholly-Owned Subsidiary or any director holding qualifying shares in accordance with applicable law) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or a Wholly-Owned Subsidiary by such Person during such period, and (d) any gains attributable to sales of assets out of the ordinary course of business.

"***Contractual Obligation***" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its assets or properties is bound.

"***Contribution Agreement***" shall mean that certain Contribution, Assignment and Assumption Agreement, dated as of December [11], 2020, by and among AAC Holdings Prepetition Borrower and AAC Dropdown-Co, LLC, a Delaware limited liability company, as amended or otherwise modified from time to time in accordance with its terms.

"***Tax Cooperation Agreement***" shall mean that certain Tax Cooperation Agreement, dated as of December [11], 2020, by and among AAC Holdings Prepetition Borrower and the Borrower, as amended or otherwise modified from time to time in accordance with its terms.

"***Control***" (a) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of Voting Equity Interests, by contract or otherwise (including any member of the senior management group of any such Person), and the terms "***Controlling***" and "***Controlled***" shall have meanings correlative thereto, and (b) when used in connection with any Deposit Account, securities account, commodities account, or other cash account, shall have the meaning assigned thereto in the Guarantee and Collateral Agreement.

"***Controlled Account***" shall mean each Deposit Account that (i) is owned by, and held in the name of, the Borrower or any Subsidiary Guarantor, (ii) has been approved in writing by the Administrative Agent, (iii) is Controlled by the Collateral Agent and (iv) is not subject to any sweep or other arrangements pursuant to which any cash or other funds on deposit in such Deposit Account at any time are transferred into, or credited to, any AAC Holdings Legacy Deposit Account without the prior written consent of the

9

Collateral Agent or the Required Lenders.  For the avoidance of doubt, on and as of the Closing Date, that certain Deposit Account maintained at HSBC Bank in the name of American Addiction Centers, Inc. (account number: 879024372) constitutes a Controlled Account.

"*Controlled Physician Affiliate*" shall mean any Person comprised of or constituting a physician group or healthcare practice in the business of providing health care services through employed or contracted health care professionals (a) as to which the Borrower or a Wholly-Owned Subsidiary has the option to require a transfer of all of the Voting Equity Interests of such group or practice to itself or a nominee, (b) with which the Borrower or a Wholly-Owned Subsidiary has a long-term business agreement to provide management services to such group or practice and (c) the Voting Equity Interests of which cannot, pursuant to applicable Laws, or should not, in the reasonable good faith determination of the Borrower, be owned by the Borrower or a Wholly-Owned Subsidiary.

"*Controlled Physician Affiliate Restructuring Transaction*" shall mean (a) with respect to any Controlled Physician Affiliate owed, managed or Controlled by Mark A Calarco, D.O., any transaction or arrangement entered into or consummated by a Loan Party or any Subsidiary thereof that is determined in good faith by the board of directors of the Borrower to be reasonably necessary or desirable in connection with any transfer of ownership, management or Control of, or any business or assets of, such Controlled Physician Affiliate from Mark A Calarco, D.O. to any other Person (including a Loan Party or any Subsidiary thereof); provided, that the terms thereof (including any payments made pursuant thereto) shall be at least as favorable to the Loan Parties and/or their Subsidiaries as negotiated at an arm's length basis and (b) each action or transaction taken in connection with, or relating to, or required to effectuate, the foregoing (including any release of Liens on any Controlled Physician Affiliate pursuant to any transaction referred to herein, to the extent such release is required thereby).

"*Credit Event*" shall have the meaning assigned to such term in Section 4.01.

"*Credit Facility*" shall mean the term loan facility provided for by this Agreement.

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"*Current Assets*" shall mean, at any time, the consolidated current assets (other than cash and Permitted Investments) of the Borrower and the Subsidiaries determined in accordance with GAAP.

"*Current Liabilities*" shall mean, at any time, the consolidated current liabilities of the Borrower and the Subsidiaries at such time determined in accordance with GAAP, but excluding, without duplication, (a) the current portion of any long-term Indebtedness and (b) any loans or other Indebtedness outstanding under any Revolving Credit Facility.

"*Debtor*" shall have the meaning assigned to such term in the recitals.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Declined Proceeds*" shall have the meaning assigned to such term in Section 2.13(f).

1" = "1" "NY 78231004v14" "" NY 78231004v14

"*Default*" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"*Defaulting Lender*" shall mean, subject to Section 2.24(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), (d) has become the subject of a Bail-In Action or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or Federal regulatory authority acting in such a capacity; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.24(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"*Deposit Account*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Designated Jurisdiction*" shall mean any country or territory to the extent that such country or territory is the subject of any Sanctions.

"*DIP Credit Agreement*" shall have the meaning assigned to such term in the Recitals.

"*DIP Lender Claims*" shall have the meaning assigned to such term in the Plan of Reorganization.

"*DIP Lenders*" shall have the meaning assigned to such term in the Recitals.

"*Disqualified Institution*" shall mean (a) any Person identified by name in writing to the Administrative Agent by the Borrower from time to time, (b) any competitor of the Borrower and its Subsidiaries identified by name in writing to the Administrative Agent and the Lenders from time to time after the Closing Date by the Borrower and (c) any clearly and reasonably identifiable Affiliate of any Person referred to in clauses (i) or (ii) above solely on the basis of such Affiliate's name; provided, that a

11

Disqualified Institution shall not include any bona fide fixed income investor, debt fund, investment vehicle or lending entity that is primarily engaged in, or that advises investors, funds, investment vehicles or other lending entities that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds or similar extensions of credit or securities in the ordinary course and with respect to which a Disqualified Institution does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity; provided, further, that no Disqualified Institution may become a Lender or otherwise participate in the Credit Facility without consent of the Borrower; provided, further, that any Disqualified Institution identified from time to time after the Closing Date shall not apply retroactively to disqualify any party that has previously acquired an assignment or participation interest in the Credit Facility; provided, further, that the parties hereto hereby understand and agree that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to any Disqualified Institution.

"*Disqualified Stock*" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely for Equity Interests which are common equity interests or otherwise not Disqualified Stock), in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the ninety-first day after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time such Equity Interest is issued, or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time such Equity Interest is issued.

"*Dollars*" or "*$*" shall mean lawful money of the United States of America.

"*Dutch Auction*" shall mean an auction conducted by the Borrower or any Subsidiary in order to purchase Term Loans as contemplated by Section 9.04(l), as applicable, in accordance with the Auction Procedures.

"*EEA Financial Institution*" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"*EEA Member Country*" shall mean any of the member states of the European Union, Iceland, Liechtenstein, Norway and the United Kingdom.

"*EEA Resolution Authority*" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligible Assignee*" shall mean (a) a Lender, (b) an Affiliate of a Lender, (c) a Related Fund of a Lender and (d) any other Person (other than a natural person) approved by (x) the Administrative Agent and (y) except with respect to assignments when an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld, conditioned or delayed); provided, that the Borrower shall be deemed to have consented to any proposed Eligible Assignee unless it shall object thereto

12

by written notice to the Administrative Agent within five Business Days after having received written notice thereof; provided, further, that notwithstanding the foregoing, "Eligible Assignee" shall not include (i) the Borrower or any of the Borrower's Affiliates (except any Permitted Holder) (it being understood and agreed that assignments to the Borrower or a Subsidiary may be made pursuant to Section 9.04(l)), (ii) any Defaulting Lender or (iii) any Disqualified Institution.

"*Environmental Laws*" shall mean all applicable Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives and orders (including consent orders), in each case, relating to (a) protection of the environment or natural resources, (b) the presence, Release of, or exposure to Hazardous Materials, or (c) the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, or the exposure to, Hazardous Materials.

"*Environmental Liability*" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Interests*" shall mean, with respect to a Person, (a) shares of capital stock (whether denominated as common stock or preferred stock), partnership interests, membership interests (including in a limited liability company), beneficial interests (including in a trust), joint venture interests, participations, and all other equity, ownership or profit interests (or equivalents, and irrespective of how designated) of, or in, such Person, whether voting or non-voting and (b) any and all securities convertible into, or exchangeable for, any of the foregoing, and any and all options, warrants and/or other rights entitling the holder thereof to purchase, subscribe for or otherwise acquire any of the foregoing (whether or not presently convertible, exchangeable or exercisable).

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"*ERISA Affiliate*" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b), 414(c), 414(m) or 414(o) of the Code.

"*ERISA Event*" shall mean (a) the occurrence of any "reportable event" as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the failure by any Plan to meet the minimum funding standard of Sections 412 and 430 of the Code or Section 302 and 303 of ERISA, in each case, whether or not waived, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Multiemployer Plan, (e) a determination that any Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA), (f) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Sections 4041 and 4042 of ERISA, respectively, (g) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA, (h) the adoption of any

13

amendment to a Plan that would require the provision of security pursuant to Section 436(f) of the Code, (i) the receipt by the Borrower or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Section 4245 of ERISA, respectively, (j) the occurrence of a "prohibited transaction" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code), (k) the disqualification by the Internal Revenue Service of any Plan under Section 401(a) of the Code or the determination by the Internal Revenue Service that any trust forming part of any Plan fails to qualify for exemption from taxation under Section 501(a) of the Code, (l) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Plan or (m) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Events of Default*" shall have the meaning assigned to such term in Section 7.01.

"*Excluded Assets*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Excluded Taxes*" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income Taxes imposed on (or measured by) its net income (however denominated) or franchise Taxes imposed in lieu of income Taxes, in each case by (i) the United States of America or by the jurisdiction under the Laws of which such recipient is organized or in which its principal office is located, (ii) any jurisdiction with which such recipient has a present or former connection (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected security interests under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned any interest in a Loan Document) or (iii) in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction described in clause (a) above, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any U.S. federal withholding Tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.20(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 2.20(a), (d) any backup withholding tax that is required by the Code to be withheld from amounts payable to it, and (e) any Taxes imposed by FATCA.

"*Extended Term Loans*" shall mean any Class of Term Loans the maturity of which shall have been extended pursuant to Section 2.25.

"*Extension*" shall have the meaning assigned to such term in Section 2.25(a).

"*Extension Offer*" shall have the meaning assigned to such term in Section 2.25(a).

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to

comply with), any current or future regulations or official interpretations thereof, any agreement entered into thereto, or any law implementing an intergovernmental agreement or approach thereto.

"*FCPA*" shall have the meaning assigned to such term in Section 3.26.

"*Federal Funds Effective Rate*" shall mean, for any day, the greater of (a) weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, and (b) 0.00% per annum.

"*Fees*" shall mean the Administrative Agent Fees and any other fees required to be paid by any of the Loan Parties on the Closing Date pursuant to the Loan Documents or otherwise.

"*Financial Covenant*" means the covenant in Section 6.10.

"*Financial Officer*" of any Person shall mean the chief financial officer, chief restructuring officer, principal accounting officer, treasurer or controller of such Person.

"*Financing Lease Obligations*" of any Person shall mean, subject to Section 1.04, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*Floating Investments Basket*" shall mean, at any time, (a) $20,000,000 minus (b) the aggregate amount of all Investments made in reliance on the Floating Investments Basket pursuant to Section 6.04(a), (h) and/or (i) at or prior to such time.

"*Foreign Lender*" shall mean any Lender that is organized under the laws of a jurisdiction other than the United States of America, each State thereof or the District of Columbia.

"*GAAP*" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements delivered pursuant to Section 4.02(j).

"*Government Official*" shall mean (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or government-controlled company or business, (c) a political party or official thereof, or candidate for political office or (d) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank).

"*Governmental Authority*" shall mean any Federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"*Granting Lender*" shall have the meaning assigned to such term in Section 9.04(i).

"*Guarantee*" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other

15

obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness or other obligation of the primary obligor in respect of which such Guarantee is made (or, if less, the maximum amount of such Indebtedness or other obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Guarantee) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"*Guarantee and Collateral Agreement*" shall mean the Guarantee and Collateral Agreement, dated as of the Closing Date and substantially in the form of Exhibit D (as in effect on the Closing Date), among the Borrower, the Subsidiaries of the Borrower party thereto and the Collateral Agent for the benefit of the Secured Parties, as amended, restated, supplemented or otherwise modified from time to time (including pursuant to any joinder thereto).

"*Guarantor*" shall mean (a) on the Closing Date, Holdings and each Subsidiary Guarantor party to the Guarantee and Collateral Agreement thereon and (b) from time to time after the Closing Date, each other Person that is or becomes a party to the Guarantee and Collateral Agreement.

"*Hazardous Materials*" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"*Healthcare Authorizations*" shall mean any and all permits, licenses, authorizations, certificates, certificates of need, and accreditations of third-party accreditation agencies and Nongovernmental Payors (a) necessary to enable the Borrower or any of its Subsidiaries to engage in the Healthcare Service Business, participate in and receive payment under plans of Nongovernmental Payors or otherwise continue to conduct its Healthcare Service Business or (b) required under any law relating to Persons engaged in the Healthcare Service Business.

"*Healthcare Facility*" shall mean any facility which provides inpatient or outpatient abuse treatment services for individuals with drug or alcohol addiction, any sober living facility and any facility which provides laboratory services that is owned, leased or operated by the Borrower or its Subsidiaries, and any ancillary business thereto.

"*Healthcare Laws*" shall mean, collectively, any and all current or future laws with respect to any healthcare regulatory matters, any Healthcare Authorizations, any Healthcare Facility and any Healthcare Service Business, and any rule, regulation, directive, order or decision promulgated or issued pursuant thereto, including without limitation: (a) any and all federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a 7(b)), the Stark Law (42 U.S.C. § 1395nn and §1395(q)), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code, the criminal False Claims Law (42 U.S.C. § 1320a-7b(a)), all criminal laws relating to healthcare fraud and abuse, including but not limited to 18 U.S.C. Sections 286 and 287, the healthcare fraud criminal provisions under HIPAA, and the regulations promulgated pursuant to such statutes; (b) the federal Food, Drug & Cosmetic Act (21 U.S.C. §§ 301 et seq.) and the regulations promulgated thereunder; (c) HIPAA; (d) the Patient Protection and Affordable Care Act (P.L. 111-148), as amended by the Health Care and Education Reconciliation Act (P.L. 111-152) and the regulations promulgated thereunder; (e) quality, safety and accreditation standards and requirements of all applicable

16

state laws or regulatory bodies; (f) Requirements of Law relating to the licensure, certification, qualification or authority to transact business relating to the provision of and/or payment for healthcare services; (g) the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a) and the regulations promulgated thereunder; (h) laws related to the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (i) corporate practice of medicine laws and fee-splitting prohibitions; (j) health planning or rate-setting laws, including laws regarding certificates of need and certificates of exemption; (k) the HITECH Act; (l) MHPAEA; and (m) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (m) as may be amended from time to time.

"***Healthcare Service Business***" shall mean a business, the majority of whose revenues are derived from arranging to provide or administering, managing or monitoring healthcare services, or any business or activity that is reasonably similar thereto (including, for the avoidance of doubt, a business providing inpatient or outpatient abuse treatment services for individuals with drug or alcohol addiction) or a reasonable extension, development or expansion thereof or ancillary thereto.

"***Hedging Agreement***" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"***HIPAA***" shall have the meaning assigned to such term in Section 5.16(f).

"***HITECH Act***" shall have the meaning assigned to such term in Section 5.16(f).

"***Holdings***" shall mean (a) as of the Closing Date, AAC Intermediate Holdco, Inc., a Delaware corporation, in its capacity as the direct parent of the Borrower as of such time and (b) from time to time after the Closing Date, any entity that succeeds AAC Intermediate Holdco, Inc. as the direct parent of the Borrower, and each subsequent successor entity acting in such capacity, to the extent constituting Successor Holdings pursuant to, and in accordance with, Section 6.05(a).

"***Incremental Loan Assumption Agreement***" shall mean an Incremental Loan Assumption Agreement among, and in form and substance reasonably satisfactory to, the Borrower, the Administrative Agent and one or more Incremental Term Lenders.

"***Incremental Term Borrowing***" shall mean a Borrowing comprised of Incremental Term Loans.

"***Incremental Term Lender***" shall mean a Lender with an Incremental Term Loan Commitment or an outstanding Incremental Term Loan.

"***Incremental Term Loan Amount***" shall mean, on the Closing Date, $0.00.

"***Incremental Term Loan Commitment***" shall mean the commitment of any Lender, established pursuant to Section 2.23, to make Incremental Term Loans to the Borrower. As of the Closing Date, no Lender has an Incremental Term Loan Commitment.

"***Incremental Term Loan Maturity Date***" shall mean the final maturity date of any Incremental Term Loan, as set forth in the applicable Incremental Loan Assumption Agreement.

"***Incremental Term Loan Repayment Dates***" shall mean the dates scheduled for the repayment of principal of any Incremental Term Loan, as set forth in the applicable Incremental Loan Assumption Agreement.

17

"*Incremental Term Loans*" shall mean the term loans made by one or more Incremental Term Lenders to the Borrower pursuant to Section 2.01(b).  Incremental Term Loans may be made in the form of additional Term Loans with terms and provisions identical to those of the Term Loans made by the Lenders to the Borrower pursuant to clause (i) of Section 2.01(a) or, to the extent permitted by Section 2.23 and provided for in the relevant Incremental Loan Assumption Agreement, Other Term Loans.

"*Initial Term Loan Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make Term Loans hereunder on the Closing Date pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as in effect on the Closing Date) under the heading "Initial Term Loan Commitment".  The original aggregate principal amount of the Initial Term Loan Commitments on the Closing Date (determined immediately prior to giving effect to any funding of Term Loans on the Closing Date) is $[____].

"*Indebtedness*" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed (but limited to the lesser of the fair market value of such property and the outstanding principal amount of such Indebtedness), (g) all Guarantees by such Person of Indebtedness of others, (h) all Financing Lease Obligations of such Person, (i) all Synthetic Lease Obligations of such Person, (j) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (k) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (l) all obligations of such Person as an account party in respect of letters of credit and (m) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner (but only to the extent such general partner is obligated thereunder); provided, that, notwithstanding anything to the contrary in the foregoing definition, Indebtedness shall exclude (1) ordinary course intercompany payables among the Borrower and its Subsidiaries, (2) right-of-use liabilities recorded in connection with ASU 2016-02, Leases, issued by FASB, solely to the extent such liabilities would not have constituted Indebtedness prior to giving effect to the application of ASU 2016-2 and (3) solely for the purposes of calculating any Senior Secured Leverage Ratio under this Agreement, any Attributable Indebtedness or any other lease obligation resulting from any Sale and Leaseback Transaction permitted pursuant to Section 6.03.

"*Indemnified Taxes*" shall mean Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of the Borrower under any Loan Document.

"*Indemnitee*" shall have the meaning assigned to such term in Section 9.05(b).

"*Information*" shall have the meaning assigned to such term in Section 9.16.

"*Intellectual Property*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

18

"***Intercreditor Agreement***" shall mean an intercreditor agreement in form and substance satisfactory to the Required Lenders.

"***Interest Payment Date***" shall mean the last Business Day of each calendar month (commencing with the last Business Day of the calendar month in which the Closing Date occurs).

"***Interest Rate Agreement***" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"***Investment***" shall mean: (i) any direct or indirect purchase, redemption, retirement or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Equity Interests of any other Person (other than a Subsidiary Guarantor); (ii) any direct or indirect loan, guarantee, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by the Borrower or any of its Subsidiaries to any other Person (other than the Borrower or any Subsidiary Guarantor), including all Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business, and (iii) all investments consisting of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes or otherwise.  The amount of any Investment of the type described in clauses (i) and (ii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"***Junior Capital***" shall mean any common or preferred Equity Interests of the Borrower that do not (a) provide for scheduled payments of dividends (or other payments constituting a return on capital) in cash prior to the date that is 91 days after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such Equity Interests, or (b) become mandatorily redeemable (including at the option of the holder thereof) pursuant to a sinking fund obligation or otherwise prior to the date that is 91 days after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such Equity Interests.

"***Landlord Personal Property Collateral Access Agreement***" shall mean a Landlord Personal Property Collateral Access Agreement substantially in the form of Exhibit H with such amendments or modifications as may be approved by the Collateral Agent.

"***Law***" shall mean any federal, state, local, national or supranational or foreign law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction, decree or arbitration award or finding.

"***Lender Financial Consultant***" shall mean, at any time, each Person acting as financial consultant or adviser to the Required Lenders at such time.  For the avoidance of doubt, FTI Consulting shall be a Lender Financial Consultant on and as of the Closing Date and until such time (if any) as any other Person is engaged or appointed by or on behalf of the Required Lenders to replace FTI Consulting in such capacity.

"***Lender Parties***" shall have the meaning given such term in Section 9.24.

"***Lenders***" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance), (b) any Person (other than a natural person) that has become a party hereto pursuant to an Assignment and Acceptance and (c) any Person (other

1" = "1" "NY 78231004v14" "" NY 78231004v14

than a natural person) that has become a party hereto pursuant to an Incremental Loan Assumption Agreement.

"***Lien***" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; provided, that in no event shall any operating lease, any license of intellectual property or any agreement to sell be deemed to constitute a Lien.

"***Loan Documents***" shall mean this Agreement (including each amendment thereto), any Intercreditor Agreement, the Agency Fee Letter, the Security Documents, each Incremental Loan Assumption Agreement, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e), any other document executed in connection with any of the foregoing and each document referred to as a "Loan Document", and, in each case, together with all schedules, exhibits, annexes and other attachments thereto.

"***Loan Parties***" shall mean the Borrower and the Guarantors.

"***Loans***" shall mean the Term Loans.

"***Margin Stock***" shall have the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" shall mean (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of any Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse change in, or a material adverse effect upon, the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"***Material Indebtedness***" shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of the Borrower or any Subsidiary in an aggregate principal amount exceeding $16,500,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the Agreement Value of such Hedging Agreement at such time.

"***Material Subsidiary***" shall mean any Subsidiary of the Borrower that, together with its Subsidiaries, (a) generates more than 5% of Consolidated EBITDA on a *pro forma* basis for the four (4) fiscal quarter period most recently ended or (b) has total assets (including Equity Interests in other Subsidiaries and excluding Investments that are eliminated in consolidation) of equal to or greater than 5% of the total assets of the Borrower and its Subsidiaries, on a consolidated basis as of the end of the most recent four (4) fiscal quarters; provided, however, that if at any time there are Subsidiaries which are not classified as "Material Subsidiaries" but which collectively (i) generate more than 10% of Consolidated EBITDA on a *pro forma* basis or (ii) have total assets (including Equity Interests in other Subsidiaries and excluding Investments that are eliminated in consolidation) of equal to or greater than 10% of the total assets of the Borrower and its Subsidiaries on a consolidated basis, then the Borrower shall promptly designate one or more of such Subsidiaries as Material Subsidiaries and cause any such Subsidiaries to comply with the provisions of Section 5.12 such that, after such Subsidiaries become Subsidiary Guarantors hereunder, the Subsidiaries that are not Subsidiary Guarantors shall (A) generate less than 10% of

20

Consolidated EBITDA and (B) have total assets of less than 10% of the total assets of the Borrower and its Subsidiaries on a consolidated basis.

"***Maximum Rate***" shall have the meaning assigned to such term in Section 9.09.

"***Medicaid***" shall mean that government-sponsored entitlement program under Title XIX, P.L. 89-97 of the Social Security Act, which provides federal grants to states for medical assistance based on specific eligibility criteria, as set forth on Sections 1396, et seq. of Title 42 of the United States Code.

"***Medicare***" shall mean that government-sponsored insurance program under Title XVIII, P.L. 89-97 of the Social Security Act, which provides for a health insurance system for eligible elderly and disabled individuals, as set forth on Sections 1395, et seq. of Title 42 of the United States Code.

"***Merger Agreement***" shall have the meaning assigned to such term in the recitals.

"***Merger Transactions***" shall have the meaning assigned to such term in the recitals.

"***MHPAEA***" shall have the meaning assigned to such term in Section 5.16(f).

"***Moody's***" shall mean Moody's Investors Service, Inc., or any successor thereto.

"***Mortgaged Properties***" shall mean, on the Closing Date, the owned real properties of the Loan Parties specified on Schedule 1.01(b) (as in effect on the Closing Date), and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.12 or Section 5.17.

"***Mortgages***" shall mean the mortgages, deeds of trust, assignments of leases and rents, modifications and other security documents delivered pursuant to clause (i) of Section 4.02(g), Section 5.12 or Section 5.17, each substantially in the form of Exhibit E (with such changes as are reasonably consented to by the Collateral Agent to account for local law matters) or in such other form as is reasonably satisfactory to the Collateral Agent and the Borrower.

"***Multiemployer Plan***" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower or any of its ERISA Affiliates is contributing or has an obligation to contribute.

"***Net Cash Proceeds***" shall mean (a) with respect to any Asset Sale or any Recovery Event, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable broker's fees or commissions, reasonable legal fees, transfer and similar taxes, reasonable real estate due diligence fees or expenses, and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale), (ii) amounts provided as a reserve, in accordance with GAAP, against any retained liabilities associated with such Asset Sale, including under any indemnification obligations or in respect of any purchase price adjustments (provided, that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (other than any such Indebtedness assumed by the purchaser of such asset other than repayments of revolving debt, except to the extent that the commitments with respect thereto are correspondingly decreased) which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds; provided, that, if (x) the Borrower shall deliver a certificate of a Financial Officer to the Administrative Agent at the time of receipt thereof setting forth the Borrower's intent to reinvest such proceeds in productive assets of a kind then used or usable in the business of the Borrower and its Subsidiaries within 365 days of receipt of such proceeds

21

and (y) no Default or Event of Default shall have occurred and shall be continuing at the time of delivery of such certificate or at the proposed time of the application of such proceeds, such proceeds shall not constitute Net Cash Proceeds except to the extent not so used at the end of such 365-day period, at which time such proceeds shall be deemed to be Net Cash Proceeds; and (b) with respect to any issuance or incurrence of Indebtedness, or any issuance of Equity Interests, the cash proceeds thereof, net of all taxes and customary fees (including attorneys' fees, investment banking fees and accountants' fees), underwriting discounts, commissions, costs and other expenses incurred in connection therewith.

"*Non-Defaulting Lender*" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"*Nongovernmental Payors*" shall mean third-party payors (other than government reimbursement programs) that reimburse providers for healthcare goods and services rendered in the Healthcare Service Business, such as private insurers and managed care organizations.

"*Obligations*" shall mean all obligations defined as "Obligations" in the Guarantee and Collateral Agreement and the other Security Documents.

"*Other Taxes*" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21(a)).

"*Other Term Loans*" shall have the meaning assigned to such term in Section 2.23(a).

"*Paid in Kind*", "*Payable in Kind*", and "*Payment in Kind*" (as applicable) means, with respect to the payment of any interest accruing on any principal of any Loan at the PIK Interest Rate, that the Dollar amount of such interest payment shall, as the context may require, be payable or paid "in kind", by capitalizing the amount of such interest payment as of such payment date as additional Loan "principal" deemed incurred as of the date of such payment (and compounding such amount onto, and adding such amount to, the aggregate principal amount of Loans outstanding immediately prior to such payment date) (such interest, paid as set forth herein, "*PIK Interest*"), such that, pro forma for the payment of such PIK Interest on the applicable payment date, the aggregate principal amount of Loans outstanding shall be equal to the sum of (i) the aggregate principal amount of Loans outstanding immediately prior to such payment "in kind" *plus* (ii) the amount of PIK Interest due on such payment date. PIK Interest shall be Paid in Kind (and a Payment in Kind of PIK Interest shall be deemed to occur) automatically at 12:01 a.m. (New York City time) on the applicable payment date, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment. For the avoidance of doubt, upon Payment in Kind of PIK Interest in accordance with the foregoing provisions, the amount of all future interest payments and all other amounts required to be calculated on the basis of the outstanding "principal" of Loans, shall, in each case, be calculated on the basis of the then-outstanding principal amount of Loans, taking into account the principal comprising PIK Interest amounts Paid in Kind on each payment date prior to the applicable date of determination.

"*Parent*" means each direct or indirect parent of the Borrower (including Holdings and Ultimate Parent).

"*Participant Register*" shall have the meaning assigned to such term in Section 9.04(f).

22

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor statute.

"*Perfection Certificate*" shall mean (a) on the Closing Date, the perfection certificate, dated as of the Closing Date and duly executed by a Responsible Officer of the Borrower, in form and substance satisfactory to the Administrative Agent and delivered to it pursuant to Section 4.02 and (b) each perfection certificate delivered to the Administrative Agent after the Closing Date, in each case, in form and substance satisfactory to the Administrative Agent, which updates, supplements or otherwise modifies the information set forth on the perfection certificate delivered on the Closing Date or any other perfection certificate previously delivered to the Administrative Agent pursuant to the Loan Documents.

"*Permitted Acquisition*" shall have the meaning assigned to such term in Section 6.04(h).

"*Permitted Holder*" means (a) each Person that, pursuant to the Plan of Reorganization, is entitled to receive on the Plan Effective Date Reorganized AAC Equity Interests (as such term is defined in the Plan of Reorganization) as a distribution under the Plan of Reorganization, so long as the amount of Reorganized AAC Equity Interests "beneficially owned" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) as of the Closing Date by such Person and its Affiliates in the aggregate (after giving effect to the Plan of Reorganization) is not less than 5.0% of the aggregate amount of all Reorganized AAC Equity Interests issued and outstanding as of the Plan Effective Date (each such Person, together with its successors, an "*Initial Equity Investor*") and (b) (i) each Affiliate of an Initial Equity Investor (but excluding such Initial Equity Investor's operating portfolio companies) and without duplication (ii) each Person, all or substantially all of the assets of which are comprised of the Borrower, Holdings or any Parent, and which beneficially owns (directly or indirectly) 100% of the common voting Equity Interests of Holdings and the Borrower on a fully diluted basis at the time of determination; provided, that such Person is at such time Controlled by the Initial Equity Investors.  For the avoidance of doubt, common voting Equity Interests of Ultimate Parent shall constitute Reorganized AAC Equity Interests referred to herein.

"*Permitted Discretion*" shall mean, with respect to any term or provision of this Agreement or any other Loan Document, that requires or permits the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by any Agent, in each case, whether at the request of any of the Loan Parties or otherwise, as applicable (collectively, an "*Agent Action*"), a determination made in good faith with respect to such Agent Action by the applicable Agent in the exercise of its reasonable business judgment; provided, that, Agent shall be permitted to request that Required Lenders confirm its authority to take and/or consent to it taking such Agent Action by (a) notifying all Lenders via the Platform of the proposed Agent Action and (b) Lenders constituting Required Lenders consenting to such Agent Action in the manner prescribed in the relevant Electronic Communication or as otherwise permitted pursuant to Section 9.08(d).

"*Permitted Investments*" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(b)     Investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's, or in the case of the United States Government, a rating of AA or higher;

23

(c)     Investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $1,000,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above; and

(e)     Investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in Investments of the type described in clauses (a) through (d) above.

"*Permitted Liens*" shall have the meaning assigned to such term in Section 6.02.

 "*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"*Petition Date*" shall have the meaning assigned to such term in the Recitals.

"*PIK Interest*" has the meaning assigned thereto in the definition of Paid In Kind.

"*PIK Interest Rate*" means 8.00% per annum.

"*Plan*" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Plan Confirmation Order*" shall mean the "Confirmation Order", as such term is defined in the Plan of Reorganization (as in effect on October 11, 2020).

"*Plan Documents*" shall mean, collectively, the Plan Confirmation Order, the Plan of Reorganization, the Plan Supplement (as defined in the Plan of Reorganization in effect on October 11, 2020), the Restructuring Documents (as defined in the Plan of Reorganization in effect on October 11, 2020), and all orders, documents and agreements (including any amendments and supplements to any of the foregoing) entered into in connection with, or relating to, any of the foregoing (but excluding this Agreement and the other Loan Documents).

"*Plan Effective Date*" shall mean December [11], 2020 being the "Effective Date" under the Plan of Reorganization.

"*Plan of Reorganization*" shall mean that certain Second Amended Joint Chapter 11 Plan of Reorganization of AAC Holdings, Inc. and its Debtor Affiliates Docket No. 649, dated October 11, 2020 (including any exhibits, supplements, annexes, appendices and schedules thereto) filed in the Chapter 11 Cases (as supplemented, amended or otherwise modified from time to time prior to entry of the Plan Confirmation Order in a manner reasonably acceptable to the Required Lenders), as confirmed by the Plan

24

Confirmation Order pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended.

"*Platform*" shall have the meaning assigned to such term in Section 9.01.

"*Prepetition Lenders*" shall have the meaning assigned to such term in the Recitals.

"*Prepetition Priming Credit Agreement*" shall have the meaning assigned to such term in the Recitals.

"*Prepetition Priming Facility Claims*" shall mean the Priming Facility Claims (as defined in the Plan of Reorganization).

"*Public Lender*" shall have the meaning assigned to such term in Section 9.01.

"*Recovery Event*" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of the Borrower or any Subsidiary.

"*Register*" shall have the meaning assigned to such term in Section 9.04(d).

"*Regulation T*" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation U*" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Related Fund*" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"*Related Parties*" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"*Release*" shall mean any release, spill, emission, pumping, leaking, dumping, emptying, escaping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Materials or pollutant or contaminant).

"*Releasing Party*" shall have the meaning given such term in Section 9.24.

"*Removal Effective Date*" shall have the meaning assigned to such term in Article VIII.

"*Required Lenders*" shall mean, at any time, Lenders having Loans and unused Term Loan Commitments representing more than 50% of the sum of all Loans outstanding and unused Term Loan Commitments at such time; provided, that the Loans and unused Term Loan Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

1" = "1" "NY 78231004v14" "" NY 78231004v14

"*Requirement of Law*" shall mean, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its assets or property or to which such Person or any of its assets or property is subject.

"*Responsible Officer*" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"*Restricted Indebtedness*" shall mean Indebtedness of the Borrower or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(b).

"*Restricted Payment*" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary.

"*Revolving Credit Facility*" shall have the meaning assigned to such term in Section 6.01(r).

"*Ringwood Property*" shall mean 474 Sloatsburg Road, Ringwood, New Jersey, NJ 07456.

"*Sale and Leaseback Transaction*" shall have the meaning assigned to such term in Section 6.03.

"*S&P*" shall mean S&P Global Ratings, or any successor thereto.

"*Sanctions*" shall have the meaning assigned to such term in Section 3.24.

"*SEC*" shall mean the Securities and Exchange Commission.

"*Secured Parties*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Securities Account*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Security Documents*" shall mean the Mortgages, the Guarantee and Collateral Agreement and each of the other security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.12 or Section 5.17.

"*Senior Secured Debt*" shall mean, at any time, Total Debt of the Borrower and the Subsidiaries that is secured by a Lien on the property or assets of the Borrower or the Subsidiaries.

"*Senior Secured Leverage Ratio*" shall mean, for any period, the ratio of Senior Secured Debt outstanding as of the last day of such period to Consolidated EBITDA for such period, in each case, calculated on a *pro forma* basis.

"*Solvent*" shall mean, with respect to any Person (a) the fair value and present fair saleable value of the assets of such Person, at a fair valuation, will exceed its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), (b) such Person, on a consolidated basis, has the

26

ability to pay its debts and liabilities, (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business and (c) such Person, on a consolidated basis, does not have an unreasonably small amount of capital with which to conduct its business.

"*SPV*" shall have the meaning assigned to such term in Section 9.04(i).

"*Subordinated Debt*" shall mean all unsecured Indebtedness of the Borrower and its Subsidiaries that (a) is expressly subordinated to the prior payment in full of the Obligations, (b) no part of the principal or interest of which is required to be paid (whether by way of mandatory sinking fund, mandatory redemption or mandatory prepayment or otherwise) earlier than six months after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such unsecured Indebtedness and (c) that is evidenced by an indenture or other agreement reasonably satisfactory to the Administrative Agent in respect of subordination and related matters.

"*subsidiary*" shall mean, with respect to any Person (herein referred to as the "*parent*"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the aggregate equity or more than 50% of the aggregate Voting Equity Interests or more than 50% of the aggregate general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"*Subsidiary*" shall mean any direct or indirect subsidiary of the Borrower (including any Controlled Physician Affiliate).

"*Subsidiary Guarantor*" shall mean (a) on the Closing Date, each Subsidiary listed on Schedule 1.01(a) and (b) from time to time after the Closing Date, each other Subsidiary that is or becomes a party to the Guarantee and Collateral Agreement.

"*Successor Borrower*" shall have the meaning assigned to such term in Section 6.05(a).

"*Successor Holdings*" shall have the meaning assigned to such term in Section 6.05(a).

"*Synthetic Lease*" shall mean, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"*Synthetic Lease Obligations*" shall mean, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Financing Lease Obligations.

"*Synthetic Purchase Agreement*" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which the Borrower or any Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than the Borrower or any Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted

27

Indebtedness; <u>provided</u>, that no phantom stock or other equity-based plan or arrangement providing for payments only to current or former directors, officers or employees of the Borrower or the Subsidiaries (or to their heirs, transferees or estates) shall be deemed to be a Synthetic Purchase Agreement.

"***Taxes***" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, assessments or withholdings of any nature (including interest, penalties, and additions thereto) that are imposed by any Governmental Authority.

"***Term Borrowing***" shall mean a Borrowing comprised of Term Loans.

"***Term Lender***" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"***Term Loan Commitment***" shall mean, with respect to each Lender, the commitment of such Lender to be deemed Term Loans hereunder as set forth on Schedule 2.01.

"***Term Loan Maturity Date***" shall mean June 25, 2025 (or, if such date is not a Business Day, the immediately preceding Business Day).

"***Term Loans***" shall mean the term loans made to the Borrower by each Lender with a Term Loan Commitment pursuant to Section 2.01(a) and shall include, for the avoidance of doubt, all term loans made on the Closing Date.  Unless the context shall otherwise require, the term "Term Loans" shall include any Incremental Term Loans.

"***Total Debt***" shall mean, at any time, the total Indebtedness (including all paid in-kind interest capitalized pursuant to Section 2.06(d)) of the Borrower and the Subsidiaries at such time (excluding Indebtedness of the type described in clauses (j) and (l) of the definition of such term, except, in the case of clause (l), to the extent of any unreimbursed drawings thereunder).

"***Total Leverage Ratio***" shall mean, on any date of determination, the ratio of Total Debt on such date to Consolidated EBITDA for the period of four consecutive fiscal quarters most recently then ended for which the financial statements and certificates required by Section 5.04(a) or (b), as the case may be, have been or were required to have been delivered.

"***Transaction Costs***" shall mean fees and expenses payable in connection with clause (a) and (c) of the definition of the term "Transactions".

"***Transactions***" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (b) the payment of the Transaction Costs, and (c) all other transactions contemplated by, entered into, consummated in connection with, or relating to, the Plan Documents (including all mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions or other corporate or other transactions that the Loan Parties or any of their Affiliates determine to be necessary or appropriate to implement the transactions contemplated pursuant to the Plan Documents).

"***Ultimate Parent***" means AAC Parent Corporation, a Delaware corporation, or any successor thereof.

"***Uniform Commercial Code***" shall mean the Uniform Commercial Code, as in effect in the State of New York from time to time.

*1" = "1" "NY 78231004v14" "" NY 78231004v14*

"*Uniform Customs*" shall have the meaning assigned to such term in Section 9.07.

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time (including, for the avoidance of doubt, the Beneficial Ownership Regulation).

"*Voting Equity Interests*" of any Person shall mean any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

"*Weighted Average Life to Maturity*" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"*Wholly-Owned Subsidiary*" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly-owned subsidiaries of such Person or by such Person and one or more wholly-owned Subsidiaries of such Person.

"*Winddown Expenses*" shall mean any amounts paid by Borrower or any of its Subsidiaries in connection with the winddown of AAC Holdings Prepetition Borrower and its business pursuant to the terms of the Contribution Agreement and/or the Plan of Reorganization.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Write-Down and Conversion Powers*" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02    *Terms Generally*.

The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The word "disposition" shall be construed as a reference to, and shall be deemed to include, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition. Except as otherwise expressly provided in this Agreement, (i) whenever this Agreement refers to a "beneficial owner" or "beneficial ownership" (including each corresponding or related usage of such terms), such terms shall be construed as having the meaning assigned thereto in, and shall be determined in accordance with, Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934 and (ii) whenever this

29

Agreement refers to beneficial ownership of (or requires determination of whether a Person is the beneficial owner of) a certain amount or percentage of Equity Interests in any other Person, such beneficial ownership shall be determined on the basis of the corresponding amount or percentage (as applicable) of the voting and economic power of Equity Interests in such other Person entitled to vote for members of the board of directors or equivalent governing body of such Person at such time, on a fully-diluted basis. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of this Agreement, and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the date hereof and consistent with financial statements delivered pursuant to Section 3.05(a). If at any time any change in GAAP would affect the computation of any financial ratio or any other covenant or requirements set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio, covenant or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided, that, until so amended, (i) such ratio, covenant or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirements made before and after giving effect to such change in GAAP.

Notwithstanding anything to the contrary, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP as in effect prior to the issuance by the Financial Accounting Standards Board of an Accounting Standards Update on February 25, 2016 (the "ASU") shall continue to be accounted for as operating leases for purposes of all financial definitions (including the definition of Indebtedness) and calculations for purposes of the Loan Documents (whether or not such operating lease obligations were in effect on such date), notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated, or to be recharacterized, as capitalized lease obligations in financial statements.

SECTION 1.03    *Pro Forma Calculations*.

All *pro forma* calculations permitted or required to be made by the Borrower or any Subsidiary pursuant to this Agreement shall include only those adjustments that (a) are permitted or required by Regulation S-X under the Securities Act of 1933, as amended, (b) (i) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon assumptions that were believed to be reasonable at the time such assumptions were made and (ii) are based on reasonably detailed written assumptions reasonably acceptable to the Administrative Agent, or (c) are required by the definition of "Consolidated EBITDA."

SECTION 1.04    *Classification of Loans and Borrowings*.

For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.*, an "Initial Term Loan" or an "Incremental Term Loan").

SECTION 1.05    *Designation as Senior Debt*.

The Loans and other Obligations are hereby designated as "Senior Debt" and "Designated Senior Debt," as applicable, for all purposes under the indenture or other agreement governing any Subordinated Debt.

30

ARTICLE II

*The Credits*

SECTION 2.01     *Commitments*.

(a)     On the Closing Date, subject to Sections 4.01 and 4.02 and pursuant to the Plan Documents, each Term Lender shall be deemed to have extended to the Borrower, without any funding or other action on the part of such Term Lender, term loans (the "Term Loans") in the aggregate principal amount equal to such Term Lender's Term Commitment and, immediately upon the incurrence by the Borrower thereof, the amount of each Term Lender's (or its Affiliate's) Prepetition Priming Facility Claims and/or DIP Lender Claims (as applicable with respect to such Term Lender) outstanding on the Closing Date (calculated immediately prior to giving effect to the deemed extension of the Term Loans) equal to the aggregate principal amount of Term Loans made by such Term Lender shall be deemed automatically, fully and finally satisfied, released and discharged and converted into Term Loans outstanding as of the Closing Date.

(b)     Each Lender having an Incremental Term Loan Commitment, severally and not jointly, hereby agrees, subject to the terms and conditions and relying upon the representations and warranties set forth herein and in the applicable Incremental Loan Assumption Agreement, to make Incremental Term Loans to the Borrower, in an aggregate principal amount not to exceed its Incremental Term Loan Commitment.  Amounts paid or prepaid in respect of Incremental Term Loans may not be reborrowed.

SECTION 2.02     *Loans*.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; provided, however, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  On the Closing Date (after giving effect to the incurrence of Term Loans on such date), the Initial Term Loan Commitments of each Lender shall automatically be reduced to zero and terminate in full.

(b)     [Reserved].

(c)     Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 2:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders; provided, however, that the Term Loans deemed to be extended on the Closing Date pursuant to Section 2.01 shall not require any cash funding by the Lenders and shall be deemed incurred by the Borrower on the Closing Date in accordance with Section 2.01(a).

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such

31

Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

SECTION 2.03    *[Reserved]*.

SECTION 2.04    *Evidence of Debt; Repayment of Loans*.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Term Loan of such Lender as provided in Section 2.11.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made or deemed made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Subsidiary Guarantor and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.  In the event of any conflict between the accounts of each Lender maintained pursuant to paragraph (b) and the accounts of the Administrative Agent maintained pursuant to paragraph (c), the accounts maintained by the Administrative Agent shall control absent manifest error.

(e)    Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to the Administrative Agent and the Borrower. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05    *Fees*.

(a)    [Reserved].

(b)    The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative fees set forth in the Agency Fee Letter in immediately available funds at the times and in the amounts specified therein (the "***Administrative Agent Fees***").  Once paid, none of the Administrative Agent

32

Fees shall be refundable under any circumstances absent manifest error in the calculation of such Administrative Agent Fees.

SECTION 2.06      ***Interest on Loans***.

(a)      Subject to the provisions of Section 2.07, the Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Applicable Margin; provided, that, the portion of each interest payment that is calculated by reference to (i) the Cash Interest Rate shall be paid in cash and (ii) the PIK Interest Rate shall be Paid in Kind.

(b)      [Reserved].

(c)      Subject to the provisions of Section 2.07, interest on each Loan shall be payable on each Interest Payment Date.

SECTION 2.07      ***Default Interest***.

If (i) the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other Loan Document, by acceleration or otherwise or (ii) if any Event of Default has occurred and is continuing, then, in the case of clause (i) above, until such defaulted amount shall have been paid in full or, in the case of clause (ii) above, from the date such Event of Default and for so long as such Event of Default is continuing, to the extent permitted by law, all amounts outstanding under this Agreement and the other Loan Documents shall bear interest (after as well as before judgment), payable on demand, at the Applicable Margin plus 2.00% per annum (computed on the basis of the actual number of days elapsed over a year of 360 days).  All interest accruing pursuant to this Section 2.07 shall be payable on demand and in cash.

SECTION 2.08      ***[Reserved]***.

SECTION 2.09      ***Termination and Reduction of Commitments***.

(a)      The Term Loan Commitments (other than any Incremental Term Loan Commitments, which shall terminate as provided in the related Incremental Loan Assumption Agreement) shall automatically terminate upon the making of the Term Loans on the Closing Date.

(b)      Upon at least three Business Days' prior irrevocable (subject to the following provisos below) written, fax or email notice to the Administrative Agent, the Borrower may at any time after the Closing Date in whole permanently terminate, or from time to time in part permanently reduce, the Term Loan Commitments; provided, that if such notice is for the termination of all of the then outstanding Term Loan Commitments, then the Borrower may revoke such notice and/or extend the termination date by not more than five Business Days' written notice; provided, further, that a notice of voluntary termination or reduction hereunder may state that such notice is conditional upon the consummation of a certain transaction, the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness, in which case such notice of termination or reduction, as the case may be, may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to 1:00 p.m., New York City time, on the specified date of termination or reduction) if such condition is not satisfied; provided, however, that each partial reduction of the Term Loan Commitments shall be in an integral multiple of $1,000,000 and in a minimum amount of $5,000,000 (but only to the extent that Term Loan Commitments greater than such amounts are outstanding).

33

(c)     Each reduction in the Term Loan Commitments hereunder shall be made ratably among the applicable Lenders in accordance with their respective applicable Commitments.

SECTION 2.10     *[Reserved]*.

SECTION 2.11     *Repayment of Term Borrowings*.

(a)     [Reserved].

(b)     [Reserved].

(c)     To the extent not previously paid, all Term Loans shall be due and payable on the Term Loan Maturity Date, as the case may be, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(d)     All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

SECTION 2.12     *Voluntary Prepayments*.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written, fax or other electronically transmitted notice (or telephone notice promptly confirmed by written, fax or other electronically transmitted notice) before 1:00 p.m., New York City time to the Administrative Agent; provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000.

(b)     Voluntary prepayments of outstanding Term Loans under this Agreement shall be allocated pro rata between the Term Loans and pro rata among the Class of Term Loans.

(c)     [Reserved].

(d)     [Reserved].

(e)     Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable (subject to the following provisos below) and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; provided, that if such prepayment is for all of the then outstanding Loans, then the Borrower may revoke such notice and/or extend the prepayment date by not more than one Business Day; provided, further, that a notice of voluntary prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness, in which case such notice of prepayment may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to 1:00 p.m., New York City time, on the specified date of prepayment) if such condition is not satisfied; provided, however, that the provisions of Section 2.16 shall apply with respect to any such revocation or extension. All prepayments under this Section 2.12 shall be subject to Section 2.16 but otherwise without premium or penalty. All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13     *Mandatory Prepayments*.

34

(a)      [Reserved].

(b)      Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Asset Sale (including any Sale and Leaseback Transaction permitted pursuant to Section 6.03) or any Recovery Event, the Borrower shall apply 100% of the Net Cash Proceeds received therefrom to prepay outstanding Loans and other Obligations in accordance with Section 2.13(f).

(c)      [Reserved].

(d)      In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance of Disqualified Stock or incurrence of Indebtedness for money borrowed of any Loan Party or any subsidiary of a Loan Party (other than any cash proceeds from the issuance of Indebtedness for money borrowed permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans and other Obligations in accordance with Section 2.13(f).

(e)      [reserved].

(f)      Prepayments pursuant to this Section 2.13 shall be made in accordance with Section 2.17 and Section 2.19.  Any Lender may elect, by notice to the Administrative Agent at or prior to the time and in the manner specified by the Administrative Agent, prior to any mandatory prepayment of the Term Loans required to be made by the Borrower pursuant to Section 2.13(b), to decline all (but not a portion) of its pro rata share of such mandatory prepayment (such declined amounts, the "***Declined Proceeds***").  Provided that no Default or Event of Default then exists, any Declined Proceeds may be retained by the Borrower or applied at the Borrower's discretion as otherwise permitted by Section 2.12(b).  Notwithstanding the foregoing, the Administrative Agent shall have no duty or obligation to (a) return to Borrower any Declined Proceeds that have been received from Borrower if either (i) the Administrative Agent has received notice from the Borrower or any Lender that a Default or Event of Default exists, or (ii) the Administrative Agent has already transferred such proceeds to a Declining Lender, unless such Declining Lender subsequently returns such proceeds to the Administrative Agent and in connection therewith has directed that the Administrative Agent return such proceeds to Borrower, in which case, Administrative Agent will promptly return such proceeds to Borrower to the extent received back from such Declining Lender, subject to immediately preceding clause (i), or (b) as a result of any Declining Lender declining to receive such Declined Proceeds, to reallocate among Lenders or to return to Borrower, the proceeds of any mandatory prepayments of the Term Loans made by the Borrower pursuant to Section 2.13(b) to the extent such proceeds have already been received by the Administrative Agent and distributed to the Lenders.

(g)      The Borrower shall deliver to the Administrative Agent in connection with each prepayment required under this Section 2.13, (i) at the time of each prepayment required under this Section 2.13, a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) at least three Business Days prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments of Borrowings under this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.14      ***Reserve Requirements; Change in Circumstances***.

1" = "1" "NY 78231004v14" "" NY 78231004v14

(a)      Notwithstanding any other provision of this Agreement, if any Change in Law shall: (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender, (ii) subject any Agent or Lender to any Taxes (other than Indemnified Taxes, Excluded Taxes and Other Taxes) on its Loans, loan principal, Commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (iii) impose on such Lender or the London interbank market any other condition affecting this Agreement, and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrower will pay to such Lender upon demand such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company and the calculation thereof in reasonable detail, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)      Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be under any obligation to compensate any Lender under paragraph (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 120 days prior to such request if such Lender knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; provided further that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 120-day period. The protection of this Section 2.14 shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.15      *[Reserved]*.

SECTION 2.16      *Breakage*.

The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of any default in the making of any payment or prepayment required to be made hereunder.  A certificate of any Lender setting forth in reasonable detail the calculations of any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17      *Pro Rata Treatment*.

36

Except in connection with any assignment of Loans in accordance with Section 9.04 and any payments relating thereto, and subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each reduction of the Term Loan Commitments shall be allocated pro rata among the applicable Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.18    *Sharing of Setoffs*.

Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided, however, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.18 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any of its Affiliates (other than pursuant to Section 9.04(l)), as to which the provisions of this Section 2.18 shall apply. The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19    *Payments*.

(a)    The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees, premium or other amounts) hereunder and under any other Loan Document in cash not later than 1:00 p.m., New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. All payments received by the Administrative Agent after 1:00 p.m., New York City time, shall be deemed received on the next succeeding Business Day (in the Administrative Agent's sole discretion) and any applicable interest, premium or fee shall continue to accrue. Each such payment shall be made to the account of the Administrative Agent for which the wire instructions are set forth below (or to such other account in accordance with such other wire instructions as the Administrative Agent may designate after the Closing Date) (the "*Administrative Agent Account*"). The Administrative

37

1" = "1" "NY 78231004v14" "" NY 78231004v14

Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

The wire instructions referred to in this clause (a) are as follows:

USD Remittance Instructions –
Texas Capital Bank, N. A
2350 Lakeside Blvd, Suite 800
Richardson, TX 75082
Account Name: Ankura Trust Company, LLC
ABA 111017979
Account number: 1511022764
Ref: American Addiction EXIT

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

(c)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower does not in fact make such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, and to pay interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at a rate reasonably determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).

(d)    If an Event of Default shall have occurred and be continuing and shall not otherwise have been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 7.01, all payments or proceeds received by the Administrative Agent and the Collateral Agent hereunder in respect of any of the Obligations shall be applied in accordance with the application of proceeds described in Section 6.05 of the Guarantee and Collateral Agreement.  Subject to the foregoing and Section 6.05 of the Guarantee and Collateral Agreement, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premium, Fees and all other amounts then due hereunder, such funds shall be applied by the Administrative Agent (i) first, to pay interest, Fees and other amounts then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, Fees and other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

SECTION 2.20    *Taxes*.

(a)    Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without withholding or deduction for any Taxes unless required under applicable law; provided, that, if the Borrower or any other Loan Party shall be required under applicable law to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after

38

making all required withholding or deductions of Indemnified Taxes or Other Taxes (including withholding or deductions applicable to additional sums payable under this Section 2.20) the Administrative Agent and each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the Borrower or such Loan Party shall make such deductions and (iii) the Borrower or such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) and any penalties, interest and reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on behalf of itself or a Lender, shall be conclusive as to such amount absent manifest error.

(d)    As soon as practicable after any payment of Taxes by the Borrower or any other Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Foreign Lender shall furnish to the Borrower and the Administrative Agent, as applicable, two accurate and complete copies of (i) U.S. Internal Revenue Service Form W-8BEN or W-8BEN-E (or successor form) certifying exemption from or in reduction in the rate of U.S. federal withholding tax under an applicable treaty to which the United States is a party, (ii) U.S. Internal Revenue Service Form W-8ECI (or successor form) certifying that the income receivable pursuant to the Loan Documents is effectively connected with the conduct of a trade or business in the United States, (iii) U.S. Internal Revenue Service Form W-8IMY (or successor form), together with required attachments, certifying exemption from or reduction in the rate of U.S. federal withholding tax, (iv) in the case of a Foreign Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," U.S. Internal Revenue Service Form W-8BEN or W-8BEN-E (or successor form) together with a statement that (A) such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with a U.S. trade or business conducted by such Foreign Lender or (v) forms other than those described in clauses (i) through (iv) as may be prescribed by applicable Laws as a basis for claiming exemption from or a reduction in U.S. federal withholding tax together with such supplementary documentation as may be necessary to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement.  In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form (or any other form of certification adopted by the U.S. taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a

39

Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(f)     Each Lender that is not a Foreign Lender shall furnish to the Borrower and the Administrative Agent two accurate and complete copies of U.S. Internal Revenue Service Form W-9 (or successor form) establishing that the Lender is not subject to U.S. backup withholding tax.

(g)     If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund or credit in lieu of a refund in respect of any Taxes as to which it has been indemnified under this Section 2.20 or with respect to which any sum payable hereunder has been increased and paid by the Borrower under this Section 2.20, it shall pay to the Borrower an amount equal to such refund or credit in lieu of a refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.20 with respect to the Taxes giving rise to such refund or credit in lieu of a refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to promptly repay the amount paid over to the Borrower to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or such Lender be required to pay any amount to the Borrower pursuant to this paragraph (g) the payment which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to the Borrower or any other Person.

(h)     The Administrative Agent and each Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

SECTION 2.21   *Assignment   of   Commitments   under   Certain Circumstances; Duty to Mitigate*.

(a)     In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, (iv) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders and such amendment, waiver or other modification is consented to by the Required Lenders or (v) any Lender is a Defaulting Lender, then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(l)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement (or, in the case of clause (iv) above, all of its interests, rights and obligation with respect to the Class of Loans or Commitments that is the subject of

40

the related consent, amendment, waiver or other modification) to an Eligible Assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Documents (which assignee may be another Lender, if a Lender accepts such assignment); provided, that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Administrative Agent, which consents shall not unreasonably be withheld, conditioned or delayed, and (z) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender plus all Fees and other amounts accrued for the account of or due to such Lender with respect thereto (including any amounts under Sections 2.14 and 2.16); provided further that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14, notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification or shall cease to be a Defaulting Lender, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(a).

(b)      If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable documented out-of-pocket costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

SECTION 2.22      *[Reserved]*.

SECTION 2.23      *Incremental Loans*.

(a)      The Borrower may, by written notice to the Administrative Agent from time to time, request prior to the Term Loan Maturity Date, the establishment of Incremental Term Loan Commitments in an aggregate amount not to exceed the Incremental Term Loan Amount from one or more Incremental Term Lenders, all of which must be Eligible Assignees.  Such notice shall set forth (A) the amount of Incremental Term Loan Commitments being requested (which shall be in minimum increments of $500,000 and a minimum amount of $1,000,000 or such lesser amount equal to the remaining Incremental Term Loan Amount), (B) the date on which such Incremental Term Loan Commitments are requested to become effective and (C) in the case of Incremental Term Loan Commitments, whether such Incremental Term

41

Loan Commitments are commitments to make additional Term Loans having the same terms as the Term Loans on the Closing Date or commitments to make term loans with terms different from the Term Loans on the Closing Date (the "*Other Term Loans*").

(b)      The Borrower may seek Incremental Term Loan Commitments from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and, subject to the Required Lender's consent (not to be unreasonably withheld, conditioned or delayed), additional banks, financial institutions and other institutional lenders who will become Incremental Term Lenders in connection therewith.  The Borrower and each Incremental Term Lender shall execute and deliver to the Administrative Agent an Incremental Loan Assumption Agreement and such other documentation as the Administrative Agent shall reasonably specify to evidence the Incremental Term Loan Commitment of such Person.  The terms and provisions of the Incremental Term Loans shall be identical to those of the Term Loans made pursuant to clause (i) of Section 2.01(a), except as otherwise set forth herein or in the Incremental Loan Assumption Agreement, and any such terms not consistent with those of such Term Loans shall be reasonably satisfactory to the Required Lenders.  Without the prior written consent of the Required Lenders, (i) the final maturity date of any Other Term Loans shall be no earlier than the Term Loan Maturity Date and (ii) the Weighted Average Life to Maturity of the Other Term Loans shall be no shorter than the Weighted Average Life to Maturity of the Term Loans made pursuant to clause (i) of Section 2.01(a).  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Loan Assumption Agreement.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Loan Assumption Agreement, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Incremental Term Loan Commitment and the Incremental Term Loans evidenced thereby, and the Administrative Agent and the Borrower may revise this Agreement to evidence such amendments.

(c)      Notwithstanding the foregoing, no Incremental Term Loan Commitment shall become effective under this Section 2.23 unless (i) on the date of such effectiveness the conditions set forth in paragraphs (b) and (c) of Section 4.01 shall be satisfied shall be required to be satisfied and (y) at the time of and immediately after such effectiveness, no Default or Event of Default under Section 7.01(b), (c), (g) or (h) shall have occurred and be continuing) and the Administrative Agent shall have received a certificate to that effect dated as of such date and executed by a Financial Officer of the Borrower, (ii) the Incremental Term Loans shall rank *pari passu* in right of payment and be equal with respect to security under the Loan Documents and none of the obligors or guarantors with respect thereto shall be a Person that is not a Loan Party, (iii) all fees and expenses owing in respect of such Incremental Term Loan Commitments to the Administrative Agent and the Lenders shall have been paid and (iv) except as otherwise specified in the applicable Incremental Loan Assumption Agreement, the Administrative Agent shall have received (with sufficient copies for each Incremental Term Lender) legal opinions, board resolutions and other closing certificates reasonably requested by the Administrative Agent and consistent with those delivered on the Closing Date under Section 4.02, including, without limitation, amendments to the Mortgages, datedown endorsements to the title policies, flood zone determinations and the other deliverables, pursuant to Section 4.02(g).

(d)      Each of the parties hereto hereby agrees that the Administrative Agent may, in consultation with the Borrower, take any and all action as may be reasonably necessary to ensure that all Incremental Term Loans (other than Other Term Loans), when originally made, are included in each Borrowing of outstanding Term Loans on a pro rata basis.

SECTION 2.24      *Defaulting Lenders*.

1" = "1" "NY 78231004v14" "" NY 78231004v14

(a)     Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)     Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.06 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, [reserved]; *third*, [reserved]; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.24(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.25     ***Amend and Extend Transactions***.

43

(a)      The Borrower may, by written notice to the Administrative Agent and the Lenders from time to time, request an extension (each, an "***Extension***") of the Term Loan Maturity Date of any Class of Loans and Commitments to the extended maturity date specified in such notice.  Such notice shall (i) set forth the amount of the applicable Class of Term Loans to be extended (which shall be in minimum increments of $1,000,000 and a minimum amount of $5,000,000), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten (10) Business Days nor more than sixty (60) days after the date of such notice of requested Extension (or such longer or shorter periods as the Administrative Agent and the Required Lenders shall agree)) and (iii) identify the relevant Class of Term Loans to which such Extension relates.  Each Lender of the applicable Class shall be offered (an "***Extension Offer***") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Required Lenders.  If the aggregate principal amount of Term Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans requested to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans of Lenders of the applicable Class shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accented such Extension Offer.

(b)      It shall be a condition precedent to the effectiveness of any Extension that (i) no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension, (ii) the representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Extension, (iii) [reserved] and (iv) the terms of such Extended Term Loans shall comply with Section 2.25(c).

(c)      The terms of each Extension shall be determined by the Borrower and the applicable extending Lender and set forth in an amendment to this Agreement (which may, at the option of the Administrative Agent or the Required Lenders, be in the form of an amendment and restatement of this Agreement) providing for Extended Term Loans pursuant to this Section 2.25; provided, that (i) the final maturity date of any Extended Term Loan shall be no earlier than the Term Loan Maturity Date, (ii) (A) there shall be no scheduled amortization of Extended Term Loans and (B) the average life to maturity of the Extended Term Loans shall be no shorter than the remaining average life to maturity of the existing Term Loans, (iii) the Extended Term Loans will rank *pari passu* (or junior) in right of payment and with respect to security with the existing the Term Loans and the borrower and guarantors of the Extended Term Loans shall be the same as the Borrower and Subsidiary Guarantors with respect to the existing Term Loans, (iv) the interest rate margin, rate floors, fees, original issue discounts and premiums applicable to any Extended Term Loan shall be determined by the Borrower and the applicable extending Lender and (v) to the extent the terms of the Extended Term Loans are inconsistent with the terms set forth herein (except as set forth in clause (i) through (iv) above), such terms shall be reasonably satisfactory to the Administrative Agent and the Required Lenders.

(d)      In connection with any Extension, the Borrower, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an amendment to this Agreement (which may, at the option of the Administrative Agent or the Required Lenders, be in the form of an amendment and restatement of this Agreement) providing for Extended Term Loans pursuant to this Section 2.25 and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension, including, without limitation, amendments to the Mortgages, datedown endorsements to the title policies, flood zone determinations and the other deliverables, pursuant to Section 4.02(g).  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension.  Any amendment to this Agreement (which may, at the option of the Administrative Agent or the Required Lenders, be in the form of an amendment and restatement of this Agreement) providing for

44

Extended Term Loans pursuant to this Section 2.25 may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to implement the terms of any such Extension Offer, including any amendments necessary to establish Extended Term Loans as a new Class or tranche of Term Loans and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches) on terms consistent with this Section 2.25).

## ARTICLE III

### *Representations and Warranties*

The Borrower represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

SECTION 3.01    *Organization; Powers*.

The Borrower and each of its Material Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, except to the extent that the failure to possess such power and authority could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify or be in good standing could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, and (d) has, upon the entry of the Plan Confirmation Order, the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

SECTION 3.02    *Authorization; No Default*.

The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of (x) any material law, statute, rule or regulation, or (y) the certificate or articles of incorporation or other constitutive documents or by-laws of the Borrower or any Subsidiary, (B) any material order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound (in each case which is material to the conduct of their business), (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument, in the case of this clause (ii) as could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect or (iii) result in the creation or imposition of any Lien upon or with respect to any material property or assets now owned or hereafter acquired, created, developed or invented by the Borrower or any Subsidiary (other than any Lien created hereunder or under the Security Documents and/or Liens permitted pursuant to Section 6.02(u)).

SECTION 3.03    *Enforceability*.

Subject to the entry of the Plan Confirmation Order, this Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by

45

each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

SECTION 3.04     *Approvals and Consents*.

Other than the Plan Confirmation Order and the Plan of Reorganization, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority or Person is or will be required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and the United States Copyright Office, (b) recordation of the Mortgages and (c) such as have been made or obtained and are in full force and effect.

SECTION 3.05     *Financial Statements*.

The Borrower has heretofore furnished to the Lenders the consolidated balance sheets of AAC Holdings Prepetition Borrower and related statements of income, stockholder's equity and cash flows (i) as of and for the fiscal year ended December 31, 2019; and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2020, June 30, 2020 and September 30, 2020. Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of AAC Holdings Prepetition Borrower and its consolidated Subsidiaries as of such dates and for such periods, without giving effect to the Merger Transactions or the Plan Effective Date. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of AAC Holdings Prepetition Borrower and its consolidated Subsidiaries as of the dates thereof, in accordance with GAAP applied on a consistent basis, in all material respects. Such financial statements were prepared in accordance with GAAP applied on a consistent basis, in all material respects, subject, in the case of unaudited financial statements, to year-end audit adjustments and the absence of footnotes; provided, that such financial statements do not include footnotes or year-end audit adjustments and have been prepared on the basis that AAC Holdings Prepetition Borrower and its Subsidiaries are a going concern, and, accordingly no account balances shall have been adjusted to indicate AAC Holdings Prepetition Borrower and its Subsidiaries are not a going concern.

SECTION 3.06     *No Material Adverse Effect*.

Since the entry of the Plan Confirmation Order, there has been no event or circumstance that has had or could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.07     *Title to Properties; Possession Under Leases*.

(a)     Each of the Borrower and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its tangible properties and assets (including all Mortgaged Property), except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title or interest could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. All such material tangible properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b)     Each of the Borrower and the Subsidiaries has complied with all obligations under all leases to which it is a party and all such leases are in full force and effect and except where the failure of such compliance or leases to be in full force and effect could not reasonably be expected to result in,

46

individually or in the aggregate, a Material Adverse Effect. As of the Closing Date, each of the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all material leases.

(c)    As of the Closing Date, the Borrower has not received any notice of, nor has any knowledge of, any pending or contemplated material condemnation proceeding affecting the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation.

(d)    As of the Closing Date, none of the Borrower or any of the Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein.

SECTION 3.08    *Subsidiaries*.

Schedule 3.08 sets forth as of the Closing Date a list of all Subsidiaries and the percentage ownership interest of the Borrower therein. The shares of capital stock or other ownership interests so indicated on Schedule 3.08 are fully paid and non-assessable (to the extent such concepts are applicable to the capital stock of Subsidiaries that are corporations) and are owned by the Borrower, directly or indirectly, free and clear of all Liens (other than Liens created under the Security Documents).

SECTION 3.09    ***Litigation; Compliance with Laws***.

(a)    Except as disclosed in the periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC prior to the Closing Date, there are no actions, suits, investigations or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any Subsidiary or any business, property or rights of any such Person (i) that involve any Loan Document or the Transactions or (ii) as to which there is a reasonable possibility of a determination that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(b)    The Borrower and its Subsidiaries are in full compliance with the terms of the Permanent Injunction and Final Judgment, entered into on October 21, 2016, by and among the American Addiction Centers, Inc. (formerly known as Forterus, Inc.), Forterus Health Care Services, Inc., ABTTC and the Bureau of Medi-Cal Fraud and Elder Abuse.

(c)    None of the Borrower or any of the Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their respective properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. Nothing in the foregoing is to be construed as a representation or warranty with respect to Intellectual Property or noninfringement, which is the subject matter of Section 3.27.

(d)    Certificates of occupancy and material permits are in effect for each Mortgaged Property as currently constructed.

(e)    Each of the Borrower and the Subsidiaries has all permits, licenses, authorizations and all legally required accreditations (including, for the avoidance of doubt, all material Healthcare Authorizations) for the operation of its business, except where the failure to have any such licenses, authorizations or accreditations, could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

47

1" = "1" "NY 78231004v14" "" NY 78231004v14

SECTION 3.10      *Agreements*.

None of the Borrower or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.11      *Federal Reserve Regulations*.

(a)      None of the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)      No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.12      *Investment Company Act*.

None of the Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.13      *Use of Proceeds*.

The Borrower will use the proceeds of the Loans deemed made on the Closing Date to satisfy certain Prepetition Priming Facility Claims and DIP Lender Claims in accordance with the Plan of Reorganization.

SECTION 3.14      *Tax Returns*.

Each of the Borrower and the Subsidiaries has timely filed (or caused to be filed), or has timely requested an extension to file or has received an approved extension to file, all federal income and all other Tax returns or materials required to have been filed by it and has paid or caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP and except any such filings or taxes, fees or charges, the failure of which to make or pay, could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.15      *No Material Misstatements*.

Any information, report, financial statement, exhibit or schedule furnished by or on behalf of the Borrower to the Administrative Agent or any Lender, taken as a whole, in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto is complete and correct in all material respects and does not, as of the date on which such information, report, financial statement, exhibit or schedule was furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such information, report, financial statement, exhibit or schedule was made; provided, that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast, projection or other forward-looking information, such forecast, projection or other forward-looking information furnished by or on behalf of the Borrower to the Administrative Agent

48

or any Lender have been prepared in good faith based upon assumptions that Borrower believed to be reasonable at the time made and at the time made available to the Administrative Agent or any Lender; it being understood and agreed that projections are not a guarantee of financial performance and actual results may differ from projections and such differences may be material.

SECTION 3.16     *Employee Benefit Plans*.

With respect to each Plan, the Borrower is in compliance in all respects with the applicable provisions of ERISA and the Code and the regulations thereunder, except where such non-compliance could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect to the Borrower.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect to the Borrower or any of its ERISA Affiliates. The present value of all benefit liabilities under each Plan (based on the assumptions used for purposes of Financial Accounting Standards Board Accounting Standards Codification 715) did not, as of the last annual valuation date applicable thereto, exceed the fair market value of the assets of such Plan in such amount that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, and the present value of all benefit liabilities of all underfunded Plans (based on the assumptions used for purposes of Financial Accounting Standards Board Accounting Standards Codification 715) did not, as of the last annual valuation dates applicable thereto, exceed the fair market value of the assets of all such underfunded Plans that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. As of the most recent valuation date for each Multiemployer Plan, the potential Withdrawal Liability of the Borrower and its ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan is zero.

SECTION 3.17     *Environmental Matters*.

Except with respect to any matters that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, none of the Borrower or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) to the knowledge of the Borrower, has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability, (iv) knows of any basis for any Environmental Liability or (v) has Released any Hazardous Materials or owned or operated any real property on which any Hazardous Materials are present, which, in either case, would reasonably be expected to require any investigation or remedial action by Borrower or of the Subsidiaries pursuant to any Environmental Law.

SECTION 3.18     *Insurance*.

The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies of similar size engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates.  The general liability, casualty, property, terrorism and business interruption insurance coverage of the Loan Parties as in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on Schedule 3.18 and such insurance coverage complies with the requirements set forth in this Agreement and the other Loan Documents.

SECTION 3.19     *Security Documents*.

1" = "1" "NY 78231004v14" "" NY 78231004v14

(a)      Except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, (i) the Guarantee and Collateral Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in the Guarantee and Collateral Agreement) and the proceeds thereof and (ii) when the Pledged Collateral (as defined in the Guarantee and Collateral Agreement) is delivered to the Collateral Agent, the Lien created under the Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Pledged Collateral, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)) and (iii) when financing statements in appropriate form are filed in the appropriate offices, the Lien created under the Guarantee and Collateral Agreement will constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral in which a security interest may be perfected by filing (other than in respect of the Intellectual Property as set forth in clause (b) below), in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)).

(b)      Upon the recordation of the Guarantee and Collateral Agreement (or a short-form security agreement in form and substance reasonably satisfactory to the Borrower and the Collateral Agent) with the United States Patent and Trademark Office and the United States Copyright Office, together with the financing statements in appropriate form filed in the appropriate offices, the Lien created under the Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in the registered Intellectual Property (as defined in the Guarantee and Collateral Agreement) in which a security interest may be perfected by filing in the United States and its territories and possessions, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)) (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the Loan Parties after the date hereof).

(c)      Except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, the Mortgages, if any, when delivered, are effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when the Mortgages are filed in the appropriate offices, the Mortgages shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)).

SECTION 3.20      ***Location of Real Property and Leased Premises***.

(a)      Schedule 3.20(a) lists completely and correctly as of the Closing Date all real property owned by the Borrower and the Subsidiaries and the addresses thereof.  The Borrower and the Subsidiaries own in fee all the real property set forth on Schedule 3.20(a).

(b)      Schedule 3.20(b) lists completely and correctly as of the Closing Date all real property leased by the Borrower and the Subsidiaries where any tangible personal property having a value in excess

50

of $2,000,000 is located and the addresses thereof.  The Borrower and the Subsidiaries have valid leases in all the real property set forth on Schedule 3.20(b).

SECTION 3.21    *Labor Matters*.

As of the Closing Date, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened in writing. Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

SECTION 3.22    *Solvency*.

Immediately after the consummation of the Transactions to occur on each of the Closing Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

SECTION 3.23    *Senior Indebtedness*.

The Obligations constitute "Senior Debt" and "Designated Senior Debt," as applicable, under the indenture or other agreement governing any Subordinated Debt then outstanding.

SECTION 3.24    *Sanctioned Persons*.

None of the Borrower or any Subsidiary or any director, officer, agent, employee or Affiliate of the Borrower or any Subsidiary is currently the subject or target of any sanctions administered by the U.S. government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Nations Security Council, the European Union or any European Union member state, the United Kingdom (including Her Majesty's Treasury) or any other relevant national or supra-national sanctions authority (collectively, "*Sanctions*"); and the Borrower will not, directly or indirectly, use the proceeds of the Loans or otherwise make available such proceeds to any Person to finance any activities or business of or with any Person that is the subject or target of any Sanctions, or in any Designated Jurisdiction, or otherwise in any manner that constitutes or would give rise to a violation of Sanctions by any Person, including any Lender.

SECTION 3.25    *USA PATRIOT Act*.

To the extent applicable, each Loan Party is in compliance with all laws or regulations concerning or relating to terrorism financing or money laundering, including the USA PATRIOT Act.

SECTION 3.26    *Foreign Corrupt Practices Act*.

Each of the Borrower and the Subsidiaries and their respective directors, officers, agents, employees and any Person acting for or on behalf of the Borrower or any Subsidiary, has complied with,

51

and will comply with, the U.S. Foreign Corrupt Practices Act, as amended from time to time (the "***FCPA***"), and any other applicable anti-bribery, anti-terrorism or anti-corruption law, and it and they have not made, offered, promised or authorized, and will not make, offer, promise or authorize, whether directly or indirectly, any payment of anything of value to a Government Official while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (a) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (b) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity or (c) securing an improper advantage, in each case in order to obtain, retain, or direct business; and the Borrower will not, directly or indirectly, use the proceeds of the Loans or otherwise make available such proceeds to any Government Official while knowing or having a reasonable belief that all or some portion will be used for any of the purposes in clause (a), (b) or (c) above, or otherwise in any manner that constitutes or would give rise to a violation of the FCPA or any other applicable anti-bribery, anti-terrorism or anti-corruption law.

SECTION 3.27    ***Intellectual Property***.

(a)     Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, each of the Borrower and the Subsidiaries own, or hold licenses in or sufficient rights to use, the Intellectual Property used in and necessary to the conduct of the business of the Borrower and each of the Subsidiaries as such business is currently conducted. Attached hereto as Schedule 3.27(a) (which the Borrower may amend from time to time provided, that notice and copies thereof are provided to the Administrative Agent in accordance with Section 5.13 is a true, correct, and complete listing of all material (i) issued patents and patent applications, (ii) registered trademarks and trademark applications, (iii) registered domain names and (iv) registered copyrights and works for which an application to register the copyright has been filed, as to which the Borrower or any Subsidiary is the owner and which is used in and necessary to the conduct of the business of the Borrower and each of the Subsidiaries as such business is currently conducted.  Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, no claim has been asserted in writing and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower or any Subsidiary know of any valid basis for any such claim.  To the knowledge of each of the Borrower and the Subsidiaries, the conduct of the business of each of the Borrower and the Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate the Intellectual Property of any Person, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(b)     To the knowledge of each of the Borrower and the Subsidiaries, on and as of the date hereof, there is no material violation by others of any right of the Borrower or any Subsidiary with respect to any Intellectual Property owned by the Borrower or any Subsidiary.

(c)     The Borrower and each of the Subsidiaries have taken actions reasonably necessary to protect their respective material Intellectual Property owned by the Borrower or any Subsidiary, including, to the extent necessary, (i) protecting the secrecy and confidentiality of the confidential information and trade secrets of the Borrower and the Subsidiaries, (ii) taking commercially reasonable steps to prevent any trade secret of the Borrower or any Subsidiary from falling into the public domain and (iii) using commercially reasonable efforts to protect the secrecy and confidentiality of all software of which the Borrower or any Subsidiary is the owner.

(d)     Each of the Borrower and the Subsidiaries has made all reasonably necessary payments, filings and recordations to protect and maintain its interest in material registered Intellectual Property used in the conduct of the business of each of the Borrower and the Subsidiaries as currently conducted in the United States of America or any other jurisdiction in which such material registered Intellectual Property

52

is filed, including (i) making all necessary registration, maintenance, and renewal fee payments, and (ii) filing all reasonably necessary documents, including all applications for registration of copyright, trademarks and patents with respect to such material registered Intellectual Property.

(e)    Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, the Borrower and each of the Subsidiaries is in compliance with all agreements relating to the license or transfer of Intellectual Property to or from the Borrower or any Subsidiary.

SECTION 3.28    *Healthcare Matters*.

(a)    Each of the Borrower and its Subsidiaries is in compliance with all Healthcare Laws applicable to it and its assets, business or operations, except such non-compliance that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  To the extent any of the following would violate any law applicable to the Borrower or any Subsidiary and except where such non-compliance could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, no officer, manager or, to Borrower's knowledge, employee of Borrower or any Subsidiary or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in any Loan Party has: (i) had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a; (ii) been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518, including any of the following categories of offenses: (A) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service, (B) criminal offenses under laws related to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickback, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency, (C) laws relating to the interference with or obstruction of any investigations into any criminal offenses described in this Section 3.28, or (D) criminal offenses under laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (iii) been named in a Governmental Authority unsealed complaint made, or any other action taken pursuant to, the False Claims Act.

(b)    To the Borrower's knowledge, there is no audit, claim, action, suit, investigation or administrative or other legal proceeding pending or threatened in writing against the Borrower or any Subsidiary relating to the Borrower's or any Subsidiary's participation in any Nongovernmental Payor program, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. To the Borrower's knowledge, no Nongovernmental Payor has requested or threatened in writing any recoupment, refund or set-off from the Borrower or any Subsidiary, which could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. To the Borrower's knowledge, there is no suit, claim, action, proceeding, arbitration, mediation or investigation pending or received or threatened in writing against the Borrower or any of Subsidiaries which relates in any way to a violation of any legal requirement pertaining to any Nongovernmental Payor, except where any such violation could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect on the ability of the Borrower and the Subsidiaries to conduct their respective businesses in the ordinary course consistent with past practice, each of the Borrower and Subsidiaries is in compliance with all applicable Healthcare Laws regarding the selection, deselection, and credentialing of employed contractors of professional services, including, but not limited to, verification of licensing status and eligibility for reimbursement under Nongovernmental Payor programs. Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect on the ability of the

53

Borrower and Subsidiaries to conduct their respective businesses in the ordinary course consistent with past practice, all of Borrower's and the Subsidiaries' employed contractors of professional services are properly licensed and hold appropriate clinical privileges and provider numbers, as applicable, for the services which they provide.

(d)     Each of the Borrower and the Subsidiaries has all Healthcare Authorizations for the operation of its business, except where the failure to have any such Healthcare Authorizations to operate its business could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  All Healthcare Authorizations have been duly obtained and are in full force and effect without any known conflict with the rights of others and free from any restrictions, except where the failure to duly obtain such Healthcare Authorizations and maintain them in full force and effect without any known conflict with the rights of others and free from restrictions could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(e)     To the extent applicable to Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, and for so long as (1) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, is a "covered entity" as defined in 45 C.F.R. § 160.103, (2) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, is a "business associate" as defined in 45 C.F.R. § 160.103, (3) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, is subject to or covered by the HIPAA Administrative Requirements codified at 45 C.F.R. Parts 160 & 162 and/or the HIPAA Security and Privacy Requirements codified at 45 C.F.R. Parts 160 & 164, and/or (4) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, sponsors any "group health plans" as defined in 45 C.F.R. § 160.103, Borrower, such Subsidiary or any Person acting on behalf of Borrower or any Subsidiary, as the case may be, is compliant with HIPAA, except any noncompliance that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE IV

### *Conditions of Lending*

The occurrence of the Closing Date, and the effectiveness of this Agreement and of the obligations of the Lenders to make Loans hereunder, are, in each case, subject to the satisfaction (or waiver by the Required Lenders, which may be provided by email of their counsel) of the following conditions precedent:

SECTION 4.01     ***All Credit Events***.    With respect to the Lenders' obligations to make Loans on the date of each Borrowing deemed made or otherwise (each such event being called a "***Credit Event***"):

(a)     The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date and except that such materiality qualifier shall not be applicable to any representation and warranty that is already qualified by materiality.

(b)     At the time of and immediately after such Credit Event, no Default or Event of Default shall have occurred and be continuing.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b) and (c) of this Section 4.01.

1" = "1" "NY 78231004v14" "" NY 78231004v14

SECTION 4.02     ***First Credit Event***.  With respect to the occurrence of the Closing Date, and the effectiveness of this Agreement and of the obligations of the Lenders to make Loans hereunder on the Closing Date:

(a)      The Administrative Agent shall have received, on behalf of itself and the Lenders, a written opinion of California, Delaware, Massachusetts, New York, Nevada and Texas counsel(s) to Holdings, the Borrower and the other Loan Parties dated the Closing Date, addressed to the Administrative Agent and the Lenders, and covering such matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request, and the Borrower hereby requests such counsel to deliver such opinions.

(b)      The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation, including all amendments thereto, of each Loan Party, certified as of a date acceptable to the Administrative Agent by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of a Responsible Officer of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; and (iv) such other documents as the Lenders or the Administrative Agent may reasonably request.

(c)      The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01 and paragraph (i) of this Section 4.02.

(d)      The Administrative Agent and the Lenders shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including counsel fees) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(e)      The Security Documents shall have been duly executed by each Loan Party that is to be a party thereto and shall be in full force and effect on the Closing Date.  The Collateral Agent on behalf of the Secured Parties shall have a security interest in the Collateral of the type and priority described in each Security Document.

(f)      The Collateral Agent shall have received a Perfection Certificate with respect to the Loan Parties dated the Closing Date and duly executed by a Responsible Officer of the Borrower, and shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such Persons, in which the chief executive office of each such Person is located and in the other jurisdictions in which such Persons maintain property, in each case as indicated on such Perfection Certificate, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence

55

reasonably satisfactory to the Collateral Agent that the Liens indicated in any such financing statement (or similar document) would be permitted under Section 6.02 or have been or will be contemporaneously released or terminated.

(g)     The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Collateral Agent as additional insured, in form and substance reasonably satisfactory to the Administrative Agent.

(h)     Immediately after giving effect to the Transactions and the other transactions contemplated hereby, Holdings, the Borrower and the Subsidiaries shall have outstanding no Indebtedness or preferred stock other than Indebtedness outstanding under this Agreement and Indebtedness permitted pursuant to the Plan Confirmation Order and Section 6.01 of this Agreement.

(i)     The Administrative Agent shall have received the financial statements referred to in Section 3.05.

(j)     The Administrative Agent and the Lenders shall have received a certificate from a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that the Borrower and its Subsidiaries, on a consolidated basis after giving effect to the Transactions, are Solvent.

(k)     All requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby in any material respect.

(l)     The Administrative Agent and the Lenders shall have received, at least five (5) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(m)     The Bankruptcy Court shall have confirmed the Plan of Reorganization and entered the Plan Confirmation Order.  The Plan of Reorganization (as in effect on October 11, 2020) shall not have been supplemented, amended or otherwise modified except to the extent acceptable to the Required Lenders and in accordance with the terms thereof.  All Plan Documentation shall be in form and substance reasonably satisfactory to the Required Lenders.

(n)     All Plan Documentation required to be executed, delivered and/or filed (as applicable) as a condition precedent to the Plan Effective Date pursuant to the Plan of Reorganization or the Plan Confirmation Order shall have been executed, delivered or filed (as applicable) prior to, or concurrently with, the occurrence of Plan Effective Date, in each case, in form and substance reasonably satisfactory to the Required Lenders.

(o)     All conditions precedent to the effectiveness of the Plan of Reorganization (in form and substance satisfactory to the Required Lenders) shall have been satisfied (or, with the prior written consent of the Required Lenders, waived) and, without duplication of the foregoing, the Plan Effective Date shall have occurred, in each case, prior to, or substantially concurrently with, the Closing Date, and, thereupon,

the Plan of Reorganization (in form and substance satisfactory to the Required Lenders) shall be in full force and effect.

For the avoidance of doubt, except to the extent consented to by the Required Lenders (as evidenced in writing or in the public records of the Bankruptcy Court relating to the Chapter 11 Cases), the Bankruptcy Court's retention of jurisdiction under the Plan Confirmation Order shall not govern the enforcement of the Loan Documents or any rights or remedies related thereto.

## ARTICLE V

### *Affirmative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash, unless the Required Lenders shall otherwise consent in writing, it will (and will (except as specified otherwise) cause each of its Subsidiaries to):

SECTION 5.01   ***Existence; Compliance with Laws; Businesses and Properties***.

(a)   Do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05, and to continue to operate its business in the ordinary course consistent with past practices.

(b)   Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, registrations, patents, copyrights, trademarks and trade names material to the conduct of its business (including, for the avoidance of doubt, the Healthcare Authorizations), except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; maintain and operate such business in substantially the manner in which it is presently conducted and operated (other than as permitted by Section 6.08); comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition (ordinary wear and tear and casualty or condemnation exempt) and from time to time make, or cause to be made, all repairs, renewals, additions, improvements and replacements thereto that are required or necessary to the conduct of their business, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(c)   Comply with all Contractual Obligations and Requirements of Law (including, without limitation ERISA, Sanctions, the USA PATRIOT Act, the FCPA, all applicable anti-bribery, anti-terrorism, anti-money laundering laws and all applicable Environmental Laws), except, other than in the case of the USA PATRIOT Act, the FCPA or Sanctions, (x) to the extent that failure to comply therewith could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect or (y) such instances in which such Contractual Obligation or Requirement of Law is being contested in good faith by appropriate proceedings diligently conducted.

SECTION 5.02   ***Insurance***.

1" = "1" "NY 78231004v14" "" NY 78231004v14

(a)     Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

(b)     Cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement, in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, which endorsement shall provide, to the extent such provisions are obtainable by the use of commercially reasonable efforts, that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Administrative Agent or the Collateral Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent; cause all such policies to provide that neither the Borrower, the Administrative Agent, the Collateral Agent nor any other party shall be a coinsurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Administrative Agent or the Collateral Agent may reasonably require from time to time to protect their interests; if requested by the Collateral Agent, deliver original or certified copies of all such policies to the Collateral Agent; will use commercially reasonable efforts to cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent; deliver to the Administrative Agent and the Collateral Agent, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent and the Collateral Agent) together with evidence reasonably satisfactory to the Administrative Agent and the Collateral Agent of payment of the premium therefor.

(c)     If at any time the area in which the Premises (as defined in the Mortgages) are located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Administrative Agent, the Collateral Agent or any Lender may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as the Administrative Agent, the Collateral Agent or the Required Lenders may from time to time require.

(d)     Carry and maintain comprehensive general liability insurance and umbrella liability insurance against any and all claims, in no event for a combined single limit of less than that which is customary for companies in the same or similar businesses operating in the same or similar locations, naming the Collateral Agent as an additional insured, on forms reasonably satisfactory to the Collateral Agent.

SECTION 5.03     *Obligations and Taxes*.

Pay its Material Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all federal income Taxes and all other Taxes imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default,

58

as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien (other than Permitted Liens) upon such properties or any material part thereof; provided, however, that such payment and discharge shall not be required with respect to any such other obligation or Tax so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation or Tax and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property or (ii) the failure to pay and discharge such other obligation or Tax could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.04   ***Financial Statements, Reports, etc.***

In the case of the Borrower, furnish to the Administrative Agent, which shall furnish to each Lender:

(a)   upon the date that is one hundred twenty (120) days after the end of the fiscal year ending on December 31, 2020 and each subsequent fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in equity holders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year (if applicable), all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of BDO USA, LLP, or such other independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit;

(b)   upon the date that is forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in equity holders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year (if applicable) and the corresponding portion of the previous fiscal year (if applicable), all in reasonable detail and prepared in accordance with GAAP and otherwise in a manner consistent with the previous reporting period, and certified by a Financial Officer of the Borrower as fairly presenting the financial condition, results of operations, equity holders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP; provided, that such financial statements shall not include footnotes or year-end audit adjustments and shall have been prepared on the basis that the Borrower and its Subsidiaries are a going concern, and, accordingly no account balances shall have been adjusted to indicate the Borrower and its Subsidiaries are not a going concern;

(c)   concurrently with any delivery of financial statements under paragraph (a) or (b) above, a Compliance Certificate (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth the Borrower's calculation of the Available Amount, Consolidated EBITDA, Consolidated Net Income, Senior Secured Leverage Ratio and Total Leverage Ratio as at the end of the fiscal period covered by such financial statements;

(d)   as soon as available, but in any event within sixty (60) days after the end of each fiscal year of the Borrower, an annual business plan and budget of the Borrower and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Borrower, in form satisfactory to the Administrative Agent and the Required Lenders, of consolidated balance sheets and statements of income

59

or operations and cash flows of the Borrower and its Subsidiaries on a monthly basis for the immediately following fiscal year; and

(e)      promptly after the request by any Lender or the Administrative Agent, all documentation and other information that such Lender or the Administrative Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

Documents required to be delivered pursuant to Section 5.04(a) or (b) or Section 5.04(e) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet; or (b) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided, that, (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by fax transmission or e-mail transmission) of the posting of any such documents and provide to the Administrative Agent by e-mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

SECTION 5.05      *Litigation and Other Notices*.

Furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)      any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, investigation or proceeding, whether at law or in equity or by or before any Governmental Authority, against the Borrower or any Affiliate thereof that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

(c)      any event or occurrence that has resulted in, or could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; and

(d)      any change to the certification regarding beneficial ownership in relation to the Borrower as required by the Beneficial Ownership Regulation.

SECTION 5.06      *Information Regarding Collateral*.

Furnish to the Administrative Agent prompt written notice of any change (i) in any Loan Party's corporate name, (ii) in the jurisdiction of organization or formation of any Loan Party, (iii) in any Loan Party's identity or corporate structure or (iv) in any Loan Party's Federal Taxpayer Identification Number. The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made, or will be made within 30 days following such change (or such longer date as the Collateral Agent may agree in its sole discretion), under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid,

60

legal and perfected security interest in all the Collateral. The Borrower also agrees promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

SECTION 5.07   *Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings*.

(a)   Keep proper books of record and account in which full, true and correct entries in conformity with GAAP in all material respects and all Requirements of Law in all material respects are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will, and will cause each of its subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the properties of such Person at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of such Person with the officers thereof and independent accountants therefor (subject to reasonable requests for confidentiality, including as may be imposed by law or contract); provided, that absent the existence of a Default or an Event of Default, inspections pursuant to this Section 5.07 shall be limited to one time per fiscal year.

(b)   Upon the reasonable written request of the Required Lenders made at any time after the Closing Date, use commercially reasonable efforts to obtain and maintain a public rating (but not any specific rating) in respect of the Credit Facility from S&P, Moody's or another ratings agency reasonably satisfactory to the Required Lenders.

SECTION 5.08   *Use of Proceeds*.

Use the proceeds of the Loans only for purposes of satisfying the Prepetition Priming Facility Claims and/or DIP Lender Claims in accordance with, and as contemplated by, the Plan of Reorganization and other applicable Plan Documents, and subject to Section 3.24.

SECTION 5.09   *Employee Benefits*.

(a) Except to the extent that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, comply with the applicable provisions of ERISA and the Code applicable to each employee benefit plan, (b) furnish to the Administrative Agent as soon as possible after, and in any event within ten days after any Responsible Officer of the Borrower or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event and the action, if any, that the Borrower proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (c) with reasonable promptness, furnish to the Administrative Agent copies of (i) all written notices received by the Borrower or any of its ERISA Affiliates from a Multiemployer Plan sponsor concerning such ERISA Event and (ii) such other documents or governmental reports or findings relating to any Plan as the Administrative Agent shall reasonably request (but only to the extent in the possession of any Loan Parties or any of their respective Subsidiaries).

SECTION 5.10   *Compliance with Environmental Laws*.

Except to the extent that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, comply, and cause all lessees and any other Person occupying its properties under an agreement with, or with the consent of, Borrower or any Subsidiary to comply, in all

61

material respects with all Environmental Laws with respect to its operations and properties; obtain, maintain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action to the extent required by law and in accordance with Environmental Laws; provided, however, that neither the Borrower nor any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

SECTION 5.11   *Preparation of Environmental Reports*.

If a Default caused by reason of a breach of Section 3.17 or Section 5.10 shall have occurred and be continuing for more than 20 days without the Borrower or any Subsidiary commencing activities reasonably likely to cure such Default, at the written request of the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of the Loan Parties, an environmental site assessment report regarding the matters which are the subject of such Default prepared by an environmental consulting firm reasonably acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Default.

SECTION 5.12   *Further Assurances*.

(a)   Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.

(b)   Cause each (x) Material Subsidiary acquired or organized after the Closing Date and (y) Subsidiary that becomes a Material Subsidiary after the Closing Date, to, in each case, become a Loan Party (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent).

(c)   In the case of Holdings, (i) take all actions necessary to become a Loan Party as of the Closing Date (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent), (ii) to the extent requested by the Required Lenders at any time after the Closing Date, agree to comply with such additional covenants and other obligations contained in the Loan Documents as may be requested by the Required Lenders), and (iii) in connection with any merger, consolidation or other transaction consummated in accordance with Section 6.05(a) or as otherwise permitted hereunder, cause any entity that succeeds or survives AAC Intermediate Holdco, Inc. as Holdings (or any prior successor thereto) pursuant to such transaction to become a Loan Party (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent). In the case of Holdings, the Borrower and its Subsidiaries (as applicable), in connection with any merger, consolidation or other similar transaction involving the Borrower or any Subsidiary that is a Guarantor and consummated in accordance with Section 6.05(a) or as otherwise permitted hereunder, cause the entity that succeeds or survives the Borrower or such Subsidiary (as applicable) to become a Guarantor (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent) and be bound by all Loan Documents applicable to Guarantors.

(d)    Promptly (at the cost and expense of the Borrower or the applicable Subsidiary) secure the Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to substantially all the assets of Holdings, the Borrower and the Guarantors (including such assets and properties as the Administrative Agent or the Required Lenders shall specifically designate), including all real and other properties acquired subsequent to the Closing Date (but excluding (i) fee owned real property (or any interest therein) with an aggregate fair market value (in the Borrower's reasonable good faith determination) of less than $15,000,000 to the extent acquired subsequent to the Closing Date, but provided that any individual parcel of fee owned real property (or any interest therein) with a fair market value (in the Borrower's reasonable good faith determination) greater than $5,000,000 acquired subsequent to the Closing Date shall be so pledged; provided, that any fee owned real property that is required to be subject to a perfected security interest in favor of the Collateral Agent pursuant to this clause (i) but that is not subject to a perfected security in favor of the Collateral Agent on the Closing Date shall be subject to Section 5.17 and (ii) all real property leasehold interests; provided, that the Borrower may, in its sole discretion, elect to grant a Mortgage over any fee owned real property (or any interest in real property) in accordance with this Section 5.12 to the extent this Section 5.12 does not otherwise require the Borrower to grant such Mortgage).  Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent, and the Borrower shall deliver or cause to be delivered to the Lenders all such instruments and documents (including instruments and documents required under Section 4.02(g), legal opinions, title insurance policies and lien searches) as the Collateral Agent shall reasonably request to evidence compliance with this Section 5.12.  The Borrower agrees to provide such evidence as the Collateral Agent shall reasonably request as to the perfection and priority status of each security interest and Lien created or required to be created under any Loan Document.  In furtherance of the foregoing, the Borrower will give prompt notice to the Administrative Agent of the acquisition by it or any of the Subsidiaries of any fee owned real property (or any interest in real property, but excluding any real property leasehold interest) having a value equal to or in excess of $5,000,000.  Notwithstanding the foregoing, no Loan Party shall be required to pledge or grant security interests in any Excluded Assets. No appraisals shall be required to be obtained in connection with any mortgage of real property pursuant to this Section 5.12, except to the extent requested by the Required Lenders in connection with title insurance policies.

SECTION 5.13    *Intellectual Property*.  In the case of each Loan Party:

(a)    Take reasonable steps in the ordinary course of business, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, to pursue any application and maintain any registration or issuance of each Trademark, Patent, and Copyright (as each such term is defined in the Guarantee and Collateral Agreement) owned by any Loan Party and constituting material Intellectual Property that such Loan Party determines is desirable in the ordinary course of business.

(b)    Other than in the ordinary course of business and except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, timely notify the Collateral Agent if it knows or has reason to know that any item of material Intellectual Property owned by such Loan Party may become (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Loan Party's ownership, registration or use or the validity or enforceability of such item of such material Intellectual Property (including but not limited to the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, any court or any tribunal) or (iv) the subject of any reversion or termination rights

63

(c)     In the event that any material Intellectual Property owned by or exclusively licensed to such Loan Party, to such Loan Party's knowledge, is infringed, misappropriated, diluted or otherwise violated by a third party, such Loan Party shall take commercially reasonable actions, as it would otherwise in such Loan Party's reasonable good faith determination and in the ordinary course of business take, to stop such infringement, misappropriation, dilution or other violation and protect its rights in such material Intellectual Property including, in such Loan Party's reasonable good faith determination, if necessary, the initiation of a suit for injunctive relief and to recover damages.

(d)     Use commercially reasonable efforts in the ordinary course of business to use proper statutory notice in connection with its use of any of the material Intellectual Property.

SECTION 5.14     *Compliance with Real Estate Obligations*.

Make all payments and otherwise perform all obligations in respect of all leases of real property to which the Borrower or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.15     *Lender Calls*.

Borrower will, upon the request of the Required Lenders, participate in a conference call with the Administrative Agent and the Lenders once during each fiscal quarter at such times as may be agreed to be the Borrower and the Administrative Agent (at the direction of the Required Lenders).

SECTION 5.16     *Healthcare Laws*.

(a)     Within five (5) Business Days after obtaining knowledge thereof, provide notice to the Administrative Agent of (i) any material investigation, audit or proceeding (or any of the foregoing threatened in writing) relating to any violation by the Borrower or its Subsidiaries of any Healthcare Laws and (ii) to the extent that it could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, any written recommendation from any Governmental Authority that the Borrower or any of its Subsidiaries should have its licensure, accreditation or registration suspended, revoked or limited.

(b)     Take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to be in compliance with all laws, rules, regulations, restrictions and requirements pertaining to a healthcare providers imposed by any Governmental Authority.

(c)     Obtain and maintain and take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to obtain and maintain all Healthcare Authorizations as are required for the conduct of its business as currently conducted and contemplated.

(d)     Ensure and take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to ensure that coding and billing policies, arrangements, protocols and instructions are in compliance with all applicable laws and all Nongovernmental Payor reimbursement requirements and will be administered by properly trained personnel.

1" = "1" "NY 78231004v14" "" NY 78231004v14

(e)    Keep and maintain all records required by Governmental Authorities in compliance with applicable Healthcare Laws.

(f)    Implement and take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to implement practices that are consistent with the applicable regulations implementing the requirements of the Health Insurance Portability and Accountability Act ("*HIPAA*"), the Mental Health Parity and Addiction Equity Act of 2008 ("*MHPAEA*") and the Health Information Technology for Economic and Clinical Health Act (the "*HITECH Act*").

(g)    Maintain the storage, use, transportation and disposal of all medical equipment, supplies, products, gases and waste in compliance with Healthcare Laws.

(h)    Maintain all deposits relating to Healthcare Laws in compliance with regulatory requirements/

(i)    Ensure that each Healthcare Facility is operated in compliance with applicable Healthcare Laws relating thereto and agreements necessary for certification, licensure or operation of such Healthcare Facility.

(j)    Ensure all residency and other similar agreements with Persons at a Healthcare Facility are in compliance with Healthcare Laws.

Notwithstanding anything to the contrary in this Section 5.16, any failure by the Borrower or any of its Subsidiaries to comply with the requirements of clauses (b)-(j) above shall not be deemed to be a Default or an Event of Default if such failure to comply could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.17    *Post-Closing Obligations*.

Execute and deliver to the Agents each of the items, and comply with all other covenants and obligations, set forth on Schedule 5.17, in each case, within the respective periods of time after the Closing Date set forth on Schedule 5.17 (or such later date as the Administrative Agent may agree in its sole discretion).

SECTION 5.18    *Deposit Account Management*

(a)    In the case of the Borrower, each Friday (commencing as of the first Friday to occur after the Closing Date) until such time as arrangements reasonably satisfactory to the Required Lenders (the "*Applicable Payment Arrangements*") have been implemented to ensure that all payments due from patients and other receivables payments are paid by the relevant payor into a Controlled Account and not into any Deposit Account in the name of AAC Holdings, Inc. (each, an "*AAC Holdings Legacy Deposit Account*"), deliver an e-mail (which shall be sent by a Financial Officer of the Borrower to Lender Financial Consultant (if any) and Stroock, or to such other Person(s) as may be notified in writing to the Borrower at any time and from time to time after the Closing Date by the Required Lenders or the Administrative Agent on their behalf) containing a copy of the Borrower's and its Subsidiaries' internally prepared report regarding the status of implementation of the Applicable Payment Arrangements including a summary of which payors have not yet converted to regularly making payments into a Controlled Account, which report shall be in form reasonably satisfactory to the Required Lenders (it being understood and agreed that a

65

report substantially consistent with the form attached as Exhibit I hereto shall be deemed satisfactory for purposes hereof);[4] and

(b)      In the case of the Borrower and Holdings, ensure that, as of the close of business on each Wednesday and Friday to occur after the Closing Date until such time as each AAC Holdings Legacy Deposit Account has been closed or is otherwise unable to receive any payments or deposits, all funds on deposit in the AAC Holdings Legacy Deposit Accounts (other than funds not exceeding the amount of funds transferred to or retained in such AAC Holdings Legacy Deposit Accounts for the payment of payroll expenses, other disbursements permitted or required to be paid by AAC Holdings Prepetition Borrower under the Plan of Reorganization, and/or Winddown Expenses at the direction of the Borrower in accordance with the Contribution Agreement (including the amount of any outstanding checks written to pay any of the foregoing items) plus $500,000 in the aggregate, determined on the basis of the balances across all such AAC Holdings Legacy Deposit Accounts at such time) are irrevocably transferred into a Controlled Account no later than the next Business Day.

## ARTICLE VI

### *Negative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will not, and will not cause or permit any of its Subsidiaries to, in each case:

SECTION 6.01      *Indebtedness*.

Incur, create, assume or permit to exist any Indebtedness, except:

(a)      [reserved];

(b)      Indebtedness created hereunder and under the other Loan Documents;

(c)      unsecured intercompany Indebtedness of the Borrower and the Subsidiaries to the extent permitted by Section 6.04(c) so long as such Indebtedness is subordinated to the Obligations pursuant to an Affiliate Subordination Agreement to the extent required by Section 6.04(c);

(d)      (i) Financing Lease Obligations of the Borrower and the Subsidiaries (including pursuant to lease arrangements in respect of the real properties set forth on Schedule 6.01(d) hereto) and (ii) other Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, and extensions, refinancings, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (except by an amount equal to any interest capitalized in connection with, any premium or other reasonable amount paid, and fees and expenses (including original issue discount and upfront fees) reasonably incurred, in connection with such extension, renewal, refinancing or replacement); provided, that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement; provided, further, that the aggregate amount of all such Indebtedness permitted by this Section 6.01(d) at any time outstanding shall not exceed (x) $11,000,000 plus (y) solely with respect to Indebtedness incurred pursuant

---

[4] GT to provide a copy of the most recent report for inclusion in the Exhibits.

*1" = "1" "NY 78231004v14" "" NY 78231004v14*

to lease arrangements entered into in the ordinary course of business with respect to the real properties set forth on Schedule 6.01(d) hereto (including any renewals, replacements and other modifications to such lease arrangements entered), an aggregate amount that is not materially higher than the amount incurred pursuant to lease arrangements in effect with respect to such real properties immediately prior to the Closing Date, in each case, as set forth on Schedule 6.01(d);[5]

(e)     Indebtedness of the Borrower and the Subsidiaries under performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, or with respect to workers' compensation claims, in each case incurred in the ordinary course of business;

(f)     Indebtedness in respect of netting services, overdraft protections, cash management obligations, credit card or debit card or similar processors and otherwise in connection with deposit accounts, in each case, in the ordinary course of business;

(g)     obligations arising under indemnity agreements or other arrangements with title insurers to cause such title insurers to issue title policies in the ordinary course of business;

(h)     Indebtedness of any Person that becomes a Subsidiary after the date hereof; provided, that (i) such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary, (ii) immediately before and after such Person becomes a Subsidiary, no Default or Event of Default under Section 7.01 shall have occurred and be continuing or would result therefrom, and (iii) the aggregate principal amount of Indebtedness permitted by this Section 6.01(h) shall not exceed $11,000,000;

(i)     Indebtedness of the Borrower and the Subsidiaries in respect of those Hedging Agreements incurred in the ordinary course of business, not for speculative purposes and consistent with prudent business practice;

(j)     unsecured Indebtedness of the Borrower and the Subsidiaries in respect of the repurchase or redemption of Equity Interests of the Borrower or any of the Subsidiaries issued to employees, officers or directors of the Borrower or any of the Subsidiaries in an aggregate principal amount not to exceed $5,500,000 at any time outstanding; provided that such Indebtedness is subordinated to the Obligations on terms reasonably acceptable to the Administrative Agent;

(k)     Indebtedness of the Borrower and the Subsidiaries representing deferred compensation or reimbursable expenses owed to employees of the Borrower or any of the Subsidiaries incurred in the ordinary course of business;

(l)     unsecured Indebtedness of the Borrower or any Loan Party to finance Permitted Acquisitions in an aggregate principal amount not to exceed $16,5000,000 at any time outstanding;

(m)     unsecured Indebtedness of the Borrower that matures at least 91 days after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such unsecured Indebtedness and so long as the Total Leverage Ratio would not exceed 6.00:1.00, calculated on a pro forma basis as of the most recently completed period of four consecutive

---

[5]     GT to update Schedule 6.01(d) to set out the amount of lease payments/obligations in effect under the existing lease arrangements and confirm the amount expected to be paid under any renewals/renegotiations.

67

fiscal quarters for which the financial statements and certificates required by Section 5.04(a) or (b), as the case may be, have been or were required to have been delivered;

(n)     unsecured Indebtedness of the Borrower and the Subsidiaries the form of obligations under indemnification, purchase price adjustments, incentive, non-compete, consulting, deferred compensation, earn-out and similar obligations incurred in connection with any Permitted Acquisition;

(o)     Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(p)     Indebtedness of the Borrower and/or American Addiction Centers, Inc. as an account party in respect of letters of credit issued prior to the Closing Date by Credit Suisse, AG in favor of providers of professional liability and general insurance policies required by the Loan Parties and set forth on Schedule 6.01(p); provided, that the aggregate amount of Indebtedness outstanding thereunder at any time shall not to exceed (x) the amount outstanding as of the Closing Date plus (y) any Indebtedness in respect of reimbursement and/or cash collateral obligations relating to such letters of credit incurred pursuant to an agreement with Credit Suisse, AG in accordance with, and to the extent permitted by, the Plan Confirmation Order;

(q)     Guarantees in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; provided, that if the Indebtedness that is being Guaranteed is unsecured and/or subordinated to the Obligations, the Guarantee shall also be unsecured and/or subordinated to the Obligations on the same basis;

(r)     Indebtedness incurred by the Borrower under one or more secured or unsecured revolving credit facilities (and any Guarantees by the Subsidiary Guarantors in respect thereof); provided, that (i) the aggregate principal amount outstanding thereunder at any time shall not to exceed $30,000,000 and (ii) such credit facility shall be governed by documentation (including, if any such Indebtedness is secured, an Intercreditor Agreement and usual and customary security and collateral documents) in form and substance satisfactory to the Required Lenders (and, with respect to any obligations imposed on the Collateral Agent pursuant to any such documentation if any such Indebtedness is secured, also reasonably satisfactory to the Collateral Agent) (Indebtedness incurred hereunder in accordance with the provisions hereof, the "***Revolving Credit Facility***");

(s)     any Attributable Indebtedness incurred by the Borrower and the Subsidiaries in connection with any Sale and Leaseback Transaction permitted by Section 6.03; and

(t)     other Indebtedness of the Borrower, not otherwise permitted by any other clause in this Section 6.01, in an aggregate principal amount not to exceed $20,000,000 (or, so long as at the time of the incurrence of such Indebtedness the Senior Secured Leverage Ratio would not exceed 4:00:1.00, calculated on a *pro forma* basis as of the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 5.04(a) or (b), as the case may be, have been or were required to have been delivered, $40,000,000) at any time outstanding.

SECTION 6.02     *Liens*.

Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including the Borrower or any Subsidiary) now owned or hereafter acquired, created, developed or invented by it or on any income or revenues or rights in respect of any thereof, except (collectively, "***Permitted Liens***"):

1" = "1" "NY 78231004v14" "" NY 78231004v14

(a)        [reserved];

(b)        any Lien created under the Loan Documents;

(c)        any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or assets of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary, as the case may be; provided, that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not apply to any other property or assets of the Borrower or any Subsidiary and (iii) such Lien secures only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be, and any extensions, refinancing, renewals and replacements thereof permitted hereunder;

(d)        Liens on property or assets of the Borrower and its Subsidiaries for Taxes not yet delinquent or that are being contested in compliance with Section 5.03;

(e)        Liens on property or assets of the Borrower and its Subsidiaries in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods in the ordinary course of business;

(f)        Liens on insurance policies and the proceeds thereof in favor of the provider of such policies securing the financing of the premiums with respect thereto;

(g)        carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens on property or assets of the Borrower and its Subsidiaries arising in the ordinary course of business and securing obligations that are not delinquent for a period of more than 30 days or which are being contested in compliance with Section 5.03;

(h)        Liens on property or assets of the Borrower and its Subsidiaries incurred and pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance, general liability, property insurance and other social security laws or regulations;

(i)        deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Financing Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business by the Borrower and its Subsidiaries;

(j)        easements, rights-of-way, restrictions on use of real property, minor defects or irregularities in title and other similar charges or encumbrances on property or assets of the Borrower and its Subsidiaries which, in the aggregate, do not materially detract from the value of the property subject thereto or do not interfere in any material respect with the business of the Borrower and the Subsidiaries, taken as a whole;

(k)        Liens on property or assets of the Borrower and its Subsidiaries securing Indebtedness to finance the acquisition, construction or improvement of any fixed or capital assets; provided, that (i) such security interests secure Indebtedness permitted by Section 6.01(d), (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 270 days after such acquisition (or construction), (iii) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of such real property, improvements or equipment at the time of such acquisition (or construction) and (iv) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary;

69

(l)      Liens securing reimbursement obligations of the Borrower or any of its Subsidiaries in respect of documentary letters of credit or bankers' acceptances in the ordinary course of business, provided, that such Liens attach only to the documents and goods covered thereby and proceeds thereof;

(m)      leases, subleases, licenses or sublicenses (but only including non-exclusive licenses of Intellectual Property) granted by Borrower or any of its Subsidiaries to other Persons in the ordinary course of business of the Borrower or its Subsidiaries;

(n)      any interest of title of a lessor under any lease entered into by the Borrower or any other Subsidiary as tenant in the ordinary course of business and covering only the assets so leased;

(o)      judgment Liens securing judgments not constituting an Event of Default under Section 7.01(i);

(p)      zoning, building codes and other land use laws, regulations and ordinances regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the business of the Borrower or any of the Subsidiaries, any violation of which could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

(q)      Liens on property or assets of the Borrower and its Subsidiaries arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Borrower or any of the Subsidiaries in the ordinary course of business permitted hereunder;

(r)      Liens solely on any cash earnest money deposits made by the Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(s)      Liens on property rented to, or leased by, Borrower or any of its Subsidiaries pursuant to a Sale and Leaseback Transaction;

(t)      Liens securing Indebtedness under any Revolving Credit Facility incurred pursuant to Section 6.01(r); provided, that such Liens are subject to an Intercreditor Agreement;

(u)      Liens on cash collateral provided to any letter of credit issuer to the extent the Indebtedness secured thereby is permitted under Section 6.01(p); and

(v)      other Liens securing liabilities of the Borrower and its Subsidiaries permitted to be incurred hereunder in an aggregate principal amount not to exceed $20,000,000 at any time outstanding; provided, that (x) if such Liens secure any funded Indebtedness, such Liens shall rank junior to the Liens securing the Obligations and shall be subject to an Intercreditor Agreement and (y) immediately prior and after giving effect to the incurrence of any Liens in reliance on this Section 6.02(t), no Default or Event of Default shall have occurred or be continuing, or would result therefrom.

SECTION 6.03      *Sale and Leaseback Transactions*.

Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (any such arrangement, a "*Sale and Leaseback Transaction*") unless (except in the case of Holdings) (a) such Sale and Leaseback Transaction

70

is consummated within 270 days after the date on which such property is sold or transferred, (b) any Liens arising in connection with such Sale and Leaseback Transaction are permitted by Section 6.02(s) and (c) the sale or transfer of such property is made for cash consideration in an amount not less than the fair market value of such property and does not exceed $24,200,000 in the aggregate when taken together with all other Sale and Leaseback Transactions consummated after the Closing Date.

SECTION 6.04    ***Investments, Loans and Advances***.

Make or permit to exist any Investment or any other interest in, any other Person, except:

(a)    (i) Investments by the Borrower and the other Loan Parties existing on the Closing Date in the Equity Interests of the Borrower and the other Loan Parties and (ii) additional Investments by the Borrower and the other Loan Parties in the Equity Interests of the Borrower and the other Loan Parties; *provided* that (A) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations referred to therein and in Section 5.12) and (B) the aggregate amount of Investments (other than in respect of Permitted Acquisitions) made after the Closing Date by Loan Parties in, and loans and advances made after the Closing Date by Loan Parties to, Subsidiaries that are not Loan Parties (determined without regard to any write-downs or write-offs of such Investments, loans and advances) shall not exceed the available Floating Investments Basket;

(b)    Permitted Investments;

(c)    loans or advances made by the Borrower to any Subsidiary and made by any Subsidiary to the Borrower or any other Subsidiary; provided that (i) any such loans and advances made by a Loan Party to a non-Loan Party in an aggregate principal amount in excess of $10,000,000 shall be evidenced by a promissory note pledged to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement, (ii) such loans and advances shall be unsecured and subordinated to the Obligations pursuant to an Affiliate Subordination Agreement and (iii) the aggregate principal amount of such loans and advances made by Loan Parties to Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (a) above;

(d)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(e)    the Borrower and the Subsidiaries may make loans and advances in the ordinary course of business to their respective employees, officers and directors so long as no Event of Default shall have occurred or be continuing and the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $5,000,000;

(f)    the Borrower or any Subsidiary may acquire all or substantially all the assets of a Person or line of business of such Person (or, in the case of an acquisition by the Borrower or any Wholly-Owned Subsidiary of any Person that will constitute a Controlled Physician Affiliate, may acquire, in its own name or through a nominee, the right to acquire all of the Voting Equity Interests of such Person and enter into a long-term business agreement with such Person to provide management services to such Person to the extent the Voting Equity Interests of such Person cannot, pursuant to applicable Laws, or should not, in the reasonable good faith determination of the Borrower, be owned by the Borrower or any Wholly-Owned Subsidiary), in one transaction or a series of related transactions (*provided* that all such related transactions shall be consummated on or prior to the date that is the six-month anniversary of the date on which the first of such related transactions was consummated), or not less than 85% (or, in the case of any Person that will constitute a Controlled Physician Affiliate, 50%) of the Equity Interests (other than directors' qualifying

71

shares) of such Person (referred to herein as the "***Acquired Entity***"); *provided* that the Acquired Entity shall be in a similar, related, incidental or complementary line of business as that of the Borrower and the Subsidiaries as conducted during the current and most recent calendar year; and (ii) at the time of consummation of such transaction (A) both before and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; (B) the Borrower shall have delivered a certificate of a Financial Officer, certifying as to compliance with the requirements of this clause (f) (and including reasonably detailed calculations in support thereof, in form and substance reasonably satisfactory to the Required Lenders), (C) the Borrower shall comply, and shall cause the Acquired Entity to comply, with the applicable provisions of Section 5.12 and the Security Documents and (D) the pro forma Available Liquidity shall not be less than $5,000,000 (any acquisition of an Acquired Entity meeting all the criteria of this Section 6.04(f) being referred to herein as a "***Permitted Acquisition***");

(g)     Investments by the Borrower in Hedging Agreements permitted under  Section 6.01(i);

(h)     Investments in joint ventures and unconsolidated subsidiaries useful in the business of the Borrower and its Subsidiaries in an aggregate amount not to exceed the Floating Investments Basket available at the time of such Investment; and

(i)     in addition to Investments permitted by paragraphs (a) through (h) above, additional Investments by the Borrower and the Subsidiaries so long as the aggregate amount invested, loaned or advanced pursuant to this paragraph (i) (determined without regard to any write-downs or write-offs of such Investments, loans and advances) does not exceed (i) the Floating Investments Basket at any time plus (ii) so long as no Event of Default or Default is continuing or would result therefrom, the Available Amount at the time of such Investment.

SECTION 6.05     ***Mergers, Consolidations, Sales of Assets and Acquisitions***.

(a)     Merge into, or consolidate or amalgamate with, any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all its assets or business (whether now owned or hereafter acquired), or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, including, in each case, pursuant to any liquidation or dissolution transaction, except that:

(i)     the Borrower and any Subsidiary may purchase and sell inventory in the ordinary course of business;

(ii)     if, at the time thereof and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, (A) any Wholly-Owned Subsidiary of the Borrower may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, Holdings or the Borrower in a transaction in which Holdings or the Borrower (as applicable) is the surviving corporation, (B) any Wholly-Owned Subsidiary of the Borrower may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, any other Wholly-Owned Subsidiary of the Borrower in a transaction in which the surviving entity is a Wholly-Owned Subsidiary of the Borrower and no Person other than Holdings, the Borrower or a Wholly-Owned Subsidiary of the Borrower receives any consideration (provided, that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be (or shall, substantially simultaneously with such transaction, become) a Loan Party), and (C) any Loan Party (other than Borrower or Holdings) may dispose of any or all of its assets or any Equity Interests of

72

any Subsidiary (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Loan Party;

(iii)    without duplication of anything in Section 6.05(a)(ii), if, at the time thereof and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, any Subsidiary of the Borrower may liquidate, dissolve or change its legal form if, in each case, the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries, does not materially adversely affect the Collateral Agent's Liens on the Collateral, and is not otherwise disadvantageous to Secured Parties in any material respect; provided, that, if the entity subject to such liquidation, dissolution or change of legal form is a Guarantor, all assets of such Guarantor entity constituting Collateral shall (to the extent not disposed of or otherwise transferred in any other manner permitted hereunder) concurrently with such liquidation or dissolution, be transferred to another Subsidiary that, at such time, is a Guarantor, and the Collateral Agent shall have a Lien thereon to the same extent as the Lien on such Collateral prior to such transfer;

(iv)    if, at the time thereof, and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, and if the Borrower determines in good faith that such action (x) is for a legitimate business purpose and in the best interests of the Borrower and its Subsidiaries, (y) shall not impair or adversely affect the Collateral or the Collateral Agent's Liens on the Collateral, Guarantees of the Obligations and (z) is not otherwise disadvantageous to Secured Parties, any Person may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, Holdings; provided that (A) Holdings shall be the surviving or continuing entity or (B) if the surviving or continuing entity is not Holdings (such other person, "*Successor Holdings*"), notice of such transaction shall have been delivered to the Administrative Agent by Holdings and the Borrower not less than five (5) Business Days prior to consummation of such transaction and (1) Successor Holdings shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) Successor Holdings shall expressly assume all obligations of Holdings under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (3) after giving effect to the consummation of such merger, consolidation or other transaction, the Collateral Agent and the other Secured Parties shall have the benefit of Guarantees and Liens granted by such Successor Holdings at least as favorable to them as the Guarantees and Liens granted or provided by Holdings prior to such transaction, and the Obligations shall be guaranteed and secured on at least the same (or more favorable basis) than prior thereto, and (4) if requested by the Administrative Agent or the Required Lenders, Successor Holdings shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document, (y) an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to Section 4.02(a) and (z) a copy of each certificate of merger, consolidation, amalgamation, liquidation or dissolution (as applicable) filed with the applicable Secretary of State in connection with such transaction and such other material documents governing such transaction reasonably requested by the Administrative Agent or the Required Lenders (to the extent permitted to be disclosed pursuant to applicable law or other requirements applicable thereto); provided, further, that if the requirements of this clause (iv) are satisfied as set forth herein, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement)];

(v)    if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, and if the

73

Borrower determines in good faith that such action (x) is for a legitimate business purpose and in the best interests of Holdings, the Borrower and its Subsidiaries, (y) shall not impair or adversely affect the Collateral or the Collateral Agent's Liens on the Collateral, or the Guarantees of the Obligations and (z) is not otherwise disadvantageous to Secured Parties, any Person may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, the Borrower; provided that (A) the Borrower shall be the surviving entity or (B) if the surviving entity is not the Borrower (such other person, the "*Successor Borrower*"), written notice of such transaction shall have been delivered to the Administrative Agent by Holdings not less than five (5) Business Days prior to consummation of such transaction and (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (3) after giving effect to the consummation of such merger, consolidation or other transaction, the Collateral Agent and the other Secured Parties shall have the benefit of Liens granted by such Successor Borrower on its assets, and Liens on the Equity Interests in such Successor Borrower, in each case, at least as favorable to them as the Guarantees and Liens granted or provided by or in the Equity Interests of, as applicable, the Borrower prior to such transaction, and, after giving effect to such merger, consolidation or other transaction, the Obligations shall be guaranteed and secured on at least the same (or more favorable basis) than prior thereto,  (4) each Guarantor, unless it is the other party to such merger, amalgamation or consolidation, shall have (by a supplement to the Guarantee and Collateral Agreement in form and substance satisfactory to the Administrative Agent) confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (5) the Collateral Agent shall have a perfected Lien on 100% of the Equity Interests issued by such Successor Borrower, which shall have the priority required by this Agreement and the Guarantee and Collateral Agreement, (6) each Guarantor, unless it is the other party to such merger, amalgamation or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant hereto, each mortgagor of a Mortgaged Property, unless it is the other party to such merger, amalgamation or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its guarantee as reaffirmed pursuant to hereto and (7) the Successor Borrower shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document, (y) if requested by the Administrative Agent, an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to pursuant to Section 4.02(a) and (z) if requested by the Administrative Agent or the Required Lenders, a copy of each certificate of merger, consolidation, amalgamation, liquidation or dissolution (as applicable) filed with the applicable Secretary of State in connection with such transaction and a copy of such other material documents governing such transaction, to the extent reasonably requested by the Administrative Agent or the Required Lenders; provided, further, that if the requirements of this clause (iv) are satisfied as set forth herein, Successor Borrower will succeed to, and be substituted for, Borrower under this Agreement);

(vi)     the Borrower or any Subsidiary may consummate any Sale and Leaseback Transaction permitted by Section 6.03;

(vii)     the Borrower and any of its Subsidiaries may make Permitted Acquisitions pursuant to Section 6.04(f) and Investments pursuant to Section 6.04(h) or Section 6.04(i); and

74

(viii)    Holdings, the Borrower and its Subsidiaries may consummate the Merger Transactions.

(b)    Make any Asset Sale unless (except in the case of Holdings) (i) such Asset Sale is permitted under Section 6.05(a), (ii) such Asset Sale is for consideration at least 75% of which is cash, and is not less than the fair market value of such asset or property and (iii) at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing or would result therefrom.

For the avoidance of doubt, nothing in this Section 6.05 shall be construed as limiting, amending or otherwise modifying the definition of Change of Control, or any analysis or determination of whether a Change of Control has occurred, it being understood and agreed that any merger, amalgamation, consolidation, liquidation, dissolution or winding-up of any Person, or any disposition, Asset Sale or other transfer, as applicable (each, a "***Fundamental Change Transaction***") that, in each case, is permitted under and consummated in accordance with this Section 6.05 (and, accordingly, does not constitute a breach of, or give rise to a Default under, this Section 6.05) shall not be deemed not to be (or not to result in) a Change of Control solely as a result of such Fundamental Change Transaction being permitted hereunder and not resulting in a breach or Default under this Section 6.05, and, accordingly, the determination of whether a Change of Control has occurred or may occur as a result of, or on the basis of, any Fundamental Change Transaction shall be made by reference to the definition of Change of Control and by applying the provisions thereof in the context of such Fundamental Change Transaction, it being acknowledged and agreed that a Fundamental Change Transaction may constitute or result in a Change of Control notwithstanding that such Fundamental Change Transaction is consummated in accordance with the terms hereof or does not otherwise constitute a breach of, or Default under, this Section 6.05.

SECTION 6.06    ***Restricted Payments; Restrictive Agreements***.

(a)    Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so; *provided* that (i) so long as no Event of Default or Default shall have occurred and be continuing or would result therefrom, the Loan Parties and the Subsidiaries may, and may make distributions to one another so that any of the Loan Parties or any of their respective Subsidiaries may, (x) repurchase Equity Interests issued to employees, directors and officers of any of the Loan Parties or any of their respective Subsidiaries (including repurchases of Equity Interests from severed or terminated employees, directors and officers) and (y) make payments to employees, directors and officers of any of the Loan Parties or any of their respective Subsidiaries in connection with Equity Interests (and the exercise thereof) pursuant to incentive plans or arrangements, in an aggregate amount under this clause (i) not to exceed $5,000,000 in the aggregate, (ii) so long as (x) no Event of Default or Default is continuing or would result therefrom and (y) the Senior Secured Leverage Ratio calculated on a pro forma basis both before and after giving effect to any such Restricted Payment is not greater than 4.00:1.00, the Loan Parties may make Restricted Payments to pay dividends to holders of Equity Interests in the Borrower or any Parent Entity in an aggregate amount not to exceed the Available Amount at the time of such Restricted Payment, (iii) any Subsidiary of the Borrower may pay dividends to, or make other distributions to, the Borrower or any other Subsidiary of the Borrower that is a Guarantor, (iv) with respect to any taxable period during which the Borrower or any of its Subsidiaries is a member of a consolidated, affiliated, unitary, combined or similar tax group of which any Parent is the common parent (a "***Tax Group***"), the Borrower and its Subsidiaries may (directly or indirectly) make any payment or other distribution to Holdings or any other Parent in order for Holdings or such Parent to pay U.S. federal, state and local Taxes and foreign Taxes of such Tax Group in an amount not exceed any such Taxes that are payable by any such Parent in respect of, or by reason of, the income, revenues or receipts  of any Loan Party or Subsidiary thereof (reduced by any such Taxes paid or to be paid directly by any Loan Party or any of its Subsidiaries) (and Holdings may make payments and distributions to any of its direct or indirect parent companies in connection with the foregoing), (v)

75

Holdings, the Borrower and its Subsidiaries may make (directly or indirectly) Restricted Payments to any Parent to pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any acquisition, Investment or other transaction otherwise permitted hereunder, (vi) the Borrower and its Subsidiaries may (directly or indirectly) make payments and distributions to Holdings (and Holdings may make distributions to any of its direct or indirect parent companies), or make payments on behalf of Holdings (or any of its direct or indirect parent companies), to the extent necessary to fund the payment of (x) customary corporate indemnities owing to directors of the Loan Parties and their Subsidiaries, and any Parent, in each case, in the ordinary course of business and (y) Taxes and the operating and administrative expenses of Holdings (or any of its direct or indirect parent companies) incurred in the ordinary course of its business including, without limitation, reasonable directors' fees and expenses (other than fees of any director that is an "insider"), and (vii) the Loan Parties and their Subsidiaries may (directly or indirectly) make any payments and/or distributions to enable the making of any payments required to be made by the Borrower, Holdings and/or any of its direct or indirect parent entities pursuant to the Contribution Agreement (including relating to Wind-Up Costs (as defined in the Contribution Agreement)) and the Tax Cooperation Agreement, and as otherwise required in connection with the Merger Transactions, in each case, in accordance with the terms of the applicable governing documents.

(b)       Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided, that (A) the foregoing shall not apply to (w) restrictions and conditions imposed by law or by any Loan Document or any Revolving Credit Facility, (x) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary (or any other sale of assets or Equity Interests permitted hereunder) pending such sale, provided, that such restrictions and conditions apply only to the Subsidiary, asset or Equity Interest that is to be sold and such sale is permitted hereunder, and (y) any agreement in effect at the time a Person became a Subsidiary, so long as such agreement (1) was not entered into solely in contemplation of such Person becoming a Subsidiary, (2) applies only to such Person, (3) does not extend to any other Loan Party and (4) is otherwise permitted hereunder and does not conflict with the provisions of this Agreement or any other Loan Document, and (B) clause (i) of the foregoing shall not apply to (x) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (y) customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.07       *Transactions with Affiliates*.

Except for transactions solely between or among Loan Parties in the ordinary course of business, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)       any transactions (i) consummated in connection with or pursuant to, or otherwise contemplated by, any of the Plan Documents (including the issuance of Equity Interests and making of the Loans on the Closing Date) and (ii) between any Loan Party and any Affiliate that is a Permitted Holder (including any Permitted Holder in its capacity as a Lender);

(b)       transactions set forth on Schedule 6.07;

(c)       transactions relating to compensation, expense reimbursement or employment, separation and severance of officers, directors or employees in the ordinary course of business (as may be updated

76

from time to time), and for any issuance of Equity Interests, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans, or indemnities provided on behalf of employees or directors, all which are approved by the board of directors or similar management body of any Loan Party, and for any issuance of Equity Interests;

(d)     transactions for the maintenance of benefit programs or arrangements with employees, officers or directors, including, without limitation, vacation plans, health and life insurance plans, deferred compensation plans and retirement or savings plans and similar plans, in each case, in the ordinary course of business; and

(e)     transactions at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 6.08     <b><i>Business of Borrower and Subsidiaries</i></b>.

Engage at any time in any business or business activity other than the business conducted by it on the Closing Date and business activities reasonably similar, incidental, related or complementary thereto and reasonable extensions thereof, including without limitation a business which is a Healthcare Service Business.

SECTION 6.09     <b><i>Other Indebtedness and Agreements</i></b>.

(a)     (i) Except for any waiver, supplement, modification, amendment, termination or release of any Revolving Credit Facility not prohibited by the Intercreditor Agreement applicable thereto or other agreement in form and substance satisfactory to the Required Lenders governing such Revolving Credit Facility, permit any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Material Indebtedness of the Borrower or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to the Borrower, any of the Subsidiaries or the Lenders or (ii) permit any waiver, supplement, modification or amendment of its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents, or any material agreement to the extent any such waiver, supplement, modification or amendment would be adverse to the Lenders in any material respect.

(b)     Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay, or commit to pay, or directly or indirectly (including pursuant to any Synthetic Purchase Agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness except (i) (x) the payment of the Obligations and other Indebtedness under the Loan Documents and (y) the payment of Indebtedness under any Revolving Credit Facility (to the extent not prohibited pursuant to any Intercreditor Agreement or any other agreement applicable thereto entered into by or for the benefits of any of the Agents or Lenders), (ii) refinancings, renewals or extensions of Indebtedness permitted by Section 6.01, (iii) the payment of secured Indebtedness incurred pursuant to Section 6.01(d) that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness; and (iv) the payment of any Indebtedness permitted under Section 6.01 in an aggregate amount not to exceed the Available Amount at the time of such payment so long as (x) no Event of Default or Default is continuing or would result therefrom and (y) the Senior Secured Leverage Ratio calculated on a pro forma basis both before and after giving effect to any such payment is not greater than 4.0:1.00.

77

SECTION 6.10     *Financial Covenant*.

Permit Available Liquidity to be less than $5,000,000; provided, that, for purposes of determining compliance with this Section 6.10, the amount of unrestricted cash and Permitted Investments held at the applicable time of determination in the AAC Holdings Legacy Deposit Account (to the extent held therein in compliance with Section 5.18(b) and not otherwise in contravention of this Agreement or any other Loan Document) shall be included in the calculation of Available Liquidity under clause (b) of the definition thereof.

SECTION 6.11     *Fiscal Year*.

With respect to the Borrower, change its fiscal year-end to a date other than December 31.

SECTION 6.12     *Sanctions*.

Directly or indirectly fund any activities of or business with any Person that is the subject of Sanctions, or in any Designated Jurisdiction, or in any other manner that constitutes or would give rise to a violation by any Person (including any Person participating in the Transactions, whether as Lender, Administrative Agent or otherwise) of Sanctions.

SECTION 6.13     *Anti-Corruption, Anti-Bribery, Anti-Terrorism and Anti-Money Laundering Laws*.

Directly or indirectly breach the FCPA, USA PATRIOT Act, the UK Bribery Act 2010 or any other applicable anti-corruption, anti-bribery, anti-terrorism or anti-money laundering legislation in the United States, United Kingdom and other jurisdictions.

SECTION 6.14     *Use of Proceeds*.

Use any proceeds of the Loans for any purpose other than as specified in Section 3.13, and subject to Section 3.24.

SECTION 6.15     *Healthcare Authorizations*.

(a)     Transfer or assign any Healthcare Authorization, reimbursement or care contract or Nongovernmental Payor contract, except in connection with a permitted sale of a healthcare asset or if transfer could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(b)     Fail to maintain in effect all Healthcare Authorizations, except to the extent that such failure to maintain a Healthcare Authorization could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 6.16     *Intellectual Property*.

(a)     In the case of any Loan Party, intentionally do any act (or intentionally omit to do any act) whereby any of the material Intellectual Property owned by such Loan Party may lapse, or become abandoned, canceled, dedicated to the public, forfeited, unenforceable or otherwise impaired, or which would adversely affect the validity, grant, or enforceability of the security interest granted therein; provided, however, that such Loan Party may discontinue the use and/or maintenance of any Intellectual Property,

1" = "1" "NY 78231004v14" "" NY 78231004v14

including any material Intellectual Property, that such Loan Party determines, in its reasonable good faith determination, is no longer desirable in the ordinary conduct of such Loan Party's business.

(b)        In the case of any Loan Party, with respect to any Trademarks (as the term is defined in the Guarantee and Collateral Agreement) constituting material Intellectual Property owned by such Loan Party, cease the use of any of such Trademarks or fail to maintain a similar level of quality of products sold and services rendered under any such Trademark as the quality of such products and services as of the Closing Date; provided, however, that such Loan Party may discontinue the use and/or maintenance of any Trademarks constituting material Intellectual Property, that such Loan Party determines, in its reasonable good faith determination, is no longer valuable in the ordinary conduct of such Loan Party's business.

(c)        In the case of any Loan Party, such Loan Party shall not permit the inclusion in any contract to which it hereafter becomes a party and pursuant to which it acquires Intellectual Property any provision that could or may in any way materially impair or prevent the creation of a security interest in, or the assignment of, such Loan Party's rights and interests in any property included within the definitions of any material Intellectual Property acquired under such contracts.

SECTION 6.17        ***Business of Holdings***.

With respect to Holdings, engage in any business activities except relating to, or have any assets or liabilities other than, its ownership of the Equity Interests of the Borrower and liabilities incidental thereto (including its liabilities pursuant to the Loan Documents).

For the avoidance of doubt, nothing in this Article VI, shall prohibit any Controlled Physician Affiliate Restructuring Transaction being consummated by the Borrower or any of its Subsidiaries in accordance with the definition of Controlled Physician Affiliate Restructuring Transaction; provided, that, to the extent that any Controlled Physician Affiliate is formed or acquired in connection with any Controlled Physician Affiliate Restructuring Transaction (or if any Controlled Physician Affiliate replaces any other Controlled Physician Affiliate in connection with such Controlled Physician Affiliate Restructuring Transaction, including for purposes of any management agreement or services arrangement), such Controlled Physician Affiliate shall, concurrently with the consummation of such Controlled Physician Affiliate Restructuring Transaction, become a Guarantor and shall grant a Lien on its assets to secure the Obligations to at least the same extent as required by the Loan Documents in connection with other Controlled Physician Affiliates who are Guarantors, and shall comply with all provisions of the Loan Documents applicable to other Controlled Physician Affiliates (including all provisions that would be applicable thereto if such Controlled Physician Affiliates had been acquired in a Permitted Acquisition).

ARTICLE VII

***Events of Default***

SECTION 7.01        ***Events of Default***.

In case of the happening of any of the following events ("***Events of Default***"):

(a)        any representation or warranty made or deemed made in or in connection with any Loan Document, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished, except that such materiality qualifier shall not be applicable to any representation and warranty that is already qualified by materiality;

79

(b)      default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)      default shall be made in the payment of any interest or premium on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five (5) Business Days;

(d)      default shall be made in the due observance or performance by any Loan Party or any Subsidiary of any covenant, condition or agreement contained in Section 5.05(a), Section 5.08, Section 5.12, Section 5.17, Section 5.18 or in Article VI;

(e)      default shall be made in the due observance or performance by any Loan Party or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days (or in the case of Section 5.04, 15 Business Days) after the earlier of (i) notice thereof from the Administrative Agent to the Borrower (which notice shall also be given at the request of any Lender) or (ii) knowledge thereof of the Borrower;

(f)      (i) any Loan Party or any Subsidiary of the Borrower shall fail to pay any principal, interest or amount, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable beyond the grace period, if any, provided therefor, (ii) any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or (iii) any other event or condition occurs that enables or permits (after giving effect to any grace period) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided, that clauses (ii) and (iii) above shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Borrower or any Material Subsidiary or of a substantial part of the property or assets of the Borrower or a Material Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Material Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or a Material Subsidiary or (iii) the winding-up or liquidation of Holdings, the Borrower or any Material Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)      Holdings, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in paragraph (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or any Material Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit

80

in writing its inability or fail generally to pay its debts as they become due or (vii) take any corporate action for the purpose of effecting any of the foregoing;

(i)      one or more judgments shall be rendered against Holdings, the Borrower, any Subsidiary or any combination thereof (to the extent not fully covered by independent and unaffiliated third-party insurance as to which the insurer has not denied coverage or does not deny coverage (or, if the applicable claim is pending, the Borrower reasonably expects the insurer not to deny coverage)) and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $16,500,000 or (ii) is for injunctive relief and could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

(j)      there shall occur an ERISA Event, that, when taken together with all other such ERISA Events, could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect to the Borrower and its ERISA Affiliates;

(k)      any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny in writing that it has any further liability under the Guarantee and Collateral Agreement (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(l)      any Lien purported to be created by the Security Documents shall cease to be, or shall be asserted by Holdings, the Borrower or any other Loan Party not to be, for any reason, a valid and perfected Lien on any material portion of the Collateral purported to be covered thereby and having the ranking and priority required by the applicable Loan Documents (subject to any prior Liens permitted under Section 6.02 or as otherwise permitted pursuant to any Intercreditor Agreement entered into in accordance herewith), except (i) pursuant to a release expressly permitted by this Agreement or any other Loan Document, (ii) as a result of the Collateral Agent's action or failure to take any action required to be taken by it following the due performance by the Loan Parties of any related obligation of a Loan Party, or (iii) as to Collateral consisting of material owned or leased real property to the extent that covered by a lender's title insurance policy and such insurer has not denied coverage;

(m)      any Subordinated Debt of the Borrower and the Subsidiaries constituting Material Indebtedness shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert in writing), for any reason, to be validly subordinated to the Obligations as provided in the indenture or other agreement evidencing such Subordinated Debt;

(n)      there occurs the loss, suspension or revocation of, or failure to renew, any registrations, licenses, permits, authorizations or clearances (including, for the avoidance of doubt, the Healthcare Authorizations) now held or hereafter acquired by the Borrower or any other Loan Party, if such loss, suspension, revocation or failure to renew could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

(o)      there shall have occurred a Change in Control; or

(p)      any Intercreditor Agreement shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against any party thereto (or against any person on whose behalf any such party makes covenants or agreements therein), or otherwise not be effective to create the rights, obligations Lien and/or payment priorities or other arrangements, as applicable, purported to be created thereunder, unless the same results directly from the action or inaction of the Administrative Agent.

then, and in every such event (other than an event described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## ARTICLE VIII

### *The Administrative Agent and the Collateral Agent; Etc.*

Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article VIII, the Administrative Agent and the Collateral Agent are referred to collectively as the "*Agents*") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents and any other documents that contemplate any action being taken, or any determination being made by, or consent of, any Agent in its capacity as such, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents (including in connection with any Controlled Physician Affiliate Restructuring Transaction consummated in accordance herewith), (ii) to execute, deliver and perform any Intercreditor Agreement in respect of this Credit Facility or the Liens granted pursuant to the Security Documents, in each case under this clause (ii) to the extent such agreement, amendment or restatement has been approved by the Required Lenders (it being understood that neither Agent is required to enter into any intercreditor agreement unless the terms thereof relating to any obligations or duties of such Agent are acceptable to such Agent), and (iii) negotiate, enforce or the settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary

82

under the circumstances as provided in Section 9.08); provided, that neither Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may (A) expose such Agent to liability or that is contrary to any Loan Document or Requirement of Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law, or (B) violate or (in the Agent's reasonable good faith determination, made after consultation with the Required Lenders) conflict with the terms of any intercreditor agreement in respect of this Credit Facility or the Liens granted pursuant to the Security Documents, and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by such Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent. In any case, where the consent or approval of any Agent is expressly required under this Agreement or any other Loan Documents, the withholding or giving of such consent or approval may be conditioned by such Agent upon the receipt of the approval of the Required Lenders, and such Agent shall be fully protected and not liable to the Lenders or any other Person in relying upon such Required Lender approval or failing to act in the absence of such Required Lender approval.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, approval or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

With respect to any term or provision of this Agreement or any other Loan Document that requires the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by any Agent, or that allows, permits, requires, empowers or otherwise provides that any matter, action, decision or similar may be taken, made or determined by any Agent without expressly referring to the requirement to obtain consent or input from any Lenders, or to otherwise notify any Lender, such term or provision shall be interpreted to refer to such Agent exercising its Permitted Discretion, and such Agent, in taking any such action or making any such determination, such Agent shall be deemed to have validly exercised the power and authority granted to it by the Lenders hereunder, whether or not such provision expressly refers to such Agent exercising its Permitted Discretion, and shall be entitled to all the benefits and protections hereof to the same extent as if such Agent had taken any such action or made any such determination at the express direction of the Required Lenders.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its

83

duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facility as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, (x) either Agent may resign at any time by notifying the Lenders and the Borrower and/or (y) any Agent may be removed by the Required Lenders on not less than 30 calendar days' prior written notice (or such shorter period as may be agreed to by the Required Lenders); provided, that, if the same Person (or an Affiliate thereof) is serving both as Administrative Agent and as Collateral Agent, the resignation or removal (as applicable) of such Person (or its applicable Affiliate) as Administrative Agent or as Collateral Agent (as applicable) in accordance with the foregoing shall constitute the resignation or removal (as applicable) of such Person (or its applicable Affiliate) as both Administrative Agent and Collateral Agent unless otherwise agreed in writing by such institution (or its applicable Affiliate) and the Required Lenders. Upon any such resignation or removal, as applicable, the Required Lenders shall have the right to appoint a successor, without the consent of the Borrower. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be, without the consent of the Borrower. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation or removal (as applicable) hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "***Removal Effective Date***"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

The Loan Parties and the Lenders hereby irrevocably authorize Collateral Agent, based upon the instruction of the Required Lenders, to (A) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code or other bankruptcy laws, including under Section 363 of the Bankruptcy Code, (B) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Uniform Commercial Code, including pursuant to Sections 9-610 or 9-620 thereof or the Bankruptcy Code, or (C) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Collateral Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Collateral Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase), and (ii) the Collateral Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle or vehicles and in connection therewith the Collateral Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, in the event that any controversy arises between or among any of the Secured Parties or any other Person in respect of any Collateral or proceeds thereof in the possession or control of any Agent, such Agent shall, to the extent directed by the Required Lenders, have the right to initiate proceedings in the Bankruptcy Court (or to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over such matter, to any other court of competent jurisdiction permitted under Section 9.15(a)) for a declaratory judgment to determine the rights of such Secured Parties or other Persons with respect to such Collateral or any proceeds thereof.  The provisions of this paragraph are in addition to and not in limitation of any right of resignation or other rights or protections afforded to the Agents pursuant to the terms of this Agreement

## ARTICLE IX

### *Miscellaneous*

SECTION 9.01    *Notices; Electronic Communications*.

Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by fax or via electronic mail, as follows:

(a)    if to the Borrower, to it at:

**AAC NEW HOLDCO INC.**
200 Powell Place,
Brentwood, TN 37027

1" = "1" "NY 78231004v14" "" NY 78231004v14

Attention: Andrew W. McWilliams, Chief Executive Officer (Telephone: 615-732-1385; Email: amcwilliams@contactaac.com)

With copy to (which shall not constitute notice):

**Greenberg Traurig, LLP**
3333 Piedmont Road, NE, Terminus 200, Suite 2500
Atlanta, GA 30305
Attention: David B. Kurzweil, Esq. (Telephone: 678-553-2100; Email: kurzweild@gtlaw.com) and John Dyer, Esq. (Telephone: 678-553-2100; Email: dyerj@gtlaw.com)

(b)       if to any Agent, to:

**Ankura Trust Company, LLC**
140 Sherman Street, 4th Floor
Fairfield, CT 06824
Attention: Michael J. Fey (Telephone: 980-226-7633, Fax No.: 202-797-3619, Email: Michael.Fey@ankura.com)

With copy to (which shall not constitute notice):

**Kilpatrick Townsend & Stockton LLP**
1100 Peachtree Street NE
Atlanta, GA 30309
Attention: Todd Meyers, Esq. (Telephone: 404-815-6482; Email: TMeyers@kilpatricktownsend.com) and Joseph L. Scibilia, Esq. (Telephone: 404-815-6070; Email: jscibilia@kilpatricktownsend.com);

(c)       [reserved]; and

(d)       if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such

86

communication that (i) is or relates to a Borrowing Request, a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "*Communications*"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "*Borrower Materials*") by posting the Borrower Materials on Intralinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information (if any exists) with respect to any of the Lon Parties and/or any of their Subsidiaries (and/or any of their respective securities)) (each, a "*Public Lender*").  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to any of the Lon Parties and/or any of their Subsidiaries (and/or any of their respective securities), for purposes of foreign, United States federal and state securities laws (<u>provided</u>, that, to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor".  Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents, (2) any notification of changes in the terms of the Credit Facility and (3) all information delivered pursuant to Sections 5.04(a), (b) and (c).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including foreign, United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any of the Lon Parties and/or any of their Subsidiaries (and/or any of their respective securities) for purposes of foreign, United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR

87

ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY LOAN PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH LOAN PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02    *Survival of Agreement*.

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

SECTION 9.03    *Binding Effect*.

This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04    *Successors and Assigns*.

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the other Loan Parties, the Administrative Agent, the Collateral

1" = "1" "NY 78231004v14" "" NY 78231004v14

Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, however, that (i) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans of the relevant Class); provided, that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about any of the Loan Parties and/or any of their Related Parties and/or any of their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including foreign, United States Federal and state securities laws) and all applicable tax forms.  Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of, and subject to the obligations of, Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid); provided, that, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Term Loan Commitment and the outstanding balances of its Term Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in clause (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04

89

and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York or Fairfield, Connecticut a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender's having been a Defaulting Lender.  The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)    Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to one or more banks or other Persons (other than to any Disqualified Institution or any natural person) in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in, and subject to the obligations contained in, Section 2.14, 2.16 and 2.20 to the same extent as if they were Lenders (provided, that such participating bank or other Person (A) agrees to be subject to the provisions of Sections 2.21 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.14 or 2.20, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participating bank or other Person acquired the applicable participation) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the

90

amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Commitments in which such participating bank or Person has an interest or releasing any Subsidiary Guarantor (other than in connection with the sale of such Subsidiary Guarantor in a transaction permitted by Section 6.05 or any Controlled Physician Affiliate Restructuring Transaction consummated in accordance herewith) or all or substantially all of the Collateral).  To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided such participating bank or other Person agrees to be subject to Section 2.18 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participating bank or other Person and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(g)    Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided, that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

(h)    Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; provided, that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)    Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPV*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided, that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or

91

liquidation proceedings under the laws of the United States or any State or territory thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to in writing by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)    The Borrower shall not  assign or delegate any of its rights or duties hereunder (except to a Successor Borrower as expressly permitted by Section 6.05(a)) without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(k)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(l)    Notwithstanding anything in this Agreement to the contrary, any Term Lender may, at any time, assign (which assignment shall not constitute a voluntary prepayment of Loans (including for purposes of Section 2.12)) all or a portion of its Term Loans on a non-pro rata basis to the Borrower or any Subsidiary through (x) Dutch Auctions open to all Term Lenders on a pro rata basis or (y) open market transactions, in each case, subject to the following limitations:

(i)    the Borrower and each Subsidiary (as applicable) shall represent and warrant as of the date of any such assignment, that neither it nor any of its respective directors or officers has any material non-public information with respect to any of the Loan Parties and/or any of their Subsidiaries (and/or any of their respective securities), that, in each case, has not been disclosed to the Term Lenders generally (other than because such Term Lenders do not wish to receive material non-public information with respect to any of the Loan Parties and/or any of their Subsidiaries (and/or any of their respective securities)) prior to such date;

(ii)    immediately upon the effectiveness of such assignment of Term Loans from a Term Lender to the Borrower or any Subsidiary, such Term Loans and all rights and obligations as a Term Lender related thereto shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated. extinguished, cancelled and of no further force and effect, and the Borrower and such Subsidiary (as applicable) shall neither obtain nor have any rights as a Term Lender hereunder or under the other Loan Documents by virtue of such assignment (including any right to consent to any matter hereunder,

92

it being understood and agreed that any Loans held by the Borrower or any Subsidiary at any time shall not be deemed outstanding for purposes of any determination of Required Lenders or otherwise in connection with any consent on any matter); and

(iii)    no Default or Event of Default shall have occurred and be continuing or would result therefrom.

SECTION 9.05    ***Expenses; Indemnity***.

(a)    The Borrower agrees to pay (i) all reasonable documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders in connection with (x) the syndication of the Credit Facility and the preparation, negotiation and execution of this Agreement and the other Loan Documents, and (y) the administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof including, in the case of clauses (x) and (y), (A) the reasonable documented fees, charges and disbursements of Kilpatrick Townsend & Stockton LLP (or any successor firm), counsel for the Administrative Agent and the Collateral Agent, it being understood that indemnification and/or expense reimbursement for legal counsel for the Administrative Agent and the Collateral Agent is limited to one lead counsel and one local counsel in each appropriate jurisdiction, and any regulatory or special counsel reasonably required by Agent and (B) the reasonable documented fees, charges and disbursements of Stroock & Stroock & Lavan LLP ("***Stroock***"), counsel for the Required Lenders, it being understood that indemnification and/or expense reimbursement for legal counsel for the Lenders is limited to such lead counsel and one local counsel in each appropriate jurisdiction and any regulatory or special counsel reasonably required by the Required Lenders), and (ii) all documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and each Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made, including the reasonable documented fees, charges and disbursements of Kilpatrick Townsend & Stockton LLP (or any successor firm), together with any local or special counsel, as counsel for the Administrative Agent and the Collateral Agent, and the reasonable documented fees, charges and disbursements of Stroock, counsel for the Required Lenders (it being understood that indemnification and/or expense reimbursement for legal counsel for the Lenders is limited to Stroock and one local counsel in each appropriate jurisdiction and any regulatory or special counsel reasonably required by the Required Lenders), in connection with any such enforcement or protection, the fees, charges and disbursements of any other counsel for the Administrative Agent, the Collateral Agent or any Lender.

(b)    The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related costs and expenses, including reasonable documented counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby (including the syndication of the Credit Facility), (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates), or (iv) any actual or alleged presence or Release of Hazardous Materials on any property currently or formerly owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or the Subsidiaries and this Agreement; provided, that such indemnity shall not, as to an Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (a) are determined by a court of competent

jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee, (b) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from a material breach of the Loan Documents by such Indemnitee or (c) result primarily from any dispute solely among Indemnitees not involving an act or omission by the Borrower or its Subsidiaries, other than claims against any Indemnitee in its capacity or in fulfilling its role as an agent or arranger or any other similar role under this Agreement.

(c)      To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Agent in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Term Loans and unused Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender).

(d)      To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)      The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement or the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby, the repayment, discharge, satisfaction of any of the Loans or other Obligations, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this Section 9.05 shall be payable within 10 Business Days of written demand therefor and, reasonably promptly following a request by the Borrower therefor, a reasonably detailed summary of such amounts (subject to such redactions as shall be considered reasonably required by the applicable Indemnitee).

(f)      The provisions of this Section 9.05 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

SECTION 9.06      *Right of Setoff*.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.24 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit

94

of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided, that the failure to give such notice shall not affect the validity of such setoff and application.  Notwithstanding the provisions of this Agreement or any other Loan Document, if at any time any Lender or any of its Affiliates maintains one or more Deposit Accounts for the Borrower or any other Loan Party into which Medicare and/or Medicaid receivables or any other government program receivables subject to federal reassignment prohibitions are deposited, then, in each case, such Person hereby waives and shall continue to waive the right of setoff set forth herein and therein.

SECTION 9.07    *Applicable Law*.

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08    *Waivers; Amendment*.

(a)    No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders; provided, however, that no such agreement shall:

(i)    decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly adversely affected thereby,

(ii)    increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender,

(iii)    amend or modify the pro rata requirements of Section 2.17, the provisions of Section 9.04(j) or (l) or the provisions of this Section 9.08 or release all or substantially all of the Subsidiary Guarantors (other than in connection with the sale of such Subsidiary Guarantors in a transaction permitted by Section 6.05) or all or substantially all of the Collateral, without the prior written consent of each Lender,

1" = "1" "NY 78231004v14" "" NY 78231004v14

(iv)     change the provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each adversely affected Class,

(v)     modify the protections afforded to an SPV pursuant to the provisions of Section 9.04(i) without the written consent of such SPV or

(vi)     amend or modify the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments on the date hereof);

provided, however, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent; provided, further that no such agreement shall change (x) Section 2.18 in a manner that would alter the pro rata sharing of payments required thereby or (y) the definition of "Class" without the written consent of each Lender directly and adversely affected thereby.

(c)     The applicable Agent party thereto and the Borrower may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender, or to make modifications contemplated by Section 2.23 or 2.25.  Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

SECTION 9.09     *Interest Rate Limitation*.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall exceed the maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10     *Entire Agreement*.

This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the

96

Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11     *WAIVER OF JURY TRIAL*.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.12     *Severability*.

In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13     *Counterparts*.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03.  Delivery of an executed signature page to this Agreement by facsimile (or other electronic) transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14     *Headings*.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15     *Jurisdiction; Consent to Service of Process*.

(a)     The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the

97

1" = "1" "NY 78231004v14" "" NY 78231004v14

parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower, any other Loan Party, their respective properties or the Collateral in the courts of any jurisdiction (including any action in any jurisdiction to realize on the Collateral or any other security for the Obligations), or to recognize or enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent or any Lender.

(b)       The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)       Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.16      *Confidentiality*.

Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors and any numbering, administration and settlement service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents and their respective financing sources or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section, "*Information*" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower; provided, that, in the case of Information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential or is information that a reasonably prudent person would presume to be confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

98

SECTION 9.17     *Lender Action*.

Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent.  The provisions of this Section 9.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 9.18     *USA PATRIOT Act Notice*.

Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

SECTION 9.19     *Withholding Taxes*.

To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding Tax.  If any taxing authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

SECTION 9.20     *No Fiduciary Duty*.

The parties hereto hereby acknowledge that the Administrative Agent, the Collateral Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "***Lender Parties***"), may have economic interests that conflict with those of any Loan Party, its stockholders and/or their respective Affiliates.  The Borrower agrees, on behalf of itself and each other Loan Party, that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender Party, on the one hand, and any Loan Party, its stockholders or their respective Affiliates, on the other hand.  The Borrower acknowledges and agrees, on behalf of itself and each other Loan Party, that (a) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lender Parties, on the one hand, and the Loan Parties, on the other hand, and (b) in connection therewith and with the process leading thereto, (i) no Lender Party has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or their respective Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender Party has advised, is currently advising or will advise any Loan Party, its stockholders or their respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (ii) each Lender Party is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, their respective Affiliates, creditors or any other Person.  The Borrower

99

acknowledges and agrees, on behalf of itself and each other Loan Party, that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Borrower agrees, on behalf of itself and each other Loan Party, that it will not claim that any Lender Party has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Loan Party, in connection with such transaction or the process leading thereto.

SECTION 9.21    ***Acknowledgment and Consent to Bail-In of EEA Financial Institutions***.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instrumentals of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

SECTION 9.22    ***Cashless Settlement***.

Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

[*Remainder of page intentionally left blank*]

1" = "1" "NY 78231004v14" "" NY 78231004v14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AAC NEW HOLDCO INC.

By _____

Name: _____

Title:

[*AAC – Exit Facility Credit Agreement*]

1" = "1" "NY 78231004v14" "" NY 78231004v14

ANKURA   TRUST   COMPANY,   LLC,   as
Administrative Agent and Collateral Agent

By _____

_____
   Name:
   Title:

LENDERS:

[                    ], as a Lender

By _____

_____
   Name:
   Title:

Schedule 2

(Redline of Exit Facility Credit Agreement)

**DRAFT – SUBJECT TO FURTHER REVISION**

CREDIT AGREEMENT[1]

dated as of

[——December [11], 2020

as amended by

among

AAC ~~HOLDINGS~~INTERMEDIATE HOLDCO, INC.,
as Holdings

AAC NEW HOLDCO INC.,
as Borrower,

THE LENDERS PARTY HERETO

and

[ANKURA TRUST COMPANY, LLC,]
as Administrative Agent and Collateral Agent

---

[1] NTD:  Subject to ~~further~~final review ~~and comment by Borrower, lenders,~~ /signoff by Lenders/Stroock and ~~agent~~Ankura/Kilpatrick.

*ACTIVE 52782809v1" = "1" "NY 78231004v14" "" NY 78231004v14*

DRAFT – SUBJECT TO FURTHER REVISION

[TABLE OF CONTENTS]²

ARTICLE I Definitions ............................................................................................... 1

　　　SECTION 1.01　　　Defined Terms .................................................................. 1
　　　SECTION 1.02　　　Terms Generally ............................................................... 27
　　　SECTION 1.03　　　Pro Forma Calculations .................................................... 28
　　　SECTION 1.04　　　Classification of Loans and Borrowings ........................... 28
　　　SECTION 1.05　　　Designation as Senior Debt .............................................. 28

ARTICLE II The Credits ............................................................................................ 28

　　　SECTION 2.01　　　Commitments ..................................................................... 28
　　　SECTION 2.02　　　Loans ................................................................................. 29
　　　SECTION 2.03　　　Borrowing Procedure ....................................................... 29
　　　SECTION 2.04　　　Evidence of Debt; Repayment of Loans .......................... 30
　　　SECTION 2.05　　　Fees .................................................................................... 31
　　　SECTION 2.06　　　Interest on Loans .............................................................. 31
　　　SECTION 2.07　　　Default Interest ................................................................. 31
　　　SECTION 2.08　　　[Reserved] ......................................................................... 32
　　　SECTION 2.09　　　Termination and Reduction of Commitments ................... 32
　　　SECTION 2.10　　　[Reserved] ......................................................................... 32
　　　SECTION 2.11　　　Repayment of Term Borrowings ...................................... 34
　　　SECTION 2.12　　　Voluntary Prepayments .................................................... 34
　　　SECTION 2.13　　　Mandatory Prepayments ................................................... 35
　　　SECTION 2.14　　　Reserve Requirements; Change in Circumstances ........... 36
　　　SECTION 2.15　　　[Reserved] ......................................................................... 37
　　　SECTION 2.16　　　Breakage ............................................................................ 38
　　　SECTION 2.17　　　Pro Rata Treatment .......................................................... 38
　　　SECTION 2.18　　　Sharing of Setoffs ............................................................. 38
　　　SECTION 2.19　　　Payments ........................................................................... 39
　　　SECTION 2.20　　　Taxes ................................................................................. 40
　　　SECTION 2.21　　　Assignment of Commitments under Certain Circumstances;
　　　　　　　　　　　　 Duty to Mitigate .............................................................. 42
　　　SECTION 2.22　　　[Reserved] ......................................................................... 43
　　　SECTION 2.23　　　Incremental Loans ............................................................ 43
　　　SECTION 2.24　　　Defaulting Lenders ........................................................... 44
　　　SECTION 2.25　　　Amend and Extend Transactions ...................................... 45

ARTICLE III Representations and Warranties ........................................................... 47

　　　SECTION 3.01　　　Organization; Powers ....................................................... 47
　　　SECTION 3.02　　　Authorization; No Default ................................................ 47
　　　SECTION 3.03　　　Enforceability ................................................................... 47
　　　SECTION 3.04　　　Approvals and Consents ................................................... 47
　　　SECTION 3.05　　　Financial Statements ......................................................... 48
　　　SECTION 3.06　　　No Material Adverse Effect .............................................. 48
　　　SECTION 3.07　　　Title to Properties; Possession Under Leases ................... 48
　　　SECTION 3.08　　　Subsidiaries ....................................................................... 49

---

² To be updated.

ACTIVE 52782809v1" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

| | | |
|---|---|---|
| SECTION 3.09 | Litigation; Compliance with Laws | 49 |
| SECTION 3.10 | Agreements | 49 |
| SECTION 3.11 | Federal Reserve Regulations | 50 |
| SECTION 3.12 | Investment Company Act | 50 |
| SECTION 3.13 | Use of Proceeds | 50 |
| SECTION 3.14 | Tax Returns | 50 |
| SECTION 3.15 | No Material Misstatements | 50 |
| SECTION 3.16 | Employee Benefit Plans | 51 |
| SECTION 3.17 | Environmental Matters | 51 |
| SECTION 3.18 | Insurance | 51 |
| SECTION 3.19 | Security Documents | 51 |
| SECTION 3.20 | Location of Real Property and Leased Premises | 52 |
| SECTION 3.21 | Labor Matters | 53 |
| SECTION 3.22 | Solvency | 53 |
| SECTION 3.23 | Senior Indebtedness | 53 |
| SECTION 3.24 | Sanctioned Persons | 53 |
| SECTION 3.25 | USA PATRIOT Act | 53 |
| SECTION 3.26 | Foreign Corrupt Practices Act | 53 |
| SECTION 3.27 | Intellectual Property | 54 |
| SECTION 3.28 | Healthcare Matters | 55 |

**ARTICLE IV Conditions of Lending** — 56

| | | |
|---|---|---|
| SECTION 4.01 | All Credit Events | 56 |
| SECTION 4.02 | First Credit Event | 56 |

**ARTICLE V Affirmative Covenants** — 59

| | | |
|---|---|---|
| SECTION 5.01 | Existence; Compliance with Laws; Businesses and Properties | 59 |
| SECTION 5.02 | Insurance | 60 |
| SECTION 5.03 | Obligations and Taxes | 60 |
| SECTION 5.04 | Financial Statements, Reports, etc. | 61 |
| SECTION 5.05 | Litigation and Other Notices | 62 |
| SECTION 5.06 | Information Regarding Collateral | 63 |
| SECTION 5.07 | Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings | 63 |
| SECTION 5.08 | Use of Proceeds | 64 |
| SECTION 5.09 | Employee Benefits | 64 |
| SECTION 5.10 | Compliance with Environmental Laws | 64 |
| SECTION 5.11 | Preparation of Environmental Reports | 65 |
| SECTION 5.12 | Further Assurances | 65 |
| SECTION 5.13 | Intellectual Property | 66 |
| SECTION 5.14 | Compliance with Real Estate Obligations | 67 |
| SECTION 5.15 | Lender Calls | 67 |
| SECTION 5.16 | Healthcare Laws | 67 |
| SECTION 5.17 | Post-Closing Obligations | 68 |

**ARTICLE VI Negative Covenants** — 69

| | | |
|---|---|---|
| SECTION 6.01 | Indebtedness | 69 |
| SECTION 6.02 | Liens | 71 |

DRAFT—SUBJECT TO FURTHER REVISION

| SECTION 6.03 | Sale and Leaseback Transactions | 73 |
| SECTION 6.04 | Investments, Loans and Advances | 73 |
| SECTION 6.05 | Mergers, Consolidations, Sales of Assets and Acquisitions | 74 |
| SECTION 6.06 | Restricted Payments; Restrictive Agreements | 74 |
| SECTION 6.07 | Transactions with Affiliates | 75 |
| SECTION 6.08 | Business of Borrower and Subsidiaries | 75 |
| SECTION 6.09 | Other Indebtedness and Agreements | 75 |
| SECTION 6.10 | Financial Covenants | 76 |
| SECTION 6.11 | Fiscal Year | 76 |
| SECTION 6.12 | Sanctions | 76 |
| SECTION 6.13 | Anti-Corruption, Anti-Bribery, Anti-Terrorism and Anti-Money Laundering Laws | 77 |
| SECTION 6.14 | Use of Proceeds | 77 |
| SECTION 6.15 | Healthcare Authorizations | 77 |
| SECTION 6.16 | Anti-Layering | 77 |

**ARTICLE VII Events of Default** ... 78

| SECTION 7.01 | Events of Default | 78 |
| SECTION 7.02 | Right to Cure | 81 |

**ARTICLE VIII The Administrative Agent and the Collateral Agent; Etc.** ... 82

**ARTICLE IX Miscellaneous** ... 84

| SECTION 9.01 | Notices; Electronic Communications | 84 |
| SECTION 9.02 | Survival of Agreement | 86 |
| SECTION 9.03 | Binding Effect | 86 |
| SECTION 9.04 | Successors and Assigns | 86 |
| SECTION 9.05 | Expenses; Indemnity | 92 |
| SECTION 9.06 | Right of Setoff | 93 |
| SECTION 9.07 | Applicable Law | 94 |
| SECTION 9.08 | Waivers; Amendment | 94 |
| SECTION 9.09 | Interest Rate Limitation | 95 |
| SECTION 9.10 | Entire Agreement | 96 |
| SECTION 9.11 | WAIVER OF JURY TRIAL | 96 |
| SECTION 9.12 | Severability | 96 |
| SECTION 9.13 | Counterparts | 96 |
| SECTION 9.14 | Headings | 97 |
| SECTION 9.15 | Jurisdiction; Consent to Service of Process | 97 |
| SECTION 9.16 | Confidentiality | 97 |
| SECTION 9.17 | Lender Action | 98 |
| SECTION 9.18 | USA PATRIOT Act Notice | 98 |
| SECTION 9.19 | Withholding Taxes | 98 |
| SECTION 9.20 | No Fiduciary Duty | 98 |
| SECTION 9.21 | Acknowledgment and Consent to Bail-In of EEA Financial Institutions | 99 |
| SECTION 9.22 | Cashless Settlement | 99 |
| SECTION 9.23 | Intercreditor Agreement | 100 |
| SECTION 9.24 | Release | 100 |

DRAFT—SUBJECT TO FURTHER REVISION

SCHEDULES

| | | |
|---|---|---|
| Schedule 1.01(a) | - | Subsidiary Guarantors |
| Schedule 1.01(b) | - | Mortgaged Property |
| Schedule 2.01 | - | Lenders and Commitments |
| Schedule 3.08 | - | Subsidiaries |
| Schedule 3.13 | - | Sources and Uses |
| Schedule 3.18 | - | Insurance |
| Schedule 3.20(a) | - | Owned Real Property |
| Schedule 3.20(b) | - | Leased Real Property |
| Schedule 3.27 | - | Intellectual Property |
| Schedule 5.17 | - | Post-Closing Deliverables |
| Schedule 6.01 | - | Existing Indebtedness(d) - Properties Subject to Lease Renegotiation |
| | | |
| Schedule 6.026.01(p) | - | Existing Liens |
| Schedule 6.03 | - | Sale and Leaseback Transactions |
| Schedule 6.07 | - | Affiliate TransactionsLetters of Credit |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Administrative Questionnaire |
| Exhibit B | - | Form of Assignment and Acceptance |
| Exhibit C | - | Form of Borrowing Request |
| Exhibit D | - | Form of Guarantee and Collateral Agreement |
| Exhibit E | - | Form of Mortgage |
| Exhibit F | - | Form of Affiliate Subordination Agreement |
| Exhibit G | - | Form of Compliance Certificate |
| Exhibit H | - | Form of Landlord Personal Property Collateral Access Agreement |
| Exhibit I | - | Form of AAC Holdings Legacy Deposit Account Report[2] |

---

[2]    GT to provide in response to Section 5.18(a).

ACTIVE 52782809v1" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

CREDIT AGREEMENT, dated as of [——December [11], 2020 (as amended, restated, supplemented or otherwise modified from time to time, this "*Agreement*"), among AAC HOLDINGS,Intermediate Holdco, Inc., a Delaware Corporation, AAC NEW HOLDCO INC., a NevadaDelaware corporation (f/k/a Restructured 20-11648 Merger Sub, Inc.) (the "*Borrower*"), the Lenders (such term and each other capitalized term used but not defined in this preamble having the meaning given to it in Article I) party hereto and ANKURA TRUST COMPANY, LLC ("*Ankura*"), as administrative agent for the Lenders (in such capacity, including any successor thereto, the "*Administrative Agent*") and as collateral agent for the Secured Parties (in such capacity, including any successor thereto, the "*Collateral Agent*").

## RECITALS

**WHEREAS**, on June 20, 2020 (the "*Petition Date*"), theAAC Holdings, Inc., a Nevada corporation ("*AAC Holdings Prepetition Borrower*") and the Subsidiary Guarantors (each a "*Debtor*" and collectively, and together with AAC Holdings Prepetition Borrower, the "*Debtors*", and, each, a "*Debtor*") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") initiating their respective jointly administered cases under Chapter 11 of the Bankruptcy Code (Case No. 20-11648 (JTD)) (collectively, the "*Chapter 11 Cases*");

**WHEREAS**, on [——————],October 20, 2020, the Bankruptcy Court entered the Plan Confirmation Order (as defined below) confirming the Plan of Reorganization (as defined below) filed by the Debtors with the Bankruptcy Court in connection with the Chapter 11 Cases;

**WHEREAS**, certain Lenders and/or their respective affiliates (the "*Prepetition Lenders*") are parties to, and extended certain loans and provided other financial accommodations to theAAC Holdings Prepetition Borrower under, that certain Credit Agreement, dated as of March 8, 2019, by and among theAAC Holdings Prepetition Borrower, the Prepetition Lenders party thereto and Ankura Trust Company, LLC (as successor to Credit Suisse AG), as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time prior to the Petition Date) (the "*Prepetition Priming Credit Agreement*");

**WHEREAS**, certain Lenders and/or their respective affiliates (the "*DIP Lenders*") are parties to, and extended certain loans and provided other financial accommodations to theAAC Holdings Prepetition Borrower under, that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of June 25, 2020, by and among theAAC Holdings Prepetition Borrower, the lenders party thereto and Ankura Trust Company, LLC, as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time prior to the Plan Effective Date) (the "*DIP Credit Agreement*");

**WHEREAS**, on the Plan Effective Date (as defined below), immediately prior to the making of the Term Loans (as defined below), AAC Holdings Prepetition Borrower contributed certain of its assets to AAC Dropdown-Co, LLC a Delaware limited liability company ("*AAC Dropdown-Co, LLC*"), as further described in the Contribution Agreement (as defined below) and, thereupon, AAC Dropdown-Co, LLC merged with and into the Borrower, as set forth further in that certain Agreement and Plan of Merger, dated as of the date hereof, by and among AAC Holdings Prepetition Borrower, AAC Dropdown-Co, LLC and the Borrower (the "*Merger Agreement*") (the transfers of property and mergers contemplated pursuant to the Contribution Agreement and/or the Merger Agreement, together with all other related or ancillary transactions, collectively, the "*Merger Transactions*");

**WHEREAS**, pursuant to the Plan of Reorganization, on the Plan Effective Date (as defined below), certain Prepetition Priming Facility Claims and DIP FacilityLender Claims (as defined below)

1

DRAFT – SUBJECT TO FURTHER REVISION

will be automatically converted into indebtedness outstanding hereunder in the form of Term Loans ~~(as defined below)~~ and, in connection therewith, the Lenders party hereto on the Closing Date shall be deemed to have advanced to the Borrower on the Closing Date Term Loans in an aggregate principal amount equal to $[____],[3] on the terms and subject to the conditions set forth herein, the other Loan Documents (as defined below) and the Plan of Reorganization; and

**WHEREAS**, the Borrower, the Lenders, the Collateral Agent and the Administrative Agent are entering into this Agreement and the other Loan Documents (as applicable) in connection with the implementation and consummation of, the Plan of Reorganization.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## ARTICLE I

### *Definitions*

SECTION 1.01    ***Defined Terms***.    As used in this Agreement, the following terms shall have the meanings specified below:

"***AAC Dropdown-Co, LLC***" shall have the meaning assigned to such term in the recitals.

"***AAC Holdings Prepetition Borrower***" shall have the meaning assigned to such term in the recitals.

"***AAC Holdings Legacy Deposit Account***" shall have the meaning assigned to such term in Section 5.18.

"***Acquired Entity***" shall have the meaning assigned to such term in Section 6.04(h).

"***Administrative Agent***" shall have the meaning assigned to such term in the preamble.

"***Administrative Agent Fees***" shall have the meaning assigned to such term in Section 2.05(b).

"***Administrative Questionnaire***" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"***Affiliate***" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, that, for purposes of the definition of "Eligible Assignee" and Section 6.07, the term "Affiliate" shall also include (i) any Person that directly or indirectly owns 10% or more of any class of Equity Interests of the Person specified and (ii) any Controlled Physician Affiliate.

---

[3] ~~**NTD: Exit facility to be in an aggregate principal amount equal to (i) (x) amount outstanding under the DIP Facility as of the Plan Effective Date (at least $62.5 million) plus (y) amount payable as the Exit Fee under the DIP Facility plus (ii) aggregate outstanding principal amount of loans outstanding under the Prepetition Priming Credit Agreement as of the Plan Effective Date (at least $47 million). Final amounts**~~ Final amount to be ~~confirmed~~included.

2

DRAFT – SUBJECT TO FURTHER REVISION

"*Affiliate Subordination Agreement*" shall mean an Affiliate Subordination Agreement in the form of Exhibit F pursuant to which intercompany obligations and advances owed by any Loan Party are subordinated to the Obligations.

"*Agency Fee Letter*" shall mean the Agency Fee Letter, dated as of the Closing Date between the Borrower and the Agents, as amended, restated, supplemented or otherwise modified from time to time.

"*Agents*" shall have the meaning assigned to such term in Article VIII.

"*Agreement*" shall have the meaning assigned to such term in the preamble.

"*Agreement Value*" shall mean, for each Hedging Agreement, at the applicable time, the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or any Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"*Allowed*" shall have the meaning assigned to such term in the Plan of Reorganization.

"*Ankura*" shall have the meaning assigned to such term in the preamble.

"*Applicable Margin*" shall mean 18.00% per annum.

"*Applicable Payments*" shall have the meaning assigned to such term in Section 5.18.

"*Applicable Payment Arrangements*" shall have the meaning assigned to such term in Section 5.18.

"*Asset Sale*" shall mean the sale, transfer or other disposition (by way of merger, casualty, condemnation or otherwise) by the Borrower or any of the Subsidiaries to any Person other than the Borrower or any Subsidiary Guarantor of (a) any Equity Interests of any of the Subsidiaries (other than directors' qualifying shares) or (b) any other assets of the Borrower or any of the Subsidiaries (other than (i) inventory, damaged, obsolete or worn out assets, scrap and Permitted Investments, in each case disposed of in the ordinary course of business, (ii) any lease or sub-lease of any real property or personal property, in each case in the ordinary course of business, (iii) any license or sublicense of intellectual property of the Borrower or any Subsidiary, in each case in the ordinary course of business, (iv) any sale, transfer or other disposition constituting the abandonment of intellectual property rights that, in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and the Subsidiaries, in each case in the ordinary course of business, (v) any sale, transfer or other disposition consisting of the granting of Liens permitted by Section 6.02 and (vi) (A) any sale, transfer or other disposition consummated prior to the Closing Date and (B) after the Closing Date, any sale, transfer or other disposition or series of related sales, transfers or other dispositions having a value not in excess of $[1,000,000] individually or $[2,500,000] in the aggregate for all such sales, transfers and other dispositions.[4]3,500,000 per fiscal year.

"*Assignment and Acceptance*" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"*Attributable Indebtedness*" shall mean, when used with respect to any Sale and Leaseback Transaction permitted by Section 6.03, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then-current weighted average cost of funds for borrowed money as at the

---

[4] NTD:  Thresholds to be confirmed by lenders.

3

DRAFT – SUBJECT TO FURTHER REVISION

time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"*Auction Procedures*" shall mean the auction procedures with respect to Dutch Auctions reasonably satisfactory to the Borrower and the Administrative Agent.

"*Available Amount*" shall mean as of any date of determination (the "*Reference Date*"), an amount determined on a cumulative basis equal to:

(a)  the sum (without duplication) of:

1.      an amount equal to 50% of Consolidated Net Income for the period from the first day of the fiscal quarter of the Borrower during which the Closing Date occurred to and including the last day of the most recently ended fiscal quarter of the Borrower prior to the Reference Date for which internal consolidated financial statements of the Borrower are available (or, in the case such Consolidated Net Income for such period is in deficit, minus 100% of such deficit);

2.      the cumulative amount of (A) any capital contributions (whether in cash or Permitted Investments) received by the Borrower after the Closing Date and on or prior to the Reference Date, and (B) any Net Cash Proceeds of any issuances of any Equity Interests of the Parent made after the Closing Date and on or prior to the Reference Date to any Person other than the Borrower or any Subsidiary thereof the Borrower (to the extent directly or indirectly contributed in cash to the Borrower);

3.      the aggregate amount received by Borrower or any Restricted Subsidiary after the Closing Date and on or prior to the Reference Date from dividends and distributions (whether in cash or Permitted Investments) made by any joint venture that is not a Restricted Subsidiary and interests, returns of principal, repayments and similar payments made by any joint venture that is not a Restricted Subsidiary in respect of Investments made by the Borrower or any Restricted Subsidiary to any joint venture that is not a Restricted Subsidiary, and the Net Cash Proceeds in connection with the sale, transfer or other disposition of assets or the Equity Interests of any joint venture that is not a Restricted Subsidiary of the Borrower to any Person (other than a Restricted Subsidiary) after the Closing Date and on or prior to the Reference Date;

4.      an amount equal to any Declined Proceeds retained by the Borrower after the Closing Date and on or prior to the Reference Date (and not, for the avoidance of doubt, applied for any other purpose, including as permitted by Section 2.12(b)); and

5.      to the extent not otherwise included, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually theretofore received in cash or Permitted Investments in respect of any Investment made pursuant to Section 6.04(i)(ii) after the Closing Date and on or prior to the Reference Date;

*minus*

(b) the sum (without duplication) of the aggregate amount of (A) Restricted Payments made pursuant to Section 6.06(a)(ii), (B) Investments made pursuant to Section 6.04(i)(ii) and (C) distributions, payments, commitments, redemptions, repurchases, retirements, acquisitions or set aside made pursuant to Section 6.09(b)(iv), in each case of the foregoing clauses (A) through (C),

4

DRAFT—SUBJECT TO FURTHER REVISION

during the period from (and including) the Business Day immediately following the Closing Date through to (and including) the Reference Date (without taking account of the intended usage of the Available Amount on such Reference Date).

"*Available Liquidity*" shall mean, at any time, [the sum of (a) (i) the aggregate amount of all unused available commitments outstanding at such time under any ~~revolving credit facility of the Borrower in effect at such time (to the extent permitted hereunder and incurred in accordance with the terms hereof), minus (ii) the aggregate amount of disbursements under any letter of credit issued at such time (to the extent permitted hereunder and incurred in accordance with the terms hereof), minus (iii) the aggregate amount of all revolving loans outstanding at such time under any revolving credit facility of the Borrower in effect at such time (to the extent permitted hereunder and incurred in accordance with the terms hereof),~~Revolving Credit Facility available to be borrowed as loans thereunder at such time plus (b) the aggregate amount of unrestricted cash and Permitted Investments of the Borrower and its Subsidiaries at such time held in any ~~deposit account~~Deposit Account, securities account, commodities account, or other cash account (or any combination thereof, as applicable) maintained in a Controlled Account or in any other account maintained by a branch office of the applicable bank or securities intermediary located within the United States that is the subject of a control agreement granting Control to the Collateral Agent (or the administrative agent or lender, as applicable, with respect to any ~~revolving credit facility (~~Revolving Credit Facility, to the extent such Revolving Credit Facility is permitted hereunder and incurred in accordance with the terms hereof~~)~~, subject to the terms of any applicable Intercreditor Agreement) in a manner reasonably satisfactory to the Required Lenders.

"*Bail-In Action*" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"*Bankruptcy Code*" shall mean the title 11 of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended and in effect from time to time, and any successor statute.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the Recitals.

"*Beneficial Ownership Regulation*" shall mean 31 C.F.R. § 1010.230.

"*Board*" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"*Borrower*" shall have the meaning assigned to such term in the preamble~~.~~, and shall include any Successor Borrower, to the extent permitted pursuant to Section 6.05.

"*Borrower Materials*" shall have the meaning assigned to such term in Section 9.01.

"*Borrowing*" shall mean Loans of the same Class made on the same date.

"*Borrowing Request*" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

"*Business Day*" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"*Capital Expenditures*" shall mean, for any period, the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP, but excluding in each case any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with insurance proceeds, condemnation awards or damage recovery proceeds relating to any such damage, loss, destruction or condemnation.

"*Cash Interest Rate*" means 10.00% per annum.

A "*Change in Control*" shall mean any event or series of events by which:

(a)  a "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than the Permitted Holders becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of thirty-five percent (35%) or more of the aggregate voting or economic power of the Equity Interests of Holdings or the Borrower entitled to vote for members of the board of directors or equivalent governing body of Holdings or the Borrower on a fully-diluted basis (and taking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right);

(b)  the Permitted Holders cease to "beneficially own" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) at least 50%Holdings shall cease to (i) Control the Borrower or (ii) have "beneficial ownership" (construed as set forth in clause (a)) of 100% of the aggregate voting or economic power of the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis, free and clear of all Liens (except Liens expressly constituting Permitted Liens pursuant to clause (b), (d), (g) or (t) of Section 6.02);

(c)  the disposition, sale, lease or transfer, in any one transaction or aany series of related transactions, of all or substantially all of the assets of Holdings, the Borrower and its Subsidiaries, taken as a whole, to any Person other than the Permitted Holders; or;

(d)  the approval by the holders of the Equity Interests of the Borrower of any plan for the liquidation or dissolution of Holdings or the Borrower (whether or not otherwise in compliance with the provisions of this Agreement).

"*Change in Law*" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that notwithstanding

6

DRAFT – SUBJECT TO FURTHER REVISION

anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"***Chapter 11 Cases***" shall have the meaning assigned to such term in the Recitals.

"***Charges***" shall have the meaning assigned to such term in Section 9.09.

"***Class***" when used in reference to any Loan or Borrowing, shall refer to whether such Loan, or the Loans comprising such Borrowing, are Term Loans or Other Term Loans and, when used in reference to any Commitment, refers to whether such Commitment is a Term Loan Commitment or Incremental Term Loan Commitment in respect of any Other Term Loan.

"***Closing Date***" shall mean the date on which the conditions set forth in Section 4.02 shall have been satisfied or waived, which date is [————————December [11]], 2020.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" shall mean all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties.

"***Collateral Agent***" shall have the meaning assigned to such term in the preamble.

"***Commitment***" shall mean, with respect to any Lender, such Lender's Term Loan Commitment or Incremental Term Loan Commitment or commitment to make any Extended Term Loans, as the case may be.

"***Communications***" shall have the meaning assigned to such term in Section 9.01.

"***Compliance Certificate***" shall mean a certificate of a Financial Officer substantially in the form of Exhibit G.

"***Consolidated EBITDA***" shall mean, for any period, [Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) Consolidated Interest Expense for such period, (ii) consolidated income tax expense for such period (including any franchise taxes imposed in lieu of income taxes and any income taxes), (iii) all amounts attributable to depreciation and amortization for such period, (iv) any non-cash charges, expenses or losses (including, but not limited to, impairment of goodwill or other intangible assets and exchange rate losses) of the Borrower or any of its Subsidiaries for such period (excluding any such charges, expenses or losses incurred that constitutes an accrual of or a reserve for cash charges for any future period); provided, that this clause (iv) shall not include any write-downs or write-offs of, or reserves in respect of, of accounts receivable and/or similar add backs in reliance on this clause (iv) or in reliance on any other clauses in this paragraph (a), (v) any extraordinary, unusual, or non-recurring cash charges or expenses for such period (including without limitation, severance, retention bonuses or other similar one time compensation payments made to employees of the Borrower or any of its Subsidiaries or made in connection with a Permitted Acquisition) not to exceed $[2,500,000], (vi) deferred compensation, stock-option or employee benefits-based and other equity-based compensation expenses for such period, (vii) [reserved]fees, costs and expenses in connection with the Transactions for such

DRAFT—SUBJECT TO FURTHER REVISION

period, (viii) fees, costs and expenses in connection with any Investment (including any Permitted Acquisition), asset disposition (including any Asset Sale), issuance of Equity Interests or issuance, modification or refinancing of any Indebtedness for such period, in each case to the extent permitted under this Agreement and whether or not such transaction shall have been consummated, (ix) [reserved]any losses or expenses to the extent reimbursable by third parties in connection with any Permitted Acquisition for such period, as reasonably determined in good faith by the Borrower, provided, however, that if the Required Lenders (or the Administrative Agent after consultation with the Required Lenders), acting reasonably, determine in such period or the immediately succeeding period that any such losses or expenses, or any portion thereof (which, in each case, were included in Consolidated EBITDA for such period or such immediately preceding period pursuant to this clause (ix)), are no longer reimbursable or are not reasonably likely to be reimbursed, then such losses or expenses, or any portion thereof, shall be subtracted from Consolidated Net Income in calculating Consolidated EBITDA in for such period, (x) unrealized losses in respect of Obligations under Hedging Agreements for such period, (xi) any losses or expenses from discontinued operations or incurred in connection with the disposal of discontinued operations in accordance with GAAP for such period (or if not in accordance with GAAP as otherwise reasonably acceptable to the Administrative Agent or the Required Lenders), (xii) non-cash charges or amounts recorded in connection with purchase accounting under FASB Accounting Standards Codification Topic 805 (ASC 805), Business Combinations (including any applicable to future Permitted Acquisitions) for such period, (xiii) non-cash purchase accounting adjustments relating to the writedown of deferred revenue (whether billed or unbilled) that are the result of accounting for any acquisition for such period, (xiv) the cumulative effect of a change in accounting principles to the extent permitted by Section 1.02(b) for such period, (xv) any expenses in connection with any litigation or claim involving the Borrower or its Subsidiaries for such period, (xvi) debt discount and debt issuance costs, fees, charges and commissions, in each case incurred in connection with Indebtedness permitted to be incurred under Section 6.01 (whether or not such Indebtedness has been incurred) for such period, (xvii) any losses or expenses incurred by the Borrower or its Subsidiaries in connection with establishing new or materially expanding existing Healthcare Facilities for a period of [6 months] prior to the new establishment or material expansion of such Healthcare Facilities and continuing for [12 months] after the new establishment or completed material expansion of such Healthcare Facilities, as reasonably determined in good faith by the Borrower, for such period, in an aggregate amount not to exceed, together with any add backs made pursuant to the succeeding clause (xviii), [10]25% of Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended prior to the determination date (without giving effect to any adjustments pursuant to this clause (xvii) and the succeeding clause (xviii)), and (xviii) the amount of net cost savings, operating expense reductions and other operating improvements and acquisition synergies projected by the Borrower in good faith to be realized during such period (calculated on a *pro forma* basis as though such items had been realized on the first day of such period) as a result of actions taken or to be taken in connection with any acquisition, disposition or restructuring by the Borrower or any Subsidiary, net of the amount of actual benefits realized during such period that are otherwise included in the calculation of Consolidated EBITDA from such actions, provided, that (A) a duly completed certificate signed by a Financial Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 5.04(c), certifying that (x) such cost savings and operating expense reductions and synergies are reasonably expected and factually supportable as determined in good faith by the Borrower, and (y) such actions are to be taken within 12 months after the consummation of the acquisition, disposition or restructuring, which is expected to result in such cost savings or expense reductions or synergies, (B) no cost savings and operating expense reductions and synergies shall be added pursuant to this clause (xviii) to the extent duplicative of any losses, expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period, (C) projected amounts (and not yet realized) may no longer be added in calculating Consolidated EBITDA pursuant to this clause (xviii) to the extent occurring more than four full fiscal quarters after the specified action taken in order to realize such projected cost savings and operating expense reductions and

8

DRAFT—SUBJECT TO FURTHER REVISION

synergies and (D) the aggregate amount of add backs made pursuant to the foregoing clause (xvii) and this clause (xviii) shall not exceed [10]20% of Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended prior to the determination date (without giving effect to any adjustments pursuant to the foregoing clause (xvii) and this clause (xviii)), and (xix) any Winddown Expenses of the Borrower or any Subsidiary for such period, and minus (b) without duplication (i) to the extent included in determining such Consolidated Net Income, any extraordinary, unusual, or non-recurring cash gains and all non-cash items of income for such period, all determined on a consolidated basis in accordance with GAAP, (ii) unrealized gains in respect of Obligations under Hedging Agreements permitted under Section 6.01 for such period and (iii) any gain from discontinued operations or any gain incurred in connection with the disposal of discontinued operations in accordance with GAAP for such period (or if not in accordance with GAAP as otherwise reasonably acceptable to the Administrative Agent); provided, that, in each case, for any period (A) the Consolidated EBITDA of any Acquired Entity acquired by the Borrower or any Subsidiary pursuant to a Permitted Acquisition during such period shall be included on a pro forma basis for such period (assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith occurred as of the first day of such period) and (B) the Consolidated EBITDA of any Person or line of business sold or otherwise disposed of by the Borrower or any Subsidiary during such period shall be excluded for such period (assuming the consummation of such sale or other disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such period)].[5]

"**Consolidated Interest Expense**" shall mean, for any period, the sum of (a) the interest expense (including imputed interest expense in respect of Financing Lease Obligations and Synthetic Lease Obligations) of the Borrower and the Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (including, for the avoidance of doubt, (i) any amounts of premium or penalty payable in connection with the payment of make-whole amounts or other prepayment premiums payable in connection with any Indebtedness of the Borrower or any of its Subsidiaries, and (ii) all commissions, discounts and other fees and charges owed in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), plus (b) any interest accrued during such period in respect of Indebtedness of the Borrower or any Subsidiary that is required to be capitalized rather than included in consolidated interest expense for such period in accordance with GAAP.  For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by the Borrower or any Subsidiary with respect to interest rate Hedging Agreements. permitted under Section 6.01.

"**Consolidated Net Income**" shall mean, for any period, the net income or loss of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, that there shall be excluded (a) the income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by the Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such Subsidiary except that (x) the Borrower's equity in any net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income and (y) the net income of any Controlled Physician Affiliate shall be included in the determination of Consolidated Net Income for any period to the extent that any Loan Party has received cash payments under the management agreement with such Controlled Physician Affiliate during such period, (b) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary, (c) the income of any Person in which any other Person (other than the Borrower or a Wholly-Owned Subsidiary or any director holding qualifying shares in accordance with applicable law) has a joint interest, except to the extent of the amount of dividends or

---

[5] NTD:  To be discussed by Stroock, Moelis and FTI.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

other distributions actually paid to the Borrower or a Wholly-Owned Subsidiary by such Person during such period, and (d) any gains attributable to sales of assets out of the ordinary course of business.

"***Contractual Obligation***" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its assets or properties is bound.

"***Contribution Agreement***" shall mean that certain Contribution, Assignment and Assumption Agreement, dated as of December [11], 2020, by and among AAC Holdings Prepetition Borrower and AAC Dropdown-Co, LLC, a Delaware limited liability company, as amended or otherwise modified from time to time in accordance with its terms.

"***Tax Cooperation Agreement***" shall mean that certain Tax Cooperation Agreement, dated as of December [11], 2020, by and among AAC Holdings Prepetition Borrower and the Borrower, as amended or otherwise modified from time to time in accordance with its terms.

"***Control***" (a) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of Voting Equity Interests, by contract or otherwise (including any member of the senior management group of any such Person), and the terms "***Controlling***" and "***Controlled***" shall have meanings correlative thereto, and (b) when used in connection with any Deposit Account, securities account, commodities account, or other cash account, shall have the meaning assigned thereto in the Guarantee and Collateral Agreement.

"***Controlled Account***" shall mean each Deposit Account that (i) is owned by, and held in the name of, the Borrower or any Subsidiary Guarantor, (ii) has been approved in writing by the Administrative Agent, (iii) is Controlled by the Collateral Agent and (iv) is not subject to any sweep or other arrangements pursuant to which any cash or other funds on deposit in such Deposit Account at any time are transferred into, or credited to, any AAC Holdings Legacy Deposit Account without the prior written consent of the Collateral Agent or the Required Lenders.  For the avoidance of doubt, on and as of the Closing Date, that certain Deposit Account maintained at HSBC Bank in the name of American Addiction Centers, Inc. (account number: 879024372) constitutes a Controlled Account.

"***Controlled Physician Affiliate***" shall mean any Person comprised of or constituting a physician group or healthcare practice in the business of providing health care services through employed or contracted health care professionals (a) as to which the Borrower or a Wholly-Owned Subsidiary has the option to require a transfer of all of the Voting Equity Interests of such group or practice to itself or a nominee, (b) with which the Borrower or a Wholly-Owned Subsidiary has a long-term business agreement to provide management services to such group or practice and (c) the Voting Equity Interests of which cannot, pursuant to applicable Laws, or should not, in the reasonable good faith determination of the Borrower, be owned by the Borrower or a Wholly-Owned Subsidiary.

"***Controlled Physician Affiliate Restructuring Transaction***" shall mean (a) with respect to any Controlled Physician Affiliate owed, managed or Controlled by Mark A Calarco, D.O., any transaction or arrangement entered into or consummated by a Loan Party or any Subsidiary thereof that is determined in good faith by the board of directors of the Borrower to be reasonably necessary or desirable in connection with any transfer of ownership, management or Control of, or any business or assets of, such Controlled Physician Affiliate from Mark A Calarco, D.O. to any other Person (including a Loan Party or any Subsidiary thereof); provided, that the terms thereof (including any payments made pursuant thereto) shall be at least as favorable to the Loan Parties and/or their Subsidiaries as negotiated at an arm's length basis and (b) each action or transaction taken in connection with, or relating to, or required to effectuate,

10

DRAFT – SUBJECT TO FURTHER REVISION

the foregoing (including any release of Liens on any Controlled Physician Affiliate pursuant to any transaction referred to herein, to the extent such release is required thereby).

"*Credit Event*" shall have the meaning assigned to such term in Section 4.01.

"*Credit Facility*" shall mean the term loan facility provided for by this Agreement.

"*Cure Amount*" shall have the meaning assigned to such term in Section 7.02(a).

"*Cure Right*" shall have the meaning assigned to such term in Section 7.02(a).

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"*Current Assets*" shall mean, at any time, the consolidated current assets (other than cash and Permitted Investments) of the Borrower and the Subsidiaries determined in accordance with GAAP.

"*Current Liabilities*" shall mean, at any time, the consolidated current liabilities of the Borrower and the Subsidiaries at such time determined in accordance with GAAP, but excluding, without duplication, (a) the current portion of any long-term Indebtedness and (b) any loans or other Indebtedness outstanding under any Revolving ~~Loans~~Credit Facility.

"*Debtor*" shall have the meaning assigned to such term in the recitals.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Declined Proceeds*" shall have the meaning assigned to such term in Section 2.13(f).

"*Default*" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"*Defaulting Lender*" shall mean, subject to Section 2.24(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided, that such

11

DRAFT—SUBJECT TO FURTHER REVISION

Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), (d) has become the subject of a Bail-In Action or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or Federal regulatory authority acting in such a capacity; *provided*, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.24(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"*Deposit Account*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Designated Jurisdiction*" shall mean any country or territory to the extent that such country or territory is the subject of any Sanctions.

"*DIP Credit Agreement*" shall have the meaning assigned to such term in the Recitals.

"*DIP Facility Lender Claims*" [shall have the meaning assigned to such term in the Plan of Reorganization].

"*DIP Lenders*" shall have the meaning assigned to such term in the Recitals.

"*Discount*" shall have the meaning assigned to such term in Section 2.23(b).

"*Disqualified Institution*" shall mean (a) any Person identified by name in writing to the Administrative Agent by the Borrower prior from time to the Closing Date time, (b) any competitor of the Borrower and its Subsidiaries identified by name in writing to the Administrative Agent and the Lenders from time to time after the Closing Date by the Borrower and (c) any clearly and reasonably identifiable Affiliate of any Person referred to in clauses (i) or (ii) above solely on the basis of such Affiliate's name; *provided*, that a Disqualified Institution shall not include any bona fide fixed income investor, debt fund, investment vehicle or lending entity that is primarily engaged in, or that advises investors, funds, investment vehicles or other lending entities that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds or similar extensions of credit or securities in the ordinary course and with respect to which a Disqualified Institution does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity; *provided*, further, that no Disqualified Institution may become a Lender or otherwise participate in the Credit Facility without consent of the Borrower; *provided*, further, that any Disqualified Institution identified from time to time after the Closing Date shall not apply retroactively to disqualify any party that has previously acquired an assignment or participation interest in the Credit Facility; *provided*, further, that the parties hereto hereby understand and agree that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to any Disqualified Institution.

12

DRAFT—SUBJECT TO FURTHER REVISION

"*Disqualified Stock*" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely for Equity Interests which are common equity interests or otherwise not Disqualified Stock), in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the ninety-first day after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time such Equity Interest is issued, or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time such Equity Interest is issued.

"*Dollars*" or "*$*" shall mean lawful money of the United States of America.

"*Dutch Auction*" shall mean an auction conducted by the Borrower or any Subsidiary in order to purchase Term Loans as contemplated by Section 9.04(l), as applicable, in accordance with the Auction Procedures.

"*EEA Financial Institution*" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"*EEA Member Country*" shall mean any of the member states of the European Union, Iceland, Liechtenstein, Norway and the United Kingdom.

"*EEA Resolution Authority*" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligible Assignee*" shall mean (a) a Lender, (b) an Affiliate of a Lender, (c) a Related Fund of a Lender and (d) any other Person (other than a natural person) approved by (x) the Administrative Agent and (y) except with respect to assignments when an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld, conditioned or delayed); provided, that the Borrower shall be deemed to have consented to any proposed Eligible Assignee unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received written notice thereof; provided, further, that notwithstanding the foregoing, "Eligible Assignee" shall not include (i) the Borrower or any of the Borrower's Affiliates (except any Permitted Holder) (it being understood and agreed that assignments to the Borrower or a Subsidiary may be made pursuant to Section 9.04(l)), (ii) any Defaulting Lender or (iii) any Disqualified Institution.

"*Environmental Laws*" shall mean all applicable Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives and orders (including consent orders), in each case, relating to (a) protection of the environment or natural resources, (b) the presence, Release of, or exposure to Hazardous Materials, or (c) the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, or the exposure to, Hazardous Materials.

13

DRAFT – SUBJECT TO FURTHER REVISION

"*Environmental Liability*" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Interests*" shall mean, with respect to a Person, (a) shares of capital stock (whether denominated as common stock or preferred stock), partnership interests, membership interests (including in a limited liability company), beneficial interests (including in a trust or), joint venture interests, participations, and all other equity, ownership or profit interests in any Person, and any option, warrant or other right (or equivalents, and irrespective of how designated) of, or in, such Person, whether voting or non-voting and (b) any and all securities convertible into, or exchangeable for, any of the foregoing, and any and all options, warrants and/or other rights entitling the holder thereof to purchase, subscribe for or otherwise acquire any such equity interestof the foregoing (whether or not presently convertible, exchangeable or exercisable).

"*Equity Issuance*" shall mean any issuance or sale by the Borrower or any of its subsidiaries of any Equity Interests of the Borrower or any such subsidiary, as applicable, except in each case for (a) any issuance or sale to the Borrower or any Subsidiary, (b) any issuance of directors' qualifying shares and (c) sales or issuances of common stock of the Borrower to management or employees of the Borrower or any Subsidiary under any employee stock option or stock purchase plan or employee benefit plan in existence from time to time, in each case within 270 days after such issuance or sale by the Borrower or any of its subsidiaries of any Equity Interests of the Borrower or any such subsidiary.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"*ERISA Affiliate*" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b), 414(c), 414(m) or 414(o) of the Code.

"*ERISA Event*" shall mean (a) the occurrence of any "reportable event" as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the failure by any Plan to meet the minimum funding standard of Sections 412 and 430 of the Code or Section 302 and 303 of ERISA, in each case, whether or not waived, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Multiemployer Plan, (e) a determination that any Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA), (f) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Sections 4041 and 4042 of ERISA, respectively, (g) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA, (h) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 436(f) of the Code, (i) the receipt by the Borrower or any of its ERISA Affiliates of any notice, or the

14

DRAFT – SUBJECT TO FURTHER REVISION

receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Section 4245 of ERISA, respectively, (j) the occurrence of a "prohibited transaction" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code), (k) the disqualification by the Internal Revenue Service of any Plan under Section 401(a) of the Code or the determination by the Internal Revenue Service that any trust forming part of any Plan fails to qualify for exemption from taxation under Section 501(a) of the Code, (l) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Plan or (m) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Events of Default*" shall have the meaning assigned to such term in Section 7.01.

"*Excluded Assets*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Excluded Taxes*" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income Taxes imposed on (or measured by) its net income (however denominated) or franchise Taxes imposed in lieu of income Taxes, in each case by (i) the United States of America or by the jurisdiction under the Laws of which such recipient is organized or in which its principal office is located, (ii) any jurisdiction with which such recipient has a present or former connection (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected security interests under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned any interest in a Loan Document) or (iii) in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction described in clause (a) above, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any U.S. federal withholding Tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.20(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 2.20(a), (d) any backup withholding tax that is required by the Code to be withheld from amounts payable to it, and (e) any Taxes imposed by FATCA.

"*Extended Term Loans*" shall mean any Class of Term Loans the maturity of which shall have been extended pursuant to Section 2.25.

"*Extension*" shall have the meaning assigned to such term in Section 2.25(a).

"*Extension Offer*" shall have the meaning assigned to such term in Section 2.25(a).

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous

15

DRAFT – SUBJECT TO FURTHER REVISION

to comply with), any current or future regulations or official interpretations thereof, any agreement entered into thereto, or any law implementing an intergovernmental agreement or approach thereto.

"*FCPA*" shall have the meaning assigned to such term in Section 3.26.

"*Federal Funds Effective Rate*" shall mean, for any day, the greater of (a) weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, and (b) 0.00% per annum.

"*Fees*" shall mean the Administrative Agent Fees and any other fees required to be paid by any of the Loan Parties on the Closing Date pursuant to the Loan Documents or otherwise.

"*Financial Covenant*" means the covenant in Section 6.10.

"*Financial Officer*" of any Person shall mean the chief financial officer, chief restructuring officer, principal accounting officer, treasurer or controller of such Person.

"*Financing Lease Obligations*" of any Person shall mean, subject to Section 1.04, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*Floating Investments Basket*" shall mean, at any time, (a) $20,000,000 minus (b) the aggregate amount of all Investments made in reliance on the Floating Investments Basket pursuant to Section 6.04(a), (h) and/or (i) at or prior to such time.

"*Foreign Lender*" shall mean any Lender that is organized under the laws of a jurisdiction other than the United States of America, each State thereof or the District of Columbia.

"*GAAP*" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements delivered pursuant to Section 4.02(j).

"*Government Official*" shall mean (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or government-controlled company or business, (c) a political party or official thereof, or candidate for political office or (d) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank).

"*Governmental Authority*" shall mean any Federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"*Granting Lender*" shall have the meaning assigned to such term in Section 9.04(i).

"*Guarantee*" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or

16

DRAFT – SUBJECT TO FURTHER REVISION

supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness or other obligation of the primary obligor in respect of which such Guarantee is made (or, if less, the maximum amount of such Indebtedness or other obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Guarantee) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"*Guarantee and Collateral Agreement*" shall mean the Guarantee and Collateral Agreement, dated as of the Closing Date and substantially in the form of Exhibit D (as in effect on the Closing Date), among the Borrower, the Subsidiaries of the Borrower party thereto and the Collateral Agent for the benefit of the Secured Parties, as amended, restated, supplemented or otherwise modified from time to time (including pursuant to any joinder thereto).

"*Guarantor*" shall mean (a) on the Closing Date, Holdings and each Subsidiary Guarantor party to the Guarantee and Collateral Agreement thereon and (b) from time to time after the Closing Date, each other Person that is or becomes a party to the Guarantee and Collateral Agreement.

"*Hazardous Materials*" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"*Healthcare Authorizations*" shall mean any and all permits, licenses, authorizations, certificates, certificates of need, and accreditations of third-party accreditation agencies and Nongovernmental Payors (a) necessary to enable the Borrower or any of its Subsidiaries to engage in the Healthcare Service Business, participate in and receive payment under plans of Nongovernmental Payors or otherwise continue to conduct its Healthcare Service Business or (b) required under any law relating to Persons engaged in the Healthcare Service Business.

"*Healthcare Facility*" shall mean any facility which provides inpatient or outpatient abuse treatment services for individuals with drug or alcohol addiction, any sober living facility and any facility which provides laboratory services that is owned, leased or operated by the Borrower or its Subsidiaries, and any ancillary business thereto.

"*Healthcare Laws*" shall mean, collectively, any and all current or future laws with respect to any healthcare regulatory matters, any Healthcare Authorizations, any Healthcare Facility and any Healthcare Service Business, and any rule, regulation, directive, order or decision promulgated or issued pursuant thereto, including without limitation: (a) any and all federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a 7(b)), the Stark Law (42 U.S.C. § 1395nn and §1395(q)), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code, the criminal False Claims Law (42 U.S.C. § 1320a-7b(a)), all criminal laws relating to healthcare fraud and abuse, including but not limited to 18 U.S.C. Sections 286 and 287, the healthcare fraud criminal provisions under HIPAA, and the regulations promulgated pursuant to such statutes; (b) the federal Food, Drug & Cosmetic Act (21 U.S.C. §§ 301 et seq.) and the regulations promulgated thereunder; (c) HIPAA; (d) the Patient Protection and Affordable

17

DRAFT – SUBJECT TO FURTHER REVISION

Care Act (P.L. 111-148), as amended by the Health Care and Education Reconciliation Act (P.L. 111-152) and the regulations promulgated thereunder; (e) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies; (f) Requirements of Law relating to the licensure, certification, qualification or authority to transact business relating to the provision of and/or payment for healthcare services; (g) the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a) and the regulations promulgated thereunder; (h) laws related to the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (i) corporate practice of medicine laws and fee-splitting prohibitions; (j) health planning or rate-setting laws, including laws regarding certificates of need and certificates of exemption; (k) the HITECH Act; (l) MHPAEA; and (m) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (m) as may be amended from time to time.

"*Healthcare Service Business*" shall mean a business, the majority of whose revenues are derived from arranging to provide or administering, managing or monitoring healthcare services, or any business or activity that is reasonably similar thereto (including, for the avoidance of doubt, a business providing inpatient or outpatient abuse treatment services for individuals with drug or alcohol addiction) or a reasonable extension, development or expansion thereof or ancillary thereto.

"*Hedging Agreement*" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"*HIPAA*" shall have the meaning assigned to such term in Section 5.16(f).

"*HITECH Act*" shall have the meaning assigned to such term in Section 5.16(f).

"*Holdings*" shall mean (a) as of the Closing Date, AAC Intermediate Holdco, Inc., a Delaware corporation, in its capacity as the direct parent of the Borrower as of such time and (b) from time to time after the Closing Date, any entity that succeeds AAC Intermediate Holdco, Inc. as the direct parent of the Borrower, and each subsequent successor entity acting in such capacity, to the extent constituting Successor Holdings pursuant to, and in accordance with, Section 6.05(a).

["*Incremental Loan Assumption Agreement*" shall mean an Incremental Loan Assumption Agreement among, and in form and substance reasonably satisfactory to, the Borrower, the Administrative Agent and one or more Incremental Term Lenders.

"*Incremental Term Borrowing*" shall mean a Borrowing comprised of Incremental Term Loans.

"*Incremental Term Lender*" shall mean a Lender with an Incremental Term Loan Commitment or an outstanding Incremental Term Loan.

"*Incremental Term Loan Amount*" shall mean, ~~as of~~on the Closing Date, $~~0.~~0.00.

"*Incremental Term Loan Commitment*" shall mean the commitment of any Lender, established pursuant to Section 2.23, to make Incremental Term Loans to the Borrower. As of the Closing Date, no Lender has an Incremental Term Loan Commitment.

"*Incremental Term Loan Maturity Date*" shall mean the final maturity date of any Incremental Term Loan, as set forth in the applicable Incremental Loan Assumption Agreement.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

"*Incremental Term Loan Repayment Dates*" shall mean the dates scheduled for the repayment of principal of any Incremental Term Loan, as set forth in the applicable Incremental Loan Assumption Agreement.

"*Incremental Term Loans*" shall mean the term loans made by one or more Incremental Term Lenders to the Borrower pursuant to Section 2.01(b).  Incremental Term Loans may be made in the form of additional Term Loans with terms and provisions identical to those of the Term Loans made by the Lenders to the Borrower pursuant to clause (i) of Section 2.01(a) or, to the extent permitted by Section 2.23 and provided for in the relevant Incremental Loan Assumption Agreement, Other Term Loans.[6]

"*Initial Term Loan Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make Term Loans hereunder on the Closing Date pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as in effect on the Closing Date) under the heading "Initial Term Loan Commitment".  The original aggregate principal amount of the Initial Term Loan Commitments on the Closing Date (determined immediately prior to giving effect to any funding of Term Loans on the Closing Date) is $[____].

"*Indebtedness*" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed (but limited to the lesser of the fair market value of such property and the outstanding principal amount of such Indebtedness), (g) all Guarantees by such Person of Indebtedness of others, (h) all Financing Lease Obligations of such Person, (i) all Synthetic Lease Obligations of such Person, (j) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (k) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (l) all obligations of such Person as an account party in respect of letters of credit and (m) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner (but only to the extent such general partner is obligated thereunder); provided, that, notwithstanding anything to the contrary in the foregoing definition, Indebtedness shall exclude (1) ordinary course intercompany payables among the Borrower and its Subsidiaries, (2) right-of-use liabilities recorded in connection with ASU 2016-02, Leases, issued by FASB, solely to the extent such liabilities would not have constituted Indebtedness prior to giving effect to the application of ASU 2016-2 and (3) solely for the purposes of calculating any Senior Secured Leverage Ratio under this Agreement, any Attributable Indebtedness or any other lease obligation resulting from any Sale and Leaseback Transaction permitted pursuant to Section 6.03.

"*Indemnified Taxes*" shall mean Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of the Borrower under any Loan Document.

"*Indemnitee*" shall have the meaning assigned to such term in Section 9.05(b).

---

[6] Confirm if Incremental Loans will be allowed.

19

DRAFT – SUBJECT TO FURTHER REVISION

"*Information*" shall have the meaning assigned to such term in Section 9.16.

"*Intellectual Property*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

["*Intercreditor Agreement*" shall mean [_____].][7]an intercreditor agreement in form and substance satisfactory to the Required Lenders.

"*Interest Payment Date*" shall mean the last Business Day of each calendar month (commencing with the last Business Day of the calendar month in which the Closing Date occurs).

"*Interest Rate Agreement*" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"*Investment*" shall mean: (i) any direct or indirect purchase, redemption, retirement or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Equity Interests of any other Person (other than a Subsidiary Guarantor); (ii) any direct or indirect loan, guarantee, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by the Borrower or any of its Subsidiaries to any other Person (other than the Borrower or any Subsidiary Guarantor), including all Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business, and (iii) all investments consisting of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes or otherwise. The amount of any Investment of the type described in clauses (i) and (ii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"*Junior Capital*" shall mean any common or preferred Equity Interests of the Borrower that do not (a) provide for scheduled payments of dividends (or other payments constituting a return on capital) in cash prior to the date that is 91 days after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such Equity Interests, or (b) become mandatorily redeemable (including at the option of the holder thereof) pursuant to a sinking fund obligation or otherwise prior to the date that is 91 days after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such Equity Interests.

"*Landlord Personal Property Collateral Access Agreement*" shall mean a Landlord Personal Property Collateral Access Agreement substantially in the form of Exhibit H with such amendments or modifications as may be approved by the Collateral Agent.

"*Law*" shall mean any federal, state, local, national or supranational or foreign law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction, decree or arbitration award or finding.

"*Lender Financial Consultant*" shall mean, at any time, each Person acting as financial consultant or adviser to the Required Lenders at such time. For the avoidance of doubt, FTI Consulting

---

[7] NTD: To be updated as applicable based on whether a revolving/ABL facility will be in place as of the Closing Date or entered into subsequently.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

shall be a Lender Financial Consultant on and as of the Closing Date and until such time (if any) as any other Person is engaged or appointed by or on behalf of the Required Lenders to replace FTI Consulting in such capacity.

"*Lender Parties*" shall have the meaning given such term in Section 9.24.

"*Lenders*" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance), (b) any Person (other than a natural person) that has become a party hereto pursuant to an Assignment and Acceptance and (c) any Person (other than a natural person) that has become a party hereto pursuant to an Incremental Loan Assumption Agreement.

"*Lien*" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; provided, that in no event shall any operating lease, any license of intellectual property or any agreement to sell be deemed to constitute a Lien.

"*Loan Documents*" shall mean this Agreement (including each amendment thereto), any Intercreditor Agreement, the Agency Fee Letter, the Security Documents, each Incremental Loan Assumption Agreement, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e), any other document executed in connection with any of the foregoing and each document referred to as a "Loan Document", and, in each case, together with all schedules, exhibits, annexes and other attachments thereto.

"*Loan Parties*" shall mean the Borrower and the Subsidiary Guarantors.

"*Loans*" shall mean the Term Loans.

"*Margin Stock*" shall have the meaning assigned to such term in Regulation U.

"*Material Adverse Effect*" shall mean (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of any Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse change in, or a material adverse effect upon, the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"*Material Indebtedness*" shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of the Borrower or any Subsidiary in an aggregate principal amount exceeding $[19,000,000].16,500,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the Agreement Value of such Hedging Agreement at such time.

"*Material Subsidiary*" shall mean any Subsidiary of the Borrower that, together with its Subsidiaries, (a) generates more than 5% of Consolidated EBITDA on a *pro forma* basis for the four (4) fiscal quarter period most recently ended or (b) has total assets (including Equity Interests in other Subsidiaries and excluding Investments that are eliminated in consolidation) of equal to or greater than

21

DRAFT – SUBJECT TO FURTHER REVISION

5% of the total assets of the Borrower and its Subsidiaries, on a consolidated basis as of the end of the most recent four (4) fiscal quarters; provided, however, that if at any time there are Subsidiaries which are not classified as "Material Subsidiaries" but which collectively (i) generate more than 10% of Consolidated EBITDA on a *pro forma* basis or (ii) have total assets (including Equity Interests in other Subsidiaries and excluding Investments that are eliminated in consolidation) of equal to or greater than 10% of the total assets of the Borrower and its Subsidiaries on a consolidated basis, then the Borrower shall promptly designate one or more of such Subsidiaries as Material Subsidiaries and cause any such Subsidiaries to comply with the provisions of Section 5.12 such that, after such Subsidiaries become Subsidiary Guarantors hereunder, the Subsidiaries that are not Subsidiary Guarantors shall (A) generate less than 10% of Consolidated EBITDA and (B) have total assets of less than 10% of the total assets of the Borrower and its Subsidiaries on a consolidated basis.

"*Maximum Rate*" shall have the meaning assigned to such term in Section 9.09.

"*Medicaid*" shall mean that government-sponsored entitlement program under Title XIX, P.L. 89-97 of the Social Security Act, which provides federal grants to states for medical assistance based on specific eligibility criteria, as set forth on Sections 1396, et seq. of Title 42 of the United States Code.

"*Medicare*" shall mean that government-sponsored insurance program under Title XVIII, P.L. 89-97 of the Social Security Act, which provides for a health insurance system for eligible elderly and disabled individuals, as set forth on Sections 1395, et seq. of Title 42 of the United States Code.

"*Merger Agreement*" shall have the meaning assigned to such term in the recitals.

"*Merger Transactions*" shall have the meaning assigned to such term in the recitals.

"*MHPAEA*" shall have the meaning assigned to such term in Section 5.16(f).

"*Moody's*" shall mean Moody's Investors Service, Inc., or any successor thereto.

"*Mortgaged Properties*" shall mean, on the Closing Date, the owned real properties of the Loan Parties specified on Schedule 1.01(b) (as in effect on the Closing Date), and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.12 or Section 5.17.

"*Mortgages*" shall mean the mortgages, deeds of trust, assignments of leases and rents, modifications and other security documents delivered pursuant to clause (i) of Section 4.02(g), Section 5.12 or Section 5.17, each substantially in the form of Exhibit E (with such changes as are reasonably consented to by the Collateral Agent to account for local law matters) or in such other form as is reasonably satisfactory to the Collateral Agent and the Borrower.

"*Multiemployer Plan*" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower or any of its ERISA Affiliates is contributing or has an obligation to contribute.

"*Net Cash Proceeds*" shall mean (a) with respect to any Asset Sale or any Recovery Event, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable broker's fees or commissions, reasonable legal fees, transfer and similar taxes, reasonable real estate due diligence fees or expenses, and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale), (ii) amounts provided as a reserve, in accordance with GAAP, against any retained liabilities

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

associated with such Asset Sale, including under any indemnification obligations or in respect of any purchase price adjustments (<u>provided</u>, that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (other than ~~(x)~~ any such Indebtedness assumed by the purchaser of such asset other than repayments of revolving debt, except to the extent that the commitments with respect thereto are correspondingly decreased ~~and/or (y) Indebtedness outstanding under the Junior Facility Credit Agreement~~) which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds; <u>provided</u>, that, if (x) the Borrower shall deliver a certificate of a Financial Officer to the Administrative Agent at the time of receipt thereof setting forth the Borrower's intent to reinvest such proceeds in productive assets of a kind then used or usable in the business of the Borrower and its Subsidiaries within 365 days of receipt of such proceeds and (y) no Default or Event of Default shall have occurred and shall be continuing at the time of delivery of such certificate or at the proposed time of the application of such proceeds, such proceeds shall not constitute Net Cash Proceeds except to the extent not so used at the end of such 365-day period, at which time such proceeds shall be deemed to be Net Cash Proceeds; ~~provided, however, that the Borrower shall not be permitted to exercise such reinvestment right with respect to proceeds from (A) any Recovery Event, unless the Administrative Agent receives evidence reasonably satisfactory to it and reasonably in advance of any such reinvestment that (x) such Recovery Event is in respect of a treatment center that has generated positive cash flow for the four consecutive quarter period ending as of the last day of the most recent fiscal quarter for which financial statements have been delivered to Lenders pursuant Section 5.04 and (y) the Borrower uses such proceeds to commence the rebuild, repair or restore such treatment center as soon as practicable after (but, in any event, within 180 days of) receipt of such proceeds and/or (B) any Asset Sale or related Asset Sales that, individually or in the aggregate, generate proceeds in excess of $[_____]~~ and (b) with respect to any issuance or incurrence of Indebtedness, or any issuance of Equity ~~Issuance~~Interests, the cash proceeds thereof, net of all taxes and customary fees (including attorneys' fees, investment banking fees and accountants' fees), underwriting discounts, commissions, costs and other expenses incurred in connection therewith.

"***Non-Defaulting Lender***" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"***Nongovernmental Payors***" shall mean third-party payors (other than government reimbursement programs) that reimburse providers for healthcare goods and services rendered in the Healthcare Service Business, such as private insurers and managed care organizations.

"***Obligations***" shall mean all obligations defined as "Obligations" in the Guarantee and Collateral Agreement and the other Security Documents.

"***Other Taxes***" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21(a)).

"***Other Term Loans***" shall have the meaning assigned to such term in Section 2.23(a).

"***Paid in Kind***", "***Payable in Kind***", and "***Payment in Kind***" (as applicable) means, with respect to the payment of any interest accruing on any principal of any Loan at the PIK Interest Rate, that the Dollar amount of such interest payment shall, as the context may require, be payable or paid "in kind", by capitalizing the amount of such interest payment as of such payment date as additional Loan "principal"

23

DRAFT – SUBJECT TO FURTHER REVISION

deemed incurred as of the date of such payment (and compounding such amount onto, and adding such amount to, the aggregate principal amount of Loans outstanding immediately prior to such payment date) (such interest, paid as set forth herein, "**PIK Interest**"), such that, pro forma for the payment of such PIK Interest on the applicable payment date, the aggregate principal amount of Loans outstanding shall be equal to the sum of (i) the aggregate principal amount of Loans outstanding immediately prior to such payment "in kind" *plus* (ii) the amount of PIK Interest due on such payment date.  PIK Interest shall be Paid in Kind (and a Payment in Kind of PIK Interest shall be deemed to occur) automatically at 12:01 a.m. (New York City time) on the applicable payment date, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment.  For the avoidance of doubt, upon Payment in Kind of PIK Interest in accordance with the foregoing provisions, the amount of all future interest payments and all other amounts required to be calculated on the basis of the outstanding "principal" of Loans, shall, in each case, be calculated on the basis of the then-outstanding principal amount of Loans, taking into account the principal comprising PIK Interest amounts Paid in Kind on each payment date prior to the applicable date of determination.

"***Parent***" means each direct or indirect parent of the Borrower (including Holdings and Ultimate Parent).

"***Participant Register***" shall have the meaning assigned to such term in Section 9.04(f).

"***PBGC***" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor statute.

"***Perfection Certificate***" shall mean (a) on the Closing Date, the perfection certificate, dated as of the Closing Date and duly executed by a Responsible Officer of the Borrower, in form and substance satisfactory to the Administrative Agent and delivered to it pursuant to Section 4.02 and (b) each perfection certificate delivered to the Administrative Agent after the Closing Date, in each case, in form and substance satisfactory to the Administrative Agent, which updates, supplements or otherwise modifies the information set forth on the perfection certificate delivered on the Closing Date or any other perfection certificate previously delivered to the Administrative Agent pursuant to the Loan Documents.

"***Permitted Holder***" means any Person that, on the Closing Date, after giving effect to the Plan of Reorganization, is the beneficial owner, together with any of its Affiliates, of Equity Interests representing 10% or more of the aggregate Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis at such time.***Acquisition***" shall have the meaning assigned to such term in Section 6.04(h).

"***Permitted Holder***" means (a) each Person that, pursuant to the Plan of Reorganization, is entitled to receive on the Plan Effective Date Reorganized AAC Equity Interests (as such term is defined in the Plan of Reorganization) as a distribution under the Plan of Reorganization, so long as the amount of Reorganized AAC Equity Interests "beneficially owned" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) as of the Closing Date by such Person and its Affiliates in the aggregate (after giving effect to the Plan of Reorganization) is not less than 5.0% of the aggregate amount of all Reorganized AAC Equity Interests issued and outstanding as of the Plan Effective Date (each such Person, together with its successors, an "***Initial Equity Investor***") and (b) (i) each Affiliate of an Initial Equity Investor (but excluding such Initial Equity Investor's operating portfolio companies) and without duplication (ii) each Person, all or substantially all of the assets of which are comprised of the Borrower, Holdings or any Parent, and which beneficially owns (directly or indirectly) 100% of the common voting Equity Interests of Holdings and the Borrower on a fully diluted basis at the time of determination; provided, that such Person is at such time Controlled by the Initial Equity Investors.  For

DRAFT—SUBJECT TO FURTHER REVISION

the avoidance of doubt, common voting Equity Interests of Ultimate Parent shall constitute Reorganized AAC Equity Interests referred to herein.

"*Permitted Discretion*" shall mean, with respect to any term or provision of this Agreement or any other Loan Document, that requires or permits the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by any Agent, in each case, whether at the request of any of the Loan Parties or otherwise, as applicable (collectively, an "*Agent Action*"), a determination made in good faith with respect to such Agent Action by the applicable Agent in the exercise of its reasonable business judgment; provided, that, Agent shall be permitted to request that Required Lenders confirm its authority to take and/or consent to it taking such Agent Action by (a) notifying all Lenders via the Platform of the proposed Agent Action and (b) Lenders constituting Required Lenders consenting to such Agent Action in the manner prescribed in the relevant Electronic Communication or as otherwise permitted pursuant to Section 9.08(d).

"*Permitted Investments*" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(b)     Investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's, or in the case of the United States Government, a rating of AA or higher;

(c)     Investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $1,000,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above; and

(e)     Investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in Investments of the type described in clauses (a) through (d) above.

"*Permitted Liens*" shall have the meaning assigned to such term in Section 6.02.

"*Permitted Restricted Payments*" shall mean [_____].

"*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"*Petition Date*" shall have the meaning assigned to such term in the Recitals.

"*PIK Interest*" has the meaning assigned thereto in the definition of Paid In Kind.

25

~~DRAFT – SUBJECT TO FURTHER REVISION~~

"***PIK Interest Rate***" means 8.00% per annum.

"***Plan***" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"***Plan Confirmation Order***" shall mean ~~[~~the "Confirmation Order", as such term is defined in the Plan of Reorganization~~]~~ (as in effect on October 11, 2020).

"***Plan Documents***" shall mean, collectively, the Plan Confirmation Order, the Plan of Reorganization, the Plan ~~Confirmation Order and any other~~Supplement (as defined in the Plan of Reorganization in effect on October 11, 2020), the Restructuring Documents (as defined in the Plan of Reorganization in effect on October 11, 2020), and all orders, documents and agreements (including any amendments and supplements to any of the foregoing) entered into in connection ~~therewith~~with, or relating to, any of the foregoing (but excluding this Agreement and the other Loan Documents).

"***Plan Effective Date***" shall mean ~~[_____~~December [11], 2020 being the "Effective Date" under the Plan of Reorganization.

"***Plan of Reorganization***" shall mean that certain ~~[~~Second Amended Joint Chapter 11 Plan of Reorganization of ~~the Debtors~~AAC Holdings, Inc. and its Debtor Affiliates Docket No. ~~[__], dated [__], 2020~~649, dated October 11, 2020 (including any exhibits, supplements, annexes, appendices and schedules thereto) filed in the Chapter 11 Cases (as ~~altered, amended, modified, or supplemented~~supplemented, amended or otherwise modified from time to time prior to entry of the Plan Confirmation Order ~~(including pursuant to the terms of the Plan Confirmation Order) and including any exhibits, supplements, annexes, appendices and schedules thereto)~~in a manner reasonably acceptable to the Required Lenders), as confirmed by the Plan Confirmation Order pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended.

"***Platform***" shall have the meaning assigned to such term in Section 9.01.

"***Prepetition Lenders***" shall have the meaning assigned to such term in the Recitals.

"***Prepetition Priming Credit Agreement***" shall have the meaning assigned to such term in the Recitals.

"***Prepetition Priming Facility Claims***" shall mean the Priming Facility Claims (as defined in the Plan of Reorganization)~~]~~.

"***Public Lender***" shall have the meaning assigned to such term in Section 9.01.

"***Recovery Event***" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of the Borrower or any Subsidiary.

"***Register***" shall have the meaning assigned to such term in Section 9.04(d).

"***Regulation T***" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

26

DRAFT—SUBJECT TO FURTHER REVISION

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, pumping, leaking, dumping, emptying, escaping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Materials or pollutant or contaminant).

"**Releasing Party**" shall have the meaning given such term in Section 9.24.

"**Removal Effective Date**" shall have the meaning assigned to such term in Article VIII.

"**Required Lenders**" shall mean, at any time, Lenders having Loans and unused Term Loan Commitments representing more than 50% of the sum of all Loans outstanding and unused Term Loan Commitments at such time; provided, that the Loans and unused Term Loan Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

"**Requirement of Law**" shall mean, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its assets or property or to which such Person or any of its assets or property is subject.

"**Responsible Officer**" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**Restricted Indebtedness**" shall mean Indebtedness of the Borrower or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(b).

"**Restricted Payment**" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary.

"**Revolving Credit Facility**" shall have the meaning assigned to such term in Section 6.01(~~u~~r).

"**Ringwood Property**" shall mean 474 Sloatsburg Road, Ringwood, New Jersey, NJ 07456.

27

DRAFT – SUBJECT TO FURTHER REVISION

"*Sale and Leaseback Transaction*" shall have the meaning assigned to such term in Section 6.03.

"*S&P*" shall mean S&P Global Ratings, or any successor thereto.

"*Sanctions*" shall have the meaning assigned to such term in Section 3.24.

"*SEC*" shall mean the Securities and Exchange Commission.

"*Secured Parties*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Securities Account*" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"*Security Documents*" shall mean the Mortgages, the Guarantee and Collateral Agreement and each of the other security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.12 or Section 5.17.

"*Senior Secured Debt*" shall mean, at any time, Total Debt of the Borrower and the Subsidiaries that is secured by a Lien on the property or assets of the Borrower or the Subsidiaries.

"*Senior Secured Leverage Ratio*" shall mean, for any period, the ratio of Senior Secured Debt outstanding as of the last day of such period to Consolidated EBITDA for such period, in each case, calculated on a *pro forma* basis.

"*Solvent*" shall mean, with respect to any Person (a) the fair value and present fair saleable value of the assets of such Person, at a fair valuation, will exceed its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), (b) such Person, on a consolidated basis, has the ability to pay its debts and liabilities, (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business and (c) such Person, on a consolidated basis, does not have an unreasonably small amount of capital with which to conduct its business.

"*SPV*" shall have the meaning assigned to such term in Section 9.04(i).

"*Subordinated Debt*" shall mean all unsecured Indebtedness of the Borrower and its Subsidiaries that (a) is expressly subordinated to the prior payment in full of the Obligations, (b) no part of the principal or interest of which is required to be paid (whether by way of mandatory sinking fund, mandatory redemption or mandatory prepayment or otherwise) earlier than six months after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such unsecured Indebtedness and (c) that is evidenced by an indenture or other agreement reasonably satisfactory to the Administrative Agent in respect of subordination and related matters.

"*subsidiary*" shall mean, with respect to any Person (herein referred to as the "*parent*"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the aggregate equity or more than 50% of the aggregate Voting Equity Interests or more than 50% of the aggregate general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

"***Subsidiary***" shall mean any direct or indirect subsidiary of the Borrower (including any Controlled Physician Affiliate).

"***Subsidiary Guarantor***" shall mean (a) on the Closing Date, each Subsidiary listed on Schedule 1.01(a) and (b) from time to time after the Closing Date, each other Subsidiary that is or becomes a party to the Guarantee and Collateral Agreement.

"***Successor Borrower***" shall have the meaning assigned to such term in Section 6.05(a).

"***Successor Holdings***" shall have the meaning assigned to such term in Section 6.05(a).

"***Synthetic Lease***" shall mean, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"***Synthetic Lease Obligations***" shall mean, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Financing Lease Obligations.

"***Synthetic Purchase Agreement***" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which the Borrower or any Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than the Borrower or any Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; <u>provided</u>, that no phantom stock or other equity-based plan or arrangement providing for payments only to current or former directors, officers or employees of the Borrower or the Subsidiaries (or to their heirs, transferees or estates) shall be deemed to be a Synthetic Purchase Agreement.

"***Taxes***" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, assessments or withholdings of any nature (including interest, penalties, and additions thereto) that are imposed by any Governmental Authority.

"***Term Borrowing***" shall mean a Borrowing comprised of Term Loans.

"***Term Lender***" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"***Term Loan Commitment***" shall mean, with respect to each Lender, the commitment of such Lender to be deemed Term Loans hereunder as set forth on Schedule 2.01.

"***Term Loan Maturity Date***" shall mean June 25, 2025 (or, if such date is not a Business Day, the immediately preceding Business Day).

"***Term Loans***" shall mean the term loans made to the Borrower by each Lender with a Term Loan Commitment pursuant to Section 2.01(a) and shall include, for the avoidance of doubt, all term

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

loans made on the Closing Date.  Unless the context shall otherwise require, the term "Term Loans" shall include any Incremental Term Loans.

"*Test Period*" shall mean the four-quarter period ending as of the last day of the most recently ended fiscal quarter for which financial statements have been or were required to be delivered to Lenders pursuant to Section 5.04. "*Total Debt*" shall mean, at any time, the total Indebtedness (including all paid in-kind interest capitalized pursuant to Section 2.06(d)) of the Borrower and the Subsidiaries at such time (excluding Indebtedness of the type described in clauses (j) and (l) of the definition of such term, except, in the case of clause (l), to the extent of any unreimbursed drawings thereunder).

"*Total Leverage Ratio*" shall mean, on any date of determination, the ratio of Total Debt on such date to Consolidated EBITDA for the period of four consecutive fiscal quarters most recently then ended for which the financial statements and certificates required by Section 5.04(a) or (b), as the case may be, have been or were required to have been delivered.

"*Transaction Costs*" shall mean fees and expenses payable in connection with clause (a) and (c) of the definition of the term "Transactions".

"*Transactions*" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (b) the payment of the Transaction Costs, and (c) all other transactions contemplated by, entered into, consummated in connection with, or relating to, the Plan of Reorganization and/or the Plan Confirmation OrderDocuments (including all mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions or other corporate or other transactions that the Loan Parties or any of their Affiliates determine to be necessary or appropriate to implement the Plan of Reorganization and/ortransactions contemplated pursuant to the Plan Confirmation OrderDocuments).

"*Ultimate Parent*" means AAC Parent Corporation, a Delaware corporation, or any successor thereof.

"*Uniform Commercial Code*" shall mean the Uniform Commercial Code, as in effect in the State of New York from time to time.

"*Uniform Customs*" shall have the meaning assigned to such term in Section 9.07.

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time (including, for the avoidance of doubt, the Beneficial Ownership Regulation).

"*Voting Equity Interests*" of any Person shall mean any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

"*Weighted Average Life to Maturity*" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated

30

DRAFT – SUBJECT TO FURTHER REVISION

to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"*Wholly-Owned Subsidiary*" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly-owned subsidiaries of such Person or by such Person and one or more wholly-owned Subsidiaries of such Person.

"*Winddown Expenses*" shall mean any amounts paid by Borrower or any of its Subsidiaries in connection with the winddown of AAC Holdings Prepetition Borrower and its business pursuant to the terms of the Contribution Agreement and/or the Plan of Reorganization.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Write-Down and Conversion Powers*" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"*Yield Differential*" shall have the meaning assigned to such term in Section 2.23(b).

SECTION 1.02    *Terms Generally*.

The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The word "disposition" shall be construed as a reference to, and shall be deemed to include, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition. Except as otherwise expressly provided in this Agreement, (i) whenever this Agreement refers to a "beneficial owner" or "beneficial ownership" (including each corresponding or related usage of such terms), such terms shall be construed as having the meaning assigned thereto in, and shall be determined in accordance with, Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934 and (ii) whenever this Agreement refers to beneficial ownership of (or requires determination of whether a Person is the beneficial owner of) a certain amount or percentage of Equity Interests in any other Person, such beneficial ownership shall be determined on the basis of the corresponding amount or percentage (as applicable) of the voting and economic power of Equity Interests in such other Person entitled to vote for members of the board of directors or equivalent governing body of such Person at such time, on a fully-diluted basis. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of this Agreement, and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the date hereof and consistent with financial statements delivered pursuant to Section 3.05(a). If at any time any change in GAAP would

31

DRAFT—SUBJECT TO FURTHER REVISION

affect the computation of any financial ratio or any other covenant or requirements set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio, covenant or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided, that, until so amended, (i) such ratio, covenant or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirements made before and after giving effect to such change in GAAP.

Notwithstanding anything to the contrary, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP as in effect prior to the issuance by the Financial Accounting Standards Board of an Accounting Standards Update on February 25, 2016 (the "ASU") shall continue to be accounted for as operating leases for purposes of all financial definitions (including the definition of Indebtedness) and calculations for purposes of the Loan Documents (whether or not such operating lease obligations were in effect on such date), notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated, or to be recharacterized, as capitalized lease obligations in financial statements.

SECTION 1.03     *Pro Forma Calculations*.

All *pro forma* calculations permitted or required to be made by the Borrower or any Subsidiary pursuant to this Agreement shall include only those adjustments that (a) are permitted or required by Regulation S-X under the Securities Act of 1933, as amended, (b) (i) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon assumptions that were believed to be reasonable at the time such assumptions were made and (ii) are based on reasonably detailed written assumptions reasonably acceptable to the Administrative Agent, or (c) are required by the definition of "Consolidated EBITDA."

SECTION 1.04     *Classification of Loans and Borrowings*.

For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.*, an "Initial Term Loan" or an "Incremental Term Loan").

SECTION 1.05     *Designation as Senior Debt*.

The Loans and other Obligations are hereby designated as "Senior Debt" and "Designated Senior Debt," as applicable, for all purposes under the indenture or other agreement governing any Subordinated Debt.

ARTICLE II

*The Credits*

SECTION 2.01     *Commitments*.

(a)     On the Closing Date, subject to Sections 4.01 and 4.02 and pursuant to the Plan of ReorganizationDocuments, each Term Lender shall be deemed to have extended to the Borrower, without any funding or other action on the part of such Term Lender, term loans (the "Term Loans") in the aggregate principal amount equal to such Term Lender's Term Commitment and, immediately upon

32

DRAFT—SUBJECT TO FURTHER REVISION

the incurrence by the Borrower thereof, the amount of each Term Lender's (or its Affiliate's) Prepetition Priming Facility Claims and/or DIP ~~Facility~~Lender Claims (as applicable with respect to such Term Lender) outstanding on the Closing Date (calculated immediately prior to giving effect to the deemed extension of the Term Loans) equal to the aggregate principal amount of Term Loans made by such Term Lender shall be deemed automatically, fully and finally satisfied, released and discharged and converted into Term Loans outstanding as of the Closing Date.

(b)      Each Lender having an Incremental Term Loan Commitment, severally and not jointly, hereby agrees, subject to the terms and conditions and relying upon the representations and warranties set forth herein and in the applicable Incremental Loan Assumption Agreement, to make Incremental Term Loans to the Borrower, in an aggregate principal amount not to exceed its Incremental Term Loan Commitment.  Amounts paid or prepaid in respect of Incremental Term Loans may not be reborrowed.

SECTION 2.02      *Loans*.

(a)      Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; provided, however, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  ~~The Loans comprising any Borrowing shall be in an aggregate principal amount that is equal to the remaining available balance of the applicable Commitments.~~ On the Closing Date (after giving effect to the incurrence of Term Loans on such date), the Initial Term Loan Commitments of each Lender shall automatically be reduced to zero and terminate in full.

(b)      [Reserved].

(c)      Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 2:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders; provided, however, that the Term Loans deemed to be extended on the Closing Date pursuant to Section 2.01 shall not require any cash funding by the Lenders and shall be deemed incurred by the Borrower on the Closing Date in accordance with Section 2.01(a).

(d)      Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

SECTION 2.03    *[Reserved]*.

SECTION 2.04    ***Evidence of Debt; Repayment of Loans***.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Term Loan of such Lender as provided in Section 2.11.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made or deemed made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Subsidiary Guarantor and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.  In the event of any conflict between the accounts of each Lender maintained pursuant to paragraph (b) and the accounts of the Administrative Agent maintained pursuant to paragraph (c), the accounts maintained by the Administrative Agent shall control absent manifest error.

(e)    Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to the Administrative Agent and the Borrower. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05    ***Fees***.

(a)    [Reserved].

(b)    The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative fees set forth in the Agency Fee Letter in immediately available funds at the times and in the amounts specified therein (the "***Administrative Agent Fees***").  Once paid, none of the Administrative Agent Fees shall be refundable under any circumstances absent manifest error in the calculation of such Administrative Agent Fees.

SECTION 2.06    ***Interest on Loans***.

34

DRAFT – SUBJECT TO FURTHER REVISION

(a)	Subject to the provisions of Section 2.07, the Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Applicable Margin; provided, that, the portion of each interest payment that is calculated by reference to (i) the Cash Interest Rate shall be paid in cash and (ii) the PIK Interest Rate shall be Paid in Kind.

(b)	[Reserved].

(c)	Subject to the provisions of Section 2.07, interest on each Loan shall be payable on each Interest Payment Date.

SECTION 2.07	*Default Interest*.

If (i) the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other Loan Document, by acceleration or otherwise or (ii) if any Event of Default has occurred and is continuing, then, in the case of clause (i) above, until such defaulted amount shall have been paid in full or, in the case of clause (ii) above, from the date such Event of Default and for so long as such Event of Default is continuing, to the extent permitted by law, all amounts outstanding under this Agreement and the other Loan Documents shall bear interest (after as well as before judgment), payable on demand, at the Applicable Margin plus 2.00% per annum (computed on the basis of the actual number of days elapsed over a year of 360 days).  All interest accruing pursuant to this Section 2.07 shall be payable on demand and in cash.

SECTION 2.08	*[Reserved]*.

SECTION 2.09	*Termination and Reduction of Commitments*.

(a)	The Term Loan Commitments (other than any Incremental Term Loan Commitments, which shall terminate as provided in the related Incremental Loan Assumption Agreement) shall automatically terminate upon the making of the Term Loans on the Closing Date.

(b)	Upon at least three Business Days' prior irrevocable (subject to the following provisos below) written, fax or email notice to the Administrative Agent, the Borrower may at any time after the Closing Date in whole permanently terminate, or from time to time in part permanently reduce, the Term Loan Commitments; provided, that if such notice is for the termination of all of the then outstanding Term Loan Commitments, then the Borrower may revoke such notice and/or extend the termination date by not more than five Business Days' written notice; provided, further, that a notice of voluntary termination or reduction hereunder may state that such notice is conditional upon the consummation of a certain transaction, the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness, in which case such notice of termination or reduction, as the case may be, may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to 1:00 p.m., New York City time, on the specified date of termination or reduction) if such condition is not satisfied; provided, however, that each partial reduction of the Term Loan Commitments shall be in an integral multiple of $1,000,000 and in a minimum amount of $5,000,000 (but only to the extent that Term Loan Commitments greater than such amounts are outstanding).

(c)	Each reduction in the Term Loan Commitments hereunder shall be made ratably among the applicable Lenders in accordance with their respective applicable Commitments.

SECTION 2.10	*[Reserved]*.

SECTION 2.11	*Repayment of Term Borrowings*.

35

DRAFT – SUBJECT TO FURTHER REVISION

(a)      [Reserved].

(b)      [Reserved].

(c)      To the extent not previously paid, all Term Loans shall be due and payable on the Term Loan Maturity Date, as the case may be, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(d)      All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

SECTION 2.12      *Voluntary Prepayments*.

(a)      The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written, fax or other electronically transmitted notice (or telephone notice promptly confirmed by written, fax or other electronically transmitted notice) before 1:00 p.m., New York City time to the Administrative Agent; provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000.

(b)      Voluntary prepayments of outstanding Term Loans under this Agreement shall be allocated pro rata between the Term Loans and pro rata among the Class of Term Loans.

(c)      [Reserved].

(d)      [Reserved].

(e)      Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable (subject to the following provisos below) and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; provided, that if such prepayment is for all of the then outstanding Loans, then the Borrower may revoke such notice and/or extend the prepayment date by not more than one Business Day; provided, further, that a notice of voluntary prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness, in which case such notice of prepayment may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to 1:00 p.m., New York City time, on the specified date of prepayment) if such condition is not satisfied; provided, however, that the provisions of Section 2.16 shall apply with respect to any such revocation or extension.  All prepayments under this Section 2.12 shall be subject to Section 2.16 but otherwise without premium or penalty.  All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13      *Mandatory Prepayments*.

(a)      [Reserved].

(b)      Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Asset Sale (including any Sale and Leaseback Transaction permitted pursuant to Section 6.03) or any Recovery Event, the Borrower shall apply 100% of the Net Cash Proceeds received therefrom to prepay outstanding Loans and other Obligations in accordance with Section 2.13(f).

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

(c)    [Reserved].

(d)    In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance of Disqualified Stock or incurrence of Indebtedness for money borrowed of any Loan Party or any subsidiary of a Loan Party (other than any cash proceeds from the issuance of Indebtedness for money borrowed permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans and other Obligations in accordance with Section 2.13(f).

(e)    [So long as the Senior Secured Leverage Ratio for the most recently ended Test Period is greater than [3.00:1.00], in the event and on each occasion that an Equity Issuance occurs, the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the occurrence of such Equity Issuance, apply 100% (or such lesser percentage required for the Senior Secured Leverage Ratio to be not greater than 3.00:1.00) of the Net Cash Proceeds therefrom to prepay outstanding Term Loans and other Obligations in accordance with Section 2.13(f).][8reserved].

(f)    Mandatory prepayments of outstanding Term Loans under this Agreement shall be allocated pro rata among the Term Loans.Prepayments pursuant to this Section 2.13 shall be made in accordance with Section 2.17 and Section 2.19.  Any Lender may elect, by notice to the Administrative Agent at or prior to the time and in the manner specified by the Administrative Agent, prior to any mandatory prepayment of the Term Loans required to be made by the Borrower pursuant to Section 2.13(b), to decline all (but not a portion) of its pro rata share of such mandatory prepayment (such declined amounts, the "*Declined Proceeds*").  Provided that no Default or Event of Default then exists, any Declined Proceeds may be retained by the Borrower or applied at the Borrower's discretion as otherwise permitted by Section 2.12(b).  Notwithstanding the foregoing, the Administrative Agent shall have no duty or obligation to (a) return to Borrower any Declined Proceeds that have been received from Borrower if either (i) the Administrative Agent has received notice from the Borrower or any Lender that a Default or Event of Default exists, or (ii) the Administrative Agent has already transferred such proceeds to a Declining Lender, unless such Declining Lender subsequently returns such proceeds to the Administrative Agent and in connection therewith has directed that the Administrative Agent return such proceeds to Borrower, in which case, Administrative Agent will promptly return such proceeds to Borrower to the extent received back from such Declining Lender, subject to immediately preceding clause (i), or (b) as a result of any Declining Lender declining to receive such Declined Proceeds, to reallocate among Lenders or to return to Borrower, the proceeds of any mandatory prepayments of the Term Loans made by the Borrower pursuant to Section 2.13(b) to the extent such proceeds have already been received by the Administrative Agent and distributed to the Lenders.

(g)    The Borrower shall deliver to the Administrative Agent, in connection with each prepayment required under this Section 2.13, (i) at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) at least three Business Days prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments of Borrowings under this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

---

[8 NTD:  Lenders/Stroock to discuss.

37

DRAFT—SUBJECT TO FURTHER REVISION

SECTION 2.14    *Reserve Requirements; Change in Circumstances*.

(a)    Notwithstanding any other provision of this Agreement, if any Change in Law shall: (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender, (ii) subject any Agent or Lender to any Taxes (other than Indemnified Taxes, Excluded Taxes and Other Taxes) on its Loans, loan principal, Commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (iii) impose on such Lender or the London interbank market any other condition affecting this Agreement, and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrower will pay to such Lender upon demand such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company and the calculation thereof in reasonable detail, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)    Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be under any obligation to compensate any Lender under paragraph (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 120 days prior to such request if such Lender knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; provided further that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 120-day period. The protection of this Section 2.14 shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.15    *[Reserved]*.

SECTION 2.16    *Breakage*.

The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of any default in the making of any payment or prepayment required to be made hereunder.  A certificate of any Lender setting forth in reasonable detail the calculations of any

38

DRAFT – SUBJECT TO FURTHER REVISION

amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17    *Pro Rata Treatment*.

Except ~~as required under Section 2.15~~in connection with any assignment of Loans in accordance with Section 9.04 and any payments relating thereto, and subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each reduction of the Term Loan Commitments shall be allocated pro rata among the applicable Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans).  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.18    *Sharing of Setoffs*.

Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided, however, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.18 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any of its Affiliates (other than pursuant to Section 9.04(l)), as to which the provisions of this Section 2.18 shall apply.  The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19    *Payments*.

(a)    The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees, premium or other amounts) hereunder and under any other Loan Document in

39

DRAFT – SUBJECT TO FURTHER REVISION

cash not later than 1:00 p.m., New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. All payments received by the Administrative Agent after 1:00 p.m., New York City time, shall be deemed received on the next succeeding Business Day (in the Administrative Agent's sole discretion) and any applicable interest, premium or fee shall continue to accrue.  Each such payment shall be made to the ~~Administrative Agent at its offices at Eleven Madison Avenue, New York, NY 10010.~~account of the Administrative Agent for which the wire instructions are set forth below (or to such other account in accordance with such other wire instructions as the Administrative Agent may designate after the Closing Date) (the "*Administrative Agent Account*").  The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

The wire instructions referred to in this clause (a) are as follows:

USD Remittance Instructions –
Texas Capital Bank, N. A
2350 Lakeside Blvd, Suite 800
Richardson, TX 75082
Account Name: Ankura Trust Company, LLC
ABA 111017979
Account number: 1511022764
Ref: American Addiction EXIT

(b)	Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

(c)	Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower does not in fact make such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, and to pay interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at a rate reasonably determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).

(d)	If an Event of Default shall have occurred and be continuing and shall not otherwise have been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 7.01, all payments or proceeds received by the Administrative Agent and the Collateral Agent hereunder in respect of any of the Obligations shall be applied in accordance with the application of proceeds described in Section 6.05 of the Guarantee and Collateral Agreement.  Subject to the foregoing and Section 6.05 of the Guarantee and Collateral Agreement, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premium, Fees and all other amounts then due hereunder, such funds shall be applied by the Administrative Agent (i) first, to pay interest, Fees and other amounts then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, Fees and other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

40

DRAFT – SUBJECT TO FURTHER REVISION

SECTION 2.20     *Taxes*.

(a)     Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without withholding or deduction for any Taxes unless required under applicable law; <u>provided</u>, that, if the Borrower or any other Loan Party shall be required under applicable law to withhold or deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required withholding or deductions of Indemnified Taxes or Other Taxes (including withholding or deductions applicable to additional sums payable under this Section 2.20) the Administrative Agent and each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the Borrower or such Loan Party shall make such deductions and (iii) the Borrower or such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) and any penalties, interest and reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on behalf of itself or a Lender, shall be conclusive as to such amount absent manifest error.

(d)     As soon as practicable after any payment of Taxes by the Borrower or any other Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Each Foreign Lender shall furnish to the Borrower and the Administrative Agent, as applicable, two accurate and complete copies of (i) U.S. Internal Revenue Service Form W-8BEN or W-8BEN-E (or successor form) certifying exemption from or in reduction in the rate of U.S. federal withholding tax under an applicable treaty to which the United States is a party, (ii) U.S. Internal Revenue Service Form W-8ECI (or successor form) certifying that the income receivable pursuant to the Loan Documents is effectively connected with the conduct of a trade or business in the United States, (iii) U.S. Internal Revenue Service Form W-8IMY (or successor form), together with required attachments, certifying exemption from or reduction in the rate of U.S. federal withholding tax, (iv) in the case of a Foreign Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," U.S. Internal Revenue Service Form W-8BEN or W-8BEN-E (or successor form) together with a statement that (A) such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with a U.S. trade or business conducted by such Foreign Lender or

41

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

(v) forms other than those described in clauses (i) through (iv) as may be prescribed by applicable Laws as a basis for claiming exemption from or a reduction in U.S. federal withholding tax together with such supplementary documentation as may be necessary to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement.  In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form (or any other form of certification adopted by the U.S. taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(f)        Each Lender that is not a Foreign Lender shall furnish to the Borrower and the Administrative Agent two accurate and complete copies of U.S. Internal Revenue Service Form W-9 (or successor form) establishing that the Lender is not subject to U.S. backup withholding tax.

(g)        If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund or credit in lieu of a refund in respect of any Taxes as to which it has been indemnified under this Section 2.20 or with respect to which any sum payable hereunder has been increased and paid by the Borrower under this Section 2.20, it shall pay to the Borrower an amount equal to such refund or credit in lieu of a refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.20 with respect to the Taxes giving rise to such refund or credit in lieu of a refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to promptly repay the amount paid over to the Borrower to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or such Lender be required to pay any amount to the Borrower pursuant to this paragraph (g) the payment which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to the Borrower or any other Person.

(h)        The Administrative Agent and each Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

SECTION 2.21    *Assignment   of   Commitments   under   Certain Circumstances; Duty to Mitigate*.

(a)        In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, (iv) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders and such amendment, waiver or other modification is consented to by the Required Lenders or (v) any Lender is a Defaulting Lender, then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(bl)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement (or, in the case of clause (iv) above, all of its interests, rights and obligation with respect to the Class of Loans or Commitments that is the subject of the related consent, amendment, waiver or other modification) to an Eligible Assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Documents (which assignee may be another Lender, if a Lender accepts such assignment); provided, that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Administrative Agent, which consents shall not unreasonably be withheld, conditioned or delayed, and (z) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender plus all Fees and other amounts accrued for the account of or due to such Lender with respect thereto (including any amounts under Sections 2.14 and 2.16); provided further that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14, notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification or shall cease to be a Defaulting Lender, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(a).

(b)      If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable documented out-of-pocket costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

43

DRAFT – SUBJECT TO FURTHER REVISION

SECTION 2.22    *[Reserved]*.

SECTION 2.23    *Incremental Loans*.

(a)    The Borrower may, by written notice to the Administrative Agent from time to time, request prior to the Term Loan Maturity Date, the establishment of Incremental Term Loan Commitments in an aggregate amount not to exceed the Incremental Term Loan Amount from one or more Incremental Term Lenders, all of which must be Eligible Assignees.  Such notice shall set forth (A) the amount of Incremental Term Loan Commitments being requested (which shall be in minimum increments of $500,000 and a minimum amount of $1,000,000 or such lesser amount equal to the remaining Incremental Term Loan Amount), (B) the date on which such Incremental Term Loan Commitments are requested to become effective and (C) in the case of Incremental Term Loan Commitments, whether such Incremental Term Loan Commitments are commitments to make additional Term Loans having the same terms as the Term Loans on the Closing Date or commitments to make term loans with terms different from the Term Loans on the Closing Date (the "*Other Term Loans*").

(b)    The Borrower may seek Incremental Term Loan Commitments from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and, subject to the ~~Administrative Agent~~Required Lender's consent (not to be unreasonably withheld, conditioned or delayed), additional banks, financial institutions and other institutional lenders who will become Incremental Term Lenders in connection therewith.  The Borrower and each Incremental Term Lender shall execute and deliver to the Administrative Agent an Incremental Loan Assumption Agreement and such other documentation as the Administrative Agent shall reasonably specify to evidence the Incremental Term Loan Commitment of such Person.  The terms and provisions of the Incremental Term Loans shall be identical to those of the Term Loans made pursuant to clause (i) of Section 2.01(a), except as otherwise set forth herein or in the Incremental Loan Assumption Agreement, and any such terms not consistent with those of such Term Loans shall be reasonably satisfactory to the ~~Administrative Agent~~Required Lenders.  Without the prior written consent of the Required Lenders, (i) the final maturity date of any Other Term Loans shall be no earlier than the Term Loan Maturity Date, and (ii) the Weighted Average Life to Maturity of the Other Term Loans shall be no shorter than the Weighted Average Life to Maturity of the Term Loans made pursuant to clause (i) of Section 2.01(a) ~~and (iii) if the initial yield on such Other Term Loans (as determined by the Administrative Agent; provided, that if such Other Term Loans are initially made at a discount, or the Lenders making the same receive a fee directly or indirectly from the Borrower or any Subsidiary for doing so (the amount of such discount or fee, expressed as a percentage of the Other Term Loans, being referred to herein as "Discount"), the amount of such Discount divided by the lesser of (A) the Weighted Average Life to Maturity of such Other Term Loans and (B) four shall be added to the amount of such initial yield) exceeds the sum of the highest Applicable Margin then in effect for outstanding Loans made pursuant to clause (i) of Section 2.01(a) by more than 50 basis points (the amount of such excess above 50 basis points being referred to herein as the "Yield Differential"), then the Applicable Margin then in effect for Term Loans shall automatically be increased by the Yield Differential, effective upon the making of the Other Term Loans.[9]~~.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Loan Assumption Agreement.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Loan Assumption Agreement, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Incremental Term Loan Commitment and the Incremental Term Loans evidenced thereby, and the Administrative Agent and the Borrower may revise this Agreement to evidence such amendments.

---

[9] ~~NTD: Allocation of Yield Differential increases between Cash and PIK Interest Rates to be discussed.~~

~~ACTIVE 52782809v1~~1" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

(c)       Notwithstanding the foregoing, no Incremental Term Loan Commitment shall become effective under this Section 2.23 unless (i) on the date of such effectiveness the conditions set forth in paragraphs (b) and (c) of Section 4.01 shall be satisfied shall be required to be satisfied and (y) at the time of and immediately after such effectiveness, no Default or Event of Default under Section 7.01(b), (c), (g) or (h) shall have occurred and be continuing) and the Administrative Agent shall have received a certificate to that effect dated as of such date and executed by a Financial Officer of the Borrower, (ii) the Incremental Term Loans shall rank *pari passu* in right of payment and be equal with respect to security under the Loan Documents and none of the obligors or guarantors with respect thereto shall be a Person that is not a Loan Party, (iii) all fees and expenses owing in respect of such Incremental Term Loan Commitments to the Administrative Agent and the Lenders shall have been paid and (iv) except as otherwise specified in the applicable Incremental Loan Assumption Agreement, the Administrative Agent shall have received (with sufficient copies for each Incremental Term Lender) legal opinions, board resolutions and other closing certificates reasonably requested by the Administrative Agent and consistent with those delivered on the Closing Date under Section 4.02, including, without limitation, amendments to the Mortgages, datedown endorsements to the title policies, flood zone determinations and the other deliverables, pursuant to Section 4.02(g).

(d)       Each of the parties hereto hereby agrees that the Administrative Agent may, in consultation with the Borrower, take any and all action as may be reasonably necessary to ensure that all Incremental Term Loans (other than Other Term Loans), when originally made, are included in each Borrowing of outstanding Term Loans on a pro rata basis.]10

SECTION 2.24       *Defaulting Lenders*.

(a)       Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)       Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)       Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.06 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, [reserved]; *third*, [reserved]; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a ~~deposit account~~Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its

---

10 NTD: Mechanics to be discussed.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.24(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.25     ***Amend and Extend Transactions***.

(a)     The Borrower may, by written notice to the Administrative Agent and the Lenders from time to time, request an extension (each, an "***Extension***") of the Term Loan Maturity Date of any Class of Loans and Commitments to the extended maturity date specified in such notice.  Such notice shall (i) set forth the amount of the applicable Class of Term Loans to be extended (which shall be in minimum increments of $1,000,000 and a minimum amount of $5,000,000), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten (10) Business Days nor more than sixty (60) days after the date of such notice of requested Extension (or such longer or shorter periods as the Administrative Agent and the Required Lenders shall agree)) and (iii) identify the relevant Class of Term Loans to which such Extension relates.  Each Lender of the applicable Class shall be offered (an "***Extension Offer***") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Required Lenders.  If the aggregate principal amount of Term Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans requested to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans of Lenders of the applicable Class shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accented such Extension Offer.

(b)     It shall be a condition precedent to the effectiveness of any Extension that (i) no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension, (ii) the representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Extension,  unless otherwise agreed among the Borrower, the Administrative Agent and each

46

DRAFT—SUBJECT TO FURTHER REVISION

applicable extending Lender, (iii) [reserved] and (iv) the terms of such Extended Term Loans shall comply with Section 2.25(c).

(c)     The terms of each Extension shall be determined by the Borrower and the applicable extending Lender and set forth in an amendment to this Agreement (which may, at the option of the Administrative Agent or the Required Lenders, be in the form of an amendment and restatement of this Agreement) providing for Extended Term Loans pursuant to this Section 2.25; provided, that (i) the final maturity date of any Extended Term Loan shall be no earlier than the Term Loan Maturity Date, (ii) (A) there shall be no scheduled amortization of Extended Term Loans and (B) the average life to maturity of the Extended Term Loans shall be no shorter than the remaining average life to maturity of the existing Term Loans, (iii) the Extended Term Loans will rank *pari passu* (or junior) in right of payment and with respect to security with the existing the Term Loans and the borrower and guarantors of the Extended Term Loans shall be the same as the Borrower and Subsidiary Guarantors with respect to the existing Term Loans, (iv) the interest rate margin, rate floors, fees, original issue discounts and premiums applicable to any Extended Term Loan shall be determined by the Borrower and the applicable extending Lender and (v) to the extent the terms of the Extended Term Loans are inconsistent with the terms set forth herein (except as set forth in clause (i) through (iv) above), such terms shall be reasonably satisfactory to the Administrative Agent and the Required Lenders.

(d)     In connection with any Extension, the Borrower, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an amendment to this Agreement (which may, at the option of the Administrative Agent or the Required Lenders, be in the form of an amendment and restatement of this Agreement) providing for Extended Term Loans pursuant to this Section 2.25 and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension, including, without limitation, amendments to the Mortgages, datedown endorsements to the title policies, flood zone determinations and the other deliverables, pursuant to Section 4.02(g). The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension. Any amendment to this Agreement (which may, at the option of the Administrative Agent or the Required Lenders, be in the form of an amendment and restatement of this Agreement) providing for Extended Term Loans pursuant to this Section 2.25 may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to implement the terms of any such Extension Offer, including any amendments necessary to establish Extended Term Loans as a new Class or tranche of Term Loans and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches) on terms consistent with this Section 2.25).

ARTICLE III

*Representations and Warranties*

The Borrower represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

SECTION 3.01     *Organization; Powers*.

The Borrower and each of its Material Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to

47

DRAFT—SUBJECT TO FURTHER REVISION

be conducted, except to the extent that the failure to possess such power and authority could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify or be in good standing could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, and (d) has, upon the entry of the Plan Confirmation Order, the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

SECTION 3.02    *Authorization; No Default*.

The Transactions (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of (x) any material law, statute, rule or regulation, or (y) the certificate or articles of incorporation or other constitutive documents or by-laws of the Borrower or any Subsidiary, (B) any material order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound (in each case which is material to the conduct of their business), (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument, in the case of this clause (ii) as could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect or (iii) result in the creation or imposition of any Lien upon or with respect to any material property or assets now owned or hereafter acquired, created, developed or invented by the Borrower or any Subsidiary (other than any Lien created hereunder or under the Security Documents and/or Liens permitted pursuant to Section 6.02(u)).

SECTION 3.03    *Enforceability*.

Subject to the entry of the Plan Confirmation Order, this Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

SECTION 3.04    *Approvals and Consents*.

Other than the Plan Confirmation Order and the Plan of Reorganization, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority or Person is or will be required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and the United States Copyright Office, (b) recordation of the Mortgages and (c) such as have been made or obtained and are in full force and effect.

SECTION 3.05    *Financial Statements*.

The Borrower has heretofore furnished to the Lenders ~~its~~the consolidated balance sheets of AAC Holdings Prepetition Borrower and related statements of income, stockholder's equity and cash flows (i) as of and for the fiscal year ended December 31, ~~2019, audited by and accompanied by the opinion of [BDO USA, LLP]; December 31, 2019, audited by and accompanied by the opinion of [BDO USA,~~

48

DRAFT—SUBJECT TO FURTHER REVISION

LLP]2019; and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2020, June 30, 2020 and September 30, 2020.  Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of theAAC Holdings Prepetition Borrower and its consolidated Subsidiaries as of such dates and for such periods, without giving effect to the Merger Transactions or the Plan Effective Date.  Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of theAAC Holdings Prepetition Borrower and its consolidated Subsidiaries as of the dates thereof, in accordance with GAAP applied on a consistent basis, in all material respects.  Such financial statements were prepared in accordance with GAAP applied on a consistent basis, in all material respects, subject, in the case of unaudited financial statements, to year-end audit adjustments and the absence of footnotes; provided, that such financial statements do not include footnotes or year-end audit adjustments and have been prepared on the basis that AAC Holdings Prepetition Borrower and its Subsidiaries are a going concern, and, accordingly no account balances shall have been adjusted to indicate AAC Holdings Prepetition Borrower and its Subsidiaries are not a going concern.

SECTION 3.06      *No Material Adverse Effect*.

Since the entry of the Plan Confirmation Order, except as disclosed in the periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC prior to the Closing Date, there has been no event or circumstance that has had or could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.07      *Title to Properties; Possession Under Leases*.

(a)      Each of the Borrower and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its tangible properties and assets (including all Mortgaged Property), except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title or interest could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. All such material tangible properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b)      Each of the Borrower and the Subsidiaries has complied with all obligations under all leases to which it is a party and all such leases are in full force and effect and except where the failure of such compliance or leases to be in full force and effect could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  As of the Closing Date, each of the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all material leases.

(c)      As of the Closing Date, the Borrower has not received any notice of, nor has any knowledge of, any pending or contemplated material condemnation proceeding affecting the Mortgaged Properties  or any sale or disposition thereof in lieu of condemnation.

(d)      As of the Closing Date, none of the Borrower or any of the Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein.

SECTION 3.08      *Subsidiaries*.

Schedule 3.08 sets forth as of the Closing Date a list of all Subsidiaries and the percentage ownership interest of the Borrower therein. The shares of capital stock or other ownership interests so indicated on Schedule 3.08 are fully paid and non-assessable (to the extent such concepts are applicable

49

DRAFT – SUBJECT TO FURTHER REVISION

to the capital stock of Subsidiaries that are corporations) and are owned by the Borrower, directly or indirectly, free and clear of all Liens (other than Liens created under the Security Documents).

SECTION 3.09    *Litigation; Compliance with Laws*.

(a)    Except as disclosed in the periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC prior to the Closing Date, there are no actions, suits, investigations or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any Subsidiary or any business, property or rights of any such Person (i) that involve any Loan Document or the Transactions or (ii) as to which there is a reasonable possibility of a determination that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(b)    The Borrower and its Subsidiaries are in full compliance with the terms of the Permanent Injunction and Final Judgment, entered into on October 21, 2016, by and among the American Addiction Centers, Inc. (formerly known as Forterus, Inc.), Forterus Health Care Services, Inc., ABTTC and the Bureau of Medi-Cal Fraud and Elder Abuse.

(c)    None of the Borrower or any of the Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their respective properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  Nothing in the foregoing is to be construed as a representation or warranty with respect to Intellectual Property or noninfringement, which is the subject matter of Section 3.27.

(d)    Certificates of occupancy and material permits are in effect for each Mortgaged Property as currently constructed.

(e)    Each of the Borrower and the Subsidiaries has all permits, licenses, authorizations and all legally required accreditations (including, for the avoidance of doubt, all material Healthcare Authorizations) for the operation of its business, except where the failure to have any such licenses, authorizations or accreditations, could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.10    *Agreements*.

None of the Borrower or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.11    *Federal Reserve Regulations*.

(a)    None of the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

(b)    No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.12    *Investment Company Act*.

None of the Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.13    *Use of Proceeds*.

The Borrower will use the proceeds of the Loans deemed made on the Closing Date to satisfy certain Prepetition Priming Facility Claims and DIP ~~Facility~~Lender Claims in accordance with the Plan of Reorganization.

SECTION 3.14    *Tax Returns*.

Each of the Borrower and the Subsidiaries has timely filed (or caused to be filed), or has timely requested an extension to file or has received an approved extension to file, all federal income and all other Tax returns or materials required to have been filed by it and has paid or caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP and except any such filings or taxes, fees or charges, the failure of which to make or pay, could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.15    *No Material Misstatements*.

Any information, report, financial statement, exhibit or schedule furnished by or on behalf of the Borrower to the Administrative Agent or any Lender, taken as a whole, in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto is complete and correct in all material respects and does not, as of the date on which such information, report, financial statement, exhibit or schedule was furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such information, report, financial statement, exhibit or schedule was made; provided, that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast, projection or other forward-looking information, such forecast, projection or other forward-looking information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender have been prepared in good faith based upon assumptions that Borrower believed to be reasonable at the time made and at the time made available to the Administrative Agent or any Lender; it being understood and agreed that projections are not a guarantee of financial performance and actual results may differ from projections and such differences may be material.

SECTION 3.16    *Employee Benefit Plans*.

With respect to each Plan, the Borrower is in compliance in all respects with the applicable provisions of ERISA and the Code and the regulations thereunder, except where such non-compliance could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect to the Borrower.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in, individually or in

51

DRAFT—SUBJECT TO FURTHER REVISION

the aggregate, a Material Adverse Effect to the Borrower or any of its ERISA Affiliates. The present value of all benefit liabilities under each Plan (based on the assumptions used for purposes of Financial Accounting Standards Board Accounting Standards Codification 715) did not, as of the last annual valuation date applicable thereto, exceed the fair market value of the assets of such Plan in such amount that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, and the present value of all benefit liabilities of all underfunded Plans (based on the assumptions used for purposes of Financial Accounting Standards Board Accounting Standards Codification 715) did not, as of the last annual valuation dates applicable thereto, exceed the fair market value of the assets of all such underfunded Plans that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  As of the most recent valuation date for each Multiemployer Plan, the potential Withdrawal Liability of the Borrower and its ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan is zero.

SECTION 3.17     *Environmental Matters*.

Except with respect to any matters that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, none of the Borrower or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) to the knowledge of the Borrower, has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability, (iv) knows of any basis for any Environmental Liability or (v) has Released any Hazardous Materials or owned or operated any real property on which any Hazardous Materials are present, which, in either case, would reasonably be expected to require any investigation or remedial action by Borrower or of the Subsidiaries pursuant to any Environmental Law.

SECTION 3.18     *Insurance*.

The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies of similar size engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates.  The general liability, casualty, property, terrorism and business interruption insurance coverage of the Loan Parties as in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on Schedule 3.18 and such insurance coverage complies with the requirements set forth in this Agreement and the other Loan Documents.

SECTION 3.19     *Security Documents*.

(a)     Except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, (i) the Guarantee and Collateral Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in the Guarantee and Collateral Agreement) and the proceeds thereof and (ii) when the Pledged Collateral (as defined in the Guarantee and Collateral Agreement) is delivered to the Collateral Agent, the Lien created under the Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Pledged Collateral, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)) and (iii) when financing statements in appropriate form are filed in the appropriate offices, the Lien created under the Guarantee and Collateral Agreement will constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

Loan Parties in such Collateral in which a security interest may be perfected by filing (other than in respect of the Intellectual Property as set forth in clause (b) below), in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)).

(b)      Upon the recordation of the Guarantee and Collateral Agreement (or a short-form security agreement in form and substance reasonably satisfactory to the Borrower and the Collateral Agent) with the United States Patent and Trademark Office and the United States Copyright Office, together with the financing statements in appropriate form filed in the appropriate offices, the Lien created under the Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in the registered Intellectual Property (as defined in the Guarantee and Collateral Agreement) in which a security interest may be perfected by filing in the United States and its territories and possessions, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)) (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the Loan Parties after the date hereof).

(c)      Except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, the Mortgages, if any, when delivered, are effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when the Mortgages are filed in the appropriate offices, the Mortgages shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (other than Permitted Liens described in Section 6.02(u)).

SECTION 3.20      *Location of Real Property and Leased Premises*.

(a)      Schedule 3.20(a) lists completely and correctly as of the Closing Date all real property owned by the Borrower and the Subsidiaries and the addresses thereof.  The Borrower and the Subsidiaries own in fee all the real property set forth on Schedule 3.20(a).

(b)      Schedule 3.20(b) lists completely and correctly as of the Closing Date all real property leased by the Borrower and the Subsidiaries where any tangible personal property having a value in excess of $2,000,000 is located and the addresses thereof.  The Borrower and the Subsidiaries have valid leases in all the real property set forth on Schedule 3.20(b).

SECTION 3.21      *Labor Matters*.

As of the Closing Date, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened in writing. Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

SECTION 3.22    *Solvency*.

Immediately after the consummation of the Transactions to occur on each of the Closing Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

SECTION 3.23    *Senior Indebtedness*.

The Obligations constitute "Senior Debt" and "Designated Senior Debt," as applicable, under the indenture or other agreement governing any Subordinated Debt then outstanding.

SECTION 3.24    *Sanctioned Persons*.

None of the Borrower or any Subsidiary or any director, officer, agent, employee or Affiliate of the Borrower or any Subsidiary is currently the subject or target of any sanctions administered by the U.S. government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Nations Security Council, the European Union or any European Union member state, the United Kingdom (including Her Majesty's Treasury) or any other relevant national or supra-national sanctions authority (collectively, "*Sanctions*"); and the Borrower will not, directly or indirectly, use the proceeds of the Loans or otherwise make available such proceeds to any Person to finance any activities or business of or with any Person that is the subject or target of any Sanctions, or in any Designated Jurisdiction, or otherwise in any manner that constitutes or would give rise to a violation of Sanctions by any Person, including any Lender.

SECTION 3.25    *USA PATRIOT Act*.

To the extent applicable, each Loan Party is in compliance with all laws or regulations concerning or relating to terrorism financing or money laundering, including the USA PATRIOT Act.

SECTION 3.26    *Foreign Corrupt Practices Act*.

Each of the Borrower and the Subsidiaries and their respective directors, officers, agents, employees and any Person acting for or on behalf of the Borrower or any Subsidiary, has complied with, and will comply with, the U.S. Foreign Corrupt Practices Act, as amended from time to time (the "*FCPA*"), and any other applicable anti-bribery, anti-terrorism or anti-corruption law, and it and they have not made, offered, promised or authorized, and will not make, offer, promise or authorize, whether directly or indirectly, any payment of anything of value to a Government Official while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (a) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (b) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity or (c) securing an improper advantage, in each case in order to obtain, retain, or direct business; and the Borrower will not, directly or indirectly, use the proceeds of the Loans or otherwise make available such proceeds to any Government Official while knowing or having a reasonable belief that all or some portion will be used for any of the purposes in clause (a), (b) or (c) above, or otherwise in any manner that constitutes or would give rise to a violation of the FCPA or any other applicable anti-bribery, anti-terrorism or anti-corruption law.

54

DRAFT – SUBJECT TO FURTHER REVISION

SECTION 3.27    *Intellectual Property*.

(a)    Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, each of the Borrower and the Subsidiaries own, or hold licenses in or sufficient rights to use, the Intellectual Property used in and necessary to the conduct of the business of the Borrower and each of the Subsidiaries as such business is currently conducted. Attached hereto as Schedule 3.27(a) (which the Borrower may amend from time to time provided, that notice and copies thereof are provided to the Administrative Agent in accordance with Section 5.13 is a true, correct, and complete listing of all material (i) issued patents and patent applications, (ii) registered trademarks and trademark applications, (iii) registered domain names and (iv) registered copyrights and works for which an application to register the copyright has been filed, as to which the Borrower or any Subsidiary is the owner and which is used in and necessary to the conduct of the business of the Borrower and each of the Subsidiaries as such business is currently conducted.  Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, no claim has been asserted in writing and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower or any Subsidiary know of any valid basis for any such claim.  To the knowledge of each of the Borrower and the Subsidiaries, the conduct of the business of each of the Borrower and the Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate the Intellectual Property of any Person, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(b)    To the knowledge of each of the Borrower and the Subsidiaries, on and as of the date hereof, there is no material violation by others of any right of the Borrower or any Subsidiary with respect to any Intellectual Property owned by the Borrower or any Subsidiary.

(c)    The Borrower and each of the Subsidiaries have taken actions reasonably necessary to protect their respective material Intellectual Property owned by the Borrower or any Subsidiary, including, to the extent necessary, (i) protecting the secrecy and confidentiality of the confidential information and trade secrets of the Borrower and the Subsidiaries, (ii) taking commercially reasonable steps to prevent any trade secret of the Borrower or any Subsidiary from falling into the public domain and (iii) using commercially reasonable efforts to protect the secrecy and confidentiality of all software of which the Borrower or any Subsidiary is the owner.

(d)    Each of the Borrower and the Subsidiaries has made all reasonably necessary payments, filings and recordations to protect and maintain its interest in material registered Intellectual Property used in the conduct of the business of each of the Borrower and the Subsidiaries as currently conducted in the United States of America or any other jurisdiction in which such material registered Intellectual Property is filed, including (i) making all necessary registration, maintenance, and renewal fee payments, and (ii) filing all reasonably necessary documents, including all applications for registration of copyright, trademarks and patents with respect to such material registered Intellectual Property.

(e)    Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, the Borrower and each of the Subsidiaries is in compliance with all agreements relating to the license or transfer of Intellectual Property to or from the Borrower or any Subsidiary.

SECTION 3.28    *Healthcare Matters*.

(a)    Each of the Borrower and its Subsidiaries is in compliance with all Healthcare Laws applicable to it and its assets, business or operations, except such non-compliance that could not

55

DRAFT – SUBJECT TO FURTHER REVISION

reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  To the extent any of the following would violate any law applicable to the Borrower or any Subsidiary and except where such non-compliance could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, no officer, manager or, to Borrower's knowledge, employee of Borrower or any Subsidiary or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in any Loan Party has: (i) had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a; (ii) been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518, including any of the following categories of offenses: (A) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service, (B) criminal offenses under laws related to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickback, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency, (C) laws relating to the interference with or obstruction of any investigations into any criminal offenses described in this Section 3.28, or (D) criminal offenses under laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (iii) been named in a Governmental Authority unsealed complaint made, or any other action taken pursuant to, the False Claims Act.

(b)    To the Borrower's knowledge, there is no audit, claim, action, suit, investigation or administrative or other legal proceeding pending or threatened in writing against the Borrower or any Subsidiary relating to the Borrower's or any Subsidiary's participation in any Nongovernmental Payor program, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. To the Borrower's knowledge, no Nongovernmental Payor has requested or threatened in writing any recoupment, refund or set-off from the Borrower or any Subsidiary, which could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect. To the Borrower's knowledge, there is no suit, claim, action, proceeding, arbitration, mediation or investigation pending or received or threatened in writing against the Borrower or any of Subsidiaries which relates in any way to a violation of any legal requirement pertaining to any Nongovernmental Payor, except where any such violation could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect on the ability of the Borrower and the Subsidiaries to conduct their respective businesses in the ordinary course consistent with past practice, each of the Borrower and Subsidiaries is in compliance with all applicable Healthcare Laws regarding the selection, deselection, and credentialing of employed contractors of professional services, including, but not limited to, verification of licensing status and eligibility for reimbursement under Nongovernmental Payor programs. Except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect on the ability of the Borrower and Subsidiaries to conduct their respective businesses in the ordinary course consistent with past practice, all of Borrower's and the Subsidiaries' employed contractors of professional services are properly licensed and hold appropriate clinical privileges and provider numbers, as applicable, for the services which they provide.

(d)    Each of the Borrower and the Subsidiaries has all Healthcare Authorizations for the operation of its business, except where the failure to have any such Healthcare Authorizations to operate its business could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  All Healthcare Authorizations have been duly obtained and are in full force and effect without any known conflict with the rights of others and free from any restrictions, except where the failure to duly obtain such Healthcare Authorizations and maintain them in full force and effect without

56

DRAFT – SUBJECT TO FURTHER REVISION

any known conflict with the rights of others and free from restrictions could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(e)     To the extent applicable to Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, and for so long as (1) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, is a "covered entity" as defined in 45 C.F.R. § 160.103, (2) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, is a "business associate" as defined in 45 C.F.R. § 160.103, (3) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, is subject to or covered by the HIPAA Administrative Requirements codified at 45 C.F.R. Parts 160 & 162 and/or the HIPAA Security and Privacy Requirements codified at 45 C.F.R. Parts 160 & 164, and/or (4) Borrower, any Subsidiary, or any Person acting on behalf of Borrower or any Subsidiary, sponsors any "group health plans" as defined in 45 C.F.R. § 160.103, Borrower, such Subsidiary or any Person acting on behalf of Borrower or any Subsidiary, as the case may be, is compliant with HIPAA, except any noncompliance that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE IV

### *Conditions of Lending*

The occurrence of the Closing Date, and the effectiveness of this Agreement and of the obligations of the Lenders to make Loans hereunder, are, in each case, subject to the satisfaction (or waiver by the Required Lenders, which may be provided by email of their counsel) of the following conditions precedent:

SECTION 4.01     ***All Credit Events***. OnWith respect to the Lenders' obligations to make Loans on the date of each Borrowing deemed made or otherwise (each such event being called a "***Credit Event***"):

(a)     The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date and except that such materiality qualifier shall not be applicable to any representation and warranty that is already qualified by materiality.

(b)     At the time of and immediately after such Credit Event, no Default or Event of Default shall have occurred and be continuing.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b) and (c) of this Section 4.01.

SECTION 4.02     ***First Credit Event***. Except as otherwise expressly set forth on Schedule 5.17,With respect to the occurrence of the Closing Date, and the effectiveness of this Agreement and of the obligations of the Lenders to make Loans hereunder on the Closing Date:

(a)     The Administrative Agent shall have received, on behalf of itself and the Lenders, a written opinion of California, Delaware, Massachusetts, New York, Nevada and Texas counsel(s) to Holdings, the Borrower and the other Loan Parties dated the Closing Date, addressed to the Administrative Agent and the Lenders, and covering such matters relating to the Loan Documents and

57

DRAFT – SUBJECT TO FURTHER REVISION

the Transactions as the Administrative Agent shall reasonably request, and the Borrower hereby requests such counsel to deliver such opinions.

(b)      The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation, including all amendments thereto, of each Loan Party, certified as of a date acceptable to the Administrative Agent by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of a Responsible Officer of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; and (iv) such other documents as the Lenders or the Administrative Agent may reasonably request.

(c)      The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01 and paragraph (i) of this Section 4.02.

(d)      The Administrative Agent and the Lenders shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including counsel fees) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(e)      The Security Documents shall have been duly executed by each Loan Party that is to be a party thereto and shall be in full force and effect on the Closing Date.  The Collateral Agent on behalf of the Secured Parties shall have a security interest in the Collateral of the type and priority described in each Security Document.

(f)      The Collateral Agent shall have received a Perfection Certificate with respect to the Loan Parties dated the Closing Date and duly executed by a Responsible Officer of the Borrower, and shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such Persons, in which the chief executive office of each such Person is located and in the other jurisdictions in which such Persons maintain property, in each case as indicated on such Perfection Certificate, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence reasonably satisfactory to the Collateral Agent that the Liens indicated in any such financing statement (or similar document) would be permitted under Section 6.02 or have been or will be contemporaneously released or terminated.

(g)      The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

payable endorsement and to name the Collateral Agent as additional insured, in form and substance reasonably satisfactory to the Administrative Agent.

(h)    Immediately after giving effect to the Transactions and the other transactions contemplated hereby, Holdings, the Borrower and the Subsidiaries shall have outstanding no Indebtedness or preferred stock other than Indebtedness outstanding under this Agreement and Indebtedness set forth on Schedule 6.01 and permitted pursuant to the Plan Confirmation Order and Section 6.01 of this Agreement.

(i)    The LendersAdministrative Agent shall have received the financial statements referred to in Section 3.05.

(j)    The Administrative Agent and the Lenders shall have received a certificate from a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that the Borrower and its Subsidiaries, on a consolidated basis after giving effect to the Transactions, are Solvent.

(k)    All requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby in any material respect.

(l)    The Administrative Agent and the Lenders shall have received, at least five (5) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(m)    The Bankruptcy Court shall have confirmed the Plan of Reorganization, and entered the Plan Confirmation Order.  The Plan of Reorganization (as in effect on [_____] at docket no. [205],October 11, 2020) shall not have been supplemented, amended, or otherwise modified or supplemented except to the extent acceptable to the Required Lenders and in accordance with the terms thereof.  The Bankruptcy Court shall have enteredAll Plan Documentation shall be in form and substance reasonably satisfactory to the Required Lenders.

(n)    All Plan Documentation required to be executed, delivered and/or filed (as applicable) as a condition precedent to the Plan Effective Date pursuant to the Plan of Reorganization or the Plan Confirmation Order shall have been executed, delivered or filed (as applicable) prior to, or concurrently with, the occurrence of Plan Effective Date, in each case, in form and substance reasonably satisfactory to the Required Lenders.

(o)    All conditions precedent to the Plan Effective Dateeffectiveness of the Plan of Reorganization (in form and substance satisfactory to the Required Lenders) shall have been, or shall be, satisfied prior to satisfied (or, with the prior written consent of the Required Lenders, waived) and, without duplication of the foregoing, the Plan Effective Date shall have occurred, in each case, prior to, or substantially concurrently with, the Closing Date and the Plan Effective Date shall have occurred and, and, thereupon, the Plan of Reorganization (in form and substance satisfactory to the Required Lenders) shall be in full force and effect .

59

DRAFT—SUBJECT TO FURTHER REVISION

For the avoidance of doubt, except to the extent consented to by the Required Lenders (as evidenced in writing or in the public records of the Bankruptcy Court relating to the Chapter 11 Cases), the Bankruptcy Court's retention of jurisdiction under the Plan Confirmation Order shall not govern the enforcement of the Loan Documents or any rights or remedies related thereto.

## ARTICLE V

### *Affirmative Covenants*

TheEach of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash, unless the Required Lenders shall otherwise consent in writing, the Borrowerit will, (and will (except as specified otherwise) cause each of theits Subsidiaries to):

SECTION 5.01    *Existence; Compliance with Laws; Businesses and Properties*.

(a)    Do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05, and to continue to operate its business in the ordinary course consistent with past practices.

(b)    Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, registrations, patents, copyrights, trademarks and trade names material to the conduct of its business (including, for the avoidance of doubt, the Healthcare Authorizations), except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; maintain and operate such business in substantially the manner in which it is presently conducted and operated (other than as permitted by Section 6.08); comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition (ordinary wear and tear and casualty or condemnation exempt) and from time to time make, or cause to be made, all repairs, renewals, additions, improvements and replacements thereto that are required or necessary to the conduct of their business, except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(c)    Comply with all Contractual Obligations and Requirements of Law (including, without limitation ERISA, Sanctions, the USA PATRIOT Act, the FCPA, all applicable anti-bribery, anti-terrorism, anti-money laundering laws and all applicable Environmental Laws), except, other than in the case of the USA PATRIOT Act, the FCPA or Sanctions, (x) to the extent that failure to comply therewith could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect or (y) such instances in which such Contractual Obligation or Requirement of Law is being contested in good faith by appropriate proceedings diligently conducted.

SECTION 5.02    *Insurance*.

(a)    Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or

60

DRAFT – SUBJECT TO FURTHER REVISION

similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

(b)    ~~Subject to the terms of any Intercreditor Agreement, cause~~Cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement, in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, which endorsement shall provide, to the extent such provisions are obtainable by the use of commercially reasonable efforts, that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Administrative Agent or the Collateral Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent; cause all such policies to provide that neither the Borrower, the Administrative Agent, the Collateral Agent nor any other party shall be a coinsurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Administrative Agent or the Collateral Agent may reasonably require from time to time to protect their interests; if requested by the Collateral Agent, deliver original or certified copies of all such policies to the Collateral Agent; will use commercially reasonable efforts to cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent; deliver to the Administrative Agent and the Collateral Agent, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent and the Collateral Agent) together with evidence reasonably satisfactory to the Administrative Agent and the Collateral Agent of payment of the premium therefor.

(c)    If at any time the area in which the Premises (as defined in the Mortgages) are located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Administrative Agent, the Collateral Agent or any Lender may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as the Administrative Agent, the Collateral Agent or the Required Lenders may from time to time require.

(d)    Carry and maintain comprehensive general liability insurance and umbrella liability insurance against any and all claims, in no event for a combined single limit of less than that which is customary for companies in the same or similar businesses operating in the same or similar locations, naming the Collateral Agent as an additional insured, on forms reasonably satisfactory to the Collateral Agent.

SECTION 5.03    *Obligations and Taxes*.

Pay its Material Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all federal income Taxes and all other Taxes imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien (other than Permitted Liens) upon such properties or any material part thereof;

DRAFT – SUBJECT TO FURTHER REVISION

provided, however, that such payment and discharge shall not be required with respect to any such other obligation or Tax so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation or Tax and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property or (ii) the failure to pay and discharge such other obligation or Tax could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.04   *Financial Statements, Reports, etc.*

In the case of the Borrower, furnish to the Administrative Agent, which shall furnish to each Lender:

(a)   upon ~~the earlier of~~ the date that is ~~ninety (90~~one hundred twenty (120) days after the end of ~~each~~the fiscal year ending on December 31, 2020 and each subsequent fiscal year of the Borrower ~~and the date such information is filed with the SEC~~, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in equity holders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year (if applicable), all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of BDO USA, LLP, or such other independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit;

(b)   ~~(i)~~ upon the ~~earlier of the~~ date that is ~~sixty~~forty-five (~~60~~45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower ~~and the date such information is filed with the SEC~~, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in equity holders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year (if applicable) and the corresponding portion of the previous fiscal year~~, all in reasonable detail and prepared in accordance with GAAP and otherwise in a manner consistent with the previous reporting period, and certified by a Financial Officer of the Borrower as fairly presenting the financial condition, results of operations, equity holders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP; provided, that such financial statements shall not include footnotes or year-end audit adjustments and shall have been prepared on the basis that the Borrower and its Subsidiaries are a going concern, and, accordingly no account balances shall have been adjusted to indicate the Borrower and its Subsidiaries are not a going concern, and (ii) upon the earlier of the date that is [thirty (30) days] after the end of each calendar month and the date such information is filed with the SEC, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such calendar month, and the related consolidated statements of income or operations, changes in equity holders' equity and cash flows for such calendar month and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding calendar month of the previous fiscal year and the corresponding portion of the previous fiscal year~~ (if applicable), all in reasonable detail and prepared in accordance with GAAP and otherwise in a manner consistent with the previous reporting period, and certified by a Financial Officer of the Borrower as fairly presenting the financial condition, results of operations, equity holders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP; provided, that such financial statements shall not include footnotes or year-end audit adjustments and shall have been prepared on the basis that the Borrower and

62

DRAFT – SUBJECT TO FURTHER REVISION

its Subsidiaries are a going concern, and, accordingly no account balances shall have been adjusted to indicate the Borrower and its Subsidiaries are not a going concern;

(c)    concurrently with any delivery of financial statements under paragraph (a) or (b) above, a ~~certificate of a Financial Officer in the form of Exhibit G~~Compliance Certificate (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth the Borrower's calculation of the Available Amount, Consolidated EBITDA, Consolidated Net Income, Senior Secured Leverage Ratio and Total Leverage Ratio as at the end of the fiscal period covered by such financial statements;

(d)    [as soon as available, but in any event within sixty (60) days after the end of each fiscal year of the Borrower, an annual business plan and budget of the Borrower and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Borrower, in form satisfactory to the Administrative Agent and the Required Lenders, of consolidated balance sheets and statements of income or operations and cash flows of the Borrower and its Subsidiaries on a monthly basis for the immediately following fiscal year; and]

(e)    promptly after the request by any Lender or the Administrative Agent, all documentation and other information that such Lender or the Administrative Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

Documents required to be delivered pursuant to Section 5.04(a) or (b) or Section 5.04(e~~) (to the extent any such documents are included in materials otherwise filed with the SEC~~) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet; or (b) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided, that, (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by fax transmission or e-mail transmission) of the posting of any such documents and provide to the Administrative Agent by e-mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

SECTION 5.05    *Litigation and Other Notices*.

Furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, investigation or proceeding, whether at law or in equity or by or before any Governmental Authority, against the Borrower or any Affiliate thereof that could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

63

DRAFT — SUBJECT TO FURTHER REVISION

(c)        any event or occurrence that has resulted in, or could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; and

(d)        any change to the certification regarding beneficial ownership in relation to the Borrower as required by the Beneficial Ownership Regulation.

SECTION 5.06        *Information Regarding Collateral*.

Furnish to the Administrative Agent prompt written notice of any change (i) in any Loan Party's corporate name, (ii) in the jurisdiction of organization or formation of any Loan Party, (iii) in any Loan Party's identity or corporate structure or (iv) in any Loan Party's Federal Taxpayer Identification Number. The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made, or will be made within 30 days following such change (or such longer date as the Collateral Agent may agree in its sole discretion), under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral. The Borrower also agrees promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

SECTION 5.07        *Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings*.

(a)        Keep proper books of record and account in which full, true and correct entries in conformity with GAAP in all material respects and all Requirements of Law in all material respects are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will, and will cause each of its subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the properties of such Person at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of such Person with the officers thereof and independent accountants therefor (subject to reasonable requests for confidentiality, including as may be imposed by law or contract); provided, that absent the existence of a Default or an Event of Default, inspections pursuant to this Section 5.07 shall be limited to one time per fiscal year.

(b)        ~~If requested by~~ Upon the reasonable written request of the Required Lenders ~~or the Administrative Agent in writing~~ made at any time after the Closing Date, use commercially reasonable efforts to obtain and maintain ~~public ratings~~ a public rating (but not any specific rating) in respect of the Credit Facility from S&P, Moody's or another ratings agency ~~in respect of the Credit Facility~~ reasonably satisfactory to the Required Lenders.

SECTION 5.08        *Use of Proceeds*.

Use the proceeds of the Loans only for ~~the purposes specified in Section 3.13~~ purposes of satisfying the Prepetition Priming Facility Claims and/or DIP Lender Claims in accordance with, and as contemplated by, the Plan of Reorganization and other applicable Plan Documents, and subject to Section 3.24.

SECTION 5.09        *Employee Benefits*.

(a) Except to the extent that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, comply with the applicable provisions of ERISA and the Code

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

applicable to each employee benefit plan, (b) furnish to the Administrative Agent as soon as possible after, and in any event within ten days after any Responsible Officer of the Borrower or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event and the action, if any, that the Borrower proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (c) with reasonable promptness, furnish to the Administrative Agent copies of (i) all written notices received by the Borrower or any of its ERISA Affiliates from a Multiemployer Plan sponsor concerning such ERISA Event and (ii) such other documents or governmental reports or findings relating to any Plan as the Administrative Agent shall reasonably request (but only to the extent in the possession of any Loan Parties or any of their respective Subsidiaries).

SECTION 5.10     *Compliance with Environmental Laws*.

Except to the extent that could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, comply, and cause all lessees and any other Person occupying its properties under an agreement with, or with the consent of, Borrower or any Subsidiary to comply, in all material respects with all Environmental Laws with respect to its operations and properties; obtain, maintain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action to the extent required by law and in accordance with Environmental Laws; provided, however, that neither the Borrower nor any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

SECTION 5.11     *Preparation of Environmental Reports*.

If a Default caused by reason of a breach of Section 3.17 or Section 5.10 shall have occurred and be continuing for more than 20 days without the Borrower or any Subsidiary commencing activities reasonably likely to cure such Default, at the written request of the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of the Loan Parties, an environmental site assessment report regarding the matters which are the subject of such Default prepared by an environmental consulting firm reasonably acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Default.

SECTION 5.12     *Further Assurances*.

(a)     Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents. The Borrower will cause any subsequently

(b)     Cause each (x) Material Subsidiary acquired or organized Material Subsidiary (or any after the Closing Date and (y) Subsidiary that becomes a Material Subsidiary) to after the Closing Date, to, in each case, become a Loan Party (including by executing the Guarantee and Collateral

65

DRAFT – SUBJECT TO FURTHER REVISION

Agreement and each other applicable Security Document in favor of the Collateral Agent). In addition, from time to time, the Borrower will, at its cost and expense, promptly

(c)     In the case of Holdings, (i) take all actions necessary to become a Loan Party as of the Closing Date (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent), (ii) to the extent requested by the Required Lenders at any time after the Closing Date, agree to comply with such additional covenants and other obligations contained in the Loan Documents as may be requested by the Required Lenders), and (iii) in connection with any merger, consolidation or other transaction consummated in accordance with Section 6.05(a) or as otherwise permitted hereunder, cause any entity that succeeds or survives AAC Intermediate Holdco, Inc. as Holdings (or any prior successor thereto) pursuant to such transaction to become a Loan Party (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent).  In the case of Holdings, the Borrower and its Subsidiaries (as applicable), in connection with any merger, consolidation or other similar transaction involving the Borrower or any Subsidiary that is a Guarantor and consummated in accordance with Section 6.05(a) or as otherwise permitted hereunder, cause the entity that succeeds or survives the Borrower or such Subsidiary (as applicable) to become a Guarantor (including by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent) and be bound by all Loan Documents applicable to Guarantors.

(d)     Promptly (at the cost and expense of the Borrower or the applicable Subsidiary) secure the Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to substantially all the assets of Holdings, the Borrower and the Guarantors (including such of its assets and properties as the Administrative Agent or the Required Lenders shall designate (it being understood that it is the intent of the parties that the Obligations shall be secured by substantially all the assets of the Borrower and the Subsidiary Guarantors (specifically designate), including all real and other properties acquired subsequent to the Closing Date, (but excluding (ai) fee owned real property (other than the Ringwood Property or any interest therein) with an aggregate fair market value (in the Borrower's reasonable good faith determination) of less than $15,000,000 to the extent acquired subsequent to the Closing Date, but provided that any individual parcel of fee owned real property (or any interest therein) with a fair market value of less than $[_____]¹¹ in the aggregate(in the Borrower's reasonable good faith determination) greater than $5,000,000 acquired subsequent to the Closing Date shall be so pledged; provided, that any fee owned real property that is required to be subject to a perfected security interest in favor of the Collateral Agent pursuant to this clause (ai) but that is not subject to a perfected security in favor of the Collateral Agent on the Closing Date shall be subject to Section 5.17, (b) [reserved]5.17 and (cii) all real property leasehold interests; provided, that (x) the Borrower may, in its sole discretion, elect to grant a Mortgage over any fee owned real property (or any interest in real property) in accordance with this Section 5.12 to the extent this Section 5.12 does not otherwise require the Borrower to grant such Mortgage and (y) the Borrower shall, within 30 days of the Closing Date, grant a valid and perfected first priority (subject, to the best of the Loan Parties' knowledge, only to Permitted Liens (if any exist), except any Liens incurred pursuant to clauses (u) of Section 6.02) Lien and Mortgage in favor of the Collateral Agent with respect to the Ringwood Property, and take such other actions and enter into such other agreements and deliver such other documents or instruments in connection therewith as shall be required to grant or perfect the Collateral Agent's Lien over the Ringwood Property or as shall be reasonably requested by the Collateral Agent).  Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent, and the Borrower shall deliver or cause to be delivered to the Lenders all such instruments and documents (including instruments and documents

---

¹¹ NTD:  Threshold for exclusion to be considered by Stroock/Lenders.

66

DRAFT – SUBJECT TO FURTHER REVISION

required under Section 4.02(g), legal opinions, title insurance policies and lien searches) as the Collateral Agent shall reasonably request to evidence compliance with this Section 5.12.  The Borrower agrees to provide such evidence as the Collateral Agent shall reasonably request as to the perfection and priority status of each security interest and Lien created or required to be created under any Loan Document.  In furtherance of the foregoing, the Borrower will give prompt notice to the Administrative Agent of the acquisition by it or any of the Subsidiaries of any fee owned real property (or any interest in real property, but excluding any real property leasehold interest), having a value equal to or in excess of $5,000,000.  Notwithstanding the foregoing, no Loan Party shall be required to pledge or grant security interests in any Excluded Assets, except to the extent that any Excluded Asset is pledged, or a security interest or Lien grated therein, to secure any other funded Indebtedness.  No appraisals shall be required to be obtained in connection with any mortgage of real property pursuant to this Section 5.12, except to the extent that any such appraisals are required by the Collateral Agent with respect to the Ringwood Property or as otherwise reasonably requested by the Collateral AgentRequired Lenders in connection with any other real propertytitle insurance policies.

SECTION 5.13    *Intellectual Property*.  In the case of each Loan Party:

(a)    No Loan Party shall intentionally do any act or intentionally omit to do any act whereby any of the material Intellectual Property owned by such Loan Party may lapse, or become abandoned, canceled, dedicated to the public, forfeited, unenforceable or otherwise impaired, or which would adversely affect the validity, grant, or enforceability of the security interest granted therein; provided, however, that such Loan Party may discontinue the use and/or maintenance of any Intellectual Property, including any material Intellectual Property, that such Loan Party determines, in its reasonable good faith determination, is no longer desirable in the ordinary conduct of such Loan Party's business.  No Loan Party shall, with respect to any Trademarks (as the term is defined in the Guarantee and Collateral Agreement) constituting material Intellectual Property owned by such Loan Party, cease the use of any of such Trademarks or fail to maintain a similar level of quality of products sold and services rendered under any such Trademark as the quality of such products and services as of the Closing Date, and such Loan Party shall take reasonable steps necessary to insure that licensees of such Trademarks use such consistent standards of quality; provided, however, that such Loan Party may discontinue the use and/or maintenance of any Trademarks constituting material Intellectual Property, that such Loan Party determines, in its reasonable good faith determination, is no longer valuable in the ordinary conduct of such Loan Party's business.  Each Loan Party shall takeTake reasonable steps in the ordinary course of business, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, to pursue any application and maintain any registration or issuance of each Trademark, Patent, and Copyright (as each such term is defined in the Guarantee and Collateral Agreement) owned by any Loan Party and constituting material Intellectual Property that such Loan Party determines is desirable in the ordinary course of business.

(b)    Other than in the ordinary course of business and except as could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, each Loan Party shall timely notify the Collateral Agent if it knows or has reason to know that any item of material Intellectual Property owned by asuch Loan Party may become (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding anysuch Loan Party's ownership, registration or use or the validity or enforceability of such item of such material Intellectual Property (including but not limited to the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

counterpart of the foregoing, any court or any tribunal) or (iv) the subject of any reversion or termination rights.

(c)    Each Loan Party shall not permit the inclusion in any contract to which it hereafter becomes a party and pursuant to which it acquires Intellectual Property any provision that could or may in any way materially impair or prevent the creation of a security interest in, or the assignment of, such Loan Party's rights and interests in any property included within the definitions of any material Intellectual Property acquired under such contracts.

(c)    (d) In the event that any material Intellectual Property owned by or exclusively licensed to anysuch Loan Party, to asuch Loan Party's knowledge, is infringed, misappropriated, diluted or otherwise violated by a third party, such Loan Party shall take commercially reasonable actions, as it would otherwise in such Loan Party's reasonable good faith determination and in the ordinary course of business take, to stop such infringement, misappropriation, dilution or other violation and protect its rights in such material Intellectual Property including, in such Loan Party's reasonable good faith determination, if necessary, the initiation of a suit for injunctive relief and to recover damages. Each Loan Party shall use

(d)    Use commercially reasonable efforts in the ordinary course of business to use proper statutory notice in connection with its use of any of the material Intellectual Property.

SECTION 5.14    *Compliance with Real Estate Obligations*.

Make all payments and otherwise perform all obligations in respect of all leases of real property to which the Borrower or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.15    *Lender Calls*.

Borrower will, upon the request of the Required Lenders, participate in a conference call with the Administrative Agent and the Lenders once during each fiscal quarter at such times as may be agreed to be the Borrower and the Administrative Agent (at the direction of the Required Lenders).

SECTION 5.16    *Healthcare Laws*.

The Borrower and its Subsidiaries shall:

(a)    Within five (5) Business Days after obtaining knowledge thereof, provide notice to the Administrative Agent of (i) any material investigation, audit or proceeding (or any of the foregoing threatened in writing) relating to any violation by the Borrower or its Subsidiaries of any Healthcare Laws and (ii) to the extent that it could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, any written recommendation from any Governmental Authority that the Borrower or any of its Subsidiaries should have its licensure, accreditation or registration suspended, revoked or limited;.

(b)    Take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to be in compliance with all laws, rules, regulations,

DRAFT – SUBJECT TO FURTHER REVISION

restrictions and requirements pertaining to a healthcare providers imposed by any Governmental Authority;.

(c)     Obtain and maintain and take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to obtain and maintain all Healthcare Authorizations as are required for the conduct of its business as currently conducted and contemplated;.

(d)     Ensure and take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to ensure that coding and billing policies, arrangements, protocols and instructions are in compliance with all applicable laws and all Nongovernmental Payor reimbursement requirements and will be administered by properly trained personnel;.

(e)     Keep and maintain all records required by Governmental Authorities in compliance with applicable Healthcare Laws;.

(f)     Implement and take all reasonable action to cause each provider of professional services employed or contracted by Borrower or its Subsidiaries to implement practices that are consistent with the applicable regulations implementing the requirements of the Health Insurance Portability and Accountability Act ("*HIPAA*"), the Mental Health Parity and Addiction Equity Act of 2008 ("*MHPAEA*") and the Health Information Technology for Economic and Clinical Health Act (the "*HITECH Act*");.

(g)     Maintain the storage, use, transportation and disposal of all medical equipment, supplies, products, gases and waste in compliance with Healthcare Laws;.

(h)     Maintain all deposits relating to Healthcare Laws in compliance with regulatory requirements; /

(i)     Ensure that each Healthcare Facility is operated in compliance with applicable Healthcare Laws relating thereto and agreements necessary for certification, licensure or operation of such Healthcare Facility; and.

(j)     Ensure all residency and other similar agreements with Persons at a Healthcare Facility are in compliance with Healthcare Laws.

Notwithstanding anything to the contrary in this Section 5.16, any failure by the Borrower or any of its Subsidiaries to comply with the requirements of clauses (b)-(j) above shall not be deemed to be a Default or an Event of Default if such failure to comply could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.17     *Post-Closing Obligations*.

Within theExecute and deliver to the Agents each of the items, and comply with all other covenants and obligations, set forth on Schedule 5.17, in each case, within the respective periods of time after the Closing Date set forth on Schedule 5.17 (or such later date as the Administrative Agent may agree in its sole discretion), each of the items listed on Schedule 5.17 shall have been duly executed by the parties thereto and delivered to the Agents, as applicable. .

SECTION 5.18     *Deposit Account Management*

69

DRAFT—SUBJECT TO FURTHER REVISION

(a)    In the case of the Borrower, each Friday (commencing as of the first Friday to occur after the Closing Date) until such time as arrangements reasonably satisfactory to the Required Lenders (the "*Applicable Payment Arrangements*") have been implemented to ensure that all payments due from patients and other receivables payments are paid by the relevant payor into a Controlled Account and not into any Deposit Account in the name of AAC Holdings, Inc. (each, an "*AAC Holdings Legacy Deposit Account*"), deliver an e-mail (which shall be sent by a Financial Officer of the Borrower to Lender Financial Consultant (if any) and Stroock, or to such other Person(s) as may be notified in writing to the Borrower at any time and from time to time after the Closing Date by the Required Lenders or the Administrative Agent on their behalf) containing a copy of the Borrower's and its Subsidiaries' internally prepared report regarding the status of implementation of the Applicable Payment Arrangements including a summary of which payors have not yet converted to regularly making payments into a Controlled Account, which report shall be in form reasonably satisfactory to the Required Lenders (it being understood and agreed that a report substantially consistent with the form attached as Exhibit I hereto shall be deemed satisfactory for purposes hereof);[4] and

(b)    In the case of the Borrower and Holdings, ensure that, as of the close of business on each Wednesday and Friday to occur after the Closing Date until such time as each AAC Holdings Legacy Deposit Account has been closed or is otherwise unable to receive any payments or deposits, all funds on deposit in the AAC Holdings Legacy Deposit Accounts (other than funds not exceeding the amount of funds transferred to or retained in such AAC Holdings Legacy Deposit Accounts for the payment of payroll expenses, other disbursements permitted or required to be paid by AAC Holdings Prepetition Borrower under the Plan of Reorganization, and/or Winddown Expenses at the direction of the Borrower in accordance with the Contribution Agreement (including the amount of any outstanding checks written to pay any of the foregoing items) plus $500,000 in the aggregate, determined on the basis of the balances across all such AAC Holdings Legacy Deposit Accounts at such time) are irrevocably transferred into a Controlled Account no later than the next Business Day.

## ARTICLE VI

### *Negative Covenants*[12]

~~The~~Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, unless the Required Lenders shall otherwise consent in writing, ~~the Borrower~~it will not, ~~nor will it~~and will not cause or permit any of ~~the~~its Subsidiaries to, in each case:

SECTION 6.01    *Indebtedness*.

Incur, create, assume or permit to exist any Indebtedness, except:

(a)    [~~Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and any extensions, renewals, refinancings or replacements of such Indebtedness to the extent the principal amount of such Indebtedness is not increased (except by an amount equal to any interest capitalized in connection with any premium or other reasonable amount paid, and fees and expenses (including original issue discount and upfront fees) reasonably incurred, in connection with such extension, renewal, refinancing or replacement), neither the final maturity nor the Weighted Average Life to Maturity of such Indebtedness is decreased, such Indebtedness, if subordinated to the Obligations, remains so subordinated on terms no less favorable to the~~

---

[4] GT to provide a copy of the most recent report for inclusion in the Exhibits.
[12] NTD: Scope/sizing of baskets/exceptions subject to consideration by Lenders/Stroock.

DRAFT – SUBJECT TO FURTHER REVISION

Lenders, and the original Loan Party obligors in respect of such Indebtedness remain the only Loan Party obligors thereon;][13]reserved];

(b)      Indebtedness created hereunder and under the other Loan Documents;

(c)      unsecured intercompany Indebtedness of the Borrower and the Subsidiaries to the extent permitted by Section 6.04(c) so long as such Indebtedness is subordinated to the Obligations pursuant to an Affiliate Subordination Agreement to the extent required by Section 6.04(c);

(d)      (i) Financing Lease Obligations of the Borrower and the Subsidiaries (including pursuant to lease arrangements in respect of the real properties set forth on Schedule 6.01(d) hereto) and (ii) other Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, and extensions, refinancings, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (except by an amount equal to any interest capitalized in connection with, any premium or other reasonable amount paid, and fees and expenses (including original issue discount and upfront fees) reasonably incurred, in connection with such extension, renewal, refinancing or replacement); provided, that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement; provided, further, that the aggregate amount of all such Indebtedness permitted by this Section 6.01(d) shall not exceed $[_____] at any time outstanding; at any time outstanding shall not exceed (x) $11,000,000 plus (y) solely with respect to Indebtedness incurred pursuant to lease arrangements entered into in the ordinary course of business with respect to the real properties set forth on Schedule 6.01(d) hereto (including any renewals, replacements and other modifications to such lease arrangements entered), an aggregate amount that is not materially higher than the amount incurred pursuant to lease arrangements in effect with respect to such real properties immediately prior to the Closing Date, in each case, as set forth on Schedule 6.01(d);[5]

(e)      Indebtedness of the Borrower and the Subsidiaries under performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, or with respect to workers' compensation claims, in each case incurred in the ordinary course of business;

(f)      Indebtedness in respect of netting services, overdraft protections, cash management obligations, credit card or debit card or similar processors and otherwise in connection with deposit accounts, in each case, in the ordinary course of business;

(g)      obligations arising under indemnity agreements or other arrangements with title insurers to cause such title insurers to issue title policies in the ordinary course of business;

(h)      Indebtedness of any Person that becomes a Subsidiary after the date hereof; provided, that (i) such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary, (ii) immediately before and after such Person becomes a Subsidiary, no Default or Event of Default under Section 7.01 shall have occurred and be continuing or would result therefrom, and (iii) the Borrower shall be in compliance with the financial covenants set forth in Section 6.10aggregate principal amount of Indebtedness permitted by this Section 6.01(h) shall not exceed $11,000,000;

---

[13] NTD:  Stroock considering whether basket remains applicable.

[5]   GT to update Schedule 6.01(d) to set out the amount of lease payments/obligations in effect under the existing lease arrangements and confirm the amount expected to be paid under any renewals/renegotiations.

71

~~DRAFT – SUBJECT TO FURTHER REVISION~~

(i)       ~~[reserved];~~<u>Indebtedness of the Borrower and the Subsidiaries in respect of those Hedging Agreements incurred in the ordinary course of business, not for speculative purposes and consistent with prudent business practice;</u>

(j)       ~~[reserved];~~<u>unsecured Indebtedness of the Borrower and the Subsidiaries in respect of the repurchase or redemption of Equity Interests of the Borrower or any of the Subsidiaries issued to employees, officers or directors of the Borrower or any of the Subsidiaries in an aggregate principal amount not to exceed $5,500,000 at any time outstanding; *provided* that such Indebtedness is subordinated to the Obligations on terms reasonably acceptable to the Administrative Agent;</u>

(k)       Indebtedness <u>of the Borrower and the Subsidiaries</u> representing deferred compensation or reimbursable expenses owed to employees of the Borrower or any of the Subsidiaries incurred in the ordinary course of business;

(l)       ~~[reserved];~~<u>unsecured Indebtedness of the Borrower or any Loan Party to finance Permitted Acquisitions in an aggregate principal amount not to exceed $16,5000,000 at any time outstanding;</u>

(m)       ~~[reserved];~~<u>unsecured Indebtedness of the Borrower that matures at least 91 days after the later of the Term Loan Maturity Date and the Incremental Term Loan Maturity Date as in effect at the time of the issuance of such unsecured Indebtedness and so long as the Total Leverage Ratio would not exceed 6.00:1.00, calculated on a pro forma basis as of the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 5.04(a) or (b), as the case may be, have been or were required to have been delivered;</u>

(n)       ~~[reserved];~~<u>unsecured Indebtedness of the Borrower and the Subsidiaries the form of obligations under indemnification, purchase price adjustments, incentive, non-compete, consulting, deferred compensation, earn-out and similar obligations incurred in connection with any Permitted Acquisition;</u>

(o)       Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(p)       Indebtedness of the Borrower ~~or any Subsidiary Guarantor~~<u>and/or American Addiction Centers, Inc.</u> as an account party in respect of letters of credit issued ~~in the ordinary course of business (including Indebtedness in respect of reimbursement obligations and/or cash collateral obligations relating to such letters of credit)~~<u>prior to the Closing Date by Credit Suisse, AG</u> in favor of providers of professional liability and general insurance policies required by the Loan Parties~~, in an aggregate amount not to exceed $[_____] at any time outstanding~~ <u>and set forth on Schedule 6.01(p); provided, that the aggregate amount of Indebtedness outstanding thereunder at any time shall not to exceed (x) the amount outstanding as of the Closing Date plus (y) any Indebtedness in respect of reimbursement and/or cash collateral obligations relating to such letters of credit incurred pursuant to an agreement with Credit Suisse, AG in accordance with, and to the extent permitted by, the Plan Confirmation Order</u>;

(q)       Guarantees in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; <u>provided</u>, that if the Indebtedness that is being Guaranteed is unsecured and/or subordinated to the Obligations, the Guarantee shall also be unsecured and/or subordinated to the Obligations on the same basis;

DRAFT – SUBJECT TO FURTHER REVISION

(r)    [reserved];Indebtedness incurred by the Borrower under one or more secured or unsecured revolving credit facilities (and any Guarantees by the Subsidiary Guarantors in respect thereof); provided, that (i) the aggregate principal amount outstanding thereunder at any time shall not to exceed $30,000,000 and (ii) such credit facility shall be governed by documentation (including, if any such Indebtedness is secured, an Intercreditor Agreement and usual and customary security and collateral documents) in form and substance satisfactory to the Required Lenders (and, with respect to any obligations imposed on the Collateral Agent pursuant to any such documentation if any such Indebtedness is secured, also reasonably satisfactory to the Collateral Agent) (Indebtedness incurred hereunder in accordance with the provisions hereof, the "*Revolving Credit Facility*");

(s)    [reserved];

(s)    (t) any Attributable Indebtedness incurred by the Borrower and the Subsidiaries in connection with any Sale and Leaseback Transaction permitted by Section 6.03; and

(t)    (u) Indebtedness incurred by the Borrower under one or more revolving credit facilities (and any Guarantees by the Subsidiary Guarantors in respect thereof); provided, that (i) theother Indebtedness of the Borrower, not otherwise permitted by any other clause in this Section 6.01, in an aggregate principal amount outstanding thereunder at any time shall not to exceed $[20,000,000][14] and (ii) such credit facility shall be on terms and governed by documentation (including with respect to any intercreditor and collateral arrangements) reasonably satisfactory to the Required Lenders (the "*Revolving Credit Facility*") (or, so long as at the time of the incurrence of such Indebtedness the Senior Secured Leverage Ratio would not exceed 4:00:1.00, calculated on a *pro forma* basis as of the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 5.04(a) or (b), as the case may be, have been or were required to have been delivered, $40,000,000) at any time outstanding.

SECTION 6.02    *Liens*.

Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including the Borrower or any Subsidiary) now owned or hereafter acquired, created, developed or invented by it or on any income or revenues or rights in respect of any thereof, except (collectively, "*Permitted Liens*"):

(a)    [Liens on property or assets of the Borrower and its Subsidiaries existing on the Closing Date and set forth in Schedule 6.02; provided, that such Liens shall secure only those obligations which they secure on the date hereof and extensions, refinancing, renewals and replacements thereof permitted pursuant to section 6.01;][15]reserved];

(b)    any Lien created under the Loan Documents;

(c)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or assets of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary, as the case may be; provided, that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not apply to any other property or assets of the Borrower or any Subsidiary and (iii) such Lien secures only those obligations which it secures on the date of such

---

[14] NTD:  Basket to be updated as applicable to reflect whether revolving facility will be in place on Closing Date.

[15] NTD:  Stroock considering whether basket remains applicable.

73

DRAFT—SUBJECT TO FURTHER REVISION

acquisition or the date such Person becomes a Subsidiary, as the case may be, and any extensions, refinancing, renewals and replacements thereof permitted hereunder;

(d)      Liens on property or assets of the Borrower and its Subsidiaries for Taxes not yet delinquent or that are being contested in compliance with Section 5.03;

(e)      Liens on property or assets of the Borrower and its Subsidiaries in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods in the ordinary course of business;

(f)      Liens on insurance policies and the proceeds thereof in favor of the provider of such policies securing the financing of the premiums with respect thereto;

(g)      carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens on property or assets of the Borrower and its Subsidiaries arising in the ordinary course of business and securing obligations that are not delinquent for a period of more than 30 days or which are being contested in compliance with Section 5.03;

(h)      Liens on property or assets of the Borrower and its Subsidiaries incurred and pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance, general liability, property insurance and other social security laws or regulations;

(i)      deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Financing Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business by the Borrower and its Subsidiaries;

(j)      easements, rights-of-way, restrictions on use of real property, minor defects or irregularities in title and other similar charges or encumbrances on property or assets of the Borrower and its Subsidiaries which, in the aggregate, do not materially detract from the value of the property subject thereto or do not interfere in any material respect with the business of the Borrower and the Subsidiaries, taken as a whole;

(k)      Liens on property or assets of the Borrower and its Subsidiaries securing Indebtedness to finance the acquisition, construction or improvement of any fixed or capital assets; provided, that (i) such security interests secure Indebtedness permitted by Section 6.01(d), (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 270 days after such acquisition (or construction), (iii) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of such real property, improvements or equipment at the time of such acquisition (or construction) and (iv) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary;

(l)      Liens securing reimbursement obligations of the Borrower or any of its Subsidiaries in respect of documentary letters of credit or bankers' acceptances in the ordinary course of business, provided, that such Liens attach only to the documents and goods covered thereby and proceeds thereof;

(m)      leases, subleases, licenses or sublicenses (but only including non-exclusive licenses of Intellectual Property) granted by Borrower or any of its Subsidiaries to other Persons in the ordinary course of business of the Borrower or its Subsidiaries;

74

DRAFT – SUBJECT TO FURTHER REVISION

(n)    any interest of title of a lessor under any lease entered into by the Borrower or any other Subsidiary as tenant in the ordinary course of business and covering only the assets so leased;

(o)    judgment Liens securing judgments not constituting an Event of Default under Section 7.01(i);

(p)    zoning, building codes and other land use laws, regulations and ordinances regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the business of the Borrower or any of the Subsidiaries, any violation of which could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

(q)    Liens on property or assets of the Borrower and its Subsidiaries arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Borrower or any of the Subsidiaries in the ordinary course of business permitted hereunder;

(r)    Liens solely on any cash earnest money deposits made by the Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(s)    Liens on property rented to, or leased by, Borrower or any of its Subsidiaries pursuant to a Sale and Leaseback Transaction;

(t)    Liens securing Indebtedness under any Revolving Credit Facility incurred pursuant to Section 6.01(r); provided, that (i) such Sale and Leaseback Transaction is permitted bysuch Liens are subject to an Intercreditor Agreement;

(u)    Liens on cash collateral provided to any letter of credit issuer to the extent the Indebtedness secured thereby is permitted under Section 6.03, (ii) such Liens do not encumber any other property of6.01(p); and

(v)    other Liens securing liabilities of the Borrower orand its Subsidiaries and (iii) such Liens secure only the Attributable Indebtedness incurred in connection with such Sale and Leaseback Transaction;(t)    other Liens (other than Liens securing funded Indebtedness) securing liabilities permitted to be incurred hereunder in an aggregate principal amount not to exceed $[_____]20,000,000 at any time outstanding; provided, that (x) if such Liens secure any funded Indebtedness, such Liens shall rank junior to the Liens securing the Obligations and shall be subject to an Intercreditor Agreement and (y) immediately prior and after giving effect to the incurrence of any Liens in reliance on this Section 6.02(t), no Default or Event of Default shall have occurred or be continuing, or would result therefrom; and(u)    Liens securing Indebtedness permitted pursuant to Section 6.01(u); provided, that such Liens are subject to an intercreditor agreement in form and substance reasonably satisfactory to the Required Lenders.

SECTION 6.03    *Sale and Leaseback Transactions*.

Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (any such arrangement, a "*Sale and Leaseback Transaction*") unless (except in the case of Holdings) (a) such Sale

75

DRAFT—SUBJECT TO FURTHER REVISION

and Leaseback Transaction is consummated within 270 days after the date on which such property is sold or transferred and, (b) any Liens arising in connection with such Sale and Leaseback Transaction are permitted by Section 6.02(s) and (c) the sale or transfer of such property is made for cash consideration in an amount not less than the fair market value of such property and does not exceed $24,200,000 in the aggregate when taken together with all other Sale and Leaseback Transactions consummated after the Closing Date.

SECTION 6.04    *Investments, Loans and Advances*.

Make or permit to exist any Investment or any other interest in, any other Person, except:

(a)    (i) Investments by the Borrower and the other Loan Parties existing on the Closing Date in the Equity Interests of the Borrower and the other Loan Parties and (ii) additional Investments by the Borrower and the other Loan Parties in the Equity Interests of the Borrower and the other Loan Parties; *provided* that (A) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations referred to therein and in Section 5.12) and (B) the aggregate amount of Investments (other than in respect of Permitted Acquisitions) made after the Closing Date by Loan Parties in, and loans and advances made after the Closing Date by Loan Parties to, Subsidiaries that are not Loan Parties (determined without regard to any write-downs or write-offs of such Investments, loans and advances) shall not exceed the available Floating Investments Basket;

(b)    Permitted Investments;

(c)    loans or advances made by the Borrower to any ~~other Loan Party~~Subsidiary and made by any ~~Loan Party~~Subsidiary to the Borrower or any other ~~Loan Party in the ordinary course of business consistent with past practices; provided, that~~Subsidiary; provided that (i) any such loans and advances made by a Loan Party to a non-Loan Party in an aggregate principal amount in excess of $10,000,000 shall be evidenced by a promissory note pledged to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement, (ii) such loans and advances shall be unsecured and subordinated to the Obligations pursuant to an Affiliate Subordination Agreement and (iii) the aggregate principal amount of such loans and advances made by Loan Parties to Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (a) above;

(d)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(e)    the Borrower and the Subsidiaries may make loans and advances in the ordinary course of business ~~consistent with past practices~~ to their respective employees, officers and directors so long as no Event of Default shall have occurred or be continuing and the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $5,000,000;

(f)    the Borrower or any Subsidiary may acquire all or substantially all the assets of a Person or line of business of such Person (or, in the case of an acquisition by the Borrower or any Wholly-Owned Subsidiary of any Person that will constitute a Controlled Physician Affiliate, may acquire, in its own name or through a nominee, the right to acquire all of the Voting Equity Interests of such Person and enter into a long-term business agreement with such Person to provide management services to such Person to the extent the Voting Equity Interests of such Person cannot, pursuant to applicable Laws, or should not, in the reasonable good faith determination of the Borrower, be owned by the Borrower or any Wholly-Owned Subsidiary), in one transaction or a series of related transactions (*provided~~, that~~*

76

DRAFT—SUBJECT TO FURTHER REVISION

immediately prior and after giving effect to the making thereof that all such related transactions shall be consummated on or prior to the date that is the six-month anniversary of the date on which the first of such related transactions was consummated), or not less than 85% (or, in the case of any Person that will constitute a Controlled Physician Affiliate, 50%) of the Equity Interests (other than directors' qualifying shares) of such Person (referred to herein as the "*Acquired Entity*"); *provided* that the Acquired Entity shall be in a similar, related, incidental or complementary line of business as that of the Borrower and the Subsidiaries as conducted during the current and most recent calendar year; and (ii) at the time of consummation of such transaction (A) both before and after giving effect thereto, no Default or Event of Default shall have occurred or be continuing, or would result therefrom; and shall have occurred and be continuing; (B) the Borrower shall have delivered a certificate of a Financial Officer, certifying as to compliance with the requirements of this clause (f) (and including reasonably detailed calculations in support thereof, in form and substance reasonably satisfactory to the Required Lenders), (C) the Borrower shall comply, and shall cause the Acquired Entity to comply, with the applicable provisions of Section 5.12 and the Security Documents and (D) the pro forma Available Liquidity shall not be less than $5,000,000 (any acquisition of an Acquired Entity meeting all the criteria of this Section 6.04(f) being referred to herein as a "*Permitted Acquisition*");

(g) (f) Investments by the Borrower in Hedging Agreements permitted under Section 6.01(i);

(h) Investments in joint ventures and unconsolidated subsidiaries useful in the business of the Borrower and its Subsidiaries in an aggregate amount not to exceed the Floating Investments Basket available at the time of such Investment; and

(i) in addition to Investments permitted by paragraphs (a) through (h) above, additional Investments by the Borrower and the Subsidiaries so long as the aggregate amount invested, loaned or advanced pursuant to this paragraph (i) (determined without regard to any write-downs or write-offs of such Investments, loans and advances) does not exceed (i) the Floating Investments Basket at any time plus (ii) so long as no Event of Default or Default is continuing or would result therefrom, the Available Amount at the time of such Investment.

SECTION 6.05 *Mergers, Consolidations, Sales of Assets and Acquisitions*.

(a) Merge into, or consolidate or amalgamate with, any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all the its assets or business (whether now owned or hereafter acquired) of the Borrower or any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, including, in each case, pursuant to any liquidation or dissolution transaction, except that (i):

(i) the Borrower and any Subsidiary may purchase and sell inventory in the ordinary course of business, (ii);

(ii) if, at the time thereof and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, (x A) any Wholly-Owned Subsidiary may merge into of the Borrower may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, Holdings or the Borrower in a transaction in which Holdings or the Borrower (as applicable) is the surviving corporation, (y B) any Wholly-Owned Subsidiary may merge into or consolidate with of the Borrower may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, any other Wholly-Owned Subsidiary

77

DRAFT – SUBJECT TO FURTHER REVISION

of the Borrower in a transaction in which the surviving entity is a Wholly-Owned Subsidiary of the Borrower and no Person other than Holdings, the Borrower or a Wholly-Owned Subsidiary of the Borrower receives any consideration (provided, that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be (or shall, substantially simultaneously with such transaction, become) a Loan Party), and (iiiC) any Loan Party (other than Borrower or Holdings) may dispose of any or all of its assets or any Equity Interests of any Subsidiary (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Loan Party and (iv) the Borrower or any Subsidiary may consummate any Sale and Leaseback Transaction permitted by Section 6.03.;

(iii)    without duplication of anything in Section 6.05(a)(ii), if, at the time thereof and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, any Subsidiary of the Borrower may liquidate, dissolve or change its legal form if, in each case, the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries, does not materially adversely affect the Collateral Agent's Liens on the Collateral, and is not otherwise disadvantageous to Secured Parties in any material respect; provided, that, if the entity subject to such liquidation, dissolution or change of legal form is a Guarantor, all assets of such Guarantor entity constituting Collateral shall (to the extent not disposed of or otherwise transferred in any other manner permitted hereunder) concurrently with such liquidation or dissolution, be transferred to another Subsidiary that, at such time, is a Guarantor, and the Collateral Agent shall have a Lien thereon to the same extent as the Lien on such Collateral prior to such transfer;

(iv)    if, at the time thereof, and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, and if the Borrower determines in good faith that such action (x) is for a legitimate business purpose and in the best interests of the Borrower and its Subsidiaries, (y) shall not impair or adversely affect the Collateral or the Collateral Agent's Liens on the Collateral, Guarantees of the Obligations and (z) is not otherwise disadvantageous to Secured Parties, any Person may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, Holdings; provided that (A) Holdings shall be the surviving or continuing entity or (B) if the surviving or continuing entity is not Holdings (such other person, "*Successor Holdings*"), notice of such transaction shall have been delivered to the Administrative Agent by Holdings and the Borrower not less than five (5) Business Days prior to consummation of such transaction and (1) Successor Holdings shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) Successor Holdings shall expressly assume all obligations of Holdings under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (3) after giving effect to the consummation of such merger, consolidation or other transaction, the Collateral Agent and the other Secured Parties shall have the benefit of Guarantees and Liens granted by such Successor Holdings at least as favorable to them as the Guarantees and Liens granted or provided by Holdings prior to such transaction, and the Obligations shall be guaranteed and secured on at least the same (or more favorable basis) than prior thereto, and (4) if requested by the Administrative Agent or the Required Lenders, Successor Holdings shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document, (y) an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to Section 4.02(a) and (z) a copy of each certificate of merger, consolidation, amalgamation, liquidation or dissolution (as applicable) filed with the applicable Secretary of State in connection with such transaction and such other material documents governing such

78

DRAFT – SUBJECT TO FURTHER REVISION

transaction reasonably requested by the Administrative Agent or the Required Lenders (to the extent permitted to be disclosed pursuant to applicable law or other requirements applicable thereto); provided, further, that if the requirements of this clause (iv) are satisfied as set forth herein, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement)];

(v)        if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, and if the Borrower determines in good faith that such action (x) is for a legitimate business purpose and in the best interests of Holdings, the Borrower and its Subsidiaries, (y) shall not impair or adversely affect the Collateral or the Collateral Agent's Liens on the Collateral, or the Guarantees of the Obligations and (z) is not otherwise disadvantageous to Secured Parties, any Person may be merged, amalgamated or consolidated with or into, or be liquidated or dissolved into, the Borrower; provided that (A) the Borrower shall be the surviving entity or (B) if the surviving entity is not the Borrower (such other person, the "**Successor Borrower**"), written notice of such transaction shall have been delivered to the Administrative Agent by Holdings not less than five (5) Business Days prior to consummation of such transaction and (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (3) after giving effect to the consummation of such merger, consolidation or other transaction, the Collateral Agent and the other Secured Parties shall have the benefit of Liens granted by such Successor Borrower on its assets, and Liens on the Equity Interests in such Successor Borrower, in each case, at least as favorable to them as the Guarantees and Liens granted or provided by or in the Equity Interests of, as applicable, the Borrower prior to such transaction, and, after giving effect to such merger, consolidation or other transaction, the Obligations shall be guaranteed and secured on at least the same (or more favorable basis) than prior thereto,  (4) each Guarantor, unless it is the other party to such merger, amalgamation or consolidation, shall have (by a supplement to the Guarantee and Collateral Agreement in form and substance satisfactory to the Administrative Agent) confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (5) the Collateral Agent shall have a perfected Lien on 100% of the Equity Interests issued by such Successor Borrower, which shall have the priority required by this Agreement and the Guarantee and Collateral Agreement, (6) each Guarantor, unless it is the other party to such merger, amalgamation or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant hereto, each mortgagor of a Mortgaged Property, unless it is the other party to such merger, amalgamation or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its guarantee as reaffirmed pursuant to hereto and (7) the Successor Borrower shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document, (y) if requested by the Administrative Agent, an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to pursuant to Section 4.02(a) and (z) if requested by the Administrative Agent or the Required Lenders, a copy of each certificate of merger, consolidation, amalgamation, liquidation or dissolution (as applicable) filed with the applicable Secretary of State in connection with such transaction and a copy of such other material documents governing such transaction, to the extent reasonably requested by the Administrative Agent or the Required Lenders; provided, further, that if the requirements of this

79

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

clause (iv) are satisfied as set forth herein, Successor Borrower will succeed to, and be substituted for, Borrower under this Agreement);

(vi)    the Borrower or any Subsidiary may consummate any Sale and Leaseback Transaction permitted by Section 6.03;

(vii)    the Borrower and any of its Subsidiaries may make Permitted Acquisitions pursuant to Section 6.04(f) and Investments pursuant to Section 6.04(h) or Section 6.04(i); and

(viii)    Holdings, the Borrower and its Subsidiaries may consummate the Merger Transactions.

(b)    Make any Asset Sale unless (~~i~~except in the case of Holdings) (i) such Asset Sale is permitted under Section 6.05(a), (ii) such Asset Sale is for consideration at least ~~100~~75% of which is cash, and is not less than the fair market value of such asset or property, and (~~ii~~iii) at the time thereof and immediately after giving effect thereto, no ~~Default or~~ Event of Default shall have occurred and be continuing or would result therefrom ~~and (iii) at the time thereof and immediately after giving effect thereto, the Borrower is in compliance with the financial covenants set forth in Section 6.10.~~.

For the avoidance of doubt, nothing in this Section 6.05 shall be construed as limiting, amending or otherwise modifying the definition of Change of Control, or any analysis or determination of whether a Change of Control has occurred, it being understood and agreed that any merger, amalgamation, consolidation, liquidation, dissolution or winding-up of any Person, or any disposition, Asset Sale or other transfer, as applicable (each, a "***Fundamental Change Transaction***") that, in each case, is permitted under and consummated in accordance with this Section 6.05 (and, accordingly, does not constitute a breach of, or give rise to a Default under, this Section 6.05) shall not be deemed not to be (or not to result in) a Change of Control solely as a result of such Fundamental Change Transaction being permitted hereunder and not resulting in a breach or Default under this Section 6.05, and, accordingly, the determination of whether a Change of Control has occurred or may occur as a result of, or on the basis of, any Fundamental Change Transaction shall be made by reference to the definition of Change of Control and by applying the provisions thereof in the context of such Fundamental Change Transaction, it being acknowledged and agreed that a Fundamental Change Transaction may constitute or result in a Change of Control notwithstanding that such Fundamental Change Transaction is consummated in accordance with the terms hereof or does not otherwise constitute a breach of, or Default under, this Section 6.05.

SECTION 6.06    ***Restricted Payments; Restrictive Agreements***.

(a)    Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so ~~other than Permitted Restricted Payments; provided, that~~; *provided* that (i) so long as no Event of Default or Default shall have occurred and be continuing or would result therefrom, the Loan Parties and the Subsidiaries may, and may make distributions to one another so that any of the Loan Parties or any of their respective Subsidiaries may, (x) repurchase Equity Interests issued to employees, directors and officers of any of the Loan Parties or any of their respective Subsidiaries (including repurchases of Equity Interests from severed or terminated employees, directors and officers) and (y) make payments to employees, directors and officers of any of the Loan Parties or any of their respective Subsidiaries in connection with Equity Interests (and the exercise thereof) pursuant to incentive plans or arrangements, in an aggregate amount under this clause (i) not to exceed $5,000,000 in the aggregate, (ii) so long as (x) no Event of Default or Default is continuing or would result therefrom and (y) the Senior Secured Leverage Ratio calculated on a pro forma basis both before and after giving

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

effect to any such Restricted Payment is not greater than 4.00:1.00, the Loan Parties may make Restricted Payments to pay dividends to holders of Equity Interests in the Borrower or any Parent Entity in an aggregate amount not to exceed the Available Amount at the time of such Restricted Payment, (iii) any Subsidiary of the Borrower may pay dividends to, or make other distributions to, ~~any of the Loan Parties~~ the Borrower or any other Subsidiary of the Borrower that is a Guarantor, (iv) with respect to any taxable period during which the Borrower or any of its Subsidiaries is a member of a consolidated, affiliated, unitary, combined or similar tax group of which any Parent is the common parent (a "*Tax Group*"), the Borrower and its Subsidiaries may (directly or indirectly) make any payment or other distribution to Holdings or any other Parent in order for Holdings or such Parent to pay U.S. federal, state and local Taxes and foreign Taxes of such Tax Group in an amount not exceed any such Taxes that are payable by any such Parent in respect of, or by reason of, the income, revenues or receipts of any Loan Party or Subsidiary thereof (reduced by any such Taxes paid or to be paid directly by any Loan Party or any of its Subsidiaries) (and Holdings may make payments and distributions to any of its direct or indirect parent companies in connection with the foregoing), (v) Holdings, the Borrower and its Subsidiaries may make (directly or indirectly) Restricted Payments to any Parent to pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any acquisition, Investment or other transaction otherwise permitted hereunder, (vi) the Borrower and its Subsidiaries may (directly or indirectly) make payments and distributions to Holdings (and Holdings may make distributions to any of its direct or indirect parent companies), or make payments on behalf of Holdings (or any of its direct or indirect parent companies), to the extent necessary to fund the payment of (x) customary corporate indemnities owing to directors of the Loan Parties and their Subsidiaries, and any Parent, in each case, in the ordinary course of business and (y) Taxes and the operating and administrative expenses of Holdings (or any of its direct or indirect parent companies) incurred in the ordinary course of its business including, without limitation, reasonable directors' fees and expenses (other than fees of any director that is an "insider"), and (vii) the Loan Parties and their Subsidiaries may (directly or indirectly) make any payments and/or distributions to enable the making of any payments required to be made by the Borrower, Holdings and/or any of its direct or indirect parent entities pursuant to the Contribution Agreement (including relating to Wind-Up Costs (as defined in the Contribution Agreement)) and the Tax Cooperation Agreement, and as otherwise required in connection with the Merger Transactions, in each case, in accordance with the terms of the applicable governing documents.

(b)     Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided, that (A) the foregoing shall not apply to (w) restrictions and conditions imposed by law or by any Loan Document or any Revolving Credit Facility, (x) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary (or any other sale of assets or Equity Interests permitted hereunder) pending such sale, provided, that such restrictions and conditions apply only to the Subsidiary, asset or Equity Interest that is to be sold and such sale is permitted hereunder, and (y) any agreement in effect at the time a Person became a Subsidiary, so long as such agreement (1) was not entered into solely in contemplation of such Person becoming a Subsidiary, (2) applies only to such Person, (3) does not extend to any other Loan Party and (4) is otherwise permitted hereunder and does not conflict with the provisions of this Agreement or any other Loan Document, and (B) clause (i) of the foregoing shall not apply to (x) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (y) customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.07     *Transactions with Affiliates*.

*ACTIVE 52782809v1*1" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

Except for transactions solely between or among Loan Parties in the ordinary course of business and consistent with past practices, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)    any transactions (i) consummated in connection with or pursuant to, or otherwise contemplated by, any of the Plan Documents (including the issuance of Equity Interests and making of the Loans on the Closing Date) and (ii) between any Loan Party and any Affiliate that is a Permitted Holder (including any Permitted Holder in its capacity as a Lender); for

(b)    transactions (a) as set forth on Schedule 6.07, (b) for6.07;

(c)    transactions relating to compensation, expense reimbursement or employment, separation and severance of officers, directors or employees in the ordinary course of business (as may be updated from time to time), and for any issuance of Equity Interests, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans, or indemnities provided on behalf of employees or directors, all which are approved by the board of directors or similar management body of any Loan Party, and for any issuance of Equity Interests, (c);

(d)    transactions for the maintenance of benefit programs or arrangements with employees, officers or directors, including, without limitation, vacation plans, health and life insurance plans, deferred compensation plans and retirement or savings plans and similar plans, in each case, in the ordinary course of business or (d); and

(e)    transactions at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 6.08    *Business of Borrower and Subsidiaries*.

Engage at any time in any business or business activity other than the business conducted by it on the Closing Date and business activities reasonably similar, incidental, related or complementary thereto and reasonable extensions thereof, including without limitation a business which is a Healthcare Service Business.

SECTION 6.09    *Other Indebtedness and Agreements*.

(a)    (i) Except for any waiver, supplement, modification, amendment, termination or release of any Revolving Credit Facility not prohibited by the Intercreditor Agreement applicable intercreditorthereto or other agreement entered in accordance with this Agreementin form and substance satisfactory to the Required Lenders governing such Revolving Credit Facility, permit any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Material Indebtedness of the Borrower or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to the Borrower, any of the Subsidiaries or the Lenders or (ii) permit any waiver, supplement, modification or amendment of its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents, or any material agreement to the extent any such waiver, supplement, modification or amendment would be adverse to the Lenders in any material respect.

82

DRAFT—SUBJECT TO FURTHER REVISION

(b)　　Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay, or commit to pay, or directly or indirectly (including pursuant to any Synthetic Purchase Agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness except (i) (x) the payment of the ~~Indebtedness created hereunder~~Obligations and other Indebtedness under the Loan Documents and (y) the payment of Indebtedness under any Revolving Credit Facility (to the extent not prohibited pursuant to any Intercreditor Agreement or any other agreement applicable thereto entered into by or for the benefits of any of the Agents or Lenders), (ii) refinancings, renewals or extensions of Indebtedness permitted by Section 6.01, (iii) the payment of secured Indebtedness incurred pursuant to Section 6.01(d) that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness; and (iv) the payment of ~~the~~any Indebtedness permitted ~~by~~under Section 6.01~~(u); provided, that no payment of principal of or interest on any Subordinated Debt permitted to exist under this Agreement shall be made.~~ in an aggregate amount not to exceed the Available Amount at the time of such payment so long as (x) no Event of Default or Default is continuing or would result therefrom and (y) the Senior Secured Leverage Ratio calculated on a pro forma basis both before and after giving effect to any such payment is not greater than 4.0:1.00.

SECTION 6.10　　*Financial ~~Covenants~~Covenant*.[16]

~~(a)　　The Borrower shall not permit the [Senior Secured Leverage Ratio] as of the last day of each Test Period set forth below to be greater than the ratio set forth opposite such date:~~

| ~~Test Period~~ | ~~[Senior Secured Leverage Ratio]~~ |
| --- | --- |
| ~~March 31, 2021~~ | ~~[[___]:1.00]~~ |
| ~~June 30, 2021~~ | ~~[[___]:1.00]~~ |
| ~~September 30, 2021 and the last day of each Test Period ending thereafter~~ | ~~[[___]:1.00]~~ |

~~(b)　　The Borrower shall not permit (i)~~Permit Available Liquidity to be less than $~~8,000,000 at any time or (ii) the average daily Available Liquidity for any calendar week to be less than $10,000,000.~~5,000,000; provided, that, for purposes of determining compliance with this Section 6.10, the amount of unrestricted cash and Permitted Investments held at the applicable time of determination in the AAC Holdings Legacy Deposit Account (to the extent held therein in compliance with Section 5.18(b) and not otherwise in contravention of this Agreement or any other Loan Document) shall be included in the calculation of Available Liquidity under clause (b) of the definition thereof.

SECTION 6.11　　*Fiscal Year*.

With respect to the Borrower, change its fiscal year-end to a date other than December 31.

SECTION 6.12　　*Sanctions*.

~~The Borrower and its Subsidiaries shall not directly~~Directly or indirectly fund any activities of or business with any Person that is the subject of Sanctions, or in any Designated Jurisdiction, or in

---

[16] ~~NTD: Financial maintenance covenants (including type of covenant, applicable requirements/levels and testing periods) to be updated once confirmed by lenders.~~

*ACTIVE 52782809v1*1" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

any other manner that constitutes or would give rise to a violation by any Person (including any Person participating in the Transactions, whether as Lender, Administrative Agent or otherwise) of Sanctions.

SECTION 6.13    *Anti-Corruption, Anti-Bribery, Anti-Terrorism and Anti-Money Laundering Laws*.

~~The Borrower and its Subsidiaries shall not directly~~Directly or indirectly breach the FCPA, USA PATRIOT Act, the UK Bribery Act 2010 or any other applicable anti-corruption, anti-bribery, anti-terrorism or anti-money laundering legislation in the United States, United Kingdom and other jurisdictions.

SECTION 6.14    *Use of Proceeds*.

~~The Borrower and its Subsidiaries shall not use the~~Use any proceeds of the Loans for any purpose other than ~~for the purposes~~as specified in Section ~~3.13~~3.13, and subject to Section 3.24.

SECTION 6.15    *Healthcare Authorizations*.

(a)    ~~The Borrower and its Subsidiaries shall not transfer~~Transfer or assign any Healthcare Authorization, reimbursement or care contract or Nongovernmental Payor contract, except in connection with a permitted sale of a healthcare asset or if transfer could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect~~; and~~.

(b)    ~~The Borrower and its Subsidiaries shall not fail~~Fail to maintain in effect all Healthcare Authorizations, except to the extent that such failure to maintain a Healthcare Authorization could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

SECTION 6.16    *Intellectual Property*.

(a)    In the case of any Loan Party, intentionally do any act (or intentionally omit to do any act) whereby any of the material Intellectual Property owned by such Loan Party may lapse, or become abandoned, canceled, dedicated to the public, forfeited, unenforceable or otherwise impaired, or which would adversely affect the validity, grant, or enforceability of the security interest granted therein; provided, however, that such Loan Party may discontinue the use and/or maintenance of any Intellectual Property, including any material Intellectual Property, that such Loan Party determines, in its reasonable good faith determination, is no longer desirable in the ordinary conduct of such Loan Party's business.

(b)    In the case of any Loan Party, with respect to any Trademarks (as the term is defined in the Guarantee and Collateral Agreement) constituting material Intellectual Property owned by such Loan Party, cease the use of any of such Trademarks or fail to maintain a similar level of quality of products sold and services rendered under any such Trademark as the quality of such products and services as of the Closing Date; provided, however, that such Loan Party may discontinue the use and/or maintenance of any Trademarks constituting material Intellectual Property, that such Loan Party determines, in its reasonable good faith determination, is no longer valuable in the ordinary conduct of such Loan Party's business.

(c)    In the case of any Loan Party, such Loan Party shall not permit the inclusion in any contract to which it hereafter becomes a party and pursuant to which it acquires Intellectual Property any provision that could or may in any way materially impair or prevent the creation of a security interest in, or the assignment of, such Loan Party's rights and interests in any property included within the definitions of any material Intellectual Property acquired under such contracts.

84

DRAFT — SUBJECT TO FURTHER REVISION

SECTION 6.17    *Business of Holdings*.

With respect to Holdings, engage in any business activities except relating to, or have any assets or liabilities other than, its ownership of the Equity Interests of the Borrower and liabilities incidental thereto (including its liabilities pursuant to the Loan Documents).

For the avoidance of doubt, nothing in this Article VI, shall prohibit any Controlled Physician Affiliate Restructuring Transaction being consummated by the Borrower or any of its Subsidiaries in accordance with the definition of Controlled Physician Affiliate Restructuring Transaction; provided, that, to the extent that any Controlled Physician Affiliate is formed or acquired in connection with any Controlled Physician Affiliate Restructuring Transaction (or if any Controlled Physician Affiliate replaces any other Controlled Physician Affiliate in connection with such Controlled Physician Affiliate Restructuring Transaction, including for purposes of any management agreement or services arrangement), such Controlled Physician Affiliate shall, concurrently with the consummation of such Controlled Physician Affiliate Restructuring Transaction, become a Guarantor and shall grant a Lien on its assets to secure the Obligations to at least the same extent as required by the Loan Documents in connection with other Controlled Physician Affiliates who are Guarantors, and shall comply with all provisions of the Loan Documents applicable to other Controlled Physician Affiliates (including all provisions that would be applicable thereto if such Controlled Physician Affiliates had been acquired in a Permitted Acquisition).

## ARTICLE VII

### *Events of Default*

SECTION 7.01    *Events of Default*.

In case of the happening of any of the following events ("*Events of Default*"):

(a)    any representation or warranty made or deemed made in or in connection with any Loan Document, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished, except that such materiality qualifier shall not be applicable to any representation and warranty that is already qualified by materiality;

(b)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest or premium on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five (5) Business Days;

(d)    default shall be made in the due observance or performance by ~~the Borrower~~any Loan Party or any Subsidiary of any covenant, condition or agreement contained in Section 5.05(a), Section 5.08, Section ~~5.12~~5.12, Section 5.17, Section 5.18 or in Article VI;

(e)    default shall be made in the due observance or performance by ~~the Borrower~~any Loan Party or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (b), (c) or (d) above) and such default shall continue unremedied for a

85

DRAFT – SUBJECT TO FURTHER REVISION

period of 30 days (or in the case of Section ~~5.04(a), (b) or (c) or 5.19,~~5.04, 15 Business Days) after the earlier of (i) notice thereof from the Administrative Agent to the Borrower (which notice shall also be given at the request of any Lender) or (ii) knowledge thereof of the Borrower;

(f)     (i) ~~the Borrower~~any Loan Party or any Subsidiary of the Borrower shall fail to pay any principal, interest or amount, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable beyond the grace period, if any, provided therefor, (ii) any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or (iii) any other event or condition occurs that enables or permits (after giving effect to any grace period) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided, that clauses (ii) and (iii) above shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Borrower or any Material Subsidiary or of a substantial part of the property or assets of the Borrower or a Material Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Material Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or a Material Subsidiary or (iii) the winding-up or liquidation of Holdings, the Borrower or any Material Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)     Holdings, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in paragraph (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or any Material Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any corporate action for the purpose of effecting any of the foregoing;

(i)     one or more judgments shall be rendered against Holdings, the Borrower, any Subsidiary or any combination thereof (to the extent not fully covered by independent and unaffiliated third-party insurance as to which the insurer has not denied coverage or does not deny coverage (or, if the applicable claim is pending, the Borrower reasonably expects the insurer not to deny coverage)) and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $~~15,000,000~~ 16,500,000 or (ii) is for injunctive relief and could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

86

(j)        there shall occur an ERISA Event, that, when taken together with all other such ERISA Events, could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect to the Borrower and its ERISA Affiliates;

(k)        any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any ~~Subsidiary~~ Guarantor shall deny in writing that it has any further liability under the Guarantee and Collateral Agreement (other than as a result of the discharge of such ~~Subsidiary~~ Guarantor in accordance with the terms of the Loan Documents);

(l)        ~~the security interests~~any Lien purported to be created by the Security Documents shall cease to be, or shall be asserted by Holdings, the Borrower or any other Loan Party not to be, for any reason, a valid and perfected Lien ~~with the priority required by the applicable Loan Documents on and security interest in~~on any material portion of the Collateral purported to be covered thereby~~, subject to Permitted Liens (other than Permitted Liens described in Section 6.02(u)), except (i~~ and having the ranking and priority required by the applicable Loan Documents (subject to any prior Liens permitted under Section 6.02 or as otherwise permitted pursuant to any Intercreditor Agreement entered into in accordance herewith), except (i) pursuant to a release expressly permitted by this Agreement or any other Loan Document, (ii) as a result of the Collateral Agent's action or failure to take any action required to be taken by it following the due performance by the Loan Parties of any related obligation of a Loan Party ~~and~~, or (~~ii~~iii) as to Collateral consisting of material owned or leased real property to the extent that covered by a lender's title insurance policy and such insurer has not denied coverage;

(m)        any Subordinated Debt of the Borrower and the Subsidiaries constituting Material Indebtedness shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert in writing), for any reason, to be validly subordinated to the Obligations as provided in the indenture or other agreement evidencing such Subordinated Debt;

(n)        there occurs the loss, suspension or revocation of, or failure to renew, any registrations, licenses, permits, authorizations or clearances (including, for the avoidance of doubt, the Healthcare Authorizations) now held or hereafter acquired by the Borrower or any other Loan Party, if such loss, suspension, revocation or failure to renew could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;

(o)        there shall have occurred a Change in Control; or

(p)        any ~~Loan Party is excluded from any Nongovernmental Payor program that has resulted or could reasonably be expected to result in non-compliance with the financial covenants in Section 6.10;~~Intercreditor Agreement shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against any party thereto (or against any person on whose behalf any such party makes covenants or agreements therein), or otherwise not be effective to create the rights, obligations Lien and/or payment priorities or other arrangements, as applicable, purported to be created thereunder, unless the same results directly from the action or inaction of the Administrative Agent.

then, and in every such event (other than an event ~~with respect to the Borrower~~ described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other

87

DRAFT -- SUBJECT TO FURTHER REVISION

Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

SECTION 7.02    *Right to Cure*.

(a)    Notwithstanding anything to the contrary contained in Section 7.01, in the event that the Borrower fails to comply with the financial covenant in Section 6.10(a), from the day after the end of the applicable four fiscal quarter period until the date that is ten Business Days after the date on which the Compliance Certificate is required to be delivered pursuant to Section 5.04(c) for such fiscal period, the Borrower shall have the right to issue Junior Capital for cash or otherwise receive the net cash proceeds of any cash capital contribution (collectively, the "*Cure Right*"), and upon the receipt by the Borrower of such cash net proceeds (the "*Cure Amount*"), the financial covenant in Section 6.10(a) shall be recalculated giving effect to the following pro forma adjustments:

(i)    Consolidated EBITDA shall be increased, solely for the purpose of measuring the financial covenant in Section 6.10(a) and not for any other purpose under this Agreement, by an amount equal to the Cure Amount for the fiscal quarter with respect to which the Cure Right is exercised and each of the following three fiscal quarters; and

(ii)    if, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the financial covenant in Section 6.10(a), the Borrower shall be deemed to have satisfied the requirements of such financial covenant, as of the relevant time with the same effect as though there had been no failure to comply therewith at such time, and the applicable breach or default of such financial covenant that had occurred shall be deemed cured for all purposes of this Agreement.

(b)    Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period there shall be at least two fiscal quarters in which the Cure Right is not exercised, (ii) the Cure Right may be exercised on no more than four occasions, (iii) the Cure Amount shall be no greater than the amount required for purposes of complying with the financial covenant in Section 6.10(a), (iv) all Cure Amounts and the use of proceeds therefrom shall be disregarded for all other purposes under the Loan Documents (including calculating Consolidated EBITDA and for purposes of Section 6.06), (v) upon the Administrative Agent's receipt of a notice from the Borrower that it intends to exercise the Cure Right, neither the Administrative Agent nor any Lender shall exercise the right to accelerate the Loans or terminate the Commitments and neither the Administrative Agent nor any Lender, Collateral Agent or any other Secured Party shall exercise any right to foreclose on or take possession of the Collateral solely on the basis of an Event of Default having occurred and being continuing under the financial covenant in Section 6.10(a) until the expiration of the ten Business Day period referred to in the first sentence of Section 7.02(a) (unless prior to the expiration thereof, the application of the Cure Right so cured such Event of Default in accordance with the foregoing provisions), and (vi) if, after increasing the amount of Consolidated EBITDA in accordance with Section 7.02(a)(i), the Borrower shall be in compliance with the requirements of Section 6.10(a) in accordance with Section 7.02(a)(ii), then

88

DRAFT – SUBJECT TO FURTHER REVISION

~~any Event of Default arising from the failure of the Borrower to be in compliance with Section 6.10(a) shall automatically, without any further action by any party hereto, be deemed not to have occurred hereunder.~~

## ARTICLE VIII

### *The Administrative Agent and the Collateral Agent; Etc.*

Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article VIII, the Administrative Agent and the Collateral Agent are referred to collectively as the "*Agents*") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents and any other documents that contemplate any action being taken, or any determination being made by, or consent of, any Agent in its capacity as such, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents ~~and (ii~~(including in connection with any Controlled Physician Affiliate Restructuring Transaction consummated in accordance herewith), (ii) to execute, deliver and perform any Intercreditor Agreement in respect of this Credit Facility or the Liens granted pursuant to the Security Documents, in each case under this clause (ii) to the extent such agreement, amendment or restatement has been approved by the Required Lenders (it being understood that neither Agent is required to enter into any intercreditor agreement unless the terms thereof relating to any obligations or duties of such Agent are acceptable to such Agent), and (iii) negotiate, enforce or the settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08); provided, that ~~the Administrative~~neither Agent shall ~~not~~ be required to take any action that, in its opinion or the opinion of its counsel, may (A) expose ~~the Administrative~~such Agent to liability or that is contrary to any Loan Document or Requirement of Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law, or (B) violate or (in the Agent's reasonable good faith determination, made after consultation with the Required Lenders) conflict with the terms of any intercreditor agreement in respect of this Credit Facility or the Liens granted pursuant to the Security Documents, and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by ~~the bank serving as Administrative Agent and/or Collateral~~such Agent or any of its Affiliates in any

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent. In any case, where the consent or approval of any Agent is expressly required under this Agreement or any other Loan Documents, the withholding or giving of such consent or approval may be conditioned by such Agent upon the receipt of the approval of the Required Lenders, and such Agent shall be fully protected and not liable to the Lenders or any other Person in relying upon such Required Lender approval or failing to act in the absence of such Required Lender approval.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, approval or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

With respect to any term or provision of this Agreement or any other Loan Document that requires the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by any Agent, or that allows, permits, requires, empowers or otherwise provides that any matter, action, decision or similar may be taken, made or determined by any Agent without expressly referring to the requirement to obtain consent or input from any Lenders, or to otherwise notify any Lender, such term or provision shall be interpreted to refer to such Agent exercising its Permitted Discretion, and such Agent, in taking any such action or making any such determination, such Agent shall be deemed to have validly exercised the power and authority granted to it by the Lenders hereunder, whether or not such provision expressly refers to such Agent exercising its Permitted Discretion, and shall be entitled to all the benefits and protections hereof to the same extent as if such Agent had taken any such action or made any such determination at the express direction of the Required Lenders.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facility as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, (x) either Agent may resign at any time by notifying the Lenders and the Borrower and/or (y) any Agent may be removed by the Required Lenders on not less than 30 calendar days' prior written notice (or such shorter period as may be agreed to by the Required Lenders); provided, that, if the same Person (or an Affiliate thereof) is serving both as Administrative Agent and as Collateral Agent, the resignation or removal (as

90

DRAFT—SUBJECT TO FURTHER REVISION

applicable) of such Person (or its applicable Affiliate) as Administrative Agent or as Collateral Agent (as applicable) in accordance with the foregoing shall constitute the resignation or removal (as applicable) of such Person (or its applicable Affiliate) as both Administrative Agent and Collateral Agent unless otherwise agreed in writing by such institution (or its applicable Affiliate) and the Required Lenders. Upon any such resignation or removal, as applicable, the Required Lenders shall have the right to appoint a successor, without the consent of the Borrower. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be, without the consent of the Borrower.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation or removal (as applicable) hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "***Removal Effective Date***"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

The Loan Parties and the Lenders hereby irrevocably authorize Collateral Agent, based upon the instruction of the Required Lenders, to (A) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code or other bankruptcy laws, including under Section 363 of the Bankruptcy Code, (B) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Uniform Commercial Code, including pursuant to Sections 9-610 or 9-620 thereof or the Bankruptcy Code, or (C) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Collateral Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Collateral Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase), and (ii) the Collateral Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle or vehicles and in connection therewith the Collateral Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, in the event that any controversy arises between or among any of the Secured Parties or any other Person in respect of any Collateral or proceeds thereof in the possession or control of any Agent, such Agent shall, to the extent directed by the Required Lenders, have the right to initiate proceedings in the Bankruptcy Court (or to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over such matter, to any other court of competent jurisdiction permitted under Section 9.15(a)) for a declaratory judgment to determine the rights of such Secured Parties or other Persons with respect to such Collateral or any proceeds thereof.  The provisions of this paragraph are in addition to and not in limitation of any right of resignation or other rights or protections afforded to the Agents pursuant to the terms of this Agreement

## ARTICLE IX

### *Miscellaneous*

SECTION 9.01        ***Notices; Electronic Communications***.

Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by fax or via electronic mail, as follows:

(a)        if to the Borrower, to it at :

**AAC** ~~Holdings, Inc.,~~**NEW HOLDCO INC.**
200 Powell Place,
Brentwood, TN ~~37027,~~37027
Attention: Andrew W. McWilliams, Chief Executive Officer (Telephone: 615-732-1385;
Email: ~~amcwilliams@contactaac.com);~~amcwilliams@contactaac.com)

With copy to (which shall not constitute notice):

**Greenberg Traurig, LLP**~~,~~
3333 Piedmont Road, NE, Terminus 200, Suite ~~2500,~~2500
Atlanta, GA ~~30305,~~30305

92

DRAFT – SUBJECT TO FURTHER REVISION

Attention: David B. Kurzweil, Esq. (Telephone: 678-553-2100; Email: kurzweild@gtlaw.com); and Attention: John Dyer, Esq. (Telephone: 678-553-2100; Email: dyerj@gtlaw.com); dyerj@gtlaw.com)

(b)      [if to the Administrativeany Agent, to :

Ankura Trust Company, LLC,
140 Sherman Street, 4th Floor,
Fairfield, CT 06824, 06824
Attention: Michael J. Fey (Telephone: 980-226-7633, Fax No.: 202-797-3619, Email: Michael.Fey@ankura.com;)

With copy to (which shall not constitute notice):

Kilpatrick Townsend & Stockton LLP,
1100 Peachtree Street NE,
Atlanta, GA 30309, 30309
Attention: Todd Meyers, Esq. (Telephone: 404-815-6482; Email: TMeyers@kilpatricktownsend.comTMeyers@kilpatricktownsend.com) and Joseph L. Scibilia, Esq. (Telephone: 404-815-6070;] Email: jscibilia@kilpatricktownsend.com);

(c)      [reserved]; and

(d)      if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Borrowing Request, a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly

93

DRAFT – SUBJECT TO FURTHER REVISION

identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "*Borrower Materials*") by posting the Borrower Materials on Intralinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information (if any exists) with respect to ~~the Borrower, their respective subsidiaries or~~any of the Lon Parties and/or any of their Subsidiaries (and/or any of their respective securities)) (each, a "*Public Lender*").  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to ~~the Borrower, their respective subsidiaries or~~any of the Lon Parties and/or any of their Subsidiaries (and/or any of their respective securities), for purposes of foreign, United States federal and state securities laws (provided, that, to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor".  Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents, (2) any notification of changes in the terms of the Credit Facility and (3) all information delivered pursuant to Sections 5.04(a), (b) and (c).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including foreign, United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any of the ~~Borrower or its~~Lon Parties and/or any of their Subsidiaries (and/or any of their respective securities) for purposes of foreign, United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY

94

DRAFT—SUBJECT TO FURTHER REVISION

OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY LOAN PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH LOAN PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02    *Survival of Agreement*.

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

SECTION 9.03    *Binding Effect*.

This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04    *Successors and Assigns*.

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the other Loan Parties, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

(b)   ~~Subject to Section 9.04(m), each~~Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, however, that (i) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans of the relevant Class); provided, that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about any of the Loan Parties and/or any of their Related Parties and/or any of their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including foreign, United States Federal and state securities laws) and all applicable tax forms.  Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of, and subject to the obligations of, Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid); provided, that, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)   By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Term Loan Commitment and the outstanding balances of its Term Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in clause (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance;

96

DRAFT – SUBJECT TO FURTHER REVISION

(v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York or Fairfield, Connecticut a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender's having been a Defaulting Lender.  The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)    Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to one or more banks or other Persons (other than to any Disqualified Institution or any natural person) in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in, and subject to the obligations contained in, Section 2.14, 2.16 and 2.20 to the same extent as if they were Lenders (provided, that such participating bank or other Person (A) agrees to be subject to the provisions of Sections 2.21 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.14 or 2.20, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participating bank or other Person acquired the applicable participation) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Commitments in which such participating bank or Person has an interest or releasing any Subsidiary Guarantor (other than in connection with the sale of such Subsidiary Guarantor in a transaction permitted by Section 6.05 or any Controlled Physician Affiliate Restructuring Transaction consummated in accordance herewith) or all or substantially all of the Collateral).  To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided such participating bank or other Person agrees to be subject to Section 2.18 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participating bank or other Person and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(g)    Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided, that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

(h)    Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; provided, that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)    Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPV*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided, that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute

*ACTIVE 52782809v11*" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State or territory thereof.  In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to in writing by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)        The Borrower shall not  assign or delegate any of its rights or duties hereunder (except to a Successor Borrower as expressly permitted by Section 6.05(a)) without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(k)        In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(l)        Notwithstanding anything in this Agreement to the contrary, any Term Lender may, at any time, assign (which assignment shall not constitute a voluntary prepayment of Loans (including for purposes of Section 2.12)) all or a portion of its Term Loans on a non-pro rata basis to the Borrower or any Subsidiary through (x) Dutch Auctions open to all Term Lenders on a pro rata basis or (y) open market transactions, in each case, subject to the following limitations:

(i)        the Borrower and each Subsidiary (as applicable) shall represent and warrant as of the date of any such assignment, that neither it nor any of its respective directors or officers has any material non-public information with respect to any of the ~~Borrower or the~~Loan Parties and/or any of their Subsidiaries (and/or any of their respective securities), that, in each case, has not been disclosed to the Term Lenders generally (other than because such Term Lenders do not wish to receive material non-public information with respect to any of the ~~Borrower or the~~Loan Parties and/or any of their Subsidiaries (and/or any of their respective securities)) prior to such date;

(ii)        immediately upon the effectiveness of such assignment of Term Loans from a Term Lender to the Borrower or any Subsidiary, such Term Loans and all rights and obligations as a Term Lender related thereto shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated. extinguished, cancelled and of no further force and effect, and the Borrower and such Subsidiary (as

99

DRAFT – SUBJECT TO FURTHER REVISION

applicable) shall neither obtain nor have any rights as a Term Lender hereunder or under the other Loan Documents by virtue of such assignment;(iii) (including any right to consent to any matter hereunder, it being understood and agreed that any Loans held by the Borrower and eachor any Subsidiary at any time shall not use the proceeds of any Revolving Loans for any such assignmentbe deemed outstanding for purposes of any determination of Required Lenders or otherwise in connection with any consent on any matter); and

(iii)     (iv) no Default or Event of Default shall have occurred and be continuing or would result therefrom.

SECTION 9.05     *Expenses; Indemnity*.

(a)     The Borrower agrees to pay (i) all reasonable documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders in connection with (x) the syndication of the Credit Facility and the preparation, negotiation and execution of this Agreement and the other Loan Documents, and (y) the administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof including, in the case of clauses (x) and (y), (A) the reasonable documented fees, charges and disbursements of Kilpatrick Townsend & Stockton LLP (or any successor firm), counsel for the Administrative Agent and the Collateral Agent, it being understood that indemnification and/or expense reimbursement for legal counsel for the Administrative Agent and the Collateral Agent is limited to one lead counsel and one local counsel in each appropriate jurisdiction, and any regulatory or special counsel reasonably required by Agent and (B) the reasonable documented fees, charges and disbursements of Stroock & Stroock & Lavan LLP ("*Stroock*"), counsel for the Required Lenders, it being understood that indemnification and/or expense reimbursement for legal counsel for the Lenders is limited to such lead counsel and one local counsel in each appropriate jurisdiction and any regulatory or special counsel reasonably required by the Required Lenders), and (ii) all documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and each Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made, including the reasonable documented fees, charges and disbursements of Kilpatrick Townsend & Stockton LLP, (or any successor firm), together with any local or special counsel, as counsel for the Administrative Agent and the Collateral Agent, and the reasonable documented fees, charges and disbursements of Stroock, counsel for the Required Lenders (it being understood that indemnification and/or expense reimbursement for legal counsel for the Lenders is limited to Stroock and one local counsel in each appropriate jurisdiction and any regulatory or special counsel reasonably required by the Required Lenders), in connection with any such enforcement or protection, the fees, charges and disbursements of any other counsel for the Administrative Agent, the Collateral Agent or any Lender, and (iii) without duplication of the foregoing, all Lender Advisor Expenses.

(b)     The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "*Indemnitee*") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related costs and expenses, including reasonable documented counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby (including the syndication of the Credit Facility), (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the

100

DRAFT – SUBJECT TO FURTHER REVISION

Borrower, any other Loan Party or any of their respective Affiliates), or (iv) any actual or alleged presence or Release of Hazardous Materials on any property currently or formerly owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or the Subsidiaries and this Agreement; provided, that such indemnity shall not, as to an Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (a) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee, (b) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from a material breach of the Loan Documents by such Indemnitee or (c) result primarily from any dispute solely among Indemnitees not involving an act or omission by the Borrower or its Subsidiaries, other than claims against any Indemnitee in its capacity or in fulfilling its role as an agent or arranger or any other similar role under this Agreement.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Agent in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Term Loans and unused Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender).

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement or the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby, the repayment, discharge, satisfaction of any of the Loans or other Obligations, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender. All amounts due under this Section 9.05 shall be payable within 10 Business Days of written demand therefor and, reasonably promptly following a request by the Borrower therefor, a reasonably detailed summary of such amounts (subject to such redactions as shall be considered reasonably required by the applicable Indemnitee).

(f)     The provisions of this Section 9.05 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

SECTION 9.06     *Right of Setoff*.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand

101

DRAFT—SUBJECT TO FURTHER REVISION

under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.24 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided, that the failure to give such notice shall not affect the validity of such setoff and application.  Notwithstanding the provisions of this Agreement or any other Loan Document, if at any time any Lender or any of its Affiliates maintains one or more ~~deposit accounts~~Deposit Accounts for the Borrower or any other Loan Party into which Medicare and/or Medicaid receivables or any other government program receivables subject to federal reassignment prohibitions are deposited, then, in each case, such Person hereby waives and shall continue to waive the right of setoff set forth herein and therein.

SECTION 9.07      *Applicable Law*.

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08      *Waivers; Amendment*.

(a)      No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders; provided, however, that no such agreement shall:

(i)      decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest ~~or premium~~ on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly adversely affected thereby,

(ii)      increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender,

102

DRAFT – SUBJECT TO FURTHER REVISION

(iii)    amend or modify the pro rata requirements of Section 2.17, the provisions of Section 9.04(j) or (l) or the provisions of this Section 9.08 or release ~~any~~all or substantially all of the Subsidiary ~~Guarantor~~Guarantors (other than in connection with the sale of such Subsidiary ~~Guarantor~~Guarantors in a transaction permitted by Section 6.05) or all or substantially all of the Collateral, without the prior written consent of each Lender,

(iv)    change the provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each adversely affected Class,

(v)    modify the protections afforded to an SPV pursuant to the provisions of Section 9.04(i) without the written consent of such SPV or

(vi)    amend or modify the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments ~~and Revolving Credit Commitments~~ on the date hereof);

provided, however, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent; provided, further that no such agreement shall change (x) Section 2.18 in a manner that would alter the pro rata sharing of payments required thereby or (y) the definition of "Class" without the written consent of each Lender directly and adversely affected thereby.

(c)    The ~~Administrative~~applicable Agent party thereto and the Borrower may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender, or to make modifications contemplated by Section 2.23 or 2.25. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

SECTION 9.09    *Interest Rate Limitation*.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall exceed the maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10    *Entire Agreement*.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT—SUBJECT TO FURTHER REVISION

This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11    *WAIVER OF JURY TRIAL*.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.12    *Severability*.

In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13    *Counterparts*.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03.  Delivery of an executed signature page to this Agreement by facsimile (or other electronic) transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14    *Headings*.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15    *Jurisdiction; Consent to Service of Process*.

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

DRAFT – SUBJECT TO FURTHER REVISION

(a)      The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or its, any other Loan Party, their respective properties or the Collateral in the courts of any jurisdiction (including any action in any jurisdiction to realize on the Collateral or any other security for the Obligations), or to recognize or enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent or any Lender.

(b)      The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.16      *Confidentiality*.

Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors and any numbering, administration and settlement service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents and their respective financing sources or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section, "*Information*" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower; provided, that, in the case of Information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as

105

DRAFT – SUBJECT TO FURTHER REVISION

confidential or is information that a reasonably prudent person would presume to be confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 9.17       *Lender Action*.

Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent.  The provisions of this Section 9.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 9.18       *USA PATRIOT Act Notice*.

Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

SECTION 9.19       *Withholding Taxes*.

To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding Tax.  If any taxing authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

SECTION 9.20       *No Fiduciary Duty*.

The parties hereto hereby acknowledge that the Administrative Agent, the Collateral Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "***Lender Parties***"), may have economic interests that conflict with those of any Loan Party, its stockholders and/or their respective Affiliates.  The Borrower agrees, on behalf of itself and each other Loan Party, that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender Party, on the one hand, and any Loan Party, its stockholders or their respective Affiliates, on the other hand.  The Borrower acknowledges and agrees, on behalf of itself and each other Loan Party, that (a) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lender Parties, on the one hand, and the Loan Parties, on the other hand, and (b) in connection therewith and with the process leading thereto, (i) no Lender Party has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or their

106

DRAFT – SUBJECT TO FURTHER REVISION

respective Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender Party has advised, is currently advising or will advise any Loan Party, its stockholders or their respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (ii) each Lender Party is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, their respective Affiliates, creditors or any other Person. The Borrower acknowledges and agrees, on behalf of itself and each other Loan Party, that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Borrower agrees, on behalf of itself and each other Loan Party, that it will not claim that any Lender Party has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Loan Party, in connection with such transaction or the process leading thereto.

SECTION 9.21    *Acknowledgment and Consent to Bail-In of EEA Financial Institutions*.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instrumentals of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

SECTION 9.22    *Cashless Settlement*.

Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

[*Remainder of page intentionally left blank*]

ACTIVE 52782809v11" = "1" "NY 78231004v14" "" NY 78231004v14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AAC ~~HOLDINGS,~~<ins>NEW HOLDCO</ins> INC.

By ~~DRAFT~~

Name:

Title:

[*~~Signature Page to~~*<ins>*AAC – Exit Facility*</ins> *Credit Agreement*]

[_____]ANKURA TRUST COMPANY, LLC, as Administrative Agent and Collateral Agent

By DRAFT

    Name:
    Title:

LENDERS:

[_____], as a Lender

    By

    Name:
    Title:

ACTIVE 52782809v1" = "1" "NY 78231004v14" "" NY 78231004v14

## Exhibit B

(New Organizational Documents)

This Exhibit B contains revised drafts of certain of the New Organizational Documents set forth in Exhibit B to the Plan Supplement, which remain subject to ongoing review and comment by the Debtors and the Consenting Lenders. Schedule 1 below contains the revised New Organizational Documents. Schedule 2 below contains redlined versions of the New Organizational Documents showing changes to the New Organizational Documents filed with the Court in the Plan Supplement.

Schedule 1

(New Organizational Documents)

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**of**

**AAC PARENT CORPORATION**

AAC PARENT CORPORATION, a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

A.      The name of the corporation is AAC PARENT CORPORATION (the "Corporation"). The Corporation was originally incorporated by the filing of a Certificate of Incorporation (as amended prior to the date hereof, the "Original Certificate of Incorporation") with the Secretary of State of the State of Delaware on November 12, 2020, which was amended on December [•], 2020. This Amended and Restated Certificate of Incorporation (this "Certificate of Incorporation") was duly adopted by the Board of Directors of the Corporation in accordance with §§ 241 and 245 of the Delaware General Corporation Law (the "DGCL") and in accordance with (a) the Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates, as confirmed by that certain order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), entered on October 20, 2020 in the cases captioned *In re AAC Holdings, Inc., et al* (Case No. 20-11648 (JTD)) under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. Sections 101-1330), as amended (the "Bankruptcy Code") (as such Chapter 11 Plan may be amended, supplemented or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan" and such order, the "Confirmation Order") and (b) that certain Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan, as entered by the Bankruptcy Court on November 20, 2020 (the "Order in Aid of the Plan").

B.      This Certificate of Incorporation is being filed pursuant to §241 of the DGCL as an amendment before the Corporation's receipt of any payment for any of its stock.

C.      This Certificate of Incorporation is effective as of [•] (prevailing Eastern Time) on December [•], 2020.

1.      **Name.**  The name of the corporation is AAC PARENT CORPORATION.

2.      **Registered Office and Agent.**   The address of the registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, Wilmington, Delaware 19808, New Castle County. The name of the registered agent of the Corporation at such address is Corporation Service Company.

3.      **Purpose.**  The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

4.      **Authorized Capital Stock; Number of Shares.**  The total number of shares of capital stock that the Corporation shall have the authority to issue is thirty-five million

NY 78205642

(35,000,000) shares, all of which shall be shares of common stock, $0.01 par value per share ("Common Stock"). Notwithstanding anything herein to the contrary, the Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; *provided*, *however*, that the foregoing restriction (i) shall have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) shall only have such force and effect to the extent and for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

5. **Rights of Stockholders.**

5.1 *Common Stock.*

5.1.1 *Dividends.* Subject to the terms of the Stockholders Agreement, the Board of Directors may cause dividends to be declared and paid on outstanding shares of Common Stock out of funds legally available for the payment of dividends. When, as and if dividends on Common Stock are declared by the Board of Directors, whether payable in cash, in property, in stock or otherwise, in accordance with this Certificate of Incorporation and the Bylaws of the Corporation, as in effect from time to time (the "Bylaws"), out of the assets of the Corporation which are at law available therefor, the holders of outstanding shares of Common Stock shall be entitled to share equally in, and to receive in accordance with the number of shares of Common Stock held by each such holder, all such dividends.

5.1.2 *Liquidation Rights.* In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of issued and outstanding shares of Common Stock shall be entitled to share, ratably according to the number of shares of Common Stock held by each such holder, in the remaining assets of the Corporation available for distribution to its stockholders after the payment, or provision for payment, of all debts and other liabilities of the Corporation.

5.1.3 *Stockholder Voting Rights.* Subject to applicable law and except as otherwise expressly provided elsewhere in this Certificate of Incorporation or the Bylaws, each holder of record of one or more issued and outstanding shares of Common Stock shall be entitled to one vote for each share of Common Stock standing in such holder's name on the books of the Corporation.

5.2 **Consideration.** Subject to applicable law and except as otherwise provided in this Certificate of Incorporation and the Stockholders Agreement, the capital stock of the Corporation, regardless of class or series, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

5.3 **Special Approval Requirements for Certain Actions**. In addition to any other vote of stockholders or stockholder or Board of Directors approval that may be required by law or by the provisions of this Certificate of Incorporation, so long as the Stockholders Agreement is in effect, whether or not specifically provided for in this Certificate of Incorporation, neither the Corporation nor any of its subsidiaries nor their Board of Directors shall take any action that under the terms of the Stockholders Agreement first requires a vote, consent or approval from

2

one or more holders of Common Stock and/or members of the Board of Directors to be obtained, without first obtaining such required vote, consent or approval.

5.4     ***Stockholders Agreement***.  To the fullest extent permitted by law, every holder of shares of Common Stock shall be subject to, shall be required to enter into, and shall be deemed to have entered into and to be bound by, the Stockholders Agreement of the Corporation to be entered into pursuant to the Plan and dated as of the "Effective Date" under the Plan (such date, the "Plan Effective Date"), by and among the Corporation and its stockholders (as may be amended, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement"), including without limitation the restrictions on transfer of Common Stock set forth therein, from and after such time as such holder receives any shares of Common Stock (whether by sale, transfer, gift, inheritance or otherwise, as a distribution under the Plan, through the exercise or conversion of options, warrants, convertible notes or other convertible securities, by operation of law or otherwise), and the Stockholders Agreement shall be deemed to be a valid and binding obligation of such stockholder, enforceable against each such holder in accordance with its terms (including any provisions thereof that require the holder to waive or refrain from exercising any appraisal, dissenters or similar rights), in each case even if such holder has not actually executed a counterpart signature page or joinder (or other written instrument pursuant to which such holder agrees to be bound thereby) to the Stockholders Agreement.  In the event the Stockholders Agreement is terminated at any time in accordance with its terms, all references to "Stockholders Agreement" contained in this Certificate of Incorporation shall, from and after the effective time of such termination, automatically cease to be of any further force or effect.  If any provisions of this Section 5.4 or the application thereof to any Person (as defined below) or circumstance are to any extent held by a court of competent jurisdiction to be invalid or unenforceable for any reason, the applicability of the remainder of this Section 5.4 to such Person or circumstance, and the application of such provision(s) to other Persons and circumstances, shall not be affected thereby and such provisions shall be enforced to the greatest extent permitted by law.  The Corporation shall furnish without charge to each holder of record of shares of Common Stock a copy of the Stockholders Agreement upon written request to the Secretary of the Corporation at the Corporation's principal executive office.  As used herein, "Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust or joint venture, or a governmental agency or political subdivision thereof.

6.     **Restrictions on Transfers of Shares.** The Corporation shall not record upon its books any sale or other sale, transfer, assignment or other disposition of Common Stock or other securities except in accordance with the applicable provisions of this Certificate of Incorporation and the Stockholders Agreement.  Any purported sale, transfer, assignment or other disposition of Common Stock or other securities in violation of such provisions shall be void *ab initio* and shall not be recognized by the Corporation for any purpose.

7.     **Board of Directors**.

7.1     ***General***.     Except as may otherwise be provided in this Certificate of Incorporation, the Bylaws, the Stockholders Agreement or the DGCL, the business of the Corporation shall be managed by the Board of Directors.  This Section 7 is inserted for the

3

management and conduct of the business and affairs of the Corporation and is intended to be in furtherance of and not in limitation or exclusion of the powers conferred on the Board of Directors by applicable law.

7.2   ***Composition of the Board of Directors; Term; Removal***.

7.2.1   The number of directors constituting the whole Board of Directors shall be fixed from time to time by a vote of a majority of the directors then in office; <u>provided</u>, that upon the Plan Effective Date such number shall be fixed at seven (7), and shall not subsequently be fixed at fewer than five (5) directors nor more than seven (7) directors except with the prior approval by holders of a majority of the aggregate voting power of the shares of capital stock then outstanding. Except as otherwise provided in the Stockholders Agreement, each director shall hold office until the next annual meeting of stockholders and until his or her successor is duly elected and qualified in accordance with the terms of this Certificate of Incorporation, the Bylaws and the Stockholders Agreement, or his or her earlier death, resignation or removal.

7.2.2   Except as otherwise provided by the Stockholders Agreement, at each annual meeting of stockholders, directors shall be elected for a one-year term by affirmative vote of a plurality (or such other threshold as may be specified in the Stockholders Agreement) of the aggregate combined voting power of the Corporation's then-issued and outstanding shares of Common Stock, present in person or represented by proxy at a meeting called for the purpose of electing directors.  Directors may also be elected by written consent of the stockholders if and to the extent provided for in the Stockholders Agreement.  There shall not be cumulative voting for directors.

7.2.3   Any director may be removed at any time in accordance with the Stockholders Agreement. In the event the chief executive officer of the Corporation is serving as a director and his or her employment as chief executive officer is terminated for any reason, such Person shall automatically, upon such termination, cease to serve as a director and be deemed to have resigned from the Board of Directors.

7.2.4   Except as otherwise provided by the Stockholders Agreement, any vacancies in the Board of Directors resulting from any director's death, resignation, removal or other cause, shall be filled as provided in the Bylaws.

8.   **Compromise, Arrangement or Reorganization**.  Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of the DGCL or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of the DGCL, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as the said court directs.  If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any

4

compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

9.      **Limitation of Liability**.  To the fullest extent permitted by the DGCL, no director of the Corporation serving in such capacity shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director arising from acts or omissions, including breaches resulting from such director's grossly negligent behavior, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the DGCL or (d) for any transaction from which the director derived any improper personal benefits. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation arising from acts or omissions shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any amendment, repeal or modification of this Section 9 by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at or prior to the time of such amendment, repeal or modification.

10.      **Corporate Opportunity**.  The Corporation hereby renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business ventures or opportunities of which any of its directors who are not employed by the Corporation or any of its subsidiaries ("Non-Employee Directors"), or any Affiliate of any such director, is made aware; *provided*, *however*, that notwithstanding anything contained herein, this Section 10 shall not apply to business ventures or opportunities presented or offered to a Non-Employee Director solely in his or her capacity as a director of the Corporation (including as a member of any committee of the Board of Directors or any governing body of any subsidiary of the Corporation). Without limiting the generality of the foregoing, the Corporation specifically renounces any rights the Corporation might have in any business venture or business opportunity of any Non-Employee Director or Affiliate thereof, and no Non-Employee Director shall have any obligation to offer any interest in any such business venture or opportunity to the Corporation or otherwise account to the Corporation in respect of any such business ventures or opportunities, even if the business venture or opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so. Furthermore, (a) it shall not be deemed a breach of any fiduciary or other duty, whether express or implied, for any Non-Employee Director or any of its Affiliates to (i) engage in a business venture or opportunity in preference or to the exclusion of the Corporation or (ii) directly or indirectly engage in the same or similar lines of business as the Corporation and its subsidiaries, and (b) a Non-Employee Director or Affiliate thereof shall have no obligation to (i) disclose to the Board of Directors or the Corporation any information in the possession of such Non-Employee Director or Affiliate thereof regarding any business ventures or opportunities even if it is material and relevant to the Corporation and/or the Board of Directors or (ii) refrain from engaging in any line of business or from investing in or doing business with any Person.  Any Person purchasing or otherwise acquiring any interest in capital stock of the Corporation shall be deemed to have notice of and to

5

have consented to the provisions of this <u>Section 10</u>.  As used in this <u>Section 10</u>, "<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any family member of such Person.  For purposes of such definition, (i) the term "<u>control</u>" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, (ii) the term "<u>family member</u>" means, with respect to any individual, (x) any of such individual's parents, spouse, siblings, children and grandchildren or (y) any trust the sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren and (iii) the term "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager or advisor as such Person or (z) an Affiliate of such investment manager or advisor.

11.   **DGCL Section 203**.  The Corporation expressly elects not to be governed by Section 203 of the DGCL.

12.   **Indemnification**.

12.1   To the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("<u>Proceeding</u>"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) with respect to any act or omission by reason of the fact that the Person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise ("<u>Other Entity</u>"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with such Proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the Person's conduct was unlawful.  To the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor with respect to any act or omission by reason of the fact that the Person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity, against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection with the defense or settlement of such action or suit if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Corporation unless

NY 78205642

and only to the extent that the Court of Chancery of the State of Delaware (the "Court of Chancery") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

12.2    The Corporation shall, from time to time, reimburse or advance to any director or officer entitled to indemnification hereunder the funds necessary for payment of expenses, including reasonable attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; *provided*, *however*, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director or officer is not entitled to be indemnified for such expenses.

12.3    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall not be deemed exclusive of any other rights to which a Person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, this Certificate of Incorporation, the Bylaws, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors, officers, employees and other agents of the Corporation are covered), any vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

12.4    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall continue as to a Person who has ceased to be a director or officer and shall inure to the benefit of the executors, administrators, legatees and distributees of such Person.

12.5    The Corporation shall have the power to purchase and maintain insurance on behalf of any Person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of an Other Entity, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not the Corporation would have the power to indemnify such Person against such liability under the provisions of this Section 12, the Bylaws, the Stockholders Agreement or under Section 145 of the DGCL or any other provision of law.

12.6    The provisions of this Section 12 shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Section 12 is in effect, on the other hand, pursuant to which the Corporation and each such director or officer intend to be legally bound.   Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this Section 12 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

7

NY 78205642

12.7    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall be enforceable by any Person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction.    Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such Person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such Person is not so entitled. Such a Person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action.

12.8    Any director or officer of the Corporation serving in any capacity in (i) another corporation of which a majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (ii) any employee benefit plan of the Corporation or any corporation referred to in clause (i) shall be deemed to be doing so at the request of the Corporation.

12.9    Any Person entitled to be indemnified or to reimbursement or advancement of expenses as a matter of right pursuant to this Section 12 may elect to have the right to indemnification or reimbursement or advancement of expenses interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the applicable Proceeding, to the extent permitted by law, or on the basis of the applicable law in effect at the time such indemnification or reimbursement or advancement of expenses is sought. Such election shall be made, by a notice in writing to the Corporation, at the time indemnification or reimbursement or advancement of expenses is sought; *provided*, *however*, that if no such notice is given, the right to indemnification or reimbursement or advancement of expenses shall be determined by the law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

12.10    It is the intent that with respect to all advancement, reimbursement and indemnification obligations to Non-Employee Directors under this Section 12, the Corporation shall be the indemnitor of first resort (*i.e.*, its obligations to indemnitees under this Certificate of Incorporation are primary and any obligation of any such stockholder or affiliate thereof are secondary) irrespective of any obligation that any stockholder or affiliate thereof may have with respect to such Non-Employee Director with respect to such amounts, and if any such stockholder or affiliate thereof pays or causes to be paid, for any reason, any such amounts otherwise indemnifiable or payable by the Corporation hereunder or under any other indemnification or similar agreement (whether pursuant to this Certificate of Incorporation, the Bylaws, the Stockholders Agreement, contract, law or regulation), then (i) such stockholder or affiliate thereof shall be fully subrogated to all rights hereunder of the indemnitee with respect to such payment and (ii) the Corporation shall reimburse such stockholder or affiliate thereof for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such stockholder or affiliate thereof.

8

NY 78205642

13.     **Books and Records**.  The books and records of the Corporation may be kept (subject to any provision contained in the DGCL or other applicable law) at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws.

14.     **Notices**.  All notices, requests, waivers and other communications made pursuant to this Certificate of Incorporation shall be in writing and shall be deemed to have been effectively given or delivered (a) when personally delivered to the party to be notified; (b) if given by electronic transmission in the manner provided in Section 232 of the DGCL; (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case as follows: (i) in the case of any stockholder, to such stockholder at its address or facsimile number set forth in the stock records of the Corporation; and (ii) in the case of the Corporation, to the Secretary of the Corporation at the Corporation's principal executive office.  A party may change its address for purposes of notice hereunder by giving notice of such change in the manner provided in this Section 14.  As used herein, "business day" means any day, other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized to be closed.

15.     **Amendments**.  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the DGCL and in accordance with the terms of the Stockholders Agreement.

16.     **Forum**.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws, or (d) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.  Any Person purchasing or otherwise acquiring shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 16.

17.     **Enforceability; Severability**.  Each provision of this Certificate of Incorporation shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Certificate of Incorporation shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Certificate of Incorporation, and this Certificate of Incorporation shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

18.     **Bylaws; Inconsistent Provisions**.  In furtherance and not in limitation of the powers conferred by law and except as otherwise set forth in the Stockholders Agreement, the

9

NY 78205642

Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of the Bylaws without any action on the part of the stockholders of the Corporation, subject to the power of the stockholders of the Corporation to amend or repeal any Bylaws adopted or amended by the Board of Directors. If there is any conflict between the provisions of the Stockholders Agreement and this Certificate of Incorporation, the provisions of the Stockholders Agreement will prevail unless such prevalence would be in contravention of the requirements of the DGCL.

[*Remainder of Page Intentionally Left Blank*]

10

NY 78205642

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation, which amends and restates the Corporation's Original Certificate of Incorporation, to be made, executed and acknowledged by its duly authorized officer this [•] day of December, 2020, as directed by and provided for in the Confirmation Order and the Order in Aid of the Plan.

By: _____

      Name:

      Title:

NY 78205642

**BYLAWS**

**OF**

**AAC PARENT CORPORATION**

(a Delaware corporation)

Effective as of December [•], 2020

These Amended and Restated Bylaws (these "Bylaws") of AAC PARENT CORPORATION, a Delaware corporation previously known as Restructured 20-11648 Holdings, Inc. (the "Corporation"), are subject to the provisions of the Delaware General Corporation Law (the "DGCL"), the Amended and Restated Certificate of Incorporation of the Corporation (as may be amended, restated or otherwise modified from time to time, the "Certificate of Incorporation") and the Stockholders Agreement (as defined in the Certificate of Incorporation).

ARTICLE I

OFFICES

1.    REGISTERED OFFICE.

The registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, Wilmington, Delaware 19808, New Castle County. The name of the registered agent of the Corporation at such address is Corporation Service Company.  The registered office or registered agent of the Corporation may be changed from time to time by action of the board of directors of the Corporation (the "Board of Directors").

2.    OTHER OFFICES.

The Corporation may also have offices at such other places, within or without the State of Delaware, as the Board of Directors may from time to time designate or as the business of the Corporation may require.

ARTICLE II

STOCKHOLDERS

1.    CERTIFICATES REPRESENTING STOCK.

(a)    The shares of common stock of the Corporation, par value $0.01 per share, shall be uncertificated shares evidenced by a direct registration book-entry system maintained by a transfer agent retained by the Corporation for such stock.  Notwithstanding the foregoing, the Board of Directors may provide by resolution or resolutions that some or all of any class or series of capital stock shall be represented by physical certificates.  If any shares of capital stock are represented by certificates, such certificates shall be in such form, other than bearer form, as is approved by the Board of Directors.  Any certificates representing shares of capital stock shall be signed by, or

in the name of, the Corporation by the Chief Executive Officer of the Corporation (the "Chief Executive Officer") or by the President or any Senior Vice-President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Corporation. If such certificate is countersigned by a transfer agent other than the Corporation or its employee or by a registrar other than the Corporation or its employee, any other signature on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

(b)      Whenever the Corporation shall be authorized to issue more than one class of stock or more than one series of any class of stock, and whenever the Corporation shall issue any shares of its stock as partly paid stock, the certificates representing shares of any such class or series or of any such partly paid stock shall set forth thereon the statements prescribed by the DGCL. Any restrictions on the transfer or registration of transfer of any shares of stock of any class or series shall be noted conspicuously on the certificate representing such shares.

(c)      The Corporation may issue a new certificate of stock in place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost, stolen or destroyed certificate, or such person's legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

2.      FRACTIONAL SHARES.

The Corporation may, but shall not be required to, issue fractions of a share.

3.      STOCK TRANSFERS.

Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, set forth in the Certificate of Incorporation, the Stockholders Agreement or in these Bylaws, transfers or registration of transfer of shares of stock of the Corporation shall be made only on the stock ledger of the Corporation by the registered holder thereof, or by such person's attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the Corporation or with a transfer agent or a registrar, if any, and on surrender of the certificate or certificates for such shares of stock properly endorsed and the payment of all taxes due thereon.

4.      RECORD DATE FOR STOCKHOLDERS.

(a)      In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to notice of

-2-

NY 78204778v15

or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided*, *however*, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)      In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date has been fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

5.      MEANING OF CERTAIN TERMS.

As used herein in respect of the right to notice of a meeting of stockholders or a waiver thereof or to participate or vote threat or to consent or dissent in writing in lieu of a meeting, as the case may be, the term "share" or "shares" or "share of stock" or "shares of stock" or "stockholder" or "stockholders" refers to an outstanding share or shares of stock and to a holder or holders of record of outstanding shares of stock when the Corporation is authorized to issue only one class of shares of stock, and said reference is also intended to include any outstanding share or shares of stock and any holder or holders of record of outstanding shares of stock of any class upon which or upon whom the Certificate of Incorporation confers such rights where there are two or more classes or series of shares of stock or upon which or upon whom the DGCL confers such rights notwithstanding that the Certificate of Incorporation may provide for more than one class or series of shares of stock, one or more of which are limited or denied such rights thereunder; *provided*, *however*, that no such right shall vest in the event of an increase or a decrease in the authorized number of shares of stock of any class or series which is otherwise denied voting rights under the provisions of the Certificate of Incorporation.

6.      STOCKHOLDER MEETINGS.

(a)      ANNUAL MEETING.   Unless directors are elected by written consent of stockholders in lieu of an annual meeting in accordance with the provisions of these Bylaws, applicable law and the Stockholders Agreement, an annual meeting of the stockholders shall be held for the purpose of electing directors and conducting such other proper business as may properly be brought before the meeting.  The date, time and place, if any, either within or without the State of Delaware, and/or the means of remote communication, of the annual meeting shall be determined by the Board of Directors. Unless determined otherwise by the Board of Directors, the annual meeting shall be held at the principal executive office of the Corporation.

(b)      SPECIAL MEETINGS.  Except as otherwise required by applicable law or provided in the Certificate of Incorporation, special meetings of stockholders for any purpose or purposes (including, without limitation, the filling of board vacancies and newly created

-3-

directorships) may be called only by the Chairman of the Board of Directors (the "Chairman"), by the Chief Executive Officer, by the Board of Directors, or by the Secretary at the request in writing of stockholders holding shares representing not less than 50% of the voting power of the outstanding shares entitled to vote on the matter for which such meeting is to be called. The Secretary shall call such a meeting upon receiving such a written request. The date, time and place, if any, either within or without the State of Delaware, and/or the means of remote communication, of any special meeting shall be determined by the Board of Directors or, if applicable, by such stockholders (to the extent set forth in the notice pursuant to which they requested such meeting), and shall be stated in the Corporation's notice of the meeting. If no designation is made the place of meeting shall be the principal executive office of the Corporation.

(c)      NOTICE OR WAIVER OF NOTICE. Whenever stockholders are required or permitted to take any action at a meeting, written notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting. All such notices shall be delivered, either personally, by mail, or by a form of electronic transmission consented to by the stockholder to whom the notice is given (including pursuant to the notice provisions of the Stockholders Agreement), by or at the direction of the Board of Directors, the Chief Executive Officer or the Secretary, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation or when delivered in accordance with the notice provisions of the Stockholders Agreement. If given by electronic transmission, such notice shall be deemed to be delivered (i) if by facsimile telecommunication, when directed to a facsimile number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network (e.g., a secure website or electronic data room used for posting information to stockholders) together with separate notice to the stockholder of such posting, upon the later of such posting and the giving of such separate notice; and (iv) if by any other form of electronic transmission, when directed to the stockholder. Any such consent to notice by facsimile or electronic mail shall be revocable (or the applicable facsimile number or electronic mail address may be changed) by the stockholder by written notice to the Secretary of the Corporation at the Corporation's principal executive office. Notwithstanding anything to the contrary in these Bylaws, notice shall be deemed validly delivered to any stockholder that is party to the Stockholders Agreement if such notice is delivered to such stockholder in accordance with the Stockholders Agreement, and each such stockholder shall be deemed to have consented thereto, which consent shall be irrevocable except to the extent provided otherwise in the Stockholders Agreement. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address and is consented to by the stockholders at that address to whom such notice

-4-

NY 78204778v15

is given; *provided*, any such stockholder may revoke such consent by delivering written notice of such revocation to the Secretary of the Corporation at the Corporation's principal executive office.

(d)     STOCKHOLDER LIST.  There shall be prepared and made, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by this Section 6.2(d) or the books of the Corporation, or to vote at any meeting of stockholders.

(e)     CONDUCT OF MEETING.  Meetings of the stockholders shall be presided over by one of the following officers in the order of seniority and if present and acting:  the Chairman, the Vice-Chairman of the Board of Directors (the "Vice Chairman"), if any, the Chief Executive Officer, a Senior Vice President, a chairman for the meeting chosen by the Board of Directors or, if none of the foregoing is in office and present and acting, by a chairman to be chosen by the stockholders.  The Secretary of the Corporation or, in such person's absence, an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present the chairman for the meeting shall appoint a secretary of the meeting.

(f)     PROXY REPRESENTATION.  Every stockholder may authorize another person or persons to act for such stockholder by proxy in all matters in which a stockholder is entitled to participate, whether by waiving notice of any meeting, voting or participating at a meeting, or expressing consent or dissent without a meeting.  Every proxy must be signed by the stockholder or by such person's attorney-in-fact.  No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

(g)     INSPECTORS AND JUDGES. The Board of Directors, in advance of any meeting, may, but need not, appoint one or more inspectors of election or judges of the vote, as the case may be, to act at the meeting or any adjournment thereof.  If an inspector or inspectors or judge or judges are not appointed by the Board of Directors, the person presiding at the meeting may, but need not, appoint one or more inspectors or judges.  In case any person who may be appointed as an inspector or judge fails to appear or act, the vacancy may be filled by appointment made by the person presiding thereat.  Each inspector or judge, if any, before entering upon the discharge of such person's duties, shall take and sign an oath faithfully to execute the duties of inspector or judge at such meeting with strict impartiality and according to the best of his ability.  The inspectors or judges, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum

-5-

NY 78204778v15

and the validity and effect of proxies, receive votes, ballots or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result, and do such other acts as are proper to conduct the election or vote with fairness to all stockholders.  On request of the person presiding at the meeting, the inspector or inspectors or judge or judges, if any, shall make a report in writing of any challenge, question or matter determined by such person or persons and execute a certificate of any fact so found.

(h)      QUORUM.  Except as the DGCL, these Bylaws or the Stockholders Agreement may otherwise provide, the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum at a meeting of stockholders for the transaction of any business.  The stockholders present may adjourn the meeting despite the absence of a quorum.  When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any stockholders.

(i)      VOTING.  Each holder of common stock ("Common Stock") of the Corporation shall be entitled to one (1) vote, in person or by proxy, for each share of Common Stock entitled to vote held by such stockholder.  Any action shall be authorized by a majority of the votes cast except where the Stockholders Agreement, the Certificate of Incorporation or the DGCL prescribes a higher percentage of votes and/or a different exercise of voting power.  When a quorum is present, the affirmative vote of the majority of the voting power of the shares cast by stockholders present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law, the Stockholders Agreement, these Bylaws or the Certificate of Incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.  The Corporation shall not directly or indirectly vote any shares of its own stock; *provided*, that the Corporation may vote shares that it holds in a fiduciary capacity to the extent permitted by law.  Voting by ballot shall not be required for corporate action except as otherwise provided by the DGCL.

7.      STOCKHOLDER ACTION WITHOUT MEETINGS.

Any action required to be taken, or any action which may be taken, at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

-6-

NY 78204778v15

8.      FACSIMILE, EMAIL OR OTHER ELECTRONIC TRANSMISSION.

A facsimile, email or other electronic transmission by a stockholder or proxyholder (or by any person authorized to act on such person's behalf, including pursuant to the Stockholders Agreement) of a proxy or a written consent to an action to be taken (including the delivery of such a document in the .pdf, .tif, .gif, .peg or similar format attached to an email message) shall be deemed to be written, signed, dated and delivered to the Corporation for the purposes of this ARTICLE II; *provided* that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (or the Corporation is otherwise aware) (A) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person transmitted such facsimile, email or other electronic transmission. The date on which such facsimile, email or other electronic transmission is transmitted shall be deemed to be the date on which such consent or proxy was signed. Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of the Board of Directors, the Chief Executive Officer or the Secretary of the Corporation, each stockholder, proxyholder or other authorized person who delivered a consent or proxy by facsimile, email or other electronic transmission shall re-execute the original form thereof and deliver such original to the Corporation at its registered office in the State of Delaware, its principal place of business or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded; *provided* that no such request shall invalidate, or affect the date of, the proxy or written consent as initially transmitted.

## ARTICLE III

## BOARD OF DIRECTORS

1.      GENERAL.

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by applicable law, these Bylaws or the Certificate of Incorporation required to be exercised or done by the stockholders or are not otherwise restricted by the terms of the Certificate of Incorporation or the Stockholders Agreement. Each member of the Board of Directors is referred to in this Article III as a "Director". The use of the phrase "Whole Board" herein refers to, at the time of determination, the total number of Directors which the Corporation would have at such time if there were no vacancies (excluding, with respect to any particular matter or meeting, any Director who is recused from such meeting or vote because they are not disinterested and independent).

2.      NUMBER AND ELECTION; TERM.

Subject to the Stockholders Agreement, the total number of Directors constituting the Whole Board shall be fixed by, or in the manner provided in, the Certificate of Incorporation. Directors need not be stockholders of the Corporation. Subject to the Stockholders Agreement,

NY 78204778v15

Directors shall be elected, at each annual meeting of stockholders and at any special meeting of stockholders called for the purpose of electing Directors, by a plurality of the total voting power of the outstanding shares of Common Stock present in person or represented by proxy at such meeting and entitled to vote on the election of Directors; *provided*, *however* that any election of Directors by written consent of the stockholders in lieu of a meeting shall require the written consent of stockholders holding a majority of the total voting power of the outstanding shares of Common Stock.  The term of office of each Director shall expire at each annual meeting of the stockholders, and each Director shall hold office until such Director's successor has been elected and qualified or until such Director's earlier death, resignation or removal.

3.     VACANCIES; RESIGNATIONS.

Subject to the Stockholders Agreement, any vacancy on the Board of Directors (whether resulting from the death, resignation, removal of any Director, from an increase in the size of the Whole Board, or otherwise) may be filled at any time by the vote of a majority of the remaining Directors then in office, although less than a quorum, or (if applicable) by the sole remaining Director.  Any Director may resign at any time by giving written notice thereof to the Chairman, to the Chief Executive Officer, or to the Secretary of the Corporation. Any such resignation shall take effect at the date and time specified in such notice or, if not specified therein, then upon receipt of such notice by the Chairman, the Chief Executive Officer or the Secretary of the Corporation, as applicable. The acceptance of such resignation shall not be necessary to make it effective unless otherwise stated therein.

4.     DIRECTOR NOMINATIONS.

Except for Directors nominated pursuant to the Stockholders Agreement and subject to the terms and provisions set forth therein, Directors may be nominated by action of the Board of Directors, or by the proposal of a stockholder that satisfies the following conditions:

(a)     The stockholder proposes the nomination for an election to be held at an annual meeting of stockholders or at a special meeting of stockholders called for such purpose;

(b)     The stockholder is a record holder of at least 5.0% of the outstanding shares of Common Stock on the record date for determining stockholders entitled to receive notice of and to vote at such annual meeting or special meeting (a "Proposing Stockholder");

(c)     The Proposing Stockholder delivers written notice identifying such nominees to the Corporation's Secretary at the Corporation's principal place of business at least seven (7) business days prior to the meeting by (i) personal delivery, (ii) facsimile transmission, (iii) registered or certified mail, postage prepaid, return receipt requested, (iv) nationally recognized overnight or other express courier service, or (v) by electronic transmission.  All notices shall be effective and shall be deemed delivered (a) if by personal delivery or electronic transmission, on the date of delivery if delivered during normal business hours of the Corporation, and if not delivered during such normal business hours, on the next business day following delivery, (b) if by facsimile transmission, on the next business day following dispatch of such facsimile, (c) if by courier service, on the second business day after dispatch of a notice addressed to the Corporation, and (d) if by mail, on the fifth day after deposit in the mail, addressed to the Corporation;

(d)    The Proposing Stockholder's notice includes: (i) the name and address of the Proposing Stockholder, as they appear on the Corporation's books, and the telephone number at which the Proposing Stockholder may be contacted during normal business hours through the time for which the meeting is scheduled and (ii) the names and qualifications of the Proposing Stockholder's nominees;

(e)    The Proposing Stockholder must also provide such other information as any officer of the Corporation shall reasonably deem relevant with respect to the nominees within such time limits as any officer of the Corporation shall reasonably impose for such information; and

(f)    If the chairman of such meeting of the stockholders determines that a nomination was not made in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Notwithstanding the foregoing, no such nomination may be made with respect to any Director seat that is subject to a "Designation Right" under the Stockholders Agreement except in accordance with the applicable provisions of the Stockholders Agreement.

5.    MEETINGS.

(a)    TIME.  The Board of Directors will meet at least once during each calendar quarter. In addition, the Chairman, the Chief Executive Officer, or any two (2) Directors may call a special meeting of the Board of Directors at any time upon two (2) business days' written notice.

(b)    PLACE.  The Board of Directors may designate any place, either within or without the State of Delaware, and/or by any means of remote communication permitted by the DGCL by which all Directors participating in the meeting can hear each other at the same time ("Remote Communication"), as the place of any meeting of the Board of Directors; *provided*, that for any such meeting held in person, reasonable provision shall be made to allow any Directors who wish to do so to participate in such meeting by means of Remote Communication. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal executive office of the Corporation.

(c)    NOTICE OR ACTUAL OR CONSTRUCTIVE WAIVER.  No notice shall be required for regular meetings for which the time and place have been fixed.  Written, oral or any other mode of notice of the time and place shall be given for special meetings at least twenty-four hours prior to the meeting; notice may be given by telephone, facsimile or electronic transmission (in which case it is effective when given) or by mail (in which case it is effective seventy-two hours after mailing by prepaid first class mail).  The notice of any meeting need not specify the purpose of the meeting.  Any requirement of furnishing a notice shall be waived by any Director who signs a written waiver of such notice before or after the time stated therein.  Attendance of a Director at a meeting of the Board of Directors shall constitute a waiver of notice of such meeting, except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

-9-

(d)      QUORUM AND ACTION.  A majority of the Whole Board shall constitute a quorum except when a vacancy or vacancies prevents such majority, whereupon a majority of the Directors in office shall constitute a quorum; *provided* that such majority shall constitute at least one-third (1/3) of the Whole Board.  Any Director may participate in a meeting of the Board of Directors by means of Remote Communication, and such participation in a meeting of the Board of Directors shall constitute presence in person at such meeting.  A majority of the Directors present, whether or not a quorum is present, may adjourn a meeting to another time and place.  Except as herein otherwise provided, and except as otherwise provided by the DGCL or the Stockholders Agreement, the act of the Board of Directors shall be the act by vote of a majority of the Directors present at a meeting, a quorum being present.  In addition, the Board of Directors may take action by written consent as provided in <u>Section 6</u> of this <u>Article III</u>.  The quorum and voting provisions herein stated shall not be construed as conflicting with any provisions of the DGCL and these Bylaws which govern a meeting of Directors held to fill vacancies and newly created Directorships in the Board of Directors.

(e)      CHAIRMAN OF THE MEETING.  The Chairman, if present and acting, shall preside at all meetings.  Otherwise, the Vice-Chairman, if any and if present and acting, or the Chief Executive Officer, if present and acting, or any other Director chosen by the Board of Directors, shall preside.

6.      ACTION IN WRITING.

Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or such committee.

7.      REMOVAL OF DIRECTORS.

Directors may be removed in the manner provided in the Stockholders Agreement and the DGCL.

8.      COMMITTEES.

The Board of Directors shall establish an Audit Committee and a Compensation Committee which shall each have and may exercise the powers of the Board of Directors with respect to the powers delegated to it.  The Board of Directors may also establish, by resolution passed by a majority of the Whole Board, one or more other Board committees of the Board, *provided* that the authority of any such committee shall be limited to making recommendations to the full Board of Directors for their approval (except to the extent the Board of Directors, by the affirmative vote of at least sixty-six and two-third percent (66-2/3%) of the Whole Board, delegates authority to a committee of disinterested Directors with respect to a particular transaction or matter for which the Board of Directors determines in good faith that such delegation is appropriate).  Each committee shall consist of one or more of the Directors of the Corporation.  The Board of Directors may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of any member of any such committee or committees, the members thereof present

NY 78204778v15

at any meeting and not disqualified from voting, whether or not they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

9.      COMPENSATION.

Subject to the Stockholders Agreement, Directors not employed by the Corporation or any of its direct or indirect subsidiaries may receive compensation determined by the Board of Directors.  Subject to the Stockholders Agreement, Directors may be reimbursed for reasonable and documented expenses incurred in connection with their service as a Director.

ARTICLE IV

OFFICERS

1.      EXECUTIVE OFFICERS.

The Board of Directors shall appoint a Chief Executive Officer, a Secretary and a Treasurer.  The Board of Directors in its discretion may also appoint, from time to time, a President, one or more Senior Vice Presidents (which may be denominated with additional descriptive titles), one or more Vice Presidents (which may be denominated with additional descriptive titles), and such other or additional officers as in its opinion are desirable for the conduct of the business of the Corporation.  Any number of offices may be held by the same person. The Board of Directors shall also elect from among its members, subject to the applicable provisions of the Stockholders Agreement, the Chairman of the Board who may or may not also be an officer of the Corporation, and may at any time and from time to time also appoint a Vice Chairman.  For the avoidance of doubt, the Chief Executive Officer may designate one or more members of the Corporation's management as a "Vice President," provided that any such person shall not by such designation be considered an officer of the Corporation, except for purposes of insurance, indemnification and advancement of expenses.

2.      ELECTION; TERM OF OFFICE.

The officers of the Corporation shall be appointed by the Board of Directors from time to time in its discretion.  Subject to the provisions of the Stockholders Agreement, vacancies may be filled or new offices created and filled at any meeting of the Board of Directors.  Each officer shall hold office until a successor is duly appointed or until such officer's earlier death, resignation or removal as hereinafter provided.

3.      REMOVAL.

Any officer or agent may be removed with or without cause, at any time by the Board of Directors, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

-11-

NY 78204778v15

4.    COMPENSATION.

Compensation of all officers shall be fixed by the Board of Directors or a committee thereof, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

5.    AUTHORITY AND DUTIES.

All officers, as between themselves and the Corporation, shall have such power and perform such duties in the management of the Corporation as may be provided by applicable law, by these Bylaws or by the Board of Directors and, unless otherwise prescribed by these Bylaws or by the Board of Directors, each officer shall have such further powers and duties as ordinarily pertain to such office.

6.    CHAIRMAN.

The Chairman, if present and acting, shall preside at all meetings of the Board of Directors, otherwise, the Vice-Chairman, if any and if present and acting, otherwise, the Chief Executive Officer, if present, shall preside, or if the Chief Executive Officer does not so preside, any other Director chosen by the Board of Directors shall preside.

7.    CHIEF EXECUTIVE OFFICER.

The Chief Executive Officer shall be the senior officer of the Corporation, and shall preside at all meetings of the stockholders and all meetings of the Board of Directors at which he or she is present and at which the Chairman or Vice-Chairman (if any) is not present. The Chief Executive Officer shall have the general authority, subject to the powers of and supervision by the Board of Directors, to manage and control the business, affairs and properties of the Corporation and its controlled direct and indirect subsidiaries in the ordinary course, and general authority and control over the Corporation's officers, agents and employees, and shall see that all orders and resolutions of the Board of Directors are carried into effect. The Chief Executive Officer may sign, execute and deliver, in the name of the Corporation, powers of attorney, contracts, bonds and other obligations. The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or as may be provided in these Bylaws.

8.    PRESIDENT.

The President, if any, subject to the powers of and supervision by the Board of Directors and the Chief Executive Officer, shall act in a general executive capacity and, in the absence or disability of the Chief Executive Officer, shall perform the duties and exercise the powers of the Chief Executive Officer. The President shall perform such other duties and exercise such powers as may be prescribed by the Board of Directors. The President may sign, execute and deliver, in the name of the Corporation, contracts and other obligations pertaining to the regular course of his or her duties, subject to such policies and limitations as may be established by the Board of Directors. The Chief Executive Officer shall also be the President, unless a separate President is appointed by the Board of Directors in its discretion.

-12-

NY 78204778v15

9.      SENIOR VICE PRESIDENTS.

Any Senior Vice President that may have been appointed, in the absence or disability of the Chief Executive Officer and the President, shall perform the duties and exercise the powers of the Chief Executive Officer, in the order of their seniority, and shall perform such other duties as may be prescribed by the Board of Directors. Senior Vice Presidents may sign, execute and deliver, in the name of the Corporation, contracts and other obligations pertaining to the regular course of his or her duties, subject to such policies and limitations as may be established by the Board of Directors.

10.     SECRETARY.

The Secretary shall keep in safe custody the seal of the Corporation and affix it to any instrument when authorized by the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors.  The Secretary (or in such officer's absence, an Assistant Secretary, but if neither is present another person selected by the Chairman for the meeting) shall have the duty to record the proceedings of the meetings of the stockholders and Directors in a book to be kept for that purpose.

11.     TREASURER.

The Treasurer shall have the care and custody of the corporate funds, and other valuable effects, including securities, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.  The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer and Board of Directors, at the regular meetings of the Board of Directors, or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Corporation.  If required by the Board of Directors, the Treasurer shall give the Corporation a bond for such term, in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of such office and for the restoration to the Corporation, in case of such person's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in such person's possession or under such person's control belonging to the Corporation.  The Treasurer shall perform such other duties and exercise such powers as may be prescribed by the Board of Directors.

ARTICLE V

CORPORATE SEAL; CORPORATE BOOKS

The corporate seal shall be in such form as the Board of Directors shall prescribe.  The books of the Corporation may be kept within or without the State of Delaware, at such place or places as the Board of Directors may, from time to time, determine.

-13-

NY 78204778v15

## ARTICLE VI

## FISCAL YEAR

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.  Except as otherwise determined by the Board of Directors, the fiscal year of the Corporation shall end on December 31 of each year.

## ARTICLE VII

## INDEMNITY

1.    INDEMNITY.

(a)    Without limiting the provisions of Section 12 of the Certificate of Incorporation, any person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) with respect to any act or omission solely occurring by reason of the fact that he or she is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (including employee benefit plans) (hereinafter an "indemnitee"), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification than permitted prior thereto), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such indemnitee in connection with such action, suit or proceeding, if the indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe such conduct was unlawful.  The termination of the proceeding, whether by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, had reasonable cause to believe such conduct was unlawful.

(b)    Any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor with respect to any act or omission by reason of the fact that he or she is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise (including employee benefit plans), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification than permitted prior thereto), against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good

-14-

NY 78204778v15

faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court in which such suit or action was brought, shall determine, upon application, that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)     All reasonable expenses incurred by or on behalf of the indemnitee in connection with any suit, action or proceeding, may be reimbursed or advanced to the indemnitee by the Corporation, to the fullest extent authorized by the Certificate of Incorporation and the DGCL.

(d)     Notwithstanding anything contained in this Article VII, the Corporation shall not be obligated to indemnify any Director or officer or advance expenses in connection with any proceeding (other than proceedings contemplated in Section 1(e)) initiated by such person unless the commencement of such proceeding (or part thereof) was authorized or consented to by the Board of Directors.

(e)     The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this ARTICLE VII shall be enforceable by any person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction.    Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such person is not so entitled.  Such a person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action.

(f)     The rights to indemnification and to advancement of expenses conferred in this article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Certificate of Incorporation, a Bylaw of the Corporation, agreement, vote of stockholders or disinterested Directors or otherwise.

(g)     The indemnification and advancement of expenses provided by this article shall continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

(h)     In addition to the indemnification rights of Directors, officers, employees or agents of the Corporation, the Corporation shall have the power to, in the sole discretion of the Board of Directors, indemnify any other person made a party to any action, suit or proceeding who the Corporation may indemnify under Section 145 of the DGCL.

-15-

NY 78204778v15

(i)     The provisions of this <u>ARTICLE VII</u> shall be deemed to be contract rights based upon good and valuable consideration between the Corporation and each director and officer or other person entitled to indemnification who serves in any such capacity at any time while this <u>ARTICLE VII</u> and the relevant provisions of the DGCL or other applicable law are in effect, and such person may bring suit as if the provisions of this <u>ARTICLE VII</u> were set forth in a separate written contract between such person and the Corporation. Such contract right shall vest for each director and officer or other person entitled to indemnification at the time such person is elected or appointed to such position or is requested to serve in the capacity that entitled such person to indemnification under this <u>ARTICLE VII</u>, and no repeal or modification of this <u>ARTICLE VII</u> or any such law shall affect any such vested rights or obligations of any current or former director or officer  or other person with respect to any state of facts or proceeding regardless of when occurring.

(j)     For purposes of this <u>ARTICLE VII,</u> references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was or agreed to be a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust, association, employee benefit plan or other enterprise, shall stand in the same position under this <u>ARTICLE VII</u> with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

<u>ARTICLE VIII</u>

<u>GENERAL PROVISIONS</u>

1.     DIVIDENDS.

Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board at any regular or special meeting, pursuant to law and in accordance with the Stockholders Agreement.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and the Stockholders Agreement.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

2.     CHECKS, DRAFTS AND ORDERS.

All checks, drafts, or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed

-16-

by such officer or officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors or a duly authorized committee thereof.

3.    CONTRACTS.

Subject to the Stockholders Agreement, the Board of Directors may authorize any officer or officers, or any agent or agents, of the Corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

4.    LOANS.

Subject to the Stockholders Agreement, the Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiary, including any officer or employee who is a director of the Corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation.  Nothing in this Section 4 shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

5.    VOTING SECURITIES OWNED BY THE CORPORATION.

Voting securities in any other corporation or other entity held by the Corporation shall be voted as directed by the Chief Executive Officer, unless the Board of Directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

6.    INSPECTION OF BOOKS AND RECORDS.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger and a list of its stockholders.  A proper purpose shall mean any purpose reasonably related to such person's interest as a stockholder.  In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder.  The demand under oath shall be directed to the Corporation at its registered office in the State of Delaware or at its principal place of business.

7.    EXCLUSIVE JURISDICTION.

Unless otherwise waived by resolution of the Board of Directors, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the Corporation to the Corporation or the

-17-

Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the DGCL or the Certificate of Incorporation or Bylaws or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine, except, as to each of (i) through (iv), for any claim for which the Court of Chancery of the State of Delaware determines there is an indispensable party not subject to its jurisdiction (and such party does not consent to such jurisdiction within ten (10) days of such determination).

8.      SECTION HEADINGS.

Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

9.      INCONSISTENT PROVISIONS.

In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL or any other applicable law, the provision of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.  If there is any conflict between the provisions of the Stockholders Agreement and these Bylaws, the provisions of the Stockholders Agreement will prevail unless for them to do so would be in contravention of the requirements of the DGCL.

<u>ARTICLE IX</u>

<u>AMENDMENTS</u>

So long as the Stockholders Agreement and the Certificate of Incorporation are each in effect, these Bylaws may be amended in accordance with the provisions of the Stockholders Agreement and the Certificate of Incorporation, as applicable.  At any time the Stockholders Agreement and the Certificate of Incorporation are not in effect, these Bylaws may be amended by the vote of a majority of the voting power of the shares of stock of the Corporation then outstanding.

*[Remainder of Page Intentionally Left Blank]*

NY 78204778v15

<u>Schedule 2</u>

(Redline of New Organizational Documents)

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**of**

**AAC HOLDINGS, INC.PARENT CORPORATION**

AAC HOLDINGS, INC.PARENT CORPORATION, a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

A.     The name of the corporation is AAC HOLDINGS, INC. (the "Corporation"). ThisPARENT CORPORATION (the "Corporation"). The Corporation was originally incorporated by the filing of a Certificate of Incorporation (as amended prior to the date hereof, the "Original Certificate of Incorporation") with the Secretary of State of the State of Delaware on November 12, 2020, which was amended on December [•], 2020. This Amended and Restated Certificate of Incorporation (thethis "Certificate of Incorporation") has beenwas duly adopted by the Board of Directors of the Corporation in accordance with the §§ 241 and 245 of the Delaware General Corporation Law (the "DGCL") and in accordance with (a) the Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates, (as supplemented, the "Plan") of AAC Holdings, Inc., a Nevada corporation (the "Nevada Corporation") and predecessor to the Corporation, and certain of its direct and indirect subsidiaries, approved by order dated [•], 2020as confirmed by that certain order of the United States Bankruptcy Court for the District of Delaware [Docket No. [•]], in *In re:*(the "Bankruptcy Court"), entered on October 20, 2020 in the cases captioned *In re* AAC Holdings, Inc., et al.,(Case No. 20-11648 (JTD)) under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. Sections 101-1330), as amended (the "Bankruptcy Code"). (as such Chapter 11 Plan may be amended, supplemented or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan" and such order, the "Confirmation Order") and (b) that certain Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan, as entered by the Bankruptcy Court on November 20, 2020 (the "Order in Aid of the Plan").

B.     This Certificate of Incorporation is being filed pursuant to §241 of the DGCL as an amendment before the Corporation's receipt of any payment for any of its stock.

C.     B. The Corporation is being incorporated in Delaware in connection with the conversion of the Nevada Corporation to the Corporation (the "Conversion") pursuant to Section 265 of the DGCL, by the filing of thisThis Certificate of Incorporation and a certificate of conversion with respect to the Conversion with the Secretary of State of the State of Delaware in accordance with Section 265(b) of the DGCL, and upon such filing the Conversion and this Certificate of Incorporation shall become effective as of [•] a.m.,is effective as of [•] (prevailing Eastern Time, on [•], 2020 (the "Effective Time" and such date, the "Effective Date").) on December [•], 2020.

1.     **Name.**  The name of the corporation is AAC HOLDINGS, INC. Capitalized terms used and not otherwise defined in this Certificate of Incorporation shall have the meanings given to them in Section 19 hereof.PARENT CORPORATION.

NY 78205642

DRAFT – SUBJECT TO FURTHER REVISION

2.        **Registered Office and Agent.**   The address of the registered office of the Corporation in the State of Delaware is [●]251 Little Falls Drive, Wilmington, Delaware 19808, New Castle County. The name of the registered agent of the Corporation at such address is [●]Corporation Service Company.

3.        **Purpose.**   The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

4.        3.1 **Authorized Capital Stock; Number of Shares.**   The total number of shares of capital stock that the Corporation shall have the authority to issue is [         ] ([●]thirty-five million (35,000,000) shares, all of which shall be shares of common stock, $0.01 par value per share ("Common Stock"). 4. Notwithstanding anything herein to the contrary, the Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; *provided*, *however*, that the foregoing restriction (i) shall have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) shall only have such force and effect to the extent and for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

5.        **Rights of Stockholders.**

5.1     ***Common Stock.***

5.1.1   *Dividends*.   Subject to the terms of the Stockholders Agreement, the Board of Directors may cause dividends to be declared and paid on outstanding shares of Common Stock out of funds legally available for the payment of dividends.   When, as and if dividends on Common Stock are declared by the Board of Directors, whether payable in cash, in property, in stock or otherwise, in accordance with this Certificate of Incorporation and the Bylaws of the Corporation, as in effect from time to time (the "Bylaws"), out of the assets of the Corporation which are at law available therefor, the holders of outstanding shares of Common Stock shall be entitled to share equally in, and to receive in accordance with the number of shares of Common Stock held by each such holder, all such dividends.

5.1.2   *Liquidation Rights*.   In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of issued and outstanding shares of Common Stock shall be entitled to share, ratably according to the number of shares of Common Stock held by each such holder, in the remaining assets of the Corporation available for distribution to its stockholders after the payment, or provision for payment, of all debts and other liabilities of the Corporation.

5.1.3   *Stockholder Voting Rights*.   Subject to applicable law and except as otherwise expressly provided elsewhere in this Certificate of Incorporation or the Bylaws, each holder of record of one or more issued and outstanding shares of Common Stock shall be entitled to one vote for each share of Common Stock standing in such holder's name on the books of the Corporation.

NY 78205642

DRAFT – SUBJECT TO FURTHER REVISION

5.2     ***Consideration.***  Subject to applicable law and except as otherwise provided in this Certificate of Incorporation and the Stockholders Agreement, the capital stock of the Corporation, regardless of class or series, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

5.3     ***Special Approval Requirements for Certain Actions***.  In addition to any other vote of stockholders or stockholder or Board of Directors approval that may be required by law or by the provisions of this Certificate of Incorporation, so long as the Stockholders Agreement is in effect, whether or not specifically provided for in this Certificate of Incorporation, neither the Corporation nor any of its subsidiaries nor their Board of Directors shall take any action that under the terms of the Stockholders Agreement first requires a vote, consent or approval from one or more holders of Common Stock and/or members of the Board of Directors to be obtained, without first obtaining such required vote, consent or approval.

5.4     ***Stockholders Agreement***.  To the fullest extent permitted by law, every holder of shares of Common Stock shall be subject to, shall be required to enter into, and shall be deemed to have entered into and to be bound by, the Stockholders Agreement of the Corporation to be entered into pursuant to the Plan and dated as of the "Effective Date" under the Plan (such date, the "Plan Effective Date"), by and among the Corporation and its stockholders (as may be amended, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement"), including without limitation the restrictions on transfer of Common Stock set forth therein, from and after such time as such holder receives any shares of Common Stock (whether by sale, transfer, gift, inheritance or ~~other Transfer~~otherwise, as a distribution under the Plan, through the exercise or conversion of options, warrants, convertible notes or other convertible securities, by operation of law or otherwise), and the Stockholders Agreement shall be deemed to be a valid and binding obligation of such stockholder, enforceable against each such holder in accordance with its terms (including any provisions thereof that require the holder to waive or refrain from exercising any appraisal, dissenters or similar rights), in each case even if such holder has not actually executed a counterpart signature page or joinder (or other written instrument pursuant to which such holder agrees to be bound thereby) to the Stockholders Agreement.  In the event the Stockholders Agreement is terminated at any time in accordance with its terms, all references to "Stockholders Agreement" contained in this Certificate of Incorporation shall, from and after the effective time of such termination, automatically cease to be of any further force or effect.  If any provisions of this Section 5.4 or the application thereof to any Person (as defined below) or circumstance are to any extent held by a court of competent jurisdiction to be invalid or unenforceable for any reason, the applicability of the remainder of this Section 5.4 to such Person or circumstance, and the application of such provision(s) to other Persons and circumstances, shall not be affected thereby and such provisions shall be enforced to the greatest extent permitted by law.  The Corporation shall furnish without charge to each holder of record of shares of Common Stock a copy of the Stockholders Agreement upon written request to the Secretary of the Corporation at the Corporation's principal executive office.  As used herein, "Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust or joint venture, or a governmental agency or political subdivision thereof.

3

NY 78205642

DRAFT—SUBJECT TO FURTHER REVISION

6.      **Restrictions on Transfers of Shares**.

6.1   *Restrictions on Transfer*.   Without limiting any other provisions or restrictions or conditions of this Section 6, unless otherwise waived by the Board of Directors in its sole discretion, no shares of Common Stock shall be Transferred by any stockholder (regardless of the manner in which the Transferor initially acquired such shares of Common Stock), if such Transfer is not made in accordance with the applicable provisions of the Stockholders Agreement.

6.2   *Legends on Certificates*.   All certificates (if any) evidencing shares of Common Stock shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate does not actually bear such legends), the legends required by the Stockholders Agreement (to the extent the Stockholders Agreement requires such certificates to bear such legends) and such other legends as the Board of Directors determines are necessary or appropriate. Each stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Certificate of Incorporation and the Stockholders Agreement (including, without limitation, the restrictions on Transfer set forth in this Section 6 and the restrictions on Transfer set forth in the Stockholders Agreement) for all purposes of this Certificate of Incorporation, the Stockholders Agreement and applicable law (including, without limitation, the DGCL and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate evidencing shares of Common Stock owned or held by such stockholder bear the legends required by the Stockholders Agreement or whether or not any such stockholder received a separate notice of such terms, provisions, restrictions and conditions.6.3*Prohibited Transfers Void*. The Corporation shall not record upon its books any sale or other ~~Transfer of~~sale, transfer, assignment or other disposition of Common Stock or other securities except in accordance with the applicable provisions of this Certificate of Incorporation and ~~(to the extent applicable)~~ the Stockholders Agreement. Any purported sale ~~or Transfer~~, transfer, assignment or other disposition of Common Stock or other securities in violation of such provisions shall be void *ab initio* and shall not be recognized by the Corporation for any purpose.

7.      **Board of Directors**.

7.1   *General*.   Except as may otherwise be provided in this Certificate of Incorporation, the Bylaws, the Stockholders Agreement or the DGCL, the business of the Corporation shall be managed by the Board of Directors. This Section 7 is inserted for the management and conduct of the business and affairs of the Corporation and is intended to be in furtherance of and not in limitation or exclusion of the powers conferred on the Board of Directors by applicable law.

7.2   ***Composition of the Board of Directors; Term; Removal***.

7.2.1   The number of directors constituting the whole Board of Directors shall be fixed from time to time by a vote of a majority of the directors then in office; provided, that upon the Plan Effective Date such number shall be fixed at seven (7), and shall not subsequently be fixed

4

DRAFT—SUBJECT TO FURTHER REVISION

at fewer than five (5) directors nor more than seven (7) directors except with the prior approval by holders of a majority of the aggregate voting power of the shares of capital stock then outstanding. Except as otherwise provided in the Stockholders Agreement, each director shall hold office until the next annual meeting of stockholders and until his or her successor is duly elected and qualified in accordance with the terms of this Certificate of Incorporation, the Bylaws and the Stockholders Agreement, or his or her earlier death, resignation or removal.

7.2.2    Except as otherwise provided by the Stockholders Agreement, at each annual meeting of stockholders, directors shall be elected for a one-year term by affirmative vote of a plurality (or such other threshold as may be specified in the Stockholders Agreement) of the aggregate combined voting power of the Corporation's then-issued and outstanding shares of Common Stock, present in person or represented by proxy at a meeting called for the purpose of electing directors.  Directors may also be elected by written consent of the stockholders if and to the extent provided for in the Stockholders Agreement.  There shall not be cumulative voting for directors.

7.2.3    Any director may be removed at any time in accordance with the Stockholders Agreement. In the event the chief executive officer of the Corporation is serving as a director and his or her employment as chief executive officer is terminated for any reason, such Person shall automatically, upon such termination, cease to serve as a director and be deemed to have resigned from the Board of Directors.

7.2.4    Except as otherwise provided by the Stockholders Agreement, any vacancies in the Board of Directors resulting from any director's death, resignation, removal or other cause, shall be filled as provided in the Bylaws.

8.    **Compromise, Arrangement or Reorganization**.  Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of the DGCL or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of the DGCL, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as the said court directs.  If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

9.    **Limitation of Liability**.  To the fullest extent permitted by the DGCL, no director of the Corporation serving in such capacity shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director arising from acts or

5

NY 78205642

DRAFT—SUBJECT TO FURTHER REVISION

omissions, including breaches resulting from such director's grossly negligent behavior, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the DGCL or (d) for any transaction from which the director derived any improper personal benefits. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation arising from acts or omissions shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any amendment, repeal or modification of this Section 9 by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at or prior to the time of such amendment, repeal or modification.

10.     **Corporate Opportunity**.  The Corporation hereby renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business ventures or opportunities of which any of its directors who are not employed by the Corporation or any of its subsidiaries ("Non-Employee Directors"), or any Affiliate of any such director, is made aware; *provided*, *however*, that notwithstanding anything contained herein, this Section 10 shall not apply to business ventures or opportunities presented or offered to a Non-Employee Director solely in his or her capacity as a director of the Corporation (including as a member of any committee of the Board of Directors or any governing body of any subsidiary of the Corporation). Without limiting the generality of the foregoing, the Corporation specifically renounces any rights the Corporation might have in any business venture or business opportunity of any Non-Employee Director or Affiliate thereof, and no Non-Employee Director shall have any obligation to offer any interest in any such business venture or opportunity to the Corporation or otherwise account to the Corporation in respect of any such business ventures or opportunities, even if the business venture or opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so. Furthermore, (a) it shall not be deemed a breach of any fiduciary or other duty, whether express or implied, for any Non-Employee Director or any of its Affiliates to (i) engage in a business venture or opportunity in preference or to the exclusion of the Corporation or (ii) directly or indirectly engage in the same or similar lines of business as the Corporation and its subsidiaries, and (b) a Non-Employee Director or Affiliate thereof shall have no obligation to (i) disclose to the Board of Directors or the Corporation any information in the possession of such Non-Employee Director or Affiliate thereof regarding any business ventures or opportunities even if it is material and relevant to the Corporation and/or the Board of Directors or (ii) refrain from engaging in any line of business or from investing in or doing business with any Person.  Any Person purchasing or otherwise acquiring any interest in capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Section 10.  As used in this Section 10, "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any family member of such Person.  For purposes of such definition, (i) the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, (ii) the term "family member" means, with respect

6

NY 78205642

DRAFT – SUBJECT TO FURTHER REVISION

to any individual, (x) any of such individual's parents, spouse, siblings, children and grandchildren or (y) any trust the sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren and (iii) the term "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager or advisor as such Person or (z) an Affiliate of such investment manager or advisor.

11.    **DGCL Section 203**.  The ~~Company~~Corporation expressly elects not to be governed by Section 203 of the DGCL.

12.    **Indemnification**.

12.1    To the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) with respect to any act or omission by reason of the fact that the Person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise ("Other Entity"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with such Proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the Person's conduct was unlawful.  To the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor with respect to any act or omission by reason of the fact that the Person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity, against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection with the defense or settlement of such action or suit if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "Court of Chancery") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

12.2    The Corporation shall, from time to time, reimburse or advance to any director or officer entitled to indemnification hereunder the funds necessary for payment of expenses,

7

DRAFT – SUBJECT TO FURTHER REVISION

including reasonable attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; *provided*, *however*, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director or officer is not entitled to be indemnified for such expenses.

12.3    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall not be deemed exclusive of any other rights to which a Person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, this Certificate of Incorporation, the Bylaws, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors, officers, employees and other agents of the Corporation are covered), any vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

12.4    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall continue as to a Person who has ceased to be a director or officer and shall inure to the benefit of the executors, administrators, legatees and distributees of such Person.

12.5    The Corporation shall have the power to purchase and maintain insurance on behalf of any Person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of an Other Entity, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not the Corporation would have the power to indemnify such Person against such liability under the provisions of this Section 12, the Bylaws, the Stockholders Agreement or under Section 145 of the DGCL or any other provision of law.

12.6    The provisions of this Section 12 shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Section 12 is in effect, on the other hand, pursuant to which the Corporation and each such director or officer intend to be legally bound.  Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this Section 12 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

12.7    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall be enforceable by any Person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction.  Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such

8

DRAFT – SUBJECT TO FURTHER REVISION

Person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such Person is not so entitled. Such a Person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action.

12.8   Any director or officer of the Corporation serving in any capacity in (i) another corporation of which a majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (ii) any employee benefit plan of the Corporation or any corporation referred to in clause (i) shall be deemed to be doing so at the request of the Corporation.

12.9   Any Person entitled to be indemnified or to reimbursement or advancement of expenses as a matter of right pursuant to this Section 12 may elect to have the right to indemnification or reimbursement or advancement of expenses interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the applicable Proceeding, to the extent permitted by law, or on the basis of the applicable law in effect at the time such indemnification or reimbursement or advancement of expenses is sought. Such election shall be made, by a notice in writing to the Corporation, at the time indemnification or reimbursement or advancement of expenses is sought; *provided*, *however*, that if no such notice is given, the right to indemnification or reimbursement or advancement of expenses shall be determined by the law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

12.10   It is the intent that with respect to all advancement, reimbursement and indemnification obligations to Non-Employee Directors under this Section 12, the Corporation shall be the indemnitor of first resort (*i.e.*, its obligations to indemnitees under this Certificate of Incorporation are primary and any obligation of any such stockholder (or any of its Affiliates) to provide advancement or indemnification for the same losses incurred by indemnitees are secondary), and if aor affiliate thereof are secondary) irrespective of any obligation that any stockholder or affiliate thereof may have with respect to such Non-Employee Director with respect to such amounts, and if any such stockholder or affiliate thereof pays or causes to be paid, for any reason, any such amounts otherwise indemnifiable or payable by the Corporation hereunder or under any other indemnification or similar agreement (whether pursuant to this Certificate of Incorporation, the Bylaws, the Stockholders Agreement, contract, law or regulation), then (i) such stockholder (or such Affiliate, as the case may be)or affiliate thereof shall be fully subrogated to all rights hereunder of the indemnitee with respect to such payment and (ii) the Corporation shall reimburse such stockholder (or such Affiliate, as the case may be)or affiliate thereof for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such stockholder (or such Affiliate, as the case may be)or affiliate thereof.

13.   **Books and Records**.  The books and records of the Corporation may be kept (subject to any provision contained in the DGCL or other applicable law) at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws.

NY 78205642

DRAFT – SUBJECT TO FURTHER REVISION

14.    **Notices**.  All notices, requests, waivers and other communications made pursuant to this Certificate of Incorporation shall be in writing and shall be deemed to have been effectively given or delivered (a) when personally delivered to the party to be notified; (b) if given by electronic transmission in the manner provided in Section 232 of the DGCL; (c) three (3) ~~Business Days~~business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) ~~Business Day~~business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next ~~Business Day~~business day delivery guaranteed, in each case as follows:  (i) in the case of any stockholder, to such stockholder at its address or facsimile number set forth in the stock records of the Corporation; and (ii) in the case of the Corporation, to the Secretary of the Corporation at the Corporation's principal executive office.  A party may change its address for purposes of notice hereunder by giving notice of such change in the manner provided in this Section 14.  As used herein, "business day" means any day, other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized to be closed.

15.    **Amendments**.  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the DGCL and in accordance with the terms of the Stockholders Agreement.

16.    **Forum**.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws, or (d) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.  Any Person purchasing or otherwise acquiring shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 16.

17.    **Enforceability; Severability**.  Each provision of this Certificate of Incorporation shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Certificate of Incorporation shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Certificate of Incorporation, and this Certificate of Incorporation shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

18.    **Bylaws; Inconsistent Provisions**.  In furtherance and not in limitation of the powers conferred by law and except as otherwise set forth in the Stockholders Agreement, the Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of the Bylaws without any action on the part of the stockholders of the Corporation, subject to the power of the stockholders of the Corporation to amend or repeal any Bylaws adopted or amended by the Board of Directors. If there is any conflict between the provisions of the Stockholders

10

DRAFT — SUBJECT TO FURTHER REVISION

Agreement and this Certificate of Incorporation, the provisions of the Stockholders Agreement will prevail unless such prevalence would be in contravention of the requirements of the DGCL.

19.    Certain Definitions.    As used in this Certificate of Incorporation, the following terms shall have the following meanings:[1]

(i)    "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member of such Person; *provided, however*, that a Stockholder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Stockholder's being a party to the Stockholders Agreement.  For purposes hereof, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)    "Business Day" means any day, other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized to be closed.

(iii)    "Family Member" means, with respect to any individual, (i) any of such individual's parents, spouse, siblings, children and grandchildren or (ii) any trust the sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren.

(iv)    "Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust or joint venture, or a governmental agency or political subdivision thereof.

(v)    "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager or advisor as such Person or (z) an Affiliate of such investment manager or advisor.

(vi)    "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Common Stock (including (x) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Common Stock, or (y) the sale, transfer, assignment or other disposition of any securities or rights convertible into, or exchangeable or exercisable for, Common Stock), whether voluntary or involuntary, whether of record, constructively or beneficially and whether by operation of law or

---

[1] Note to Draft:  Definitions to be conformed as necessary to corresponding definitions in the execution version of the Stockholders Agreement.

11

DRAFT – SUBJECT TO FURTHER REVISION

otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise. Notwithstanding the foregoing, any transaction in which a stockholder lends or borrows any shares of Common Stock to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers shares of Common Stock in connection with such stockholder's financing arrangements, in any case in the ordinary course of business, shall not constitute a Transfer of shares of Common Stock for purposes of this Certificate of Incorporation; provided, however, that any foreclosure (including the retention of shares of Common Stock in satisfaction of any obligations) on shares of Common Stock by any such broker, bank or other financial institution shall be deemed a Transfer of shares of Common Stock for purposes of this Certificate of Incorporation. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

[*Remainder of Page Intentionally Left Blank*]

NY 78205642

DRAFT – SUBJECT TO FURTHER REVISION

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation, which amends and restates the Corporation's Original Certificate of Incorporation, to be made, executed and acknowledged by its incorporatorduly authorized officer this [●●] day of [●]December, 2020, as directed by and provided for in the Order of the United States Bankruptcy Court for the District of Delaware, dated [●], 2020, confirming the Plan of Reorganization under Chapter 11 of the Bankruptcy CodeConfirmation Order and the Order in Aid of the Plan.

By: _____

   Name:
   Title: Incorporator

NY 78205642

~~DRAFT – SUBJECT TO FURTHER REVISION~~

# BYLAWS

## OF

## AAC ~~HOLDINGS, INC.~~PARENT CORPORATION

(a Delaware corporation)

Effective as of ~~[●]~~December [•], 2020

These Amended and Restated Bylaws (~~the~~these "Bylaws") of AAC ~~HOLDINGS, INC.~~PARENT CORPORATION, a Delaware corporation previously known as Restructured 20-11648 Holdings, Inc. (the "Corporation"), are subject to~~, and governed by,~~ the provisions of the Delaware General Corporation Law (the "DGCL"), the Amended and Restated Certificate of Incorporation of the Corporation (as may be amended, restated or otherwise modified from time to time, the "Certificate of Incorporation")~~,~~ and the Stockholders Agreement~~, dated as of [●], 2020, among the Corporation and its stockholders (as may be amended, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement"~~ (as defined in the Certificate of Incorporation).

## ARTICLE I

## OFFICES

1.      REGISTERED OFFICE.

The registered office of the Corporation in the State of Delaware is ~~[●]~~251 Little Falls Drive, Wilmington, Delaware 19808, New Castle County. The name of the registered agent of the Corporation at such address is ~~[●]~~Corporation Service Company.  The registered office or registered agent of the Corporation may be changed from time to time by action of the board of directors of the Corporation (the "Board of Directors").

2.      OTHER OFFICES.

The Corporation may also have offices at such other places, within or without the State of Delaware, as the Board of Directors may from time to time designate or as the business of the Corporation may require.

## ARTICLE II

## STOCKHOLDERS

1.      CERTIFICATES REPRESENTING STOCK.

(a)      The shares of common stock of the Corporation, par value $0.01 per share, shall be uncertificated shares evidenced by a direct registration book-entry system maintained by a transfer agent retained by the Corporation for such stock.  Notwithstanding the foregoing, the Board of Directors may provide by resolution or resolutions that some or all of any class or series

DRAFT – SUBJECT TO FURTHER REVISION

of capital stock shall be represented by physical certificates. If any shares of capital stock are represented by certificates, such certificates shall be in such form, other than bearer form, as is approved by the Board of Directors. Any certificates representing shares of capital stock shall be signed by, or in the name of, the Corporation by the Chief Executive Officer of the Corporation (the "Chief Executive Officer") or by the President or any Senior Vice-President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Corporation. If such certificate is countersigned by a transfer agent other than the Corporation or its employee or by a registrar other than the Corporation or its employee, any other signature on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

(b)    Whenever the Corporation shall be authorized to issue more than one class of stock or more than one series of any class of stock, and whenever the Corporation shall issue any shares of its stock as partly paid stock, the certificates representing shares of any such class or series or of any such partly paid stock shall set forth thereon the statements prescribed by the DGCL. Any restrictions on the transfer or registration of transfer of any shares of stock of any class or series shall be noted conspicuously on the certificate representing such shares.

(c)    The Corporation may issue a new certificate of stock in place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost, stolen or destroyed certificate, or such person's legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

2.    FRACTIONAL SHARES.

The Corporation may, but shall not be required to, issue fractions of a share.

3.    STOCK TRANSFERS.

Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, set forth in the Certificate of Incorporation, the Stockholders Agreement or in these Bylaws, transfers or registration of transfer of shares of stock of the Corporation shall be made only on the stock ledger of the Corporation by the registered holder thereof, or by such person's attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the Corporation or with a transfer agent or a registrar, if any, and on surrender of the certificate or certificates for such shares of stock properly endorsed and the payment of all taxes due thereon.

4.    RECORD DATE FOR STOCKHOLDERS.

(a)    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may

NY 78204778v15

DRAFT – SUBJECT TO FURTHER REVISION

fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided*, *however*, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date has been fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

5.     MEANING OF CERTAIN TERMS.

As used herein in respect of the right to notice of a meeting of stockholders or a waiver thereof or to participate or vote threat or to consent or dissent in writing in lieu of a meeting, as the case may be, the term "share" or "shares" or "share of stock" or "shares of stock" or "stockholder" or "stockholders" refers to an outstanding share or shares of stock and to a holder or holders of record of outstanding shares of stock when the Corporation is authorized to issue only one class of shares of stock, and said reference is also intended to include any outstanding share or shares of stock and any holder or holders of record of outstanding shares of stock of any class upon which or upon whom the Certificate of Incorporation confers such rights where there are two or more classes or series of shares of stock or upon which or upon whom the DGCL confers such rights notwithstanding that the Certificate of Incorporation may provide for more than one class or series of shares of stock, one or more of which are limited or denied such rights thereunder; *provided*, *however*, that no such right shall vest in the event of an increase or a decrease in the authorized number of shares of stock of any class or series which is otherwise denied voting rights under the provisions of the Certificate of Incorporation.

6.     STOCKHOLDER MEETINGS.

(a)     ANNUAL MEETING. Unless directors are elected by written consent of stockholders in lieu of an annual meeting in accordance with the provisions of these Bylaws, applicable law and the Stockholders Agreement, an annual meeting of the stockholders shall be held for the purpose of electing directors and conducting such other proper business as may properly be brought before the meeting. The date, time and place, if any, either within or without the State of Delaware, and/or the means of remote communication, of the annual meeting shall be

- 3-

DRAFT – SUBJECT TO FURTHER REVISION

determined by the Board of Directors. Unless determined otherwise by the Board of Directors, the annual meeting shall be held at the principal executive office of the Corporation.

(b)    SPECIAL MEETINGS.    Except as otherwise required by applicable law or provided in the Certificate of Incorporation, special meetings of stockholders for any purpose or purposes (including, without limitation, the filling of board vacancies and newly created directorships) may be called only by the Chairman of the Board of Directors (the "Chairman"), by the Chief Executive Officer, by the Board of Directors, or by the Secretary at the request in writing of stockholders holding shares representing not less than 50% of the voting power of the outstanding shares entitled to vote on the matter for which such meeting is to be called.  The Secretary shall call such a meeting upon receiving such a written request.  The date, time and place, if any, either within or without the State of Delaware, and/or the means of remote communication, of any special meeting shall be determined by the Board of Directors or, if applicable, by such stockholders (to the extent set forth in the notice pursuant to which they requested such meeting), and shall be stated in the Corporation's notice of the meeting.  If no designation is made the place of meeting shall be the principal executive office of the Corporation.

(c)    NOTICE OR WAIVER OF NOTICE.    Whenever stockholders are required or permitted to take any action at a meeting, written notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.  All such notices shall be delivered, either personally, by mail, or by a form of electronic transmission consented to by the stockholder to whom the notice is given (including pursuant to the notice provisions of the Stockholders Agreement), by or at the direction of the Board of Directors, the Chief Executive Officer or the Secretary, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation or when delivered in accordance with the notice provisions of the Stockholders Agreement.  If given by electronic transmission, such notice shall be deemed to be delivered (i) if by facsimile telecommunication, when directed to a facsimile number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network (e.g., a secure website or electronic data room used for posting information to stockholders) together with separate notice to the stockholder of such posting, upon the later of such posting and the giving of such separate notice; and (iv) if by any other form of electronic transmission, when directed to the stockholder.  Any such consent to notice by facsimile or electronic mail shall be revocable (or the applicable facsimile number or electronic mail address may be changed) by the stockholder by written notice to the Secretary of the Corporation at the Corporation's principal executive office.  Notwithstanding anything to the contrary in these Bylaws, notice shall be deemed validly delivered to any stockholder that is party to the Stockholders Agreement if such notice is delivered to such stockholder in accordance with the Stockholders Agreement, and each such stockholder shall be deemed to have consented thereto, which consent shall be irrevocable except to the extent provided otherwise in the Stockholders Agreement.  Attendance of a person at a meeting shall constitute a waiver of notice of such

- 4-

DRAFT – SUBJECT TO FURTHER REVISION

meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address and is consented to by the stockholders at that address to whom such notice is given; *provided*, any such stockholder may revoke such consent by delivering written notice of such revocation to the Secretary of the Corporation at the Corporation's principal executive office.

(d)     STOCKHOLDER LIST.  There shall be prepared and made, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by this Section 6.2(d) or the books of the Corporation, or to vote at any meeting of stockholders.

(e)     CONDUCT OF MEETING.  Meetings of the stockholders shall be presided over by one of the following officers in the order of seniority and if present and acting:  the Chairman, the Vice-Chairman of the Board of Directors (the "Vice Chairman"), if any, the Chief Executive Officer, a Senior Vice President, a chairman for the meeting chosen by the Board of Directors or, if none of the foregoing is in office and present and acting, by a chairman to be chosen by the stockholders.  The Secretary of the Corporation or, in such person's absence, an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present the chairman for the meeting shall appoint a secretary of the meeting.

(f)     PROXY REPRESENTATION.  Every stockholder may authorize another person or persons to act for such stockholder by proxy in all matters in which a stockholder is entitled to participate, whether by waiving notice of any meeting, voting or participating at a meeting, or expressing consent or dissent without a meeting.  Every proxy must be signed by the stockholder or by such person's attorney-in-fact.  No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

(g)     INSPECTORS AND JUDGES.  The Board of Directors, in advance of any meeting, may, but need not, appoint one or more inspectors of election or judges of the vote, as the case may be, to act at the meeting or any adjournment thereof. If an inspector or inspectors or judge or judges are not appointed by the Board of Directors, the person presiding at the meeting

- 5-

DRAFT – SUBJECT TO FURTHER REVISION

may, but need not, appoint one or more inspectors or judges.  In case any person who may be appointed as an inspector or judge fails to appear or act, the vacancy may be filled by appointment made by the person presiding thereat.  Each inspector or judge, if any, before entering upon the discharge of such person's duties, shall take and sign an oath faithfully to execute the duties of inspector or judge at such meeting with strict impartiality and according to the best of his ability.  The inspectors or judges, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum and the validity and effect of proxies, receive votes, ballots or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result, and do such other acts as are proper to conduct the election or vote with fairness to all stockholders.  On request of the person presiding at the meeting, the inspector or inspectors or judge or judges, if any, shall make a report in writing of any challenge, question or matter determined by such person or persons and execute a certificate of any fact so found.

(h)    QUORUM.  Except as the DGCL, these Bylaws or the Stockholders Agreement may otherwise provide, the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum at a meeting of stockholders for the transaction of any business.  The stockholders present may adjourn the meeting despite the absence of a quorum.  When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any stockholders.

(i)    VOTING.  Each holder of common stock ("Common Stock") of the Corporation shall be entitled to one (1) vote, in person or by proxy, for each share of Common Stock entitled to vote held by such stockholder.  Any action shall be authorized by a majority of the votes cast except where the Stockholders Agreement, the Certificate of Incorporation or the DGCL prescribes a higher percentage of votes and/or a different exercise of voting power.  When a quorum is present, the affirmative vote of the majority of the voting power of the shares cast by stockholders present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law, the Stockholders Agreement, these Bylaws or the Certificate of Incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.  The Corporation shall not directly or indirectly vote any shares of its own stock; *provided*, that the Corporation may vote shares that it holds in a fiduciary capacity to the extent permitted by law.  Voting by ballot shall not be required for corporate action except as otherwise provided by the DGCL.

7.    STOCKHOLDER ACTION WITHOUT MEETINGS.

Any action required to be taken, or any action which may be taken, at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and shall be delivered to the Corporation by delivery to its

NY 78204778v15

DRAFT – SUBJECT TO FURTHER REVISION

registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

8.       FACSIMILE, EMAIL OR OTHER ELECTRONIC TRANSMISSION.

A facsimile, email or other electronic transmission by a stockholder or proxyholder (or by any person authorized to act on such person's behalf, including pursuant to the Stockholders Agreement) of a proxy or a written consent to an action to be taken (including the delivery of such a document in the .pdf, .tif, .gif, .peg or similar format attached to an email message) shall be deemed to be written, signed, dated and delivered to the Corporation for the purposes of this ARTICLE II; *provided* that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (or the Corporation is otherwise aware) (A) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person transmitted such facsimile, email or other electronic transmission.  The date on which such facsimile, email or other electronic transmission is transmitted shall be deemed to be the date on which such consent or proxy was signed.  Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of the Board of Directors, the Chief Executive Officer or the Secretary of the Corporation, each stockholder, proxyholder or other authorized person who delivered a consent or proxy by facsimile, email or other electronic transmission shall re-execute the original form thereof and deliver such original to the Corporation at its registered office in the State of Delaware, its principal place of business or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded; *provided* that no such request shall invalidate, or affect the date of, the proxy or written consent as initially transmitted.

ARTICLE III

BOARD OF DIRECTORS

1.       GENERAL.

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by applicable law, these Bylaws or the Certificate of Incorporation required to be exercised or done by the stockholders or are not otherwise restricted by the terms of the Certificate of Incorporation or the Stockholders Agreement.  Each member of the Board of Directors is referred to in this Article III as a "Director".  The use of the phrase "Whole Board" herein refers to, at the time of determination, the total number of Directors which the Corporation would have at such time if there were no vacancies (excluding, with respect to any particular matter or meeting, any Director who is recused from such meeting or vote because they are not disinterested and independent).

- 7-

NY 78204778v15

DRAFT – SUBJECT TO FURTHER REVISION

2.      NUMBER AND ELECTION; TERM.

Subject to the Stockholders Agreement, the total number of Directors constituting the Whole Board shall be fixed by, or in the manner provided in, the Certificate of Incorporation. Directors need not be stockholders of the Corporation.  Subject to the Stockholders Agreement, Directors shall be elected, at each annual meeting of stockholders and at any special meeting of stockholders called for the purpose of electing Directors, by a plurality of the total voting power of the outstanding shares of Common Stock present in person or represented by proxy at such meeting and entitled to vote on the election of Directors; *provided*, *however* that any election of Directors by written consent of the stockholders in lieu of a meeting shall require the written consent of stockholders holding a majority of the total voting power of the outstanding shares of Common Stock.  The term of office of each Director shall expire at each annual meeting of the stockholders, and each Director shall hold office until such Director's successor has been elected and qualified or until such Director's earlier death, resignation or removal.

3.      VACANCIES; RESIGNATIONS.

Subject to the Stockholders Agreement, any vacancy on the Board of Directors (whether resulting from the death, resignation, removal of any Director, from an increase in the size of the Whole Board, or otherwise) may be filled at any time by the vote of a majority of the remaining Directors then in office, although less than a quorum, or (if applicable) by the sole remaining Director.  Any Director may resign at any time by giving written notice thereof to the Chairman, to the Chief Executive Officer, or to the Secretary of the Corporation. Any such resignation shall take effect at the date and time specified in such notice or, if not specified therein, then upon receipt of such notice by the Chairman, the Chief Executive Officer or the Secretary of the Corporation, as applicable. The acceptance of such resignation shall not be necessary to make it effective unless otherwise stated therein.

4.      DIRECTOR NOMINATIONS.

Except for Directors nominated pursuant to the Stockholders Agreement and subject to the terms and provisions set forth therein, Directors may be nominated by action of the Board of Directors, or by the proposal of a stockholder that satisfies the following conditions:

(a)      The stockholder proposes the nomination for an election to be held at an annual meeting of stockholders or at a special meeting of stockholders called for such purpose;

(b)      The stockholder is a record holder of at least 5.0% of the outstanding shares of Common Stock on the record date for determining stockholders entitled to receive notice of and to vote at such annual meeting or special meeting (a "Proposing Stockholder");

(c)      The Proposing Stockholder delivers written notice identifying such nominees to the Corporation's Secretary at the Corporation's principal place of business at least seven (7) business days prior to the meeting by (i) personal delivery, (ii) facsimile transmission, (iii) registered or certified mail, postage prepaid, return receipt requested, (iv) nationally recognized overnight or other express courier service, or (v) by electronic transmission.  All notices shall be effective and shall be deemed delivered (a) if by personal delivery or electronic transmission, on

- 8-

DRAFT – SUBJECT TO FURTHER REVISION

the date of delivery if delivered during normal business hours of the Corporation, and if not delivered during such normal business hours, on the next business day following delivery, (b) if by facsimile transmission, on the next business day following dispatch of such facsimile, (c) if by courier service, on the second business day after dispatch of a notice addressed to the Corporation, and (d) if by mail, on the fifth day after deposit in the mail, addressed to the Corporation;

(d)     The Proposing Stockholder's notice includes: (i) the name and address of the Proposing Stockholder, as they appear on the Corporation's books, and the telephone number at which the Proposing Stockholder may be contacted during normal business hours through the time for which the meeting is scheduled and (ii) the names and qualifications of the Proposing Stockholder's nominees;

(e)     The Proposing Stockholder must also provide such other information as any officer of the Corporation shall reasonably deem relevant with respect to the nominees within such time limits as any officer of the Corporation shall reasonably impose for such information; and

(f)     If the chairman of such meeting of the stockholders determines that a nomination was not made in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Notwithstanding the foregoing, no such nomination may be made with respect to any Director seat that is subject to a "Designation Right" under the Stockholders Agreement except in accordance with the applicable provisions of the Stockholders Agreement.

5.     MEETINGS.

(a)     TIME.  The Board of Directors will meet at least once during each calendar quarter.  In addition, the Chairman, the Chief Executive Officer, or any two (2) Directors may call a special meeting of the Board of Directors at any time upon two (2) business days' written notice.

(b)     PLACE.  The Board of Directors may designate any place, either within or without the State of Delaware, and/or by any means of remote communication permitted by the DGCL by which all Directors participating in the meeting can hear each other at the same time ("Remote Communication"), as the place of any meeting of the Board of Directors; *provided*, that for any such meeting held in person, reasonable provision shall be made to allow any Directors who wish to do so to participate in such meeting by means of Remote Communication. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal executive office of the Corporation.

(c)     NOTICE OR ACTUAL OR CONSTRUCTIVE WAIVER.  No notice shall be required for regular meetings for which the time and place have been fixed.  Written, oral or any other mode of notice of the time and place shall be given for special meetings at least twenty-four hours prior to the meeting; notice may be given by telephone, facsimile or electronic

DRAFT – SUBJECT TO FURTHER REVISION

transmission (in which case it is effective when given) or by mail (in which case it is effective seventy-two hours after mailing by prepaid first class mail).  The notice of any meeting need not specify the purpose of the meeting.  Any requirement of furnishing a notice shall be waived by any Director who signs a written waiver of such notice before or after the time stated therein.  Attendance of a Director at a meeting of the Board of Directors shall constitute a waiver of notice of such meeting, except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(d)    QUORUM AND ACTION.  A majority of the Whole Board shall constitute a quorum except when a vacancy or vacancies prevents such majority, whereupon a majority of the Directors in office shall constitute a quorum; *provided* that such majority shall constitute at least one-third (1/3) of the Whole Board.  Any Director may participate in a meeting of the Board of Directors by means of Remote Communication, and such participation in a meeting of the Board of Directors shall constitute presence in person at such meeting.  A majority of the Directors present, whether or not a quorum is present, may adjourn a meeting to another time and place.  Except as herein otherwise provided, and except as otherwise provided by the DGCL or the Stockholders Agreement, the act of the Board of Directors shall be the act by vote of a majority of the Directors present at a meeting, a quorum being present.  In addition, the Board of Directors may take action by written consent as provided in Section 6 of this Article III.  The quorum and voting provisions herein stated shall not be construed as conflicting with any provisions of the DGCL and these Bylaws which govern a meeting of Directors held to fill vacancies and newly created Directorships in the Board of Directors.

(e)    CHAIRMAN OF THE MEETING.  The Chairman, if present and acting, shall preside at all meetings.  Otherwise, the Vice-Chairman, if any and if present and acting, or the Chief Executive Officer, if present and acting, or any other Director chosen by the Board of Directors, shall preside.

6.    ACTION IN WRITING.

Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or such committee.

7.    REMOVAL OF DIRECTORS.

Directors may be removed in the manner provided in the Stockholders Agreement and the DGCL.

8.    COMMITTEES.

The Board of Directors shall establish an Audit Committee and a Compensation Committee which shall each have and may exercise the powers of the Board of Directors with respect to the powers delegated to it.  The Board of Directors may also establish, by resolution passed by a majority of the Whole Board, one or more other Board committees of the Board,

-10-

DRAFT—SUBJECT TO FURTHER REVISION

*provided* that the authority of any such committee shall be limited to making recommendations to the full Board of Directors for their approval (except to the extent the Board of Directors, by the affirmative vote of at least sixty-six and two-third percent (66-2/3%) of the Whole Board, delegates authority to a committee of disinterested Directors with respect to a particular transaction or matter for which the Board of Directors determines in good faith that such delegation is appropriate).  Each committee shall consist of one or more of the Directors of the Corporation.  The Board of Directors may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of any member of any such committee or committees, the members thereof present at any meeting and not disqualified from voting, whether or not they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

9.    COMPENSATION.

Subject to the Stockholders Agreement, Directors not employed by the Corporation or any of its direct or indirect subsidiaries may receive compensation determined by the Board of Directors.  Subject to the Stockholders Agreement, Directors may be reimbursed for reasonable and documented expenses incurred in connection with their service as a Director.

ARTICLE IV

OFFICERS

1.    EXECUTIVE OFFICERS.

The Board of Directors shall appoint a Chief Executive Officer, a Secretary and a Treasurer.  The Board of Directors in its discretion may also appoint, from time to time, a President, one or more Senior Vice Presidents (which may be denominated with additional descriptive titles), one or more Vice Presidents (which may be denominated with additional descriptive titles), and such other or additional officers as in its opinion are desirable for the conduct of the business of the Corporation.  Any number of offices may be held by the same person. The Board of Directors shall also elect from among its members, subject to the applicable provisions of the Stockholders Agreement, the Chairman of the Board who may or may not also be an officer of the Corporation, and may at any time and from time to time also appoint a Vice Chairman.  For the avoidance of doubt, the Chief Executive Officer may designate one or more members of the Corporation's management as a "Vice President," provided that any such person shall not by such designation be considered an officer of the Corporation, except for purposes of insurance, indemnification and advancement of expenses.

2.    ELECTION; TERM OF OFFICE.

The officers of the Corporation shall be appointed by the Board of Directors from time to time in its discretion.  Subject to the provisions of the Stockholders Agreement, vacancies may be filled or new offices created and filled at any meeting of the Board of Directors.  Each officer shall hold office until a successor is duly appointed or until such officer's earlier death, resignation or removal as hereinafter provided.

-11-

NY 78204778v15

DRAFT—SUBJECT TO FURTHER REVISION

3.      REMOVAL.

Any officer or agent may be removed with or without cause, at any time by the Board of Directors, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.      COMPENSATION.

Compensation of all officers shall be fixed by the Board of Directors or a committee thereof, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

5.      AUTHORITY AND DUTIES.

All officers, as between themselves and the Corporation, shall have such power and perform such duties in the management of the Corporation as may be provided by applicable law, by these Bylaws or by the Board of Directors and, unless otherwise prescribed by these Bylaws or by the Board of Directors, each officer shall have such further powers and duties as ordinarily pertain to such office.

6.      CHAIRMAN.

The Chairman, if present and acting, shall preside at all meetings of the Board of Directors, otherwise, the Vice-Chairman, if any and if present and acting, otherwise, the Chief Executive Officer, if present, shall preside, or if the Chief Executive Officer does not so preside, any other Director chosen by the Board of Directors shall preside.

7.      CHIEF EXECUTIVE OFFICER.

The Chief Executive Officer shall be the senior officer of the Corporation, and shall preside at all meetings of the stockholders and all meetings of the Board of Directors at which he or she is present and at which the Chairman or Vice-Chairman (if any) is not present.  The Chief Executive Officer shall have the general authority, subject to the powers of and supervision by the Board of Directors, to manage and control the business, affairs and properties of the Corporation and its controlled direct and indirect subsidiaries in the ordinary course, and general authority and control over the Corporation's officers, agents and employees, and shall see that all orders and resolutions of the Board of Directors are carried into effect.  The Chief Executive Officer may sign, execute and deliver, in the name of the Corporation, powers of attorney, contracts, bonds and other obligations. The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or as may be provided in these Bylaws.

8.      PRESIDENT.

The President, if any, subject to the powers of and supervision by the Board of Directors and the Chief Executive Officer, shall act in a general executive capacity and, in the absence or disability of the Chief Executive Officer, shall perform the duties and exercise the powers of the Chief Executive Officer.  The President shall perform such other duties and exercise such powers

-12-

DRAFT—SUBJECT TO FURTHER REVISION

as may be prescribed by the Board of Directors. The President may sign, execute and deliver, in the name of the Corporation, contracts and other obligations pertaining to the regular course of his or her duties, subject to such policies and limitations as may be established by the Board of Directors. The Chief Executive Officer shall also be the President, unless a separate President is appointed by the Board of Directors in its discretion.

9.      SENIOR VICE PRESIDENTS.

Any Senior Vice President that may have been appointed, in the absence or disability of the Chief Executive Officer and the President, shall perform the duties and exercise the powers of the Chief Executive Officer, in the order of their seniority, and shall perform such other duties as may be prescribed by the Board of Directors. Senior Vice Presidents may sign, execute and deliver, in the name of the Corporation, contracts and other obligations pertaining to the regular course of his or her duties, subject to such policies and limitations as may be established by the Board of Directors.

10.     SECRETARY.

The Secretary shall keep in safe custody the seal of the Corporation and affix it to any instrument when authorized by the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors.  The Secretary (or in such officer's absence, an Assistant Secretary, but if neither is present another person selected by the Chairman for the meeting) shall have the duty to record the proceedings of the meetings of the stockholders and Directors in a book to be kept for that purpose.

11.     TREASURER.

The Treasurer shall have the care and custody of the corporate funds, and other valuable effects, including securities, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.  The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer and Board of Directors, at the regular meetings of the Board of Directors, or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Corporation.  If required by the Board of Directors, the Treasurer shall give the Corporation a bond for such term, in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of such office and for the restoration to the Corporation, in case of such person's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in such person's possession or under such person's control belonging to the Corporation.  The Treasurer shall perform such other duties and exercise such powers as may be prescribed by the Board of Directors.

DRAFT – SUBJECT TO FURTHER REVISION

## ARTICLE V

## CORPORATE SEAL; CORPORATE BOOKS

The corporate seal shall be in such form as the Board of Directors shall prescribe.  The books of the Corporation may be kept within or without the State of Delaware, at such place or places as the Board of Directors may, from time to time, determine.

## ARTICLE VI

## FISCAL YEAR

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.  Except as otherwise determined by the Board of Directors, the fiscal year of the Corporation shall end on December 31 of each year.

## ARTICLE VII

## INDEMNITY

1.    INDEMNITY.

(a)    Without limiting the provisions of Section 12 of the Certificate of Incorporation, any person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) with respect to any act or omission solely occurring by reason of the fact that he or she is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (including employee benefit plans) (hereinafter an "indemnitee"), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification than permitted prior thereto), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such indemnitee in connection with such action, suit or proceeding, if the indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe such conduct was unlawful. The termination of the proceeding, whether by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, had reasonable cause to believe such conduct was unlawful.

(b)    Any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor with respect to any act or omission by reason of the fact that he or she is or

-14-

NY 78204778v15

DRAFT—SUBJECT TO FURTHER REVISION

was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise (including employee benefit plans), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification than permitted prior thereto), against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court in which such suit or action was brought, shall determine, upon application, that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)     All reasonable expenses incurred by or on behalf of the indemnitee in connection with any suit, action or proceeding, may be reimbursed or advanced to the indemnitee by the Corporation, to the fullest extent authorized by the Certificate of Incorporation and the DGCL.

(d)     Notwithstanding anything contained in this Article VII, the Corporation shall not be obligated to indemnify any Director or officer or advance expenses in connection with any proceeding (other than proceedings contemplated in Section 1(e)) initiated by such person unless the commencement of such proceeding (or part thereof) was authorized or consented to by the Board of Directors.

(e)     The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this ARTICLE VII shall be enforceable by any person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction.  Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such person is not so entitled. Such a person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action.

(f)     The rights to indemnification and to advancement of expenses conferred in this article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Certificate of Incorporation, a Bylaw of the Corporation, agreement, vote of stockholders or disinterested Directors or otherwise.

NY 78204778v15

DRAFT – SUBJECT TO FURTHER REVISION

(g)      The indemnification and advancement of expenses provided by this article shall continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

(h)      In addition to the indemnification rights of Directors, officers, employees or agents of the Corporation, the Corporation shall have the power to, in the sole discretion of the Board of Directors, indemnify any other person made a party to any action, suit or proceeding who the Corporation may indemnify under Section 145 of the DGCL.

(i)      The provisions of this ARTICLE VII shall be deemed to be contract rights based upon good and valuable consideration between the Corporation and each director and officer or other person entitled to indemnification who serves in any such capacity at any time while this ARTICLE VII and the relevant provisions of the DGCL or other applicable law are in effect, and such person may bring suit as if the provisions of this ARTICLE VII were set forth in a separate written contract between such person and the Corporation. Such contract right shall vest for each director and officer or other person entitled to indemnification at the time such person is elected or appointed to such position or is requested to serve in the capacity that entitled such person to indemnification under this ARTICLE VII, and no repeal or modification of this ARTICLE VII or any such law shall affect any such vested rights or obligations of any current or former director or officer  or other person with respect to any state of facts or proceeding regardless of when occurring.

(j)      For purposes of this ARTICLE VII, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was or agreed to be a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust, association, employee benefit plan or other enterprise, shall stand in the same position under this ARTICLE VII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

ARTICLE VIII

GENERAL PROVISIONS

1.      DIVIDENDS.

Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board at any regular or special meeting, pursuant to law and in accordance with the Stockholders Agreement.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and the Stockholders Agreement.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or

NY 78204778v15

DRAFT – SUBJECT TO FURTHER REVISION

reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

2.      CHECKS, DRAFTS AND ORDERS.

All checks, drafts, or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors or a duly authorized committee thereof.

3.      CONTRACTS.

Subject to the Stockholders Agreement, the Board of Directors may authorize any officer or officers, or any agent or agents, of the Corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

4.      LOANS.

Subject to the Stockholders Agreement, the Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiary, including any officer or employee who is a director of the Corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation.  Nothing in this Section 4 shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

5.      VOTING SECURITIES OWNED BY THE CORPORATION.

Voting securities in any other corporation or other entity held by the Corporation shall be voted as directed by the Chief Executive Officer, unless the Board of Directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

6.      INSPECTION OF BOOKS AND RECORDS.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger and a list of its stockholders.  A proper purpose shall mean any purpose reasonably related to such person's interest as a stockholder.  In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder.

-17-

DRAFT—SUBJECT TO FURTHER REVISION

The demand under oath shall be directed to the Corporation at its registered office in the State of Delaware or at its principal place of business.

7.    EXCLUSIVE JURISDICTION.

Unless otherwise waived by resolution of the Board of Directors, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the DGCL or the Certificate of Incorporation or Bylaws or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine, except, as to each of (i) through (iv), for any claim for which the Court of Chancery of the State of Delaware determines there is an indispensable party not subject to its jurisdiction (and such party does not consent to such jurisdiction within ten (10) days of such determination).

8.    SECTION HEADINGS.

Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

9.    INCONSISTENT PROVISIONS.

In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL or any other applicable law, the provision of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.  If there is any conflict between the provisions of the Stockholders Agreement and these Bylaws, the provisions of the Stockholders Agreement will prevail unless for them to do so would be in contravention of the requirements of the DGCL.

ARTICLE IX

AMENDMENTS

So long as the Stockholders Agreement and the Certificate of Incorporation are each in effect, these Bylaws may be amended in accordance with the provisions of the Stockholders Agreement and the Certificate of Incorporation, as applicable.  At any time the Stockholders Agreement and the Certificate of Incorporation are not in effect, these Bylaws may be amended by the vote of a majority of the voting power of the shares of stock of the Corporation then outstanding.

*[Remainder of Page Intentionally Left Blank]*

-18-

NY 78204778v15

## Exhibit C

(New Board Composition)

This Exhibit C contains the revised composition of the directors the Ad Hoc Group has selected for the New Board and the Chief Executive Officer. Schedule 1 contains a clean copy of the New Board Composition. Schedule 2 contains a redlined copy of the New Board Composition showing changes made to the New Board Composition filed with the Court in the Third Amended Plan Supplement.

<u>Schedule 1</u>

(New Board Composition)

## New Board of Reorganized AAC Holdings

On the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and such board members will be deemed to have resigned, and the New Board of each of the Reorganized Debtors, without further order of the Bankruptcy Court, shall be appointed.

The New Board will consist of:

| Name | Biography & Affiliations |
|---|---|
| Jason Gart | Jason Gart is an analyst at HG Vora Capital Management where he is responsible for sourcing, analyzing, and executing investments across the capital structure. Prior to joining HG Vora in 2018, Mr. Gart was an investment banking analyst at GLC Advisors where he worked in financial restructuring. Mr. Gart holds a B.S. in Commerce with concentrations in Finance and Management from the University of Virginia's McIntire School of Commerce. |
| Loren Beck | Loren Beck is a seasoned litigator with substantial managerial experience in the healthcare provider space. Previously, Mr. Beck served as President and Chief Legal Officer of Cliffside Malibu, a nationally-recognized leader in addiction treatment. During his tenure at Cliffside, Mr. Beck oversaw an over four–fold growth of the business and played a key role in orchestrating Cliffside's sale to a private equity investor. Prior to working at Cliffside, Mr. Beck practiced for nine years as a commercial litigator, representing plaintiffs and defendants in various business disputes, including a high-profile case involving hundreds of millions of dollars in questionable bond trades. In addition to his high-stakes securities cases, Mr. Beck has litigated a wide variety of commercial disputes involving breaches of contract, insurance coverage, partnership disputes, construction and real estate, professional negligence, and fraud. Mr. Beck earned his undergraduate degree from Cornell College and his J.D. from Loyola Law School. He has been a guest lecturer at Berkeley Law and has served as President of the Century City Bar Association. |
| Bowen S. Diehl | Bowen S. Diehl is the current President, Chief Executive Officer and Director of Capital Southwest Corporation. Mr. Diehl joined Capital Southwest in 2014 as Chief Investment Officer. He was appointed President and Chief Executive Officer in 2015 and led the relaunch of the firm as a lender to middle market companies. Mr. Diehl came to Capital Southwest from American Capital, Ltd., which he joined in 2001 and where he had acted as Managing Director and Co- |

| | |
|---|---|
| | Head of the Sponsor Finance Group since 2007. While at American Capital, he closed investments in 15 platform companies and numerous add-on acquisitions, representing over $1.1 billion of invested capital. While at American Capital, Mr. Diehl served for eight years (2006-2014) as Chairman of the Board of The Meadows of Wickenburg, an Arizona-based provider of treatment for alcohol and drug addiction and other co-occurring disorders. Mr. Diehl earned a Bachelor of Engineering degree, with majors in Environmental and Geotechnical Engineering and Economics from Vanderbilt University and a Masters of Business Administration from the University of Texas at Austin. Mr. Diehl lives in Dallas with his wife and three children. |
| Mikhail Katz | Mikhail Katz is a Director on the Investment Team of Brightwood Capital Advisors, LLC. Mr. Katz manages the execution process including documentation and presentation to the investment committee. Prior to Brightwood, Mr. Katz was a Senior Vice President at Jefferies Finance LLC where he led structuring and origination of asset-based loans, non-investment grade loans and high yield bridges for corporate and financial sponsor clients in the consumer products, retail and restaurant sectors. Prior to this, he was with Standard & Poor's where he was a credit analyst in the Global Fixed Income Research Group. Mr. Katz holds a BS from the New York University Stern Business School. |
| Sengal Selassie | Sengal Selassie is Co-CEO and Co-Founder of Brightwood Capital Advisors, LLC. Mr. Selassie has been involved in all phases of the firm's development since its founding in 2010. He is a member of the Executive Committee and serves on the Investment Committee of all Brightwood Managed Funds. Mr. Selassie currently participates on the boards of many of Brightwood's portfolio companies and has managed capital for hundreds of limited partners, including a number of prominent public, private and corporate pension plans, endowments, family offices, and high net worth individuals. Prior to forming Brightwood, Mr. Selassie led Cowen Capital Partners, LLC, where he served as managing partner from 2006 through 2009. Mr. Selassie joined Cowen Capital from SG Capital Partners LLC, Cowen Capital's predecessor fund where he worked from 1998 through 2006. At SG Capital he was a Managing Director and served as group head starting in 2002. Prior to SG Capital, Mr. Selassie worked in the Mergers & Acquisitions Group at Morgan Stanley where he helped media and |

| | |
|---|---|
| | telecommunications companies execute strategic transactions. He began his career in the Corporate Finance Group of the Investment Banking Division of Goldman Sachs in 1990. Mr. Selassie holds a A.B. in economics, as well as a J.D. and Masters of Business Administration from Harvard College. |
| Mark D. Stolper | Mark D. Stolper currently serves as the Executive Vice President and Chief Financial Officer of RadNet, Inc. (Nasdaq: RDNT), a position he has held since 2004. Prior to that, Mr. Stolper was an independent member of Radnet's Board of Directors. He is responsible for all aspects of Radnet's financial functions and disciplines. Before joining RadNet, he had diverse experiences in investment banking, private equity, venture capital investing, and operations. Mr. Stolper began his career as a member of the corporate finance group at Dillon, Read and Co., Inc., executing mergers and acquisitions, public and private financings, and private equity investments with Saratoga Partners LLP, an affiliated principal investment group of Dillon Read. After Dillon Read, Mr. Stolper joined Archon Capital Partners, which made private equity investments in media and entertainment companies. Mr. Stolper also worked for Eastman Kodak, where he was responsible for business development for Kodak's Entertainment Imaging subsidiary ($1.5 billion in sales). He was also co-founder of Broadstream Capital Partners, a Los Angeles-based investment banking firm focused on advising middle market companies engaged in financing and merger and acquisition transactions. Mr. Stolper is currently a member of the Board of Directors of Rotech Healthcare and Surgalign Holdings, Inc. (Nasdaq: SRGA). Mr. Stolper graduated with a liberal arts degree from the University of Pennsylvania and a finance degree from the Wharton School. Additionally, he earned a postgraduate Award in Accounting from UCLA. |
| Andrew McWilliams[1] | With over 20 years of extensive experience with a wide variety of healthcare organizations including for-profit and not-for-profit entities and ranging from complex Fortune 100 companies to stand-alone community hospitals and over 10 years of behavioral health experience, Andrew McWilliams brings a wealth of knowledge to AAC. Mr. McWilliams leverages his broad experience in healthcare including behavioral health to lead AAC in revolutionizing the delivery of substance abuse services in the U.S. |

---

[1] Mr. McWilliams will serve as the chief executive officer for the Reorganized Debtors.

3

| | Mr. McWilliams previously served as the Chief Financial Officer and the Chief Accounting Officer of American Addiction Centers.   Prior to joining American Addiction Centers in 2014, Mr. McWilliams worked with Ernst & Young LLP, a national public accounting firm. During his tenure with Ernst & Young, Mr. McWilliams served multiple healthcare clients and also gained experience across a variety of corporate transactions, including public equity and debt offerings of securities mergers and acquisitions and divestitures. |
|---|---|

4

Schedule 2

(Redline of New Board Composition)

**New Board of Reorganized AAC Holdings**

On the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and such board members will be deemed to have resigned, and the New Board of each of the Reorganized Debtors, without further order of the Bankruptcy Court, shall be appointed.

The New Board will consist of[1]:

| Name | Biography & Affiliations |
|---|---|
| Jason Gart | Jason Gart is an analyst at HG Vora Capital Management where he is responsible for sourcing, analyzing, and executing investments across the capital structure. Prior to joining HG Vora in 2018, Mr. Gart was an investment banking analyst at GLC Advisors where he worked in financial restructuring. Mr. Gart holds a B.S. in Commerce with concentrations in Finance and Management from the University of Virginia's McIntire School of Commerce. |
| ~~Justin~~Loren ~~Kerber~~Beck | ~~Justin Kerber is an analyst at HG Vora Capital Management where he is responsible for sourcing, analyzing, and executing investments across the capital structure. Prior to joining HG Vora in 2014, Mr. Kerber was an investment banking analyst at Goldman Sachs where he worked in leveraged finance. Mr. Kerber holds a B.S. in Applied Economics and Management with a dual concentration in Finance and Accounting from Cornell University~~Loren Beck is a seasoned litigator with substantial managerial experience in the healthcare provider space. Previously, Mr. Beck served as President and Chief Legal Officer of Cliffside Malibu, a nationally-recognized leader in addiction treatment. During his tenure at Cliffside, Mr. Beck oversaw an over four–fold growth of the business and played a key role in orchestrating Cliffside's sale to a private equity investor. Prior to working at Cliffside, Mr. Beck practiced for nine years as a commercial litigator, representing plaintiffs and defendants in various business disputes, including a high-profile case involving hundreds of millions of dollars in questionable bond trades. In addition to his high-stakes securities cases, Mr. Beck has litigated a wide variety of commercial disputes involving breaches of contract, insurance coverage, partnership disputes, construction and real estate, professional negligence, and fraud. Mr. Beck |

[1] ~~The Consenting Lenders are continuing to finalize the identity of the Chief Executive Officer, who will serve as the seventh director of the New Board of Reorganized AAC Holdings, and whose identity shall be disclosed on or before the Effective Date.~~

| | earned his undergraduate degree from Cornell College and his J.D. from Loyola Law School. He has been a guest lecturer at Berkeley Law and has served as President of the Century City Bar Association. |
|---|---|
| Bowen S. Diehl | Bowen S. Diehl is the current President, Chief Executive Officer and Director of Capital Southwest Corporation. Mr. Diehl joined Capital Southwest in 2014 as Chief Investment Officer.  He was appointed President and Chief Executive Officer in 2015 and led the relaunch of the firm as a lender to middle market companies.  Mr. Diehl came to Capital Southwest from American Capital, Ltd., which he joined in 2001 and where he had acted as Managing Director and Co-Head of the Sponsor Finance Group since 2007. While at American Capital, he closed investments in 15 platform companies and numerous add-on acquisitions, representing over $1.1 billion of invested capital.  While at American Capital, Mr. Diehl served for eight years (2006-2014) as Chairman of the Board of The Meadows of Wickenburg, an Arizona-based provider of treatment for alcohol and drug addiction and other co-occurring disorders.  Mr. Diehl earned a Bachelor of Engineering degree, with majors in Environmental and Geotechnical Engineering and Economics from Vanderbilt University and a Masters of Business Administration from the University of Texas at Austin.  Mr. Diehl lives in Dallas with his wife and three children. |
| ~~Michael~~Mikhail Katz | ~~Michael~~Mikhail Katz is a Director on the Investment Team of Brightwood Capital Advisors, LLC.  Mr. Katz manages the execution process including documentation and presentation to the investment committee.   Prior to Brightwood, Mr. Katz was a Senior Vice President at Jefferies Finance LLC where he led structuring and origination of asset-based loans, non-investment grade loans and high yield bridges for corporate and financial sponsor clients in the consumer products, retail and restaurant sectors. Prior to this, he was with Standard & Poor's where he was a credit analyst in the Global Fixed Income Research Group.  Mr. Katz holds a BS from the New York University Stern Business School. |
| Sengal Selassie | Sengal Selassie is Co-CEO and Co-Founder of Brightwood Capital Advisors, LLC. Mr. Selassie has been involved in all phases of the firm's development since its founding in 2010. He is a member of the Executive Committee and serves on the Investment Committee of all Brightwood |

2

ACTIVE 53591571v1

| | |
|---|---|
| | Managed Funds. Mr. Selassie currently participates on the boards of many of Brightwood's portfolio companies and has managed capital for hundreds of limited partners, including a number of prominent public, private and corporate pension plans, endowments, family offices, and high net worth individuals.  Prior to forming Brightwood, Mr. Selassie led Cowen Capital Partners, LLC, where he served as managing partner from 2006 through 2009. Mr. Selassie joined Cowen Capital from SG Capital Partners LLC, Cowen Capital's predecessor fund where he worked from 1998 through 2006. At SG Capital he was a Managing Director and served as group head starting in 2002. Prior to SG Capital, Mr. Selassie worked in the Mergers & Acquisitions Group at Morgan Stanley where he helped media and telecommunications companies execute strategic transactions. He began his career in the Corporate Finance Group of the Investment Banking Division of Goldman Sachs in 1990. Mr. Selassie holds a A.B. in economics, as well as a J.D. and Masters of Business Administration from Harvard College. |
| Mark D. Stolper | Mark D. Stolper currently serves as the Executive Vice President and Chief Financial Officer  of RadNet, Inc. (Nasdaq:  RDNT), a position he has held since 2004. Prior to that, Mr. Stolper was an independent member of Radnet's Board of Directors. He is responsible for all aspects of Radnet's financial functions and disciplines. Before joining RadNet, he had diverse experiences in investment banking, private equity, venture capital investing, and operations. Mr. Stolper began his career as a member of the corporate finance group at Dillon, Read and Co., Inc., executing mergers and acquisitions, public and private financings, and private equity investments with Saratoga Partners LLP, an affiliated principal investment group of Dillon Read. After Dillon Read, Mr. Stolper joined Archon Capital Partners, which made private equity investments in media and entertainment companies. Mr. Stolper also worked for Eastman Kodak, where he was responsible for business development for Kodak's Entertainment Imaging subsidiary ($1.5 billion in sales). He was also co-founder of Broadstream Capital Partners, a Los Angeles-based investment banking firm focused on advising middle market companies engaged in financing and merger and acquisition transactions.  Mr. Stolper is currently a member of the Board of Directors of Rotech Healthcare and Surgalign Holdings, Inc. (Nasdaq: SRGA). Mr. Stolper graduated with a liberal arts degree from the |

3

ACTIVE 53591571v1

| | University of Pennsylvania and a finance degree from the Wharton School. Additionally, he earned a postgraduate Award in Accounting from UCLA. |
|---|---|
| Andrew McWilliams[1] | With over 20 years of extensive experience with a wide variety of healthcare organizations including for-profit and not-for-profit entities and ranging from complex Fortune 100 companies to stand-alone community hospitals and over 10 years of behavioral health experience, Andrew McWilliams brings a wealth of knowledge to AAC. Mr. McWilliams leverages his broad experience in healthcare including behavioral health to lead AAC in revolutionizing the delivery of substance abuse services in the U.S. <br><br> Mr. McWilliams previously served as the Chief Financial Officer and the Chief Accounting Officer of American Addiction Centers.  Prior to joining American Addiction Centers in 2014, Mr. McWilliams worked with Ernst & Young LLP, a national public accounting firm. During his tenure with Ernst & Young, Mr. McWilliams served multiple healthcare clients and also gained experience across a variety of corporate transactions, including public equity and debt offerings of securities mergers and acquisitions and divestitures. |

---

[1] Mr. McWilliams will serve as the chief executive officer for the Reorganized Debtors.

4

ACTIVE 53591571v1

## Exhibit D

(New Stockholders' Agreement)

This Exhibit D contains a revised draft of the New Stockholders' Agreement set forth in Exhibit D to the Amended Plan Supplement, which remains subject to ongoing review and comment by the Debtors and the Consenting Lenders. Schedule 1 below contains the revised New Stockholders' Agreement. Schedule 2 below contains a redlined version of the New Stockholders' Agreement showing changes made to the New Stockholders' Agreement filed with the Court in the Amended Plan Supplement.

Schedule 1

(New Stockholders' Agreement)

**AAC PARENT CORPORATION**

**STOCKHOLDERS AGREEMENT**

This STOCKHOLDERS AGREEMENT (this "Agreement"), dated as of December [•], 2020, is made by and among AAC PARENT CORPORATION, a Delaware corporation (the "Company"), each of the Initial Stockholders and each other person or entity that hereafter becomes a Stockholder, and (solely for purposes of Sections 3.1, 4.1, 5.1, 10.1, 11.1 and Articles VII and XII), the Warrant Holders.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth for such terms in Article I hereof.

**W I T N E S S E T H :**

WHEREAS, (a) on June 20, 2020, AAC Holdings, Inc., a Nevada corporation ("AAC Holdings") and certain of its Subsidiaries filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), (b) on October 20, 2020, the Bankruptcy Court entered an order [Docket No. 695] (the "Confirmation Order") confirming the *Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and Its Debtor Affiliates* (as confirmed, and as may be amended, supplemented or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan"), (c) on November 20, 2020, the Bankruptcy Court entered that certain Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan [Docket No. 765] (the "Order in Aid of the Plan") and (d) the "Effective Date" of the Plan (the "Effective Date") is occurring on the date of this Agreement;

WHEREAS, pursuant to the Plan, the Confirmation Order, the Order in Aid of the Plan, and the Restructuring Steps (as defined in the Order in Aid of the Plan), as of the Effective Date, (a) the Company, a newly-formed corporation, became the parent entity of the Reorganized Debtors (as defined in the Plan) and is the entity referred to in the Plan as "Reorganized AAC Holdings", (b) the holders of Junior Lender Secured Claims (as defined in the Plan) received or became entitled to receive, among other things, in satisfaction of such claims, thirteen million (13,000,000) shares of the Company's newly issued common stock, par value $0.01 per share (the "Common Stock"), representing in the aggregate one hundred percent (100%) of the issued and outstanding Common Stock as of the Effective Date, subject to dilution by the Management Incentive Plan and any shares of Common Stock issued upon exercise of Warrants and (c) the holders of DIP Lender Claims and Senior Lender Claims (each as defined in the Plan) received or became entitled to receive the Warrants, among other things, in satisfaction of such claims;

WHEREAS, as of the Effective Date, each of the Initial Stockholders and each of the Initial Warrant Holders has executed and delivered to the Company a counterpart signature page to this Agreement or, pursuant to the Plan and the Confirmation Order, is deemed to be bound by and to have agreed to, this Agreement; and

NOW THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and

NY 78204977

sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Section 1.1    As used in this Agreement, the following terms shall have the definitions set forth below:

"Accelerated Purchaser" has the meaning specified in Section 5.1(f).

"Accelerated Sale" has the meaning specified in Section 5.1(f).

"Accredited Investor" has the meaning given to such term in Rule 501 under the Securities Act.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person; *provided, however*, that a Stockholder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Stockholder's or any of its Affiliates' being a party to this Agreement or by being a lender to or an equity holder or creditor of the Company or any of its Subsidiaries. For purposes hereof, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning specified in the preamble of this Agreement.

"At-Large Director" means an independent Director who (i) is not a Designated Director, (ii) is nominated in accordance with the Bylaws and (iii) is elected by the Company's stockholders in accordance with the Bylaws.

"Bankruptcy Code" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"beneficial owner" (and related terms such as "beneficial ownership") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"Board of Directors" means the board of directors of the Company.

"Brightwood Stockholders" has the meaning specified in Section 6.2(b)(i).

2

"Business Day" means any day other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized by law to be closed.

"Bylaws" means the Amended and Restated Bylaws of the Company in effect as of the date hereof, a copy of which is attached hereto as Exhibit A, as the same may be amended, amended and restated, supplemented or otherwise modified in accordance with the terms hereof and thereof and in effect from time to time.

"Cause" means, with respect to any Director, (i) such individual's conviction or plea of *nolo contendere* of a felony involving moral turpitude, (ii) such individual's commission of any material act of dishonesty resulting or intended to result in material personal gain or enrichment of such individual at the expense of the Company or any of its Subsidiaries, (iii) such individual's willful failure to perform (or gross negligence in performing) the duties of a Director in any material respect, and his or her failure to cure the same after being given reasonably detailed written notice thereof, or (iv) such individual's being adjudged legally incompetent by a court of competent jurisdiction.

"CEO" means the Chief Executive Officer of the Company.

"CEO Director" has the meaning specified in Section 6.2(b)(v).

"Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company in effect as of the date hereof, a copy of which is attached hereto as Exhibit B, as the same may be amended, amended and restated, supplemented or otherwise modified in accordance with the terms hereof and thereof and in effect from time to time.

"Chairman" means the Chairman of the Board of Directors.

"Common Stock" has the meaning specified in the recitals to this Agreement.  For purposes of this Agreement, if the Common Stock has been reclassified or changed, or if the Company pays a dividend or makes a distribution on the Common Stock in shares of capital stock, or subdivides (or combines) the outstanding shares of Common Stock into a greater (or smaller) number of shares of Common Stock, a share of Common Stock shall be deemed to be such number of shares of stock and amount of other securities to which a holder of a share of Common Stock outstanding immediately prior to such change, reclassification, exchange, dividend, distribution, subdivision or combination would be entitled to hold as a result of such change, reclassification, exchange, dividend, distribution, subdivision or combination.

"Company" has the meaning specified in the preamble of this Agreement.

"Company Asset Sale" means the bona fide sale, lease, transfer, conveyance or other disposition to a Third Party Purchaser, in a single transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, whether directly or indirectly.

3

NY 78204977

"Company Entities" means, collectively, the Company and each of its Subsidiaries.

"Company ROFO Offer" has the meaning specified in Section 10.2(b).

"Company Stock Sale" means the bona fide sale, transfer, conveyance or other disposition to a Third Party Purchaser, in a single transaction or a series of related transactions, of all of the outstanding shares of Common Stock, whether directly or indirectly, or by way of any merger, consolidation, statutory share exchange, recapitalization, sale of equity, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership.

"Competitor" means any Person that competes directly with the Company or any of its Subsidiaries, as reasonably determined in good faith by the Board of Directors (or by a Company officer to whom the Board of Directors has delegated such authority), and shall also include any such Person's Affiliates; *provided*, *however*, that Competitor shall not include any Significant Stockholder.

"Confirmation Order" has the meaning specified in the recitals to this Agreement.

"CQS Stockholders" has the meaning specified in Section 6.2(b)(iii).

"CSWC Stockholders" has the meaning specified in Section 6.2(b)(iv).

"Data Room" has the meaning specified in Section 7.1(a).

"Designated Director" means, with respect to any Designating Stockholder (x) any Director for whom the Designating Stockholder is identified as such in Schedule 6.2 and (y) any other Director who was elected as a result of being nominated or designated pursuant to such Designating Stockholder's exercise of its Designation Right, in each case for so long as such individual continues to serve as a Director.

"Designating Stockholders" means, collectively, the Brightwood Stockholders, the HG Vora Stockholders, the CQS Stockholders, the Main Street and/or CSWC Stockholders, and, if applicable, any other Stockholder to whom a Designation Right has been assigned in accordance with this Agreement, in each case for so long as it has a Designation Right.  A Designating Stockholder shall automatically cease to be a Designating Stockholder if and when it ceases to have any Designation Rights.

"Designation Right" means any of the following: (i) the exclusive right of the Brightwood Stockholders to nominate one or two Directors, as applicable, pursuant to Section 6.2(b)(i), (ii) the exclusive right of the HG Vora Stockholders to nominate one or two Directors, as applicable, pursuant to Section 6.2(b)(ii), (iii) the exclusive right of the CQS Stockholders to nominate a Director pursuant to Section 6.2(b)(iii), (iv) the exclusive right of the Main Street Stockholders and CSWC Stockholders to jointly nominate a Director pursuant to Section 6.2(b)(iv), in each case together with the exclusive right to remove or replace, at any time, the applicable Director serving in such Designated Director seat and to fill vacancies with respect to such Designated Director seat in accordance with Section 6.3.

4

"Director" means, at any time of determination, any director then serving on the Board of Directors.

"Disinterested Director Approval" means, with respect to any particular matter, the affirmative vote at a duly held meeting of the Board of Directors (at which a quorum is present) of a majority of the Directors then in office who are "disinterested" with respect to such matter, or the unanimous written consent of all Directors then in office so long as at least one of the Directors is "disinterested" with respect to such matter.

"DGCL" means the General Corporation Law of the State of Delaware, as amended from time to time.

"Drag-Along Notice" has the meaning specified in Section 3.1(a).

"Drag-Along Purchaser" has the meaning specified in Section 3.1(a).

"Drag-Along Sale" has the meaning specified in Section 3.1(a).

"Dragged Holders" has the meaning specified in Section 3.1(a).

"Effective Date" has the meaning specified in the recitals to this Agreement.

"Equity Holder" means any Person who is a Stockholder and/or a Warrant Holder.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Issuance" means (i) the issuance and distribution of shares of Common Stock pursuant to and in accordance with the Plan; (ii) any issuance of shares of Common Stock upon exercise of Warrants; (iii) any issuance of shares of Common Stock by means of a *pro rata* distribution to all Stockholders; (iv) any issuance of shares of Common Stock or other equity awards pursuant to the Management Incentive Plan or any future director or employee equity plan approved by the Board of Directors, including shares of Common Stock issued upon the vesting of awards issued pursuant thereto; (v) any issuance of shares of Common Stock as purchase price consideration in a merger or acquisition transaction approved by the Board of Directors; (vi) any issuance of shares of Common Stock to any lender to the Company or any of its Subsidiaries in connection with a *bona fide* financing or refinancing of any indebtedness of the Company or any of its Subsidiaries; (vii) any issuance of shares of Common Stock in a Public Offering; and (viii) any issuance of shares of Common Stock pursuant to the exercise, conversion or exchange of any options, warrants or other securities issued after the Effective Date that by their terms are exercisable or exchangeable for or convertible into shares of Common Stock (in accordance with such terms), so long as the initial sale or issuance of such options, warrants or other securities complied with the terms of Article V.

"Family Member" means, with respect to any individual, (i) any of such individual's parents, spouse, siblings, children and grandchildren or (ii) any trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity, the

5

sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren.

"GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied, as recommended by the American Institute of Certified Public Accountants.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"HG Vora Stockholders" has the meaning specified in Section 6.2(b)(ii).

"Holder ROFO Offer" has the meaning specified in Section 10.2(b).

"Information" has the meaning specified in Section 7.2(a).

"Initial Stockholders" means, collectively, each Person that as of the Effective Date has received or is entitled to receive a distribution of shares of Common Stock pursuant to the Plan and duly executes and delivers to the Company a counterpart signature page to this Agreement, or is deemed to have entered into and/or to be bound by this Agreement pursuant to the Confirmation Order and Article IV.C.3 of the Plan as further specified in Section 12.3 hereof.

"Initial Warrant Holders" means, collectively, each Person that as of the Effective Date has received or is entitled to receive a distribution of Warrants pursuant to the Plan and duly executes and delivers to the Company a counterpart signature page to this Agreement, or is deemed to have entered into and/or to be bound by this Agreement pursuant to Article IV.C.3 of the Plan.

"Initiating Drag-Along Holders" has the meaning specified in Section 3.1(a).

"Initiating Holders" means (a) with respect to any Drag-Along Sale, the Initiating Drag-Along Holders and (b) with respect to any Tag-Along Sale, the Initiating Tag-Along Holders.

"Initiating Tag-Along Holders" has the meaning specified in Section 4.1(a).

"Initiating Tag-Along Holder Shares" has the meaning specified in Section 4.1(a).

"Joinder Agreement" means a Joinder Agreement in the form attached hereto as Exhibit D, or otherwise in form and substance acceptable to the Board of Directors (or, if applicable, to any officer of the Company to whom the Board of Directors has delegated such authority ) in its discretion, pursuant to which a Person agrees to become bound as a Stockholder party to this Agreement.

6

"Key Action" means any of the following (*provided*, *however*, that a Drag-Along Sale effectuated pursuant to the terms and conditions set forth in Article III shall not constitute a Key Action, notwithstanding that it would otherwise fall within this definition):

(i)      any direct or indirect sale or other disposition (including by way of equity sale, asset sale, lease, merger, consolidation or similar transaction), in one transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole; *provided*, *however*, that any such transaction that is solely between two or more Company Entities (excluding any Company Entity that is not a wholly-owned Subsidiary) shall not constitute a Key Action;

(ii)     the dissolution and/or winding up of the Company;

(iii)    any material amendment or modification to the Certificate of Incorporation or the Bylaws;

(iv)     the incurrence of indebtedness, by the Company and its Subsidiaries on a consolidated basis, in an aggregate principal amount greater than fifty million dollars ($50,000,000), excluding any indebtedness incurred in an amount necessary to refinance amounts outstanding (at the time of such refinancing) under the Exit Facility (as defined in the Plan) and/or any other indebtedness previously approved as a Key Action;

(v)      hiring or terminating the CEO;

(vi)     declaring or making dividends or distributions to, or redeeming or repurchasing shares from, holders of equity interest in the Company, other than (A) repurchases or redemptions contemplated by the terms of this Agreement or (with respect to the Warrants) the Warrant Agreement, (B) repurchases or redemptions contemplated by the terms of any employment or similar agreement entered into with the Company or any of its Subsidiaries (including the Management Incentive Plan) or (C) dividends or other distributions by a wholly owned Subsidiary of the Company to the Company or another wholly owned Subsidiary of the Company;

(vii) any acquisition, disposition or sale of assets by any Company Entity outside the ordinary course of business for a purchase price that exceeds fifty million dollars ($50,000,000); provided, however, that any such transaction that is solely between two or more Company Entities (excluding any Company Entity that is not a wholly-owned Subsidiary) shall not constitute a Key Action; and

(viii) entering into any binding agreement or commitment to do any of the foregoing.

"Lien" means any lien, encumbrance, claim, right, demand, charge, option, pledge, security interest or similar interest, title defect, hypothecation, right of first refusal, preemptive right, judgment, and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

7

"Main Street Stockholders" has the meaning specified in Section 6.2(b)(iv).

"Majority Stockholder Approval" means the approval of one or more Stockholders holding, in the aggregate, more than fifty percent (50%) of the outstanding shares of Common Stock, which approval is obtained (i) by the affirmative vote of such Stockholders at a duly convened stockholder meeting or (ii) by the written consent of such Stockholders in accordance with the Bylaws.

"Management Incentive Plan" means the management incentive plan to be established and implemented with respect to the Company (and/or its Subsidiaries) by the Board of Directors after the Effective Date, as provided for in the Plan.

"MD&A" has the meaning specified in Section 7.1(b).

"New Securities" has the meaning specified in Section 5.1(a).

"New Securities Issuance" has the meaning specified in Section 5.1(a).

"Non-Employee Director" has the meaning specified in Section 6.5.

"Offering Holder" has the meaning specified in Section 10.2(a).

"Permitted Lien" means any Liens that are imposed (i) by the terms of this Agreement or the Certificate of Incorporation, or (ii) under applicable securities laws.

"Person" means any natural person, corporation, limited liability, partnership, unincorporated organization, joint stock company, association, joint venture, trust, or other legal entity, or a Governmental Authority.

"Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Equity Holder that is an individual.

"Plan" has the meaning specified in the recitals to this Agreement.

"Preemptive Rights Election Notice" has the meaning specified in Section 5.1(b).

"Preemptive Rights Offer Notice" has the meaning specified in Section 5.1(a).

"Pro Rata Portion" means, for any Significant Stockholder with respect to any New Securities Issuance, (x) the total amount of New Securities offered in the New Securities Issuance, *multiplied by* (y) a fraction in which the numerator is the Total Equity Interests then held by such Significant Stockholder and the denominator is the Total Equity Interests then held, in the aggregate, by all Significant Stockholders, in each case as of the date of the applicable Preemptive Rights Offer Notice.

8

"Public Offering" means a public offering of Common Stock or other capital stock of the Company pursuant to an effective registration statement under the Securities Act (other than on Form S-4, Form S-8 or any successor to such forms).

"Qualified Institutional Buyer" has the meaning given to such term in Rule 144A under the Securities Act.

"Qualified Public Offering" means (A) a bona fide, marketed underwritten Public Offering of Common Stock after the closing of which the Common Stock is listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange or (B) a "direct listing" of the Common Stock on any such exchange, in the case of clause (A) which satisfies at least one of the following two criteria: (i) the gross cash proceeds of such offering exceed seventy-five million dollars ($75,000,000) or (ii) at least twenty percent (20%) of the outstanding shares of Common Stock shall have been issued or sold to the public in such offering.

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager, advisor or subadvisor as controls or manages such Person or (z) an Affiliate of such investment manager, advisor or subadvisor.

"Related Party" means: (i) any Director, any member of a Subsidiary Governing Body, any executive officer of a Company Entity, or an immediate Family Member of any of the foregoing Persons; (ii) any Person (other than a Company Entity) of which an individual described in clause (i) hereof is a partner, director or executive officer; (iii) any Person (or any Affiliate thereof) that beneficially owns, or otherwise controls (or shares control of), at least ten percent (10.0%) of the Total Equity Interests; or (iv) any director or executive officer of a Person described in clause (iii) hereof (or an immediate Family Member of any such director or executive officer).

"Related Party Transaction" means any transaction, contract, agreement, understanding, arrangement, loan, advance or guarantee (or series of related transactions, contracts, agreements, understandings, arrangements, loans, advances or guarantees) between any Company Entity and a Related Party, but shall exclude the following: (i) any purchase of conventional insurance products from national insurance companies for the benefit of the Company and its Subsidiaries in the ordinary course of the Company's business; (ii) any dividend payments or distributions to all holders of Common Stock that are approved by the Board of Directors; (iii) any payment of reasonable and customary compensation and fees to, and indemnities provided for the benefit of, and reimbursement of expenses incurred by, officers, directors, employees or consultants of any Company Entity in the ordinary course of the Company's business, in each case, as approved by the Board of Directors; (iv) any employment agreements, benefit plans (including the Management Incentive Plan) and similar arrangements for employees and directors of any Company Entity (including the issuance of Common Stock or other equity interests thereunder) which, in each case, are approved by the Board of Directors; (v) any advances and loans to officers, employees or consultants of any Company Entity in an amount less than one hundred thousand dollars ($100,000) in the aggregate outstanding at any time, in

9

each case, in connection with the anticipated incurrence of business expenses by such officers, employees or consultants or the relocation of such officers, employees or consultant in connection with such individual's services to the Company; (vi) transactions with Related Parties that were the subject of a competitive bidding process involving multiple third-party bidders in the ordinary course consistent with past practice; and (vii) any transactions wholly between or among two or more Company Entities (provided that non-wholly-owned Subsidiaries shall not be deemed Company Entities for purposes of this clause (vii)).

"Remote Communication" means any means of remote communication, including conference call, permitted by the DGCL by which all Directors participating in the meeting can hear each other at the same time.

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Restructuring Steps" has the meaning given to such term in the Order in Aid of the Plan.

"ROFO Acceptance Notice" has the meaning specified in Section 10.2(d).

"ROFO Holder" has the meaning specified in Section 10.2(a).

"ROFO Offer" has the meaning specified in Section 10.2(e).

"ROFO Sale" has the meaning specified in Section 10.2(a).

"ROFO Sale Notice" has the meaning specified in Section 10.2(b).

"ROFO Shares" has the meaning specified in Section 10.2(a).

"Sale Transaction" means any Company Stock Sale or any Company Asset Sale.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Significant Stockholder" means each Equity Holder that (i) was a Designating Stockholder on the Effective Date (or is an Affiliate of such a Person) and (ii) at the time of determination holds (including shares held by its Affiliates) at least the lesser of (x) six percent (6.0%) of the Total Equity Interests and (y) fifty percent (50.0%) of the Total Equity Interests that such Equity Holder (together with its Affiliates) received or was entitled to receive on the Effective Date.

"Stockholders" means, collectively, (i) the Initial Stockholders and (ii) all other Persons who (A) become a holder of shares of Common Stock (*provided*, that the Transfer or issuance by which such Person acquired such shares was made in accordance with the applicable provisions of this Agreement) and (B) become a party to this Agreement by duly

10

executing and delivering to the Company a Joinder Agreement or are deemed or required by the Plan, the Confirmation Order, this Agreement or the Certificate of Incorporation to become a party hereto.

"Subsidiary" means any Person in which the Company, directly or indirectly through one or more subsidiaries or otherwise, beneficially owns more than fifty percent (50.0%) of either the equity interests in, or the voting control of, such Person.

"Subsidiary Governing Body" means the board of directors, board of managers or other governing body of any wholly-owned Subsidiary of the Company.

"Supermajority Stockholder Approval" means the approval of one or more Stockholders holding, in the aggregate, at least sixty-six and two-thirds percent (66-2/3%) of the outstanding shares of Common Stock, which approval is obtained (i) by the affirmative vote of such Stockholders at a duly convened stockholder meeting or (ii) by the written consent of such Stockholders in accordance with the Bylaws.

"Tag-Along Buyer" has the meaning specified in Section 4.1(a).

"Tag-Along Closing" has the meaning specified in Section 4.1(c).

"Tag-Along Election Deadline" has the meaning specified in Section 4.1(a).

"Tag-Along Percentage" means, with respect to any Tag-Along Sale, the quotient, expressed as a percentage, of (x) the total number of shares of Common Stock that the Initiating Tag-Along Holders are proposing to Transfer to the Tag-Along Buyer pursuant to the Tag-Along Sale, divided by (y) the total number of shares of Common Stock held by the Initiating Tag-Along Holders.

"Tag-Along Sale" has the meaning specified in Section 4.1(a).

"Tag-Along Sale Notice" has the meaning specified in Section 4.1(a).

"Tag-Along Sellers" has the meaning specified in Section 4.1(a).

"Tag-Along Share Cap" has the meaning specified in Section 4.1(a).

"Third Party Purchaser" means, with respect to any Drag-Along Sale, any Person (other than the Company, the Initiating Drag-Along Holders, or any Affiliate thereof or any Related Party) or group of such Persons that is the purchaser in such Drag-Along Sale.

"Total Equity Interests" means, at any time of determination, a number of shares of Common Stock equal to the sum of (i) the total shares of Common Stock then outstanding *plus* (ii) the total shares of Common Stock issuable upon exercise of all Warrants then outstanding.  For any Person, the percentage of the Total Equity Interests held by such Person at any time of determination shall be equal to the quotient (expressed as a percentage) of (x) the sum of the shares of Common Stock then held by such Person *plus*

11

the shares of Common Stock issuable upon exercise of all Warrants then held by such Person, *divided by* (y) the Total Equity Interests.

"Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Common Stock or Warrants (including (x) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Common Stock or Warrants, or (y) the sale, transfer, assignment or other disposition of any securities or rights convertible into, or exchangeable or exercisable for, Common Stock or Warrants), whether voluntary or involuntary, whether of record, constructively or beneficially and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Stockholder or Warrant Holder lends or borrows any shares of Common Stock or Warrants to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers such  securities in connection with its internal financing arrangements, in any case in the ordinary course of its business, shall not constitute a Transfer of Common Stock or Warrants, as applicable, for purposes of this Agreement; *provided*, *however*, that any redemption or foreclosure (including the retention of shares of Common Stock or Warrants in satisfaction of any obligations) on shares of Common Stock or Warrants by any such broker, bank or other financial institution shall be deemed a Transfer of such securities for purposes of this Agreement.  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Transfer Notice" has the meaning specified in Section 10.1(c).

"Unsubscribed New Securities" has the meaning specified in Section 5.1(d).

"Warrants" means the warrants, issued by the Company as of the Effective Date pursuant to the Plan, the Confirmation Order, the Order in Aid of the Plan, and the Restructuring Steps, exercisable, in the aggregate, for seven million (7,000,000) shares of Common Stock.

"Warrant Agreement" means that certain Warrant Agreement, dated as of the date hereof, by and between the Company, and American Stock Transfer & Trust Company, LLC, as the Warrant Agent, in the form attached hereto as Exhibit C, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Warrant Holders" means, collectively, (i) the Initial Warrant Holders and (ii) each other Person who (A) becomes a Holder (as defined in the Warrant Agreement) of Warrants and (B) becomes a party to this Agreement by duly executing and delivering to the Company a Joinder Agreement or is deemed or required by the Plan, the Confirmation Order, this Agreement or the Warrant Agreement to become a party hereto. A Person shall automatically cease to be a Warrant Holder for all purposes of this Agreement upon such Person's ceasing to be a "Holder" under the Warrant Agreement; *provided*, *however*, that such Person shall continue to be bound by the provisions of Section 7.2.

12

"Whole Board" means, at any time of determination, the total number of Directors which the Company would have at such time if there were no vacancies on the Board of Directors.

"Whole Board Approval" means, with respect to any matter, either (i) the affirmative vote, at a duly held meeting, of Directors that constitute a majority of the Whole Board (excluding, in calculating the size of the Whole Board for purposes of this definition, any Director who is recused because they are not disinterested and independent with respect to such matter) or (ii) the unanimous written consent of all Directors then in office.

Section 1.2    Interpretation.  The definitions in this Article I shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Articles, Sections, Schedules and Exhibits shall be deemed to be references to Articles and Sections of, and Schedules and Exhibits to, this Agreement unless the context shall otherwise require. All Schedules and Exhibits attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the meaning ascribed to such term in this Agreement. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by GAAP. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Any reference in this Agreement to "$" or "dollars" shall mean United States dollars. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day the period in question shall end on the next succeeding Business Day. In calculating any Stockholder's ownership of Common Stock or Total Equity Interests for the purposes of determining whether such Stockholder shall have certain rights under this Agreement that are subject to a minimum ownership threshold, all shares of Common Stock and (for purposes of determining ownership of Total Equity Interests) shares of Common Stock issuable upon exercise of Warrants held by such Stockholder and by Affiliates of such Stockholder shall be aggregated for the purposes of such determination.

## ARTICLE II

### STOCKHOLDERS; VOTING RIGHTS

Section 2.1    Stockholders; Voting Rights.

(a)    Each share of Common Stock shall be entitled to one (1) vote on all matters for which Stockholders are entitled to vote under the terms of this Agreement, the Certificate of

13

NY 78204977

Incorporation or under applicable law.  Except as expressly set forth herein, no Stockholder shall have any special or preferential voting or blocking rights.

(b)    A Person shall automatically cease to be a Stockholder for all purposes of this Agreement upon the disposition of all of such Person's shares of Common Stock in accordance with Article X hereof; *provided*, *however*, that such Person shall continue to be bound by the provisions of Section 7.2.

Section 2.2    Limited Liability for Stockholders.  Without prejudice to any additional or further limitations on liability applicable to Stockholders, no Stockholder shall be personally liable to any other Stockholder or to the Company or any Affiliate or creditor of any of the foregoing or to any other Person for any losses, claims, damages, debts, obligations, or liabilities incurred by such other Stockholder or the Company or any Affiliate or creditor of any of the foregoing or to any other Person, whether such losses, claims, damages, debts, liabilities or obligations arise in contract, tort, or otherwise, solely by reason of being a Stockholder.

**ARTICLE III**

DRAG-ALONG SALE

Section 3.1    Drag-Along Sale.

(a)    If at any time after the date that is twelve (12) months after the Effective Date any one or more Equity Holders then holding, in the aggregate, more than fifty percent (50.0%) of the Total  Equity Interests desire to effectuate a Company Stock Sale or a Company Asset Sale, then such Equity Holder(s) (collectively, the "Initiating Drag-Along Holders") shall have the right to elect to require that all Equity Holders participate in such transaction (a "Drag-Along Sale") on the terms and conditions set forth in this Article III, by delivering written notice of such election to the Company, and the Company shall promptly deliver a copy of such notice to all the other Equity Holders (collectively, the "Dragged Holders") in accordance with Section 12.2.  Any such notice (a "Drag-Along Notice") shall contain a reasonably detailed summary of the material terms and conditions of the Drag-Along Sale, including the identity of the applicable Third Party Purchaser (the "Drag-Along Purchaser"), the amount and form of the consideration to be paid by the Drag-Along Purchaser (stated on both an aggregate basis and, for any Drag-Along Sale that is a Company Stock Sale, on a per-share basis based on the total number of shares of Common Stock outstanding when the Drag-Along Notice is delivered, including all shares issuable upon exercise in full of all then-outstanding Warrants).  The amount and form of consideration paid in respect of each Warrant shall be determined based on the number of shares of Common Stock issuable upon the exercise in full of such Warrant, net of the exercise price that would have been payable with respect to such exercise.

(b)    In connection with any Drag-Along Sale, each of the Dragged Holders shall be obligated to do each of the following, in each case to the extent applicable to such transaction and subject in all cases to Section 3.1(c): (i) at the closing of such Drag-Along Sale, sell or transfer to the Drag-Along Purchaser all of such Dragged Holder's shares of Common Stock and Warrants free and clear of any Liens (other than Permitted Liens) and duly endorsed for transfer, or accompanied by duly endorsed stock powers, for the same type and amount of per-share

14

consideration and on the same terms as the Initiating Drag-Along Holders (except that if any Equity Holder is given an option as to the form of consideration to be received in respect of its Common Stock or Warrants, each other Equity Holder shall be given the same option); (ii) to the extent such Dragged Holder is entitled to vote thereon, vote all such Dragged Holder's shares of Common Stock, whether by proxy, voting agreement or otherwise, in favor of the Drag-Along Sale; (iii) use commercially reasonable efforts to obtain any consents necessary for such Dragged Holder to consummate the Drag-Along Sale; (iv) waive and refrain from exercising any appraisal or dissenters rights with respect to such Drag-Along Sale; (v) effectuate the allocation and distribution of the aggregate consideration upon the Drag-Along Sale as set forth below; (vi) refrain from directly or indirectly taking (or causing any other Person to take) any action that is prejudicial to or inconsistent with such Drag-Along Sale; and (vii) take any and all reasonably necessary action in furtherance of the foregoing, to the extent requested by the Initiating Drag-Along Holders or the Board of Directors, at the Company's sole expense.

(c)     Notwithstanding anything to the contrary in this Article III, (i) no Dragged Holder shall be required to agree to any covenants that do not also apply to the Initiating Drag-Along Holders, or make any representations or warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, or provide any indemnity in connection with any Drag-Along Sale, except that each Dragged Holder may be required to (A) provide customary representations, warranties, covenants and agreements (and customary indemnification with respect thereto) with respect to itself and its Common Stock and its Warrants (in respect of which such Dragged Holder may be required to bear 100% of any damages or indemnification obligations resulting from such Dragged Holder's breach thereof) and/or (B) bear its *pro rata* share (in proportion to its ownership of the Total Equity Interests) of any escrows, holdbacks or adjustments in respect of the purchase price related obligations or, in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets or covenants or other agreements of the Company or its Subsidiaries, any indemnification obligations (*provided*, that a Dragged Holder may be required to bear 100% of any damages or indemnification obligations resulting from such Dragged Holder's breach) and (ii) no Dragged Holder shall be obligated (A) to indemnify any Person in connection with a breach by any other Equity Holder of its representations, warranties, covenants or other agreements, (B) in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, to incur liability to any Person in connection with the Drag-Along Sale, including under any indemnity, in excess of the lesser of (x) such Dragged Holder's *pro rata* share of such liability based on the relative amount of proceeds payable to the Stockholders in such sale (other than in the case of fraud or willful breach of such Dragged Holder) and (y) the proceeds payable to such Dragged Holder in such Drag-Along Sale (other than in the case of fraud or willful breach of such Dragged Holder), (C) to agree to any non-competition, non-solicitation, non-disparagement or non-hire covenants or similar restrictive covenants or (D) provide any representations, warranties, covenants or agreements the terms of which are more onerous (on a per-share basis) with respect to the Dragged Holders than the Initiating Drag-Along Holders.

(d)     Each Initiating Drag-Along Holder and each Dragged Holder will bear its *pro rata* share (based upon the net proceeds received by each such holder in the Drag-Along Sale) of the costs of any Drag-Along Sale to the extent such costs are incurred for the benefit of all such holders and are not otherwise paid by the Company or the Drag-Along Purchaser.  Costs incurred by such holders on their own behalf will not be considered costs of the Drag-Along Sale.

15

NY 78204977

(e)     The Company shall take, and shall use commercially reasonable efforts to cause the Board of Directors to take, any such actions as may reasonably be required or requested by the Initiating Drag-Along Holder to ensure that the Drag-Along Sale is consummated in accordance with the terms and conditions set forth in this Article III and any other applicable provisions of the Agreement, including by using commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to cooperate in any proposed Drag-Along Sale and not to take any action which might impede any such Drag-Along Sale. Notwithstanding anything to the contrary in this Article III, any Drag-Along Sale that is structured as a merger or a Company Asset Sale shall be subject to approval of the Board of Directors to the extent otherwise required under applicable law, and the Board of Directors shall act in accordance with its duties under applicable law with respect thereto.  Pending the completion of any proposed Drag-Along Sale, the Company shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing.

(f)     The Initiating Drag-Along Holders shall have power and authority, subject to the requisite Board of Directors approval in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale, to require that the Company enter into the definitive agreement for such Drag-Along Sale and take any and all such further action in connection therewith as the Initiating Drag-Along Holders may reasonably deem necessary or appropriate in order to consummate the Drag-Along Transaction or, if expressly directed in writing by the Initiating Drag-Along Holders in their sole discretion, to abandon the Drag-Along Transaction; *provided*, *however*, that in the case of a Company Asset Sale or merger, the Board of Directors shall act in accordance with its duties under applicable law; *provided further*, *however*, that to the fullest extent permitted by law, the Initiating Drag-Along Holders shall not have any liability to any other Person if the Drag-Along Sale is not consummated for any reason (except due to the Initiating Drag-Along Holders' breach of any of their obligations under any definitive written agreement entered into in connection therewith, but subject to the limitations set forth therein).  Subject to any required approval by the Board of Directors (in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale), the issuance of the Drag-Along Notice and the other provisions of this Section 3.1, the Initiating Drag-Along Holders, in exercising their rights under this Section 3.1, shall have complete discretion over the terms and conditions of the Drag-Along Sale effected thereby, including per-share price, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows.

## ARTICLE IV

## TAG-ALONG SALE

Section 4.1    Tag-Along Sale.

(a)     In the event of any proposed Transfer by one or more Stockholders (the "Initiating Tag-Along Holders") of more than fifty percent (50.0%) of the outstanding shares of Common Stock to a single Person or group of related Persons (the "Tag-Along Buyer"), in a single transaction or series of related transactions (a "Tag-Along Sale"), the Initiating Tag-Along Holders shall first give written notice of such proposed Transfer to the Company, and the Company shall promptly deliver a copy of such notice to each of the other Equity Holders, in accordance with Section 12.2.  Such notice (a "Tag-Along Sale Notice") shall offer to each of the other Equity

16

Holders (collectively, the "Tag-Along Sellers") the option to participate in such Tag-Along Sale on the same terms and conditions as the Initiating Tag-Along Holders, and at the same per-share sale price and in the same form of consideration as the Initiating Tag-Along Holders, and shall set forth (i) the names of the Tag-Along Buyer and the Initiating Tag-Along Holders, (ii) the number of shares of Common Stock that the Initiating Tag-Along Holder is proposing to Transfer to the Tag-Along Buyer pursuant to the Tag-Along Sale (the "Initiating Tag-Along Holder Shares"), (iii) the Tag-Along Percentage, and (iv) a reasonably detailed summary of the material terms and conditions of the proposed Tag-Along Sale, including the proposed amount and form of consideration per share of Common Stock. Each Tag-Along Seller may irrevocably elect, by written notice delivered to the Initiating Tag-Along Holders (or their designated representative) within ten (10) calendar days after delivery of the Tag-Along Sale Notice (the "Tag-Along Election Deadline" and any such notice, a "Tag-Along Election Notice")), to sell up to the Tag-Along Percentage of its shares of Common Stock in such Tag-Along Sale, on the terms and conditions set forth in the Tag-Along Sale Notice (a "Tag-Along Election" and each Tag-Along Seller that makes such an election, an "Electing Tag-Along Seller"); *provided*, *however*, that if the Tag-Along Buyer is not willing to purchase on such terms and conditions an aggregate number of shares of Common Stock equal to the Initiating Tag-Along Holder Shares plus all shares of Common Stock with respect to which Tag-Along Elections are made, then the Initiating Tag-Along Holders in their sole discretion may elect to either (A) terminate such Tag-Along Sale or (B) consummate the Tag-Along Sale with respect to the total such number of shares as the Tag-Along Buyer is willing to purchase on such terms and conditions (such number of shares, the "Tag-Along Share Cap"), and in such event (1) each Electing Tag-Along Seller shall be permitted to sell to the Tag-Along Buyer a number of shares of Common Stock owned by such Electing Tag-Along Seller equal to the Final Tag-Along Percentage (as defined below) of the shares with respect to which the Electing Tag-Along Seller made a Tag-Along Election, and (2) the Initiating Tag-Along Holders shall be permitted to sell to the Tag-Along Buyer a number of shares of Common Stock owned by the Initiating Tag-Along Holders equal to the Final Tag-Along Percentage of the Initiating Tag-Along Holder Shares, in each case rounded to the nearest whole share. As used herein, "Final Tag-Along Percentage" means, with respect to any Tag-Along Sale, the quotient, expressed as a percentage, of (x) the Tag-Along Share Cap *divided by* (y) an aggregate number of shares of Common Stock equal to the sum of the Initiating Tag-Along Holder Shares plus the total number of shares of Common Stock with respect to which Tag-Along Elections are made.

(b)    The number of shares of Common Stock that each Tag-Along Seller may irrevocably elect to sell in a Tag-Along Sale in accordance with this Section 4.1 and, if applicable, the amount by which each Electing Tag-Along Seller will be cut back if the Tag-Along Buyer is not willing to purchase all the Initiating Tag-Along Holder Shares plus all shares with respect to which Tag-Along Elections are made, shall be determined based on such Tag-Along Seller's respective ownership of the shares of Common Stock outstanding as of the Tag-Along Election Deadline; *provided*, *however*, that solely for purposes of such calculation, all shares of Common Stock issuable upon exercise of Warrants with respect to which an Electing Tag-Along Seller makes a Tag-Along Election (as specified in the Tag-Along Election Notice) shall be deemed outstanding as of such date (such shares, "Eligible Warrant Shares"). If an Electing Tag-Along Seller makes a Tag-Along Election with respect to any Eligible Warrant Shares, then (x) the Electing Tag-Along Seller shall be obligated to exercise the underlying Warrants and deliver such Eligible Warrant Shares to the Tag-Along Buyer at the Tag-Along Closing and (y) solely for purposes of this Section 4.1 as it applies to such Tag-Along Sale, the Eligible Warrant Shares shall

17

be treated as shares of Common Stock that the Warrant Holder irrevocably elected to sell in the Tag-Along Sale.

(c)    In no event shall any Tag-Along Seller have any rights under this Section 4.1 or otherwise with respect to a sale by any Initiating Tag-Along Holders of any securities of the Company other than the Common Stock.  Notwithstanding anything to the contrary in this Article IV, in connection with any Tag-Along Sale, (i) no Tag-Along Seller shall be required to agree to any covenants that do not also apply to the Initiating Tag-Along Holders, or make any representations or warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, or provide any indemnity in connection with any Tag-Along Sale, except such Tag-Along Seller may be required to (x) provide customary representations, warranties, covenants and agreements (and customary indemnification with respect thereto) with respect to itself and its Common Stock (in respect of which such Tag-Along Seller may be required to bear 100% of any damages or indemnification obligations resulting from such Tag-Along Seller's breach thereof) and/or (y) bear its *pro rata* share (in proportion to its ownership of Common Stock) of any escrows, holdbacks or adjustments in respect of the purchase price related obligations or, in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets or covenants or other agreements of the Company or its Subsidiaries, any indemnification obligations (*provided*, that a Tag-Along Seller may be required to bear 100% of any damages or indemnification obligations resulting from such Tag-Along Seller's breach) and (ii) no Tag-Along Seller shall be obligated (A) to indemnify any Person in connection with a breach by any other Stockholder of its representations, warranties, covenants or other agreements, (B) in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, to incur liability to any Person in connection with the Tag-Along Sale, including under any indemnity, in excess of the lesser of (x) such Tag-Along Seller's *pro rata* share of such liability based on the relative amount of proceeds payable to the Stockholders in such sale (other than in the case of fraud or willful breach of such Tag-Along Seller) and (y) the proceeds payable to such Tag-Along Seller in such Tag-Along Sale (other than in the case of fraud or willful breach of such Tag-Along Seller), (C) to agree to any non-competition, non-solicitation, non-disparagement or non-hire covenants or similar restrictive covenants or (D) provide any representations, warranties, covenants or agreements the terms of which are more onerous (on a per-share basis) with respect to the Tag-Along Sellers than the Initiating Tag-Along Holders. The election by any Tag-Along Seller to sell or not to sell all or any portion of such Tag-Along Seller's Common Stock (including any Eligible Warrant Shares) in any Tag-Along Sale shall be irrevocable (except with the express consent of the Initiating Tag-Along Holders in their sole discretion) and shall not adversely affect such Tag-Along Seller's right to participate in any future Tag-Along Sale.

(d)    At the closing of any Tag-Along Sale (the "Tag-Along Closing"), each Initiating Tag-Along Holder and Tag-Along Seller shall deliver, against payment of the purchase price therefor, certificates (or other evidence thereof reasonably acceptable to the transferee of such Common Stock) representing their Common Stock to be sold, duly endorsed for Transfer or accompanied by duly endorsed stock powers, evidence of good title to the Common Stock to be sold, the absence of Liens (other than Permitted Liens), encumbrances and adverse claims with respect thereto and such other documents as are deemed reasonably necessary by the Initiating Tag-Along Holders and the Company for the proper Transfer of such Common Stock on the books of the Company.

18

NY 78204977

(e)     The provisions of this Section 4.1 shall not apply to any proposed Transfer (i) between Significant Stockholders, (ii) by a Stockholder to any of its Affiliates, or (iii) in a Drag-Along Sale pursuant to Article III.

## ARTICLE V

## PREEMPTIVE RIGHTS

Section 5.1     Preemptive Rights.

(a)     The Company shall not sell or issue to any Person (including any then-current Stockholder) after the Effective Date any shares of Common Stock, or other equity securities or debt convertible into or exchangeable for shares of Common Stock, or options, warrants conferring any right to acquire Common Stock or other rights to acquire Common Stock, or any debt securities (any of the foregoing, "New Securities" and such sale or issuance, a "New Securities Issuance"), unless the Company first delivers a written notice thereof (the "Preemptive Rights Offer Notice") to each Significant Stockholder in accordance with Section 12.2.  The Preemptive Rights Offer Notice shall set forth the terms of the New Securities (including the price, number or aggregate principal amount and type of securities, and all other material terms) and offer to each Significant Stockholder the opportunity to purchase up to its Pro Rata Portion of the New Securities (prior to giving effect to such offering) and its Pro Rata Portion of any New Securities not purchased by other Significant Stockholders, in each case on terms and conditions, including price, not less favorable to the Significant Stockholders than those on which the Company is proposing to sell or issue the New Securities, as set forth in this Section 5.1. Notwithstanding anything contained herein, an Excluded Issuance shall not constitute a New Securities Issuance and shall not be subject to this Section 5.1.

(b)     The Company's offer to each Significant Stockholder pursuant to the Preemptive Rights Offer Notice shall remain open until 5:00 p.m. New York City Time on the date that is twenty (20) days after the Company's delivery of the Preemptive Rights Offer Notice (or such later date and time as the Company may specify in the Preemptive Rights Offer Notice), during which time (the "Preemptive Rights Offer Period") the Significant Stockholder may irrevocably elect to accept such offer by delivering to the Company, in accordance with Section 12.2 or as otherwise specified in the Preemptive Rights Offer Notice, a duly executed written notice (a "Preemptive Rights Election Notice") that (i) refers to and expressly accepts the offer set forth in the Preemptive Rights Offer Notice, (ii) sets forth the maximum number of such New Securities that the Significant Stockholder is electing to purchase, (iii) includes a representation that the Significant Stockholder is a Qualified Institutional Buyer or an Accredited Investor, and (iv) provides such other information as may be reasonably requested in the Preemptive Rights Offer Notice.

(c)     With respect to any New Securities Issuance, each Significant Stockholder who does not timely elect to purchase any New Securities by delivering a Preemptive Rights Offer Notice to the Company during the Preemptive Rights Offer Period shall be deemed to have irrevocably waived its rights under this Section 5.1 with respect to such New Securities Issuance. Each Significant Stockholder who timely elects to purchase New Securities as provided in Section 5.1(b) shall be allocated a number of New Securities equal to the aggregate number of

19

New Securities to be issued in such New Securities Issuance multiplied by such Significant Stockholder's Pro Rata Portion (or, if less, the number of New Securities that the Significant Stockholder elected to purchase as set forth in such Significant Stockholder's Preemptive Rights Election Notice) and, if fewer than all of the Significant Stockholders elect to purchase all of their respective Pro Rata Portions of the New Securities to be issued in such New Securities Issuance, the unallocated New Securities shall be allocated to those Significant Stockholders who elected in their Preemptive Rights Election Notice to purchase more than their Pro Rata Portions (pro rata based on their respective Pro Rata Portions, subject to any limitations specified by the applicable Significant Stockholder in its Preemptive Rights Election Notice).

(d)     In the event the total number of New Securities offered in the New Securities Issuance exceeds the aggregate number of shares that Significant Stockholders elect to purchase pursuant to this Section 5.1 (the "Unsubscribed New Securities"), the Company or its applicable Subsidiary will have sixty (60) days after expiration of the Preemptive Rights Offer Period to sell such Unsubscribed New Securities, at a price no less than the price set forth in the Preemptive Rights Offer Notice and on other terms and conditions not more favorable, in the aggregate, to the purchaser thereof, than those specified in the Preemptive Rights Offer Notice. Following the date of the expiration of the sixty (60) day period referred to in the immediately preceding sentence, the Company will not, and the Company shall cause its Subsidiaries not to, issue or sell any Unsubscribed New Securities without again complying with this Section 5.1, which shall be treated as a new New Securities Issuance hereunder.

(e)     Any Significant Stockholder shall have the right to assign, to any one or more of its Affiliates, its right to purchase and/or receive delivery of all or any portion of the New Securities that such Significant Stockholder elects to purchase pursuant to this Section 5.1, by written notice to the Company, which notice (i) shall be duly executed by the Significant Stockholder and the assignee and shall include representations, in form and substance satisfactory to the Company, that the assignee is a Qualified Institutional Buyer or an Accredited Investor and (ii) if the assignee is not already a party hereto, shall be accompanied by a Joinder Agreement, duly executed by the assignee.  Notwithstanding the foregoing, no such assignment shall relieve the Significant Stockholder from its obligations under this Section 5.1 with respect to the New Securities that it elected to purchase pursuant to this Section 5.1, and no such assignment shall be permitted if the assignee's purchase of such New Securities would result in any of the consequences described in Section 10.1(a).

(f)     Notwithstanding the foregoing provisions of this Section 5.1, the Company may proceed with any issuance or sale of New Securities (including to any Significant Stockholder) to any Person (an "Accelerated Purchaser") prior to having complied with such foregoing provisions (an "Accelerated Sale") if the Board of Directors determines in good faith that it is in the best interests of the Company to consummate such issuance or sale without having first complied with such provisions; *provided* that:

(i)     the Company shall provide each Significant Stockholder with prompt written notice of such Accelerated Sale, specifying the actual price per share paid for such New Securities;

NY 78204977

(ii)     the Company shall offer to issue to each Significant Stockholder additional New Securities up to the amount that, if purchased by each Significant Stockholder, would, (A) with respect to shares of Common Stock, result in each such Significant Stockholder maintaining the same percentage (or increasing such percentage by the maximum amount any other Person increased its percentage) of the total number of shares of Common Stock then held by such Significant Stockholder (relative to the total number of shares of Common Stock then held, in the aggregate, by all Significant Stockholders) that such Significant Stockholder owned immediately prior to the issuance or sale of additional shares of Common Stock pursuant to this Section 5.1(g)(ii) and (B) with respect to any other additional New Securities, be equal to the amount that such Significant Stockholder would have been entitled to purchase pursuant to Section 5.1(a) if the Company complied with the foregoing provisions of this Section 5.1 with respect to the Accelerated Sale, in each case at the same price per share and on the same terms applicable to the Accelerated Sale;

(iii)     the Company shall keep such offer available to each Significant Stockholder for a period of twenty (20) days after the delivery of such notice, during which period, each Significant Stockholder may accept such offer by delivering a notice to the Company to purchase New Securities in an amount no greater than the amount offered by the Company to such Significant Stockholder pursuant to Section 5.1(f)(ii);

(iv)     if one or more Significant Stockholders exercise their right to accept such offer to purchase New Securities, the Company shall give effect to each such exercise by (A) requiring that the Accelerated Purchaser sell down a portion of its New Securities, (B) issuing additional new Securities to such Significant Stockholder or (C) a combination of (A) and (B), so long as such action effectively provides such Significant Stockholder with the opportunity to hold the same percentage of the total outstanding New Securities (after giving effect to the issuance of New Securities to all Significant Stockholders exercising such right) that such Significant Stockholder would have been entitled to purchase had this Section 5.1(f) not been invoked; and

(v)     any dilution in any Significant Stockholder's percentage ownership of Common Stock or Total Equity Interests resulting from an Accelerated Issuance shall not be given effect for purposes of any provision of this Agreement  of any rights under this Agreement that are tied to such percentage ownership Agreement until the Company has complied with its obligations under this Section 5.1(f) and issued the New Securities, if any, to be issued to the Significant Stockholders pursuant to this Section 5.1(f).

Any offer, issuance or sale of New Securities to  Significant Stockholders pursuant to this Section 5.1(f) shall be conducted in accordance with the provisions applicable to New Securities acquired pursuant to a Preemptive Rights Election Notice under Sections 5.1(b), 5.1(c), 5.1(d) and 5.1(e), *mutatis mutandis*.

21

NY 78204977

# ARTICLE VI

## BOARD OF DIRECTORS

Section 6.1   Agreement to Vote.   Each Stockholder hereby agrees to hold all of the shares of Common Stock registered in its name (and any other voting securities of the Company issued with respect to, upon conversion of, or in exchange or substitution of any Common Stock, and any other voting securities of the Company subsequently acquired by such Stockholder) subject to the provisions of this Article VI, and to vote all such securities at regular or special meetings of stockholders, and give written consents with respect to all such securities, as necessary to give full effect to the Designation Rights and the provisions of this Article VI, and to cause the Board of Directors to at all times be constituted as provided in this Article VI. The Company shall use commercially reasonable efforts to cause the Board of Directors to at all times be constituted as provided in this Article VI, and to give full effect to the Designation Rights and the provisions of this Article VI.

Section 6.2   Composition of the Board of Directors.

(a)   The Board of Directors shall at all times consist of seven (7) Directors, unless the size of the Board of Directors is increased or decreased by the Board of Directors pursuant to Whole Board Approval; *provided*, *however*, that the size of the Board of Directors shall not be decreased to fewer than five (5) Directors nor increased to more than seven (7) Directors except with Whole Board Approval and Majority Stockholder Approval. The Board of Directors, as of the Effective Date, shall be comprised of the seven (7) individuals listed in Schedule 6.2 attached hereto.

(b)   Following the Effective Date, and notwithstanding anything to the contrary in this Agreement or in the Bylaws:

(i) for so long as Brightwood Capital Advisors, LLC and its Affiliates and Related Funds  (collectively, the "Brightwood Stockholders") own, in the aggregate, (A) at least seventeen and one-half percent (17.5%) of the Total Equity Interests, the Brightwood Stockholders shall have a designation right with respect to two (2) seats on the Board of Directors, pursuant to which the Brightwood Stockholders shall have the exclusive right to nominate two individuals for election to such Director seats and (B) at least eight and three-quarters percent (8.75%) (but less than seventeen and one-half percent (17.5%)) of the Total Equity Interests, the Brightwood Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Brightwood Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(ii) for so long as HG Vora Capital Management, LLC and its Affiliates and Related Funds  (collectively, the "HG Vora Stockholders") own, in the aggregate, (A) at least seventeen and one-half percent (17.5%) of the Total Equity Interests, the HG Vora Stockholders shall have a designation right with respect to two (2) seats on the Board of Directors, pursuant to which the HG Vora Stockholders shall have the exclusive right to nominate two individuals for election to such Director seats  and (B) at least eight and

22

three-quarters percent (8.75%) (but less than seventeen and one-half percent (17.5%)) of the Total Equity Interests, the HG Vora Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the HG Vora Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(iii) for so long as CQS (UK) LLP and its Affiliates and Related Funds (collectively, the "CQS Stockholders") own, in the aggregate, at least eight and three-quarters percent (8.75%) of the Total Equity Interests, the CQS Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the CQS Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(iv) for so long as Capital Southwest Corporation and its Affiliates and Related Funds (collectively, the "CSWC Stockholders") and Main Street Capital Corporation and its Affiliates and Related Funds (collectively, the "Main Street Stockholders") own, in the aggregate, at least eight and three-quarters percent (8.75%) of the Total Equity Interests, they shall have a joint designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Main Street Stockholders and CSWS Stockholders shall have the exclusive right to jointly nominate an individual for election to such Director seat; *provided,* that if either the CSWC Stockholders or the Main Street Stockholders cease to own at least four and three-eighths percent (4.375%) of the Total Equity Interests, then from and after such time the CSWC Stockholders or Main Street Stockholders (including their respective ownership of the Total Equity Interests), as applicable, shall be disregarded for purposes of selecting a Director;

(v) with respect to the Director designation rights set forth in subsections (i) through (iv) of this Section 6.2(b), the applicable Designating Stockholder shall have, in addition to the exclusive right to nominate an individual for election to the applicable Director seat(s), the exclusive right to remove or replace, at any time, the applicable Director(s) serving in such Director seat(s) and to fill vacancies with respect to such Director seat(s) in accordance with Section 6.3; and

(vi) at all times the individual then serving as the CEO, if any, shall automatically be a Director (the "CEO Director"), *provided*, that any such individual's status as a director shall automatically terminate upon their ceasing to be the CEO.

(c)     If at any time a Designating Stockholder loses a Designation Right because it ceases to satisfy the applicable Total Equity Interest ownership threshold set forth in subsection (b) of this Section 6.2, then the term of the Designated Director then serving on the Board of Directors as a result of such terminated Designation Right shall expire at the next annual meeting of stockholders following such termination, and thereafter such Director seat shall be an At-Large Director seat and that (including at such annual meeting) is subject to election by the Company's stockholders at such annual meeting or by written consent.  Notwithstanding anything to the contrary in this Section 6.2, the then-current term of a Designated Director shall not be affected solely by the applicable Designating Stockholder's loss of its Designation Right.

23

NY 78204977

(d)     A Designating Stockholder may not assign or otherwise Transfer its Designation Rights to any Person, except that (i) any Designating Stockholder may freely assign Designation Rights to any of its controlled Affiliates or Related Funds, (ii) any Designating Stockholder may assign its Designation Rights to the Transferee in connection with any Transfer of all (but not less than all) of the shares of Common Stock and Warrants that such Designating Stockholder received or was entitled to receive on the Effective Date pursuant to the Plan, (iii) any Designating Stockholder with Designation Rights for two (2) Director seats may assign its Designation Rights with respect to both Director seats to a Transferee in connection with any transfer of Common Stock and/or Warrants representing at least seventeen and one-half percent (17.5%) of the Total Equity Interests, and (iv) any Designating Stockholder with Designation Rights may assign its Designation Rights with respect to one (1) Director seat, to the Transferee in connection with any Transfer of shares of Common Stock and/or Warrants representing at least eight and three-quarters percent (8.75%) of the Total Equity Interests, *provided*, that in each case the Designating Stockholder provides the Company with at prior written notice of such assignment, and *provided further*, that in the case of (ii) through (iv) the Transfer of Common Stock and/or Warrants complies with all applicable provisions of this Agreement and the Transferee (if not already a signatory hereto) executes and delivers a Joinder Agreement.

Section 6.3     Removal; Vacancies.   At any time, a Director may be removed with or without Cause by Majority Stockholder Approval.  In the event of the death, resignation or removal of a Director, or if there is a vacancy on the Board of Directors for any other reason, the vacancy shall be promptly filled by the remaining Directors, in accordance with the Bylaws, subject (in the case of any Director seat that is subject to a Designation Right) to the exclusive right of the Designating Stockholder to designate the individual to fill such vacancy.  Notwithstanding anything to the contrary in this Article VI, a Designating Stockholder shall have the exclusive right (exercisable at any time in its sole discretion) to remove its respective Designated Director and to fill any vacancy with respect to the Director seat to which its Designation Right relates.

Section 6.4     Voting.   Except as otherwise provided in this Agreement, approval of the Board of Directors of any action or decision will require unanimous written consent of all Directors then in office or approval of a majority of the Directors present at a validly convened meeting of the Board of Directors at which a quorum is present.

Section 6.5     Director Compensation.   From and after the Effective Date, each Director who is not an employee of the Company or any of its Subsidiaries (each, a "Non-Employee Director") and who is not an employee of his or her respective Designating Stockholder (if applicable) or an Affiliate of such Designating Stockholder shall be entitled to such compensation (which may include cash and/or equity awards) from the Company as shall have been determined by the Designating Stockholders and the Company by the date that is thirty (30) days after the Effective Date and set forth in a written notice given to the Company on or prior to such date, subject to such changes as may be approved from time to time by the Board of Directors; *provided, however*, that such compensation shall not be increased (other than reasonable annual cost of living increases) unless such increase shall have been approved by Majority Stockholder Approval.  Any equity awards granted to Non-Employee Directors shall be in addition to the equity awards provided under the Management Incentive Plan.  All Directors will be reimbursed by the Company for all reasonable and documented expenses incurred in connection with his or her service as a Director and (as applicable) committee member, and will be entitled to customary

24

NY 78204977

indemnification/advancement and exculpation provisions and directors' and officers' liability insurance coverage.

Section 6.6   Chairman of the Board.  The initial Chairman of the Board, as of the Effective Date, shall be the Director identified as such in Schedule 6.2.  Following each annual meeting of the stockholders, the Board of Directors shall elect the Chairman of the Board from among the Directors.

Section 6.7   Committees of the Board of Directors.  The Board of Directors shall establish and maintain an Audit Committee and a Compensation Committee.  In addition, the Board of Directors may, by a majority vote of the Whole Board, establish one or more additional committees from time to time, in each case in accordance with the Certificate of Incorporation and the Bylaws.

Section 6.8   Subsidiary Boards.  The Company shall use commercially reasonable efforts to cause the size and composition of the board of directors, board of managers or similar governing body of each of the Company's wholly-owned Subsidiaries that owns all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis to at all times be identical to that of the Board of Directors; *provided*, *however*, that the foregoing requirement shall not apply to any wholly-owned Subsidiary which is (i) a limited liability company that is managed by its members, (ii) a limited partnership that is managed by its general partner, or (iii) required by law or contract to have a different composition.

## ARTICLE VII

## INFORMATION RIGHTS

Section 7.1   Information Rights.

(a)   For so long as the Company is not required to file periodic reports under the Exchange Act, the Company shall provide to each Equity Holder who is not a Competitor the information, reports and other materials that Equity Holders are entitled to receive under this Article VII, within the time periods and subject to the applicable terms and conditions set forth in this Article VII; *provided*, *however*, that notwithstanding anything contained in this Article VII, any Equity Holder that has not duly executed and delivered to the Company a counterpart signature page to this Agreement or a Joinder Agreement (and has not otherwise entered into a confidentiality agreement, in form and substance acceptable to the Board of Directors in its sole discretion, with respect to such information, reports and other materials) shall not be entitled to receive any such information, reports or other materials, or access to the Data Room. All information, reports and other materials that the Company is required to provide to Equity Holders under this Article VII shall be posted to an electronic data room on a secure website to which all Equity Holders entitled to receive such information, reports and other materials are given access (the "Data Room").  The Company shall also provide access to the Data Room, upon request by any Equity Holder entitled to such access, to any Transferee or potential Transferee of shares of Common Stock to whom such Equity Holder would be entitled to disclose Information pursuant to Section 7.2, *provided*, that such Transferee or potential Transferee (a) is a Qualified Institutional Buyer or Accredited Investor (or is otherwise acceptable to the Board of Directors, in its reasonable

NY 78204977

discretion) and (b) enters into a confidentiality agreement, in form and substance acceptable to the Board of Directors in its sole discretion, with respect to such information, reports and other materials.  All information provided by the Company to Equity Holders pursuant to this Article VII (including all information provided to or obtained by any Significant Equity Holder pursuant to Section 7.1(d)) shall be subject to the confidentiality provisions set forth in Section 7.2.

(b)    Each Equity Holder who is not a Competitor shall have the right to receive, (i) within ninety (90) days after the end of each fiscal year of the Company, audited annual consolidated financial statements of the Company for such fiscal year (including balance sheets, statements of operations and statements of cash flows), certified by a national accounting firm and prepared in accordance with GAAP, along with a reasonably detailed management's discussion and analysis, in narrative form, commenting on the audited consolidated financial statements ("MD&A"), (ii) within sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year of the Company, unaudited quarterly condensed consolidated financial statements of the Company for such quarter and the year-to-date period and the comparable period of the prior fiscal year (including balance sheets, statements of operations and statements of cash flows), prepared in accordance with GAAP, along with an MD&A with respect thereto, and (iii) as promptly as practicable after each of the quarterly conference calls described below, a transcript or recording of such call.

(c)    Within a reasonable time after it provides quarterly or annual financial statements to Equity Holders pursuant to Section 7.1(b), the Company shall hold quarterly conference calls with the Equity Holders (and reasonable prior notice and dial-in information will be provided to each Equity Holder entitled to participate in such call) to discuss the Company's results of operations and financial performance for the immediately preceding fiscal quarter and year-to-date, including a reasonable question and answer session.  Notwithstanding the foregoing, the Company in its sole discretion may exclude from any such calls any Equity Holder who is a Competitor.

(d)    The Company shall, and shall cause its officers and employees to, provide each Significant Equity Holder reasonable access, upon reasonable prior notice and during normal business hours, to management personnel and the books and records of the Company and its Subsidiaries, subject to customary exceptions regarding Competitors, conflicts of interest, and attorney-client privilege.

(e)    If at any time following the Effective Date the Company is required to register the Common Stock or Warrants or any other class of equity security under Section 12(g) of the Exchange Act because the number of holders of record of such class exceeds any of the applicable thresholds, the Company shall provide a minimum of thirty (30) days prior written notice of such registration to all Equity Holders, and the Company shall not otherwise register the Common Stock or any class of equity security under Section 12 of the Exchange Act at any time prior to consummation of a Qualified Public Offering except with Supermajority Stockholder Approval.  The Common Stock will not be listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange except in connection with or following the consummation of a Qualified Public Offering.

Section 7.2    Confidentiality.

26

(a)      Each Equity Holder shall, and shall cause its Representatives to, keep confidential and not divulge any information (including all budgets, business plans and analyses) concerning the Company and its Subsidiaries, including its assets, business, operations, financial condition, liabilities or business prospects ("Information"), and shall use, and cause its Representatives to use, such Information only in connection with the operation of the Company and its investment in the Company; *provided*, *however*, that nothing herein shall prevent any Equity Holder from disclosing such Information (i) upon the order of any court or administrative agency, (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Equity Holder, (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (iv) to the extent necessary in connection with the exercise of any remedy hereunder, (v) to other Equity Holders who have entered into this Agreement, (vi) to such Equity Holder's Representatives that in the reasonable judgment of such Equity Holder need to know such Information and have an obligation to maintain the confidentiality of such Information, (vii) to any Related Party as long as the Related Party agrees in writing to be bound by the provisions of this Section 7.2 as if it were an Equity Holder, (viii) to a potential Transferee of shares of Common Stock, to the extent reasonably necessary in connection with an actual or potential Transfer to such Person that would be permitted by this Agreement, *provided* that such potential Transferee is not a Competitor and (prior to such disclosure) enters into a non-disclosure agreement in a form approved by the Board of Directors pursuant to which the potential Transferee agrees in writing to maintain the confidential nature of such Information in accordance with the terms of this Section 7.2, or (ix) with the prior written consent of the Company; *provided further*, *that* in the case of clause (i), (ii) or (iii), the applicable Equity Holder shall notify the Company in writing of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment, when and if available.

(b)      The restrictions set forth in this Section 7.2 shall, with respect to any Information provided to the Equity Holders pursuant to Sections 7.1(a) through 7.1(c), expire on the date that is one year after such Information was so provided.  The restrictions set forth in Section 7.2(a) shall not apply to any Information that (i) is or becomes generally available to the public other than as a result of a disclosure by an Equity Holder or any of its Representatives in violation of this Agreement; (ii) is or becomes available to an Equity Holder or any of its Representatives on a non-confidential basis prior to its disclosure by or on behalf of the Company to the receiving Equity Holder and any of its Representatives, (iii) is or has been independently developed or conceived by such Equity Holder or any of its Representatives without use of the Company's Information or (iv) becomes available to the receiving Equity Holder or any of its Representatives on a non-confidential basis from a source other than the Company, any other Equity Holder or any of their respective Representatives, *provided*, that such source is not known by the recipient of the information to be bound by a confidentiality agreement with the disclosing party or any of its Representatives.

NY 78204977

## ARTICLE VIII

KEY ACTIONS

Section 8.1   Approval Requirements for Key Actions.   In addition to any vote of Stockholders that may be required by applicable law or by the provisions of the Certificate of Incorporation, the Company shall not directly or indirectly take (and, as applicable, the Company shall not cause or permit its Subsidiaries to take) any Key Action without first obtaining approval of such Key Action by the Board of Directors pursuant to Whole Board Approval.

## ARTICLE IX

RELATED PARTY TRANSACTIONS

Section 9.1   Approval Requirements for Related Party Transactions.   In addition to any other vote of Stockholders of the Company that may be required by law or by the provisions of the Certificate of Incorporation, the Company shall not enter into, or permit any other Company Entity to enter into, any Related Party Transaction (or series of Related Party Transactions) without first obtaining approval of such Related Party Transaction(s) by Disinterested Director Approval; *provided, further that* if such Related Party Transaction (or series of Related Party Transactions) involves or (as determined by the disinterested members of the Board of Directors) could reasonably be expected to involve more than five million dollars ($5,000,000) in cash payments or other consideration or value, the Company shall not enter into, or permit any other Company Entity to enter into, any Related Party Transaction (or series of Related Party Transactions) without obtaining either of the following prior to obtaining Disinterested Director Approval: (a) a fairness opinion with respect to such proposed Related Party Transaction from a nationally recognized investment banking or valuation firm or (b) Majority Stockholder Approval (excluding for such purpose any shares held by the applicable Related Party or any of its Affiliates).

## ARTICLE X

TRANSFERS

Section 10.1   Restrictions on Transfer.

(a)   Each Equity Holder covenants and agrees that it shall not Transfer any shares of Common Stock or Warrants except in accordance with the provisions of this Section 10.1 and the other applicable provisions of this Agreement.   The Board of Directors, in its sole discretion, may at any time and from time to time waive any of the restrictions or requirements set forth in this Section 10.1, other than clause (i) of Section 10.1(b).   The Board of Directors may delegate, to one or more specified officers of the Company, all or any portion of its authority to make decisions and determinations pursuant to this Section 10.1. All Transfers of Common Stock must comply with, to the extent applicable, the provisions of Article III, Article IV, and Section 10.2.

(b)   Shares of Common Stock and/or Warrants shall not be Transferred by any Stockholder in any Transfer that, if consummated, (i) would result in a violation of the Securities

28

NY 78204977

Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or (ii) would result in the Company's having a number of "holders of record" (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of Common Stock that (A) is three hundred (300) or more (except to the extent the Board of Directors determines, at any time after January 1, 2021 based on advice of outside counsel, that such threshold is not applicable for purposes of determining whether the Company will be subject to periodic reporting obligations under the Exchange Act), (B) exceeds the applicable threshold for the Company's having to register the Common Stock under Section 12(g) of the Exchange Act or (C) would otherwise subject the Company to reporting obligations under Section 13 or Section 15 of the Exchange Act (if, at any time after January 1, 2021, it is not already subject to such reporting obligations). In calculating the number of holders of record of Common Stock for purposes of the immediately preceding sentence, (x) any pending Transfers for which a Transfer Notice (as defined below) has previously been given to the Company shall be taken into account and (y) all then-outstanding Warrants shall be treated as if they were fully exercised for shares of Common Stock with all such shares issued to and held by the holders of such Warrants.

(c)     It shall be a condition precedent to any Equity Holder's Transfer of shares of Common Stock or Warrants that, prior to the consummation thereof, the Equity Holder provide written notice of such Transfer to the Company (a "Transfer Notice"). A Transfer Notice shall be delivered to the Company in accordance with Section 12.2 and, except as determined otherwise by the Board of Directors in its sole discretion, shall include (A) the name, address, telephone number and email address of the Transferor and the Transferee, (B) the number of shares of Common Stock and/or Warrants proposed to be Transferred (C) the total shares of Common Stock and total Warrants then held by the Transferor, (D) the date on which the Transfer is expected to take place and (E) such additional information and documentation as may be reasonably requested by the Company and the Company's stock transfer agent or Warrant Agent, as applicable. So long as the applicable provisions of this Agreement and the Certificate of Incorporation shall have been fully satisfied and complied with to the satisfaction of the Board, the Company shall, within seven (7) Business Days after delivery of the Transfer Notice (including, without limitation, the provision of any information and documentation requested pursuant to the foregoing clause (E) and, if applicable, the Joinder Agreement and/or legal opinion required by subsection (d) below), cause the Transfer to be registered on the books of the Company, unless the Board of Directors determines that the Transfer is not permitted pursuant to the terms of this Section 10.1, in which case the Company shall promptly inform the Transferor of such determination.

(d)     It shall be a condition precedent to any Equity Holder's Transfer of shares of Common Stock or Warrants that the Transferee shall have delivered to the Company a Joinder Agreement, duly completed and executed by the Transferee, if the Transferee was not an original signatory to this Agreement and has not previously executed and delivered a Joinder Agreement. It shall also be a condition precedent to any Equity Holder's Transfer of shares of Common Stock or Warrants that, if requested by the Board of Directors in its sole discretion, the Transferor shall have delivered to the Company a legal opinion reasonably acceptable to the Board of Directors, stating that registration of the shares of Common Stock and/or Warrants, as applicable, that are the subject of such proposed Transfer is not required under the Securities Act. Notwithstanding the foregoing, such a legal opinion shall not be required for any Transfer of shares of Common Stock or Warrants that were issued under the Plan in reliance on the registration exemption provided by

29

Section 1145 of the Bankruptcy Code, unless the Company has reason to believe that such shares or Warrants are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Company or an "underwriter" (as such term is defined in Section 1145(b) of the Bankruptcy Code) with respect to such shares or Warrants.

(e)   Certificates.  All certificates (if any) evidencing shares of Common Stock shall conspicuously bear the applicable legends set forth below, with such changes as the Board of Directors, in its discretion, deems to be necessary and appropriate, and any other legends required by the Certificate of Incorporation.  Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the Certificate of Incorporation and this Agreement (including the restrictions on Transfer set forth in this Section 10.1), whether or not any certificate evidencing shares of Common Stock owned or held by such Stockholder bear the legends set forth below and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

Each certificate, if any, representing shares of Common Stock issued under the Plan in reliance on the Securities Act exemption provided by Section 1145 of the Bankruptcy Code shall include a legend substantially to the following effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM.  THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Each certificate, if any, representing shares of Common Stock issued in reliance on the Securities Act exemption provided by Section 4(a)(2) of the Securities Act shall include a legend substantially to the following effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES

30

NY 78204977

ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 4(a)(2) OF THE SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Each certificate, if any, representing other shares of Common Stock shall contain such legends as the Board of Directors, in its discretion, deems to be necessary and appropriate.

(f)     Certain Restricted Transfers.  Shares of Common Stock and/or Warrants shall not be Transferred by any Equity Holder to a Competitor, except with the prior written approval of the Board of Directors (or, if applicable, of any officer of the Company to whom the Board of Directors has delegated such authority) in its sole discretion.  Shares of Common Stock and/or Warrants shall not be Transferred by any Equity Holder pursuant to any Transfer (other than to an Affiliate of the Transferor) that would, if consummated, result in the Transferee (together with its Affiliates) becoming the holder of more than five percent (5%) of the Total Equity Interests, except with the prior written approval of the Board of Directors (or, if applicable, of any officer of the Company to whom the Board of Directors has delegated such authority) in its sole discretion, such approval not to be unreasonably withheld, *provided*, *however*, that such restriction shall not apply to any Transfer to a Significant Stockholder, or if the Transferee (together with its Affiliates) already holds more than five percent (5%) of the Total Equity Interests and was the Transferee in another Transfer approved pursuant to this Section 10.1(f). The foregoing restrictions shall not apply to Transfers (i) between Significant Stockholders, (ii) in a Drag-Along Sale pursuant to Article III hereof, or (iii) by the Electing Tag-Along Sellers in any Tag-Along Sale pursuant to Article IV hereof.

(g)     Transfers Not in Compliance.  Any Transfer or attempted Transfer of any shares of Common Stock and/or Warrants that does not fully comply with the applicable provisions of this Agreement shall be null and void *ab initio* and of no force or effect whatsoever, and shall not be recognized by the Company.  Any such Transfer or attempted Transfer shall not be recorded on the Company's books and the purported Transferee shall not be treated as the owner of such shares of Common Stock and/or Warrants, as applicable, for any purpose. The Company may institute legal proceedings to force rescission of any Transfer made in violation of any provision of this Agreement and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer.

31

Section 10.2    Right of First Offer.

(a)    In the event that any Stockholder proposes to Transfer shares of Common Stock that represent more than five percent (5%) of the outstanding shares of Common Stock in a single transaction or series of related transactions (such shares, the "ROFO Shares", and such Stockholder, the "Offering Holder"), the Company shall have a right of first offer with respect to such proposed Transfer of the ROFO Shares (a "ROFO Sale") and, if the Company does not exercise such right to purchase all the ROFO Shares, each Significant Stockholder (excluding the Offering Holder and its Affiliates, to the extent any of them is a Significant Stockholder) (a "ROFO Holder") shall have a right of first offer with respect to the ROFO Shares, which rights of first offer shall be subject to, and be exercised in accordance with, the provisions of this Section 10.2.

(b)    With respect to any proposed ROFO Sale, the Offering Holder shall first deliver written notice thereof to the Company and each of the ROFO Holders in accordance with Section 12.2 (a "ROFO Sale Notice"), which ROFO Sale Notice shall set forth the number of ROFO Shares proposed to be Transferred.  The Company shall have the right, exercisable within five (5) Business Days following delivery of the ROFO Sale Notice to make a written offer to the Offering Holder (a "Company ROFO Offer") to purchase (either directly or through one or more Affiliates) all, but not less than all, of the ROFO Shares at a cash purchase price specified in the Company ROFO Offer.  If the Company does not exercise such right within the five (5) Business Days following delivery of the ROFO Transfer Notice or expressly declines to exercise such right, the Company shall give prompt written notice thereof to each the ROFO Holders, and each ROFO Holder shall have the right, exercisable within five (5) Business Days following the Company's delivery of such notice to the ROFO Holders, to make a written offer (a "Holder ROFO Offer") to purchase (either directly or through one or more Affiliates) all, but not less than all, of the ROFO Shares at a cash price specified in the Holder ROFO Offer.  For the avoidance of doubt, if the Company exercises its right to make a ROFO Offer, then the ROFO Holders shall not be entitled to any rights described in this Section 10.2.

(c)    If the Company makes a Company ROFO Offer and the Offering Holder accepts such Company ROFO Offer, subject to Section 10.2(e) below, the Company shall be irrevocably obligated to purchase (either directly or through one or more  Affiliates, as applicable), and the offering Holder shall be irrevocably obligated to sell, all, but not less than all, of the ROFO Shares at the price specified in the Company ROFO Offer, and on the terms and subject to the conditions set forth in this Section 10.2.

(d)    If the Company does not exercise its right to make a Company ROFO Offer, and the Offering Holder receives Holder ROFO Offers from one or more ROFO Holders, then the Offering Holder shall have the right, exercisable within five (5) Business Days following the last day a timely Holder ROFO Offer could have been made by a ROFO Holder for the ROFO Shares, to accept the highest Holder ROFO Offer by sending written notice of its acceptance to the ROFO Holder making such Holder ROFO Offer (a "ROFO Acceptance Notice"); provided, that if two or more Holder ROFO Offers provide for the same purchase price and the Offering Holder wishes to accept a ROFO Offer at such price, then the Offering Holder shall accept each such Holder ROFO Offer in part, with each such ROFO Offer to be accepted by allocating the ROFO Shares proportionately in accordance with the respective ownership of Common Stock (calculated as of the date of the ROFO Sale Notice) by each of the ROFO Holders making such Holder ROFO

32

Offers.   Upon the Offering Holder's acceptance of a one or more Holder ROFO Offers in accordance with this Section 10.2(d), the ROFO Holder(s) making such Holder ROFO Offer(s) shall be irrevocably obligated to purchase (either directly or through one or more Affiliates), and the Offering Holder shall be irrevocably obligated to sell, in each case the ROFO Holder Shares with respect to which such Holder ROFO Offer(s) was accepted, at the price specified in such Holder ROFO Offer(s), and on the terms and subject to the conditions set forth in this Section 10.2.

(e)     In the event the Offering Holder accepts a Company ROFO Offer or one or more Holder ROFO Offers (each, a "ROFO Offer"), the closing for such purchase and sale of the ROFO Shares pursuant thereto shall take place within ten (10) Business Days after the Offering Holder's delivery of the applicable ROFO Acceptance Notice, and at such closing, (i) the Offering Holder shall deliver, against payment of the purchase price therefor, certificates (if any) or other documentation (or other evidence thereof reasonably acceptable to the purchaser) representing such ROFO Shares, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by the purchaser for the proper transfer of such ROFO Shares on the books of the Company free and clear of any Liens (other than Permitted Liens) and (ii) the purchasers shall deliver to the Offering Holder the purchase price for such ROFO Shares.   The Offering Holder shall not be required to provide any representations or warranties in the definitive Transfer documentation for such purchase and sale of the ROFO Shares, other than with respect to (i) the authority of the Offering Holder to execute the relevant Transfer documents and Transfer the ROFO Shares pursuant thereto, (ii) the due execution and delivery of the relevant Transfer documents by the Offering Holder and (iii) the Offering Holder's ownership of the ROFO Shares free and clear of adverse interests and other liens.

(f)     If the Offering Holder does not receive any timely ROFO Offers, the Offering Holder shall have the right to Transfer the ROFO Shares, in whole or in part, to one or more third parties at such price as it so determines.   If the Offering Holder receives one or more timely ROFO Offers but the Offering Holder elects not to accept any such ROFO Offer, the Offering Holder shall have the right, within  180 days thereafter, to Transfer all, but not less than all, of its ROFO Shares to one or more third parties; *provided*, *however*, that no such Transfers shall be made at a price that is less than 110% of the highest price set forth in any timely ROFO Offer not accepted by the Offering Holder.   If the Offering Holder desires to Transfer the ROFO Shares at a price less than 110% of the highest price set forth in any timely ROFO Offer, or more than 180 days after a ROFO Offer was received, then it shall not be permitted to do so without re-commencing the right of first offer process set forth in this Section 10.2.

(g)     The foregoing restrictions shall not apply to Transfers (i) between Significant Stockholders, (ii) by a Stockholder to any of its Affiliates, (iii) in a Drag-Along Sale pursuant to Article III hereof, or (iv) by any Tag-Along Seller in a Tag-Along Sale pursuant to Article IV hereof.

## ARTICLE XI
REPRESENTATIONS AND WARRANTIES

Section 11.1   Stockholder and Warrant Holder Representations and Warranties.   Each Stockholder and each Warrant Holder executing or otherwise becoming a party to this Agreement,

33

NY 78204977

severally and not jointly, hereby represents and warrants to the Company that as of the date of such execution or its becoming a party hereto, (a) such Stockholder or Warrant Holder is duly organized and validly existing under the laws of the jurisdiction of its organization and is in good standing thereunder, (b) such Stockholder or Warrant Holder and its signatories have the requisite power and authority to enter into, deliver and perform its obligations under this Agreement and (c) this Agreement constitutes the valid and binding obligation of such Stockholder or Warrant Holder, enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

## ARTICLE XII

## MISCELLANEOUS

Section 12.1    Term and Termination.

(a)    This Agreement shall terminate automatically upon consummation of a Qualified Public Offering, a Company Asset Sale or Company Stock Sale,  subject to compliance with all applicable provisions of this Agreement relating to rights of Stockholders and Warrant Holders in connection with such transaction; *provided*, *however*, that Section 7.2 (and any other provisions of this Agreement necessary to give effect to Section 7.2) shall survive any termination hereof.

(b)    This Agreement may also be terminated in its entirety at any time by obtaining the following approvals: (i) approval by the Board of Directors pursuant to a majority vote of the Whole Board or the unanimous written consent of all Directors then in office and (ii) approval of one or more Stockholders holding, in the aggregate, shares of Common Stock representing at least eighty-five percent (85.0%) of the outstanding shares of Common Stock.

(c)    Notwithstanding anything to the contrary in this Agreement, in the event of any termination of this Agreement, (i) the provisions of this Agreement shall survive to the extent necessary for any Party to enforce any right of such Party that accrued hereunder prior to or on account of such termination and (ii) Section 7.2 shall survive such termination.

Section 12.2    Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when personally delivered to the party to be notified; (b) when sent by confirmed facsimile or electronic mail to the party to be notified; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:

(i) In the case of any Stockholder, to such Stockholder at its address, electronic mail address or facsimile number set forth in the stock records of the Company; *provided*, that

34

any Stockholder may change its address for purposes of notice hereunder at any time by giving notice of such change to the Company in the manner provided in this Section 12.2.

(ii) In the case of any Warrant Holder, to such Warrant Holder in accordance with the Warrant Agreement provisions regarding notices to "Holders" thereunder.

(iii) In the case of the Company, as follows (provided, that the Company may change its address for purposes of notice hereunder at any time by giving notice of such change to all other parties in the manner provided in this Section 12.2):

AAC Parent Corporation
200 Powell Place
Brentwood, Tennessee 37027
Attn:       Karen Abbott, Chief Legal Officer
E-mail:    kabbott@ContactAAC.com

The Company shall cause a copy of any notice or other written communication given by or on behalf of the Company to the Stockholders or Warrant Holders generally to be posted to the Data Room on the same date as such notice or other written communication is given.

Section 12.3   Deemed Execution; Effective Date.  On the Effective Date, pursuant to the paragraph 87 of the Confirmation Order and Article IV.C.3 of the Plan, the Company and each Person that, as of the Effective Date, has received or is entitled to receive a distribution of shares of Common Stock pursuant to the Plan shall be deemed to have entered into and be parties to this Agreement, and this Agreement shall be binding on the Company and all Persons receiving Common Stock, in each case regardless of whether such Person actually executes this Agreement. This Agreement shall take effect immediately and automatically on the Effective Date.

Section 12.4   Binding Effect; No Assignment.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto.  Except as expressly provided otherwise in this Agreement, no party to this Agreement may assign any of its respective rights (including Significant Stockholder status and/or any rights resulting from such status) or delegate any of its respective obligations under this Agreement, and any attempted assignment or delegation in violation of the foregoing shall be null and void *ab initio*. Notwithstanding the foregoing, (a) any Person to whom shares of Common Stock or Warrants are Transferred in accordance with the provisions of Article X hereof will (by virtue of having executed a Joinder Agreement) have the rights and obligations of a Stockholder or Warrant Holder, as applicable, hereunder and (b) any Significant Stockholder may freely assign, by written notice to the Company, Significant Stockholder rights to any of its Affiliates that are Stockholders.

Section 12.5   Entire Agreement.  Subject to Section 12.13, this Agreement supersedes all prior discussions and agreements among any of the parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the sole entire understanding of the parties with respect to the subject matter hereof.

35

Section 12.6   Amendments.

(a)   This Agreement may not be amended or modified without first obtaining Majority Stockholder Approval and Whole Board Approval.  In addition, any amendment or modification to this Agreement shall, if applicable, require the following additional approvals in the circumstances set forth below:

(i) Supermajority Stockholder Approval shall be required for (A) any material amendment or modification to any provisions of Article III (Drag-Along Sale), Article IV (Tag-Along Sale), Article VI (Board of Directors), Article VII (Information Rights), Article IX (Related Party Transactions), Section 10.1 (Restrictions on Transfer), or Section 12.1 (Termination), or any other amendment or modification to this Agreement to the extent directly relating to any of the foregoing provisions, in each case to the extent that such amendment or modification adversely affects, in any material respect, the rights or obligations of the Stockholders generally under any of the foregoing provisions or (B) any amendment or modification to this Section 12.6(a)(i).

(ii) any amendment or modification to the provisions of this Agreement that apply specifically to Significant Stockholders (including the definition thereof) shall require the prior written consent of all Significant Stockholders, and any amendment or modification to the provisions of this Agreement that apply specifically to Designating Stockholders and/or Designation Rights (including the definitions thereof shall require the prior written consent of all Designating Stockholders, in each case to the extent such amendment or modification would adversely affect any of the Significant Stockholders or Designating Stockholders (in their capacities as such) or any Designation Rights, as the case may be;

(iii) any amendment or modification to any provisions of this Agreement that materially and adversely affects the rights or obligations of the Warrant Holders generally in a manner that is materially disproportionate to the effect on the Stockholders generally, shall also require the prior written consent of Warrant Holders holding a majority of the outstanding Warrants held by all Warrant Holders; and

(iv) any provision of this Agreement that by its terms confers consent or approval rights on a specified number or percentage of the Stockholders (or a specified subset of the Stockholders) shall not be amended without the prior written consent of such number or percentage of the Stockholders (or subset of the Stockholders, as applicable).

(b)   Notwithstanding anything to the contrary in this Section 12.6, the Board of Directors, in its sole discretion and without the need for any Stockholder approval, may amend or modify this Agreement to correct any typographical or ministerial error as long as such amendment or modification does not have an adverse impact on the rights or obligations of the Stockholders generally.

(c)   Each Stockholder agrees to vote all of its Common Stock or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the Certificate of Incorporation or the Bylaws (i) facilitate, and do not at any time conflict with, any

36

provision of this Agreement and (ii) permit each Stockholder to receive the benefits to which each such Stockholder is entitled under this Agreement. Each of the Parties agrees that it will not authorize or consent to any amendment, modification or repeal of any provision of the Certificate of Incorporation or the Bylaws that affects, in any material respect any of the provisions of this Agreement that apply specifically to Significant Stockholders (including the definition thereof) without the prior written consent of all Significant Stockholders, and any amendment or modification to the provisions of this Agreement that apply specifically to Designating Stockholders or Designation Rights shall require the prior written consent of all Designating Stockholders, in each case to the extent such amendment, modification or repeal would adversely affect the Significant Stockholders, Designating Stockholders or Designation Rights, as the case may be.

Section 12.7    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

Section 12.8    Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 12.9    Governing Law; Consent to Jurisdiction and Service of Process.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  The Company and each Stockholder hereby submits to the exclusive jurisdiction of (i) the Bankruptcy Court and (ii) the courts of the State of Delaware, and any judicial proceeding brought against the Company or any Stockholder with respect to any dispute arising out of this Agreement or any matter related hereto shall be brought only in such courts.  The Company and each Stockholder hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Company and each Stockholder hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 12.2, or in any other manner permitted by law.  THE COMPANY AND EACH STOCKHOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Section 12.10  Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, an aggrieved Person will be irreparably damaged and will not have an adequate remedy at law.  Any such Person shall, therefore, be entitled to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.  The parties hereby waive, and cause their

37

NY 78204977

respective representatives to waive, any requirement for the securing or posting of any bond in connection with any action brought for injunctive relief hereunder.

Section 12.11  Severability.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

Section 12.12  Conflicts.  In the event that any of the terms or provisions of this Agreement conflict with any of the terms or provisions of the Certificate of Incorporation, the terms and provisions of the Certificate of Incorporation shall control.  In the event that any of the terms or provisions of this Agreement conflict with any of the terms or provisions of the Plan, the terms and provisions of this Agreement shall control.

Section 12.13  Recapitalization, etc.  In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of capital stock of the Company by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to Stockholders or combination of Common Stock or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the parties hereto under this Agreement.

[*Signature Page Follows*]

38

NY 78204977

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

AAC PARENT CORPORATION


By: _____
Name:
Title:

[*Signature Page to Stockholders Agreement of AAC Parent Corporation*]

NY 78204977
NY 78204977

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**STOCKHOLDERS:**

_____

By: _____

  Name:
  Title:

*[Signature Page to Stockholders Agreement of AAC Parent Corporation]*

NY 78204977

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**WARRANT HOLDERS:**

_____

By: _____
      Name:
      Title:

[*Signature Page to Stockholders Agreement of AAC Parent Corporation*]

NY 78204977

## SCHEDULE 6.2

## INITIAL BOARD OF DIRECTORS

| Director Name | | Designating Stockholder (if applicable) |
| --- | --- | --- |
| Sengal Selassie | | Brightwood Stockholders |
| Mikhail Katz | | Brightwood Stockholders |
| Jason Gart | | HG Vora Stockholders |
| Loren Beck | | HG Vora Stockholders |
| Mark D. Stolper | | CQS Stockholders |
| Bowen S. Diehl* | | Main Street/Capital Southwest Stockholders |
| Andrew McWilliams | | N/A (CEO Director) |

* Initial Chairman of the Board

## EXHIBIT A

### Bylaws

## EXHIBIT B

## Certificate of Incorporation

## **EXHIBIT C**

## **Warrant Agreement**

NY 78204977

## EXHIBIT D

### Form of Joinder to Stockholders Agreement

The undersigned hereby (a) acknowledges that it has received and reviewed a complete copy of the Stockholders Agreement, dated as of December [•], 2020 (as may be amended from time to time, the "Agreement"), by and among AAC PARENT CORPORATION, a Delaware corporation (the "Company"), and the stockholders of the Company party thereto and (b) agrees that, effective as of the date hereof, the undersigned (i) shall become a party to the Agreement and be subject to and fully bound by the Agreement and all of the provisions thereof that are applicable to Stockholders (and entitled to all the rights incidental thereto), as though an original party to the Agreement and (ii) shall be included within the term "Stockholder" for all purposes under the Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

The undersigned hereby makes the representations and warranties set forth in Section 11.1 of the Agreement, and represents and warrants to the Company that the undersigned (a) is a Qualified Institutional Buyer or an Accredited Investor and (b) is not a Competitor.

The mailing address, e-mail address and (if applicable) facsimile number to which notices and other communications made pursuant to the Agreement, the Certificate of Incorporation or the Bylaws may be sent to the undersigned are as follows:

Mailing address:


E-mail address:
Facsimile number:


Date:                                          _____

                                               Name:

<u>Schedule 2</u>

(Redline of New Stockholders' Agreement)

~~SSL Draft 10/11/2020~~

AAC ~~HOLDINGS, INC.~~PARENT CORPORATION

**STOCKHOLDERS AGREEMENT**

This STOCKHOLDERS AGREEMENT (this "Agreement"), dated as of ~~[●~~December [•], 2020, is made by and among AAC ~~Holdings, Inc.~~PARENT CORPORATION, a Delaware corporation (the "Company"), each of the Initial Stockholders and each other person or entity that hereafter becomes a Stockholder, and~~,~~ (solely for purposes of ~~Section~~Sections 3.1, ~~Section~~ 4.1, ~~Section~~ 5.1, ~~Article~~10.1, 11.1 and Articles VII and ~~Section 10.1)~~XII), the Warrant Holders. Capitalized terms used and not otherwise defined herein shall have the meanings set forth for such terms in Article I hereof.

**W I T N E S S E T H :**

WHEREAS, (a) on June 20, 2020, ~~the Company~~AAC Holdings, Inc., a Nevada corporation ("AAC Holdings") and certain of its Subsidiaries filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), (b) on ~~[●],~~October 20, 2020, the Bankruptcy Court entered an order [Docket No. ~~[●]~~695] (the Confirmation Order") confirming the ~~[~~Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and Its Debtor Affiliates~~]~~ (as confirmed, and as may be amended, supplemented or otherwise modified from time to time, and including ~~any amendments~~all exhibits and supplements thereto, the "Plan"), ~~and~~ (c) on November 20, 2020, the Bankruptcy Court entered that certain Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan [Docket No. 765] (the "Order in Aid of the Plan") and (d) the "Effective Date" of the Plan (the "Effective Date") is occurring on the date of this Agreement;

~~WHEREAS, the Company was a Nevada corporation prior to the Effective Date and was redomiciled as a Delaware corporation, effective as of the Effective Date, pursuant to the Plan, the Confirmation Order and Section 265 of the DGCL;~~

WHEREAS, pursuant to the Plan ~~and~~, the Confirmation Order, ~~on the Effective Date, (a~~the Order in Aid of the Plan, and the Restructuring Steps (as defined in the Order in Aid of the Plan), as of the Effective Date, (a) the Company, a newly-formed corporation, became the parent entity of the Reorganized Debtors (as defined in the Plan) and is the entity referred to in the Plan as "Reorganized AAC Holdings", (b) the holders of Junior Lender Secured Claims (as defined in the Plan) received or became entitled to receive, among other things, in satisfaction of such claims, thirteen million (13,000,000) shares of the Company's newly issued ~~Common Stock~~common stock, par value $0.01 per share (the "Common Stock"), representing in the aggregate one hundred percent (100%) of the ~~Company's outstanding capital stock~~issued and outstanding Common Stock as of the Effective Date ~~and (b) the Warrants were issued to the holders of Senior Lender Secured Claims (as defined in the Plan) and~~, subject to dilution by the Management Incentive Plan and any shares of Common Stock issued upon exercise of Warrants and (c) the holders of DIP Lender Claims ~~(~~and Senior Lender Claims (each as defined in the Plan) received or became entitled to receive the Warrants, among other things, in satisfaction of such claims;

NY 78204977

WHEREAS, as of the Effective Date, each of the Initial Stockholders and each of the Initial Warrant Holders has executed and delivered to the Company a counterpart signature page to this Agreement or, pursuant to the Plan and the Confirmation Order, is deemed to be bound by and is deemed to have agreed to, this Agreement; and

NOW THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Section 1.1    As used in this Agreement, the following terms shall have the definitions set forth below:

(a)    "Accelerated Purchaser" has the meaning specified in Section 5.1(f).

(b)    "Accelerated Sale" has the meaning specified in Section 5.1(f).

(c)    "Accredited Investor" has the meaning given to such term in Rule 501 under the Securities Act.

(d)    "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person; *provided*, *however*, that a Stockholder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Stockholder's or any of its Affiliates' being a party to this Agreement or by being a lender to or an equity holder or creditor of such other Person the Company or any of its Subsidiaries.  For purposes hereof, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "Agreement" has the meaning specified in the preamble of this Agreement.

(f)    "At-Large Director" means an independent Director who (i) is not a Designated Director, (ii) is nominated in accordance with the Bylaws and (iii) is elected by the Company's stockholders in accordance with the Bylaws.

(g)    "Bankruptcy Code" has the meaning specified in the recitals to this Agreement.

NY 78204977

(h) "Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

(i) "beneficial owner" (and related terms such as "beneficial ownership") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

(j) "Board of Directors" means the board of directors of the Company.

(k) "Brightwood Stockholders" has the meaning specified in Section 6.2(b)(i).

(l) "Business Day" means any day other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized by law to be closed.

(m) "Bylaws" means the Amended and Restated Bylaws of the Company in ~~the form~~effect as of the date hereof, a copy of which is attached hereto as Exhibit A, as the same may be amended, amended and restated, supplemented or otherwise modified in accordance with the terms hereof and thereof ~~and the terms of this Agreement~~ and in effect from time to time.

(n) "Cause" means, with respect to any Director, (i) such individual's conviction or plea of *nolo contendere* of a felony involving moral turpitude, (ii) such individual's commission of any material act of dishonesty resulting or intended to result in material personal gain or enrichment of such individual at the expense of the Company or any of its Subsidiaries, (iii) such individual's willful failure to perform (or gross negligence in performing) the duties of a Director in any material respect, and his or her failure to cure the same after being given reasonably detailed written notice thereof, or (iv) such individual's being adjudged legally incompetent by a court of competent jurisdiction.

(o) "CEO" means the Chief Executive Officer of the Company.

(p) "CEO Director" has the meaning specified in Section 6.2(b)(v).

(q) "Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company in ~~the form~~effect as of the date hereof, a copy of which is attached hereto as Exhibit B, as ~~filed by the Company with the Secretary of State of the State of Delaware on or prior to the date hereof, as~~the same may be amended, amended and restated, supplemented or otherwise modified in accordance with the terms hereof and thereof ~~and the terms of this Agreement~~ and in effect from time to time.

(r) "Chairman" means the Chairman of the Board of Directors.

(s) "Common Stock" has the meaning specified in the recitals to this Agreement. For purposes of this Agreement, if the Common Stock has been reclassified

3

or changed, or if the Company pays a dividend or makes a distribution on the Common Stock in shares of capital stock, or subdivides (or combines) the outstanding shares of Common Stock into a greater (or smaller) number of shares of Common Stock, a share of Common Stock shall be deemed to be such number of shares of stock and amount of other securities to which a holder of a share of Common Stock outstanding immediately prior to such change, reclassification, exchange, dividend, distribution, subdivision or combination would be entitled to hold as a result of such change, reclassification, exchange, dividend, distribution, subdivision or combination.

(t)   "Company" has the meaning specified in the preamble of this Agreement.

(u)   "Company Asset Sale" means the bona fide sale, lease, transfer, conveyance or other disposition to a Third Party Purchaser, in a single transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, whether directly or indirectly.

(v)   "Company Entities" means, collectively, the Company and its alleach of its wholly-owned Subsidiaries.

(w)   "Company ROFO Offer" has the meaning specified in Section 10.2(b).

(x)   "Company Stock Sale" means the bona fide sale, transfer, conveyance or other disposition to a Third Party Purchaser, in a single transaction or a series of related transactions, of all of the outstanding shares of Common Stock, whether directly or indirectly, or by way of any merger, consolidation, statutory share exchange, recapitalization, sale of equity, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership.

(y)   "Competitor" means [any Person that competes directly with the Company or any of its Subsidiaries, as reasonably determined in good faith by the Board of Directors (or, if applicable, by anya Company officer of the Company to whom the Board of Directors has delegated such authority), and shall also include any such Person's Affiliates; provided, however, that solely for purposes of this Agreement a Competitor shall not include (y) any Person who at the time of determination is already a Stockholder or a Warrant Holder, or (y) any Investment Fund or (z) any Entity formed by an Investment Fund and whose only assets will be, after giving effect to any proposed Transfer of Warrants and/or shares of Common Stock to such entity, the Warrants and/or shares of Common Stock owned by such Entity. As used herein,, "Investment Fund" means a bona fide investment fund or other investment vehicle, such as a hedge fund, private equity fund, an account, a share trust, an investment trust, an investment company, a pension fund or an insurance company, in each case, the business, operations or assets of which are held for investment purposes and the investments in which are professionally managed]any Significant Stockholder.

(z)   "Confirmation Order" has the meaning specified in the recitals to this Agreement.

4

(aa)    "CQS Stockholders" has the meaning specified in Section 6.2(b)(iii).

(bb)    "CSWC Stockholders" has the meaning specified in Section 6.2(b)(iv).

(cc)    "Data Room" has the meaning specified in Section 7.1(a).

(dd)    "Designated Director" means, with respect to any Designating Stockholder (x) any Director for whom the Designating Stockholder is identified as such in Schedule 6.2 and (y) any other Director who was elected as a result of being nominated or designated pursuant to such Designating Stockholder's exercise of its Designation Right, in each case for so long as such individual continues to serve as a Director.

(ee)    "Designating Stockholders" means, collectively, the Brightwood Stockholders, the HG Vora Stockholders, the CQS Stockholders, the Main Street and/or CSWC Stockholders, and, if applicable, any other Stockholder to whom a Designation Right has been assigned in accordance with this Agreement, in each case for so long as it has a Designation Right.  A Designating Stockholder shall automatically cease to be a Designating Stockholder if and when it ceases to have any Designation Rights.

(ff)    "Designation Right" means any of the following: (i) the exclusive right of the Brightwood Stockholders to nominate one or two Directors, as applicable, pursuant to Section 6.2(b)(i), (ii) the exclusive right of the HG Vora Stockholders to nominate one or two Directors, as applicable, pursuant to Section 6.2(b)(ii), (iii) the exclusive right of the CQS Stockholders to nominate a Director pursuant to Section 6.2(b)(iii), (iv) the exclusive right of the Main Street Stockholders and CSWC Stockholders to jointly nominate a Director pursuant to Section 6.2(b)(iv), in each case together with the exclusive right to remove or replace, at any time, the applicable Director serving in such Designated Director seat and to fill vacancies with respect to such Designated Director seat in accordance with Section 6.3.

(gg)    "Director" means, at any time of determination, any director then serving on the Board of Directors.

(hh)    "Disinterested Director Approval" means, with respect to any particular matter, the affirmative vote at a duly held meeting of the Board of Directors (at which a quorum is present) of a majority of the Directors then in office who are "disinterested" with respect to such matter, or the unanimous written consent of all Directors then in office so long as at least one of the Directors is "disinterested" with respect to such matter.

(ii)    "DGCL" means the General Corporation Law of the State of Delaware, as amended from time to time.

(jj)    "Drag-Along Notice" has the meaning specified in Section 3.1(a).

(kk)    "Drag-Along Purchaser" has the meaning specified in Section 3.1(a).

(ll)    "Drag-Along Sale" has the meaning specified in Section 3.1(a).

5

NY 78204977

(mm) "Dragged Holders" has the meaning specified in Section 3.1(a).

(nn) "Effective Date" has the meaning specified in the recitals to this Agreement.

(oo) "Equity Holder" means any Person who is a Stockholder and/or a Warrant Holder.

(pp) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(qq) "Excluded Issuance" means (i) the issuance and distribution of shares of Common Stock pursuant to and in accordance with the Plan; (ii) any issuance of shares of Common Stock upon exercise of Warrants; (iii) any issuance of shares of Common Stock by means of a *pro rata* distribution to all Stockholders; (iv) any issuance of shares of Common Stock or other equity awards pursuant to the Management Incentive Plan or any future director or employee equity plan approved by the Board of Directors, including shares of Common Stock issued upon the vesting of awards issued pursuant thereto; (v) any issuance of shares of Common Stock as purchase price consideration in a merger or acquisition transaction approved by the Board of Directors; (vi) any issuance of shares of Common Stock to any lender to the Company or any of its Subsidiaries in connection with a *bona fide* financing or refinancing of any indebtedness of the Company or any of its Subsidiaries; (vii) any issuance of shares of Common Stock in a Public Offering; and (viii) any issuance of shares of Common Stock pursuant to the exercise, conversion or exchange of any options, warrants or other securities issued after the Effective Date that by their terms are exercisable or exchangeable for or convertible into shares of Common Stock (in accordance with such terms), so long as the initial sale or issuance of such options, warrants or other securities complied with the terms of Article V.

(rr) "Family Member" means, with respect to any individual, (i) any of such individual's parents, spouse, siblings, children and grandchildren or (ii) any trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity, the sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren.

(ss) "GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied, as recommended by the American Institute of Certified Public Accountants.

(tt) "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

(uu) "HG Vora Stockholders" has the meaning specified in Section 6.2(b)(ii).

6

NY 78204977

(vv)    "Holder ROFO Offer" has the meaning specified in Section 10.2(b).

(ww)    "Information" has the meaning specified in Section 7.2(a).

(xx)    "Initial Stockholders" means, collectively, each Person that as of the Effective Date has received or is entitled to receive a distribution of shares of Common Stock pursuant to the Plan and duly executes and delivers to the Company a counterpart signature page to this Agreement, or is deemed to have entered into and/or to be bound by this Agreement pursuant to [the Confirmation Order and] Section [●] Article IV.C.3 of the Plan as further specified in Section 12.8 12.3 hereof.

"Initial Warrant Holders" means, collectively, each Person that as of the Effective Date has received or is entitled to receive a distribution of Warrants pursuant to the Plan and duly executes and delivers to the Company a counterpart signature page to this Agreement, or is deemed to have entered into and/or to be bound by this Agreement pursuant to Article IV.C.3 of the Plan.

(yy)    "Initiating Drag-Along Holders" has the meaning specified in Section 3.1(a).

(zz)    "Initiating Holders" means (a) with respect to any Drag-Along Sale, the Initiating Drag-Along Holders and (b) with respect to any Tag-Along Sale, the Initiating Tag-Along Holders.

(a)    "Initiating Tag-Along Holders" has the meaning specified in Section 4.1(a).

(b)    "Initiating Tag-Along Holder Shares" has the meaning specified in Section 4.1(a).(aaa)

(c)    "Joinder Agreement" means a Joinder Agreement in the form attached hereto as Exhibit D, or otherwise in form and substance acceptable to the Board of Directors (or, if applicable, to any officer of the Company to whom the Board of Directors has delegated such authority ) in its discretion, pursuant to which a Person agrees to become bound as a Stockholder party to this Agreement.

(d)    "Key Action" means any of the following (provided, however, that a Drag-Along Sale effectuated pursuant to the terms and conditions set forth in Article III shall not constitute a Key Action, notwithstanding that it would otherwise fall within this definition):

(i)    any direct or indirect sale or other disposition (including by way of equity sale, asset sale, lease, merger, consolidation or similar transaction), in one transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole; provided, however, that any such transaction that is solely between two or more Company

7

Entities (excluding any Company Entity that is not a wholly-owned Subsidiary) shall not constitute a Key Action;

(ii)     the dissolution and/or winding up of the Company;

(iii)    any material amendment or modification to the Certificate of Incorporation or the Bylaws;

(iv)    ~~any change to the size of the Board of Directors;(v)~~      the incurrence of indebtedness, by the Company and its Subsidiaries on a consolidated basis, in an aggregate principal amount greater than fifty million dollars ($50,000,000), excluding any indebtedness incurred in an amount necessary to refinance amounts outstanding (at the time of such refinancing) under the Exit Facility (as defined in the Plan) and/or any other indebtedness previously approved as a Key Action;

(~~vi~~v)    hiring or terminating the CEO;

(~~vii~~vi)   declaring or making dividends or distributions to, or redeeming or repurchasing shares from, holders of equity interest in the Company, other than (A) repurchases or redemptions contemplated by the terms of this Agreement or (with respect to the Warrants) the Warrant Agreement, (B) repurchases or redemptions contemplated by the terms of any employment or similar agreement entered into with the Company or any of its Subsidiaries (including the Management Incentive Plan) or (C) dividends or other distributions by a wholly owned Subsidiary of the Company to the Company or another wholly owned Subsidiary of the Company;

(~~viii~~vii)  any acquisition, disposition or sale of assets by any Company Entity outside the ordinary course of business for a purchase price that exceeds fifty million dollars ($50,000,000); provided, however, that any such transaction that is solely between two or more Company Entities (excluding any Company Entity that is not a wholly-owned Subsidiary) shall not constitute a Key Action; and

(~~ix~~viii)  entering into any binding agreement or commitment to do any of the foregoing.

~~(e)~~     "Lien" means any lien, encumbrance, claim, right, demand, charge, option, pledge, security interest or similar interest, title defect, hypothecation, right of first refusal, preemptive right, judgment, and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

~~(f)~~     "Main Street Stockholders" has the meaning specified in Section 6.2(b)(iv).

~~(g)~~     "Majority Stockholder Approval" means the approval of one or more Stockholders holding, in the aggregate, more than fifty percent (50%) of the outstanding shares of Common Stock, which approval is obtained (i) by the affirmative vote of such

8

NY 78204977

Stockholders at a duly convened stockholder meeting or (ii) by the written consent of such Stockholders in accordance with the Bylaws.

(h) "Management Incentive Plan" means the management incentive plan to be established and implemented with respect to the Company (and/or its Subsidiaries) by the Board of Directors after the Effective Date, as provided for in the Plan.

(i) "MD&A" has the meaning specified in Section 7.1(b).

(j) "New Securities" has the meaning specified in Section 5.1(a).

(k) "New Securities Issuance" has the meaning specified in Section 5.1(a).

(l) "Non-Employee Director" has the meaning specified in Section 6.5.

(m) "Offering Holder" has the meaning specified in Section 10.2(a).

(n) "Permitted Lien" means any Liens that are imposed (i) by the terms of this Agreement or the Certificate of Incorporation, or (ii) under applicable securities laws.

(o) "Person" means any natural person, corporation, limited liability, partnership, unincorporated organization, joint stock company, association, joint venture, trust, or other legal entity, or a Governmental Authority.

(p) "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Equity Holder that is an individual.

(q) "Plan" has the meaning specified in the recitals to this Agreement.

(r) "Preemptive Rights Election Notice" has the meaning specified in Section 5.1(b).

(s) "Preemptive Rights Offer Notice" has the meaning specified in Section 5.1(a).

(t) "Pro Rata Portion" means, for any Significant Stockholder with respect to any New Securities Issuance, (x) the total amount of New Securities offered in the New Securities Issuance, *multiplied by* (y) a fraction in which the numerator is the Total Equity Interests then held by such Significant Stockholder and the denominator is the Total Equity Interests then held, in the aggregate, by all Significant Stockholders, in each case as of the date of the applicable Preemptive Rights Offer Notice.

(u) "Public Offering" means a public offering of Common Stock or other capital stock of the Company pursuant to an effective registration statement under the Securities Act (other than on Form S-4, Form S-8 or any successor to such forms).

9

(v) "Qualified Institutional Buyer" has the meaning given to such term in Rule 144A under the Securities Act.

(w) "Qualified Public Offering" means (A) a bona fide, marketed underwritten Public Offering of Common Stock after the closing of which the Common Stock is listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange or (B) a "direct listing" of the Common Stock on any such exchange, in the case of clause (A) which satisfies at least one of the following two criteria: (i) the gross cash proceeds of such offering exceed seventy-five million dollars ($75,000,000) or (ii) at least twenty percent (20%) of the outstanding shares of Common Stock shall have been issued or sold to the public in such offering.

(x) "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager, advisor or subadvisor as controls or manages such Person or (z) an Affiliate of such investment manager, advisor or subadvisor.

(y) "Related Party" means: (i) any Director or, any member of a Subsidiary Governing Body, any executive officer of a Company Entity, or an immediate Family Member of any such Person of the foregoing Persons; (ii) any Person (other than a Company Entity) of which an individual described in clause (i) hereof is a partner, director or executive officer; (iii) any Person (or any Affiliate thereof) that beneficially owns, or otherwise controls (or shares control of), at least ten percent (10.0%) of the Total Equity Interests; or (iv) any director or executive officer of a Person described in clause (iii) hereof (or an immediate Family Member of any such director or executive officer).

(z) "Related Party Transaction" means any transaction, contract, agreement, understanding, arrangement, loan, advance or guarantee (or series of related transactions, contracts, agreements, understandings, arrangements, loans, advances or guarantees) between any Company Entity and a Related Party, but shall exclude the following: (i) any purchase of conventional insurance products from national insurance companies for the benefit of the Company and its Subsidiaries in the ordinary course of the Company's business; (ii) any dividend payments or distributions to all holders of Common Stock that are approved by the Board of Directors; (iii) any payment of reasonable and customary compensation and fees to, and indemnities provided for the benefit of, and reimbursement of expenses incurred by, officers, directors, employees or consultants of any Company Entity in the ordinary course of the Company's business, in each case, as approved by the Board of Directors; (iv) any employment agreements, benefit plans (including the Management Incentive Plan) and similar arrangements for employees and directors of any Company Entity (including the issuance of Common Stock or other equity interests thereunder) which, in each case, are approved by the Board of Directors; (v) any advances and loans to officers, employees or consultants of any Company Entity in an amount less than one hundred thousand dollars ($100,000) in the aggregate outstanding at any time, in each case, in connection with the anticipated incurrence of business expenses by such officers, employees or consultants or the relocation of such officers, employees or consultant in connection with such individual's services to the Company; (vi) transactions

10

with Related Parties that were the subject of a competitive bidding process involving multiple third-party bidders in the ordinary course consistent with past practice; and (vii) any transactions wholly between or among two or more Company Entities (provided that non-wholly-owned Subsidiaries shall not be deemed Company Entities for purposes of this clause (vii)).

(aa) "Remote Communication" means any means of remote communication, including conference call, permitted by the DGCL by which all Directors participating in the meeting can hear each other at the same time.

(bb) "Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

(cc) "Restructuring Steps" has the meaning given to such term in the Order in Aid of the Plan.

"ROFO Acceptance Notice" has the meaning specified in Section 10.2(d).

(dd) "ROFO Holder" has the meaning specified in Section 10.2(a).

(ee) "ROFO Offer" has the meaning specified in Section 10.2(e).

(ff) "ROFO Sale" has the meaning specified in Section 10.2(a).

(gg) "ROFO Sale Notice" has the meaning specified in Section 10.2(b).

(hh) "ROFO Shares" has the meaning specified in Section 10.2(a).

(ii) "Sale Transaction" means any Company Stock Sale or any Company Asset Sale.

(jj) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(kk) "Significant Stockholder" means each Equity Holder that (i) was a Designating Stockholder on the Effective Date (or is an Affiliate of such a Person) and (ii) at the time of determination holds (including shares held by its Affiliates) at least the lesser of (x) six percent (6.0%) of the Total Equity Interests and (y) fifty percent (50.0%) of the Total Equity Interests that such Equity Holder (together with its Affiliates) received or was entitled to receive on the Effective Date.

(ll) "Stockholders" means, collectively, (i) the Initial Stockholders and (ii) all other Persons who (A) become a holder of shares of Common Stock (*provided*, that the Transfer or issuance by which such Person acquired such shares was made in accordance with the applicable provisions of this Agreement) and (B) become a party to this Agreement by duly executing and delivering to the Company a Joinder Agreement or are

11

NY 78204977

deemed or required by the Plan, the Confirmation Order, this Agreement or the Certificate of Incorporation to become a party hereto.

(mm) "Subsidiary" means any Person in which the Company, directly or indirectly through one or more subsidiaries or otherwise, beneficially owns more than fifty percent (50.0%) of either the equity interests in, or the voting control of, such Person.

(nn) "Subsidiary Governing Body" means the board of directors, board of managers or other governing body of any wholly-owned Subsidiary of the Company.

(oo) "Supermajority Stockholder Approval" means the approval of one or more Stockholders holding, in the aggregate, more than [●]at least sixty-six and two-thirds percent ([●]66-2/3%) of the outstanding shares of Common Stock, which approval is obtained (i) by the affirmative vote of such Stockholders at a duly convened stockholder meeting or (ii) by the written consent of such Stockholders in accordance with the Bylaws.

(pp) "Tag-Along Buyer" has the meaning specified in Section 4.1(a).

(qq) "Tag-Along Closing" has the meaning specified in Section 4.1(c).

(rr) "Tag-Along Election Deadline" has the meaning specified in Section 4.1(a).

(ss) "Tag-Along Percentage" means, with respect to any Tag-Along Sale, the quotient, expressed as a percentage, of (x) the total number of shares of Common Stock that the Initiating Tag-Along Holders are proposing to Transfer to the Tag-Along Buyer pursuant to the Tag-Along Sale, divided by (y) the total number of shares of Common Stock held by the Initiating Tag-Along Holders.

(tt) "Tag-Along Sale" has the meaning specified in Section 4.1(a).

(uu) "Tag-Along Sale Notice" has the meaning specified in Section 4.1(a).

(vv) "Tag-Along Sellers" has the meaning specified in Section 4.1(a).

(ww) "Tag-Along Share Cap" has the meaning specified in Section 4.1(a).

(xx) "Third Party Purchaser" means, with respect to any Drag-Along Sale, any Person (other than the Company, the Initiating Drag-Along Holders, or any Affiliate thereof or any Related Party) or group of such Persons that is the purchaser in such Drag-Along Sale.

(yy) "Total Equity Interests" means, at any time of determination, a number of shares of Common Stock equal to the sum of (i) the total shares of Common Stock then outstanding *plus* (ii) the total shares of Common Stock issuable upon exercise of all Warrants then outstanding.  For any Person, the percentage of the Total Equity Interests

12

held by such Person at any time of determination shall be equal to the quotient (expressed as a percentage) of (x) the sum of the shares of Common Stock then held by such Person *plus* the shares of Common Stock issuable upon exercise of all Warrants then held by such Person, *divided by* (y) the Total Equity Interests.

(zz)    "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Common Stock or Warrants (including (x) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Common Stock or Warrants, or (y) the sale, transfer, assignment or other disposition of any securities or rights convertible into, or exchangeable or exercisable for, Common Stock or Warrants), whether voluntary or involuntary, whether of record, constructively or beneficially and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Stockholder or Warrant Holder lends or borrows any shares of Common Stock or Warrants to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers ~~shares of Common Stock~~such securities in connection with ~~such Stockholder's~~its internal financing arrangements, in any case in the ordinary course of ~~such Stockholder's~~its business, shall not constitute a Transfer of Common Stock or Warrants, as applicable, for purposes of this Agreement; *provided*, *however*, that any redemption or foreclosure (including the retention of shares of Common Stock or Warrants in satisfaction of any obligations) on shares of Common Stock or Warrants by any such broker, bank or other financial institution shall be deemed a Transfer of ~~shares of Common Stock~~such securities for purposes of this Agreement.  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

(aaa)    "Transfer Notice" has the meaning specified in Section 10.1(c).

(bbb)    "Unsubscribed New Securities" has the meaning specified in Section 5.1(d).

(ccc)    "Warrants" means the ~~Warrants to purchase shares of Common Stock~~warrants, issued by the Company ~~under~~as of the ~~Warrant Agreement and~~Effective Date pursuant to the Plan, the Confirmation Order, the Order in Aid of the Plan, and the Restructuring Steps, exercisable, in the aggregate, for seven million (7,000,000) shares of Common Stock.

(ddd)    "Warrant Agreement" means that certain Warrant Agreement, dated as of [the date hereof], by and between the Company, and [●]American Stock Transfer & Trust Company, LLC, as the Warrant Agent , in the form attached hereto as Exhibit C, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

(eee)    "Warrant ~~Holder" means a registered holder of Warrants.~~Holders" means, collectively, (i) the Initial Warrant Holders and (ii) each other Person who (A) becomes a Holder (as defined in the Warrant Agreement) of Warrants and (B) becomes a

13

party to this Agreement by duly executing and delivering to the Company a Joinder Agreement or is deemed or required by the Plan, the Confirmation Order, this Agreement or the Warrant Agreement to become a party hereto. A Person shall automatically cease to be a Warrant Holder for all purposes of this Agreement upon such Person's ceasing to be a "Holder" under the Warrant Agreement; *provided*, *however*, that such Person shall continue to be bound by the provisions of Section 7.2.

(fff)    "Whole Board" means, at any time of determination, the total number of Directors which the Company would have at such time if there were no vacancies on the Board of Directors.

(ggg)    "Whole Board Approval" means, with respect to any matter, either (i) the affirmative vote, at a duly held meeting, of Directors that constitute a majority of the Whole Board (excluding, in calculating the size of the Whole Board for purposes of this definition, any Director who is recused because they are not disinterested and independent with respect to such matter) or (ii) the unanimous written consent of all Directors then in office.

Section 1.2    Interpretation.  The definitions in this Article I shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Articles, Sections, Schedules and Exhibits shall be deemed to be references to Articles and Sections of, and Schedules and Exhibits to, this Agreement unless the context shall otherwise require. All Schedules and Exhibits attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the meaning ascribed to such term in this Agreement. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by GAAP. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Any reference in this Agreement to "$" or "dollars" shall mean United States dollars. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day the period in question shall end on the next succeeding Business Day. In calculating any Stockholder's ownership of Common Stock or Total Equity Interests for the purposes of determining whether such Stockholder shall have certain rights under this Agreement that are subject to a minimum ownership threshold, all shares of Common Stock and (for purposes of determining ownership of Total Equity Interests) shares of Common Stock issuable upon exercise of Warrants held by such Stockholder and by Affiliates of such Stockholder shall be aggregated for the purposes of such determination.

14

**ARTICLE II**

STOCKHOLDERS; VOTING RIGHTS

Section 2.1     Stockholders; Voting Rights.

(a)      Each share of Common Stock shall be entitled to one (1) vote on all matters for which Stockholders are entitled to vote under the terms of this Agreement, the Certificate of Incorporation or under applicable law.  Except as expressly set forth herein, no Stockholder shall have any special or preferential voting or blocking rights.

(b)      A Person shall automatically cease to be a Stockholder for all purposes of this Agreement upon the disposition of all of such Person's shares of Common Stock in accordance with Article X hereof; *provided*, *however*, that such Person shall continue to be bound by the provisions of Section 7.2.

Section 2.2     Limited Liability for Stockholders.  Without prejudice to any additional or further limitations on liability applicable to Stockholders, no Stockholder shall be personally liable to any other Stockholder or to the Company or any Affiliate or creditor of any of the foregoing or to any other Person for any losses, claims, damages, debts, obligations, or liabilities incurred by such other Stockholder or the Company or any Affiliate or creditor of any of the foregoing or to any other Person, whether such losses, claims, damages, debts, liabilities or obligations arise in contract, tort, or otherwise, solely by reason of being a Stockholder.

**ARTICLE III**

DRAG-ALONG SALE

Section 3.1     Drag-Along Sale.

(a)      If at any time after the date that is twelve (12) months after the Effective Date any one or more Equity Holders then holding, in the aggregate, more than fifty percent (50.0%) of the Total  Equity Interests desire to effectuate a Company Stock Sale or ~~(subject to subsection (h))~~ a Company Asset Sale, then such Equity Holder(s) (collectively, the "Initiating Drag-Along Holders") shall have the right to elect to require that all Equity Holders participate in such transaction (a "Drag-Along Sale") on the terms and conditions set forth in this Article III, by delivering written notice of such election to the Company, and the Company shall promptly deliver a copy of such notice to all the other Equity Holders (collectively, the "Dragged Holders") in accordance with Section ~~12.2 (with respect to Stockholders) and in accordance with the Warrant Agreement notice provisions (with respect to Warrant Holders).~~12.2. Any such notice (a "Drag-Along Notice") shall contain a reasonably detailed summary of the material terms and conditions of the Drag-Along Sale, including the identity of the applicable Third Party Purchaser (the "Drag-Along Purchaser"), the amount and form of the consideration to be paid by the Drag-Along Purchaser (stated on both an aggregate basis and, for any Drag-Along Sale that is a Company Stock Sale, on a per-share basis based on the total number of shares of Common Stock outstanding when the Drag-Along Notice is delivered~~)~~, including all shares issuable upon exercise in full of all then-outstanding Warrants).  The amount and form of

15

consideration paid in respect of each Warrant shall be determined based on the number of shares of Common Stock issuable upon the exercise in full of such Warrant, net of the exercise price that would have been payable with respect to such exercise.

(b)      In connection with any Drag-Along Sale, each of the Dragged Holders shall be obligated to do each of the following, in each case to the extent applicable to such transaction and subject in all cases to Section 3.1(c):  (i) at the closing of such Drag-Along Sale, sell or transfer to the Drag-Along Purchaser all of such Dragged Holder's shares of Common Stock and Warrants free and clear of any Liens (other than Permitted Liens) and duly endorsed for transfer, or accompanied by duly endorsed stock powers, for the same type and amount of per-share consideration and on the same terms as the Initiating Drag-Along Holders (except that if any Equity Holder is given an option as to the form of consideration to be received in respect of its Common Stock or Warrants, each other Equity Holder shall be given the same option) [, provided, that the type and amount of consideration payable with respect to each Warrant shall be equal to the consideration payable with respect to a number of shares of Common Stock equal to the number of shares issuable upon exercise of such Warrant, net of the Exercise Price]; (ii) to the extent such Dragged Holder is entitled to vote thereon, vote all such Dragged Holder's shares of Common Stock, whether by proxy, voting agreement or otherwise, in favor of the Drag-Along Sale; (iii) use commercially reasonable efforts to obtain any consents necessary for such Dragged Holder to consummate the Drag-Along Sale; (iv) waive and refrain from exercising any appraisal or dissenters rights with respect to such Drag-Along Sale; (v) effectuate the allocation and distribution of the aggregate consideration upon the Drag-Along Sale as set forth below; (vi) refrain from directly or indirectly taking (or causing any other Person to take) any action that is prejudicial to or inconsistent with such Drag-Along Sale; and (vii) take any and all reasonably necessary action in furtherance of the foregoing, to the extent requested by the Initiating Drag-Along Holders or the Board of Directors, at the Company's sole expense.

(c)      Notwithstanding anything to the contrary in this Article III, (i) no Dragged Holder shall be required to agree to any covenants that do not also apply to the Initiating Drag-Along Holders, or make any representations or warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, or provide any indemnity in connection with any Drag-Along Sale, except that each Dragged Holder may be required to (xA) provide customary representations, warranties, covenants and agreements (and customary indemnification with respect thereto) with respect to itself and its Common Stock and its Warrants (in respect of which such Dragged Holder may be required to bear 100% of theany damages or indemnification obligations resulting from such Dragged Holder's breach thereof) and/or (yB) bear its *pro rata* share (in proportion to its ownership of the Total Equity Interests) of any escrows, holdbacks or adjustments in respect of the purchase price related obligations or, in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets or covenants or other agreements of the Company or its Subsidiaries, any indemnification obligations (*provided*, in the casethat a Dragged Holder may be required to bear 100% of any damages or indemnification obligations resulting from such Dragged Holder's breach, such Dragged Holder may be required to bear 100% of such damages); *provided, that*) and (ii) no Dragged Holder shall be obligated (A) to indemnify any Person in connection with a breach by any other Equity Holder of its representations, warranties, covenants or other agreements, (B) in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, to incur liability to any

16

NY 78204977

Person in connection with the Drag-Along Sale, including under any indemnity, in excess of the lesser of (1x) such Dragged Holder's *pro rata* share of such liability based on the relative amount of proceeds payable to the Stockholders in such sale (other than in the case of fraud or willful breach of such Dragged Holder) and (2y) the proceeds payable to such Dragged Holder in such Drag-Along Sale (other than in the case of fraud or willful breach of such Dragged Holder), (C) to agree to any non-competition, non-solicitation, non-disparagement or non-hire covenants or similar restrictive covenants or (D) provide any representations, warranties, covenants or agreements the terms of which are more onerous (on a per-share basis) with respect to the Dragged Holders than the Initiating Drag-Along Holders.

(d)    Each Initiating Drag-Along Holder and each Dragged Holder will bear its *pro rata* share (based upon the net proceeds received by each such holder in the Drag-Along Sale) of the costs of any Drag-Along Sale to the extent such costs are incurred for the benefit of all such holders and are not otherwise paid by the Company or the Drag-Along Purchaser.  Costs incurred by such holders on their own behalf will not be considered costs of the Drag-Along Sale.

(e)    The Company shall take, and shall use commercially reasonable efforts to cause the Board of Directors to take, any such actions as may reasonably be required or requested by the Initiating Drag-Along Holder to ensure that the Drag-Along Sale is consummated in accordance with the terms and conditions set forth in this Article III and any other applicable provisions of the Agreement, including by using commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to cooperate in any proposed Drag-Along Sale and not to take any action which might impede any such Drag-Along Sale; *provided, however, that in the case of a*.  Notwithstanding anything to the contrary in this Article III, any Drag-Along Sale that is structured as a merger or a Company Asset Sale, shall be subject to approval of the Board of Directors to the extent otherwise required under applicable law, and the Board of Directors shall act in accordance with its duties under applicable law with respect thereto.  Pending the completion of any proposed Drag-Along Sale, the Company shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing.

(f)    The Initiating Drag-Along Holders shall have power and authority, subject to the requisite Board of Directors approval in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale, to causerequire that the Company to enter into the definitive agreement for such Drag-Along Sale and to take any and all such further action in connection therewith as the Initiating Drag-Along Holders may reasonably deem necessary or appropriate in order to consummate or abandon any suchthe Drag-Along Transaction or, if expressly directed in writing by the Initiating Drag-Along Holders in their sole discretion, to abandon the Drag-Along Transaction; *provided*, *however*, that in the case of a Company Asset Sale or merger, the Board of Directors shall act in accordance with its duties under applicable law; *provided further*, *however*, that to the fullest extent permitted by law, the Initiating Drag-Along Holders shall not have any liability to any other Person if athe Drag-Along Sale is not consummated for any reason (except due to the Initiating Drag-Along Holders' breach of any of their obligations under any definitive written agreement entered into in connection therewith, but subject to the limitations set forth therein).  Subject to any required approval by the Board of Directors (in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale), the issuance

17

of the Drag-Along Notice and the other provisions of this <u>Section 3.1</u>, the Initiating Drag-Along Holders, in exercising their rights under this <u>Section 3.1</u>, shall have complete discretion over the terms and conditions of the Drag-Along Sale effected thereby, including per-share price, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows.

**ARTICLE IV**

TAG-ALONG SALE

Section 4.1    <u>Tag-Along Sale</u>.

(a)    In the event of any proposed Transfer by one or more Stockholders (the "<u>Initiating Tag-Along Holders</u>") of more than fifty percent (50.0%) of the outstanding shares of Common Stock to a single Person or group of related Persons (the "<u>Tag-Along Buyer</u>"), in a single transaction or series of related transactions (a "<u>Tag-Along Sale</u>"), the Initiating Tag-Along Holders shall first give written notice of such proposed Transfer to the Company, and the Company shall promptly deliver a copy of such notice to each of the other Equity Holders, in accordance with <u>Section 12.2</u>.  Such notice (a "<u>Tag-Along Sale Notice</u>") shall offer to each of the other Equity Holders (collectively, the "<u>Tag-Along Sellers</u>") the option to participate in such Tag-Along Sale on the same terms and conditions as the Initiating Tag-Along Holders, and at the same per-share sale price and in the same form of consideration as the Initiating Tag-Along Holders, and shall set forth (i) the names of the Tag-Along Buyer and the Initiating Tag-Along Holders, (ii) the number of shares of Common Stock that the Initiating Tag-Along Holder is proposing to Transfer to the Tag-Along Buyer pursuant to the Tag-Along Sale (the "<u>Initiating Tag-Along Holder Shares</u>"), (iii) the Tag-Along Percentage, and (iv) a reasonably detailed summary of the material terms and conditions of the proposed Tag-Along Sale, including the proposed amount and form of consideration per share of Common Stock.  Each Tag-Along Seller may irrevocably elect, by written notice delivered to the Initiating Tag-Along Holders (or their designated representative) within ten (10) calendar days after delivery of the Tag-Along Sale Notice (the "<u>Tag-Along Election Deadline</u>"<u> and any such notice, a "Tag-Along Election Notice")</u>), to sell up to the Tag-Along Percentage of its shares of Common Stock in such Tag-Along Sale, on the terms and conditions set forth in the Tag-Along Sale Notice (a "<u>Tag-Along Election</u>" and each Tag-Along Seller that makes such an election, an "<u>Electing Tag-Along Seller</u>"); *provided*, *however*, that if the Tag-Along Buyer is not willing to purchase on such terms and conditions an aggregate number of shares of Common Stock equal to the Initiating Tag-Along Holder Shares plus all shares of Common Stock with respect to which Tag-Along Elections are made, then the Initiating Tag-Along Holders in their sole discretion may elect to either (A) terminate such Tag-Along Sale or (B) consummate the Tag-Along Sale with respect to the total such number of shares as the Tag-Along Buyer is willing to purchase on such terms and conditions (such number of shares, the "<u>Tag-Along Share Cap</u>"), and in such event (1) each Electing Tag-Along Seller shall be permitted to sell to the Tag-Along Buyer a number of shares of Common Stock owned by such Electing Tag-Along Seller equal to the Final Tag-Along Percentage (as defined below) of the shares with respect to which the Electing Tag-Along Seller made a Tag-Along Election, and (2) the Initiating Tag-Along Holders shall be permitted to sell to the Tag-Along Buyer a number of shares of Common Stock owned by the Initiating Tag-Along Holders equal to the Final Tag-Along Percentage of the Initiating Tag-Along Holder Shares, in

18

each case rounded to the nearest whole share. As used herein, "Final Tag-Along Percentage" means, with respect to any Tag-Along Sale, the quotient, expressed as a percentage, of (x) the Tag-Along Share Cap *divided by* (y) an aggregate number of shares of Common Stock equal to the sum of the Initiating Tag-Along Holder Shares plus the total number of shares of Common Stock  with respect to which Tag-Along Elections are made.

(b)     The number of shares of Common Stock that each Tag-Along Seller may irrevocably elect to sell in a Tag-Along Sale in accordance with this Section 4.1 and, if applicable, the amount by which each Electing Tag-Along Seller will be cut back if the Tag-Along Buyer is not willing to purchase all the Initiating Tag-Along Holder Shares plus all shares with respect to which Tag-Along Elections are made, shall be determined based on its such Tag-Along Seller's  respective ownership of the shares of Common Stock outstanding as of the Tag-Along Election Deadline; *provided*, *however*, that solely for the purposes of such calculation, all shares of Common Stock issuable upon exercise of Warrants that are irrevocably exercised on or prior to the with respect to which an Electing Tag-Along Seller makes a Tag-Along Election Deadline (pursuant to a "conditional" exercise or otherwise) in accordance with the Warrant Agreement (as specified in the Tag-Along Election Notice) shall be deemed outstanding as of such date (such shares, "Eligible Warrant Shares"). If a Warrant Holder irrevocably elects, in accordance with this Section 4.1, to sell an Electing Tag-Along Seller makes a Tag-Along Election with respect to any Eligible Warrant Shares in a Tag-Along Sale, then (x) the Electing Tag-Along Seller shall be obligated to exercise the underlying Warrants and deliver such Eligible Warrant Shares to the Tag-Along Buyer at the Tag-Along Closing and (y) solely for purposes of this Section 4.1 as it applies to such Tag-Along Sale, the Eligible Warrant Shares shall be treated as shares of Common Stock that the Warrant Holder irrevocably elected to sell in the Tag-Along Sale and the Warrant Holder shall be treated as an Electing Tag-Along Seller with respect thereto.

(c)     In no event shall any Tag-Along Seller have any rights under this Section 4.1 or otherwise with respect to a sale by any Initiating Tag-Along Holders of any securities of the Company other than the Common Stock.  In Notwithstanding anything to the contrary in this Article IV, in connection with any Tag-Along Sale, (i) no Tag-Along Seller shall be required to agree to any covenants that do not also apply to the Initiating Tag-Along Holders, or make any representations or warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, or provide any indemnity in connection with any Tag-Along Sale, except such Tag-Along Seller may be required to (x) provide customary representations, warranties, covenants and agreements (and customary indemnification with respect thereto) with respect to itself and its Common Stock (in respect of which such Tag-Along Seller may be required to bear 100% of any damages or indemnification obligations resulting from such Tag-Along Seller's breach thereof) and/or (y) bear its *pro rata* share (in proportion to its ownership of Common Stock) of any escrows, holdbacks or adjustments in respect of the purchase price related obligations or, in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets or covenants or other agreements of the Company or its Subsidiaries, any indemnification obligations (*provided*, in the case that a Tag-Along Seller may be required to bear 100% of any damages or indemnification obligations resulting from such Tag-Along Seller's breach, such Tag-Along Seller may be required to bear 100% of such damages); *provided, that*) and (ii) no Tag-Along Seller shall be obligated

19

(A) to indemnify any Person in connection with a breach by any other Stockholder of its representations, warranties, covenants or other agreements, (B) in the case of representations and warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, to incur liability to any Person in connection with the Tag-Along Sale, including under any indemnity, in excess of the lesser of (~~1~~x) such Tag-Along Seller's *pro rata* share of such liability based on the relative amount of proceeds payable to the Stockholders in such sale (other than in the case of fraud or willful breach of such Tag-Along Seller) and (~~2~~y) the proceeds payable to such Tag-Along Seller in such Tag-Along Sale (other than in the case of fraud or willful breach of such Tag-Along Seller), (C) to agree to any non-competition, non-solicitation, non-disparagement or non-hire covenants or similar restrictive covenants or (D) provide any representations, warranties, covenants or agreements the terms of which are more onerous (on a per-share basis) with respect to the Tag-Along Sellers than the Initiating Tag-Along Holders. The election by any Tag-Along Seller to sell or not to sell all or any portion of such Tag-Along Seller's Common Stock (including any Eligible Warrant Shares) in any Tag-Along Sale shall be irrevocable (except with the express consent of the Initiating Tag-Along Holders in their sole discretion) and shall not adversely affect such Tag-Along Seller's right to participate in any future Tag-Along Sale.

(d)    At the closing of any Tag-Along Sale (the "<u>Tag-Along Closing</u>"), each Initiating Tag-Along Holder and Tag-Along Seller shall deliver, against payment of the purchase price therefor, certificates (or other evidence thereof reasonably acceptable to the transferee of such Common Stock) representing their Common Stock to be sold, duly endorsed for Transfer or accompanied by duly endorsed stock powers, evidence of good title to the Common Stock to be sold, the absence of Liens (other than Permitted Liens), encumbrances and adverse claims with respect thereto and such other documents as are deemed reasonably necessary by the Initiating Tag-Along Holders and the Company for the proper Transfer of such Common Stock on the books of the Company.

(e)    The provisions of this <u>Section 4.1</u> shall not apply to any proposed Transfer (i) between Significant Stockholders, (ii) by a Stockholder to any of its Affiliates ~~or Related Funds~~, or (iii) in a Drag-Along Sale pursuant to <u>Article III</u>.

**ARTICLE V**

PREEMPTIVE RIGHTS

Section 5.1    <u>Preemptive Rights</u>.

(a)    The Company shall not sell or issue to any Person (including any then-current Stockholder) after the Effective Date any shares of Common Stock, or other equity securities or debt convertible into or exchangeable for shares of Common Stock, or options, warrants conferring any right to acquire Common Stock or other rights to acquire Common Stock, or any debt securities (any of the foregoing, "<u>New Securities</u>" and such sale or issuance, a "<u>New Securities Issuance</u>"), unless the Company first delivers a written notice thereof (the "<u>Preemptive Rights Offer Notice</u>") to each Significant Stockholder in accordance with Section 12.2.  The Preemptive Rights Offer Notice shall set forth the terms of the New Securities (including the price, number or aggregate principal amount and type of securities, and all other

20

NY 78204977

material terms) and offer to each Significant Stockholder the opportunity to purchase up to its Pro Rata Portion of the New Securities (prior to giving effect to such offering) and its Pro Rata Portion of any New Securities not purchased by other Significant Stockholders, in each case on terms and conditions, including price, not less favorable to the Significant Stockholders than those on which the Company is proposing to sell or issue the New Securities, as set forth in this Section 5.1.   Notwithstanding anything contained herein, an Excluded Issuance shall not constitute a New Securities Issuance and shall not be subject to this Section 5.1.

(b)     The Company's offer to each Significant Stockholder pursuant to the Preemptive Rights Offer Notice shall remain open until 5:00 p.m. New York City Time on the date that is twenty (20) days after the Company's delivery of the Preemptive Rights Offer Notice (or such later date and time as the Company may specify in the Preemptive Rights Offer Notice), during which time (the "Preemptive Rights Offer Period") the Significant Stockholder may irrevocably elect to accept such offer by delivering to the Company, in accordance with Section 12.2 or as otherwise specified in the Preemptive Rights Offer Notice, a duly executed written notice (a "Preemptive Rights Election Notice") that (i) refers to and expressly accepts the offer set forth in the Preemptive Rights Offer Notice, (ii) sets forth the maximum number of such New Securities that the Significant Stockholder is electing to purchase, (iii) includes a representation that the Significant Stockholder is a Qualified Institutional Buyer or an Accredited Investor, and (iv) provides such other information as may be reasonably requested in the Preemptive Rights Offer Notice.

(c)     With respect to any New Securities Issuance, each Significant Stockholder who does not timely elect to purchase any New Securities by delivering a Preemptive Rights Offer Notice to the Company during the Preemptive Rights Offer Period shall be deemed to have irrevocably waived its rights under this Section 5.1 with respect to such New Securities Issuance. Each Significant Stockholder who timely elects to purchase New Securities as provided in Section 5.1(b) shall be allocated a number of New Securities equal to the aggregate number of New Securities to be issued in such New Securities Issuance multiplied by such Significant Stockholder's Pro Rata Portion (or, if less, the number of New Securities that the Significant Stockholder elected to purchase as set forth in such Significant Stockholder's Preemptive Rights Election Notice) and, if fewer than all of the Significant Stockholders elect to purchase all of their respective Pro Rata Portions of the New Securities to be issued in such New Securities Issuance, the unallocated New Securities shall be allocated to those Significant Stockholders who elected in their Preemptive Rights Election Notice to purchase more than their Pro Rata Portions (pro rata based on their respective Pro Rata Portions, subject to any limitations specified by the applicable Significant Stockholder in its Preemptive Rights Election Notice).

(d)     In the event the total number of New Securities offered in the New Securities Issuance exceeds the aggregate number of shares that Significant Stockholders elect to purchase pursuant to this Section 5.1 (the "Unsubscribed New Securities"), the Company or its applicable Subsidiary will have sixty (60) days after expiration of the Preemptive Rights Offer Period to sell such Unsubscribed New Securities, at a price no less than the price set forth in the Preemptive Rights Offer Notice and on other terms and conditions not more favorable, in the aggregate, to the purchaser thereof, than those specified in the Preemptive Rights Offer Notice. Following the date of the expiration of the sixty (60) day period referred to in the immediately preceding sentence, the Company will not, and the Company shall cause its Subsidiaries not to,

21

issue or sell any Unsubscribed New Securities without again complying with this Section 5.1, which shall be treated as a new New Securities Issuance hereunder.

(e)       Any Significant Stockholder shall have the right to assign, to any one or more of its Affiliates, its right to purchase and/or receive delivery of all or any portion of the New Securities that such Significant Stockholder elects to purchase pursuant to this Section 5.1, by written notice to the Company, which notice (i) shall be duly executed by the Significant Stockholder and the assignee and shall include representations, in form and substance satisfactory to the Company, that the assignee is a Qualified Institutional Buyer or an Accredited Investor and (ii) if the assignee is not already a party hereto, shall be accompanied by a Joinder Agreement, duly executed by the assignee.  Notwithstanding the foregoing, no such assignment shall relieve the Significant Stockholder from its obligations under this Section 5.1 with respect to the New Securities that it elected to purchase pursuant to this Section 5.1, and no such assignment shall be permitted if the assignee's purchase of such New Securities would result in any of the consequences described in Section 10.1(a).

(f)       Notwithstanding the foregoing provisions of this Section 5.1, the Company may proceed with any issuance or sale of New Securities (including to any Significant Stockholder) to any Person (an "Accelerated Purchaser") prior to having complied with such foregoing provisions (an "Accelerated Sale") if the Board of Directors determines in good faith that it is in the best interests of the Company to consummate such issuance or sale without having first complied with such provisions; *provided* that:

(i)       the Company shall provide each Significant Stockholder with prompt written notice of such Accelerated Sale, specifying the actual price per share paid for such New Securities;

(ii)       the Company shall offer to issue to each Significant Stockholder additional New Securities up to the amount that, if purchased by each Significant Stockholder, would, (A) with respect to shares of Common Stock, result in each such Significant Stockholder maintaining the same percentage (or increasing such percentage by the maximum amount any other Person increased its percentage) of the total number of shares of Common Stock then held by such Significant Stockholder (relative to the total number of shares of Common Stock then held, in the aggregate, by all Significant Stockholders) that such Significant Stockholder owned immediately prior to the issuance or sale of additional shares of Common Stock pursuant to this Section 5.1(g)(ii) and (B) with respect to any other additional New Securities, be equal to the amount that such Significant Stockholder would have been entitled to purchase pursuant to Section 5.1(a) if the Company complied with the foregoing provisions of this Section 5.1 with respect to the Accelerated Sale, in each case at the same price per share and on the same terms applicable to the Accelerated Sale;

(iii)       the Company shall keep such offer available to each Significant Stockholder for a period of twenty (20) days after the delivery of such notice, during which period, each Significant Stockholder may accept such offer by delivering a notice to the Company to purchase New Securities in an amount no greater than the amount offered by the Company to such Significant Stockholder pursuant to Section 5.1(f)(ii);

22

NY 78204977

(iv)     if one or more Significant Stockholders exercise their right to accept such offer to purchase New Securities, the Company shall give effect to each such exercise by (A) requiring that the Accelerated Purchaser sell down a portion of its New Securities, (B) issuing additional new Securities to such Significant Stockholder or (C) a combination of (A) and (B), so long as such action effectively provides such Significant Stockholder with the opportunity to hold the same percentage of the total outstanding New Securities (after giving effect to the issuance of New Securities to all Significant Stockholders exercising such right) that such Significant Stockholder would have been entitled to purchase had this Section 5.1(f) not been invoked; and

(v)     any dilution in any Significant Stockholder's percentage ownership of Common Stock or Total Equity Interests resulting from an Accelerated Issuance shall not be given effect for purposes of any provision of this Agreement  of any rights under this Agreement that are tied to such percentage ownership Agreement until the Company has complied with its obligations under this Section 5.1(f) and issued the New Securities, if any, to be issued to the Significant Stockholders pursuant to this Section 5.1(f).

Any offer, issuance or sale of New Securities to  Significant Stockholders pursuant to this Section 5.1(f) shall be conducted in accordance with the provisions applicable to New Securities acquired pursuant to a Preemptive Rights Election Notice under Sections 5.1(b), 5.1(c), 5.1(d) and 5.1(e), *mutatis mutandis*.

## ARTICLE VI

### BOARD OF DIRECTORS

Section 6.1     Agreement to Vote.  Each Stockholder hereby agrees to hold all of the shares of Common Stock registered in its name (and any other voting securities of the Company issued with respect to, upon conversion of, or in exchange or substitution of any Common Stock, and any other voting securities of the Company subsequently acquired by such Stockholder) subject to the provisions of this Article VI, and to vote all such securities at regular or special meetings of stockholders, and give written consents with respect to all such securities, as necessary to give full effect to the Designation Rights and the provisions of this Article VI, and to cause the Board of Directors to at all times be constituted as provided in this Article VI. The Company shall use commercially reasonable efforts to cause the Board of Directors to at all times be constituted as provided in this Article VI, and to give full effect to the Designation Rights and the provisions of this Article VI.

Section 6.2     Composition of the Board of Directors.

(a)     The Board of Directors shall at all times consist of seven (7) Directors, unless the size of the Board of Directors is increased or decreased by the Board of Directors ~~in accordance with Section 8.1~~pursuant to Whole Board Approval; *provided*, *however*, that the size of the Board of Directors shall not be decreased to fewer than five (5) Directors nor increased to more than seven (7) Directors except with Whole Board Approval and Majority Stockholder Approval. The Board of Directors, as of the Effective Date, shall be comprised of the seven (7) individuals listed in Schedule 6.2 attached hereto.

23

(b)     Following the Effective Date, and notwithstanding anything to the contrary in this Agreement or in the Bylaws:

(i) for so long as Brightwood Capital Advisors, LLC and its Affiliates and Related Funds  (collectively, the "Brightwood Stockholders") own, in the aggregate, (A) at least seventeen and one-half percent (17.5%) of the Total Equity Interests, the Brightwood Stockholders shall have a designation right with respect to two (2) seats on the Board of Directors, pursuant to which the Brightwood Stockholders shall have the exclusive right to nominate two individuals for election to such Director seats and (B) at least eight and three-quarters percent (8.75%) (but less than seventeen and one-half percent (17.5%)) of the Total Equity Interests, the Brightwood Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Brightwood Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(ii) for so long as HG Vora Capital Management, LLC and its Affiliates and Related Funds  (collectively, the "HG Vora Stockholders") own, in the aggregate, (A) at least seventeen and one-half percent (17.5%) of the Total Equity Interests, the HG Vora Stockholders shall have a designation right with respect to two (2) seats on the Board of Directors, pursuant to which the HG Vora Stockholders shall have the exclusive right to nominate two individuals for election to such Director seats  and (B) at least eight and three-quarters percent (8.75%) (but less than seventeen and one-half percent (17.5%)) of the Total Equity Interests, the HG Vora Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the HG Vora Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(iii) for so long as CQS (UK) LLP and its Affiliates and Related Funds (collectively, the "CQS Stockholders") own, in the aggregate, at least eight and three-quarters percent (8.75%) of the Total Equity Interests, the CQS Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the CQS Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(iv) for so long as Capital Southwest Corporation and its Affiliates and Related Funds (collectively, the "CSWC Stockholders") and Main Street Capital Corporation and its Affiliates and Related Funds (collectively, the "Main Street Stockholders") own, in the aggregate, at least eight and three-quarters percent (8.75%) of the Total Equity Interests, they shall have a joint designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Main Street Stockholders and CSWS Stockholders shall have the exclusive right to jointly nominate an individual for election to such Director seat; *provided,* that if either the CSWC Stockholders or the Main Street Stockholders cease to own at least four and three-eighths percent (4.375%) of the Total Equity Interests, then from and after such time the CSWC Stockholders or Main Street Stockholders (including their respective ownership of the Total Equity Interests), as applicable, shall be disregarded for purposes of selecting a Director;

24

NY 78204977

(v) with respect to the Director designation rights set forth in subsections (i) through (iv) of this Section 6.2(b), the applicable Designating Stockholder shall have, in addition to the exclusive right to nominate an individual for election to the applicable Director seat(s), the exclusive right to remove or replace, at any time, the applicable Director(s) serving in such Director seat(s) and to fill vacancies with respect to such Director seat(s) in accordance with Section 6.3; and

(vi) at all times the individual then serving as the CEO, if any, shall automatically be a Director (the "CEO Director"), *provided*, that any such individual's status as a director shall automatically terminate upon their ceasing to be the CEO.

(c)     If at any time a Designating Stockholder loses a Designation Right because it ceases to satisfy the applicable Total Equity Interest ownership threshold set forth in subsection (b) of this Section 6.2, then the term of the Designated Director then serving on the Board of Directors as a result of such terminated Designation Right shall expire at the next annual meeting of stockholders following such termination, and thereafter such Director seat shall be an At-Large Director seat and that (including at such annual meeting) is subject to election by the Company's stockholders at such annual meeting or by written consent. Notwithstanding anything to the contrary in this Section 6.2, the then-current term of a Designated Director shall not be affected solely by the applicable Designating Stockholder's loss of its Designation Right.

(d)     A Designating Stockholder may not assign or otherwise Transfer its Designation Rights to any Person, except that (i) any Designating Stockholder may freely assign Designation Rights to any of its controlled Affiliates or Related Funds, (ii) any Designating Stockholder may assign its Designation Rights to the Transferee in connection with any Transfer of all (but not less than all) of the shares of Common Stock and Warrants that such Designating Stockholder received or was entitled to receive on the Effective Date pursuant to the Plan, (iii) any Designating Stockholder with Designation Rights for two (2) Director seats may assign its Designation Rights with respect to both Director seats to a Transferee in connection with any transfer of Common Stock and/or Warrants representing at least seventeen and one-half percent (17.5%) of the Total Equity Interests, and (iv) any Designating Stockholder with Designation Rights may assign its Designation Rights with respect to one (1) Director seat, to the Transferee in connection with any Transfer of shares of Common Stock and/or Warrants representing at least eight and three-quarters percent (8.75%) of the Total Equity Interests, *provided*, that in each case the Designating Stockholder provides the Company with at prior written notice of such assignment, and *provided further*, that in the case of (ii) through (iv) the Transfer of Common Stock and/or Warrants complies with all applicable provisions of this Agreement and the Transferee (if not already a signatory hereto) executes and delivers a Joinder Agreement.

Section 6.3     Removal; Vacancies.   At any time, a Director may be removed with or without Cause by Majority Stockholder Approval.   In the event of the death, resignation or removal of a Director, or if there is a vacancy on the Board of Directors for any other reason, the vacancy shall be promptly filled by the remaining Directors, in accordance with the Bylaws, subject (in the case of any Director seat that is subject to a Designation Right) to the exclusive right of the Designating Stockholder to designate the individual to fill such vacancy. Notwithstanding anything to the contrary in this Article VI, a Designating Stockholder shall have

25

the exclusive right (exercisable at any time in its sole discretion) to remove its respective Designated Director and to fill any vacancy with respect to the Director seat to which its Designation Right relates.

Section 6.4    Voting.  Except as otherwise provided in this Agreement, approval of the Board of Directors of any action or decision will require unanimous written consent of all Directors then in office or approval of a majority of the Directors present at a validly convened meeting of the Board of Directors at which a quorum is present.

Section 6.5    Director Compensation.  From and after the Effective Date, each Director who is not an employee of the Company or any of its Subsidiaries (each, a "Non-Employee Director") and who is not an employee of his or her respective Designating Stockholder (if applicable) or an Affiliate of such Designating Stockholder shall be entitled to such compensation (which may include cash and/or equity awards) from the Company as shall have been determined by the [prospective Designating Stockholders] prior to and the Company by the date that is thirty (30) days after the Effective Date and set forth in a written notice given to the Company, and shall otherwise be entitled to receive market-rate compensation, on or prior to such date, subject to such changes as may be approved from time to time by the Board of Directors; provided, however, that such compensation shall not be increased (other than reasonable annual cost of living increases) unless such increase shall have been approved by Majority Stockholder Approval.  Any equity awards granted to Non-Employee Directors shall be in addition to the equity awards provided under the Management Incentive Plan.  All Directors will be reimbursed by the Company for all reasonable and documented expenses incurred in connection with his or her service as a Director and (as applicable) committee member, and will be entitled to customary indemnification/advancement and exculpation provisions and directors' and officers' liability insurance coverage.

Section 6.6    Chairman of the Board.  The initial Chairman of the Board, as of the Effective Date, shall be the Director identified as such in Schedule 6.2[1].6.2.  Following each annual meeting of the stockholders, the Board of Directors shall elect the Chairman of the Board from among the Directors.

Section 6.7    Committees of the Board of Directors.  The Board of Directors shall establish and maintain an Audit Committee and a Compensation Committee.  In addition, the Board of Directors may, by a majority vote of the Whole Board, establish one or more additional committees from time to time, in each case in accordance with the Certificate of Incorporation and the Bylaws.

Section 6.8    Subsidiary Boards.  The Company shall use commercially reasonable efforts to cause the size and composition of the board of directors, board of managers or similar governing body of each of the Company's wholly-owned Subsidiaries that owns all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis to at all times be identical to that of the Board of Directors; provided, however, that the foregoing requirement shall not apply to any wholly-owned Subsidiary which is (i) a limited liability

---

[1] Note to Draft: To be selected by Brightwood Stockholders and HG Vora Stockholders prior to the Effective Date.

26

company that is managed by its members, (ii) a limited partnership that is managed by its general partner, or (iii) required by law or contract to have a different composition.

## ARTICLE VII

### INFORMATION RIGHTS

Section 7.1     Information Rights.

(a)     For so long as the Company is not required to file periodic reports under the Exchange Act, the Company shall provide to each Equity Holder who is not a Competitor the information, reports and other materials that Equity Holders are entitled to receive under this Article VII, within the time periods and subject to the applicable terms and conditions set forth in this Article VII; *provided*, *however*, that notwithstanding anything contained in this Article VII, any Equity Holder that has not duly executed and delivered to the Company a counterpart signature page to this Agreement or a Joinder Agreement (and has not otherwise entered into a confidentiality agreement, in form and substance acceptable to the Board of Directors in its sole discretion, with respect to such information, reports and other materials) shall not be entitled to receive any such information, reports or other materials, or access to the Data Room. All information, reports and other materials that the Company is required to provide to Equity Holders under this Article VII shall be posted to an electronic data room on a secure website to which all Equity Holders entitled to receive such information, reports and other materials are given access (the "Data Room").  The Company shall also provide access to the Data Room, upon request by any Equity Holder entitled to such access, to any Transferee or potential Transferee of shares of Common Stock to whom such Equity Holder would be entitled to disclose Information pursuant to Section 7.2, *provided*, that such Transferee or potential Transferee (a) is a Qualified Institutional Buyer or Accredited Investor (or is otherwise acceptable to the Board of Directors, in its reasonable discretion) and (b) enters into a confidentiality agreement, in form and substance acceptable to the Board of Directors in its sole discretion, with respect to such information, reports and other materials.  All information provided by the Company to Equity Holders pursuant to this Article VII (including all information provided to or obtained by any Significant Equity Holder pursuant to Section 7.1(d)) shall be subject to the confidentiality provisions set forth in Section 7.2.

(b)     Each Equity Holder who is not a Competitor shall have the right to receive, (i) within ninety (90) days after the end of each fiscal year of the Company, audited annual consolidated financial statements of the Company for such fiscal year (including balance sheets, statements of operations and statements of cash flows), certified by a national accounting firm and prepared in accordance with GAAP, along with a reasonably detailed management's discussion and analysis, in narrative form, commenting on the audited consolidated financial statements ("MD&A"), (ii) within sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year of the Company, unaudited quarterly condensed consolidated financial statements of the Company for such quarter and the year-to-date period and the comparable period of the prior fiscal year (including balance sheets, statements of operations and statements of cash flows), prepared in accordance with GAAP, along with an MD&A with respect thereto, and (iii) as promptly as practicable after each of the quarterly conference calls described below, a transcript or recording of such call.

NY 78204977

(c)     Within a reasonable time after it provides quarterly or annual financial statements to Equity Holders pursuant to Section 7.1(b), the Company shall hold quarterly conference calls with the Equity Holders (and reasonable prior notice and dial-in information will be provided to each Equity Holder entitled to participate in such call) to discuss the Company's results of operations and financial performance for the immediately preceding fiscal quarter and year-to-date, including a reasonable question and answer session.    Notwithstanding the foregoing, the Company in its sole discretion may exclude from any such calls any Equity Holder who is a Competitor.

(d)     The Company shall, and shall cause its officers and employees to, provide each Significant Equity Holder reasonable access, upon reasonable prior notice and during normal business hours, to management personnel and the books and records of the Company and its Subsidiaries, subject to customary exceptions regarding Competitors, conflicts of interest, and attorney-client privilege.

(e)     If at any time following the Effective Date the Company is required to register the Common Stock or Warrants or any other class of equity security under Section 12(g) of the Exchange Act because the number of holders of record of such class exceeds any of the applicable thresholds, the Company shall provide a minimum of thirty (30) days prior written notice of such registration to all Equity Holders, and the Company shall not otherwise register the Common Stock or any class of equity security under Section 12 of the Exchange Act at any time prior to consummation of a Qualified Public Offering [except with Supermajority ~~Equity Holder~~Stockholder  Approval].    The Common Stock will not be listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange ~~at any time prior to~~except in connection with or following the consummation of a Qualified Public Offering.

Section 7.2    Confidentiality.

(a)     Each Equity Holder shall, and shall cause its Representatives to, keep confidential and not divulge any information (including all budgets, business plans and analyses) concerning the Company and its Subsidiaries, including its assets, business, operations, financial condition, liabilities or business prospects ("Information"), and shall use, and cause its Representatives to use, such Information only in connection with the operation of the Company and its investment in the Company; *provided*, *however*, that nothing herein shall prevent any Equity Holder from disclosing such Information (i) upon the order of any court or administrative agency, (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Equity Holder, (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (iv) to the extent necessary in connection with the exercise of any remedy hereunder, (v) to other Equity Holders who have entered into this Agreement, (vi) to such Equity Holder's Representatives that in the reasonable judgment of such Equity Holder need to know such Information and have an obligation to maintain the confidentiality of such Information, (vii) to any Related Party as long as the Related Party agrees in writing to be bound by the provisions of this Section 7.2 as if it were an Equity Holder, (viii) to a potential Transferee of shares of Common Stock, to the extent reasonably necessary in connection with an actual or potential Transfer to such Person that would be permitted by this Agreement, *provided* that such potential Transferee is not a Competitor and

28

(prior to such disclosure) enters into a non-disclosure agreement in a form approved by the Board of Directors pursuant to which the potential Transferee agrees in writing to maintain the confidential nature of such Information in accordance with the terms of this Section 7.2, or (ix) with the prior written consent of the Company; *provided further*, *that* in the case of clause (i), (ii) or (iii), the applicable Equity Holder shall notify the Company in writing of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment, when and if available.

(b)     The restrictions set forth in this Section 7.2 shall, with respect to any Information provided to the Equity Holders pursuant to Sections 7.1(a) through 7.1(c), expire on the date that is one year after such Information was so provided.  The restrictions set forth in Section 7.2(a) shall not apply to any Information that (i) is or becomes generally available to the public other than as a result of a disclosure by an Equity Holder or any of its Representatives in violation of this Agreement; (ii) is or becomes available to an Equity Holder or any of its Representatives on a non-confidential basis prior to its disclosure by or on behalf of the Company to the receiving Equity Holder and any of its Representatives, (iii) is or has been independently developed or conceived by such Equity Holder or any of its Representatives without use of the Company's Information or (iv) becomes available to the receiving Equity Holder or any of its Representatives on a non-confidential basis from a source other than the Company, any other Equity Holder or any of their respective Representatives, *provided*, that such source is not known by the recipient of the information to be bound by a confidentiality agreement with the disclosing party or any of its Representatives.

## ARTICLE VIII

### KEY ACTIONS

Section 8.1    Approval Requirements for Key Actions.  In addition to any vote of Stockholders that may be required by applicable law or by the provisions of the Certificate of Incorporation, the Company shall not directly or indirectly take (and, as applicable, the Company shall not cause or permit its Subsidiaries to take) any Key Action without first obtaining approval of such Key Action by the Board of Directors pursuant to Whole Board Approval.  ~~Notwithstanding the foregoing, Whole Board Approval shall not be required with respect to any Company Stock Sale or Company Asset Sale effectuated pursuant to the terms and conditions set forth in Article III hereof.~~

## ARTICLE IX

### RELATED PARTY TRANSACTIONS

Section 9.1    Approval Requirements for Related Party Transactions.  In addition to any other vote of Stockholders of the Company that may be required by law or by the provisions of the Certificate of Incorporation, the Company shall not enter into, or permit any other Company Entity to enter into, any Related Party Transaction (or series of Related Party Transactions) without first obtaining approval of such Related Party Transaction(s) by Disinterested Director

29

Approval; *provided, further that* if such Related Party Transaction (or series of Related Party Transactions) involves or (as determined by the disinterested members of the Board of Directors) could reasonably be expected to involve more than five million dollars ($5,000,000) in cash payments or other consideration or value, the Company shall not enter into, or permit any other Company Entity to enter into, any Related Party Transaction (or series of Related Party Transactions) without obtaining either (a)of the following prior to obtaining Disinterested Director Approval, obtaining: (a) a fairness opinion with respect to such proposed Related Party Transaction from a nationally recognized investment banking or valuation firm or (b) obtaining prior approval of the Stockholders by Majority Stockholder Approval (excluding for such purpose any shares held by the applicable Related Party or any of its Affiliates).

## ARTICLE X

### TRANSFERS

Section 10.1    Restrictions on Transfer.

(a)    Each Equity Holder covenants and agrees that it shall not Transfer any shares of Common Stock or Warrants except in accordance with the provisions of this Section 10.1 and the other applicable provisions of this Agreement.  The Board of Directors, in its sole discretion, may at any time and from time to time waive any of the restrictions or requirements set forth in this Section 10.1, other than clause (i) of Section 10.1(b).  The Board of Directors may delegate, to one or more specified officers of the Company, all or any portion of its authority to make decisions and determinations pursuant to this Section 10.1. All Transfers of Common Stock must comply with, to the extent applicable, the provisions of Article III, Article IV, and Section 10.2.

(b)    Shares of Common Stock and/or Warrants shall not be Transferred by any Stockholder in any Transfer that, if consummated, (i) would result in a violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or (ii) would result in the Company's having a number of "holders of record" (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of Common Stock that (A) is three hundred (300) or more (except to the extent the Board of Directors determines, at any time after January 1, 2021 based on advice of outside counsel, that such threshold is not applicable for purposes of determining whether the Company will be subject to periodic reporting obligations under the Exchange Act), (B) exceeds the applicable threshold for the Company's having to register the Common Stock under Section 12(g) of the Exchange Act or (C) would otherwise subject the Company to reporting obligations under Section 13 or Section 15 of the Exchange Act (if, at any time after January 1, 2021, it is not already subject to such reporting obligations).  In calculating the number of holders of record of Common Stock for purposes of the immediately preceding sentence, (x) any pending Transfers for which a Transfer Notice (as defined below) has previously been given to the Company shall be taken into account and (y) all then-outstanding Warrants shall be treated as if they were fully exercised for shares of Common Stock with all such shares issued to and held by the holders of such Warrants.

30

(c)     It shall be a condition precedent to any Equity Holder's Transfer of shares of Common Stock or Warrants that, prior to the consummation thereof, the Equity Holder provide written notice of such Transfer to the Company (a "Transfer Notice").  A Transfer Notice shall be delivered to the Company in accordance with Section 12.2 and, except as determined otherwise by the Board of Directors in its sole discretion, shall include (A) the name, address, telephone number and email address of the Transferor and the Transferee, (B) the number of shares of Common Stock and/or Warrants proposed to be Transferred (C) the total shares of Common Stock and total Warrants then held by the Transferor, (D) the date on which the Transfer is expected to take place and (E) such additional information and documentation as may be reasonably requested by the Company and the Company's stock transfer agent or Warrant Agent, as applicable.  So long as the applicable provisions of this Agreement and the Certificate of Incorporation shall have been fully satisfied and complied with to the satisfaction of the Board, the Company shall, within seven (7) Business Days after delivery of the Transfer Notice (including, without limitation, the provision of any information and documentation requested pursuant to the foregoing clause (E) and, if applicable, the Joinder Agreement and/or legal opinion required by subsection (d) below), cause the Transfer to be registered on the books of the Company, unless the Board of Directors determines that the Transfer is not permitted pursuant to the terms of this Section 10.1, in which case the Company shall promptly inform the Transferor of such determination.

(d)     It shall be a condition precedent to any Equity Holder's Transfer of shares of Common Stock or Warrants that the Transferee shall have delivered to the Company a Joinder Agreement, duly completed and executed by the Transferee, if the Transferee was not an original signatory to this Agreement and has not previously executed and delivered a Joinder Agreement. It shall also be a condition precedent to any Equity Holder's Transfer of shares of Common Stock or Warrants that, if requested by the Board of Directors in its sole discretion, the Transferor shall have delivered to the Company a legal opinion reasonably acceptable to the Board of Directors, stating that registration of the shares of Common Stock and/or Warrants, as applicable, that are the subject of such proposed Transfer is not required under the Securities Act.  Notwithstanding the foregoing, such a legal opinion shall not be required for any Transfer of shares of Common Stock or Warrants that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Company has reason to believe that such shares or Warrants are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Company or an "underwriter" (as such term is defined in Section 1145(b) of the Bankruptcy Code) with respect to such shares or Warrants.

(e)     Certificates.  All certificates (if any) evidencing shares of Common Stock shall conspicuously bear the applicable legends set forth below, with such changes as the Board of Directors, in its discretion, deems to be necessary and appropriate, and any other legends required by the Certificate of Incorporation.  Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the Certificate of Incorporation and this Agreement (including the restrictions on Transfer set forth in this Section 10.1), whether or not any certificate evidencing shares of Common Stock owned or held by such Stockholder bear the legends set forth below and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

31

Each certificate, if any, representing shares of Common Stock issued under the Plan in reliance on the Securities Act exemption provided by Section 1145 of the Bankruptcy Code shall include a legend substantially to the following effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM.  THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Each certificate, if any, representing shares of Common Stock issued in reliance on the Securities Act exemption provided by Section 4(a)(2) of the Securities Act shall include a legend substantially to the following effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 4(a)(2) OF THE SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM.  THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

32

NY 78204977

Each certificate, if any, representing other shares of Common Stock shall contain such legends as the Board of Directors, in its discretion, deems to be necessary and appropriate.

(f)     Certain Restricted Transfers.  Shares of Common Stock and/or Warrants shall not be Transferred by any Equity Holder to a Competitor, except with the prior written approval of the Board of Directors (or, if applicable, of any officer of the Company to whom the Board of Directors has delegated such authority) in its sole discretion.  Shares of Common Stock and/or Warrants shall not be Transferred by any Equity Holder pursuant to any Transfer (other than to an Affiliate of the Transferor) that would, if consummated, result in the Transferee (together with its Affiliates) becoming the holder of more than five percent (5%) of the Total Equity Interests, except with the prior written approval of the Board of Directors (or, if applicable, of any officer of the Company to whom the Board of Directors has delegated such authority) in its sole discretion, such approval not to be unreasonably withheld, *provided*, *however*, that such restriction shall not apply to any Transfer to a Significant Stockholder, or if the Transferee (together with its Affiliates) already holds more than five percent (5%) of the Total Equity Interests and was the Transferee in another Transfer approved pursuant to this Section 10.1(f). The foregoing restrictions shall not apply to Transfers (i) between Significant Stockholders, (ii) in a Drag-Along Sale pursuant to Article III hereof, or (iii) by ~~any~~the Electing Tag-Along ~~Seller~~Sellers in ~~a~~any Tag-Along Sale pursuant to Article IV hereof.

(g)     Transfers Not in Compliance.  Any Transfer or attempted Transfer of any shares of Common Stock and/or Warrants that does not fully comply with the applicable provisions of this Agreement shall be null and void *ab initio* and of no force or effect whatsoever, and shall not be recognized by the Company.  Any such Transfer or attempted Transfer shall not be recorded on the Company's books and the purported Transferee shall not be treated as the owner of such shares of Common Stock and/or Warrants, as applicable, for any purpose. The Company may institute legal proceedings to force rescission of any Transfer made in violation of any provision of this Agreement and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer.

Section 10.2    Right of First Offer.

(a)     In the event that any Stockholder proposes to Transfer shares of Common Stock that represent more than five percent (5%) of the outstanding shares of Common Stock in a single transaction or series of related transactions (such shares, the "ROFO Shares", and such Stockholder, the "Offering Holder"), the Company shall have a right of first offer with respect to such proposed Transfer of the ROFO Shares (a "ROFO Sale") and, if the Company does not exercise such right to purchase all the ROFO Shares, each Significant Stockholder (excluding the Offering Holder and its Affiliates, to the extent any of them is a Significant Stockholder) (a "ROFO Holder") shall have a right of first offer with respect to the ROFO Shares, which rights of first offer shall be subject to, and be exercised in accordance with, the provisions of this Section 10.2.

(b)     With respect to any proposed ROFO Sale, the Offering Holder shall first deliver written notice thereof to the Company and each of the ROFO Holders in accordance with Section 12.2 (a "ROFO Sale Notice"), which ROFO Sale Notice shall set forth the number of ROFO Shares proposed to be Transferred.  The Company shall have the right, exercisable within

33

five (5) Business Days following delivery of the ROFO Sale Notice to make a written offer to the Offering Holder (a "Company ROFO Offer") to purchase (either directly or through one or more Affiliates) all, but not less than all, of the ROFO Shares at a cash purchase price specified in the Company ROFO Offer.  If the Company does not exercise such right within the five (5) Business Days following delivery of the ROFO Transfer Notice or expressly declines to exercise such right, the Company shall give prompt written notice thereof to each the ROFO Holders, and each ROFO Holder shall have the right, exercisable within five (5) Business Days following the Company's delivery of such notice to the ROFO Holders, to make a written offer (a "Holder ROFO Offer") to purchase (either directly or through one or more Affiliates) all, but not less than all, of the ROFO Shares at a cash price specified in the Holder ROFO Offer.  For the avoidance of doubt, if the Company exercises its right to make a ROFO Offer, then the ROFO Holders shall not be entitled to any rights described in this Section 10.2.

(c)    If the Company makes a Company ROFO Offer and the Offering Holder accepts such Company ROFO Offer, subject to Section 10.2(e) below, the Company shall be irrevocably obligated to purchase (either directly or through one or more Affiliates, as applicable), and the offering Holder shall be irrevocably obligated to sell, all, but not less than all, of the ROFO Shares at the price specified in the Company ROFO Offer, and on the terms and subject to the conditions set forth in this Section 10.2.

(d)    If the Company does not exercise its right to make a Company ROFO Offer, and the Offering Holder receives Holder ROFO Offers from one or more ROFO Holders, then the Offering Holder shall have the right, exercisable within five (5) Business Days following the last day a timely Holder ROFO Offer could have been made by a ROFO Holder for the ROFO Shares, to accept the highest Holder ROFO Offer by sending written notice of its acceptance to the ROFO Holder making such Holder ROFO Offer (a "ROFO Acceptance Notice"); provided, that if two or more Holder ROFO Offers provide for the same purchase price and the Offering Holder wishes to accept a ROFO Offer at such price, then the Offering Holder shall accept each such Holder ROFO Offer in part, with each such ROFO Offer to be accepted by allocating the ROFO Shares proportionately in accordance with the respective ownership of Common Stock (calculated as of the date of the ROFO Sale Notice) by each of the ROFO Holders making such Holder ROFO Offers.  Upon the Offering Holder's acceptance of a one or more Holder ROFO Offers in accordance with this Section 10.2(d), the ROFO Holder(s) making such Holder ROFO Offer(s) shall be irrevocably obligated to purchase (either directly or through one or more Affiliates), and the Offering Holder shall be irrevocably obligated to sell, in each case the ROFO Holder Shares with respect to which such Holder ROFO Offer(s) was accepted, at the price specified in such Holder ROFO Offer(s), and on the terms and subject to the conditions set forth in this Section 10.2.

(e)    In the event the Offering Holder accepts a Company ROFO Offer or one or more Holder ROFO Offers (each, a "ROFO Offer"), the closing for such purchase and sale of the ROFO Shares pursuant thereto shall take place within ten (10) Business Days after the Offering Holder's delivery of the applicable ROFO Acceptance Notice, and at such closing, (i) the Offering Holder shall deliver, against payment of the purchase price therefor, certificates (if any) or other documentation (or other evidence thereof reasonably acceptable to the purchaser) representing such ROFO Shares, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by the

34

purchaser for the proper transfer of such ROFO Shares on the books of the Company free and clear of any Liens (other than Permitted Liens) and (ii) the purchasers shall deliver to the Offering Holder the purchase price for such ROFO Shares.  The Offering Holder shall not be required to provide any representations or warranties in the definitive Transfer documentation for such purchase and sale of the ROFO Shares, other than with respect to (i) the authority of the Offering Holder to execute the relevant Transfer documents and Transfer the ROFO Shares pursuant thereto, (ii) the due execution and delivery of the relevant Transfer documents by the Offering Holder and (iii) the Offering Holder's ownership of the ROFO Shares free and clear of adverse interests and other liens.

(f)     If the Offering Holder does not receive any timely ROFO Offers, the Offering Holder shall have the right to Transfer the ROFO Shares, in whole or in part, to one or more third parties at such price as it so determines.  If the Offering Holder receives one or more timely ROFO Offers but the Offering Holder elects not to accept any such ROFO Offer, the Offering Holder shall have the right, within  180 days thereafter, to Transfer all, but not less than all, of its ROFO Shares to one or more third parties; *provided*, *however*, that no such Transfers shall be made at a price that is less than 110% of the highest price set forth in any timely ROFO Offer not accepted by the Offering Holder.  If the Offering Holder desires to Transfer the ROFO Shares at a price less than 110% of the highest price set forth in any timely ROFO Offer, or more than 180 days after a ROFO Offer was received, then it shall not be permitted to do so without re-commencing the right of first offer process set forth in this Section 10.2.

(g)     The foregoing restrictions shall not apply to Transfers (i) between Significant Stockholders, (ii) by a Stockholder to any of its Affiliates, (iii) in a Drag-Along Sale pursuant to Article III hereof, or (iv) by any Tag-Along Seller in a Tag-Along Sale pursuant to Article IV hereof.

## ARTICLE XI
### REPRESENTATIONS AND WARRANTIES

Section 11.1    Stockholder and Warrant Holder Representations and Warranties.  Each Stockholder and each Warrant Holder executing or otherwise becoming a party to this Agreement, severally and not jointly, hereby represents and warrants to the Company that as of the date of such execution or its becoming a party hereto, (a) such Stockholder or Warrant Holder is duly organized and validly existing under the laws of the jurisdiction of its organization and is in good standing thereunder, (b) such Stockholder or Warrant Holder and its signatories have the requisite power and authority to enter into, deliver and perform its obligations under this Agreement and (c) this Agreement constitutes the valid and binding obligation of such Stockholder or Warrant Holder, enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

35

## ARTICLE XII

## MISCELLANEOUS

Section 12.1    Term and Termination.

(a)     This Agreement shall terminate automatically upon consummation of a Qualified Public Offering, a Company Asset Sale or Company Stock Sale,  subject to compliance with all applicable provisions of this Agreement relating to rights of Stockholders and Warrant Holders in connection with such transaction; *provided*, *however*, that Section 7.2 (and any other provisions of this Agreement necessary to give effect to Section 7.2) shall survive any termination hereof.

(b)     [This Agreement may also be terminated in its entirety at any time by obtaining the following approvals: (i) approval by the Board of Directors pursuant to a majority vote of the Whole Board or the unanimous written consent of all Directors then in office and (ii) approval of one or more Stockholders holding, in the aggregate, shares of Common Stock representing at least [eighty-five percent (85.0%)] of the outstanding shares of Common Stock.]

(c)     Notwithstanding anything to the contrary in this Agreement, in the event of any termination of this Agreement, (i) the provisions of this Agreement shall survive to the extent necessary for any Party to enforce any right of such Party that accrued hereunder prior to or on account of such termination and (ii) Section 7.2 shall survive such termination.

Section 12.2    Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when personally delivered to the party to be notified; (b) when sent by confirmed facsimile or electronic mail to the party to be notified; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:

(i) In the case of any Stockholder, to such Stockholder at its address, electronic mail address or facsimile number set forth in the stock records of the Company; *provided*, that any Stockholder may change its address for purposes of notice hereunder at any time by giving notice of such change to the Company in the manner provided in this Section 12.2.

(ii) In the case of any Warrant Holder, to such Warrant Holder in accordance with the Warrant Agreement provisions regarding notices to "Holders" thereunder.

(iii) In the case of the Company, as follows (provided, that the Company may change its address for purposes of notice hereunder at any time by giving notice of such change to all other parties in the manner provided in this Section 12.2):

NY 78204977

> AAC ~~Holdings, Inc.~~
> ~~[INSERT]~~Parent Corporation
> 200 Powell Place
> Brentwood, Tennessee 37027
> Attn: ~~[INSERT]~~Karen Abbott, Chief Legal Officer
> E-mail: ~~[INSERT]~~kabbott@ContactAAC.com

The Company shall cause a copy of any notice or other written communication given by or on behalf of the Company to the Stockholders or Warrant Holders generally to be posted to the Data Room on the same date as such notice or other written communication is given.

Section 12.3    Deemed Execution; Effective Date.  On the Effective Date, pursuant to the paragraph 87 of the Confirmation Order and ~~[●]~~Article IV.C.3 of the Plan, the Company and each Person that, as of the Effective Date, has received or is entitled to receive a distribution of shares of Common Stock ~~on the Effective Date of~~pursuant to the Plan shall be deemed to have entered into and be parties to this Agreement, and this Agreement shall be binding on the Company and all Persons receiving Common Stock, in each case regardless of whether such Person actually executes this Agreement.  This Agreement shall take effect immediately and automatically on the Effective Date.

Section 12.4    Binding Effect; No Assignment.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto. Except as expressly provided otherwise in this Agreement, no party to this Agreement may assign any of its respective rights (including Significant Stockholder status and/or any rights resulting from such status) or delegate any of its respective obligations under this Agreement, and any attempted assignment or delegation in violation of the foregoing shall be null and void *ab initio*. Notwithstanding the foregoing, (a) any Person to whom shares of Common Stock or Warrants are Transferred in accordance with the provisions of Article X hereof will (by virtue of having executed a Joinder Agreement) have the rights and obligations of a Stockholder or Warrant Holder, as applicable, hereunder and (b) any Significant Stockholder may freely assign, by written notice to the Company, Significant Stockholder rights to any of its Affiliates that are Stockholders.

Section 12.5    Entire Agreement.  Subject to Section 12.13, this Agreement supersedes all prior discussions and agreements among any of the parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the sole entire understanding of the parties with respect to the subject matter hereof.

Section 12.6    Amendments.

(a)    This Agreement may not be amended or modified without first obtaining Majority Stockholder Approval and Whole Board Approval.  In addition, any amendment or modification to this Agreement shall, if applicable, require the following additional approvals in the circumstances set forth below:

(i)    ~~[~~Supermajority Stockholder Approval shall be required for (A) any material amendment or modification to ~~this Section 12.6(a)(i), or any provisions of~~

37

~~Section [___], Section [___], or Section [___],~~any provisions of Article III (Drag-Along Sale), Article IV (Tag-Along Sale), Article VI (Board of Directors), Article VII (Information Rights), Article IX (Related Party Transactions), Section 10.1 (Restrictions on Transfer), or Section 12.1 (Termination), or any other amendment or modification to this Agreement to the extent directly relating to any of the foregoing ~~Articles or Sections~~provisions, in each case to the extent that such amendment or modification adversely affects, in any material respect, the rights or obligations of the Stockholders generally under any of the foregoing provisions or (B) any amendment or modification to this Section 12.6(a)(i).~~]~~

(ii) any amendment or modification to the provisions of this Agreement that apply specifically to Significant Stockholders (including the definition thereof) shall require the prior written consent of all Significant Stockholders, and any amendment or modification to the provisions of this Agreement that apply specifically to Designating Stockholders and/or Designation Rights (including the definitions thereof shall require the prior written consent of all Designating Stockholders, in each case to the extent such amendment or modification would adversely affect any of the Significant Stockholders, or Designating Stockholders ~~or~~(in their capacities as such) or any Designation Rights, as the case may be;

(iii) ~~[~~any amendment or modification to ~~the~~any provisions of this Agreement that ~~apply specifically to Warrants and/or Warrant Holders (including the definitions thereof)~~materially and adversely affects the rights or obligations of the Warrant Holders generally in a manner that is materially disproportionate to the effect on the Stockholders generally, shall also require the prior written consent of ~~one or more Equity~~Warrant Holders holding~~, in the aggregate,~~ a majority of the outstanding Warrants~~, to the extent such amendment or modification would affect the rights or obligations of Warrants and/or~~ held by all Warrant Holders ~~under such provisions]~~; and

(iv) any provision of this Agreement that by its terms confers consent or approval rights on a specified number or percentage of the Stockholders (or a specified subset of the Stockholders) shall not be amended without the prior written consent of such number or percentage of the Stockholders (or subset of the Stockholders, as applicable).

(b)     Notwithstanding anything to the contrary in this Section 12.6, the Board of Directors, in its sole discretion and without the need for any Stockholder approval, may amend or modify this Agreement to correct any typographical or ministerial error as long as such amendment or modification does not have an adverse impact on the rights or obligations ~~of any~~ of the Stockholders generally.

(c)     Each Stockholder agrees to vote all of its Common Stock or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the Certificate of Incorporation or the Bylaws (i) facilitate, and do not at any time conflict with, any provision of this Agreement and (ii) permit each Stockholder to receive the benefits to which each such Stockholder is entitled under this Agreement. Each of the Parties agrees that it

38

NY 78204977

will not authorize or consent to any amendment, modification or repeal of any provision of the Certificate of Incorporation or the Bylaws that affects, in any material respect any of the provisions of this Agreement that apply specifically to Significant Stockholders (including the definition thereof) without the prior written consent of all Significant Stockholders, and any amendment or modification to the provisions of this Agreement that apply specifically to Designating Stockholders or Designation Rights shall require the prior written consent of all Designating Stockholders, in each case to the extent such amendment, modification or repeal would adversely affect the Significant Stockholders, Designating Stockholders or Designation Rights, as the case may be.

Section 12.7    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

Section 12.8    Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 12.9    Governing Law; Consent to Jurisdiction and Service of Process.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  The Company and each Stockholder hereby submits to the exclusive jurisdiction of (i) the Bankruptcy Court and (ii) the courts of the State of Delaware, and any judicial proceeding brought against the Company or any Stockholder with respect to any dispute arising out of this Agreement or any matter related hereto shall be brought only in such courts.  The Company and each Stockholder hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Company and each Stockholder hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 12.2, or in any other manner permitted by law.  THE COMPANY AND EACH STOCKHOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Section 12.10  Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, an aggrieved Person will be irreparably damaged and will not have an adequate remedy at law.  Any such Person shall, therefore, be entitled to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.  The parties hereby waive, and cause their respective representatives to waive, any requirement for the securing or posting of any bond in connection with any action brought for injunctive relief hereunder.

NY 78204977

Section 12.11 <u>Severability</u>.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

Section 12.12 <u>Conflicts</u>.  In the event that any of the terms or provisions of this Agreement conflict with any of the terms or provisions of the Certificate of Incorporation, the terms and provisions of the Certificate of Incorporation shall control.  In the event that any of the terms or provisions of this Agreement conflict with any of the terms or provisions of the Plan, the terms and provisions of this Agreement shall control.

Section 12.13 <u>Recapitalization, etc.</u>  In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of capital stock of the Company by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to Stockholders or combination of Common Stock or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the parties hereto under this Agreement.

[*Signature Page Follows*]

40

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

AAC ~~HOLDINGS,~~PARENT ~~INC.~~CORPORATION

By: _____

Name:

Title:

*[Signature Page to Stockholders Agreement of AAC ~~Holdings, Inc.~~Parent Corporation]*

NY 78204977
NY 78204977

[*Signature Page to Stockholders Agreement of AAC ~~Holdings, Inc.~~Parent Corporation*]

NY 78204977
NY 78204977

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**STOCKHOLDERS:**

[NAME OF STOCKHOLDER]_____

_____

By:    _____

        Name:
        Title:

[*Signature Page to Stockholders Agreement of AAC Holdings, Inc.Parent Corporation*]

[*Signature Page to Stockholders Agreement of AAC Holdings, Inc.Parent Corporation*]

NY 78204977

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**WARRANT HOLDERS:**

_____

By: _____
Name:
Title:

*[Signature Page to Stockholders Agreement of AAC Parent Corporation]*

NY 78204977

## SCHEDULE 6.2

## INITIAL BOARD OF DIRECTORS

| Director Name | | Designating Stockholder (if applicable) |
|---|---|---|
| [●]Sengal Selassie | | Brightwood Stockholders |
| [●]Mikhail Katz | | Brightwood Stockholders |
| [●]Jason Gart | | HG Vora Stockholders |
| [●]Loren Beck | | HG Vora Stockholders |
| [●]Mark D. Stolper | | CQS Stockholders |
| [●]Bowen S. Diehl* | | Main Street/Capital Southwest Stockholders |
| [●]Andrew McWilliams | | N/A (CEO Director) |

\* Initial Chairman of the Board

## EXHIBIT A

## Bylaws

# EXHIBIT B

## Certificate of Incorporation

NY 78204977

## EXHIBIT C

## Warrant Agreement

SSL Draft 10/11/2020

## EXHIBIT D

### Form of Joinder to Stockholders Agreement

The undersigned hereby (a) acknowledges that it has received and reviewed a complete copy of the Stockholders Agreement, dated as of December [•], 2020 (as may be amended from time to time, the "Agreement"), by and among AAC HOLDINGS, INC.PARENT CORPORATION, a Delaware corporation (the "Company"), and the stockholders of the Company party thereto and (b) agrees that, effective as of the date hereof, the undersigned (i) shall become a party to the Agreement and be subject to and fully bound by the Agreement and all of the provisions thereof that are applicable to Stockholders (and entitled to all the rights incidental thereto), as though an original party to the Agreement and (ii) shall be included within the term "Stockholder" for all purposes under the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

The undersigned hereby makes the representations and warranties set forth in Section 11.1 of the Agreement, and represents and warrants to the Company that the undersigned (a) is a Qualified Institutional Buyer or an Accredited Investor and (b) is not a Competitor.

The mailing address, e-mail address and (if applicable) facsimile number to which notices and other communications made pursuant to the Agreement, the Certificate of Incorporation or the Bylaws may be sent to the undersigned are as follows:

Mailing address:


E-mail address:
Facsimile number:


Date:                                                                                          
                                        Name:

NY 78204977

## Exhibit E

(New Warrant Agreement)

This Exhibit E contains a revised draft of the New Warrant Agreement set forth in Exhibit E to the Plan Supplement, which remains subject to ongoing review and comment by the Debtors and the Consenting Lenders. Schedule 1 below contains the revised New Warrant Agreement. Schedule 2 below contains a redline of the New Warrant Agreement showing changes made to the New Warrant Agreement filed with the Court in the Plan Supplement.

## Schedule 1

(New Warrant Agreement)

# WARRANT AGREEMENT

This WARRANT AGREEMENT dated as of December [•], 2020 (as amended, supplemented, or otherwise modified from time to time, this "Agreement") is by and between AAC Parent Corporation, a Delaware corporation (the "Company"), and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (together with its successors and permitted assigns under Section 8.9, the "Warrant Agent").  Capitalized terms used and not otherwise defined in this Agreement shall have the meanings set forth for such terms in Article I hereof.

## RECITALS:

WHEREAS, (a) on June 20, 2020, AAC Holdings, Inc., a Nevada corporation, and certain of its Subsidiaries filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), (b) on October 20, 2020, the Bankruptcy Court entered that certain *Order Confirming Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. And Its Debtor Affiliates* (as confirmed, including any amendments and supplements thereto, the "Plan") [Docket No. 695] (the Confirmation Order"), (c) on November 20, 2020, the Bankruptcy Court entered that certain *Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan* [Docket No. 765] (the "Order in Aid of the Plan") and (d) the "Effective Date" of the Plan (the "Effective Date") is expected to occur on the date of this Agreement;

WHEREAS, (a) pursuant to the Plan, the Confirmation Order and the Order in Aid of Confirmation, on the Effective Date the holders of DIP Lender Claims and Senior Lender Claims (each as defined in the Plan) received or became entitled to receive the New Warrants (as defined in the Plan), among other things, in satisfaction of such claims and (b) the Company has engaged the Warrant Agent to act on the Company's behalf in connection with the issuance, registration and exercise of the Warrants (as the "New Warrants" under the Plan of Reorganization and the Confirmation Order), and this Agreement sets forth, among other things, the terms and provisions of the Warrants and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced; and

WHEREAS, pursuant to the Plan and the Confirmation Order, the Warrants and the shares of Common Stock issuable upon the exercise thereof are being issued (or in the case of such shares will be issued) pursuant to, and in reliance on the exemption from the registration requirements of the Securities Act afforded by, section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein and in the Plan of Reorganization the parties to this Agreement agree as follows:

NY 78209447v14

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1    **Certain Definitions**.  As used herein:

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person; *provided*, *however*, that a Holder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Holder's or any of its Affiliates' being a party to this Agreement or by being a lender to or an equity holder or creditor of the Company or any of its Subsidiaries.   For purposes hereof, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time, as applicable to the Chapter 11 Cases.

"Board" means the board of directors of the Company.

"Business Day" means any day other than a day which is a Saturday, Sunday or other day on which banks in the New York City, New York are required or authorized by law to be closed.

"Common Stock" means the Common Stock, par value $0.01 per share, of the Company.

"Competitor" has the meaning given to such term in the Stockholders Agreement.

"Data Room" has the meaning set forth in Section 7.4(a).

"Date of Issuance" means December [•], 2020.

"Date of Expiration" means the date that is five (5) years after the Date of Issuance.

"Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exercise Agreement" means an exercise agreement substantially in the form of Exhibit A attached hereto.

"Exercise Price" means $0.01 per one (1) Warrant Share, which amount is subject to adjustment as set forth herein.

2

"Fair Market Value" means, with respect to a Warrant Share as of any date of determination, the fair market value of a Warrant Share as of such date, as determined by the Board in its sole discretion.

"Family Member" means, with respect to any individual, (a) any of such individual's parents, spouse, siblings, children and grandchildren or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of the individuals described in clause (a).

"GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied, as recommended by the American Institute of Certified Public Accountants.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"Holder" means a registered holder of the Warrants.

"IPO" means the first underwritten public offering of Common Stock (or of the common stock of any successor or Subsidiary of the Company the shares of which are issuable as the Warrant Shares hereunder) pursuant to an effective registration statement under the Securities Act, after the closing of which the Common Stock (or the successor or Subsidiary common stock, as applicable) is listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange.

"Joinder Agreement" means a joinder agreement to the Stockholders Agreement substantially in the form of Exhibit B attached hereto.

"Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

"Liquidity Event" means (a) an IPO or (b) the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (i) all or substantially all of the consolidated assets of the Company and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share or unit exchange, consolidation or other business combination) of at least a majority of the aggregate voting power of the Voting Securities of any direct and/or indirect Subsidiary or Subsidiaries of the Company if substantially all of the consolidated assets of the Company and its Subsidiaries are held by such Subsidiary or Subsidiaries); provided, however, that if any sale, transfer or disposition of assets is to be followed by a dissolution and liquidation of the Company

3

in connection therewith, then the Liquidity Event shall not occur until such dissolution and liquidation has been consummated, or (ii) at least a majority of the then-issued and outstanding shares of Common Stock (whether directly or indirectly or by way of any reorganization, merger, share or unit exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership), to (in either case of clause (b)(i) or clause (b)(ii)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision); provided, however, that a Liquidity Event shall not include any consolidation, merger or other business combination of the Company with or into an Affiliate of the Company for the purpose of changing the legal domicile of the Company or any other transaction for the purpose of domesticating the Company in another jurisdiction or changing the legal form of the Company.

"Permitted Liens" means Liens that are imposed (a) by the Stockholders Agreement or (b) under applicable securities laws.

"Person" means an individual, an Entity, or a Governmental Authority.

"Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Holder that is an individual.

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (a) such Person or an Affiliate thereof, (b) the same investment manager, advisor or subadvisor that controls or manages such Person or (c) an Affiliate of such investment manager, advisor or subadvisor.

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Stockholder" means a stockholder of the Company.

"Stockholders Agreement" means the Stockholders Agreement, dated as of the date hereof, by and among the Company and the other Persons from time to time party thereto as "Stockholders" and/or Warrant Holders thereunder, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time. A copy of the Stockholders Agreement, as in effect on the date hereof, is attached as Exhibit C hereto.

"Subsidiary" means any Person in which the Company, directly or indirectly through one or more subsidiaries or otherwise, beneficially owns more than fifty percent (50.0%) of either the equity interests in, or the voting control of, such Person.

"Successor Entity" means the Person formed by, resulting from or surviving any Fundamental Change or the Person with which such Fundamental Change shall have been entered into.

4

"Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Warrants (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Warrants), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Holder lends or borrows any Warrants to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers Warrants in connection with such Holder's or any of its Affiliates' financing arrangements, shall not constitute a Transfer of Warrants for purposes of this Agreement; provided, however, that any foreclosure (including the retention of Warrants in satisfaction of any obligations) on Warrants by any such broker, bank or other financial institution shall be deemed a Transfer of Warrants for purposes of this Agreement. The terms "Transferee," "Transferring," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Voting Securities" means, with respect to any Person, the equity interests of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

"Warrant Agent" has the meaning set forth in the preamble.

"Warrant Agent Office" has the meaning set forth in Section 3.2(a).

"Warrant Register" has the meaning set forth in Section 2.7.

"Warrant Share" means each share of Common Stock or, as applicable, such other capital stock, limited liability company interests, securities, property and/or assets (including cash) as shall be issuable in lieu of such share of Common Stock, upon exercise of Warrants as provided in Section 4.1(c).

"Warrants" means, collectively, the warrants issued by the Company pursuant to this Warrant Agreement and entitling the Holders thereof to purchase Warrant Shares, on the terms and subject to the conditions set forth in this Agreement.

Section 1.2    **Rules of Construction**.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Annexes, Articles, Sections, clauses, and Exhibits shall be deemed to refer to Annexes, Articles, Sections, clauses and Exhibits to, or contained in, this Agreement.

(b)    All Annexes and Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any such Annex or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

5

(c)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to "$" or "dollars" shall mean United States dollars.

(f)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(g)    The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to any particular provision of this Agreement in which such words appear unless the context otherwise requires.

(h)    Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.

## ARTICLE II
## APPOINTMENT OF WARRANT AGENT; ISSUANCE OF WARRANTS; WARRANT CERTIFICATES

Section 2.1    **Appointment of Warrant Agent**. The Company hereby appoints the Warrant Agent to act as agent for the Company with respect to the Warrants, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

Section 2.2    **Issuance of Warrants**.

(a)    Each Warrant shall initially represent the right, subject to the provisions contained in this Agreement and the applicable Warrant, to receive one Warrant Share (subject to adjustment as set forth in Section 4.1) at the Exercise Price.  Each Warrant Share shall initially consist of one share of Common Stock.

(b)    On the terms and subject to the conditions of this Agreement and the Plan of Reorganization, on the Date of Issuance, the Company shall issue the Warrants.

Section 2.3    **Form of Warrant Certificates**.

6

(a)    The Warrants shall be issued by book-entry registration on the books of the Warrant Agent and the issuance thereof shall be confirmed by statements delivered by the Warrant Agent to the Holders reflecting such book-entry registration; provided, however, that, at the request of any Holder, the Warrants held by such Holder shall be evidenced by certificates substantially in the form attached hereto as Annex A (the "Warrant Certificates" and each, a "Warrant Certificate").  The terms and provisions of the Warrant Certificates annexed as Annex A constitute, and are hereby expressly made, a part of this Agreement.  Each Warrant Certificate shall be dated the date of signature by any officer of the Company that has been authorized to execute such Warrant Certificate on behalf of the Company (each, an "Appropriate Officer").  If any Appropriate Officer who shall have signed any of the Warrant Certificates shall cease to be an Appropriate Officer before the Warrant Certificates so signed shall have been delivered by the Company, such Warrant Certificates nevertheless may be delivered as though such Appropriate Officer had not ceased to be an Appropriate Officer, and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be an Appropriate Officer to sign such Warrant Certificate, although at the date of the execution of this Agreement any such person was not such an Appropriate Officer.

(b)    The Warrant Certificates (if any) may have such insertions, letters, numbers or other marks of identification and such legends and endorsements stamped, printed, lithographed or engraved thereon as may, consistently herewith, be determined to be necessary or appropriate by the officers of the Company executing such Warrant Certificates as evidenced by their execution of the Warrant Certificates, or as may be required to comply with any applicable law.  The Warrant Certificates shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by applicable law.

(c)    A Warrant Certificate will not be valid until the Warrant Agent countersigns the Warrant Certificate, with the signature serving as conclusive evidence that the Warrant Certificate has been countersigned under this Agreement.

Section 2.4    **Legends**.

(a)    All Warrant Certificates (if any) or statements evidencing any Warrants issued in book-entry registration shall conspicuously bear, or shall be deemed to conspicuously bear (even if any such Warrant Certificate or statement does not actually bear such legend), a legend substantially to the following effect (subject to Section 2.4(c) below):

"THE WARRANTS REPRESENTED BY THIS [CERTIFICATE] [STATEMENT] HAVE BEEN, AND THE SHARES OF COMMON STOCK ISSUABLE PURSUANT TO THE EXERCISE OF THE WARRANTS WILL BE (SUCH WARRANTS AND SHARES, COLLECTIVELY, THE "SECURITIES"), ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND

7

NY 78209447v14

TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(b)     All Warrant Certificates (if any) or statements evidencing any Warrants issued in book-entry registration shall also conspicuously bear, or shall be deemed to conspicuously bear (even if any such Warrant Certificate or statement does not actually bear such legend), a legend substantially to the following effect:

"THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF DECEMBER [•], 2020 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "WARRANT AGREEMENT") BY AND BETWEEN AAC PARENT CORPORATION (THE "COMPANY") AND AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC (THE "WARRANT AGENT"). NO REGISTRATION OR TRANSFER OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WILL BE MADE ON THE BOOKS OF THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] COPIES OF THE WARRANT AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF WARRANTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(c)     In the event that any Warrants shall be sold or otherwise Transferred pursuant to an effective registration statement under the Securities Act, the Warrant Agent shall, upon the written request of the Holder of such Warrants, issue to such Holder a new Warrant

Certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Warrants without the legend required by Section 2.4(a).

(d)     Each Holder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including the restrictions on Transfer set forth in Section 2.5) for all purposes of this Agreement and applicable law (including the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any Warrant Certificate or statement of book-entry position, as applicable, representing or otherwise evidencing any Warrants owned by such Holder bears the legends set forth in Section 2.4(a) and Section 2.4(b), and whether or not any such Holder received a separate notice of such terms, provisions, restrictions and conditions.

(e)     The Warrant Shares (to the extent consisting of shares of Common Stock) issued upon exercise of any Warrants shall be issued in book-entry form on the books and records of the Company (or, as applicable, the transfer agent for the Common Stock) and shall bear the legends set forth in the Stockholders Agreement (which legends may be in the form of an electronic entry on the stock register maintained by the Company's transfer agent for the Common Stock of a notation to similar effect).

Section 2.5     **Restrictions on Transfers**.

(a)     Unless otherwise waived by the Board in its sole discretion and except for any Transfers in connection with the transactions contemplated by the Plan, the Order in Aid of the Plan and the Restructuring Steps (as defined in the Order in Aid of the Plan), no Warrants shall be Transferred by any Holder (regardless of the manner in which the Holder initially acquired such Warrants), (i) except in accordance with and pursuant to the applicable restrictions on transfer set forth in the Stockholders Agreement or (ii) if such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers or transfers of Warrants for which a notice of any thereof has been previously delivered to the Company, but not yet consummated), result in the Company having, in the aggregate, (A) 1,500 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act), or (B) 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) that are not "accredited investors" as such term is defined in Rule 501 under the Securities Act, of Warrants.

(b)     In addition to the restrictions set forth in Section 2.5(a), except for any Transfers in connection with the transactions contemplated by the Plan, the Order in Aid of the Plan and the Restructuring Steps (as defined in the Order in Aid of the Plan), no Warrants shall be Transferred by any Holder unless (i) the Warrant Certificates (if any) representing such Warrants bear legends as provided in Section 2.4, for so long as such legends are applicable, and (ii) prior to such Transfer, if requested by the Company in its sole discretion with respect to any proposed Transfer by a Holder who the Company determines is or is may be deemed an "affiliate" (within the meaning of such term under the Securities Act) of the Company or an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code, the Transferor shall have delivered to the Company a legal opinion, reasonably acceptable to the Company, stating that the registration of the Warrants that are the subject of such proposed Transfer is not required under the Securities Act.

9

(c)     Except for any Transfers in connection with the transactions contemplated by the Plan, the Order in Aid of the Plan and the Restructuring Steps (as defined in the Order in Aid of the Plan), any Holder proposing to effect a Transfer of Warrants must submit to the Company a written notice of such proposed Transfer, in accordance with the applicable provisions of the Stockholders Agreement, and all proposed Transfers shall be subject to all restrictions on Transfer of Warrants as are set forth in the Stockholders Agreement.

(d)     Upon the closing of each Transfer that is permitted by this Agreement, (i) the Transferee shall be deemed a Holder for purposes of this Agreement, (ii) the Transferee shall be entitled to the rights and subject to the obligations of a Holder under this Agreement with respect to the Transferred Warrants, and (iii) the Warrant Register shall be amended by the Warrant Agent accordingly.

(e)     The Warrant Agent shall not record upon its books any Transfer of any Warrants except in accordance with the terms and provisions of this Agreement.  Any purported Transfer of Warrants in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Company or the Warrant Agent.

(f)     If any Holder is an Entity that was formed for the primary purpose of acquiring indebtedness of, or securities in, the Company, or that has no substantial assets other than Warrants and indebtedness of, or securities (including shares of Common Stock) in, the Company, then such Holder agrees that no shares of capital stock of, or other equity interests in, such Holder may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this Section 2.5 as if such capital stock or other equity interests were Warrants; provided, that a sale, transfer or other disposition of shares of capital stock of, or other equity interests in such Holder to any Affiliate of such Holder (other than to any Affiliate of such Holder that is a portfolio company of such Holder or any of its other Affiliates) shall not be subject to this this Section 2.5.

(g)     The Company shall have the power to determine, in its sole discretion, all matters related to this Section 2.5, including matters necessary or desirable to administer or to determine compliance with this Section 2.5 and, absent manifest error, the determinations of the Company shall be final and binding on the Holders.

Section 2.6     **Surrender and Cancellation of Warrant Certificates.**  Any Warrant Certificate surrendered for registration of Transfer, exchange or exercise of the Warrants represented thereby shall be surrendered to the Warrant Agent, and all Warrant Certificates surrendered shall be promptly canceled by the Warrant Agent.  The Company will forward to the Warrant Agent any Warrant Certificates surrendered to it for exercise.  The Warrant Agent will cancel all Warrant Certificates surrendered for exercise or cancellation and dispose of them in accordance with its normal procedures.  Certification of the cancellation of all Warrant Certificates and all cancelled Warrant Certificates shall be delivered to the Company upon written request of the Company.  The Company may not issue new Warrant Certificates to replace Warrant Certificates that have been exercised (subject to Section 3.2(b)) or delivered to the Warrant Agent for cancellation.

10

Section 2.7    **Warrant Register**. The Warrants will be issued in registered form only, and the Company shall cause the Warrant Agent to maintain a register (the "Warrant Register") of the Warrants for registering the record ownership of the Warrants by the Holders.  Each Warrant shall be registered in the name of the Holder thereof or its nominee.

Section 2.8    **General Provisions Relating to Transfers**.

(a)    No Transfer of Warrants shall be effected until, and a Transferee of Warrants shall succeed to the rights of the applicable Holder with respect to the Transferred Warrants only upon, registration of the Transfer by the Warrant Agent in the Warrant Register in accordance with this Agreement.  Prior to such registration of Transfer, the Company and the Warrant Agent may deem and treat the Person in whose name the Warrants are registered upon the Warrant Register as the absolute owner thereof for all purposes (notwithstanding any notation of ownership or other writing on any Warrant Certificate made by anyone), and the Company and the Warrant Agent shall not be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or an interest in any Warrants on the part of any other Person.

(b)    When Warrants are presented to the Company or Warrant Agent with a request to register the Transfer thereof or to exchange any Warrant represented by a Warrant Certificate for new Warrant Certificates, the Company and the Warrant Agent shall register the Transfer or make the exchange as requested if the requirements of this Agreement for such Transfer or exchange are met, and shall execute any Warrant Certificates or statements of book-entry position, as applicable, necessary to reflect such Transfer or exchange.

(c)    No charge shall be made for any registration of Transfer or exchange of Warrants, but the Company shall not be required to pay any tax, expense or charge which may be payable in respect of any registration of Transfer of Warrants and any such taxes, expenses or charges shall be paid by the Holder of such Warrants and the Company shall not be required to effect any Transfer of Warrants until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

(d)    All Warrant Certificates issued upon any registration of Transfer or exchange of Warrants shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for registration of Transfer or exchange.

### ARTICLE III
### EXERCISE OF WARRANTS

Section 3.1    **Exercise Period**.  Each Warrant may be exercised by the Holder thereof at any time during the period commencing on the Date of Issuance and ending on the earlier of (a) the consummation of a Liquidity Event and (ii) 5:00 p.m. (New York City time) on the Date of Expiration (such period, the "Exercise Period").  The Warrants owned by each Holder may be exercised at any time and from time to time, in whole or in part, during the Exercise Period; provided, however, that a Warrant may only be exercised in whole and not in part.

Section 3.2    **Exercise Procedure**.

11

NY 78209447v14

(a)    Warrants shall be deemed to have been validly exercised by the Holder of such Warrants when the Warrant Agent has received at its corporate actions department or such other office designated by the Warrant Agent for such purposes (provided that notice of any such designation shall have been given by the Warrant Agent to the Company and the Holders in accordance with Section 9.7) (the "Warrant Agent Office"), all of the following items (the date on which the Warrant Agent shall have received all such items with respect to any exercise of Warrants being the "Date of Exercise", subject to Section 3.2(e)):

(i)    a completed Exercise Agreement, as described in Section 3.3 hereof, duly executed and delivered by such Holder;

(ii)    a completed Joinder Agreement, duly executed and delivered by such Holder and/or, if any of the Warrant Shares are not to be issued in the name of such Holder, duly executed and delivered by the Person to whom the Warrant Shares are to be issued (unless such Holder or Person, as applicable, is already a party to the Stockholders Agreement);

(iii)    if such Warrants are represented by a Warrant Certificate, the original Warrant Certificate representing such Warrants or an affidavit of loss and indemnity, reasonably acceptable to the Company and the Warrant Agent, if such Holder does not have possession of such Warrant Certificate at the time of exercise;

(iv)    any notices, information, instruments and documents required to be delivered to the Warrant Agent pursuant to Section 3.2(e), if applicable;

(v)    payment of all taxes, expenses or charges required to be paid by such Holder pursuant to Section 3.2(d) or Section 9.1, such payment to be made in the form of cash or in the form of a bank or certified check payable to the Warrant Agent on behalf of the Company; and

(vi)    payment of an amount equal to the product of the Exercise Price multiplied by the number of Warrant Shares being purchased upon such exercise (the "Aggregate Exercise Price"), such payment to be made in the form of cash or in the form of a bank or certified check payable to the Warrant Agent on behalf of the Company; provided, however, that a Holder may elect (the "Cashless Exercise") that the Company deduct from the number of Warrant Shares to be delivered to such Holder upon such exercise a number of Warrant Shares having a Fair Market Value, on the Business Day immediately prior to the Date of Exercise, equal to the Aggregate Exercise Price.

(b)    Certificates (if any) for the Warrant Shares purchased upon exercise of any Warrants shall be delivered by the Warrant Agent to the Holder of such Warrants as promptly as reasonably practicable after the Date of Exercise; provided, however, that if the Warrant Agent has not issued certificates representing all outstanding shares of Common Stock, the Warrant Agent shall cause to be delivered to the Holder a statement reflecting the book-entry position of the Warrant Shares purchased upon exercise of such Warrants registered on the books of the Company's transfer agent.  If less than all of the Warrants represented by a Warrant Certificate

12

are exercised by a Holder, then, unless such unexercised Warrants have expired, the Warrant Agent shall prepare and deliver to such Holder a new Warrant Certificate, of like tenor and registered in such name or names as may be directed in writing by such Holder in accordance with this Agreement, for such unexercised number of Warrants.  Any Warrant Certificate surrendered for exercise to the Company or the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Warrant Agent.

(c)    The Warrant Shares issuable upon the exercise of any of the Warrants shall be deemed to have been issued to the Holder of such Warrants, and such Holder shall be deemed for all purposes to have become the registered holder of such Warrant Shares, at the close of business on the Date of Exercise; provided, however, that in the event that a Holder is exercising any Warrants (or such Holder's Warrants are deemed to be exercised pursuant to Section 4.1(d)) in connection with, or in contemplation of, the occurrence of a Liquidity Event, the Warrant Shares shall be deemed to have been issued to such Holder, and such Holder shall be deemed for all purposes to have become the registered holder of such Warrant Shares, as of immediately prior to the consummation of such Liquidity Event.

(d)    The issue of Warrant Shares on exercise of any Warrants shall be made without charge to the Holder of such Warrants for any issue or transfer tax, transfer agent fee or other similar incidental tax or expense in respect of the issue thereof.  The Company shall not, however, be required to pay any tax, expense or charge which may be payable in respect of the issue and delivery of Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration in, or the payment of any cash or other property in respect of Warrant Shares or any Warrants to, any name other than that of the Holder of the Warrants that were exercised, and any such taxes, expenses or charges shall be paid by such Holder and the Warrant Agent shall not be required to issue or deliver any Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration (or pay any cash or other property) until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

(e)    Anything herein to the contrary notwithstanding, no Holder shall be permitted to (i) request that Warrant Shares issuable upon exercise of any Warrants be issued in the name of any Person other than such Holder unless, with respect to Warrant Shares that are shares of Common Stock, such Holder would be permitted to transfer such Warrant Shares to such Person pursuant to the Stockholders Agreement (and such Holder shall comply with the terms, provisions and procedures set forth in the Stockholders Agreement applicable to any such transfer as a condition precedent to making any such request), or (ii) request that a new Warrant Certificate be issued in the name of any Person other than such Holder unless such Holder would be permitted to transfer the Warrants represented by such Warrant Certificate to such Person pursuant to the terms hereof (and such Holder shall comply with the terms, provisions and procedures set forth herein applicable to a Transfer of Warrants as a condition precedent to making any such request).  In the event that a Holder exercising any Warrants requests that Warrant Shares that are shares of Common Stock issuable upon exercise of such Warrants be issued in the name of any Person other than such Holder or that a new Warrant Certificate be issued in the name of any Person other than such Holder, then the Date of Exercise shall occur on the later of (x) the date on which the Warrant Agent shall have received all of the items described in clauses (i)-(vi) of Section 3.2(a) and (y) the date of compliance with the terms,

13

provisions and procedures set forth in the Stockholders Agreement applicable to a transfer of shares of Common Stock and/or the terms, provisions and procedures set forth herein applicable to a Transfer of Warrants, as applicable.

(f)     The Warrant Agent shall:

(i)     examine the Exercise Agreement and all other documents delivered to it by or on behalf of the Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Agreement and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)     where an Exercise Agreement or other document appears on its face to have been improperly completed or executed or some other irregularity or deficiency in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the Holder submitting such agreement or document) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)     inform the Company of and reasonably cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Agreement or other documents received and the crediting of Warrant Shares to the respective Holders' accounts; and

(iv)     advise the Company, no later than two Business Days after receipt of the Exercise Agreement, of (A) the receipt of such Exercise Agreement, the number of Warrants exercised in accordance with the terms and conditions of this Agreement and the amount deposited, (B) the identity of the Holder that has submitted the Exercise Agreement, (C) the percentage or total to date of then-outstanding Warrants represented by such exercise and (D) such other information as the Company shall reasonably request.

Section 3.3     **Exercise Agreement**.   The Company reserves the right to reject any Exercise Agreement that is not in proper form (including if an Exercise Agreement specifies delivery of Warrant Shares and/or a new Warrant Certificate to an improper recipient) and the Company shall not incur any liability for any such rejection.  Such determination by the Company shall be final and binding on each of the Holders.  In the event an Exercise Agreement provides for any of the Warrant Shares to be issued to any Person other than the Holder of the underlying Warrant, the Exercise Agreement shall contain a representation from such Holder that such other Person is not a Competitor.  Any Holder may elect, as specified in the Exercise Agreement, to condition an exercise of Warrants upon the occurrence of a Liquidity Event, and such exercise shall be deemed revoked if such Liquidity Event does not occur.

Section 3.4     **Termination of Warrants**.   If any Warrant is not validly exercised prior to the expiration of the Exercise Period (including any deemed exercise pursuant to Section 4.1(d)), then (a) such Warrant shall (i) not be exercisable after the expiration of the Exercise Period (such right to exercise being deemed permanently and irrevocably waived following the expiration of the Exercise Period), and (ii) become permanently and irrevocably null and void at the expiration

14

of the Exercise Period and all rights hereunder and under any Warrant Certificate representing such Warrant shall cease and terminate at the expiration of the Exercise Period, and (b) the Holder of such Warrant shall not be entitled to any distribution, payment or other amount on or in respect of such Warrant.

**ARTICLE IV**
**ADJUSTMENTS**

Section 4.1    **Adjustments**.  The number of Warrant Shares issuable upon exercise of each Warrant shall be subject to adjustment from time to time as follows:

(a)    Distributions, Subdivisions or Splits.  If, at any time after the Date of Issuance, the number of shares of Common Stock outstanding is increased by a *pro rata* distribution to holders of shares of Common Stock payable in shares of Common Stock or by a subdivision or split-up of outstanding shares of Common Stock, then the number of Warrant Shares issuable upon exercise of each Warrant immediately prior to the time of such distribution, subdivision or split-up shall be increased in proportion to such increase in outstanding shares of Common Stock.  Any adjustment to the number of Warrant Shares issuable upon exercise of each Warrant described in this Section 4.1(a) shall become effective at 9:00 a.m. (New York City time) on the first Business Day following the date on which the applicable distribution, subdivision or split-up is paid or becomes effective, as applicable.

(b)    Combinations or Reverse Splits.  If, at any time after the Date of Issuance, the number of shares of Common Stock outstanding is decreased by a combination or reverse split of the outstanding shares of Common Stock into a smaller number of shares of Common Stock, then the number of Warrant Shares issuable upon exercise of each Warrant immediately prior to the time of such combination or reverse split shall be decreased in proportion to such decrease in outstanding shares of Common Stock.  Any adjustment to the number of Warrant Shares issuable upon exercise of each Warrant described in this Section 4.1(b) shall become effective at 9:00 a.m. (New York City time) on the first Business Day following the date on which the applicable combination or reverse split becomes effective.

(c)    Fundamental Change.  If (i) the Company shall consummate any transaction or series of related transactions constituting (x) any reclassification or change of the outstanding shares of Common Stock (other than a distribution, subdivision, split-up, combination or reverse split to which Section 4.1(a) or Section 4.1(b) applies), or (y) any consolidation, merger, equity exchange or combination of the Company with another Person in which, in the case of clause (x) or clause (y), the previously outstanding shares of Common Stock shall be cancelled, reclassified or converted or changed into or exchanged for other stock, limited liability company interests, securities, property and/or assets (including cash), and (ii) such transaction or series of related transactions referred to in clause (i) is not a Liquidity Event (any such transaction or series of related transactions, a "Fundamental Change"), then the Holder of each Warrant outstanding immediately prior to the occurrence of such Fundamental Change will have the right upon any subsequent exercise of a Warrant to receive the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) that such Holder would have received if such Warrant had been exercised pursuant to the terms hereof immediately prior to the consummation of such Fundamental Change (assuming such Holder failed to exercise its

15

rights of election, if any, as to the kind or amount of stock, limited liability company interests, securities, property and/or assets (including cash) receivable upon such Fundamental Change; provided, that, if the kind or amount of stock, limited liability company interests, securities, property and/or assets (including cash) receivable upon such Fundamental Change is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised (a "nonelecting share"), then for the purposes of this Section 4.1(c) the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) receivable upon such Fundamental Change for each nonelecting share shall be deemed to be the kind and amount so receivable per share by a plurality of the nonelecting shares).  Upon the consummation of each Fundamental Change, appropriate adjustment shall be deemed to be made with respect to each Holder's rights under this Agreement, including with respect to the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) thereafter acquirable upon exercise of each Warrant, such that the provisions of this Agreement shall thereafter be applicable, as nearly as possible, to any stock, limited liability company interests, securities, property and/or assets (including cash) thereafter acquirable upon exercise of each Warrant, and the Company shall provide notice of such deemed adjustment to the Warrant Agent and the Holders in accordance with Section 9.7.  The provisions of this Section 4.1(c) shall similarly apply to successive Fundamental Changes.  The Company shall not enter into or be a party to any Fundamental Change unless the Successor Entity (if any) assumes in writing all of the obligations of the Company under this Agreement in accordance with this Section 4.1(c) pursuant to written agreements, including agreements to deliver to each Holder, in exchange for such Holder's Warrants, a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to the Warrants. Any adjustment required by this Section 4.1(c) with respect to a Fundamental Change shall be made immediately after the effective date for such Fundamental Change.

(d)   Liquidity Event.

(i)   In the event of a Liquidity Event other than an IPO in which the only consideration payable to Holders of Common Stock is cash, each Warrant shall be deemed to be exercised immediately prior to the consummation of such Liquidity Event and the Holder thereof shall receive solely the cash consideration to which such Holder would have been entitled as a result of such Liquidity Event, less the Exercise Price, as though the Warrant had been exercised immediately prior thereto. Upon a Liquidity Event other than an IPO in which the consideration payable to Holders of Common Stock is other than only cash, each Warrant will be deemed to be exercised immediately prior to the consummation of such Liquidity Event and the Holder thereof shall receive the consideration to which such Holder would have been entitled as a result of such Liquidity Event, less the Exercise Price, as though the Warrant had been exercised immediately prior thereto.

(ii)   In the event of a Liquidity Event that is an IPO, each Warrant shall be deemed exercised immediately prior to the consummation of the IPO and the Holder thereof shall receive a number of Warrant Shares that such Holder would have been entitled as though each Warrant held by such Holder had been exercised pursuant to the Cashless Exercise immediately prior to the IPO.

16

(iii)      After compliance by the Company with this Section 4.1(d), each Holder (A) agrees to raise no objections with respect to the treatment provided in Section 4.1(d)(i)-(ii) with respect to a Liquidity Event (provided that such Holder shall not be deemed to have waived any applicable dissenters rights, appraisal rights or similar rights in connection with such Liquidity Event) and (B) shall, subject to any applicable dissenters rights, appraisal rights or similar rights in connection with such Liquidity Event, surrender all Warrant Certificates to the Warrant Agent, and all such Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company.

Section 4.2      **Notice of Adjustment**. Whenever the number of Warrant Shares issuable upon exercise of each Warrant is required to be adjusted pursuant to Section 4.1, the Company or the Warrant Agent, at the direction of the Company, shall deliver to each Holder a certificate setting forth (a) the number of Warrant Shares issuable upon exercise of each Warrant after such adjustment (including the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) thereafter issuable upon exercise of each Warrant), (b) a brief statement of the facts requiring such adjustment and (c) the computation by which such adjustment was made.  Such certificate shall be conclusive evidence of the correctness of such adjustment absent manifest error.  Failure to deliver such certificate shall not affect the legality or validity of any adjustment required to be made pursuant to Section 4.1.

Section 4.3      **Statement on Warrants**. The form of Warrant Certificate need not be changed because of any adjustment made pursuant to Section 4.1, and Warrant Certificates issued after such adjustment may state the same number and kind of Warrant Shares as are stated in the Warrant Certificates issued prior to such adjustment.  The Company may, however, at any time in its sole discretion (which shall be conclusive), make any change in the form of Warrant Certificate that it may deem appropriate to reflect any such adjustment and any Warrant Certificate thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form so changed.

Section 4.4      **No Fractional Warrant Shares**.  With respect to Warrant Shares that are shares of Common Stock, Holders shall only be permitted to exercise Warrants for whole Warrant Shares and the Company shall not be required to issue any fraction of a Warrant Share in connection with the exercise of any Warrants.  If more than one Warrant shall be exercised at the same time by the same Holder, the number of full Warrant Shares that shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Shares purchasable on exercise of the Warrants so exercised.  If any fraction of a share of Warrant Share constituting a share of Common Stock would, except for the provisions of this Section 4.4, be issuable on the exercise of any Warrant, in lieu of the issuance of such fractional share of a Warrant Share, the Company shall round such fraction of a share to the nearest whole number of shares (where for the avoidance of doubt, 0.5 of a share shall be rounded to one share).  No Holder shall receive payment or any other amount in respect of any fractional Warrant Share that would otherwise be issuable upon exercise of any Warrants.

Section 4.5      **No Exercise Price Adjustment**.  The Exercise Price payable upon exercise of the Warrants is not subject to adjustment in connection with the provisions of Section 4.1.

17

NY 78209447v14

Section 4.6    **Treasury Shares**.  Shares of Common Stock at any time owned by the Company or its subsidiaries shall not be deemed to be outstanding for the purposes of any computation under Section 4.1.

## ARTICLE V
## LOSS, THEFT, DESTRUCTION OR MUTILATION OF WARRANT CERTIFICATES

Section 5.1    **Loss, Theft, Destruction or Mutilation**.   If any mutilated Warrant Certificate is surrendered to the Warrant Agent or the Warrant Agent receives evidence to its reasonable satisfaction of the destruction, loss or theft of any Warrant Certificate (an affidavit of the Holder shall be satisfactory), the Company shall issue and the Warrant Agent will countersign a replacement Warrant Certificate of like tenor and representing the same number of Warrants as the mutilated, destroyed, lost or stolen Warrant Certificate.  If required by the Company or the Warrant Agent, a reasonable and customary indemnity must be furnished by the Holder that is sufficient in the reasonable, good faith judgment of the Company and the Warrant Agent to protect the Company and the Warrant Agent from any loss they may suffer if a Warrant Certificate is replaced. The Company may charge the Holder for its expenses in replacing a Warrant Certificate. Upon the issuance of any new Warrant Certificate under this Section 5.1, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the fees and expenses of the Company) in connection therewith and the Warrant Agent shall not be required to issue or deliver any new Warrant Certificate until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

## ARTICLE VI
## COVENANTS OF THE COMPANY

Section 6.1    **Authorization of Common Stock**. The Company covenants that all Warrant Shares issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free from all charges and Liens in respect of the issue thereof (other than Permitted Liens).  The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares may be so issued without violation of any applicable law.

Section 6.2    **Reservation of Warrant Shares**.  For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company covenants that it will, at all times during the Exercise Period, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, free of preemptive rights and solely for the issuance and delivery upon exercise of Warrants, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants.  The Company further covenants that it will, from time to time during the Exercise Period, take all steps necessary to increase the number of authorized shares of Common Stock if at any time the number of authorized shares of Common Stock that remain unissued would otherwise be insufficient to allow delivery of all Warrant Shares then deliverable upon the exercise in full of all outstanding Warrants.  The Company will keep a copy of this Agreement on file with the Warrant Agent.  If Warrant Shares are to be represented by stock certificates, the Warrant Agent is hereby irrevocably authorized to requisition from time to time from the Company's transfer agent for the Common Stock, stock certificates issuable upon

18

exercise of outstanding Warrants, and the Company will supply such transfer agent with duly executed stock certificates for such purpose.

Section 6.3    **Notices of Certain Events**.  In the event of:

(a)    any taking by the Company of a record of the holders of shares of Common Stock for the purpose of determining the holders thereof who are entitled to vote on any matter or are entitled to receive any distribution, or any right to subscribe for, purchase or otherwise acquire any class of securities of the Company or any other securities or property, or to receive any other right;

(b)    any vote (including by written consent) by the holders of shares of Common Stock;

(c)    any amendment or proposed amendment to this Agreement;

(d)    any dividend or distribution to holders of shares of Common Stock;

(e)    any Liquidity Event or any other capital reorganization of the Company, any reclassification or recapitalization of the shares of Common Stock or any transfer of all or substantially all of the assets of the Company to, or any consolidation or merger of the Company with or into, any other Person;

(f)    any filing of any registration statement with the SEC in respect of an IPO;

(g)    any matter or event with respect to which the holders of shares of Common Stock are entitled to receive notice; or

(h)    any voluntary or involuntary dissolution, liquidation or winding-up of the Company,

then, and in each such event, the Company will deliver a notice to each Holder specifying (i) the date on which any such record is to be taken for the purpose of such distribution or right, and stating the amount and character of such distribution or right, (ii) the date on which any such Liquidity Event or other reorganization, reclassification, recapitalization, transfer, consolidation, merger, dissolution, liquidation or winding-up is anticipated to be effective or (iii) the date on which any such registration statement is to be filed.  The Company shall use commercially reasonable efforts to provide such notice at least ten (10) days prior to the date fixed as any such record date, any such effective date or any such filing date.

## ARTICLE VII
## NO RIGHTS AS STOCKHOLDERS

Section 7.1    **No Rights as Stockholders.**

(a)    Nothing contained in this Agreement, any Warrant Certificate (if any) or any statement evidencing any Warrants issued in book-entry registration shall be construed as conferring upon any Holder (in its capacity as the holder of Warrants) the right to vote or to

19

consent or to receive notice as a Stockholder in respect of any meeting of Stockholders or for the election of directors to the Board or of any other matter, or any other rights whatsoever as a Stockholder, including (i) the right to receive dividends or distributions on Warrant Shares, or (ii) to right to share in the assets of the Company in the event of its liquidation, dissolution or winding up.

(b)    Nothing contained in this Agreement shall be construed as imposing any obligation on any Holder to purchase any securities or exercise its Warrants, or imposing any liabilities on any Holder as a Stockholder, whether such obligations or liabilities are asserted by the Company or by creditors of the Company.

(c)    By accepting and holding Warrants, each Holder is deemed to acknowledge and agree that, in its capacity as a Holder, the relationship of such Holder to the Company is strictly contractual in nature and is not the relationship of a Stockholder.  Notwithstanding anything to the contrary herein, no fiduciary or similar duties of any kind or description are owed to any Holder, in its capacity as a Holder.  In furtherance of the foregoing (and not in limitation thereof), no director or officer of the Company shall owe any duty (including any fiduciary duty) to any Holder, in its capacity as a Holder, of any kind, including in connection with any act or failure to act, whether under this Agreement, any of the Warrant Certificates or otherwise.  Each Holder hereby covenants and agrees, to the fullest extent permitted by law, that it shall not institute or seek to institute, directly or indirectly, and shall cause its Affiliates not to institute or seek to institute, in the name of or on behalf of the Company, such Holder or any other Person, any proceeding or bring any other claim arising out of, or relating to this Agreement or the Warrants against any director or officer of the Company in connection with an alleged breach of such director's or officer's duties, including fiduciary duties.

Section 7.2    **Rights of Action**.  All rights of action against the Company in respect of this Agreement are vested in the Holders, and any Holder, without the consent of the Warrant Agent or any other Holder, may, on such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

Section 7.3    **No Redemption**.  The Warrants shall not be subject to redemption by the Company or its Subsidiaries.  Notwithstanding the foregoing, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.  Any Warrants acquired by the Company or its Subsidiaries shall not be outstanding for any purpose and any Warrant Certificates acquired by the Company or its Subsidiaries shall be delivered to the Warrant Agent for cancellation.

Section 7.4    **Stockholders Agreement**.  The Warrants and all Warrant Shares issuable upon exercise of the Warrants are and shall become subject to, and have the benefit of, the Stockholders Agreement, and each Holder shall be required, for so long as such Holder holds any Warrants or any Warrant Shares, to become and remain a party to the Stockholders Agreement. In the event of any amendment or modification to any provisions of the Stockholders Agreement

20

NY 78209447v14

applicable to the Warrants and/or Holders, the Company shall give (or cause to be given ) prompt written notice of such amendment or modification to each Holder.

Section 7.5    **Information Rights; Confidentiality**.    Pursuant to the Stockholders Agreement, each Warrant Holder that is party thereto shall be entitled to the same information rights as Stockholders under the Stockholders Agreement, and shall be subject to the same confidentiality restrictions as apply to Stockholders under the Stockholders Agreement, in each case on the terms and subject to the conditions set forth in the Stockholders Agreement.

## ARTICLE VIII
## CONCERNING THE WARRANT AGENT

Section 8.1    **Warrant Agent**. The Company has appointed the Warrant Agent to act as agent for the Company with respect to the Warrants pursuant to this Agreement and the Warrant Agent has accepted such appointment.  The Warrant Agent shall have the powers and authority granted to and conferred upon it in this Agreement and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it as agreed upon in writing between the Company and the Warrant Agent.

Section 8.2    **Fees and Expenses of Warrant Agent**.  The Company agrees to pay the Warrant Agent reasonable remuneration in an amount separately agreed to between the Company and the Warrant Agent for its services as Warrant Agent hereunder and will reimburse the Warrant Agent, promptly following any demand therefor, for all reasonable and documented out-of-pocket costs and expenses that the Warrant Agent may incur in the execution of its duties hereunder.

Section 8.3    **Liability of Warrant Agent**.

(a)    Whenever, in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The Warrant Agent may rely, and be held harmless for such reliance, upon such statement for any action taken or suffered by it pursuant to the provisions of this Agreement, and shall not be held liable in connection with any delay in receiving such statement.  The Company agrees that it will perform, execute, acknowledge and deliver, or cause to be performed, executed, acknowledged and delivered, all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

(b)    The Warrant Agent shall be liable hereunder only for its own gross negligence or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The Company covenants and agrees to indemnify and to hold the Warrant Agent harmless against any out-of-pocket costs, expenses (including reasonable fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant to this Agreement.  Notwithstanding the foregoing,

21

such covenant and agreement of the Company does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of its own gross negligence or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).

(c)     The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant Certificate (except its countersignature hereof and thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Certificate; nor shall it be responsible to make any adjustments required under the provisions of Section 4.1 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it, by any act hereunder, be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any Warrant Certificate or as to whether any shares of Common Stock will, when issued, be valid and fully paid and nonassessable.

(d)     From time to time, the Company may provide the Warrant Agent with instructions concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any Appropriate Officer for instruction, and may consult with legal counsel for the Warrant Agent or the Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement.  The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken, suffered or omitted to be taken by the Warrant Agent in reliance upon any instructions by an Appropriate Officer or upon the advice or opinion of such counsel.  The Warrant Agent shall not be held to have notice of any change of authority of any person until receipt of written notice thereof from the Company.

Section 8.4     **Rights and Duties of Warrant Agent**.

(a)     The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in accordance with such opinion.

(b)     The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement (except its countersignature hereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(c)     The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any Holder with respect to any action or default by the Company, including any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(d)     The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company

22

or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not the Warrant Agent under this Agreement.  Nothing in this Agreement shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(e)    The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, absent gross negligence or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction) in the selection or continued employment or engagement thereof.

(f)    The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken or omitted to be taken by it in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as the Warrant Agent hereunder.

(g)    The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)    The Warrant Agent shall not be liable or responsible for any failure of the Company to comply with any of its obligations relating to any registration statement filed with the SEC or this Agreement, including obligations under applicable regulation or law.

(i)    The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrant Certificates authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the exercise of the Warrants.

(j)    The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act in accordance with (i) any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person; or (ii) any applicable law, act, regulation or any interpretation of the same.

(k)    In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in

23

NY 78209447v14

any way to the Company, any Holder or any other Person for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of the Warrant Agent.

(l)     In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Warrant Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 8.5     **Acceptance of Agency**.  The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the Holders.  The Warrant Agent hereby accepts the agency established by this Agreement and agrees to perform the same upon the terms and conditions set forth in this Agreement.

Section 8.6     **Limitation of Liability**.  Notwithstanding anything contained in this Agreement to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to the Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought.  Neither party to this Agreement shall be liable for any consequential, indirect, special, punitive or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility or likelihood of such damages.

Section 8.7     **Survival**.  The provisions of this Article VIII shall survive the termination of this Agreement and the resignation, removal or replacement of the Warrant Agent.

Section 8.8     **Further Assurances**.  Each of the Company and the Warrant Agent agrees to perform, execute, acknowledge and deliver, or cause to be performed, executed, acknowledged and delivered, all such further and other acts, instruments and assurances as may be required for the carrying out or performing of the provisions of this Agreement.

Section 8.9     **Resignation and Appointment of Successor**.

(a)     The Company agrees, for the benefit of the Holders from time to time, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

24

(b)     The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective.  Notwithstanding the foregoing, such date shall be not less than 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice.  Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent.  Subject to 30 days' written notice, the Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.  Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon (and shall not become effective prior to such time) acceptance of such appointment by the successor Warrant Agent as provided in Section 8.9(d)Section 1.01(b).  In the event a successor Warrant Agent has not been appointed and accepted its duties within 30 days of the Warrant Agent's notice of resignation, the Warrant Agent and/or any Holder may apply at the expense of the Company to any court of competent jurisdiction for the appointment of a successor Warrant Agent (qualified as aforesaid).  Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and all other amounts due hereunder.

(c)     The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be the Warrant Agent hereunder.

(d)     Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and, upon the payment of all outstanding fees to the predecessor Warrant Agent, such predecessor shall thereupon become obligated to Transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

25

(e)     Any Person into which the Warrant Agent hereunder may be merged or converted or any Person with which the Warrant Agent may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person to which the Warrant Agent shall sell or otherwise Transfer all or substantially all the assets and business of the Warrant Agent, <u>provided</u> that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any instrument or other document or any further act on the part of any of the parties to this Agreement.

**ARTICLE IX**
**MISCELLANEOUS**

Section 9.1     **Withholding and Reporting Requirements**.  The Company shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Authority, and all distributions, exercises or other situations requiring withholding under applicable law, including deemed distributions, with respect to the Warrants will be subject to applicable withholding and reporting requirements.   Notwithstanding any provision to the contrary, the Company will be authorized to (a) take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made with respect to the Warrants to pay applicable withholding taxes, (c) liquidate a portion of any non-cash distribution to be made with respect to the Warrants to generate sufficient funds to pay applicable withholding taxes, (d) require reimbursement from any Holder to the extent any withholding is required in excess of, or in the absence of, any distribution or (e) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) that are necessary to comply with this <u>Section 9.1</u>.

Section 9.2     **Entire Agreement**.  This Agreement (including the exhibits and annexes to this Agreement) contains the entire understanding between the Company and the Warrant Agent with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement between the Company and the Warrant Agent.

Section 9.3     **Counterparts**.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.4     **Severability**.  In the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

26

NY 78209447v14

Section 9.5    **Successors and Assigns**.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and the Holders, and the respective legal representatives, heirs, administrators, executors, successors and permitted assigns of the parties hereto and the Holders.

Section 9.6    **Notices and Demands to the Company**.  If the Warrant Agent shall receive any notice or demand addressed to the Company by a Holder, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 9.7    **Notices**.  All notices, requests, waivers, document deliveries and other communications given, sent, provided, delivered or received pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("e-mail") to the party to be notified upon written acknowledgement of receipt by such party, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows: (i) in the case of any Holder, to such Holder at its address or e-mail address set forth in the Warrant Register, (ii) in the case of the Company, to the Company at 200 Powell Place, Brentwood, TN 37027; Attention: Karen Abbott, Chief Legal Officer (kabbott@ContactAAC.com) (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement) and (iii) in the case of the Warrant Agent, to the Warrant Agent at 48 Wall Street, 22nd Floor; New York, New York 10005, Attention: Legal Department (legalteamAST@astfinancial.com).  A party may change its address or e-mail address for purposes of notice hereunder by (x) in the case of the Company, giving notice of such change to the Holders and the Warrant Agent in the manner provided in this Section 9.7, (y) in the case of any Holder, giving notice of such change to the Company and the Warrant Agent in the manner provided in this Section 9.7, and (z) in the case of the Warrant Agent, giving notice of such change to the Company and the Holders in the manner provided in this Section 9.7.

Section 9.8    **Headings**.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 9.9    **Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial**.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE.  EACH OF THE COMPANY, THE WARRANT AGENT AND EACH HOLDER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR ANY HOLDER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT**

27

**ONLY IN SUCH COURTS. EACH OF THE COMPANY, THE HOLDERS AND THE WARRANT AGENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION ANY OF THEM MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE COMPANY, THE HOLDERS AND THE WARRANT AGENT HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN <u>SECTION 9.7</u>, OR IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE COMPANY, THE HOLDERS AND THE WARRANT AGENT HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.**

Section 9.10   **No Third Party Beneficiaries**.   The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and the Holders, and the legal representatives, heirs, administrators, executors, successors and permitted assigns of each party hereto and the Holders, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than the Holders.

Section 9.11   **Binding Effect on Holders**.  By its acceptance of any Warrant, each Holder acknowledges the terms of this Agreement and agrees to be bound hereby.

Section 9.12   **Inspection of Warrant Agreement**.  A copy of this Agreement shall be available at all reasonable times for inspection by any Holder at the office of the Warrant Agent designated for such purposes.  The Warrant Agent may require any Holder to submit evidence of ownership of a Warrant for inspection by it of this Agreement.

Section 9.13   **Injunctive Relief**.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such non-breaching party shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity.  Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

Section 9.14   **Amendments**.  Any term, condition or provision of this Agreement may be amended, modified or waived from time to time if, and only if, such amendment, modification or waiver is in writing and signed, (a) in the case of an amendment or modification, by the Company

28

NY 78209447v14

and the Warrant Agent with the consent of Holders of a majority of the Warrants issued and outstanding at the time of such amendment or modification, or (b) in the case of a waiver, by the party against whom the waiver is to be effective.  The consent of each Holder of Warrants affected shall be required for any amendment or modification (i) of this Section 9.14, (ii) pursuant to which the Exercise Price would be increased (other than pursuant to adjustments provided in this Agreement), (iii) pursuant to which the Date of Expiration would be changed to an earlier date and (iv) pursuant to which the number of Warrant Shares issuable upon exercise of Warrants would be decreased (other than pursuant to adjustments provided in this Agreement).

Section 9.15    **Termination**.  This Agreement shall terminate at the expiration of the Exercise Period.  Notwithstanding the foregoing, this Agreement will terminate on any earlier date when all Warrants have been exercised.

* * * * *

29

NY 78209447v14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

AAC PARENT CORPORATION

By: _____
      Name:
      Title:

[Signature Page to Warrant Agreement]

NY 78209447v14

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC

By: _____
    Name:
    Title:

[Signature Page to Warrant Agreement]

<u>**ANNEX A**</u>

**FORM OF WARRANT CERTIFICATE**

**AAC PARENT CORPORATION**

[Face of Warrant Certificate]

No.____

[_____] Warrants

**WARRANTS TO PURCHASE CLASS A VOTING COMMON STOCK**

THE WARRANTS REPRESENTED BY THIS CERTIFICATE HAVE BEEN, AND THE SHARES OF COMMON STOCK ISSUABLE PURSUANT TO THE EXERCISE OF THE WARRANTS WILL BE (SUCH WARRANTS AND SHARES, COLLECTIVELY, THE "<u>SECURITIES</u>"), ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS CERTIFICATEARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF DECEMBER [•], 2020 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "<u>WARRANT AGREEMENT</u>") BY AND BETWEEN AAC PARENT CORPORATION (THE "<u>COMPANY</u>") AND AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC (THE "<u>WARRANT AGENT</u>").    NO REGISTRATION OR TRANSFER OF THE

Anx. A-1

WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS CERTIFICATE WILL BE MADE ON THE BOOKS OF THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.  THE COMPANY OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS CERTIFICATE COPIES OF THE WARRANT AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF WARRANTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

This certifies that [●], or its registered assigns (collectively, the "Registered Holder"), is the registered owner of the number of Warrants set forth above, each of which represents the right to purchase, during the Exercise Period (as defined in the Warrant Agreement (as defined below)), from AAC Parent Corporation, a Delaware corporation (the "Company"), one share of Common Stock of the Company (a "Warrant Share") (subject to adjustment as provided in the Warrant Agreement) at the purchase price (the "Exercise Price") of $0.01 per one Warrant Share (subject to adjustment as provided in the Warrant Agreement), subject to surrender of this Warrant Certificate, payment of the Exercise Price in accordance with the Warrant Agreement and the satisfaction of the other conditions set forth the Warrant Agreement for a valid exercise of the Warrants.  The number of Warrant Shares issuable upon exercise of the Warrants represented by this Warrant Certificate are subject to adjustment upon the occurrence of certain events set forth in the Warrant Agreement.  This Warrant Certificate may be exercised as to all or any whole number of the Warrants represented hereby.

This Warrant Certificate is issued under and pursuant to a Warrant Agreement, dated as of December [●], 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Warrant Agreement"), by and between the Company and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (together with its successors and permitted assigns under Section 8.9 of the Warrant Agreement, the "Warrant Agent").  The Warrant Agreement is hereby incorporated herein by reference and made a part hereof.  Reference is hereby made to the Warrant Agreement for a full description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Company, the Holders and the Warrant Agent.  The summary of the terms of the Warrant Agreement contained in this Warrant Certificate is qualified in its entirety by express reference to the Warrant Agreement.  All capitalized terms used in this Warrant Certificate and not defined herein shall have the meanings assigned to them in the Warrant Agreement.

If any Warrant represented by this Warrant Certificate is not validly exercised prior to the expiration of the Exercise Period (including any deemed exercise pursuant to Section 4.1(d) of the Warrant Agreement), then (a) such Warrant shall (i) not be exercisable after the expiration of the Exercise Period (such right to exercise being deemed permanently and irrevocably waived following the expiration of the Exercise Period), and (ii) become permanently and irrevocably null and void at the expiration of the Exercise Period and all rights under the Warrant Agreement and hereunder shall cease and terminate at the expiration of the Exercise Period, and (b) the Registered

Anx. A-2

Holder shall not be entitled to any distribution, payment or other amount on or in respect of such Warrant.

Copies of the Warrant Agreement are on file at the office of the Warrant Agent and may be obtained by writing to the Warrant Agent at the following address:

> American Stock Transfer & Trust Company, LLC
> 48 Wall Street, 22nd Floor
> New York, New York 10005
> Attention: Legal Department
> Email: legalteamAST@astfinancial.com

The Warrants represented by this Warrant Certificate are not Transferable except in accordance with the terms of the Warrant Agreement.  Any purported Transfer of the Warrants represented by this Warrant Certificate in violation of the terms and provisions of the Warrant Agreement shall be void *ab initio* and shall not be recognized by the Company.

The issue of Warrant Shares on exercise of any Warrants represented by this Warrant Certificate shall be made without charge to the Registered Holder for any issue or transfer tax, transfer agent fee or other similar incidental tax or expense in respect of the issue thereof.  The Company shall not, however, be required to pay any tax, expense or charge which may be payable in respect of the issue and delivery of Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration in, or the payment of any cash or other property in respect of Warrant Shares or any Warrants to, any name other than that of the Registered Holder, and any such taxes, expenses or charges shall be paid by the Registered Holder and the Warrant Agent shall not be required to issue or deliver any Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration (or pay any cash or other property) until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

The Registered Holder shall only be permitted to exercise Warrants represented by this Warrant Certificate for whole Warrant Shares and the Company shall not be required to issue any fraction of a Warrant Share in connection with the exercise of any Warrants represented by this Warrant Certificate, any such fraction of a Warrant Share being deemed forfeited.  If more than one Warrant represented by this Warrant Certificate shall be exercised at the same time by the Registered Holder, the number of full Warrant Shares that shall be issuable upon the exercise hereof shall be computed on the basis of the aggregate number of Warrant Shares purchasable on exercise of the Warrants so exercised.  If any fraction of a share of Warrant Share constituting a share of Common Stock would be issuable on the exercise of any Warrant, in lieu of the issuance of such fractional share of a Warrant Share, the Company shall round such fraction of a share to the nearest whole number of shares (where for the avoidance of doubt, 0.5 of a share shall be rounded to one share). The Registered Holder shall not receive payment or any other amount in respect of any fractional Warrant Share that would otherwise be issuable upon exercise of any Warrants represented by this Warrant Certificate.

No Transfer of Warrants represented by this Warrant Certificate shall be effected until, and a Transferee of Warrants represented by this Warrant Certificate shall succeed to the rights of the

Anx. A-3

Registered Holder with respect to the Transferred Warrants only upon, registration of the Transfer by the Warrant Agent on the Warrant Register in accordance with the Warrant Agreement.  Prior to such registration of Transfer, the Company and the Warrant Agent may deem and treat the Person in whose name this Warrant Certificate is registered as the absolute owner hereof for all purposes (notwithstanding any notation of ownership or other writing hereon made by anyone), and the Company and the Warrant Agent shall not be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or an interest in any Warrants represented by this Warrant Certificate on the part of any other Person.

AAC PARENT CORPORATION

By: _____

Name:
Title:

Dated: _____

NY 78209447v14

Countersigned:

AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC, as Warrant
Agent

By: _____
       Authorized Signatory

Dated: _____

Anx. A-5

NY 78209447v14

**EXHIBIT A**

**EXERCISE AGREEMENT**
**(TO BE EXECUTED ONLY UPON EXERCISE OF WARRANTS)**

To:     [●]

Dated:

Reference is hereby made to the Warrant Agreement, dated as of December [•], 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Warrant Agreement"), by and between AAC Parent Corporation (the "Company") and American Stock Transfer & Trust Company, LLC (together with its successors and permitted assigns under Section 8.9 of the Warrant Agreement, the "Warrant Agent").  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Warrant Agreement.

The undersigned, pursuant to the provisions set forth in [the attached Warrant Certificate (Certificate No. _) and] the Warrant Agreement, hereby irrevocably elects [(subject to the penultimate paragraph of this Exercise Agreement)] to exercise Warrants registered in the name of the undersigned [and represented by the attached Warrant Certificate] to subscribe for the purchase of _____ Warrant Shares and (check one):

☐     herewith tenders payment of the Aggregate Exercise Price for such Warrant Shares by bank or certified check payable to the Warrant Agent on behalf of the Company in the amount of $_____; or

☐     hereby agrees that it is electing a Cashless Exercise by requesting that the Company deduct from the number of Warrant Shares to be delivered to the undersigned upon such exercise a number of Warrant Shares having a Fair Market Value, on the Business Day immediately prior to the date of such exercise, equal to the Aggregate Exercise Price.

The undersigned hereby requests that the Warrant Shares issuable upon exercise of the Warrants, as specified above, be issued in such names set forth below; provided, however, that the undersigned acknowledges and agrees that no such Warrant Shares shall be delivered to, or for the account of, any Person to whom the undersigned would not have been permitted to sell or otherwise transfer shares of Common Stock pursuant to the Stockholders Agreement.

[The undersigned is exercising Warrants pursuant to this Exercise Agreement in connection with, or in contemplation of, the occurrence of the following Liquidity Event:  [Describe Liquidity Event].  The undersigned hereby elects to condition such exercise upon the occurrence of such Liquidity Event and such exercise shall be deemed revoked if such Liquidity Event does not occur.]

The undersigned hereby represents and warrants to the Company and the Warrant Agent that, as of the date of this Exercise Agreement, if applicable, each Person other than the undersigned named below to whom any of the Warrant Shares are issuable upon exercise of the Warrants pursuant to this Exercise Agreement are to be issued is not a Competitor.

NY 78209447v14

Ex. A-2

|  | Signature | |
| --- | --- | --- |
|  | Name | |
|  | Address | |
|  | | |

Warrant Shares to be issued in the name(s) of: [_____]

Ex. A-2

NY 78209447v14

**EXHIBIT B**

**STOCKHOLDER JOINDER AGREEMENT**
**(TO BE EXECUTED UPON EXERCISE OF WARRANTS)**

The undersigned hereby (a) acknowledges that it has received and reviewed a complete copy of the Stockholders Agreement, dated as of December [•], 2020 (as may be amended from time to time, the "Agreement"), by and among AAC Parent Corporation, a Delaware corporation (the "Company"), and the stockholders of the Company party thereto and (b) agrees that, effective as of the date hereof, the undersigned (i) shall become a party to the Agreement and be subject to and fully bound by the Agreement and all of the provisions thereof that are applicable to Stockholders (and entitled to all the rights incidental thereto), as though an original party to the Agreement and (ii) shall be included within the term "Stockholder" for all purposes under the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

The undersigned hereby makes the representations and warranties set forth in Section 11.1 of the Agreement, and represents and warrants to the Company that the undersigned [(a)] is a Qualified Institutional Buyer or an Accredited Investor and (b) is not a Competitor.

The mailing address, e-mail address and (if applicable) facsimile number to which notices and other communications made pursuant to the Agreement, the Certificate of Incorporation or the Bylaws may be sent to the undersigned are as follows:

Mailing address:


E-mail address:
Facsimile number:


Date:                                     _____
                                          Name:

Ex. B-1

NY 78209447v14

**EXHIBIT C**

**STOCKHOLDERS AGREEMENT**

(See Attached)

NY 78209447v14

Schedule 2

(Redline of New Warrant Agreement)

DRAFT—SUBJECT TO FURTHER REVISION

## WARRANT AGREEMENT

This WARRANT AGREEMENT dated as of [●December [•]], 2020 (as amended, supplemented, or otherwise modified from time to time, this "Agreement") is by and between AAC Holdings, Inc.Parent Corporation, a Delaware corporation (the "Company"), and [●], a [●]American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (together with its successors and permitted assigns under Section 8.9, the "Warrant Agent"). Capitalized terms used and not otherwise defined in this Agreement shall have the meanings set forth for such terms in Article I hereof.

### RECITALS:

WHEREAS, (a) on June 20, 2020, the CompanyAAC Holdings, Inc., a Nevada corporation, and certain of its Subsidiaries filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), (b) on [●],October 20, 2020, the Bankruptcy Court entered an order [Docket No. [●]] (the Confirmation Order") confirming the [that certain *Order Confirming Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. andAnd Its Debtor Affiliates]* (as confirmed, including any amendments and supplements thereto, the "Plan") [Docket No. 695] (the Confirmation Order"), and (c) on November 20, 2020, the Bankruptcy Court entered that certain *Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan* [Docket No. 765] (the "Order in Aid of the Plan") and (d) the "Effective Date" of the Plan (the "Effective Date") is occurringexpected to occur on the date of this Agreement;

WHEREAS, (a) pursuant to the Plan and, the Confirmation Order and the Order in Aid of Confirmation, on the Effective Date the holders of DIP Lender Claims and Senior Lender Claims (each as defined in the Plan) received or became entitled to receive the New Warrants (as defined in the Plan), among other things, in satisfaction of such claims and (b) the Company has engaged the Warrant Agent to act on the Company's behalf in connection with the issuance, registration and exercise of the Warrants (as the "New Warrants" under the Plan of Reorganization and the Confirmation Order), and this Agreement sets forth, among other things, the terms and provisions of the Warrants and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced; and

WHEREAS, pursuant to the Plan and the Confirmation Order, the Warrants and the shares of Common Stock issuable upon the exercise thereof are being issued (or in the case of such shares will be issued) pursuant to, and in reliance on the exemption from the registration requirements of the Securities Act afforded by, section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein and in the Plan of Reorganization the parties to this Agreement agree as follows:

DRAFT—SUBJECT TO FURTHER REVISION

# ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1   **Certain Definitions**.  As used herein:[1]

"Affiliate" means, with respect to any Person, any other Person that (either directly, or indirectly) through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified Person, and shall also include (a) any Related Fund of such Person, and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person; *provided*, *however*, that a Holder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Holder's or any of its Affiliates' being a party to this Agreement or by being a lender to or an equity holder or creditor of such other Person.  Thethe Company or any of its Subsidiaries.  For purposes hereof, the term "control" (including, with its correlative meanings, the terms "controlling,", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, (whether through the ownership of voting securities, by contract, or otherwise).

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time, as applicable to the Chapter 11 Cases.

"Board" means the board of directors of the Company.

"Business Day" means any day other than a day which is a Saturday, Sunday or other day on which banks in the New York City, New York are required or authorized by law to be closed.

"Common Stock" means the Common Stock, par value $0.01 per share, of the Company.

"Competitor" has the meaning given to such term in the Stockholders Agreement.

"Data Room" has the meaning set forth in Section 7.4(a).

"Date of Issuance" means [●December [•], 2020.[2]

"Date of Expiration" means the date that is five (5) years after the Date of Issuance.

"Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exercise Agreement" means an exercise agreement substantially in the form of Exhibit A attached hereto.

---

[1] Note to Draft: Definitions set forth in this Section 1.1 to be conformed, as necessary, to corresponding definitions in the execution version of the Stockholders Agreement.

[2] Note to Draft:  Will be the same date as the Effective Date.

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

"Exercise Price" means $0.01 per one (1) Warrant Share, which amount is subject to adjustment as set forth herein.

"Fair Market Value" means, with respect to a Warrant Share as of any date of determination, the fair market value of a Warrant Share as of such date, as determined by the Board in its sole discretion.

"Family Member" means, with respect to any individual, (a) any of such individual's parents, spouse, siblings, children and grandchildren or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of the individuals described in clause (a).

"GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied, as recommended by the American Institute of Certified Public Accountants.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"Holder" means a registered holder of the Warrants.

"IPO" means the first underwritten public offering of Common Stock (or of the common stock of any successor or Subsidiary of the Company the shares of which are issuable as the Warrant Shares hereunder) pursuant to an effective registration statement under the Securities Act, after the closing of which the Common Stock (or the successor or Subsidiary common stock, as applicable) is listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange.

"Joinder Agreement" means a joinder agreement to the Stockholders Agreement substantially in the form of Exhibit B attached hereto.

"Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

"Liquidity Event" means (a) an IPO or (b) the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (i) all or substantially all of the consolidated assets of the Company and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share or unit exchange, consolidation or other business combination) of at least a majority of the aggregate voting power of the Voting Securities of any direct and/or indirect Subsidiary or Subsidiaries of the Company if substantially all of the consolidated assets of the

3

DRAFT – SUBJECT TO FURTHER REVISION

Company and its Subsidiaries are held by such Subsidiary or Subsidiaries); provided, however, that if any sale, transfer or disposition of assets is to be followed by a dissolution and liquidation of the Company in connection therewith, then the Liquidity Event shall not occur until such dissolution and liquidation has been consummated, or (ii) at least a majority of the then-issued and outstanding shares of Common Stock (whether directly or indirectly or by way of any reorganization, merger, share or unit exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership), to (in either case of clause (b)(i) or clause (b)(ii)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision); provided, however, that a Liquidity Event shall not include any consolidation, merger or other business combination of the Company with or into an Affiliate of the Company for the purpose of changing the legal domicile of the Company or any other transaction for the purpose of domesticating the Company in another jurisdiction or changing the legal form of the Company.

"MD&A" has the meaning set forth in Section 7.2(b).

"Permitted Liens" means Liens that are imposed (a) by the Stockholders Agreement or (b) under applicable securities laws.

"Person" means an individual, an Entity, or a Governmental Authority.

"Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Holder that is an individual.

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (a) such Person or an Affiliate thereof, (b) the same investment manager, advisor or subadvisor that controls or manages such Person or (c) an Affiliate of such investment manager, advisor or subadvisor.

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Stockholder" means a stockholder of the Company.

"Stockholders Agreement" means the Stockholders Agreement, dated as of the date hereof, by and among the Company and the other Persons from time to time party thereto as "Stockholders" and/or Warrant Holders thereunder, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.  A copy of the Stockholders Agreement, as in effect on the date hereof, is attached as Exhibit C hereto.

4

DRAFT—SUBJECT TO FURTHER REVISION

"Subsidiary" means any Person in which the Company, directly or indirectly through one or more subsidiaries or otherwise, beneficially owns more than fifty percent (50.0%) of either the equity interests in, or the voting control of, such Person.

"Successor Entity" means the Person formed by, resulting from or surviving any Fundamental Change or the Person with which such Fundamental Change shall have been entered into.

"Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Warrants (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Warrants), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Holder lends or borrows any Warrants to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers Warrants in connection with such Holder's or any of its Affiliates' financing arrangements, shall not constitute a Transfer of Warrants for purposes of this Agreement; provided, however, that any foreclosure (including the retention of Warrants in satisfaction of any obligations) on Warrants by any such broker, bank or other financial institution shall be deemed a Transfer of Warrants for purposes of this Agreement.   The terms "Transferee," "Transferring," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Voting Securities" means, with respect to any Person, the equity interests of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

"Warrant Agent" has the meaning set forth in the preamble.

"Warrant Agent Office" has the meaning set forth in Section 3.2(a).

"Warrant Register" has the meaning set forth in Section 2.7.

"Warrant Share" means each share of Common Stock or, as applicable, such other capital stock, limited liability company interests, securities, property and/or assets (including cash) as shall be issuable in lieu of such share of Common Stock, upon exercise of Warrants as provided in Section 4.1(c).

"Warrants" means, collectively, the warrants issued by the Company pursuant to this Warrant Agreement and entitling the Holders thereof to purchase Warrant Shares, on the terms and subject to the conditions set forth in this Agreement.

Section 1.2   **Rules of Construction**.   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

5

DRAFT—SUBJECT TO FURTHER REVISION

(a)    All references in this Agreement to Annexes, Articles, Sections, clauses, and Exhibits shall be deemed to refer to Annexes, Articles, Sections, clauses and Exhibits to, or contained in, this Agreement.

(b)    All Annexes and Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any such Annex or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to "$" or "dollars" shall mean United States dollars.

(f)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(g)    The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to any particular provision of this Agreement in which such words appear unless the context otherwise requires.

(h)    Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.

## ARTICLE II
## APPOINTMENT OF WARRANT AGENT; ISSUANCE OF WARRANTS; WARRANT CERTIFICATES

Section 2.1    **Appointment of Warrant Agent**. The Company hereby appoints the Warrant Agent to act as agent for the Company with respect to the Warrants, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

Section 2.2    **Issuance of Warrants**.

(a)    Each Warrant shall initially represent the right, subject to the provisions contained in this Agreement and the applicable Warrant, to receive one Warrant Share (subject

6

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

to adjustment as set forth in <u>Section 4.1</u>) at the Exercise Price.  Each Warrant Share shall initially consist of one share of Common Stock.

(b)    On the terms and subject to the conditions of this Agreement and the Plan of Reorganization, on the Date of Issuance, the Company shall issue the Warrants.

Section 2.3    **Form of Warrant Certificates**.

(a)    The Warrants shall be issued by book-entry registration on the books of the Warrant Agent and the issuance thereof shall be confirmed by statements delivered by the Warrant Agent to the Holders reflecting such book-entry registration; <u>provided</u>, <u>however</u>, that, at the request of any Holder, the Warrants held by such Holder shall be evidenced by certificates substantially in the form attached hereto as <u>Annex A</u> (the "<u>Warrant Certificates</u>" and each, a "<u>Warrant Certificate</u>").  The terms and provisions of the Warrant Certificates annexed as <u>Annex A</u> constitute, and are hereby expressly made, a part of this Agreement.  Each Warrant Certificate shall be dated the date of signature by any officer of the Company that has been authorized to execute such Warrant Certificate on behalf of the Company (each, an "<u>Appropriate Officer</u>").  If any Appropriate Officer who shall have signed any of the Warrant Certificates shall cease to be an Appropriate Officer before the Warrant Certificates so signed shall have been delivered by the Company, such Warrant Certificates nevertheless may be delivered as though such Appropriate Officer had not ceased to be an Appropriate Officer, and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be an Appropriate Officer to sign such Warrant Certificate, although at the date of the execution of this Agreement any such person was not such an Appropriate Officer.

(b)    The Warrant Certificates (if any) may have such insertions, letters, numbers or other marks of identification and such legends and endorsements stamped, printed, lithographed or engraved thereon as may, consistently herewith, be determined to be necessary or appropriate by the officers of the Company executing such Warrant Certificates as evidenced by their execution of the Warrant Certificates, or as may be required to comply with any applicable law.  The Warrant Certificates shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by applicable law.

(c)    A Warrant Certificate will not be valid until the Warrant Agent countersigns the Warrant Certificate, with the signature serving as conclusive evidence that the Warrant Certificate has been countersigned under this Agreement.

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

Section 2.4    **Legends**.

(a)    All Warrant Certificates (if any) or statements evidencing any Warrants issued in book-entry registration shall conspicuously bear, or shall be deemed to conspicuously bear (even if any such Warrant Certificate or statement does not actually bear such legend), a legend substantially to the following effect (subject to Section 2.4(c) below):

"THE WARRANTS REPRESENTED BY THIS [CERTIFICATE] [STATEMENT] HAVE BEEN, AND THE SHARES OF COMMON STOCK ISSUABLE PURSUANT TO THE EXERCISE OF THE WARRANTS WILL BE (SUCH WARRANTS AND SHARES, COLLECTIVELY, THE "SECURITIES"), ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. [THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF [●DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.]³"

(b)    All Warrant Certificates (if any) or statements evidencing any Warrants issued in book-entry registration shall also conspicuously bear, or shall be deemed to conspicuously bear (even if any such Warrant Certificate or statement does not actually bear such legend), a legend substantially to the following effect:

"THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [●DECEMBER [•], 2020 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "WARRANT AGREEMENT") BY AND BETWEEN AAC HOLDINGS, INC.PARENT

---

³ Note to Draft: To be included if the Holders will be required to sign the Stockholders Agreement.

8

DRAFT—SUBJECT TO FURTHER REVISION

CORPORATION (THE "COMPANY") AND [●]AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC (THE "WARRANT AGENT"). NO REGISTRATION OR TRANSFER OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WILL BE MADE ON THE BOOKS OF THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] COPIES OF THE WARRANT AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF WARRANTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(c)    In the event that any Warrants shall be sold or otherwise Transferred pursuant to an effective registration statement under the Securities Act, the Warrant Agent shall, upon the written request of the Holder of such Warrants, issue to such Holder a new Warrant Certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Warrants without the legend required by Section 2.4(a).

(d)    Each Holder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including the restrictions on Transfer set forth in Section 2.5) for all purposes of this Agreement and applicable law (including the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any Warrant Certificate or statement of book-entry position, as applicable, representing or otherwise evidencing any Warrants owned by such Holder bears the legends set forth in Section 2.4(a) and Section 2.4(b), and whether or not any such Holder received a separate notice of such terms, provisions, restrictions and conditions.

(e)    The Warrant Shares (to the extent consisting of shares of Common Stock) issued upon exercise of any Warrants shall be issued in book-entry form on the books and records of the Company (or, as applicable, the transfer agent for the Common Stock) and shall bear the legends set forth in the Stockholders Agreement (which legends may be in the form of an electronic entry on the stock register maintained by the Company's transfer agent for the Common Stock of a notation to similar effect).

Section 2.5    **Restrictions on Transfers**.

(a)    Unless otherwise waived by the Board in its sole discretion and except for any Transfers in connection with the transactions contemplated by the Plan, the Order in Aid of the Plan and the Restructuring Steps (as defined in the Order in Aid of the Plan), no Warrants shall be Transferred by any Holder (regardless of the manner in which the Holder initially acquired such Warrants), (i) except in accordance with and pursuant to the applicable restrictions on transfer set forth in the Stockholders Agreement or (ii) if such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers or transfers of Warrants for which a notice of any thereof has been previously delivered to the

9

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

Company, but not yet consummated), result in the Company having, in the aggregate, (A) 1,500 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act), or (B) 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) that are not "accredited investors" as such term is defined in Rule 501 under the Securities Act, of Warrants.

(b)    In addition to the restrictions set forth in Section 2.5(a), except for any Transfers in connection with the transactions contemplated by the Plan, the Order in Aid of the Plan and the Restructuring Steps (as defined in the Order in Aid of the Plan), no Warrants shall be Transferred by any Holder unless (i) the Warrant Certificates (if any) representing such Warrants bear legends as provided in Section 2.4, for so long as such legends are applicable, and (ii) prior to such Transfer, if requested by the Company in its sole discretion with respect to any proposed Transfer by a Holder who the Company determines is or is may be deemed an "affiliate" (within the meaning of such term under the Securities Act) of the Company or an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code, the Transferor shall have delivered to the Company a legal opinion, reasonably acceptable to the Company, stating that the registration of the Warrants that are the subject of such proposed Transfer is not required under the Securities Act.

(c)    AnyExcept for any Transfers in connection with the transactions contemplated by the Plan, the Order in Aid of the Plan and the Restructuring Steps (as defined in the Order in Aid of the Plan), any Holder proposing to effect a Transfer of Warrants must submit to the Company a written notice of such proposed Transfer, in accordance with the applicable provisions of the Stockholders Agreement, and all proposed Transfers shall be subject to all restrictions on Transfer of Warrants as are set forth in the Stockholders Agreement.

(d)    Upon the closing of each Transfer that is permitted by this Agreement, (i) the Transferee shall be deemed a Holder for purposes of this Agreement, (ii) the Transferee shall be entitled to the rights and subject to the obligations of a Holder under this Agreement with respect to the Transferred Warrants, and (iii) the Warrant Register shall be amended by the Warrant Agent accordingly.

(e)    The Warrant Agent shall not record upon its books any Transfer of any Warrants except in accordance with the terms and provisions of this Agreement.  Any purported Transfer of Warrants in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Company or the Warrant Agent.

(f)    If any Holder is an Entity that was formed for the primary purpose of acquiring indebtedness of, or securities in, the Company, or that has no substantial assets other than Warrants and indebtedness of, or securities (including shares of Common Stock) in, the Company, then such Holder agrees that no shares of capital stock of, or other equity interests in, such Holder may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this Section 2.5 as if such capital stock or other equity interests were Warrants.; provided, that a sale, transfer or other disposition of shares of capital stock of, or other equity interests in such Holder to any Affiliate of such Holder (other

10

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

than to any Affiliate of such Holder that is a portfolio company of such Holder or any of its other Affiliates) shall not be subject to this this Section 2.5.

(g)    The Company shall have the power to determine, in its sole discretion, all matters related to this Section 2.5, including matters necessary or desirable to administer or to determine compliance with this Section 2.5 and, absent manifest error, the determinations of the Company shall be final and binding on the Holders.

Section 2.6    **Surrender and Cancellation of Warrant Certificates.**  Any Warrant Certificate surrendered for registration of Transfer, exchange or exercise of the Warrants represented thereby shall be surrendered to the Warrant Agent, and all Warrant Certificates surrendered shall be promptly canceled by the Warrant Agent.  The Company will forward to the Warrant Agent any Warrant Certificates surrendered to it for exercise.  The Warrant Agent will cancel all Warrant Certificates surrendered for exercise or cancellation and dispose of them in accordance with its normal procedures.  Certification of the cancellation of all Warrant Certificates and all cancelled Warrant Certificates shall be delivered to the Company upon written request of the Company.  The Company may not issue new Warrant Certificates to replace Warrant Certificates that have been exercised (subject to Section 3.2(b)) or delivered to the Warrant Agent for cancellation.

Section 2.7    **Warrant Register**. The Warrants will be issued in registered form only, and the Company shall cause the Warrant Agent to maintain a register (the "Warrant Register") of the Warrants for registering the record ownership of the Warrants by the Holders.  Each Warrant shall be registered in the name of the Holder thereof or its nominee.

Section 2.8    **General Provisions Relating to Transfers**.

(a)    No Transfer of Warrants shall be effected until, and a Transferee of Warrants shall succeed to the rights of the applicable Holder with respect to the Transferred Warrants only upon, registration of the Transfer by the Warrant Agent in the Warrant Register in accordance with this Agreement.  Prior to such registration of Transfer, the Company and the Warrant Agent may deem and treat the Person in whose name the Warrants are registered upon the Warrant Register as the absolute owner thereof for all purposes (notwithstanding any notation of ownership or other writing on any Warrant Certificate made by anyone), and the Company and the Warrant Agent shall not be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or an interest in any Warrants on the part of any other Person.

(b)    When Warrants are presented to the Company or Warrant Agent with a request to register the Transfer thereof or to exchange any Warrant represented by a Warrant Certificate for new Warrant Certificates, the Company and the Warrant Agent shall register the Transfer or make the exchange as requested if the requirements of this Agreement for such Transfer or exchange are met, and shall execute any Warrant Certificates or statements of book-entry position, as applicable, necessary to reflect such Transfer or exchange.

(c)    No charge shall be made for any registration of Transfer or exchange of Warrants, but the Company shall not be required to pay any tax, expense or charge which may

11

DRAFT—SUBJECT TO FURTHER REVISION

be payable in respect of any registration of Transfer of Warrants and any such taxes, expenses or charges shall be paid by the Holder of such Warrants and the Company shall not be required to effect any Transfer of Warrants until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

(d)    All Warrant Certificates issued upon any registration of Transfer or exchange of Warrants shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for registration of Transfer or exchange.

## ARTICLE III
## EXERCISE OF WARRANTS

Section 3.1    **Exercise Period**.  Each Warrant may be exercised by the Holder thereof at any time during the period commencing on the Date of Issuance and ending on the earlier of (a) the consummation of a Liquidity Event and (ii) 5:00 p.m. (New York City time) on the Date of Expiration (such period, the "Exercise Period").  The Warrants owned by each Holder may be exercised at any time and from time to time, in whole or in part, during the Exercise Period; provided, however, that a Warrant may only be exercised in whole and not in part.

Section 3.2    **Exercise Procedure**.

(a)    Warrants shall be deemed to have been validly exercised by the Holder of such Warrants when the Warrant Agent has received at its corporate actions department or such other office designated by the Warrant Agent for such purposes (provided that notice of any such designation shall have been given by the Warrant Agent to the Company and the Holders in accordance with Section 9.7) (the "Warrant Agent Office"), all of the following items (the date on which the Warrant Agent shall have received all such items with respect to any exercise of Warrants being the "Date of Exercise", subject to Section 3.2(e)):

(i)    a completed Exercise Agreement, as described in Section 3.3 hereof, duly executed and delivered by such Holder;

(ii)    a completed Joinder Agreement, duly executed and delivered by such Holder and/or, if any of the Warrant Shares are not to be issued in the name of such Holder, duly executed and delivered by the Person to whom the Warrant Shares are to be issued (unless such Holder or Person, as applicable, is already a party to the Stockholders Agreement);

(iii)    if such Warrants are represented by a Warrant Certificate, the original Warrant Certificate representing such Warrants or an affidavit of loss and indemnity, reasonably acceptable to the Company and the Warrant Agent, if such Holder does not have possession of such Warrant Certificate at the time of exercise;

(iv)    any notices, information, instruments and documents required to be delivered to the Warrant Agent pursuant to Section 3.2(e), if applicable;

12

DRAFT—SUBJECT TO FURTHER REVISION

(v)     payment of all taxes, expenses or charges required to be paid by such Holder pursuant to Section 3.2(d) or Section 9.1, such payment to be made in the form of cash or in the form of a bank or certified check payable to the Warrant Agent on behalf of the Company; and

(vi)     payment of an amount equal to the product of the Exercise Price multiplied by the number of Warrant Shares being purchased upon such exercise (the "Aggregate Exercise Price"), such payment to be made in the form of cash or in the form of a bank or certified check payable to the Warrant Agent on behalf of the Company; provided, however, that a Holder may elect (the "Cashless Exercise") that the Company deduct from the number of Warrant Shares to be delivered to such Holder upon such exercise a number of Warrant Shares having a Fair Market Value, on the Business Day immediately prior to the Date of Exercise, equal to the Aggregate Exercise Price.

(b)     Certificates (if any) for the Warrant Shares purchased upon exercise of any Warrants shall be delivered by the Warrant Agent to the Holder of such Warrants as promptly as reasonably practicable after the Date of Exercise; provided, however, that if the Warrant Agent has not issued certificates representing all outstanding shares of Common Stock, the Warrant Agent shall cause to be delivered to the Holder a statement reflecting the book-entry position of the Warrant Shares purchased upon exercise of such Warrants registered on the books of the Company's transfer agent.  If less than all of the Warrants represented by a Warrant Certificate are exercised by a Holder, then, unless such unexercised Warrants have expired, the Warrant Agent shall prepare and deliver to such Holder a new Warrant Certificate, of like tenor and registered in such name or names as may be directed in writing by such Holder in accordance with this Agreement, for such unexercised number of Warrants.  Any Warrant Certificate surrendered for exercise to the Company or the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Warrant Agent.

(c)     The Warrant Shares issuable upon the exercise of any of the Warrants shall be deemed to have been issued to the Holder of such Warrants, and such Holder shall be deemed for all purposes to have become the registered holder of such Warrant Shares, at the close of business on the Date of Exercise; provided, however, that in the event that a Holder is exercising any Warrants (or such Holder's Warrants are deemed to be exercised pursuant to Section 4.1(d)) in connection with, or in contemplation of, the occurrence of a Liquidity Event, the Warrant Shares shall be deemed to have been issued to such Holder, and such Holder shall be deemed for all purposes to have become the registered holder of such Warrant Shares, as of immediately prior to the consummation of such Liquidity Event.

(d)     The issue of Warrant Shares on exercise of any Warrants shall be made without charge to the Holder of such Warrants for any issue or transfer tax, transfer agent fee or other similar incidental tax or expense in respect of the issue thereof.  The Company shall not, however, be required to pay any tax, expense or charge which may be payable in respect of the issue and delivery of Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration in, or the payment of any cash or other property in respect of Warrant Shares or any Warrants to, any name other than that of the Holder of the Warrants that were exercised, and any such taxes, expenses or charges shall be paid by such

13

DRAFT—SUBJECT TO FURTHER REVISION

Holder and the Warrant Agent shall not be required to issue or deliver any Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration (or pay any cash or other property) until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

(e)    Anything herein to the contrary notwithstanding, no Holder shall be permitted to (i) request that Warrant Shares issuable upon exercise of any Warrants be issued in the name of any Person other than such Holder unless, with respect to Warrant Shares that are shares of Common Stock, such Holder would be permitted to transfer such Warrant Shares to such Person pursuant to the Stockholders Agreement (and such Holder shall comply with the terms, provisions and procedures set forth in the Stockholders Agreement applicable to any such transfer as a condition precedent to making any such request), or (ii) request that a new Warrant Certificate be issued in the name of any Person other than such Holder unless such Holder would be permitted to transfer the Warrants represented by such Warrant Certificate to such Person pursuant to the terms hereof (and such Holder shall comply with the terms, provisions and procedures set forth herein applicable to a Transfer of Warrants as a condition precedent to making any such request).  In the event that a Holder exercising any Warrants requests that Warrant Shares that are shares of Common Stock issuable upon exercise of such Warrants be issued in the name of any Person other than such Holder or that a new Warrant Certificate be issued in the name of any Person other than such Holder, then the Date of Exercise shall occur on the later of (x) the date on which the Warrant Agent shall have received all of the items described in clauses (i)-(vi) of Section 3.2(a) and (y) the date of compliance with the terms, provisions and procedures set forth in the Stockholders Agreement applicable to a transfer of shares of Common Stock and/or the terms, provisions and procedures set forth herein applicable to a Transfer of Warrants, as applicable.

(f)    The Warrant Agent shall:

(i)    examine the Exercise Agreement and all other documents delivered to it by or on behalf of the Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Agreement and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an Exercise Agreement or other document appears on its face to have been improperly completed or executed or some other irregularity or deficiency in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the Holder submitting such agreement or document) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and reasonably cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Agreement or other documents received and the crediting of Warrant Shares to the respective Holders' accounts; and

14

DRAFT – SUBJECT TO FURTHER REVISION

(iv)    advise the Company, no later than two Business Days after receipt of the Exercise Agreement, of (A) the receipt of such Exercise Agreement, the number of Warrants exercised in accordance with the terms and conditions of this Agreement and the amount deposited, (B) the identity of the Holder that has submitted the Exercise Agreement, (C) the percentage or total to date of then-outstanding Warrants represented by such exercise and (D) such other information as the Company shall reasonably request.

Section 3.3    **Exercise Agreement**.  The Company reserves the right to reject any Exercise Agreement that is not in proper form (including if an Exercise Agreement specifies delivery of Warrant Shares and/or a new Warrant Certificate to an improper recipient) and the Company shall not incur any liability for any such rejection.  Such determination by the Company shall be final and binding on each of the Holders.  [In the event an Exercise Agreement provides for any of the Warrant Shares to be issued to any Person other than the Holder of the underlying Warrant, the Exercise Agreement shall contain a representation from such Holder that such other Person is not a Competitor.][4]  Any Holder may elect, as specified in the Exercise Agreement, to condition an exercise of Warrants upon the occurrence of a Liquidity Event, and such exercise shall be deemed revoked if such Liquidity Event does not occur.

Section 3.4    **Termination of Warrants**.  If any Warrant is not validly exercised prior to the expiration of the Exercise Period (including any deemed exercise pursuant to Section 4.1(d)), then (a) such Warrant shall (i) not be exercisable after the expiration of the Exercise Period (such right to exercise being deemed permanently and irrevocably waived following the expiration of the Exercise Period), and (ii) become permanently and irrevocably null and void at the expiration of the Exercise Period and all rights hereunder and under any Warrant Certificate representing such Warrant shall cease and terminate at the expiration of the Exercise Period, and (b) the Holder of such Warrant shall not be entitled to any distribution, payment or other amount on or in respect of such Warrant.

**ARTICLE IV**
**ADJUSTMENTS**

Section 4.1    **Adjustments.**  The number of Warrant Shares issuable upon exercise of each Warrant shall be subject to adjustment from time to time as follows:

(a)    Distributions, Subdivisions or Splits.  If, at any time after the Date of Issuance, the number of shares of Common Stock outstanding is increased by a *pro rata* distribution to holders of shares of Common Stock payable in shares of Common Stock or by a subdivision or split-up of outstanding shares of Common Stock, then the number of Warrant Shares issuable upon exercise of each Warrant immediately prior to the time of such distribution, subdivision or split-up shall be increased in proportion to such increase in outstanding shares of Common Stock.  Any adjustment to the number of Warrant Shares issuable upon exercise of each Warrant described in this Section 4.1(a) shall become effective at 9:00 a.m. (New York City time) on the first Business Day following the date on which the applicable distribution, subdivision or split-up is paid or becomes effective, as applicable.

---

[4] Note to Draft:  To be deleted if the execution version of the Stockholders Agreement does not restrict Transfers to Competitors.

15

DRAFT – SUBJECT TO FURTHER REVISION

(b)    Combinations or Reverse Splits.  If, at any time after the Date of Issuance, the number of shares of Common Stock outstanding is decreased by a combination or reverse split of the outstanding shares of Common Stock into a smaller number of shares of Common Stock, then the number of Warrant Shares issuable upon exercise of each Warrant immediately prior to the time of such combination or reverse split shall be decreased in proportion to such decrease in outstanding shares of Common Stock.  Any adjustment to the number of Warrant Shares issuable upon exercise of each Warrant described in this Section 4.1(b) shall become effective at 9:00 a.m. (New York City time) on the first Business Day following the date on which the applicable combination or reverse split becomes effective.

(c)    Fundamental Change.    If (i) the Company shall consummate any transaction or series of related transactions constituting (x) any reclassification or change of the outstanding shares of Common Stock (other than a distribution, subdivision, split-up, combination or reverse split to which Section 4.1(a) or Section 4.1(b) applies), or (y) any consolidation, merger, equity exchange or combination of the Company with another Person in which, in the case of clause (x) or clause (y), the previously outstanding shares of Common Stock shall be cancelled, reclassified or converted or changed into or exchanged for other stock, limited liability company interests, securities, property and/or assets (including cash), and (ii) such transaction or series of related transactions referred to in clause (i) is not a Liquidity Event (any such transaction or series of related transactions, a "Fundamental Change"), then the Holder of each Warrant outstanding immediately prior to the occurrence of such Fundamental Change will have the right upon any subsequent exercise of a Warrant to receive the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) that such Holder would have received if such Warrant had been exercised pursuant to the terms hereof immediately prior to the consummation of such Fundamental Change (assuming such Holder failed to exercise its rights of election, if any, as to the kind or amount of stock, limited liability company interests, securities, property and/or assets (including cash) receivable upon such Fundamental Change; provided, that, if the kind or amount of stock, limited liability company interests, securities, property and/or assets (including cash) receivable upon such Fundamental Change is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised (a "nonelecting share"), then for the purposes of this Section 4.1(c) the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) receivable upon such Fundamental Change for each nonelecting share shall be deemed to be the kind and amount so receivable per share by a plurality of the nonelecting shares).  Upon the consummation of each Fundamental Change, appropriate adjustment shall be deemed to be made with respect to each Holder's rights under this Agreement, including with respect to the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) thereafter acquirable upon exercise of each Warrant, such that the provisions of this Agreement shall thereafter be applicable, as nearly as possible, to any stock, limited liability company interests, securities, property and/or assets (including cash) thereafter acquirable upon exercise of each Warrant, and the Company shall provide notice of such deemed adjustment to the Warrant Agent and the Holders in accordance with Section 9.7.  The provisions of this Section 4.1(c) shall similarly apply to successive Fundamental Changes.  The Company shall not enter into or be a party to any Fundamental Change unless the Successor Entity (if any) assumes in writing all of the obligations of the Company under this Agreement

16

DRAFT – SUBJECT TO FURTHER REVISION

in accordance with this Section 4.1(c) pursuant to written agreements, including agreements to deliver to each Holder, in exchange for such Holder's Warrants, a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to the Warrants. Any adjustment required by this Section 4.1(c) with respect to a Fundamental Change shall be made immediately after the effective date for such Fundamental Change.

(d)    Liquidity Event.

(i)    In the event of a Liquidity Event other than an IPO in which the only consideration payable to Holders of Common Stock is cash, each Warrant shall be deemed to be exercised immediately prior to the consummation of such Liquidity Event and the Holder thereof shall receive solely the cash consideration to which such Holder would have been entitled as a result of such Liquidity Event, less the Exercise Price, as though the Warrant had been exercised immediately prior thereto. Upon a Liquidity Event other than an IPO in which the consideration payable to Holders of Common Stock is other than only cash, each Warrant will be deemed to be exercised immediately prior to the consummation of such Liquidity Event and the Holder thereof shall receive the consideration to which such Holder would have been entitled as a result of such Liquidity Event, less the Exercise Price, as though the Warrant had been exercised immediately prior thereto.

(ii)    In the event of a Liquidity Event that is an IPO, each Warrant shall be deemed exercised immediately prior to the consummation of the IPO and the Holder thereof shall receive a number of Warrant Shares that such Holder would have been entitled as though each Warrant held by such Holder had been exercised pursuant to the Cashless Exercise immediately prior to the IPO.

(iii)    After compliance by the Company with this Section 4.1(d), each Holder (A) agrees to raise no objections with respect to the treatment provided in Section 4.1(d)(i)-(ii) with respect to a Liquidity Event (provided that such Holder shall not be deemed to have waived any applicable dissenters rights, appraisal rights or similar rights in connection with such Liquidity Event) and (B) shall, subject to any applicable dissenters rights, appraisal rights or similar rights in connection with such Liquidity Event, surrender all Warrant Certificates to the Warrant Agent, and all such Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company.

Section 4.2    **Notice of Adjustment**. Whenever the number of Warrant Shares issuable upon exercise of each Warrant is required to be adjusted pursuant to Section 4.1, the Company or the Warrant Agent, at the direction of the Company, shall deliver to each Holder a certificate setting forth (a) the number of Warrant Shares issuable upon exercise of each Warrant after such adjustment (including the kind and amount of stock, limited liability company interests, securities, property and/or assets (including cash) thereafter issuable upon exercise of each Warrant), (b) a brief statement of the facts requiring such adjustment and (c) the computation by which such adjustment was made.  Such certificate shall be conclusive evidence of the

17

DRAFT—SUBJECT TO FURTHER REVISION

correctness of such adjustment absent manifest error.  Failure to deliver such certificate shall not affect the legality or validity of any adjustment required to be made pursuant to Section 4.1.

Section 4.3    **Statement on Warrants**. The form of Warrant Certificate need not be changed because of any adjustment made pursuant to Section 4.1, and Warrant Certificates issued after such adjustment may state the same number and kind of Warrant Shares as are stated in the Warrant Certificates issued prior to such adjustment.  The Company may, however, at any time in its sole discretion (which shall be conclusive), make any change in the form of Warrant Certificate that it may deem appropriate to reflect any such adjustment and any Warrant Certificate thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form so changed.

Section 4.4    **No Fractional Warrant Shares**.  With respect to Warrant Shares that are shares of Common Stock, Holders shall only be permitted to exercise Warrants for whole Warrant Shares and the Company shall not be required to issue any fraction of a Warrant Share in connection with the exercise of any Warrants.  If more than one Warrant shall be exercised at the same time by the same Holder, the number of full Warrant Shares that shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Shares purchasable on exercise of the Warrants so exercised.  If any fraction of a share of Warrant Share constituting a share of Common Stock would, except for the provisions of this Section 4.4, be issuable on the exercise of any Warrant, in lieu of the issuance of such fractional share of a Warrant Share, the Company shall round such fraction of a share to the nearest whole number of shares (where for the avoidance of doubt, 0.5 of a share shall be rounded to one share).  No Holder shall receive payment or any other amount in respect of any fractional Warrant Share that would otherwise be issuable upon exercise of any Warrants.

Section 4.5    **No Exercise Price Adjustment**.   The Exercise Price payable upon exercise of the Warrants is not subject to adjustment in connection with the provisions of Section 4.1.

Section 4.6    **Treasury Shares**.  Shares of Common Stock at any time owned by the Company or its subsidiaries shall not be deemed to be outstanding for the purposes of any computation under Section 4.1.

## ARTICLE V
## LOSS, THEFT, DESTRUCTION OR MUTILATION OF WARRANT CERTIFICATES

Section 5.1    **Loss, Theft, Destruction or Mutilation**.   If any mutilated Warrant Certificate is surrendered to the Warrant Agent or the Warrant Agent receives evidence to its reasonable satisfaction of the destruction, loss or theft of any Warrant Certificate (an affidavit of the Holder shall be satisfactory), the Company shall issue and the Warrant Agent will countersign a replacement Warrant Certificate of like tenor and representing the same number of Warrants as the mutilated, destroyed, lost or stolen Warrant Certificate.  If required by the Company or the Warrant Agent, a reasonable and customary indemnity must be furnished by the Holder that is sufficient in the reasonable, good faith judgment of the Company and the Warrant Agent to protect the Company and the Warrant Agent from any loss they may suffer if a Warrant Certificate is replaced. The Company may charge the Holder for its expenses in replacing a

18

DRAFT – SUBJECT TO FURTHER REVISION

Warrant Certificate.  Upon the issuance of any new Warrant Certificate under this <u>Section 5.1</u>, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the fees and expenses of the Company) in connection therewith and the Warrant Agent shall not be required to issue or deliver any new Warrant Certificate until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

**ARTICLE VI**
**COVENANTS OF THE COMPANY**

Section 6.1    **Authorization of Common Stock**. The Company covenants that all Warrant Shares issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free from all charges and Liens in respect of the issue thereof (other than Permitted Liens).  The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares may be so issued without violation of any applicable law.

Section 6.2    **Reservation of Warrant Shares**.  For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company covenants that it will, at all times during the Exercise Period, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, free of preemptive rights and solely for the issuance and delivery upon exercise of Warrants, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants.  The Company further covenants that it will, from time to time during the Exercise Period, take all steps necessary to increase the number of authorized shares of Common Stock if at any time the number of authorized shares of Common Stock that remain unissued would otherwise be insufficient to allow delivery of all Warrant Shares then deliverable upon the exercise in full of all outstanding Warrants.  The Company will keep a copy of this Agreement on file with the Warrant Agent.  If Warrant Shares are to be represented by stock certificates, the Warrant Agent is hereby irrevocably authorized to requisition from time to time from the Company's transfer agent for the Common Stock, stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such transfer agent with duly executed stock certificates for such purpose.

Section 6.3    **Notices of Certain Events**.  In the event of:

(a)    any taking by the Company of a record of the holders of shares of Common Stock for the purpose of determining the holders thereof who are entitled to vote on any matter or are entitled to receive any distribution, or any right to subscribe for, purchase or otherwise acquire any class of securities of the Company or any other securities or property, or to receive any other right;

(b)    any vote (including by written consent) by the holders of shares of Common Stock;

(c)    any amendment or proposed amendment to this Agreement;

19

DRAFT — SUBJECT TO FURTHER REVISION

(d)    any dividend or distribution to holders of shares of Common Stock;

(e)    any Liquidity Event or any other capital reorganization of the Company, any reclassification or recapitalization of the shares of Common Stock or any transfer of all or substantially all of the assets of the Company to, or any consolidation or merger of the Company with or into, any other Person;

(f)    any filing of any registration statement with the SEC in respect of an IPO;

(g)    any matter or event with respect to which the holders of shares of Common Stock are entitled to receive notice; or

(h)    any voluntary or involuntary dissolution, liquidation or winding-up of the Company,

then, and in each such event, the Company will deliver a notice to each Holder specifying (i) the date on which any such record is to be taken for the purpose of such distribution or right, and stating the amount and character of such distribution or right, (ii) the date on which any such Liquidity Event or other reorganization, reclassification, recapitalization, transfer, consolidation, merger, dissolution, liquidation or winding-up is anticipated to be effective or (iii) the date on which any such registration statement is to be filed.  The Company shall use commercially reasonable efforts to provide such notice at least ten (10) days prior to the date fixed as any such record date, any such effective date or any such filing date.

## ARTICLE VII
## NO RIGHTS AS STOCKHOLDERS

Section 7.1    **No Rights as Stockholders.**

(a)    Nothing contained in this Agreement, any Warrant Certificate (if any) or any statement evidencing any Warrants issued in book-entry registration shall be construed as conferring upon any Holder (in its capacity as the holder of Warrants) the right to vote or to consent or to receive notice as a Stockholder in respect of any meeting of Stockholders or for the election of directors to the Board or of any other matter, or any other rights whatsoever as a Stockholder, including (i) the right to receive dividends or distributions on Warrant Shares, or (ii) to right to share in the assets of the Company in the event of its liquidation, dissolution or winding up.

(b)    Nothing contained in this Agreement shall be construed as imposing any obligation on any Holder to purchase any securities or exercise its Warrants, or imposing any liabilities on any Holder as a Stockholder, whether such obligations or liabilities are asserted by the Company or by creditors of the Company.

(c)    By accepting and holding Warrants, each Holder is deemed to acknowledge and agree that, in its capacity as a Holder, the relationship of such Holder to the Company is strictly contractual in nature and is not the relationship of a Stockholder. Notwithstanding anything to the contrary herein, no fiduciary or similar duties of any kind or description are owed to any Holder, in its capacity as a Holder.  In furtherance of the foregoing

20

DRAFT – SUBJECT TO FURTHER REVISION

(and not in limitation thereof), no director or officer of the Company shall owe any duty (including any fiduciary duty) to any Holder, in its capacity as a Holder, of any kind, including in connection with any act or failure to act, whether under this Agreement, any of the Warrant Certificates or otherwise.  Each Holder hereby covenants and agrees, to the fullest extent permitted by law, that it shall not institute or seek to institute, directly or indirectly, and shall cause its Affiliates not to institute or seek to institute, in the name of or on behalf of the Company, such Holder or any other Person, any proceeding or bring any other claim arising out of, or relating to this Agreement or the Warrants against any director or officer of the Company in connection with an alleged breach of such director's or officer's duties, including fiduciary duties.

Section 7.2    **Rights of Action**.  All rights of action against the Company in respect of this Agreement are vested in the Holders, and any Holder, without the consent of the Warrant Agent or any other Holder, may, on such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

Section 7.3    **No Redemption**.  The Warrants shall not be subject to redemption by the Company or its Subsidiaries.  Notwithstanding the foregoing, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.  Any Warrants acquired by the Company [or its Subsidiaries] shall not be outstanding for any purpose and any Warrant Certificates acquired by the Company [or its Subsidiaries] shall be delivered to the Warrant Agent for cancellation.

Section 7.4    **Stockholders Agreement**.  The Warrants and all Warrant Shares issuable upon exercise of the Warrants are and shall become subject to, and have the benefit of, the Stockholders Agreement, and each Holder shall be required, for so long as such Holder holds any Warrants or any Warrant Shares, to become and remain a party to the Stockholders Agreement.  In the event of any amendment or modification to any provisions of the Stockholders Agreement applicable to the Warrants and/or Holders, the Company shall give (or cause to be given ) prompt written notice of such amendment or modification to each Holder.

Section 7.5    **Information Rights; Confidentiality**.  Pursuant to the Stockholders Agreement, each Warrant Holder that is party thereto shall be entitled to the same information rights as Stockholders under the Stockholders Agreement, and shall be subject to the same confidentiality restrictions as apply to Stockholders under the Stockholders Agreement, in each case on the terms and subject to the conditions set forth in the Stockholders Agreement.

## ARTICLE VIII
## CONCERNING THE WARRANT AGENT

Section 8.1    **Warrant Agent**. The Company has appointed the Warrant Agent to act as agent for the Company with respect to the Warrants pursuant to this Agreement and the Warrant Agent has accepted such appointment.  The Warrant Agent shall have the powers and authority

21

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

granted to and conferred upon it in this Agreement and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it as agreed upon in writing between the Company and the Warrant Agent.

Section 8.2   **Fees and Expenses of Warrant Agent**.  The Company agrees to pay the Warrant Agent reasonable remuneration in an amount separately agreed to between the Company and the Warrant Agent for its services as Warrant Agent hereunder and will reimburse the Warrant Agent, promptly following any demand therefor, for all reasonable and documented out-of-pocket costs and expenses that the Warrant Agent may incur in the execution of its duties hereunder.

Section 8.3   **Liability of Warrant Agent**.

(a)   Whenever, in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The Warrant Agent may rely, and be held harmless for such reliance, upon such statement for any action taken or suffered by it pursuant to the provisions of this Agreement, and shall not be held liable in connection with any delay in receiving such statement.  The Company agrees that it will perform, execute, acknowledge and deliver, or cause to be performed, executed, acknowledged and delivered, all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

(b)   The Warrant Agent shall be liable hereunder only for its own gross negligence or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The Company covenants and agrees to indemnify and to hold the Warrant Agent harmless against any out-of-pocket costs, expenses (including reasonable fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant to this Agreement.  Notwithstanding the foregoing, such covenant and agreement of the Company does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of its own gross negligence or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).

(c)   The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant Certificate (except its countersignature hereof and thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Certificate; nor shall it be responsible to make any adjustments required under the provisions of Section 4.1 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it, by any act hereunder, be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any

22

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

Warrant Certificate or as to whether any shares of Common Stock will, when issued, be valid and fully paid and nonassessable.

(d)    From time to time, the Company may provide the Warrant Agent with instructions concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any Appropriate Officer for instruction, and may consult with legal counsel for the Warrant Agent or the Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement.  The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken, suffered or omitted to be taken by the Warrant Agent in reliance upon any instructions by an Appropriate Officer or upon the advice or opinion of such counsel.  The Warrant Agent shall not be held to have notice of any change of authority of any person until receipt of written notice thereof from the Company.

Section 8.4    **Rights and Duties of Warrant Agent**.

(a)    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in accordance with such opinion.

(b)    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement (except its countersignature hereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(c)    The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any Holder with respect to any action or default by the Company, including any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(d)    The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not the Warrant Agent under this Agreement.  Nothing in this Agreement shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(e)    The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, absent gross negligence or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction) in the selection or continued employment or engagement thereof.

23

DRAFT—SUBJECT TO FURTHER REVISION

(f)     The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken or omitted to be taken by it in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as the Warrant Agent hereunder.

(g)     The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)     The Warrant Agent shall not be liable or responsible for any failure of the Company to comply with any of its obligations relating to any registration statement filed with the SEC or this Agreement, including obligations under applicable regulation or law.

(i)     The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrant Certificates authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the exercise of the Warrants.

(j)     The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act in accordance with (i) any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person; or (ii) any applicable law, act, regulation or any interpretation of the same.

(k)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company, any Holder or any other Person for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of the Warrant Agent.

(l)     In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Warrant Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

24

DRAFT—SUBJECT TO FURTHER REVISION

Section 8.5   **Acceptance of Agency**.  The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the Holders.  The Warrant Agent hereby accepts the agency established by this Agreement and agrees to perform the same upon the terms and conditions set forth in this Agreement.

Section 8.6   **Limitation of Liability**.  Notwithstanding anything contained in this Agreement to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to the Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought.  Neither party to this Agreement shall be liable for any consequential, indirect, special, punitive or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility or likelihood of such damages.

Section 8.7   **Survival**.  The provisions of this Article VIII shall survive the termination of this Agreement and the resignation, removal or replacement of the Warrant Agent.

Section 8.8   **Further Assurances**.  Each of the Company and the Warrant Agent agrees to perform, execute, acknowledge and deliver, or cause to be performed, executed, acknowledged and delivered, all such further and other acts, instruments and assurances as may be required for the carrying out or performing of the provisions of this Agreement.

Section 8.9   **Resignation and Appointment of Successor**.

(a)   The Company agrees, for the benefit of the Holders from time to time, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)   The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective.  Notwithstanding the foregoing, such date shall be not less than 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice.  Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent.  Subject to 30 days' written notice, the Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one

25

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

copy to the successor Warrant Agent.  Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon (and shall not become effective prior to such time) acceptance of such appointment by the successor Warrant Agent as provided in Section 8.9(d).  In the event a successor Warrant Agent has not been appointed and accepted its duties within 30 days of the Warrant Agent's notice of resignation, the Warrant Agent and/or any Holder may apply at the expense of the Company to any court of competent jurisdiction for the appointment of a successor Warrant Agent (qualified as aforesaid).  Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and all other amounts due hereunder.

(c)     The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be the Warrant Agent hereunder.

(d)     Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and, upon the payment of all outstanding fees to the predecessor Warrant Agent, such predecessor shall thereupon become obligated to Transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)     Any Person into which the Warrant Agent hereunder may be merged or converted or any Person with which the Warrant Agent may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person to which the Warrant Agent shall sell or otherwise Transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any instrument or other document or any further act on the part of any of the parties to this Agreement.

## ARTICLE IX
## MISCELLANEOUS

26

DRAFT – SUBJECT TO FURTHER REVISION

Section 9.1    **Withholding and Reporting Requirements**.  The Company shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Authority, and all distributions, exercises or other situations requiring withholding under applicable law, including deemed distributions, with respect to the Warrants will be subject to applicable withholding and reporting requirements.   Notwithstanding any provision to the contrary, the Company will be authorized to (a) take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made with respect to the Warrants to pay applicable withholding taxes, (c) liquidate a portion of any non-cash distribution to be made with respect to the Warrants to generate sufficient funds to pay applicable withholding taxes, (d) require reimbursement from any Holder to the extent any withholding is required in excess of, or in the absence of, any distribution or (e) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) that are necessary to comply with this Section 9.1.

Section 9.2    **Entire Agreement**.  This Agreement (including the exhibits and annexes to this Agreement) contains the entire understanding between the Company and the Warrant Agent with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement between the Company and the Warrant Agent.

Section 9.3    **Counterparts**.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.  Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.4    **Severability**.  In the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.  [Upon any such determination of invalidity or unenforceability, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner, such that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.][5]

Section 9.5    **Successors and Assigns**.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and the Holders, and the respective legal representatives, heirs, administrators, executors, successors and permitted assigns of the parties hereto and the Holders.

---

[5] Note to Draft: Discuss whether to include and consider what consent right (if any) Holders should have regarding such negotiated modifications.

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

Section 9.6    **Notices and Demands to the Company**.  If the Warrant Agent shall receive any notice or demand addressed to the Company by a Holder, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 9.7    **Notices**.  All notices, requests, waivers, document deliveries and other communications given, sent, provided, delivered or received pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("e-mail") to the party to be notified upon written acknowledgement of receipt by such party, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (i) in the case of any Holder, to such Holder at its address or e-mail address set forth in the Warrant Register, (ii) in the case of the Company, to the Company [●]at 200 Powell Place, Brentwood, TN 37027; Attention: [●] ([●]Karen Abbott, Chief Legal Officer (kabbott@ContactAAC.com) (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement) and (iii) in the case of the Warrant Agent, to the Warrant Agent at [●]; Attention: [●]48 Wall Street, 22nd Floor; New York, New York 10005, Attention: Legal Department (legalteamAST@astfinancial.com).  A party may change its address or e-mail address for purposes of notice hereunder by (x) in the case of the Company, giving notice of such change to the Holders and the Warrant Agent in the manner provided in this Section 9.7, (y) in the case of any Holder, giving notice of such change to the Company and the Warrant Agent in the manner provided in this Section 9.7, and (z) in the case of the Warrant Agent, giving notice of such change to the Company and the Holders in the manner provided in this Section 9.7.

Section 9.8    **Headings**.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 9.9    **Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial**.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE. EACH OF THE COMPANY, THE WARRANT AGENT AND EACH HOLDER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR ANY HOLDER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS. EACH OF THE COMPANY, THE HOLDERS AND THE WARRANT AGENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION ANY OF THEM

28

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE COMPANY, THE HOLDERS AND THE WARRANT AGENT HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN **SECTION 9.7**, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE COMPANY, THE HOLDERS AND THE WARRANT AGENT HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.

Section 9.10  **No Third Party Beneficiaries**.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and the Holders, and the legal representatives, heirs, administrators, executors, successors and permitted assigns of each party hereto and the Holders, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than the Holders.

Section 9.11  **Binding Effect on Holders**.  By its acceptance of any Warrant, each Holder acknowledges the terms of this Agreement and agrees to be bound hereby.

Section 9.12  **Inspection of Warrant Agreement**.  A copy of this Agreement shall be available at all reasonable times for inspection by any Holder at the office of the Warrant Agent designated for such purposes.  The Warrant Agent may require any Holder to submit evidence of ownership of a Warrant for inspection by it of this Agreement.

Section 9.13  **Injunctive Relief**.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such non-breaching party shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity.  Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

Section 9.14  **Amendments**.  Any term, condition or provision of this Agreement may be amended, modified or waived from time to time if, and only if, such amendment, modification or waiver is in writing and signed, (a) in the case of an amendment or modification, by the Company and the Warrant Agent with the consent of Holders of a majority of the Warrants issued and outstanding at the time of such amendment or modification, or (b) in the case of a waiver, by the party against whom the waiver is to be effective.  The consent of each Holder of

29

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

Warrants affected shall be required for any amendment or modification (i) of this Section 9.14, (ii) pursuant to which the Exercise Price would be increased (other than pursuant to adjustments provided in this Agreement), (iii) pursuant to which the Date of Expiration would be changed to an earlier date and (iv) pursuant to which the number of Warrant Shares issuable upon exercise of Warrants would be decreased (other than pursuant to adjustments provided in this Agreement).

Section 9.15    **Termination**.   This Agreement shall terminate at the expiration of the Exercise Period.   Notwithstanding the foregoing, this Agreement will terminate on any earlier date when all Warrants have been exercised.

\* \* \* \* \*

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

AAC HOLDINGS, INC.PARENT CORPORATION


By:   _____
Name:
Title:


[●]

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC


By: _____
     Name:
     Title:

DRAFT—SUBJECT TO FURTHER REVISION

**ANNEX A**

**FORM OF WARRANT CERTIFICATE**

**AAC** ~~HOLDINGS, INC.~~PARENT CORPORATION

[Face of Warrant Certificate]

No.____

[_____] Warrants

**WARRANTS TO PURCHASE CLASS A VOTING COMMON STOCK**

THE WARRANTS REPRESENTED BY THIS CERTIFICATE HAVE BEEN, AND THE SHARES OF COMMON STOCK ISSUABLE PURSUANT TO THE EXERCISE OF THE WARRANTS WILL BE (SUCH WARRANTS AND SHARES, COLLECTIVELY, THE "SECURITIES"), ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. [THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF [●]DECEMBER [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.][6]

THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS CERTIFICATEARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [●]DECEMBER [•], 2020 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "WARRANT AGREEMENT") BY AND BETWEEN AAC ~~HOLDINGS, INC.~~PARENT CORPORATION (THE "COMPANY") AND [●]AMERICAN STOCK TRANSFER & TRUST

---

[6] Note to Draft: To be included if the Holders will be required to sign the Stockholders Agreement.

Anx. A- 1

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

COMPANY, LLC (THE "WARRANT AGENT"). NO REGISTRATION OR TRANSFER OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS CERTIFICATE WILL BE MADE ON THE BOOKS OF THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS CERTIFICATE COPIES OF THE WARRANT AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF WARRANTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

This certifies that [●], or its registered assigns (collectively, the "Registered Holder"), is the registered owner of the number of Warrants set forth above, each of which represents the right to purchase, during the Exercise Period (as defined in the Warrant Agreement (as defined below)), from AAC HOLDINGS, INC.Parent Corporation, a Delaware corporation (the "Company"), one share of Common Stock of the Company (a "Warrant Share") (subject to adjustment as provided in the Warrant Agreement) at the purchase price (the "Exercise Price") of $0.01 per one Warrant Share (subject to adjustment as provided in the Warrant Agreement), subject to surrender of this Warrant Certificate, payment of the Exercise Price in accordance with the Warrant Agreement and the satisfaction of the other conditions set forth the Warrant Agreement for a valid exercise of the Warrants. The number of Warrant Shares issuable upon exercise of the Warrants represented by this Warrant Certificate are subject to adjustment upon the occurrence of certain events set forth in the Warrant Agreement. This Warrant Certificate may be exercised as to all or any whole number of the Warrants represented hereby.

This Warrant Certificate is issued under and pursuant to a Warrant Agreement, dated as of [●December [●], 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Warrant Agreement"), by and between the Company and [●]American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (together with its successors and permitted assigns under Section 8.9 of the Warrant Agreement, the "Warrant Agent"). The Warrant Agreement is hereby incorporated herein by reference and made a part hereof. Reference is hereby made to the Warrant Agreement for a full description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Company, the Holders and the Warrant Agent. The summary of the terms of the Warrant Agreement contained in this Warrant Certificate is qualified in its entirety by express reference to the Warrant Agreement. All capitalized terms used in this Warrant Certificate and not defined herein shall have the meanings assigned to them in the Warrant Agreement.

If any Warrant represented by this Warrant Certificate is not validly exercised prior to the expiration of the Exercise Period (including any deemed exercise pursuant to Section 4.1(d) of the Warrant Agreement), then (a) such Warrant shall (i) not be exercisable after the expiration of the Exercise Period (such right to exercise being deemed permanently and irrevocably waived following the expiration of the Exercise Period), and (ii) become permanently and irrevocably null and void at the expiration of the Exercise Period and all rights under the Warrant Agreement

Anx. A- 2

NY 78209447v14

DRAFT – SUBJECT TO FURTHER REVISION

and hereunder shall cease and terminate at the expiration of the Exercise Period, and (b) the Registered Holder shall not be entitled to any distribution, payment or other amount on or in respect of such Warrant.

Copies of the Warrant Agreement are on file at the office of the Warrant Agent and may be obtained by writing to the Warrant Agent at the following address:

[●]
[●]
[●]
Attention: [●]
E-mail:  [●]

American Stock Transfer & Trust Company, LLC
48 Wall Street, 22nd Floor
New York, New York 10005
Attention: Legal Department
Email: legalteamAST@astfinancial.com

The Warrants represented by this Warrant Certificate are not Transferable except in accordance with the terms of the Warrant Agreement.  Any purported Transfer of the Warrants represented by this Warrant Certificate in violation of the terms and provisions of the Warrant Agreement shall be void *ab initio* and shall not be recognized by the Company.

The issue of Warrant Shares on exercise of any Warrants represented by this Warrant Certificate shall be made without charge to the Registered Holder for any issue or transfer tax, transfer agent fee or other similar incidental tax or expense in respect of the issue thereof.  The Company shall not, however, be required to pay any tax, expense or charge which may be payable in respect of the issue and delivery of Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration in, or the payment of any cash or other property in respect of Warrant Shares or any Warrants to, any name other than that of the Registered Holder, and any such taxes, expenses or charges shall be paid by the Registered Holder and the Warrant Agent shall not be required to issue or deliver any Warrant Shares or a new Warrant Certificate or a statement evidencing any Warrants issued in book-entry registration (or pay any cash or other property) until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

The Registered Holder shall only be permitted to exercise Warrants represented by this Warrant Certificate for whole Warrant Shares and the Company shall not be required to issue any fraction of a Warrant Share in connection with the exercise of any Warrants represented by this Warrant Certificate, any such fraction of a Warrant Share being deemed forfeited.  If more than one Warrant represented by this Warrant Certificate shall be exercised at the same time by the Registered Holder, the number of full Warrant Shares that shall be issuable upon the exercise hereof shall be computed on the basis of the aggregate number of Warrant Shares purchasable on exercise of the Warrants so exercised.  If any fraction of a share of Warrant Share constituting a share of Common Stock would be issuable on the exercise of any Warrant, in lieu of the issuance of such fractional share of a Warrant Share, the Company shall round such fraction of a share to

Anx. A- 3

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

the nearest whole number of shares (where for the avoidance of doubt, 0.5 of a share shall be rounded to one share). The Registered Holder shall not receive payment or any other amount in respect of any fractional Warrant Share that would otherwise be issuable upon exercise of any Warrants represented by this Warrant Certificate.

No Transfer of Warrants represented by this Warrant Certificate shall be effected until, and a Transferee of Warrants represented by this Warrant Certificate shall succeed to the rights of the Registered Holder with respect to the Transferred Warrants only upon, registration of the Transfer by the Warrant Agent on the Warrant Register in accordance with the Warrant Agreement.  Prior to such registration of Transfer, the Company and the Warrant Agent may deem and treat the Person in whose name this Warrant Certificate is registered as the absolute owner hereof for all purposes (notwithstanding any notation of ownership or other writing hereon made by anyone), and the Company and the Warrant Agent shall not be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or an interest in any Warrants represented by this Warrant Certificate on the part of any other Person.

AAC ~~HOLDINGS,~~PARENT ~~INC.~~CORPORATION

By: _____

    Name:
    Title:

Dated: _____

Anx. A- 4

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

Countersigned:

[●]AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent

By:    _____
         Authorized Signatory

Dated:    _____

NY 78209447v14

DRAFT—SUBJECT TO FURTHER REVISION

**EXHIBIT A**

## EXERCISE AGREEMENT
### (TO BE EXECUTED ONLY UPON EXERCISE OF WARRANTS)

To:     ~~AAC Holdings, Inc.~~[●]

Dated:

Reference is hereby made to the Warrant Agreement, dated as of [~~●~~December [•]], 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Warrant Agreement"), by and between AAC ~~Holdings, Inc.~~Parent Corporation (the "Company") and [~~●~~]American Stock Transfer & Trust Company, LLC (together with its successors and permitted assigns under Section 8.9 of the Warrant Agreement, the "Warrant Agent").  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Warrant Agreement.

The undersigned, pursuant to the provisions set forth in [the attached Warrant Certificate (Certificate No. _) and] the Warrant Agreement, hereby irrevocably elects [(subject to the penultimate paragraph of this Exercise Agreement)] to exercise Warrants registered in the name of the undersigned [and represented by the attached Warrant Certificate] to subscribe for the purchase of _____ Warrant Shares and (check one):

☐     herewith tenders payment of the Aggregate Exercise Price for such Warrant Shares by bank or certified check payable to the Warrant Agent on behalf of the Company in the amount of $_____; or

☐     hereby agrees that it is electing a Cashless Exercise by requesting that the Company deduct from the number of Warrant Shares to be delivered to the undersigned upon such exercise a number of Warrant Shares having a Fair Market Value, on the Business Day immediately prior to the date of such exercise, equal to the Aggregate Exercise Price.

The undersigned hereby requests that the Warrant Shares issuable upon exercise of the Warrants, as specified above, be issued in such names set forth below; provided, however, that the undersigned acknowledges and agrees that no such Warrant Shares shall be delivered to, or for the account of, any Person to whom the undersigned would not have been permitted to sell or otherwise transfer shares of Common Stock pursuant to the Stockholders Agreement.

[The undersigned is exercising Warrants pursuant to this Exercise Agreement in connection with, or in contemplation of, the occurrence of the following Liquidity Event: [Describe Liquidity Event].  The undersigned hereby elects to condition such exercise upon the occurrence of such Liquidity Event and such exercise shall be deemed revoked if such Liquidity Event does not occur.]

Ex. A- 1

DRAFT – SUBJECT TO FURTHER REVISION

[The undersigned hereby represents and warrants to the Company and the Warrant Agent that, as of the date of this Exercise Agreement, if applicable, each Person other than the undersigned named below to whom any of the Warrant Shares are issuable upon exercise of the Warrants pursuant to this Exercise Agreement are to be issued is not a Competitor.][7]

Signature     _____

Name     _____

Address     _____

_____

Warrant Shares to be issued in the name(s) of: [_____]

---

[7] Note to Draft:  To be deleted if the execution version of the Stockholders Agreement does not restrict Transfers to Competitors.

Ex. A- 2

NY 78209447v14

~~DRAFT – SUBJECT TO FURTHER REVISION~~

**EXHIBIT B**

### STOCKHOLDER JOINDER AGREEMENT
### (TO BE EXECUTED UPON EXERCISE OF WARRANTS)

The undersigned hereby (a) acknowledges that it has received and reviewed a complete copy of the Stockholders Agreement, dated as of <u>December</u> [•], 2020 (as may be amended from time to time, the "<u>Agreement</u>"), by and among AAC ~~HOLDINGS, INC.~~<u>Parent Corporation</u>, a Delaware corporation (the "<u>Company</u>"), and the stockholders of the Company party thereto and (b) agrees that, effective as of the date hereof, the undersigned (i) shall become a party to the Agreement and be subject to and fully bound by the Agreement and all of the provisions thereof that are applicable to Stockholders (and entitled to all the rights incidental thereto), as though an original party to the Agreement and (ii) shall be included within the term "Stockholder" for all purposes under the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

The undersigned hereby makes the representations and warranties set forth in Section 11.1 of the Agreement, and represents and warrants to the Company that the undersigned [(a)] is a Qualified Institutional Buyer or an Accredited Investor [and (b) is not a Competitor][8].

The mailing address, e-mail address and (if applicable) facsimile number to which notices and other communications made pursuant to the Agreement, the Certificate of Incorporation or the Bylaws may be sent to the undersigned are as follows:

Mailing address:


E-mail address:
Facsimile number:


Date: _____       _____
                                    Name:

---

[8] ~~Note to Draft:  To be deleted if the execution version of the Stockholders Agreement does not restrict Transfers to Competitors.~~

Ex. B- 1

DRAFT—SUBJECT TO FURTHER REVISION

**EXHIBIT C**

**STOCKHOLDERS AGREEMENT**

(See Attached)

DRAFT—SUBJECT TO FURTHER REVISION

NY 78209447v14

## **Exhibit F-3**

(Third Supplement to the Schedule of Rejected Executory Contracts and Unexpired Leases)

As provided in the Plan Supplement, the Debtors reserved the right, with the consent of the Requisite Consenting Lenders, to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases filed with the Court on September 24, 2020 [Docket No. 582] (as amended, the "Rejection Schedule") prior to the Effective Date.

On October 12, 2020, the Debtors filed the Amended Plan Supplement [Docket No. 651], which included the supplement to the Rejection Schedule (the "First Rejection Schedule Supplement") attached thereto at Exhibit F-1, and reserved the right, with the consent of the Requisite Consenting Lenders, to further alter, amend, modify, or supplement the Rejection Schedule.

On October 14, 2020, the Debtors filed the Second Amended Plan Supplement [Docket No. 667], which included the second supplement to the Rejection Schedule (the "Second Rejection Schedule Supplement") attached thereto at Exhibit F-2, and reserved the right, with the consent of the Requisite Consenting Lenders, to further alter, amend, modify, or supplement the Rejection Schedule.

This Exhibit F-3 is a third supplement to the Rejection Schedule (this "Third Rejection Schedule Supplement" and collectively with the First Rejection Schedule Supplement and the Second Rejection Schedule Supplement, the "Supplements"). The Rejected Executory Contracts and Unexpired Leases listed on this Third Rejection Schedule Supplement are in addition to the Rejected Contracts and Unexpired Leases set forth on the Rejection Schedule, as supplemented by the First Rejection Schedule Supplement and the Second Rejection Schedule Supplement.

For the avoidance of doubt, and as provided in the Plan, the Debtors reserve the right, with the consent of the Requisite Consenting Lenders, to alter, amend, modify, or supplement the Rejection Schedule, as supplemented by the Supplements, on or prior to the Effective Date.

Notwithstanding anything herein, the Rejection Schedule, as supplemented by the Supplements, shall not be deemed to be an assumption, assignment, adoption, rejection or termination of any of the Executory Contracts and Unexpired Leases. Moreover, the Debtors explicitly reserve their rights to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and nothing herein (i) alters in any way the prepetition nature of the Executory Contracts and Unexpired Leases or the validity, priority, or amount of any claims of a counterparty to an Executory Contract or Unexpired Lease against the Debtors that may arise under such Executory Contract or Unexpired Lease, (ii) creates a post-petition contract or agreement or (iii) elevates to administrative expense priority any claims of a counterparty to an Executory Contract or Unexpired Lease against the Debtors that may arise under such Executory Contract or Unexpired Lease.

| Debtor Entity | Counterparty | Contract Type | Counterparty Address |
|---|---|---|---|
| American Addiction Centers, Inc. | Freedom Solutions Group LLC d/b/a Litera Microsystems | Vendor/Services Agreement | 300 S. Riverside Plaza Suite 800 S Chicago, Illinois 60606 |
| Addiction Labs of America, LLC | Siemens Healthcare Diagnostics Inc. | Vendor/Services Agreement | 115 Norwood Park South Norwood, MA 02062 |

**Exhibit J**

(Form of Litigation Trust Agreement)

This Exhibit J contains a revised draft of the Form of Litigation Trust Agreement set forth in Exhibit J to the Second Amended Plan Supplement, which remains subject to ongoing review and comment by the Debtors and the Consenting Lenders. Schedule 1 below contains the revised Form of Litigation Trust Agreement. Schedule 2 below contains a redlined version of the Form of Litigation Trust Agreement showing changes to the Litigation Trust Agreement filed with the Court in the Second Amended Plan Supplement.

Schedule 1

(Form of Litigation Trust Agreement)

## LITIGATION TRUST AGREEMENT AND DECLARATION OF TRUST

This litigation trust agreement and declaration of trust (the "Agreement"), dated as of [●], 2020, is made by and among AAC Holdings, Inc. and its affiliated chapter 11 debtors and debtors-in-possession (collectively, as reorganized under and pursuant to the Plan from and after the Effective Date, the "Reorganized Debtors")[1] and Peter Kravitz (together with his successors, the "Trustee," and together with the Debtors, each, a "Party" and collectively, the "Parties").

### RECITALS

A    On June 20, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re AAC Holdings, Inc., et al.*, Case No. 20-11648 (JTD).

B    On July 7, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") consisting of (i) Collect RX LLC; (ii) Beckman Coulter, Inc; and (iii) Willie Meadows [Docket No. 97].

C    On October 11, 2020, the Debtors filed the *Second Amended Joint Plan of Reorganization of AAC Holdings, Inc. and its Affiliated Debtors* (as confirmed, the "Plan") [Docket No. 647].

D    On October 20, 2020, the Bankruptcy Court that certain *Order Confirming Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. And Its Debtor Affiliates* (as confirmed, including any amendments and supplements thereto, the "Plan") [Docket No. 695] (the "Confirmation Order") confirming the Plan.

E         On November 20, 2020, the Bankruptcy Court entered that certain *Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan* [Docket No. 765].

F         The "Effective Date" of the Plan (the "<u>Effective Date</u>") is the date of this Agreement.

G         The Plan provides for the establishment of the Litigation Trust (the "<u>Trust</u>"), effective on the Effective Date of the Plan.

H         The Trust is established for the benefit of holders of Allowed General Unsecured Claims, including the holders of Junior Lender Deficiency Claims, if any (collectively, the "<u>Beneficiaries</u>").

I         The Trust is established for the purpose of investigating, pursuing (as appropriate), and collecting any proceeds of Litigation Trust Claims which constitute Litigation Trust Assets (as defined herein) for the benefit of the Beneficiaries and the distribution of such proceeds (if any) by the Trustee for ultimate distribution to the Beneficiaries in accordance with the terms and conditions of this Agreement and the Plan and with no objective to continue or engage in the conduct of a trade or business, except to the extent necessary to, and consistent with, the Plan and liquidating purpose of the Trust.

J         Pursuant to the Plan, the Debtors, Trust, Trustee, and Beneficiaries are required to treat, for all federal income tax purposes, the transfer of the Litigation Trust Assets to the Trust as a transfer of the Litigation Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Litigation Trust Assets by the Beneficiaries

---

[1]        Reference in this Agreement to "Debtors" relates to the Reorganized Debtors prior to the occurrence of the Effective Date.

2

to the Trust in exchange for the Litigation Trust Interests, and to treat the Beneficiaries as the grantors and owners of the Trust for federal income tax purposes.

K       The Trust is intended for federal income tax purposes (i) to be treated as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code of 1986, as amended ("IRC"), and (ii) to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d).

L       The Trust is further intended to be exempt from the requirements of (i) pursuant to section 1145 of the Bankruptcy Code, the Securities Exchange Act of 1933, as amended, and any applicable state and local laws requiring registration of securities, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the promises, and the mutual covenants and agreements of the Parties herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

### DECLARATION OF TRUST

The Reorganized Debtors and the Trustee enter into this Agreement to effectuate the distribution of the Litigation Trust Assets to the Beneficiaries pursuant to the Plan and the Confirmation Order;

Pursuant to the Plan, the Confirmation Order, and section 2.3 of this Agreement, all right, title, and interest in, under, and to the Litigation Trust Assets shall be absolutely and irrevocably transferred to the Trust and to its successors in trust and its successors and assigns;

TO HAVE AND TO HOLD unto the Trustee and its successors in trust; and

3

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the Litigation Trust Claims, the Litigation Trust Funding Amount and all other property held from time to time by the Trust under this Agreement and any proceeds thereof and earnings thereon (collectively, "Litigation Trust Assets") are to be held by the Trust and applied on behalf of the Trust by the Trustee on the terms and conditions set forth herein, solely for the benefit of the Beneficiaries and for no other party.

## ARTICLE I

### RECITALS, PLAN DEFINITIONS, OTHER
### DEFINITIONS, INTERPRETATION, AND CONSTRUCTION

1.1     Recitals.  The Recitals are incorporated into and made terms of this Agreement.

1.2     Terms Defined in Plan.  Any capitalized term used and not defined herein shall have the meaning assigned to it in the Plan and the Confirmation Order, as applicable.

1.3     Interpretation.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.4     Construction of Agreement. Except as specifically stated otherwise, this Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.5     Conflict Among Plan Documents.  In the event of any inconsistency between the Plan and the Confirmation Order, as applicable, on the one hand, and this Agreement, on the other hand, the Plan or the Confirmation Order, as applicable, shall control and take precedence. Notwithstanding the foregoing, in the event of any inconsistency solely between Article VII.C of the Plan and this Agreement, this Agreement shall control.

4

## ARTICLE II

## ESTABLISHMENT OF TRUST

2.1    Effectiveness of Agreement; Name of Trust.    Pursuant to the Plan and the Confirmation Order, this Agreement shall become effective on the Effective Date.  The Trust shall be officially known as the "AAC Litigation Trust."

2.2    Purpose of Trust.  The Debtors and the Trustee hereby create the Trust for the primary purpose of (i) collecting, holding, administering, liquidating, and distributing the Litigation Trust Assets for the benefit of the Beneficiaries in accordance with the terms and conditions of the Plan, the Confirmation Order and this Agreement; (ii) investigating, pursuing (as appropriate), and collecting any proceeds of Litigation Trust Claims; and (iii) reconciling, seeking to subordinate, compromising, or settling any or all General Unsecured Claims (other than Junior Lender Deficiency Claims); and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

2.3    Transfer of Litigation Trust Assets.

2.3.1    Conveyance of Litigation Trust Assets.    In accordance with Article VII.B.1 of the Plan, the Debtors hereby irrevocably grant, release, assign, transfer, convey, and deliver, on behalf of the Beneficiaries, the Litigation Trust Assets to the Trust in the manner provided in Section 2.3.2 of this Agreement as of the Effective Date in trust for the benefit of the Beneficiaries to be administered and applied as specified in this Agreement.  The transfer of the Litigation Trust Assets to the Litigation Trust shall be exempt from any stamp, transfer, recording, sales, use or similar tax.    The Reorganized Debtors shall, from time to time, as and when reasonably requested by the

5

Trustee, execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate) and the Reorganized Debtors shall take or cause to be taken such further action, as the Trustee may reasonably deem necessary or appropriate, to vest or perfect in the Trust or confirm to the Trustee title to and possession of the Litigation Trust Assets.  The Trustee shall have no duty to arrange for any of the transfers contemplated under this Agreement or by the Plan or to ensure their compliance with the terms of the Plan and the Confirmation Order, and shall be conclusively entitled to rely on the legality and validity of such transfers.

2.3.2    Title to Litigation Trust Assets.  All the Debtors' right, title, and interest in and to the Litigation Trust Assets are automatically vested in the Trust on the Effective Date, free and clear of all liens, claims, encumbrances, and other interests, and such transfer is on behalf of the Beneficiaries to establish the Trust.  The Trust is authorized to obtain possession or control of, liquidate, and collect all of the Litigation Trust Assets, pursue all of the Litigation Trust Claims, and pursue, assert, and exercise all rights of setoffs and recoupment, and defenses of the Debtors or their Estates to any counterclaims that may be asserted by any and all defendants as to any Litigation Trust Claims.  Following the Effective Date, the Trust shall stand in the shoes of the Reorganized Debtors for all purposes with respect to the Litigation Trust Assets.  The Trustee shall have no authority to bind the Debtors or Reorganized Debtors in any manner except with respect to a Litigation Trust Claim.  Notwithstanding anything in this Agreement to the contrary, the transfer of the Litigation Trust Assets to the Litigation Trust does not diminish, and fully preserves, any defenses a defendant would have if such Litigation Trust Assets had been retained by the Debtors.  By executing this Agreement, the Trustee

6

on behalf of the Trust hereby accepts all such property as Litigation Trust Assets, to be held in trust for the Beneficiaries, subject to the terms of this Agreement and the Plan.

2.4     Capacity of Trust.   Notwithstanding any state or federal law to the contrary or anything herein, the Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.   The Trust may alone be the named movant, respondent, party plaintiff, or defendant, or the like in all adversary proceedings, contested matters, and other state, or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.

2.5     Mutual Cooperation.   The Reorganized Debtors and their professionals shall use commercially reasonable efforts to cooperate with the Trust and Trustee and their professionals in effecting the transition from the Debtors to the Trust of administration of the Litigation Trust Assets.   Such cooperation shall include, but not be limited to, reasonably attempting to identify and facilitate reasonable access to any evidence and information the Trustee reasonably requests (including but not limited to reasonable access to the Debtors' or the Reorganized Debtors' books and records, as applicable), in connection with the Trust's investigation, prosecution, or other pursuit of the Litigation Trust Claims.   The Debtors and Reorganized Debtors shall preserve or, consistent with the prior sentence and subject to the terms of the Confirmation Order, turn over to the Trust copies of all physical or electronically stored documents and communications in their possession or control that relate to the Litigation Trust Claims. Notwithstanding any term to the contrary herein, neither the Reorganized Debtors nor any other party shall be required to deliver any documents, communications or information to the Litigation Trustee to the extent delivery of such documents, communications or information to

7

the extent that such delivery would effect a waiver of a privilege held by such party or would otherwise be contrary to applicable law or legal process.

The Trustee and his professionals shall use commercially reasonable efforts to cooperate with the Reorganized Debtors and their professionals in connection with implementing certain provisions of the Plan including, but not limited to, the issuance of distributions pursuant to the Plan, reporting requirements, the exchange of information in the prosecution of claim objections to the extent necessary, and any other reasonably requested information or assistance.

2.6     Reimbursement of the Reorganized Debtors.  The Litigation Trust shall reimburse the Reorganized Debtors for all out-of-pocket expenses incurred in connection with such party's compliance with its cooperation and/or delivery obligations in this Agreement.

2.7     No Retention of Excess Cash.  Neither the Trust nor the Trustee shall retain cash or cash equivalents other than reserves established pursuant to sections 3.2.21, 4.2, or 4.8 of this Agreement, and shall distribute all amounts not required to be retained for such purposes to the Beneficiaries as promptly as reasonably practicable in accordance with the Plan and this Agreement.

2.8     Acceptance by Trustee.  The Trustee accepts its appointment as trustee of the Trust.

### ARTICLE III

### ADMINISTRATION OF TRUST

3.1     Rights, Powers, and Privileges of Trustee Generally.  Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the date that the Litigation Trust Assets are transferred to the Trust, the Trustee on behalf of the Trust may control and exercise authority over the Litigation Trust Assets, over the acquisition, management, and

disposition thereof, and over the management and conduct of the affairs of the Trust in accordance with this Agreement, the Plan, and the Confirmation Order.  In administering the Litigation Trust Assets, the Trustee shall endeavor not to unduly prolong the Trust's duration, with due regard that undue haste in the administration of the Litigation Trust Assets may fail to maximize value for the benefit of the Beneficiaries and otherwise be imprudent and not in the best interests of the Beneficiaries.

> 3.1.1   Power to Contract.  In furtherance of the purpose of the Trust, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Trustee, with the consent of the Litigation Trust Advisory Board, shall have the right and power on behalf of the Trust, and also may cause the Trust, to enter into any covenants or agreements binding the Trust, and to execute, acknowledge, and deliver any and all instruments that are necessary or deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Trust.

> 3.1.2   Ultimate Right to Act Based on Advice of Counsel or Other Professionals. Nothing in this Agreement shall be deemed to prevent the Trustee from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals (and, as required, in consultation with the Litigation Trust Advisory Board), the Trustee determines it is obligated to take or to refrain from taking in the performance of any duty that the Trustee may owe the Beneficiaries or any other Person under the Plan, Confirmation Order, or this Agreement.

3.2   Powers of Trustee.  Without limiting the generality of the above section 3.1 and subject to Article VI hereof, in addition to the powers granted in the Plan, the Trustee shall have the power to take the following actions on behalf of the Trust and any powers reasonably

9

incidental thereto that the Trustee, in its reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

3.2.1    hold legal title to the Litigation Trust Assets and to any and all rights of the Debtors and the Beneficiaries in or arising from the Litigation Trust Assets;

3.2.2    receive, manage, invest, supervise, protect, and where appropriate, cause the Trust to abandon the Litigation Trust Assets, including causing the Trust to invest any moneys held as Litigation Trust Assets in accordance with the terms of section 3.6 hereof;

3.2.3    open and maintain bank accounts on behalf of or in the name of the Trust;

3.2.4    establish and maintain the Litigation Trust Expense Fund (as defined herein);

3.2.5    with authorization from the Litigation Trust Advisory Board, may borrow money or raise capital on such terms as determined by the Trustee in order to fund the Litigation Trust Expense Fund;

3.2.6    cause the Trust to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

3.2.7    collect and liquidate all Litigation Trust Assets, including the sale of any Litigation Trust Assets;

3.2.8    protect and enforce the rights to the Litigation Trust Assets (including any Litigation Trust Claims) vested in the Trust and Trustee by this Agreement by any

10

method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.2.9    investigate any Litigation Trust Assets, including potential Litigation Trust Claims and cause the Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004 or other applicable rules;

3.2.10  with authorization from the Litigation Trust Advisory Board, cause the Trust to employ and pay professionals and other agents and third parties pursuant to this Agreement;

3.2.11  cause the Trust to pay all its lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Litigation Trust Assets;

3.2.12  cause the Trust to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve all Litigation Trust Claims;

3.2.13  consistent with Article IX.B of the Plan, cause the Trust, as appropriate, to review, investigate, settle, resolve, reconcile, or object to all General Unsecured Claims (other than Junior Lender Deficiency Claims);

3.2.14  establish, adjust, and maintain reserves for Disputed General Unsecured Claims required to be administered by the Trust;

3.2.15  cause the Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, in good faith and based upon the advice of its agents or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

11

3.2.16  in reliance upon the Debtors' schedules, the Claims Register, and a list of holders of Junior Lender Claims as of the Distribution Record Date delivered by the Junior Lien Agent on the Effective Date (the "Junior Lender List") maintain a register evidencing the Litigation Trust Interests held by each Beneficiary and, in accordance with section 3.7 of this Agreement, such register may be the Claims Register to the extent of any General Unsecured Claims reflected thereon;

3.2.17  cause the Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, make tax elections by and on behalf of the Trust, and file tax returns for the Trust as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 pursuant to and in accordance with the Plan and Article VIII hereof, and pay taxes, if any, payable for and on behalf of the Trust; provided, however, that notwithstanding any other provision of this Agreement, neither the Trust nor the Trustee shall have any responsibility in any capacity whatsoever for the preparation, filing, signing, or accuracy of the Debtors' or the Reorganized Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto, which shall be the sole responsibility of the Reorganized Debtors;

3.2.18  cause the Trust to abandon or donate to a charitable organization any Litigation Trust Assets that the Trustee determines to be too impractical to distribute to Beneficiaries or of inconsequential value to the Trust and Beneficiaries in accordance with the terms of the Plan;

3.2.19  cause the Trust to send annually to Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Trust and its share of

the Trust's income, gain, loss, deduction, or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

3.2.20 cause the Trust to seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

3.2.21 cause the Trust to establish such reserves for taxes, assessments, and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of matters incident to the Trust;

3.2.22 consistent with section 3.10 hereof, cause the Trust to purchase and carry all insurance policies that the Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.2.23 undertake all administrative functions of the Trust, including overseeing the winding down and termination of the Trust; and

3.2.24 take all other actions consistent with the provisions of the Plan and this Agreement that the Trustee deems reasonably necessary or desirable to administer the Trust.

3.3 <u>Exclusive Authority to Pursue Litigation Trust Claims</u>. The Trust shall have the exclusive right, power, and interest to pursue, settle, waive, release, abandon, or dismiss the Litigation Trust Claims. The Trust shall be the sole representative of the Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Litigation Trust Assets including, but not limited to, the Litigation Trust Claims. The Trust shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant with respect to any Litigation Trust Claim. The Trust shall also be vested with and

entitled to assert all the Debtors' and the Estates' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

3.4     Abandonment.  If, in the Trustee's reasonable judgment, any non-cash Litigation Trust Assets cannot be sold or liquidated in a commercially reasonable manner or the Trustee believes in good faith that such property has inconsequential value to the Trust or its Beneficiaries, the Trustee shall have the right to cause the Trust to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization, in accordance with the terms of the Plan.

3.5     Agents and Professionals.  The Trustee may, but shall not be required to, consult with and, with authorization from the Litigation Trust Advisory Board, retain attorneys, financial advisors, accountants, appraisers, and other professionals the Trustee believes have qualifications necessary to assist in the administration of the Trust, including professionals previously retained by the Debtors or the Committee.  For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Trustee, with authorization from the Litigation Trust Advisory Board, from engaging counsel or other professionals, including the Trustee itself or the Trustee's firm or their affiliates, to do work for the Trust.  The Trustee may pay the reasonable salaries, fees, and expenses of such Persons out of the Litigation Trust Assets in the ordinary course of business.

3.6     Safekeeping and Investment of Litigation Trust Assets.  All moneys and other assets received by the Trustee shall, until distributed or paid over as provided herein and in the Plan, be held in trust for the benefit of the Beneficiaries, but (except as provided in the Plan or this Agreement) need not be segregated in separate accounts from other Litigation Trust Assets, unless and to the extent required by law or the Plan.  Neither the Trust nor the Trustee shall have

14

any liability for interest or producing income on any moneys received by them and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received by the Trust or Trustee, which shall be distributed as provided in the Plan.  Except as otherwise provided by the Plan, the powers of the Trustee to invest any moneys held by the Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Trust's liquidating purpose, and only to the extent that the Trustee is directed to invest moneys other than in short-term money market funds, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills; provided, however, that the scope of permissible investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 3.01.7701-4(d), may be permitted to hold pursuant to the Treasury Regulations, or any modification of the IRS guidelines, whether set forth in IRS rulings, IRS pronouncements, or otherwise.  For the avoidance of doubt, the provisions of any state law obligating or creating a duty on a trustee to invest trust assets shall not apply to this Agreement.  Notwithstanding the foregoing, the Trustee shall not be prohibited from engaging in any trade or business on its own account, provided that such activity does not interfere or conflict with the Trustee's administration of the Trust.

3.7     Maintenance and Disposition of Trust and Debtor Records.  The Trustee shall maintain accurate records of the administration of Litigation Trust Assets, including receipts and disbursements and other activity of the Trust.  To the extent of any General Unsecured Claims reflected thereon, the Claims Register may serve as the Trustee's register of holders of Class 2B Litigation Trust Interests held by Beneficiaries and the Junior Lender List may serve as the Trustee's register of holders of Class 1 Litigation Trust Interests and Class 2A Litigation Trust

15

Interests.  The fees and costs associated with maintaining and updating the Claims Register shall be the sole responsibility of the Trust.  The books and records maintained by the Trustee, and any records of the Debtors transferred to the Trust for the purpose of prosecuting Litigation Trust Claims, may be disposed of by the Trustee at the later of (i) such time as the Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Trust or its Beneficiaries and (ii) upon the termination and completion of the winding down of the Trust.

3.8     Preservation of Privilege.  As provided in the Confirmation Order, any attorney-client privilege, work-product privilege, or other privilege or immunity of any Debtor (but no other person) attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust.  To the extent there is overlap of supporting documents, claims, defenses, legal theories or analyses between the Litigation Trust Claims, on the one hand, and any Causes of Action, defenses, claims or counterclaims retained by, or asserted against, the Reorganized Debtors, on the other hand, the Reorganized Debtors and the Trustee shall cooperate with each other pursuant to principles of common interest with respect to privileges.  To the extent that settling or pursuing any of the Litigation Trust Claims will have a compromising effect on any Causes of Action, defenses, claims or counterclaims retained by, or asserted against, the Reorganized Debtors, the Trustee shall proceed only with the unanimous consent of the Litigation Trust Advisory Board.

3.9     Reporting Requirements.  The Trustee shall provide the Litigation Trust Advisory Board the information and reports the Litigation Trust Advisory Board may reasonably request concerning Trust administration.

16

3.10    <u>No Bond Required; Procurement of Insurance</u>.  Notwithstanding any state or other applicable law to the contrary, the Trustee (including any successor Trustee) shall be exempt from giving any bond or other security in any jurisdiction and shall serve hereunder without bond.  The Trustee is hereby authorized, but not required to obtain all reasonable insurance coverage for itself, its agents, representatives, employees, or independent contractors, including, without limitation, coverage with respect to the liabilities, duties, and obligations of the Trustee and its agents, representatives, employees, or independent contractors under this Agreement. The cost of any such insurance coverage shall be an expense of the Trust and paid out of Litigation Trust Assets.

3.11    <u>No Suit Against Released Debtor D&Os</u>.  The Trustee shall not pursue any Causes of Action or other litigation against the Released Debtor D&Os.

**ARTICLE IV**

**DISTRIBUTIONS**

4.1    <u>Distribution</u>.  Following the transfer of Litigation Trust Assets to the Trust, the Trustee shall make continuing efforts on behalf of the Trust to collect, liquidate, and distribute all Litigation Trust Assets through the Trustee subject to the reserves required under the Plan or this Agreement.  For avoidance of doubt, the Trustee shall make distributions at least annually to the Beneficiaries of its net income and net proceeds of the Litigation Trust Assets (except that the Trust may retain an amount of net income or net proceeds necessary to maintain the value of its assets or to meet claims and contingent liabilities) at the Trust's expense.

4.2    <u>Reserve of Litigation Trust Assets</u>.  The Trustee shall maintain a reserve (the "<u>Litigation Trust Expense Fund</u>") in an amount as is reasonably necessary to pay the costs and expenses incurred or expected to be incurred by the Trust and Trustee in connection with

17

administering the Litigation Trust Assets and performing the duties set forth in this Agreement, including, without limitation, paying the fees and expenses of the Trustee, and attorneys, advisors, and professionals retained by the Trust or Trustee (the "Litigation Trust Expenses").

With the prior majority approval of the Litigation Trust Advisory Board (as defined herein), the Trust may borrow money or raise capital on such terms as determined by the Trustee in order to fund the Litigation Trust Expense Fund.  Except for purposes of funding the Litigation Trust Expense Fund, the Litigation Trust shall not incur any debt.

4.3     Distributions.  Subject to the terms of the Plan, the Confirmation Order, and this Agreement, the proceeds of the Litigation Trust Assets shall be distributed as follows:

a)     First, to the extent the Litigation Trust Funding Amount is insufficient to pay in full all accrued and unpaid Litigation Trust Expenses, to pay such Litigation Trust Expenses;

b)     Second, once the amounts in sub-paragraph (a) are fully satisfied, to pay to the holders of Class 1 Litigation Trust Interests the Litigation Trust Funding Amount; and

c)     Third, once the amounts in sub-paragraphs (a) and (b) are fully satisfied, to fund distributions to the Beneficiaries to be shared as follows: (1) the holders of Class 2A Litigation Trust Interests shall receive their Pro Rata share of 65% of any distributions under this sub-paragraph (c) up to the Junior Lender Deficiency Claim Allowed Amount; and (2) holders of Class 2B Litigation Trust Interests shall receive their Pro Rata share of 35% of any distributions under this sub-paragraph (c) until the Allowed Junior Lender Deficiency Claims are fully satisfied, at which point holders

18

of Class 2B Litigation Trust Interests shall receive their Pro Rata share of 100% of such distributions.

4.4     Distributions on Account of Disputed Claims.  Except as otherwise provided in the Plan, by Final Order, or as agreed by the relevant parties, distributions on account of Disputed General Unsecured Claim that become Allowed after the Effective Date will be made by the Trustee at such periodic intervals as the Trust determines to be reasonably prudent.

4.5     No Distributions Pending Allowance.  Notwithstanding anything herein to the contrary, no distribution will be made with respect to any Disputed General Unsecured Claim until such Claim becomes an Allowed Claim.   For the Avoidance of Doubt, the Junior Lender Secured Claims and Junior Lender Deficiency Claims were Allowed pursuant to the Plan. Holders of such claims are entitled to Class 1 Litigation Trust Interests and Class 2A Litigation Trust Interests, respectively, and the distributions thereon, without any reconciliation of claims by the Trust.

4.6     Legal Proceedings.  If any Litigation Trust Claim is asserted and if such claim or any other legal proceeding is initiated or prosecuted against any General Unsecured Creditor pursuant to the Plan, Confirmation Order, or this Agreement, or asserted as an objection to any Claim, then notwithstanding anything to the contrary contained in the Plan or Confirmation Order, until such proceeding or contested matter is finally resolved and all payments to the Debtors' Estates required by such resolution have been made, such General Unsecured Creditor shall only receive distributions under the Plan or Confirmation Order to the extent that the distributions to which such General Unsecured Creditor is otherwise entitled exceed the maximum liability of such General Unsecured Creditor to the Debtors' Estates asserted in such proceedings.

4.7     Objection Deadline.  On and after the Effective Date, the Trustee shall be entitled to file objections to all General Unsecured Claims (other than Junior Lender Deficiency Claims) that are otherwise not deemed Allowed Claims, including General Unsecured Claims listed on the Debtors' Schedules, under the Plan, or otherwise.  Any objections to General Unsecured Claims shall be served and filed on or before the later of (i) 180 days after the Effective Date, or (ii) such other period of limitation as may be specifically fixed by order of the Bankruptcy Court for objecting to Claims after reasonable notice and opportunity to object.

4.8     Disputed Claims Reserve.  On and after the Effective Date, the Trust will establish a GUC Disputed Claims Reserve to the extent required under Article VIII.H of the Plan.

4.9     Settling Disputed Claims (or Interests).  The Trustee will be authorized to settle, or withdraw any objections to, any Disputed General Unsecured Claims following the Effective Date without need for approval of the Bankruptcy Court.

4.10    Distributions Net of Costs.  Distributions shall be made net the actual and reasonable costs of making the distributions.

4.11    Setoff.  The Debtors and the Trustee, pursuant to the Bankruptcy Code (including Bankruptcy Code section 553), applicable bankruptcy or nonbankruptcy law, with the approval of the Bankruptcy Court and upon no less than three (3) days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against any Allowed Claim (other than Junior Lender Deficiency Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is to be made on account of such Allowed Claim), any claims of any nature whatsoever that the Debtors may have against the Holder of such Allowed Claim, provided,

20

however, that neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Trustee of any such claim the Debtors may have against the Holder of such Claim.

4.12    Taxes.   Pursuant to Bankruptcy Code section 346(f), the Trustee will be entitled to deduct and withhold any federal, state, or local taxes from any Cash payments made with respect to Allowed Claims.

4.13    Withholding from Distributions.   The Trustee, in its discretion, may cause the Trust to withhold from amounts distributable from the Trust to any Beneficiary any and all amounts as may be sufficient to pay the maximum amount of any tax or other charge that has been or might be assessed or imposed by any law, regulation, rule, ruling, directive, or other governmental requirement on such Beneficiary or the Trust with respect to the amount to be distributed to such Beneficiary.   The Trustee shall determine such maximum amount to be withheld by the Trust in its sole, reasonable discretion and shall cause the Trust to distribute to the Beneficiary any excess amount withheld.   Notwithstanding anything herein to the contrary, each Holder of an Allowed Claim that has received a distribution of Cash under the Plan will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution.   For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

4.14    Right to Rely on Professionals.   Without limitation of the generality of section 6.7 of this Agreement, in determining the amount of any distribution or reserves, the

21

Trustee may reasonably rely and shall be fully protected in relying on the advice and opinion of the Trust's or the Reorganized Debtors' financial advisors, accountants, or other professionals.

4.15    <u>Method and Timing of Distributions</u>.  Distributions to Beneficiaries will be made in accordance with the terms of the Plan and this Agreement.  The Trustee and Reorganized Debtors shall cooperate in a commercially reasonable manner, as necessary, in providing the Trustee with the necessary written instructions and funds to make distributions to the Beneficiaries.

4.16    <u>Tax Identification Numbers</u>.  The Trustee or the Reorganized Debtors may require any Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, and may condition any distribution to any Beneficiary upon receipt of such identification number or tax form.  If, within three months of written request from the Trustee or Reorganized Debtors, a Beneficiary does not provide the Trustee or the Reorganized Debtors with the forgoing information, then the distribution to such Beneficiary shall be administered as an unclaimed distribution in accordance with section 4.17 of this Agreement and, as provided in section VIII.B of the Plan, no further distributions shall be made to such Beneficiary.

4.17    <u>Unclaimed and Undeliverable Distributions</u>.  If any distribution to a Beneficiary is returned as undeliverable or is otherwise unclaimed, such distribution shall be placed into the Undeliverable Distribution Reserve pursuant to section VIII.B.1 of the Plan and no further Distributions to such Beneficiary shall be made unless and until the Beneficiary claims the Distributions by timely notifying the Trustee or the Reorganized Debtors in writing of any information necessary to make the distribution to the Beneficiary in accordance with this Agreement, the Plan, and applicable law, including such Beneficiary's then-current address or

22

taxpayer identification number.  If a Beneficiary timely provides the Trustee the necessary information within the period prescribed by section VIII.B of the Plan, all missed distributions shall be made to the Beneficiary as soon as is practicable, without interest.  Undeliverable or unclaimed distributions shall be administered in accordance with section VIII.B of the Plan.

4.17.1  No Responsibility to Attempt to Locate Beneficiaries.  The Trustee or the Reorganized Debtors may, in their respective sole discretions, attempt to determine a Beneficiary's current address or otherwise locate a Beneficiary, but nothing in this Agreement or the Plan shall require the Trustee or the Reorganized Debtors to do so.

4.17.2  Disallowance of Claims; Cancellation of Corresponding Litigation Trust Interests.  All General Unsecured Claims in respect of undeliverable or unclaimed distributions that have been deemed to have reverted back to the Trust for all purposes (including, but not limited to, for distribution to Holders of other Allowed General Unsecured Claims) pursuant to the Plan shall be deemed disallowed and expunged without further action by the Trust, Trustee, or Reorganized Debtors and without further order of the Bankruptcy Court, and the corresponding Litigation Trust Interests of the Beneficiary holding such disallowed claims shall be deemed canceled.  The Holder of any such Disallowed General Unsecured Claim shall no longer have any right, claim, or interest in or to any distributions in respect of such General Unsecured Claim.  The Holder of any such Disallowed General Unsecured Claim is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such Disallowed General Unsecured Claim against the Trust, Trustee, or Reorganized Debtors unless the Bankruptcy Court orders otherwise.

23

4.17.3 <u>Inapplicability of Unclaimed Property or Escheat Laws</u>.   Unclaimed property held by the Trust shall not be subject to the unclaimed property or escheat laws of the United States, any state, or any local governmental unit.

4.18     <u>Voided Checks; Request for Reissuance</u>.  In accordance with section VIII.B.2 of the Plan, distribution checks issued to Beneficiaries shall be null and void if not negotiated within three months after the date of issuance thereof.  Distributions in respect of voided checks shall be treated as unclaimed distributions under section VIII.B of the Plan and administered under section 4.17 of this Agreement.  Requests for reissuance of any check shall be made in writing directly to the Trustee by the Beneficiary that was originally issued such check.  All such requests shall be made promptly and in time for the check to be reissued and cashed before the funds for the checks become unrestricted Litigation Trust Assets under section Article VIII.B of the Plan.  The Beneficiary shall bear all the risk that, and shall indemnify and hold the Trust, Trustee, and the Reorganized Debtors harmless against any loss that may arise if, the Trustee does not reissue a check promptly after receiving a request for its reissuance.

4.19     <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted with respect to the Litigation Trust Interests under this Agreement, or if there is any disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made in connection with such interest, then, in any of such events, the Trustee shall be entitled, in its sole discretion, to refuse to comply with any such conflicting claims or demands.

4.19.1 The Trustee may elect to cause the Trust to not make any payment or distribution with respect to Litigation Trust Interests subject to the conflicting claims or demand, or any part thereof, and to refer such conflicting claims or demands to the

24

Bankruptcy Court, which shall have continuing jurisdiction over resolution of such conflicting claims or demands.  Neither the Trust nor the Trustee shall be or become liable to any of such parties for their refusal to comply with any such conflicting claims or demands, nor shall the Trust or Trustee be liable for interest on any funds which may be so withheld.

4.19.2  The Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court; or (ii) all differences have been resolved by a valid written agreement among all such parties to the satisfaction of the Trustee, which agreement shall include a complete release of the Trust and Trustee.  Until the Trustee receives written notice that one of the conditions of the preceding sentence is met, the Trustee may deem and treat as the absolute owner under this Agreement of the applicable Litigation Trust Interests the Beneficiary identified as the owner of that interest in the books and records maintained by the Trustee.  The Trustee may deem and treat such Beneficiary as the absolute owner for purposes of receiving Distributions and any payments on account thereof for federal and state income tax purposes, and for all other purposes whatsoever.

4.19.3  In acting or refraining to act under and in accordance with this section 4.19 of the Agreement, the Trustee shall be fully protected and incur no liability to any purported claimant or any other Person pursuant to Article VII of this Agreement.

4.20    De Minimis Distributions.  No payment of Cash in an amount of less than $10.00 shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be used in accordance with the Plan and this Agreement.

25

4.21    Litigation Trust Proceeds Waterfall.    Any Litigation Trust Assets shall be distributed in accordance with the Litigation Trust Proceeds Waterfall and otherwise in accordance with this Agreement.

## ARTICLE V

## BENEFICIARIES

5.1    Interest Beneficial Only.    The ownership of a Litigation Trust Interest shall not entitle any Beneficiary, the Debtors, or the Reorganized Debtors to any title in or title to the Litigation Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.

5.2    Allocation of Litigation Trust Interests.    The allocation and distribution of the Litigation Trust Interests shall be accomplished as set forth in the Plan and the Confirmation Order.    The aggregate number and face value of Litigation Trust Interests to be distributed pursuant to the Plan shall be determined by the Litigation Trustee, consistent with the intent and purposes of the Plan, subject to the approval of the Litigation Trust Advisory Board.

5.3    Evidence of Litigation Trust Interest.    Ownership of a Litigation Trust Interest shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.

5.4    No Right to Accounting.    Neither the Beneficiaries nor their successors, assigns, creditors, nor any other Person (other than Litigation Trust Advisory Board) shall have any right to an accounting by the Trustee, and the Trustee shall not be obligated to provide any accounting to any Person.    Nothing in this Agreement is intended to require the Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the

26

administration of the Trust or as a condition for making any advance, payment, or distribution out of proceeds of Litigation Trust Assets.

5.5     No Standing.  Except as expressly provided in this Agreement, a Beneficiary shall not have standing to direct or to seek to direct the Trust or Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any Person upon or with respect to the Litigation Trust Assets.

5.6     Requirement of Undertaking.  The Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; provided, however, that the provisions of this section 5.6 shall not apply to any suit by the Trustee.

5.7     Limitation on Transferability.  It is understood and agreed that the Litigation Trust Interests shall be non-transferable and non-assignable during the term of this Agreement except by (i) operation of law, (ii) merger of the holder of the Litigation Trust Interests into another Entity, (iii) sale of the holder of the Litigation Trust Interests to another Entity, or (iv) an event that causes an involuntary transfer of a Beneficiary's Litigation Trust Interests.  Any such transfer or sale shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to cause the Trust to pay all amounts to or for the benefit of the assigning Beneficiaries until receipt of proper notification and proof of assignment by operation of law.   The notice shall be executed by the transferee (or appropriate representative) and the transferor (or appropriate representative).   The notice must clearly describe the interest being transferred and must include the transferee's tax identification

27

number, current mailing address, telephone number and email address.  The Trustee may rely upon such notice and proof of assignment without the requirement of any further investigation. Unless the Trustee receives actual written notice of an assignment from the duly authorized transferee (or appropriate representative) not less than thirty (30) days prior to a distribution, the Trustee shall have no duty or obligation to make or direct any distributions or payments to such transferee.

5.8     Exemption from Registration.  The rights of the Beneficiaries arising under this Agreement may be deemed "securities" under applicable law.  However, such rights have not been defined as "securities" under the Plan because (i) the parties hereto intend that such rights shall not be securities and (ii) if the rights arising under this Agreement in favor of the Beneficiaries are deemed to be "securities," the exemption from registration under section 1145 of the Bankruptcy Code is intended to be applicable to such securities.  No party to this Agreement shall make a contrary or different contention.

5.9     Delivery of Distributions.  Subject to the terms of this Agreement, the Trustee shall make distributions to Beneficiaries in the manner provided in the Plan.

**ARTICLE VI**

**Litigation Trust Advisory Board**

6.1     General.  The Litigation Trust Advisory Board shall oversee, review, and guide the activities and performance of the Trustee.

6.2     Litigation Trust Advisory Board Membership.

a)      The Litigation Trust Advisory Board shall consist of three (3) members (the "Litigation Trust Advisory Board Members").  Each Litigation Trust Advisory Board Member that is a natural person shall be at least 18 years

28

of age.   The Litigation Trust Advisory Board Members shall initially consist of (i) Joseph Esparraguera, (ii) Scott Grass, and (iii) Matthew Dundon.   By execution hereof, each Litigation Trust Advisory Board Member agrees to the terms set forth herein.

b)   Each Litigation Trust Advisory Board Member shall hold office until the earlier of (i) the termination of the Trust, (ii) the resignation, death, or disability of such Litigation Trust Advisory Board Member or (iii) the removal of such Litigation Trust Advisory Board Member in accordance with this Agreement.

c)   Any Litigation Trust Advisory Board Member may resign upon thirty (30) days' prior written notice to the other members of the Litigation Trust Advisory Board and the Trustee.

d)   A Litigation Trust Advisory Board Member may be removed only for "cause" by order of the Bankruptcy Court upon application of the Trustee or the other members of the Litigation Trust Advisory Board acting unanimously, with the reasonable costs of such application (and any objection or response thereto) to be paid for by the Trust.

e)   In the event of a vacancy on the Litigation Trust Advisory Board, whether as a result of the resignation, death, disability, or removal of a Litigation Trust Advisory Board Member, (i) if, prior to the termination of service of such Litigation Trust Advisory Board Member other than as a result of removal, such Litigation Trust Advisory Board Member has designated in writing an individual to succeed him or her, such individual shall be his or

29

her successor, subject to the consent of the Trustee and each of the remaining Litigation Trust Advisory Board Members, with such consent not to be unreasonably withheld, or (ii) if such Litigation Trust Advisory Board Member did not designate a successor prior to the termination of his or her service in accordance with clause (i) of this Section 6.2(e), the remaining Litigation Trust Advisory Board Members, acting by unanimous vote, shall select a replacement Litigation Trust Advisory Board Member; *provided, however,* that to the extent that the remaining Litigation Trust Advisory Board Members cannot agree to a joint designee to the Litigation Trust Advisory Board within thirty (30) days after such vacancy, the third member of the Litigation Trust Advisory Board shall be designated by the Bankruptcy Court.  Until a successor member has been appointed, the Litigation Trust Advisory Board shall operate with two (2) members.

f)      Any two (2) members of the Litigation Trust Advisory Board constitute a quorum for voting and approval purposes.

For purposes of this Article, the term "cause" shall mean (a) the Litigation Trust Advisory Board Member's gross negligence, willful misconduct, or willful failure to perform his or her duties under the Plan, the Confirmation Order, or this Agreement, or (b) the Litigation Trust Advisory Board Member's misappropriation or embezzlement of any Litigation Trust Assets or the proceeds thereof.

30

6.3     Compensation. The Litigation Trust Advisory Board Members shall not be compensated for their services, but will be entitled to reimbursement from the Trust for reasonable and documented out-of-pocket expenses.

6.4     Authority. Except as otherwise expressly provided herein, the Litigation Trust Advisory Board shall have no authority to act on behalf of the Trust.

6.5     Rights and Powers of the Litigation Trust Advisory Board. In addition to such other rights as are set forth in this Agreement, the Litigation Trust Advisory Board shall have the right to:

a)     acting by a majority, remove a Trustee for any reason, with or without cause;

b)     acting by a majority, consent to the taking of any Material Action by the Trustee, as set forth in Section 6.6 herein;

c)     receive and review the reports of the Trustee and consult with same on any matters related to the Trust or the Litigation Trust Assets;

d)     review and consult with the Trustee regarding: (i) distributions to Beneficiaries; (ii) the prosecution, settlement, transfer, release, or abandonment of any Trust Causes of Action on behalf of the Trust; (iii) the amendment of this Agreement as provided in Section 11.7 of this Agreement; and (iv) such other actions as are specified in this Agreement;

e)     acting by a majority, appoint a successor Trustee as provided in Section 9.5 this Agreement;

f)   acting by a majority, apply to the Bankruptcy Court for the removal of a Litigation Trust Advisory Board Member as provided in Section 6.2(d) of this Agreement;

g)   have access, upon reasonable notice and during normal business hours, to all reports, documents, memoranda, and other work product of the Trustee; and

h)   monitor the actions of the Trustee and receive, upon request, periodic status reports from the Trustee as to the status of (i) the litigation, settlement, administration, and pursuit of the Trust Causes of Action and (ii) the administration of the Litigation Trust Assets.  For the avoidance of doubt, the failure to specifically identify rights in this Section 6.5 shall not limit or otherwise impair the right of the Trustee or the members of the Litigation Trust Advisory Board to consult with the Trustee or members of the Litigation Trust Advisory Board individually or collectively on any or all issues that he or they may determine to be relevant or appropriate; and

i)   acting by a majority, retain and employ attorneys and other professionals on behalf of the Trust to facilitate the Trustee's performance of his or her duties under this Agreement.

6.6   <u>Material Actions</u>.  "Material Action" means each of the following, each of which may only be undertaken with the consent of a majority of the Litigation Trust Advisory Board:

a)   the filing of any complaint or initiation of any proceeding in respect of any Trust Causes of Action;

b)   the settlement or dismissal of any Trust Cause of Action;

32

c)     the settlement of any General Unsecured Claim which would result in such Claim being Allowed in an amount greater than $100,000;

d)     entry into any contingency fee agreement or litigation funding agreement;

e)     borrowing money or raising capital; and

f)     the selection and engagement of any material legal, financial, accounting, investment, auditing, experts, and other advisors and professionals as the Trust requires.

6.7     Duties; Standard of Care

a)     Each Litigation Trust Advisory Board Member's rights and powers hereunder are exercisable solely on behalf of the Trust, consistent with, and in furtherance of, the purpose of the Trust and not otherwise, and in accordance with applicable law.

b)     No Litigation Trust Advisory Board Member shall have the authority to bind the Trust.

c)     No Litigation Trust Advisory Board Member, in its capacity as such, shall have any liability whatsoever to the Trust or its Beneficiaries for any claim, cause of action, loss, liability, damage, or expense suffered by the Trust or its Beneficiaries.

**ARTICLE VII**

**THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY**

7.1     Parties Dealing With the Trustee. In the absence of actual knowledge to the contrary, any Person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Litigation

33

Trust Assets. There is no obligation of any Person dealing with the Trustee to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

7.2 <u>Limitation of Trustee's Liability</u>. In exercising the rights granted in this Agreement, the Plan and Confirmation Order, the Trustee shall exercise the Trustee's best judgment, to the end that the affairs of the Trust shall be properly managed and the interests of all the Beneficiaries safeguarded. However, notwithstanding anything herein to the contrary, neither the Trustee nor its firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents, or agents, and any of such Person's successors and assigns shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, whether sounding in tort, contract, or otherwise, except for actual fraud, gross negligence, reckless or willful misconduct, or willful disregard of the Trustee's duties or material breach of the Agreement that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Trust. Except in the case of actual fraud, gross negligence, reckless or willful misconduct, or willful disregard of the Trustee's duties or material breach of the Agreement that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Trust, in no event shall the Trustee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Trustee has been informed of the likelihood of such loss or damages and regardless of the form of action. Without limiting the

34

foregoing, the Trustee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Plan and Confirmation Order.

7.3 No Liability for Acts of Other Persons. None of the Persons identified in the immediately preceding section 7.2 of this Agreement shall be liable for the act or omission of any other Person identified in that section.

7.4 No Liability for Acts of Predecessors. No successor Trustee shall be in any way responsible for the acts or omissions of any Trustee in office prior to the date on which such successor becomes the Trustee, unless a successor Trustee expressly assumes such responsibility.

7.5 No Liability for Good Faith Error of Judgment. The Trustee shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Trustee was grossly negligent in ascertaining the pertinent facts.

7.6 Reliance by Trustee on Documents and Advice of Counsel or Other Persons. Except as otherwise provided herein, the Trustee may reasonably rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties. The Trustee also may engage and consult with its legal counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or suffered by the Trustee in reasonable reliance upon the advice of such counsel, agents, or advisors.

7.7 No Liability For Acts Approved by Bankruptcy Court. The Trustee shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Litigation Trust Assets required to be administered by the Trust. The Trustee

35

shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute actual fraud, gross negligence, or willful misconduct.

7.8   No Personal Obligation for Trust Liabilities.   Except as otherwise provided herein, persons dealing with the Trustee shall have recourse only to the Litigation Trust Assets to satisfy any liability incurred by the Trustee to any such Person in carrying out the terms of this Agreement, and the Trustee shall have no personal, individual obligation to satisfy any such liability.

7.9   Indemnification.   The Trustee and its consultants, agents, attorneys, accountants, financial advisors, beneficiaries, estates, employees, officers, directors, principals, professionals, and other representatives, each in their representative capacity as such, the Litigation Trust Advisory Board Members, and any of such parties' successors and assigns (collectively, the "Indemnified Parties" and each, an "Indemnified Party") shall, to the fullest extent permitted by applicable law, be defended, held harmless, and indemnified by the Trust from time to time and receive reimbursement from and against any and all loss, liability, expense (including counsel fees), or damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the Indemnified Parties may incur or sustain in connection with the exercise or performance of any of the Trust's or Trustee's powers and duties under this Agreement or in rendering services by the Indemnified Party to the Trust or Trustee (the "Indemnified Conduct"), including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or

36

review) of a court of competent jurisdiction to result directly and primarily from the actual fraud, gross negligence, reckless or willful misconduct, or willful disregard of the duties or material breach of the Agreement of the Indemnified Party asserting this provision.

7.9.1 <u>Expense of Trust; Limitation on Source of Payment of Indemnification</u>. All indemnification liabilities of the Trust under this section 7.9 shall be expenses of the Trust. The amounts necessary for such indemnification and reimbursement shall be paid by the Trust out of the available Litigation Trust Assets after reserving for all actual and anticipated expenses and liabilities of the Trust. The Trustee shall not be personally liable for the payment of any Trust expense or claim or other liability of the Trust, and no Person shall look to the Trustee or other Indemnified Parties personally for the payment of any such expense or liability.

7.9.2 <u>Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay</u>. The Trust shall reasonably promptly pay an Indemnified Party all amounts subject to indemnification under this section 7.9 on submission of invoices for such amounts by the Indemnified Party. The Trustee shall approve the indemnification of any Indemnified Party and thereafter shall approve any monthly bills of such Indemnified Party for indemnification. All invoices for indemnification shall be subject to the approval of the Trustee. By accepting any indemnification payment, the Indemnified Party undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 7.9.

7.10    No Implied Obligations.    The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

7.11    Confirmation of Survival of Provisions.    Without limitation in any way of any provision of this Agreement, the provisions of this Article VII shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of the Trustee, or the termination of the Trust or this Agreement, and shall inure to the benefit of the Trustee's and the Indemnified Parties' heirs and assigns.

## ARTICLE VIII

### TAX MATTERS

8.1    Tax Treatment of Trust.    Pursuant to and in accordance with the Plan, for all federal income tax purposes, the Debtors, the Reorganized Debtors, the Beneficiaries, the Trustee, and the Trust shall treat the Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124 and transfer of the Litigation Trust Assets to the Trust shall be treated as a transfer of the Litigation Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed General Unsecured Claims, followed by a transfer of the Litigation Trust Assets by the Beneficiaries to the Trust in exchange for their pro rata beneficial interests in the Trust.    The Beneficiaries shall be treated as the grantors and owners of the Trust for federal income tax purposes.    Notwithstanding the foregoing, in the event of a final determination that the Trust does not qualify as a grantor trust, the Beneficiaries and the Trustee intend that it be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Trust to be treated as such a partnership.

38

8.2     Annual Reporting and Filing Requirements.  Pursuant to and in accordance with the terms of the Plan and this Agreement, the Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Income Tax Regulation Section 1.671-4(a).

8.3     Tax Treatment of Reserves for Disputed General Unsecured Claims.  The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed General Unsecured Claims, including (i) filing a tax election to treat any and all reserves for Disputed General Unsecured Claims as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust; or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report any reserve for Disputed General Unsecured Claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal or state income tax due.

8.4     Valuation of Litigation Trust Assets.  After the Effective Date, but in no event later than the due date for timely filing of the Trust's first federal income tax return (taking into account applicable tax filing extensions), the Trustee shall (a) determine the fair market value of the Litigation Trust Assets as of the Effective Date, based on the Trustee's good faith determination; and (b) establish appropriate means to apprise the Beneficiaries of such valuation. The Litigation Trust shall bear the costs and expenses incurred in connection with determining such value, including the fees and expenses of any Persons retained by the Trustee in connection therewith.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Trust, the Trustee, and the Beneficiaries) for all

39

federal income tax purposes; *provided*, *however*, that such valuation shall not be binding on the Trustee or any other party for any other purposes, including without limitation in regard to the liquidation of the Litigation Trust Assets, whether by disposition, liquidation, litigation, settlement, or otherwise.  Any such valuation shall be inadmissible in any proceeding concerning the Litigation Trust Claims.

## ARTICLE IX

### SELECTION, REMOVAL, REPLACEMENT AND COMPENSATION OF TRUSTEE

9.1     Initial Trustee.  Peter Kravitz shall be the initial Trustee and is appointed effective as of the Effective Date.

9.2     Term of Service.  The Trustee shall serve until (a) the completion of the administration of the Litigation Trust Assets and the Trust, including the winding up of the Trust, in accordance with this Agreement and the Plan; (b) termination of the Trust in accordance with the terms of this Agreement and the Plan; or (c) the Trustee's death, dissolution, liquidation, resignation, incapacity, or removal.  If the Trustee's appointment terminates by reason of death, dissolution, liquidation, resignation, incapacity, or removal, except as provided in Section 9.3 of this Agreement, the Trustee shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced.  The provisions of Article IX of this Agreement shall survive the resignation or removal of any Trustee.

9.3     Removal of Trustee.  The Litigation Trust Advisory Board may remove the Trustee at any time, with or without cause.  However, if a Trustee is removed for cause, such Trustee shall not be entitled to any accrued but unpaid fees, reimbursements, or other compensation under this Agreement or otherwise.  If the Trustee is removed other than for

"cause," or is unwilling or unable to serve (a) by virtue of his inability to perform his duties under this Agreement due to death, illness, or other physical or mental disability, or (b) for any other reason whatsoever other than for "cause," subject to a final accounting, the Trustee shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Trustee.  For purposes of this Article, the term "cause" shall mean (a) the Trustee's actual fraud, gross negligence, reckless or willful misconduct, willful disregard of his duties under the Plan, the Confirmation Order, or this Agreement, or material breach of the Agreement, or (b) the Trustee's misappropriation or embezzlement of any Litigation Trust Assets or the proceeds thereof.

9.4     Resignation of Trustee.  The Trustee may resign at any time on written notice to the U.S. Trustee and Bankruptcy Court.  The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is thirty (30) days after the date such notice is filed with the Bankruptcy Court and served on the U.S. Trustee.  In the event of a resignation, the resigning Trustee shall render to the Litigation Trust Advisory Board a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Trustee.

9.5     Appointment of Successor Trustee.  Upon the death, dissolution, liquidation, resignation, incapacity, or removal of a Trustee, a successor Trustee shall be appointed by a majority vote of the Litigation Trust Advisory Board.  To the extent that the Litigation Trust Advisory Board cannot agree to a successor Trustee within thirty (30) days after a vacancy, the successor Trustee shall be designated by the Bankruptcy Court.  Any successor Trustee so

41

appointed (a) shall consent to and accept its appointment as successor Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of its appointment as successor Trustee and (b) shall not have any liability or responsibility for the acts or omissions of any of its predecessor(s).  Any successor Trustee may be appointed to serve on an interim basis.

9.6     Powers and Duties of Successor Trustee.  A successor Trustee shall have all the rights, privileges, powers, and duties of its predecessor under this Agreement, the Plan, and Confirmation Order.

9.7     Trust Continuance.  The death, dissolution, liquidation, resignation, incapacity, or removal of the Trustee shall not terminate the Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.

9.8     Compensation of Trustee and Costs of Administration.  The Trustee shall receive fair and reasonable compensation for its services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Litigation Trust Assets.  All costs, expenses, and obligations incurred by the Trustee (or professionals who may be employed by the Trustee in administering the Trust, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Trust from the Litigation Trust Assets prior to any distribution to the Beneficiaries.  The terms of the compensation of the Trustee are set forth on Exhibit A hereto.

**ARTICLE X**

**DURATION OF TRUST**

10.1    Duration.  Once the Trust becomes effective upon the Effective Date of the Plan, the Trust and this Agreement shall remain and continue in full force and effect until the Trust is terminated.

10.2    Termination on Payment of Trust Expenses and Distribution of Litigation Trust Assets.  Upon the payment of all costs, expenses, and obligations incurred in connection with administering the Trust, and the distribution of all Litigation Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement, the Trust shall terminate and the Trustee shall have no further responsibility in connection therewith except as may be required to effectuate such termination under relevant law; provided, however, that in no event shall the Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth anniversary (or within the six (6) month period prior to the end of an extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed five (5) years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

10.3    No Termination by Beneficiaries.  The Trust may not be terminated at any time by the Beneficiaries.

10.4    Continuance of Trust for Winding Up; Discharge; and Release of Trustee.  After the termination of the Trust and solely for the purpose of liquidating and winding up the affairs

of the Trust, the Trustee shall continue to act as such until its responsibilities have been fully performed. Except as otherwise specifically provided herein, upon the distribution of the Litigation Trust Assets including all excess reserves, the Trustee and the Trust's professionals and agents shall be deemed discharged and have no further duties or obligations hereunder. Upon a motion by the Trustee, the Bankruptcy Court may enter an order relieving the Trustee, its employees, professionals, and agents of any further duties, discharging and releasing the Trustee, its employees, professionals, and agents from all liability related to the Trust, and releasing the Trustee's bond, if any.

**ARTICLE XI**

**MISCELLANEOUS**

11.1 <u>Cumulative Rights and Remedies</u>. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

11.2 <u>Notices</u>. All notices to be given to Beneficiaries may be given by ordinary mail, or may be delivered personally, to the Holders at the addresses appearing on the books kept by the Trustee. Any notice or other communication which may be or is required to be given, served, or sent to the Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> If to the Trust or Trustee:
>
> AAC Holdings, Inc. Litigation Trust
> c/o Province, Inc.
> 2360 Corporate Circle
> Suite 330
> Henderson, NV 89074
> Attn: Peter Kravitz
>
> with a copy to its counsel:

44

Cole Schotz P.C.
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Attn: Seth Van Aalten, Esq.

or to such other address as may from time to time be provided in written notice by the Trustee.

11.3    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

11.4    Successors and Assigns.    This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

11.5    Particular Words.    Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement.    The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

11.6    Execution.    All funds in the Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish, or attach the Litigation Trust Assets or the Trustee in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court.    Payments will be solely governed by the Plan and this Agreement.

11.7    Amendment.    Any provision of this Agreement may be amended, supplemented or waived by the Trustee and the Reorganized Debtors, subject to the prior approval of a majority of the members of the Litigation Trust Advisory Board, without notice to or the consent of any Beneficiary or the approval of the Bankruptcy Court; *provided*, *however*, that no change

45

may be made to this Agreement without the approval of the Bankruptcy Court, following notice to the Beneficiaries, that would (a) adversely affect (i) the distributions to any of the Beneficiaries or (ii) the U.S. Federal income tax status of the Trust as a "liquidating trust," (b) require any Beneficiary to furnish or advance funds to the Trustee or entail any personal liability or the surrender of any individual right on the part of any Beneficiary except with the written consent of such Beneficiary, (c) expand, add to, or modify the original stated purpose of the Trust (as described in the Plan and Section 2.4 of this Agreement), or (d) otherwise be in contravention of the Plan or the Confirmation Order.

11.8    No Waiver.  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

11.9    No Relationship Created.   Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind.

11.10   Severability.   If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable, or against its regulatory policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

11.11   Further Assurances.  The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

11.12   Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.13   Entire Agreement.   This Agreement (including the recitals), the Plan, and the Confirmation Order constitute the entire agreement of the Parties and there are no representations, warranties, covenants, or obligations except as set forth herein or therein.  This Agreement, the Plan, and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  In the event of any inconsistency between this Agreement, the Plan, and the Confirmation Order, the Confirmation Order and Plan, in that order, shall govern; provided, however, that the Trustee may amend, modify, or correct the terms hereof to supersede the Plan and/or the Confirmation Order, with the approval of the Bankruptcy Court.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

11.14   Jurisdiction.   The Bankruptcy Court shall have jurisdiction regarding the Reorganized Debtors, Trust, Trustee, and Litigation Trust Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Trust.  The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Trust.  The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters.

47

48

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

[*Remainder of this page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

AAC Dallas Outpatient Center, LLC

By:_____

Name:_____

Title:_____

AAC Healthcare Network, Inc.

By:_____

Name:_____

Title:_____

AAC Holdings, Inc.

By: _____

Name_____

Title:_____

AAC Las Vegas Outpatient Center, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

ABTTC, LLC

By: _____

Name_____

Title:_____

AdCare Criminal Justice Services, Inc.

By: _____

Name_____

Title:_____

AdCare Hospital of Worcester, Inc.

By: _____

Name_____

Title:_____

AdCare Rhode Island, Inc.

By: _____

Name_____

Title:_____

AdCare, Inc.

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Addiction Labs of America, LLC

By: _____

Name _____

Title: _____

American Addiction Centers, Inc.

By: _____

Name _____

Title: _____

B&B Holdings Intl. LLC

By: _____

Name _____

Title: _____

Behavioral Healthcare Realty, LLC

By: _____

Name _____

Title: _____

BHR Aliso Viejo Real Estate, LLC

By: _____

Name _____

Title: _____

[Signature Page to Litigation Trust Agreement]

BHR Greenhouse Real Estate, LLC

By: _____

Name_____

Title:_____

BHR Oxford Real Estate, LLC

By: _____

Name_____

Title:_____

BHR Ringwood Real Estate, LLC

By: _____

Name_____

Title:_____

Clinical Revenue Management Services, LLC

By: _____

Name_____

Title:_____

Concorde Real Estate, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Concorde Treatment Center, LLC

By: _____

Name_____

Title:_____

Diversified Healthcare Strategies, Inc.

By: _____

Name_____

Title:_____

Fitrx, LLC

By: _____

Name_____

Title:_____

Forterus Health Care Services, Inc.

By: _____

Name_____

Title:_____

Grand Prairie Professional Group, P.A.

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Green Hill Realty Corporation

By: _____

Name_____

Title:_____

Greenhouse Treatment Center, LLC

By: _____

Name_____

Title:_____

Laguna Treatment Hospital, LLC

By: _____

Name_____

Title:_____

Las Vegas Professional Group - Calarco, P.C.

By: _____

Name_____

Title:_____

Lincoln Catharine Realty Corporation

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

New Jersey Addiction Treatment Center, LLC

By: _____

Name_____

Title:_____

Oxford Outpatient Center, LLC

By: _____

Name_____

Title:_____

Oxford Professional Group, P.C.

By: _____

Name_____

Title:_____

Oxford Treatment Center, LLC

By: _____

Name_____

Title:_____

Palm Beach Professional Group, Professional
Corporation

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Pontchartrain Medical Group, A Professional
Corporation

By: _____

Name_____

Title:_____

Recovery Brands, LLC

By: _____

Name_____

Title:_____

Recovery First of Florida, LLC

By: _____

Name_____

Title:_____

Referral Solutions Group, LLC

By: _____

Name_____

Title:_____

RI - Clinical Services, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

River Oaks Treatment Center, LLC

By: _____

Name _____

Title: _____

Sagenex Diagnostics Laboratory, LLC

By: _____

Name _____

Title: _____

San Diego Addiction Treatment Center, Inc.

By: _____

Name _____

Title: _____

San Diego Professional Group, P.C.

By: _____

Name _____

Title: _____

Singer Island Recovery Center LLC

By: _____

Name _____

Title: _____

[Signature Page to Litigation Trust Agreement]

Sober Media Group, LLC

By: _____

Name_____

Title:_____

Solutions Treatment Center, LLC

By: _____

Name_____

Title:_____

Taj Media LLC

By: _____

Name_____

Title:_____

The Academy Real Estate, LLC

By: _____

Name_____

Title:_____

Tower Hill Realty, Inc.

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Peter Kravitz, Trustee

By: _____

Name: Peter Kravitz

[Signature Page to Litigation Trust Agreement]

## Exhibit A

**Terms of Compensation of Trustee**

1.)     <u>Compensation</u>.  In consideration for the services of the Trustee under this Agreement, the

Trustee shall receive the following compensation from the Litigation Trust Assets:

$15,000.00 per month.

Schedule 2

(Redline of Litigation Trust Agreement)

FORM SUBJECT TO ONGOING REVIEW

## LITIGATION TRUST AGREEMENT AND DECLARATION OF TRUST

This litigation trust agreement and declaration of trust (the "Agreement"), dated as of October [●], 2020, is made by and among AAC Holdings, Inc. and its affiliated chapter 11 debtors and debtors-in-possession (collectively, as reorganized under and pursuant to the Plan from and after the Effective Date, the "Reorganized Debtors")[1] and Peter Kravitz (together with his successors, the "Trustee," and together with the Debtors, each, a "Party" and collectively, the "Parties").

### RECITALS

A       On June 20, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re AAC Holdings, Inc., et al.*, Case No. 20-11648 (JTD).

B       On July 7, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") consisting of (i) Collect RX LLC; (ii) Beckman Coulter, Inc; and (iii) Willie Meadows [Docket No. 97].

C       On October 11, 2020, the Debtors filed the *Second Amended Joint Plan of Reorganization of AAC Holdings, Inc. and its Affiliated Debtors* (as confirmed, the "Plan") [Docket No. 647].

D       On [●], 2020, the Bankruptcy Court entered an order (October 20, 2020, the Bankruptcy Court that certain *Order Confirming Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. And Its Debtor Affiliates* (as confirmed, including any amendments and

---

[1]   Reference in this Agreement to "Debtors" relates to the Reorganized Debtors prior to the occurrence of the Effective Date.

61370/0001-21426655v1

supplements thereto, the "Plan") [Docket No. 695] (the "Confirmation Order") ~~[Docket No. [●]] confirming the Plan, which became effective on [●], 2020~~confirming the Plan.

E        On November 20, 2020, the Bankruptcy Court entered that certain *Order in Aid of Second Amended Joint Chapter 11 Plan of AAC Holdings, Inc. and its Debtor Affiliates Approving Certain Transactions to Implement the Confirmed Plan* [Docket No. 765].

F        The "Effective Date" of the Plan (the "Effective Date") is the date of this Agreement.

G        ~~E~~ The Plan provides for the establishment of the Litigation Trust (the "Trust"), effective on the Effective Date of the Plan.

H        ~~F~~ The Trust is established for the benefit of holders of Allowed General Unsecured Claims, including the holders of Junior Lender Deficiency Claims, if any (collectively, the "Beneficiaries").

I        ~~G~~ The Trust is established for the purpose of investigating, pursuing (as appropriate), and collecting any proceeds of Litigation Trust Claims which constitute Litigation Trust Assets (as defined herein) for the benefit of the Beneficiaries and the distribution of such proceeds (if any) by the Trustee for ultimate distribution to the Beneficiaries in accordance with the terms and conditions of this Agreement and the Plan and with no objective to continue or engage in the conduct of a trade or business, except to the extent necessary to, and consistent with, the Plan and liquidating purpose of the Trust.

J        ~~H~~ Pursuant to the Plan, the Debtors, Trust, Trustee, and Beneficiaries are required to treat, for all federal income tax purposes, the transfer of the Litigation Trust Assets to the Trust as a transfer of the Litigation Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Litigation Trust Assets by the Beneficiaries

2

to the Trust in exchange for the Litigation Trust Interests, and to treat the Beneficiaries as the grantors and owners of the Trust for federal income tax purposes.

K.    I.  The Trust is intended for federal income tax purposes (i) to be treated as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code of 1986, as amended ("IRC"), and (ii) to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d)[2].

L.    J.  The Trust is further intended to be exempt from the requirements of (i) pursuant to section 1145 of the Bankruptcy Code, the Securities Exchange Act of 1933, as amended, and any applicable state and local laws requiring registration of securities, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the promises, and the mutual covenants and agreements of the Parties herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## DECLARATION OF TRUST

The Reorganized Debtors and the Trustee enter into this Agreement to effectuate the distribution of the Litigation Trust Assets to the Beneficiaries pursuant to the Plan and the Confirmation Order;

Pursuant to the Plan, the Confirmation Order, and section 2.3 of this Agreement, all right, title, and interest in, under, and to the Litigation Trust Assets shall be absolutely and irrevocably transferred to the Trust and to its successors in trust and its successors and assigns;

---

[2] NTD: Subject to tax review.

3

TO HAVE AND TO HOLD unto the Trustee and its successors in trust; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the Litigation Trust Claims, the Litigation Trust Funding Amount and all other property held from time to time by the Trust under this Agreement and any proceeds thereof and earnings thereon (collectively, "Litigation Trust Assets") are to be held by the Trust and applied on behalf of the Trust by the Trustee on the terms and conditions set forth herein, solely for the benefit of the Beneficiaries and for no other party.

## ARTICLE I

### RECITALS, PLAN DEFINITIONS, OTHER DEFINITIONS, INTERPRETATION, AND CONSTRUCTION

1.1     Recitals.   The Recitals are incorporated into and made terms of this Agreement.

1.2     Terms Defined in Plan.  Any capitalized term used and not defined herein shall have the meaning assigned to it in the Plan and the Confirmation Order, as applicable.

1.3     Interpretation.   Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.4     Construction of Agreement.  Except as specifically stated otherwise, this Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.5     Conflict Among Plan Documents.  In the event of any inconsistency between the Plan and the Confirmation Order, as applicable, on the one hand, and this Agreement, on the other hand, the Plan or the Confirmation Order, as applicable, shall control and take precedence.

4

Notwithstanding the foregoing, in the event of any inconsistency solely between Article VII.C of the Plan and this Agreement, this Agreement shall control.

## ARTICLE II

## ESTABLISHMENT OF TRUST

2.1    Effectiveness of Agreement; Name of Trust.    Pursuant to the Plan and the Confirmation Order, this Agreement shall become effective on the Effective Date.    The Trust shall be officially known as the "AAC Litigation Trust."

2.2    Purpose of Trust.    The Debtors and the Trustee hereby create the Trust for the primary purpose of (i) collecting, holding, administering, liquidating, and distributing the Litigation Trust Assets for the benefit of the Beneficiaries in accordance with the terms and conditions of the Plan, the Confirmation Order and this Agreement; (ii) investigating, pursuing (as appropriate), and collecting any proceeds of Litigation Trust Claims; and (iii) reconciling, seeking to subordinate, compromising, or settling any or all General Unsecured Claims (other than Junior Lender Deficiency Claims); and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

2.3    Transfer of Litigation Trust Assets.

2.3.1    Conveyance of Litigation Trust Assets.    In accordance with Article VII.B.1 of the Plan, the Debtors hereby irrevocably grant, release, assign, transfer, convey, and deliver, on behalf of the Beneficiaries, the Litigation Trust Assets to the Trust in the manner provided in Section 2.3.2 of this Agreement as of the Effective Date in trust for the benefit of the Beneficiaries to be administered and applied as specified in this Agreement.    The transfer of the Litigation Trust Assets to the Litigation Trust shall be

61370/0001-21426655v1

exempt from any stamp, transfer, recording, sales, use or similar tax.  The Reorganized Debtors shall, from time to time, as and when reasonably requested by the Trustee, execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate) and the Reorganized Debtors shall take or cause to be taken such further action, as the Trustee may reasonably deem necessary or appropriate, to vest or perfect in the Trust or confirm to the Trustee title to and possession of the Litigation Trust Assets.  The Trustee shall have no duty to arrange for any of the transfers contemplated under this Agreement or by the Plan or to ensure their compliance with the terms of the Plan and the Confirmation Order, and shall be conclusively entitled to rely on the legality and validity of such transfers.

2.3.2    Title to Litigation Trust Assets.  All the Debtors' right, title, and interest in and to the Litigation Trust Assets are automatically vested in the Trust on the Effective Date, free and clear of all liens, claims, encumbrances, and other interests, and such transfer is on behalf of the Beneficiaries to establish the Trust.  The Trust is authorized to obtain possession or control of, liquidate, and collect all of the Litigation Trust Assets, pursue all of the Litigation Trust Claims, and pursue, assert, and exercise all rights of setoffs and recoupment, and defenses of the Debtors or their Estates to any counterclaims that may be asserted by any and all defendants as to any Litigation Trust Claims. Following the Effective Date, the Trust shall stand in the shoes of the Reorganized Debtors for all purposes with respect to the Litigation Trust Assets.  The Trustee shall have no authority to bind the Debtors or Reorganized Debtors in any manner except with respect to a Litigation Trust Claim.  Notwithstanding anything in this Agreement to the contrary, the transfer of the Litigation Trust Assets to the Litigation Trust does not

6

61370/0001-21426655v1

diminish, and fully preserves, any defenses a defendant would have if such Litigation Trust Assets had been retained by the Debtors.  By executing this Agreement, the Trustee on behalf of the Trust hereby accepts all such property as Litigation Trust Assets, to be held in trust for the Beneficiaries, subject to the terms of this Agreement and the Plan.

2.4     Capacity of Trust.  Notwithstanding any state or federal law to the contrary or anything herein, the Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.  The Trust may alone be the named movant, respondent, party plaintiff, or defendant, or the like in all adversary proceedings, contested matters, and other state, or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.

2.5     Mutual Cooperation.  The Reorganized Debtors and their professionals shall use commercially reasonable efforts to cooperate with the Trust and Trustee and their professionals in effecting the transition from the Debtors to the Trust of administration of the Litigation Trust Assets.  Such cooperation shall include, but not be limited to, reasonably attempting to identify and facilitate reasonable access to any evidence and information the Trustee reasonably requests (including but not limited to reasonable access to the Debtors' or the Reorganized Debtors' books and records, as applicable), in connection with the Trust's investigation, prosecution, or other pursuit of the Litigation Trust Claims.  The Debtors and Reorganized Debtors shall preserve or, consistent with the prior sentence and subject to the terms of the Confirmation Order, turn over to the Trust copies of all physical or electronically stored documents and communications in their possession or control that relate to the Litigation Trust Claims. Notwithstanding any term to the contrary herein, neither the Reorganized Debtors nor any other party shall be required to deliver any documents, communications or information to the

7

Litigation Trustee to the extent delivery of such documents, communications or information to the extent that such delivery would effect a waiver of a privilege held by such party or would otherwise be contrary to applicable law or legal process.

The Trustee and his professionals shall use commercially reasonable efforts to cooperate with the Reorganized Debtors and their professionals in connection with implementing certain provisions of the Plan including, but not limited to, the issuance of distributions pursuant to the Plan, reporting requirements, the exchange of information in the prosecution of claim objections to the extent necessary, and any other reasonably requested information or assistance.

2.6    Reimbursement of the Reorganized Debtors.   The Litigation Trust shall reimburse the Reorganized Debtors for all out-of-pocket expenses incurred in connection with such party's compliance with its cooperation and/or delivery obligations in this Agreement.

2.7    No Retention of Excess Cash.   Neither the Trust nor the Trustee shall retain cash or cash equivalents other than reserves established pursuant to sections 3.2.21, 4.2, or 4.8 of this Agreement, and shall distribute all amounts not required to be retained for such purposes to the Beneficiaries as promptly as reasonably practicable in accordance with the Plan and this Agreement.

2.8    Acceptance by Trustee.   The Trustee accepts its appointment as trustee of the Trust.

**ARTICLE III**

**ADMINISTRATION OF TRUST**

3.1    Rights, Powers, and Privileges of Trustee Generally.   Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the date that the Litigation Trust Assets are transferred to the Trust, the Trustee on behalf of the Trust may control and

8

61370/0001-21426655v1

exercise authority over the Litigation Trust Assets, over the acquisition, management, and disposition thereof, and over the management and conduct of the affairs of the Trust in accordance with this Agreement, the Plan, and the Confirmation Order.  In administering the Litigation Trust Assets, the Trustee shall endeavor not to unduly prolong the Trust's duration, with due regard that undue haste in the administration of the Litigation Trust Assets may fail to maximize value for the benefit of the Beneficiaries and otherwise be imprudent and not in the best interests of the Beneficiaries.

3.1.1   <u>Power to Contract</u>.  In furtherance of the purpose of the Trust, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Trustee, with the consent of the Litigation Trust Advisory Board, shall have the right and power on behalf of the Trust, and also may cause the Trust, to enter into any covenants or agreements binding the Trust, and to execute, acknowledge, and deliver any and all instruments that are necessary or deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Trust.

3.1.2   <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>.  Nothing in this Agreement shall be deemed to prevent the Trustee from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals (and, as required, in consultation with the Litigation Trust Advisory Board), the Trustee determines it is obligated to take or to refrain from taking in the performance of any duty that the Trustee may owe the Beneficiaries or any other Person under the Plan, Confirmation Order, or this Agreement.

3.2   <u>Powers of Trustee</u>.  Without limiting the generality of the above section 3.1 and subject to Article VI hereof, in addition to the powers granted in the Plan, the Trustee shall have

9

61370/0001-21426655v1

the power to take the following actions on behalf of the Trust and any powers reasonably incidental thereto that the Trustee, in its reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

3.2.1   hold legal title to the Litigation Trust Assets and to any and all rights of the Debtors and the Beneficiaries in or arising from the Litigation Trust Assets;

3.2.2   receive, manage, invest, supervise, protect, and where appropriate, cause the Trust to abandon the Litigation Trust Assets, including causing the Trust to invest any moneys held as Litigation Trust Assets in accordance with the terms of section 3.6 hereof;

3.2.3   open and maintain bank accounts on behalf of or in the name of the Trust;

3.2.4   establish and maintain the Litigation Trust Expense Fund (as defined herein);

3.2.5   with authorization from the Litigation Trust Advisory Board, may borrow money or raise capital on such terms as determined by the Trustee in order to fund the Litigation Trust Expense Fund;

3.2.6   cause the Trust to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

3.2.7   collect and liquidate all Litigation Trust Assets, including the sale of any Litigation Trust Assets;

3.2.8   protect and enforce the rights to the Litigation Trust Assets (including any Litigation Trust Claims) vested in the Trust and Trustee by this Agreement by any

10

method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.2.9   investigate any Litigation Trust Assets, including potential Litigation Trust Claims and cause the Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004 or other applicable rules;

3.2.10  with authorization from the Litigation Trust Advisory Board, cause the Trust to employ and pay professionals and other agents and third parties pursuant to this Agreement;

3.2.11  cause the Trust to pay all its lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Litigation Trust Assets;

3.2.12  cause the Trust to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve all Litigation Trust Claims;

3.2.13  consistent with Article IX.B of the Plan, cause the Trust, as appropriate, to review, investigate, settle, resolve, reconcile, or object to all General Unsecured Claims (other than Junior Lender Deficiency Claims);

3.2.14  establish, adjust, and maintain reserves for Disputed General Unsecured Claims required to be administered by the Trust;

3.2.15  cause the Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, in good faith and based upon the advice of its agents or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

11

61370/0001-21426655v1

3.2.16  in reliance upon the Debtors' schedules, the Claims Register, and a list of holders of Junior Lender Claims as of the Distribution Record Date delivered by the Junior Lien Agent on the Effective Date (the "Junior Lender List") maintain a register evidencing the Litigation Trust Interests held by each Beneficiary and, in accordance with section 3.7 of this Agreement, such register may be the Claims Register to the extent of any General Unsecured Claims reflected thereon;

3.2.17  [cause the Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, make tax elections by and on behalf of the Trust, and file tax returns for the Trust as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 pursuant to and in accordance with the Plan and Article VIIVIII hereof, and pay taxes, if any, payable for and on behalf of the Trust; provided, however, that notwithstanding any other provision of this Agreement, neither the Trust nor the Trustee shall have any responsibility in any capacity whatsoever for the preparation, filing, signing, or accuracy of the Debtors' or the Reorganized Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto, which shall be the sole responsibility of the Reorganized Debtors;][3]

3.2.18  cause the Trust to abandon or donate to a charitable organization any Litigation Trust Assets that the Trustee determines to be too impractical to distribute to Beneficiaries or of inconsequential value to the Trust and Beneficiaries in accordance with the terms of the Plan;

3.2.19  cause the Trust to send annually to Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Trust and its share of

---

[3]  **NTD: Subject to tax review.**

61370/0001-21426655v1

the Trust's income, gain, loss, deduction, or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

3.2.20 cause the Trust to seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

3.2.21 cause the Trust to establish such reserves for taxes, assessments, and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of matters incident to the Trust;

3.2.22 consistent with section 3.10 hereof, cause the Trust to purchase and carry all insurance policies that the Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.2.23 undertake all administrative functions of the Trust, including overseeing the winding down and termination of the Trust; and

3.2.24 take all other actions consistent with the provisions of the Plan and this Agreement that the Trustee deems reasonably necessary or desirable to administer the Trust.

3.3     Exclusive Authority to Pursue Litigation Trust Claims.  The Trust shall have the exclusive right, power, and interest to pursue, settle, waive, release, abandon, or dismiss the Litigation Trust Claims.  The Trust shall be the sole representative of the Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Litigation Trust Assets including, but not limited to, the Litigation Trust Claims.  The Trust shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant with respect to any Litigation Trust Claim. The Trust shall also be vested with and

61370/0001-21426655v1

entitled to assert all the Debtors' and the Estates' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

3.4     Abandonment.  If, in the Trustee's reasonable judgment, any non-cash Litigation Trust Assets cannot be sold or liquidated in a commercially reasonable manner or the Trustee believes in good faith that such property has inconsequential value to the Trust or its Beneficiaries, the Trustee shall have the right to cause the Trust to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization, in accordance with the terms of the Plan.

3.5     Agents and Professionals.  The Trustee may, but shall not be required to, consult with and, with authorization from the Litigation Trust Advisory Board, retain attorneys, financial advisors, accountants, appraisers, and other professionals the Trustee believes have qualifications necessary to assist in the administration of the Trust, including professionals previously retained by the Debtors or the Committee.  For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Trustee, with authorization from the Litigation Trust Advisory Board, from engaging counsel or other professionals, including the Trustee itself or the Trustee's firm or their affiliates, to do work for the Trust.  The Trustee may pay the reasonable salaries, fees, and expenses of such Persons out of the Litigation Trust Assets in the ordinary course of business.

3.6     Safekeeping and Investment of Litigation Trust Assets.  All moneys and other assets received by the Trustee shall, until distributed or paid over as provided herein and in the Plan, be held in trust for the benefit of the Beneficiaries, but (except as provided in the Plan or this Agreement) need not be segregated in separate accounts from other Litigation Trust Assets, unless and to the extent required by law or the Plan.  Neither the Trust nor the Trustee shall have

14

any liability for interest or producing income on any moneys received by them and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received by the Trust or Trustee, which shall be distributed as provided in the Plan.  Except as otherwise provided by the Plan, the powers of the Trustee to invest any moneys held by the Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Trust's liquidating purpose, and only to the extent that the Trustee is directed to invest moneys other than in short-term money market funds, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills; provided, however, that the scope of permissible investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 3.01.7701-4(d), may be permitted to hold pursuant to the Treasury Regulations, or any modification of the IRS guidelines, whether set forth in IRS rulings, IRS pronouncements, or otherwise.  For the avoidance of doubt, the provisions of any state law obligating or creating a duty on a trustee to invest trust assets shall not apply to this Agreement. Notwithstanding the foregoing, the Trustee shall not be prohibited from engaging in any trade or business on its own account, provided that such activity does not interfere or conflict with the Trustee's administration of the Trust.

3.7     Maintenance and Disposition of Trust and Debtor Records.  The Trustee shall maintain accurate records of the administration of Litigation Trust Assets, including receipts and disbursements and other activity of the Trust.  To the extent of any General Unsecured Claims reflected thereon, the Claims Register may serve as the Trustee's register of holders of Class 2B Litigation Trust Interests held by Beneficiaries and the Junior Lender List may serve as the Trustee's register of holders of Class 1 Litigation Trust Interests and Class 2A Litigation Trust

15

Interests.  The fees and costs associated with maintaining and updating the Claims Register shall be the sole responsibility of the Trust.  The books and records maintained by the Trustee, and any records of the Debtors transferred to the Trust for the purpose of prosecuting Litigation Trust Claims, may be disposed of by the Trustee at the later of (i) such time as the Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Trust or its Beneficiaries and (ii) upon the termination and completion of the winding down of the Trust.

3.8     Preservation of Privilege.    As provided in the Confirmation Order, any attorney-client privilege, work-product privilege, or other privilege or immunity of any Debtor (but no other person) attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust.  To the extent there is overlap of supporting documents, claims, defenses, legal theories or analyses between the Litigation Trust Claims, on the one hand, and any Causes of Action, defenses, claims or counterclaims retained by, or asserted against, the Reorganized Debtors, on the other hand, the Reorganized Debtors and the Trustee shall cooperate with each other pursuant to principles of common interest with respect to privileges.  To the extent that settling or pursuing any of the Litigation Trust Claims will have a compromising effect on any Causes of Action, defenses, claims or counterclaims retained by, or asserted against, the Reorganized Debtors, the Trustee shall proceed only with the unanimous consent of the Litigation Trust Advisory Board.

3.9     Reporting Requirements.  The Trustee shall provide the Litigation Trust Advisory Board the information and reports the Litigation Trust Advisory Board may reasonably request concerning Trust administration.

16

61370/0001-21426655v1

3.10    No Bond Required; Procurement of Insurance.  Notwithstanding any state or other applicable law to the contrary, the Trustee (including any successor Trustee) shall be exempt from giving any bond or other security in any jurisdiction and shall serve hereunder without bond.  The Trustee is hereby authorized, but not required to obtain all reasonable insurance coverage for itself, its agents, representatives, employees, or independent contractors, including, without limitation, coverage with respect to the liabilities, duties, and obligations of the Trustee and its agents, representatives, employees, or independent contractors under this Agreement.  The cost of any such insurance coverage shall be an expense of the Trust and paid out of Litigation Trust Assets.

3.11    No Suit Against Released Debtor D&Os.  The Trustee shall not pursue any Causes of Action or other litigation against the Released Debtor D&Os.

## ARTICLE IV

## DISTRIBUTIONS

4.1    Distribution.  Following the transfer of Litigation Trust Assets to the Trust, the Trustee shall make continuing efforts on behalf of the Trust to collect, liquidate, and distribute all Litigation Trust Assets through the Trustee subject to the reserves required under the Plan or this Agreement.  For avoidance of doubt, the Trustee shall make distributions ~~of~~at least annually to the Beneficiaries of its net income and net proceeds of the Litigation Trust Assets ~~to the Beneficiaries~~(except that the Trust may retain an amount of net income or net proceeds necessary to maintain the value of its assets or to meet claims and contingent liabilities) at the Trust's expense.

4.2    Reserve of Litigation Trust Assets.  The Trustee shall maintain a reserve (the "Litigation Trust Expense Fund") in an amount as is reasonably necessary to pay the costs and

17

expenses incurred or expected to be incurred by the Trust and Trustee in connection with administering the Litigation Trust Assets and performing the duties set forth in this Agreement, including, without limitation, paying the fees and expenses of the Trustee, and attorneys, advisors, and professionals retained by the Trust or Trustee (the "Litigation Trust Expenses").

With the prior majority approval of the Litigation Trust Advisory Board (as defined herein), the Trust may borrow money or raise capital on such terms as determined by the Trustee in order to fund the Litigation Trust Expense Fund.  Except for purposes of funding the Litigation Trust Expense Fund, the Litigation Trust shall not incur any debt.

4.3    Distributions.  Subject to the terms of the Plan, the Confirmation Order, and this Agreement, the proceeds of the Litigation Trust Assets shall be distributed as follows:

a)    First, to the extent the Litigation Trust Funding Amount is insufficient to pay in full all accrued and unpaid Litigation Trust Expenses, to pay such Litigation Trust Expenses;

b)    Second, once the amounts in sub-paragraph (a) are fully satisfied, to pay to the holders of Class 1 Litigation Trust Interests the Litigation Trust Funding Amount; and

c)    Third, once the amounts in sub-paragraphs (a) and (b) are fully satisfied, to fund distributions to the Beneficiaries to be shared as follows: (1) the holders of Class 2A Litigation Trust Interests shall receive their Pro Rata share of 65% of any distributions under this sub-paragraph (c) up to the Junior Lender Deficiency Claim Allowed Amount; and (2) holders of Class 2B Litigation Trust Interests shall receive their Pro Rata share of 35% of any distributions under this sub-paragraph (c) until the Allowed

18

Junior Lender Deficiency Claims are fully satisfied, at which point holders of Class 2B Litigation Trust Interests shall receive their Pro Rata share of 100% of such distributions.

4.4     Distributions on Account of Disputed Claims.  Except as otherwise provided in the Plan, by Final Order, or as agreed by the relevant parties, distributions on account of Disputed General Unsecured Claim that become Allowed after the Effective Date will be made by the Trustee at such periodic intervals as the Trust determines to be reasonably prudent.

4.5     No Distributions Pending Allowance.  Notwithstanding anything herein to the contrary, no distribution will be made with respect to any Disputed General Unsecured Claim until such Claim becomes an Allowed Claim.    For the Avoidance of Doubt, the Junior Lender Secured Claims and Junior Lender Deficiency Claims were Allowed pursuant to the Plan. Holders of such claims are entitled to Class 1 Litigation Trust Interests and Class 2A Litigation Trust Interests, respectively, and the distributions thereon, without any reconciliation of claims by the Trust.

4.6     Legal Proceedings.  If any Litigation Trust Claim is asserted and if such claim or any other legal proceeding is initiated or prosecuted against any General Unsecured Creditor pursuant to the Plan, Confirmation Order, or this Agreement, or asserted as an objection to any Claim, then notwithstanding anything to the contrary contained in the Plan or Confirmation Order, until such proceeding or contested matter is finally resolved and all payments to the Debtors' Estates required by such resolution have been made, such General Unsecured Creditor shall only receive distributions under the Plan or Confirmation Order to the extent that the distributions to which such General Unsecured Creditor is otherwise entitled exceed the

19

61370/0001-21426655v1

maximum liability of such General Unsecured Creditor to the Debtors' Estates asserted in such proceedings.

4.7     Objection Deadline.  On and after the Effective Date, the Trustee shall be entitled to file objections to all General Unsecured Claims (other than Junior Lender Deficiency Claims) that are otherwise not deemed Allowed Claims, including General Unsecured Claims listed on the Debtors' Schedules, under the Plan, or otherwise.  Any objections to General Unsecured Claims shall be served and filed on or before the later of (i) 180 days after the Effective Date, or (ii) such other period of limitation as may be specifically fixed by order of the Bankruptcy Court for objecting to Claims after reasonable notice and opportunity to object.

4.8     Disputed Claims Reserve.  On and after the Effective Date, the Trust will establish a GUC Disputed Claims Reserve to the extent required under Article VIII.H of the Plan.

4.9     Settling Disputed Claims (or Interests).  The Trustee will be authorized to settle, or withdraw any objections to, any Disputed General Unsecured Claims following the Effective Date without need for approval of the Bankruptcy Court.

4.10    Distributions Net of Costs.  Distributions shall be made net the actual and reasonable costs of making the distributions.

4.11    Setoff.  The Debtors and the Trustee, pursuant to the Bankruptcy Code (including Bankruptcy Code section 553), applicable bankruptcy or nonbankruptcy law, with the approval of the Bankruptcy Court and upon no less than three (3) days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against any Allowed Claim (other than Junior Lender Deficiency Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is to be made on account of such Allowed Claim), any claims of any nature whatsoever that the Debtors

20

may have against the Holder of such Allowed Claim, provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Trustee of any such claim the Debtors may have against the Holder of such Claim.

4.12    Taxes.  [Pursuant to Bankruptcy Code section 346(f), the Trustee will be entitled to deduct and withhold any federal, state, or local taxes from any Cash payments made with respect to Allowed Claims.][4]

4.13    Withholding from Distributions.  The Trustee, in its discretion, may cause the Trust to withhold from amounts distributable from the Trust to any Beneficiary any and all amounts as may be sufficient to pay the maximum amount of any tax or other charge that has been or might be assessed or imposed by any law, regulation, rule, ruling, directive, or other governmental requirement on such Beneficiary or the Trust with respect to the amount to be distributed to such Beneficiary.  The Trustee shall determine such maximum amount to be withheld by the Trust in its sole, reasonable discretion and shall cause the Trust to distribute to the Beneficiary any excess amount withheld.  Notwithstanding anything herein to the contrary, each Holder of an Allowed Claim that has received a distribution of Cash under the Plan will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution.  For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

4.14    Right to Rely on Professionals.  Without limitation of the generality of section 6.7 of this Agreement, in determining the amount of any distribution or reserves, the Trustee may

---

[4] NTD: Subject to tax review.

61370/0001-21426655v1

reasonably rely and shall be fully protected in relying on the advice and opinion of the Trust's or the Reorganized Debtors' financial advisors, accountants, or other professionals.

4.15    <u>Method and Timing of Distributions</u>.  Distributions to Beneficiaries will be made in accordance with the terms of the Plan and this Agreement.  The Trustee and Reorganized Debtors shall cooperate in a commercially reasonable manner, as necessary, in providing the Trustee with the necessary written instructions and funds to make distributions to the Beneficiaries.

4.16    <u>Tax Identification Numbers</u>.  The Trustee or the Reorganized Debtors may require any Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, and may condition any distribution to any Beneficiary upon receipt of such identification number or tax form.  If, within three months of written request from the Trustee or Reorganized Debtors, a Beneficiary does not provide the Trustee or the Reorganized Debtors with the forgoing information, then the distribution to such Beneficiary shall be administered as an unclaimed distribution in accordance with section 4.17 of this Agreement and, as provided in section VIII.B of the Plan, no further distributions shall be made to such Beneficiary.

4.17    <u>Unclaimed and Undeliverable Distributions</u>.  If any distribution to a Beneficiary is returned as undeliverable or is otherwise unclaimed, such distribution shall be placed into the Undeliverable Distribution Reserve pursuant to section VIII.B.1 of the Plan and no further Distributions to such Beneficiary shall be made unless and until the Beneficiary claims the Distributions by timely notifying the Trustee or the Reorganized Debtors in writing of any information necessary to make the distribution to the Beneficiary in accordance with this Agreement, the Plan, and applicable law, including such Beneficiary's then-current address or

22

61370/0001-21426655v1

taxpayer identification number.  If a Beneficiary timely provides the Trustee the necessary information within the period prescribed by section VIII.B of the Plan, all missed distributions shall be made to the Beneficiary as soon as is practicable, without interest.  Undeliverable or unclaimed distributions shall be administered in accordance with section VIII.B of the Plan.

4.17.1 <u>No Responsibility to Attempt to Locate Beneficiaries</u>.  The Trustee or the Reorganized Debtors may, in their respective sole discretions, attempt to determine a Beneficiary's current address or otherwise locate a Beneficiary, but nothing in this Agreement or the Plan shall require the Trustee or the Reorganized Debtors to do so.

4.17.2 <u>Disallowance of Claims; Cancellation of Corresponding Litigation Trust Interests</u>.  All General Unsecured Claims in respect of undeliverable or unclaimed distributions that have been deemed to have reverted back to the Trust for all purposes (including, but not limited to, for distribution to Holders of other Allowed General Unsecured Claims) pursuant to the Plan shall be deemed disallowed and expunged without further action by the Trust, Trustee, or Reorganized Debtors and without further order of the Bankruptcy Court, and the corresponding Litigation Trust Interests of the Beneficiary holding such disallowed claims shall be deemed canceled.  The Holder of any such Disallowed General Unsecured Claim shall no longer have any right, claim, or interest in or to any distributions in respect of such General Unsecured Claim.  The Holder of any such Disallowed General Unsecured Claim is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such Disallowed General Unsecured Claim against the Trust, Trustee, or Reorganized Debtors unless the Bankruptcy Court orders otherwise.

23

4.17.3 <u>Inapplicability of Unclaimed Property or Escheat Laws</u>.   Unclaimed property held by the Trust shall not be subject to the unclaimed property or escheat laws of the United States, any state, or any local governmental unit.

4.18    <u>Voided Checks; Request for Reissuance</u>.  In accordance with section VIII.B.2 of the Plan, distribution checks issued to Beneficiaries shall be null and void if not negotiated within three months after the date of issuance thereof.  Distributions in respect of voided checks shall be treated as unclaimed distributions under section VIII.B of the Plan and administered under section 4.17 of this Agreement.  Requests for reissuance of any check shall be made in writing directly to the Trustee by the Beneficiary that was originally issued such check.  All such requests shall be made promptly and in time for the check to be reissued and cashed before the funds for the checks become unrestricted Litigation Trust Assets under section Article VIII.B of the Plan.  The Beneficiary shall bear all the risk that, and shall indemnify and hold the Trust, Trustee, and the Reorganized Debtors harmless against any loss that may arise if, the Trustee does not reissue a check promptly after receiving a request for its reissuance.

4.19    <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted with respect to the Litigation Trust Interests under this Agreement, or if there is any disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made in connection with such interest, then, in any of such events, the Trustee shall be entitled, in its sole discretion, to refuse to comply with any such conflicting claims or demands.

4.19.1 The Trustee may elect to cause the Trust to not make any payment or distribution with respect to Litigation Trust Interests subject to the conflicting claims or demand, or any part thereof, and to refer such conflicting claims or demands to the

24

61370/0001-21426655v1

Bankruptcy Court, which shall have continuing jurisdiction over resolution of such conflicting claims or demands. Neither the Trust nor the Trustee shall be or become liable to any of such parties for their refusal to comply with any such conflicting claims or demands, nor shall the Trust or Trustee be liable for interest on any funds which may be so withheld.

4.19.2 The Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court; or (ii) all differences have been resolved by a valid written agreement among all such parties to the satisfaction of the Trustee, which agreement shall include a complete release of the Trust and Trustee. Until the Trustee receives written notice that one of the conditions of the preceding sentence is met, the Trustee may deem and treat as the absolute owner under this Agreement of the applicable Litigation Trust Interests the Beneficiary identified as the owner of that interest in the books and records maintained by the Trustee. The Trustee may deem and treat such Beneficiary as the absolute owner for purposes of receiving Distributions and any payments on account thereof for federal and state income tax purposes, and for all other purposes whatsoever.

4.19.3 In acting or refraining to act under and in accordance with this section 4.19 of the Agreement, the Trustee shall be fully protected and incur no liability to any purported claimant or any other Person pursuant to Article VII of this Agreement.

4.20    De Minimis Distributions. No payment of Cash in an amount of less than $10.00 shall be required to be made on account of any Allowed Claim. Such undistributed amount may instead be used in accordance with the Plan and this Agreement.

61370/0001-21426655v1

4.21    Litigation Trust Proceeds Waterfall.    Any Litigation Trust Assets shall be distributed in accordance with the Litigation Trust Proceeds Waterfall and otherwise in accordance with this Agreement.

## ARTICLE V

## BENEFICIARIES

5.1    Interest Beneficial Only.    The ownership of a Litigation Trust Interest shall not entitle any Beneficiary, the Debtors, or the Reorganized Debtors to any title in or title to the Litigation Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.

5.2    Allocation of Litigation Trust Interests.    The allocation and distribution of the Litigation Trust Interests shall be accomplished as set forth in the Plan and the Confirmation Order.    The aggregate number and face value of Litigation Trust Interests to be distributed pursuant to the Plan shall be determined by the Litigation Trustee, consistent with the intent and purposes of the Plan, subject to the approval of the Litigation Trust Advisory Board.

5.3    Evidence of Litigation Trust Interest.    Ownership of a Litigation Trust Interest shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.

5.4    No Right to Accounting.    Neither the Beneficiaries nor their successors, assigns, creditors, nor any other Person (other than Litigation Trust Advisory Board) shall have any right to an accounting by the Trustee, and the Trustee shall not be obligated to provide any accounting to any Person.    Nothing in this Agreement is intended to require the Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the

26

61370/0001-21426655v1

administration of the Trust or as a condition for making any advance, payment, or distribution out of proceeds of Litigation Trust Assets.

5.5     No Standing.  Except as expressly provided in this Agreement, a Beneficiary shall not have standing to direct or to seek to direct the Trust or Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any Person upon or with respect to the Litigation Trust Assets.

5.6     Requirement of Undertaking.  The Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; provided, however, that the provisions of this section 5.6 shall not apply to any suit by the Trustee.

5.7     Limitation on Transferability.  It is understood and agreed that the Litigation Trust Interests shall be non-transferable and non-assignable during the term of this Agreement except by (i) operation of law, (ii) merger of the holder of the Litigation Trust Interests into another Entity, (iii) sale of the holder of the Litigation Trust Interests to another Entity, or (iv) an event that causes an involuntary transfer of a Beneficiary's Litigation Trust Interests.  Any such transfer or sale shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to cause the Trust to pay all amounts to or for the benefit of the assigning Beneficiaries until receipt of proper notification and proof of assignment by operation of law.  The notice shall be executed by the transferee (or appropriate representative) and the transferor (or appropriate representative).  The notice must clearly describe the interest being transferred and must include the transferee's tax identification number, current mailing

61370/0001-21426655v1

address, telephone number and email address.  The Trustee may rely upon such notice and proof of assignment without the requirement of any further investigation. Unless the Trustee receives actual written notice of an assignment from the duly authorized transferee (or appropriate representative) not less than thirty (30) days prior to a distribution, the Trustee shall have no duty or obligation to make or direct any distributions or payments to such transferee.

5.8    Exemption from Registration.  The rights of the Beneficiaries arising under this Agreement may be deemed "securities" under applicable law.  However, such rights have not been defined as "securities" under the Plan because (i) the parties hereto intend that such rights shall not be securities and (ii) if the rights arising under this Agreement in favor of the Beneficiaries are deemed to be "securities," the exemption from registration under section 1145 of the Bankruptcy Code is intended to be applicable to such securities.  No party to this Agreement shall make a contrary or different contention.

5.9    Delivery of Distributions.  Subject to the terms of this Agreement, the Trustee shall make distributions to Beneficiaries in the manner provided in the Plan.

**ARTICLE VI**

**Litigation Trust Advisory Board**

6.1    General.  The Litigation Trust Advisory Board shall oversee, review, and guide the activities and performance of the Trustee.

6.2    Litigation Trust Advisory Board Membership.

a)    The Litigation Trust Advisory Board shall consist of three (3) members (the "Litigation Trust Advisory Board Members").  ~~The Litigation Trust Advisory Board Members shall initially consist of (i) one member designated by the Committee, (ii) one member designated by the Ad~~

28

61370/0001-21426655v1

~~Hoc Group, and (iii) one member jointly designated by the Committee and the Ad Hoc Group.  To the extent that the Committee and the Ad Hoc Group cannot agree to a joint designee to the Litigation Trust Advisory Board within thirty (30) days after the Effective Date, the third member of the Litigation Trust Advisory Board shall be designated by the Bankruptcy Court.~~  Each Litigation Trust Advisory Board Member that is a natural person shall be at least 18 years of age. The Litigation Trust Advisory Board Members shall initially consist of (i) Joseph Esparraguera, (ii) Scott Grass, and (iii) Matthew Dundon.  By execution hereof, each Litigation Trust Advisory Board Member agrees to the terms set forth herein.

b)      Each Litigation Trust Advisory Board Member shall hold office until the earlier of (i) the termination of the Trust, (ii) the resignation, death, or disability of such Litigation Trust Advisory Board Member or (iii) the removal of such Litigation Trust Advisory Board Member in accordance with this Agreement.

c)      Any Litigation Trust Advisory Board Member may resign upon thirty (30) days' prior written notice to the other members of the Litigation Trust Advisory Board and the Trustee.

d)      A Litigation Trust Advisory Board Member may be removed only for "cause" by order of the Bankruptcy Court upon application of the Trustee or the other members of the Litigation Trust Advisory Board acting

29

61370/0001-21426655v1

unanimously, with the reasonable costs of such application (and any objection or response thereto) to be paid for by the Trust.

e)    In the event of a vacancy on the Litigation Trust Advisory Board, whether as a result of the resignation, death, disability, or removal of a Litigation Trust Advisory Board Member, (i) if, prior to the termination of service of such Litigation Trust Advisory Board Member other than as a result of removal, such Litigation Trust Advisory Board Member has designated in writing an individual to succeed him or her, such individual shall be his or her successor, subject to the consent of the Trustee and each of the remaining Litigation Trust Advisory Board Members, with such consent not to be unreasonably withheld, or (ii) if such Litigation Trust Advisory Board Member did not designate a successor prior to the termination of his or her service in accordance with clause (i) of this Section 6.2(e), the remaining Litigation Trust Advisory Board Members, acting by unanimous vote, shall select a replacement Litigation Trust Advisory Board Member; *provided, however,* that to the extent that the remaining Litigation Trust Advisory Board Members cannot agree to a joint designee to the Litigation Trust Advisory Board within thirty (30) days after such vacancy, the third member of the Litigation Trust Advisory Board shall be designated by the Bankruptcy Court.  Until a successor member has been appointed, the Litigation Trust Advisory Board shall operate with two (2) members.

f)    Any two (2) members of the Litigation Trust Advisory Board constitute a quorum for voting and approval purposes.

30

61370/0001-21426655v1

For purposes of this Article, the term "cause" shall mean (a) the Litigation Trust Advisory Board Member's gross negligence, willful misconduct, or willful failure to perform his or her duties under the Plan, the Confirmation Order, or this Agreement, or (b) the Litigation Trust Advisory Board Member's misappropriation or embezzlement of any Litigation Trust Assets or the proceeds thereof.

6.3    Compensation. The Litigation Trust Advisory Board Members shall not be compensated for their services, but will be entitled to reimbursement from the Trust for reasonable and documented out-of-pocket expenses.

6.4    Authority. Except as otherwise expressly provided herein, the Litigation Trust Advisory Board shall have no authority to act on behalf of the Trust.

6.5    Rights and Powers of the Litigation Trust Advisory Board. In addition to such other rights as are set forth in this Agreement, the Litigation Trust Advisory Board shall have the right to:

a)    acting by a majority, remove a Trustee for any reason, with or without cause;

b)    acting by a majority, consent to the taking of any Material Action by the Trustee, as set forth in Section 6.6 herein;

c)    receive and review the reports of the Trustee and consult with same on any matters related to the Trust or the Litigation Trust Assets;

d)    review and consult with the Trustee regarding: (i) distributions to Beneficiaries; (ii) the prosecution, settlement, transfer, release, or abandonment of any Trust Causes of Action on behalf of the Trust; (iii)

31

the amendment of this Agreement as provided in Section 11.811.7 of this Agreement; and (iv) such other actions as are specified in this Agreement;

e)   acting by a majority, appoint a successor Trustee as provided in Section 9.5 this Agreement;

f)   acting by a majority, apply to the Bankruptcy Court for the removal of a Litigation Trust Advisory Board Member as provided in Section 6.2(d) of this Agreement;

g)   have access, upon reasonable notice and during normal business hours, to all reports, documents, memoranda, and other work product of the Trustee; and

h)   monitor the actions of the Trustee and receive, upon request, periodic status reports from the Trustee as to the status of (i) the litigation, settlement, administration, and pursuit of the Trust Causes of Action and (ii) the administration of the Litigation Trust Assets.  For the avoidance of doubt, the failure to specifically identify rights in this Section 6.5 shall not limit or otherwise impair the right of the Trustee or the members of the Litigation Trust Advisory Board to consult with the Trustee or members of the Litigation Trust Advisory Board individually or collectively on any or all issues that he or they may determine to be relevant or appropriate; and

i)   acting by a majority, retain and employ attorneys and other professionals on behalf of the Trust to facilitate the Trustee's performance of his or her duties under this Agreement.

32

61370/0001-21426655v1

6.6     Material Actions.  "Material Action" means each of the following, each of which may only be undertaken with the consent of a majority of the Litigation Trust Advisory Board:

a)      the filing of any complaint or initiation of any proceeding in respect of any Trust Causes of Action;

b)      the settlement or dismissal of any Trust Cause of Action;

c)      the settlement of any General Unsecured Claim which would result in such Claim being Allowed in an amount greater than $100,000;

d)      entry into any contingency fee agreement or litigation funding agreement;

e)      borrowing money or raising capital; and

f)      the selection and engagement of any material legal, financial, accounting, investment, auditing, experts, and other advisors and professionals as the Trust requires.

6.7     Duties; Standard of Care

a)      Each Litigation Trust Advisory Board Member's rights and powers hereunder are exercisable solely on behalf of the Trust, consistent with, and in furtherance of, the purpose of the Trust and not otherwise, and in accordance with applicable law.

b)      No Litigation Trust Advisory Board Member shall have the authority to bind the Trust.

c)      No Litigation Trust Advisory Board Member, in its capacity as such, shall have any liability whatsoever to the Trust or its Beneficiaries for any claim, cause of action, loss, liability, damage, or expense suffered by the Trust or its Beneficiaries.

33

61370/0001-21426655v1

## ARTICLE VII

## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

7.1     Parties Dealing With the Trustee.  In the absence of actual knowledge to the contrary, any Person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Litigation Trust Assets. There is no obligation of any Person dealing with the Trustee to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

7.2     Limitation of Trustee's Liability.  In exercising the rights granted in this Agreement, the Plan and Confirmation Order, the Trustee shall exercise the Trustee's best judgment, to the end that the affairs of the Trust shall be properly managed and the interests of all the Beneficiaries safeguarded.  However, notwithstanding anything herein to the contrary, neither the Trustee nor its firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents, or agents, and any of such Person's successors and assigns shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, whether sounding in tort, contract, or otherwise, except for actual fraud, gross negligence, reckless or willful misconduct, or willful disregard of the Trustee's duties or material breach of the Agreement that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Trust.  Except in the case of actual fraud, gross negligence, reckless or willful misconduct, or willful disregard of the Trustee's duties or material breach of the Agreement that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and

34

primary cause of loss, liability, damage, or expense suffered by the Trust, in no event shall the Trustee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Trustee has been informed of the likelihood of such loss or damages and regardless of the form of action.  Without limiting the foregoing, the Trustee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Plan and Confirmation Order.

7.3    No Liability for Acts of Other Persons.  None of the Persons identified in the immediately preceding section 7.2 of this Agreement shall be liable for the act or omission of any other Person identified in that section.

7.4    No Liability for Acts of Predecessors.  No successor Trustee shall be in any way responsible for the acts or omissions of any Trustee in office prior to the date on which such successor becomes the Trustee, unless a successor Trustee expressly assumes such responsibility.

7.5    No Liability for Good Faith Error of Judgment.  The Trustee shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Trustee was grossly negligent in ascertaining the pertinent facts.

7.6    Reliance by Trustee on Documents and Advice of Counsel or Other Persons. Except as otherwise provided herein, the Trustee may reasonably rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties.  The Trustee also may engage and consult with its legal counsel and other agents and advisors, and shall not be liable for any action taken,

35

61370/0001-21426655v1

omitted, or suffered by the Trustee in reasonable reliance upon the advice of such counsel, agents, or advisors.

7.7     No Liability For Acts Approved by Bankruptcy Court.  The Trustee shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Litigation Trust Assets required to be administered by the Trust.  The Trustee shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute actual fraud, gross negligence, or willful misconduct.

7.8     No Personal Obligation for Trust Liabilities.  Except as otherwise provided herein, persons dealing with the Trustee shall have recourse only to the Litigation Trust Assets to satisfy any liability incurred by the Trustee to any such Person in carrying out the terms of this Agreement, and the Trustee shall have no personal, individual obligation to satisfy any such liability.

7.9     Indemnification.  The Trustee and its consultants, agents, attorneys, accountants, financial advisors, beneficiaries, estates, employees, officers, directors, principals, professionals, and other representatives, each in their representative capacity as such, the Litigation Trust Advisory Board Members, and any of such parties' successors and assigns (collectively, the "Indemnified Parties" and each, an "Indemnified Party") shall, to the fullest extent permitted by applicable law, be defended, held harmless, and indemnified by the Trust from time to time and receive reimbursement from and against any and all loss, liability, expense (including counsel fees), or damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the Indemnified Parties may incur or sustain in connection with the exercise or performance of any of the Trust's or Trustee's powers and duties under this Agreement or in rendering services

36

by the Indemnified Party to the Trust or Trustee (the "Indemnified Conduct"), including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to result directly and primarily from the actual fraud, gross negligence, reckless or willful misconduct, or willful disregard of the duties or material breach of the Agreement of the Indemnified Party asserting this provision.

7.9.1    Expense of Trust; Limitation on Source of Payment of Indemnification. All indemnification liabilities of the Trust under this section 7.9 shall be expenses of the Trust.  The amounts necessary for such indemnification and reimbursement shall be paid by the Trust out of the available Litigation Trust Assets after reserving for all actual and anticipated expenses and liabilities of the Trust.  The Trustee shall not be personally liable for the payment of any Trust expense or claim or other liability of the Trust, and no Person shall look to the Trustee or other Indemnified Parties personally for the payment of any such expense or liability.

7.9.2    Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay.  The Trust shall reasonably promptly pay an Indemnified Party all amounts subject to indemnification under this section 7.9 on submission of invoices for such amounts by the Indemnified Party. The Trustee shall approve the indemnification of any Indemnified Party and thereafter shall approve any monthly bills of such Indemnified Party for indemnification.  All invoices for indemnification shall be subject to the approval of the Trustee.  By accepting any indemnification payment, the Indemnified

37

61370/0001-21426655v1

Party undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 7.9.

7.10    No Implied Obligations.    The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

7.11    Confirmation of Survival of Provisions.    Without limitation in any way of any provision of this Agreement, the provisions of this Article VII shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of the Trustee, or the termination of the Trust or this Agreement, and shall inure to the benefit of the Trustee's and the Indemnified Parties' heirs and assigns.

## ARTICLE VIII

## TAX MATTERS[5]

8.1    Tax Treatment of Trust.  Pursuant to and in accordance with the Plan, for all federal income tax purposes, the Debtors, the Reorganized Debtors, the Beneficiaries, the Trustee, and the Trust shall treat the Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124 and transfer of the Litigation Trust Assets to the Trust shall be treated as a transfer of the Litigation Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed General Unsecured Claims, followed by a transfer of the Litigation Trust Assets by the Beneficiaries to the Trust in exchange for their pro rata beneficial interests in the Trust.  The Beneficiaries shall be treated as the grantors and owners of the Trust for federal income tax

---

[5] NTD: Subject to tax review.

38

61370/0001-21426655v1

purposes.  Notwithstanding the foregoing, in the event of a final determination that the Trust does not qualify as a grantor trust, the Beneficiaries and the Trustee intend that it be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Trust to be treated as such a partnership.

8.2    Annual Reporting and Filing Requirements.  Pursuant to and in accordance with the terms of the Plan and this Agreement, the Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Income Tax Regulation Section 1.671-4(a).

8.3    Tax Treatment of Reserves for Disputed General Unsecured Claims.  The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed General Unsecured Claims, including (i) filing a tax election to treat any and all reserves for Disputed General Unsecured Claims as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust; or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report any reserve for Disputed General Unsecured Claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal or state income tax due.

8.4    Valuation of Litigation Trust Assets.  After the Effective Date, but in no event later than the due date for timely filing of the Trust's first federal income tax return (taking into account applicable tax filing extensions), the Trustee shall (a) determine the fair market value of the Litigation Trust Assets as of the Effective Date, based on the Trustee's good faith determination; and (b) establish appropriate means to apprise the Beneficiaries of such valuation.

61370/0001-21426655v1

The Litigation Trust shall bear the costs and expenses incurred in connection with determining such value, including the fees and expenses of any Persons retained by the Trustee in connection therewith.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Trust, the Trustee, and the Beneficiaries) for all federal income tax purposes; *provided*, *however*, that such valuation shall not be binding on the Trustee or any other party for any other purposes, including without limitation in regard to the liquidation of the Litigation Trust Assets, whether by disposition, liquidation, litigation, settlement, or otherwise.  Any such valuation shall be inadmissible in any proceeding concerning the Litigation Trust Claims.

## ARTICLE IX

### SELECTION, REMOVAL, REPLACEMENT
### AND COMPENSATION OF TRUSTEE

9.1     Initial Trustee.  Peter Kravitz shall be the initial Trustee and is appointed effective as of the Effective Date.

9.2     Term of Service.  The Trustee shall serve until (a) the completion of the administration of the Litigation Trust Assets and the Trust, including the winding up of the Trust, in accordance with this Agreement and the Plan; (b) termination of the Trust in accordance with the terms of this Agreement and the Plan; or (c) the Trustee's death, dissolution, liquidation, resignation, incapacity, or removal.  If the Trustee's appointment terminates by reason of death, dissolution, liquidation, resignation, incapacity, or removal, except as provided in Section 9.3 of this Agreement, the Trustee shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced.  The provisions of Article IX of this Agreement shall survive the resignation or removal of any Trustee.

40

61370/0001-21426655v1

9.3    Removal of Trustee.  The Litigation Trust Advisory Board may remove the Trustee at any time, with or without cause.  However, if a Trustee is removed for cause, such Trustee shall not be entitled to any accrued but unpaid fees, reimbursements, or other compensation under this Agreement or otherwise.  If the Trustee is removed other than for "cause," or is unwilling or unable to serve (a) by virtue of his inability to perform his duties under this Agreement due to death, illness, or other physical or mental disability, or (b) for any other reason whatsoever other than for "cause," subject to a final accounting, the Trustee shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Trustee.  For purposes of this Article, the term "cause" shall mean (a) the Trustee's actual fraud, gross negligence, reckless or willful misconduct, or willful failure to performdisregard of his duties under the Plan, the Confirmation Order, or this Agreement, or material breach of the Agreement, or (b) the Trustee's misappropriation or embezzlement of any Litigation Trust Assets or the proceeds thereof.

9.4    Resignation of Trustee.  The Trustee may resign at any time on written notice to the U.S. Trustee and Bankruptcy Court.  The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is thirty (30) days after the date such notice is filed with the Bankruptcy Court and served on the U.S. Trustee.  In the event of a resignation, the resigning Trustee shall render to the Litigation Trust Advisory Board a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Trustee.

61370/0001-21426655v1

9.5     Appointment of Successor Trustee.  Upon the death, dissolution, liquidation, resignation, incapacity, or removal of a Trustee, a successor Trustee shall be appointed by a majority vote of the Litigation Trust Advisory Board.  To the extent that the Litigation Trust Advisory Board cannot agree to a successor Trustee within thirty (30) days after a vacancy, the successor Trustee shall be designated by the Bankruptcy Court.  Any successor Trustee so appointed (a) shall consent to and accept its appointment as successor Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of its appointment as successor Trustee and (b) shall not have any liability or responsibility for the acts or omissions of any of its predecessor(s).  Any successor Trustee may be appointed to serve on an interim basis.

9.6     Powers and Duties of Successor Trustee.  A successor Trustee shall have all the rights, privileges, powers, and duties of its predecessor under this Agreement, the Plan, and Confirmation Order.

9.7     Trust Continuance.  The death, dissolution, liquidation, resignation, incapacity, or removal of the Trustee shall not terminate the Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.

9.8     Compensation of Trustee and Costs of Administration.  The Trustee shall receive fair and reasonable compensation for its services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Litigation Trust Assets.  All costs, expenses, and obligations incurred by the Trustee (or professionals who may be employed by the Trustee in administering the Trust, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Trust

42

from the Litigation Trust Assets prior to any distribution to the Beneficiaries.  The terms of the compensation of the Trustee are set forth on Exhibit A hereto.

## ARTICLE X

## DURATION OF TRUST

10.1   Duration.  Once the Trust becomes effective upon the Effective Date of the Plan, the Trust and this Agreement shall remain and continue in full force and effect until the Trust is terminated.

10.2   Termination on Payment of Trust Expenses and Distribution of Litigation Trust Assets.  Upon the payment of all costs, expenses, and obligations incurred in connection with administering the Trust, and the distribution of all Litigation Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement, the Trust shall terminate and the Trustee shall have no further responsibility in connection therewith except as may be required to effectuate such termination under relevant law; provided, however, that in no event shall the Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth anniversary (or within the six (6) month period prior to the end of an extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed five (5) years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

10.3   No Termination by Beneficiaries.  The Trust may not be terminated at any time by the Beneficiaries.

61370/0001-21426655v1

10.4    Continuance of Trust for Winding Up; Discharge; and Release of Trustee.  After the termination of the Trust and solely for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until its responsibilities have been fully performed.  Except as otherwise specifically provided herein, upon the distribution of the Litigation Trust Assets including all excess reserves, the Trustee and the Trust's professionals and agents shall be deemed discharged and have no further duties or obligations hereunder. Upon a motion by the Trustee, the Bankruptcy Court may enter an order relieving the Trustee, its employees, professionals, and agents of any further duties, discharging and releasing the Trustee, its employees, professionals, and agents from all liability related to the Trust, and releasing the Trustee's bond, if any.

## ARTICLE XI

## MISCELLANEOUS

11.1    Cumulative Rights and Remedies.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

11.2    Notices.  All notices to be given to Beneficiaries may be given by ordinary mail, or may be delivered personally, to the Holders at the addresses appearing on the books kept by the Trustee.  Any notice or other communication which may be or is required to be given, served, or sent to the Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

If to the Trust or Trustee:

AAC Holdings, Inc. Litigation Trust
c/o Province, Inc.
2360 Corporate Circle
Suite 330

44

61370/0001-21426655v1

Henderson, NV 89074
[●] Attn: Peter Kravitz

with a copy to its counsel:

[●]

Cole Schotz P.C.
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Attn: Seth Van Aalten, Esq.

or to such other address as may from time to time be provided in written notice by the Trustee.

11.3     Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

11.4     Successors and Assigns.    This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

11.5     Particular Words.    Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement.    The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

11.6     Execution.    All funds in the Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish, or attach the Litigation Trust Assets or the Trustee in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court.    Payments will be solely governed by the Plan and this Agreement.

45

61370/0001-21426655v1

11.7    Amendment.  Any provision of this Agreement may be amended, supplemented or waived by the Trustee and the Reorganized Debtors, subject to the prior approval of a majority of the members of the Litigation Trust Advisory Board, without notice to or the consent of any Beneficiary or the approval of the Bankruptcy Court; *provided*, *however*, that no change may be made to this Agreement without the approval of the Bankruptcy Court, following notice to the Beneficiaries, that would (a) adversely affect (i) the distributions to any of the Beneficiaries or (ii) the U.S. Federal income tax status of the Trust as a "liquidating trust," (b) require any Beneficiary to furnish or advance funds to the Trustee or entail any personal liability or the surrender of any individual right on the part of any Beneficiary except with the written consent of such Beneficiary, (c) expand, add to, or modify the original stated purpose of the Trust (as described in the Plan and Section 2.4 of this Agreement), or (d) otherwise be in contravention of the Plan or the Confirmation Order.

11.8    No Waiver.  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

11.9    No Relationship Created.  Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind.

11.10   Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable, or against its regulatory policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

61370/0001-21426655v1

11.11   <u>Further Assurances</u>.  The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

11.12   <u>Counterparts</u>.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.13   <u>Entire Agreement</u>.  This Agreement (including the recitals), the Plan, and the Confirmation Order constitute the entire agreement of the Parties and there are no representations, warranties, covenants, or obligations except as set forth herein or therein.  This Agreement, the Plan, and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  In the event of any inconsistency between this Agreement, the Plan, and the Confirmation Order, the Confirmation Order and Plan, in that order, shall govern; <u>provided</u>, <u>however</u>, that the Trustee may amend, modify, or correct the terms hereof to supersede the Plan and/or the Confirmation Order, with the approval of the Bankruptcy Court.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

11.14   <u>Jurisdiction</u>.   The Bankruptcy Court shall have jurisdiction regarding the Reorganized Debtors, Trust, Trustee, and Litigation Trust Assets, including, without limitation,

61370/0001-21426655v1

the determination of all disputes arising out of or related to administration of the Trust.  The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Trust.  The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

*[Remainder of this page intentionally left blank.]*

61370/0001-21426655v1

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

AAC Dallas Outpatient Center, LLC

By:_____

Name:_____

Title:_____

AAC Healthcare Network, Inc.

By:_____

Name:_____

Title:_____

AAC Holdings, Inc.

By: _____

Name_____

Title:_____

AAC Las Vegas Outpatient Center, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

ABTTC, LLC

By: _____

Name_____

Title:_____

AdCare Criminal Justice Services, Inc.

By: _____

Name_____

Title:_____

AdCare Hospital of Worcester, Inc.

By: _____

Name_____

Title:_____

AdCare Rhode Island, Inc.

By: _____

Name_____

Title:_____

AdCare, Inc.

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Addiction Labs of America, LLC

By: _____

Name_____

Title:_____

American Addiction Centers, Inc.

By: _____

Name_____

Title:_____

B&B Holdings Intl. LLC

By: _____

Name_____

Title:_____

Behavioral Healthcare Realty, LLC

By: _____

Name_____

Title:_____

BHR Aliso Viejo Real Estate, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

BHR Greenhouse Real Estate, LLC

By: _____

Name_____

Title:_____

BHR Oxford Real Estate, LLC

By: _____

Name_____

Title:_____

BHR Ringwood Real Estate, LLC

By: _____

Name_____

Title:_____

Clinical Revenue Management Services, LLC

By: _____

Name_____

Title:_____

Concorde Real Estate, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Concorde Treatment Center, LLC

By: _____

Name_____

Title:_____

Diversified Healthcare Strategies, Inc.

By: _____

Name_____

Title:_____

Fitrx, LLC

By: _____

Name_____

Title:_____

Forterus Health Care Services, Inc.

By: _____

Name_____

Title:_____

Grand Prairie Professional Group, P.A.

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Green Hill Realty Corporation

By: _____

Name_____

Title:_____

Greenhouse Treatment Center, LLC

By: _____

Name_____

Title:_____

Laguna Treatment Hospital, LLC

By: _____

Name_____

Title:_____

Las Vegas Professional Group - Calarco, P.C.

By: _____

Name_____

Title:_____

Lincoln Catharine Realty Corporation

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

New Jersey Addiction Treatment Center, LLC

By: _____

Name_____

Title:_____

Oxford Outpatient Center, LLC

By: _____

Name_____

Title:_____

Oxford Professional Group, P.C.

By: _____

Name_____

Title:_____

Oxford Treatment Center, LLC

By: _____

Name_____

Title:_____

Palm Beach Professional Group, Professional Corporation

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Pontchartrain Medical Group, A Professional Corporation

By: _____

Name_____

Title:_____

Recovery Brands, LLC

By: _____

Name_____

Title:_____

Recovery First of Florida, LLC

By: _____

Name_____

Title:_____

Referral Solutions Group, LLC

By: _____

Name_____

Title:_____

RI - Clinical Services, LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

River Oaks Treatment Center, LLC

By: _____

Name_____

Title:_____

Sagenex Diagnostics Laboratory, LLC

By: _____

Name_____

Title:_____

San Diego Addiction Treatment Center, Inc.

By: _____

Name_____

Title:_____

San Diego Professional Group, P.C.

By: _____

Name_____

Title:_____

Singer Island Recovery Center LLC

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Sober Media Group, LLC

By: _____

Name_____

Title:_____

Solutions Treatment Center, LLC

By: _____

Name_____

Title:_____

Taj Media LLC

By: _____

Name_____

Title:_____

The Academy Real Estate, LLC

By: _____

Name_____

Title:_____

Tower Hill Realty, Inc.

By: _____

Name_____

Title:_____

[Signature Page to Litigation Trust Agreement]

Peter Kravitz, Trustee

By:_____

Name: Peter Kravitz

[Signature Page to Litigation Trust Agreement]

FORM SUBJECT TO ONGOING REVIEW

## Exhibit A

**Terms of Compensation of Trustee**

1.)    <u>Compensation</u>.  In consideration for the services of the Trustee under this Agreement, the Trustee shall receive the following compensation from the Litigation Trust Assets:

$15,000.00 per month.

61370/0001-21426655v1